IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN BROWN,  Civil Action No. 03-224

                Plaintiff,

  v.

COST COMPANY,

                Defendant.

**PLAINTIFF'S AMENDED MOTION FOR NEW TRIAL PER F.R.C.P. 59**

Plaintiff, Kathleen Brown, moves this Honorable Court for a new trial per **F.R.C.P. 59**, based on this Court's commission of reversible error at trial, including the Court's exclusion of probative and relevant evidence, in contravention of controlling precedential law, as well as the Court's use of an erroneous special interrogatory on the verdict slip. For the reasons set forth below, Brown requests a new trial in accordance with **F.R.C.P. 59**.

1. In this disparate treatment case, Brown alleges that Defendant, Cost Company, refused her application for an available laborer's position at the SCI Marienville work site ("SCIM") in 2002, on the basis of Brown's gender, female, in violation of **Title VII (42 U.S.C. § 2000(e))**, the **Pennsylvania Human Relations Act**, and **Article I, § 28 of the Pennsylvania Constitution**.

2. Trial in this case commenced June 6, 2005, and concluded on June 10, 2005, when the jury returned a verdict in favor of Cost and against Brown on all claims.

1

3.  To prevail in her claims under **Title VII**, Brown was required to make the necessary showings under the familiar **McDonnell Douglas/Burdine/Hicks** burden-shifting analysis, *viz.*, to establish the four elements of her prima facie case: (1) that she is a member of a protected class; (2) that she applied with Cost for an open position for which she was qualified; (3) that Cost rejected her application; and (4) that following her rejection, the position remained open and Cost continued to seek applicants of Brown's qualifications.  **McDonnell Douglas Corp. v. Green**, 411 U.S. 792, 802 (1973).

4.  Because Cost proffered one or more non-discriminatory rationales for refusing to hire her, Brown was also required to establish: (1) that Cost's proffered rationales were pretextual, and (2) that Cost intended to discriminate against her. **Fuentes v. Perskie**, 32 F.3d 759, 763 (3d Cir. 1994).

5.  At trial, Brown adduced evidence as to all four elements of the prima facie case. The testimony of Brown, together with that of LIUNA Business Agent Ron Barrett, established:

    (1)  that Brown belonged to a protected class (female);

    (2)  that on July 31, 2002[1], and again on August 23, 2002, Brown presented herself at the Cost trailer at SCIM to seek employment as either a laborer (for which there were no prerequisite qualifications) or a heavy equipment

---

[1] In the first special interrogatory in the verdict slip, the jury found that Brown had proven by a preponderance of the evidence that she applied for a laborer's position on July 31, 2002.

operator, and that on several occasions during that same time frame Brown returned to Cost at least three of its "Minority Recruitment" memoranda containing her handwritten contact information and request for employment as a laborer or operator;

(3) that Cost rejected each of Brown's requests for employment; and

(4) that on three occasions, beginning on or about July 31, 2002, and continuing through August 16, 2002, Cost hired at least three males, with no greater qualifications than Brown, for laborer's positions.

6. Brown also adduced evidence of Cost's rationale for rejecting her application. Under questioning from both parties' respective attorneys, Cost President, Georgia Pawk, and Dean Taylor, Cost's foreman, who also served as hiring authority at SCIM, testified that Brown was rejected for the following reasons:

(1) Brown had made clear to Cost personnel, including Pawk and Taylor, that Brown was not truly interested in a laborer's position, and instead wanted to work only as an operator, and there were no operator positions available at SCIM on and after July 31, 2002;

(2) Even if Brown had requested a laborer's position on the day that she first presented herself to Cost at SCIM, there is no evidence that Cost had a vacancy for a laborer at that time, and it is unlikely that Cost did, because its labor needs changed on a daily basis; in other words, Brown, like any other walk-on applicant, was subject to the luck of the draw—if there were no vacancies at the time the applicant presented him/herself, Cost had no further obligation to the applicant, and the applicant had no reasonable expectation of receiving employment from Cost in the future;

(3) Brown had failed to provide an emergency telephone number on the Minority Recruitment memoranda that she provided to Cost;

(4) Brown was unqualified to work as a laborer for Cost.

7. To demonstrate the pretextual nature of the proffered rationales, and to demonstrate that Cost intended to discriminate against her (per **Fuentes**), and to

establish as well the second and fourth elements of her prima facie case, Brown sought to introduce evidence related to Cost's status as a recipient of state and federal contract dollars—specifically, that Cost had a duty under the regulations of the U.S. Office of Federal Contract Compliance to increase the numbers of women in its workforce, or failing that, to demonstrate that it had taken specific, affirmative steps designed to achieve that goal.  Further, Brown sought to show that Cost had abjectly failed to meet this obligation, and had failed to do so, chronically and repeatedly, thus demonstrating that Cost was not committed to equal employment, and that this lack of commitment was tacitly communicated to Cost's foremen, who reasonably concluded that they would face no sanction based on their failure to hire women.  Specifically, Brown sought to establish the following facts (and all reasonable inferences flowing therefrom):

(1)   from 2001 to 2002, the percentage of females in Cost's total workforce decreased from 2.38% to 1.54% (Plaintiff's Exhibit 23), and that even these figures overstated the percentages of females employed in the building trades, because a substantial number of the women included in the figures were administrative employees;

(2)   at the SCIM site in particular, the number of females employed by Cost was 0, out of a total of 58 laborers, and 162 workers overall;

(3)   Cost had affirmative obligations under the regulations of the Office of Federal Contract Compliance (41 C.F.R. §§ 60-4.1 *et seq.*)(hereafter, "compliance regulations") to increase the numbers of females in its workforce (with a target goal of 6.9%; 45 Fed. Reg. 251, pp. 85750-85751, December 30, 1980) or, failing that, to show that it strictly followed the 16-step "good faith" procedures designed to assist the contractor in achieving the 6.9% target, including:

   (i)   maintaining and establishing a current list of female recruitment sources (41 C.F.R. § 60-4.3(7)(b));

      (ii)      maintaining a current file of the names, addresses and telephone numbers of each female off-the-street applicant, noting what action, if any, Cost took with respect to these individuals (41 C.F.R. § 60-4.3(7)(c));

      (iii)      continually monitoring all personnel and employment related activities to ensure that such practices do not have a disparate impact on females (41 C.F.R. § 60-4.3(7)(m)); and

      (iv)      developing, maintaining, and disseminating an EEO policy (41 C.F.R. §§ 60-4.3(7); 60-4.3(7)(f); 60-4.3(13); 60-4.3(14));

(4)      that the same regulations admonished that these steps were minimum requirements, and that Cost could not defend its failure to meet the 6.9% target by asserting that its failure was the result of low numbers of female referrals from the building trade unions (41 C.F.R. § 60-4.3(5));[2]

(5)      that Cost ostensibly promulgated an EEO policy in accordance with the mandates under these regulations;

(6)      that Cost's EEO Compliance Officer and President, Georgia Pawk, was unable to identify a single instance during her ten-year tenure in which Cost's personnel practices reflected discrimination against females, and that she specifically never approached the SCIM foreman, Dean Taylor, to express any concern or otherwise inquire about the male to female disparity of 162:0 at that worksite, nor told him that he had to hire more women;

(7)      that in the face of its obligations under federal law, and its failure to meet the target goal, Cost—which maintained a file of female candidates seeking work, but did not, as required by the regulations, keep records of actual applicants (a violation of 41 C.F.R. § 60-4.3(7)(c))—failed to furnish the names and contact information of these female candidates to anyone at SCIM, including the foreman, Dean Taylor; consequently, none of these women were contacted for the purposes of filling vacancies during the 2002 construction season; instead, Cost filled the vacancies with "walk-on" males, i.e., males who presented themselves at the Cost trailer seeking work as unskilled laborers;

---

[2]The same regulations require the contractor to take affirmative action for all women, to implement steps "at least as extensive" as those itemized at Para. 7, so as to achieve "maximum results" from such efforts. 41 C.F.R. §§ 60-4.3(5); (9); (13).

    (8)    that, in the absence of any attempt to contact females as vacancies arose for the position of unskilled laborer, ***Cost was in violation of the compliance regulations, as well as its own EEO policy***;

    (9)    that Cost's failure to hire Brown or any of the women who declared their availability for work during the 2002 season was ensured, given Cost's refusal to reform its hiring practices (which itself constituted a lack of due diligence under the regulations) so that vacancies were held open long enough to afford female candidates an opportunity to respond to any notice by Cost of an open position;

    (10)    that after Brown first requested employment on July 31, 2002, she was rejected for three laborers positions—on or about July 31, August 14, and August 16, 2002, respectively—which Cost instead filled with males who had no greater qualifications than Brown.

8. The Court repeatedly sustained Cost's objections to Brown's attempts to introduce evidence of Cost's affirmative obligations under the compliance regulations, its failure to satisfy those obligations, and its failure to follow its own EEO policy. Most seriously, the Court prohibited Brown from depicting the 162:0 hiring disparity at SCIM in 2002 as evidence of gender discrimination.[3]

9. In support of its rulings, the Court focused chiefly on Brown's inability to present evidence of the gender profile of the applicant pool of laborers for the SCIM project. According to the Court, any attempt by Brown to present the 162:0 disparity would be meaningless at best, and prejudicial to Cost at worst, in the absence of comparative data from the applicant pool. In sum, the Court's

---

[3]Prior to charging the jury, the Court specifically directed the jury to disregard Brown's counsel's statements during closing argument that the 162:0 disparity, and Pawk's failure as EEO Officer to treat it as possible evidence of discriminatory hiring practice, constituted gender discrimination.

posture reflected its belief that Brown was attempting to use statistical evidence, as in a typical disparate impact case.

10. Importantly, the Court ignored the fact that the lack of applicant data was wholly Cost's doing. As Cost's attorney represented to the Court, Cost does not maintain application records or data. Thus, in addition to violating its obligations under the compliance regulations (41 C.F.R. § 60-4.3(7)(c)), Cost's failure to maintain applicant data also led the Court to prohibit Brown from introducing evidence of the 162:0 gender disparity at SCIM.

11. In the absence of the excluded evidence, Brown was unable to establish that Cost had an affirmative duty to hire her for the July 31 vacancy, as well as an affirmative duty to hire Brown or another similarly qualified woman, for the vacancies on August 14 and August 16.

12. As explained below, the Court's decisions prohibiting Brown from introducing this evidence for the purposes of proving pretext, discrimination, and the second and fourth prongs of the prima facie case, caused Brown to suffer substantial, dispositive, and improper prejudice, and accordingly constitute reversible error.

13. The Court's decisions prohibiting Brown from introducing this evidence were also procedurally improper. Originally, Cost had filed a motion in limine to exclude any evidence related to its alter ego, Franco. In her response to Cost's motion,

> Brown cited the compliance regulations as applying to both Franco as well as Cost, and argued that given Franco's identity as an entity (owned, on paper, by the wife and daughter of Cost's owner, Charles Cost) which Cost had erected for the sole purpose of obtaining special set-aside contracts for women, this evidence demonstrated that Cost's commitment to equal employment was in bad faith.  However, after ruling the Franco evidence inadmissible, the Court, with no prior notice to Brown, indicated that it would consider excluding the compliance regulation/affirmative action evidence as it related to ***Cost***.  Having little opportunity to research and brief the issue, Brown was placed at an extreme disadvantage, and was ultimately unable to persuade the Court to admit the evidence, to her detriment.

14. Brown respectfully submits that the Court's main error was its failure to recognize and apply the appropriate standard governing the admission of "statistical" evidence in a disparate treatment case such as this.  Unlike the more rigorous standard applicable to disparate impact cases, in which the plaintiff's case rests entirely on statistical evidence and analysis, a far more liberal and less stringent standard applies in disparate treatment cases, when the proffered statistical evidence represents only one portion of the plaintiff's evidence.  **Bruno v. W.B. Saunders Co.**, 882 F.2d 760, 766-67 (3d Cir. 1989)("Unlike the main cases cited by the defendants, this is not a class action disparate impact or disparate treatment case. . . By contrast, in individual disparate treatment cases such as

8

this, statistical evidence . . . need not be so finely tuned.")(internal citations omitted); accord, **Abrams v. Lightolier**, 50 F.3d 1204, 1217 (3rd Cir. 1995); **MacDissi v. Valmont Industries, Inc.**, 856 F.2d 1054 (8th Cir. 1988)(rejecting challenge to sample size where statistical evidence used in combination with other, independent evidence of disparate treatment); **Daines v. City of Mankato**, 754 F.Supp. 681 (D.MN 1990)(rejecting challenge to proffered statistics relying on census rather than applicant flow data)("The Court finds that plaintiff's statistical evidence supports an inference of discrimination. *Minimally, the fact that no women were appointed into the officials and administrators category is surely the kind of fact which could cause a reasonable trier of fact to raise an eyebrow*.")(*citing,* **MacDissi**)(emphasis added).

15.  The evidence proffered by Brown, and excluded by the Court, represented only one portion of the evidence that Brown sought to introduce to satisfy her burden under **Fuentes** to show pretext and discrimination. For example, in addition to this evidence, Brown also adduced Dean Taylor's prior testimony (which he disavowed at trial) that women were not as suited to work as laborers on prison projects such as SCIM, an admission that is evidence of both pretext and discrimination.

16. The Court's exclusion of this evidence stripped Brown of the ability to prove both pretext and intentional discrimination by demonstrating that Cost's failures—as measured by the 162:0 disparity, et al—to diligently pursue the goal of increased hiring of women constituted violations of, or deviations from, Cost's own EEO plan. In **Antol v. Perry**, 82 F.3d 1291, 1300-01 (3d Cir. 1996), the Third Circuit held that an employer's failure to follow its own affirmative action plan constituted relevant, circumstantial evidence of pretext and discriminatory intent under **Fuentes**' two prongs, and approvingly cited cases from the Seventh, Eighth, and Ninth Circuits which held similarly. **Antol**, 82 F.3d at 1300-01; accord, **Kepple v. GPU Inc.**, 2 F.Supp.2d 730, 746-47 (W.D.Pa. 1998)(statements by high-ranking officers to personnel involved in promotion, suggesting that company intended or permitted discriminatory promotion practices, constitutes relevant circumstantial evidence of discrimination); **Johnson v. Penske Truck Leasing Co.**, 949 F.Supp. 1153, 1179 (D.NJ 1996)(willful violation of affirmative action plan if combined with other evidence may be indicative of pretext). The Court's holding in **Antol** echoes holdings in the Eighth, Tenth, and Eleventh Circuits, which construe an employer's failure to promulgate or consistently follow its own employment policies to constitute circumstantial evidence of discrimination or pretext. See, **Ash v. Tyson Foods, Inc.**, 129 Fed.Appx. 529, 533 (11th Cir. 2005)(deviation from company policy may constitute circumstantial evidence of discrimination, especially when deviation results in advantages to candidates outside protected class)(citations omitted); **Daines v. City of Mankato**, 754

F.Supp. 681, 699 (D.MN 1990)(employer's failure to consistently follow its "employee relationship" policy constitutes circumstantial evidence of discrimination); **Carter v. Three Springs Residential Treatment**, 132 F.3d 635, 644 (11th Cir. 1998)(employer's failure to promulgate hiring and promotion policies can be circumstantial evidence of discrimination)(citations omitted); **Babich v. Unisys Corporation**, 842 F.Supp. 1343, 1357 (D.KS 1994)(employer's failure to follow its own reduction in force policy constitutes evidence of pretext).

17. The Court's exclusion of Brown's proffered evidence also, perversely, rewarded Cost for its illegal and improper failure to maintain application data, in violation of 41 C.F.R. § 60-4.3(7)(c). The lack of applicant data entitled Brown to an adverse inference that the data, had it been available, would have been adverse to Cost. In essence, by failing to comply with an affirmative legal obligation to maintain applicant data (and in so doing preclude Brown from conducting an analysis of the data so as to measure its impact on Cost's female-hiring goals—a violation of 41 C.F.R. § 60-4.3(7)(m)), Cost acted no differently than a party who knowingly destroys evidence. As such, Brown was entitled to a spoliation inference, *viz.*, that the missing data would have been adverse to Cost, and favorable to Brown. See, **Baliotis v. McNeil**, 870 F.Supp. 1285, 1292-93 (M.D.PA 1994)(sanction for destruction of evidence is adverse inference that evidence would have been unfavorable to party's position). See also, **Louiseau v. Oregon Dept. of Human**

**Resources**, 567 F.Supp. 1211, 1217 (D.OR 1983)(employer's failure to keep records required by Federal Regulations entitles complaining party to adverse inference)(construing 29 C.F.R. 1607.4D); **Hicks v. Gates Rubber Company**, 833 F.3d 1406 (10th Cir. 1987)(plaintiff entitled to adverse inference where employer selectively retained employment and personnel records in violation of federal law).

18. In general, the Court's rulings fail to reflect the oft-repeated concerns of the Third Circuit that, due to the particular evidentiary hurdles confronting plaintiffs in employment discrimination cases, where direct evidence of discrimination is largely nonexistent, courts are to be particularly suspicious of requests to exclude evidence on the basis of relevance:

> A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario . . . What may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other incidents . . . In many respects, the facts of this case represent what has become the typical Title VII employment discrimination case of this decade. Anti- discrimination laws and lawsuits have "educated" would-be violators such that extreme manifestations of discrimination are thankfully rare. Though they still happen, the instances in which employers and employees openly use derogatory epithets to refer to fellow employees appear to be declining. Regrettably, however, this in no way suggests that discrimination based upon an individual's race, gender, or age is near an end. Discrimination continues to pollute the social and economic mainstream of American life, and is often simply masked in more subtle forms. It has become easier to coat various forms of discrimination with the appearance of propriety, or to ascribe some other less odious intention to what is in reality discriminatory behavior. In other words, while discriminatory conduct persists, violators have learned not to leave the proverbial "smoking gun" behind. As one court has

> recognized, "[d]efendants of even minimal sophistication will neither admit discriminatory animus or leave a paper trail demonstrating it."  But regardless of the form that discrimination takes, the impermissible impact remains the same, and the law's prohibition remains unchanged.  "Title VII tolerates no racial discrimination, subtle or otherwise.". . .  The sophisticated would-be violator has made our job a little more difficult.  ***Courts today must be increasingly vigilant in their efforts to ensure that prohibited discrimination is not approved under the auspices of legitimate conduct, and "a plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled . . . because of crabbed notions of relevance or excessive mistrust of juries.***"

**Aman v. Cort Furniture Rental Corp.**, 85 F.3d 1074, 1081-82 (3rd Cir. 1996)(citations omitted); see also, **Goosby v. Johnson & Johnson Medical, Inc.**, 228 F.3d 313 (3rd Cir. 2000)(recognizing that employer may attempt to cloak discriminatory conduct in guise of neutral application of highly subjective (and thus suspect) criteria).

19. This Circuit disapproves of the practice of excluding evidence, in general (**Spain v. Gallegos**, 26 F.3d 439, 453 (3rd Cir. 1994)), and in discrimination cases, in particular.  **Glass v. Philadelphia Electric Co.**, 34 F.3d 188, 195 (3rd Cir. 1994). Thus, according to the Third Circuit, "Evidence should be excluded under Rule 403 only sparingly since the evidence excluded is concededly probative.  The balance under [Rule 403] should be struck in favor of admissibility." **Gallegos**, 26 F.3d at 453 (*citing*, **United States v. Dennis**, 625 F.2d 782, 797 (8th Cir.1980) and **United States v. Terzado-Madruga**, 897 F.2d 1099, 1117 (11th Cir.1990)).

20. As well, the law of this Circuit holds that error is not harmless unless it is "highly unlikely" that the error did not affect the outcome of trial. **Glass v. Philadelphia Electric Co.**, 34 F.3d 188, 191 (3rd Cir. 1994)(*citing*, **Lockhart v. Westinghouse Credit Corp.**, 879 F.2d 43, 53, 59 (3d Cir.1989)).

21. In **Glass**, the Third Circuit reversed the District Court's exclusion of evidence of a hostile work environment proffered by the plaintiff. In reaching its decision, the Court in **Glass** adopted the reasoning of the Eighth Circuit, which in turn focused primarily on the especially difficult evidentiary burdens confronting plaintiffs in employment discrimination cases:

> Our decision is buttressed by the judicial inhospitability to blanket evidentiary exclusions in discrimination cases. The Eighth Circuit explained in reversing similar evidentiary exclusions in an employment discrimination suit:
>
>> The effects of blanket evidentiary exclusions can be especially damaging in employment discrimination cases, in which plaintiffs must face the difficult task of persuading the fact-finder to disbelieve an employer's account of his own motives . . . Circumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work practices—evidence which in other kinds of cases may well unfairly prejudice the jury against the defendant. In discrimination cases, however, such background evidence may be critical for jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive.
>
> Id. (*citing*, **Estes v. Dick Smith Ford, Inc.**, 856 F.2d 1097, 1103 (8th Cir.1988)).

22. In this case, the jury found, at the second special interrogatory of the verdict slip, that Brown had failed to establish the existence of an open position for laborer

when she applied for employment with Cost. Notably, this finding was apparently not a consequence of the jury's failure to believe Brown. In fact, in the very first special interrogatory on the verdict slip, the jury indicated just the opposite, as it credited Brown's testimony (the only evidence presented on this issue) that she applied for a laborer's position on July 31, 2002.

23. Clearly, the evidence of any job availability was in Cost's possession. Thus, Brown could not prevail unless: (1) Cost admitted that it had open laborers positions at the time that Brown sought employment; or (2) Brown proved by circumstantial evidence that such was the case. Because Cost did not admit to the first alternative, it was left to Brown to attack Cost's credibility.

24. The Court's evidentiary rulings deprived Brown of the right to introduce evidence attacking the credibility of Cost, as well as evidence demonstrating that Cost had failed to take affirmative steps to increase its numbers of female employees (including Brown), as well as evidence that would have suggested to any reasonable employer that its hiring practices were indicative of disparate treatment. In these respects, as well as in those cited above, the Court made it impossible for Brown to prevail on her claims.

25. Brown also asserts that the Court erred in its phrasing of the second special interrogatory. Prior to the Court's charging of the jury, Brown objected to the Court's decision to portray this portion of Brown's prima facie case in this

fashion, because it suggested to the jury that Brown could not prevail if it were shown that other available vacancies arose within a short time after Brown first expressed interest in the laborer's position (as happened on at least two occasions, August 14 and August 16, 2002). Because of Cost's affirmative duty to hire more women, the issue of job availability cannot be restricted, as Cost would argue, to either the day on which Brown applied, or the first job that arose thereafter.

26. Finally, Brown also appeals the Court's ruling on Cost's motion in limine, which resulted in the exclusion of evidence related to Cost's alter-ego, Franco (including but not limited to the federal compliance regulations, as well as Brown's efforts to portray Cost as a knowing and cynical manipulator of federal equal employment goals, such that Cost enriched itself without ever having to demonstrate a sincere commitment to equal employment goals, or any substantial improvement in its chronic and continuing failure to hire women).

WHEREFORE, Plaintiff respectfully requests that the Court vacate the verdict and judgment and set this case for retrial.

Respectfully submitted,

/s/ Richard S. Matesic
Richard S. Matesic
PA ID No. 72211

Edward A. Olds
PA ID No. 23601

1007 Mount Royal Boulevard
Pittsburgh, PA 15223
412.492.8975

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN BROWN,                                    Civil Action No. 03-224

               Plaintiff,

   v.

COST COMPANY,

               Defendant.

## ORDER

AND NOW, this _____ day of _____, 2005, upon the motion of the Plaintiff, the verdict and judgment in this case are VACATED.

By the Court:

_____, J.

## CERTIFICATE OF SERVICE

I, Richard S. Matesic, hereby certify that a true and correct copy of the foregoing Plaintiff's Amended Motion for New Trial per FRCP 59 was served upon the following by regular or electronic mail or fax on the date indicated:

Michael J. Pawk, Esquire
LUTZ, PAWK & McKAY
The Morgan Center Building
Suite 102
101 East Diamond Street
Butler, PA 16001
lpm@zoominternet.net


Date: August 8, 2005                             /s/ Richard S. Matesic
                                                 Richard S. Matesic