1                IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    KATHLEEN BROWN,                    :
                 Plaintiff             :
4                                       :
         v.                             :   C.A. No. 03-224 (WDPA)
5                                       :
     COST COMPANY,                      :
6                Defendant             :

7

8

9

10

11              Trial in the above-captioned matter held

12       on Wednesday, June 8, 2005, commencing at

         at 9:30 a.m., before the Honorable Sean J.
13
         McLaughlin, at the United States Courthouse,
14
         Courtroom B, 617 State Street, Erie, PA 16501.
15

16

17

18   For the Plaintiff:
             Richard S. Matesic, Esquire
19           1007 Mount Royal Boulevard
             Pittsburgh, PA 15223
20
     For the Defendant:
21           Lawrence P. Lutz, Esquire
             Michael J. Pawk, Esquire
22           Lutz & Pawk
             The Morgan Center Building
23           Suite 102, 101 E. Diamond Street
             Butler, PA 16001
24

25              Reported by Janis L. Ferguson, RPR

1                           I N D E X

2

3    TESTIMONY OF DEAN TAYLOR

4         Continued direct examination by Mr. Matesic  . . . 33

5         Cross-examination by MR. Pawk  . . . . . . . . . 75

6         Redirect examination by Mr. Matesic  . . . . . . 97

7

8    TESTIMONY OF GEORGIA PAWK

9         Direct examination by Mr. Matesic  . . . . . . . .120

10

11

12

13

14   EXHIBITS:

15        Defense Exhibit CC - Page 84

16

17

18

19

20

21

22

23

24

25

 1          (Whereupon the following discussion took place on

 2            the record in camera:)

 3          THE COURT:  Let's just quickly -- I got the,

 4     quote, brief, and something from the Defendant, a Circuit

 5     case, even though I'm living in the Third Circuit.  And a

 6     litigation employment discrimination civil rights case

 7     article.

 8               We have been discussing this issue -- let me

 9     for the record say what prompted this.  There was a question

10     that was asked, and I think it was how many women do you

11     have working for you, and --

12          MR. MATESIC:  Correct.

13          THE COURT:  -- and that prompted this objection

14     and this whole deal.  The issue has been teed up here by the

15     lawyers and maybe even by me as to whether statistical

16     evidence of that type is admissible.  In other words, is it

17     circumstantially probative that there were no women at the

18     work site.  I guess that's the question.  And in looking --

19     and I suppose it is a variant of statistics, because the

20     absence of women, I suppose, is a type of statistic.

21               The Third Circuit law seems to be that

22     employment discrimination -- and I'm -- for instance, at

23     this Litolier case, 55 3rd. 1204, that employment

24     discrimination plaintiffs are not precluded from introducing

25     statistical evidence as circumstantial evidence of

1  discrimination in a disparity treatment case, all things

2  being equal.

3             So first let me hear from you why it's not

4  probative; the fact that there were no women, insofar as it

5  might inform the jury's decision as to whether the

6  decision-maker in this case was motivated by an improper

7  gender bias.

8             MR. LUTZ:  We need to back up for one minute.  On

9  Monday morning when we came in here, we had discussions

10  about motions in limine, and we had discussions about

11  whether or not Cost Company could introduce evidence that

12  there were female employees in the work force overall in

13  other jobs and things like that.  And I thought the Court

14  made it clear that we weren't going to get into that.

15             For those reasons, we did not get into it

16  with Mr. Barrett, when Mr. Barrett was on the stand.

17  Because in order for -- I think what Mr. Matesic is trying

18  to show right now is he wants to put up on the board that

19  there were no women at this particular job site at this

20  time.

21             That is a statistic that makes no sense,

22  unless you compare it to the relative pool from which

23  workers are being taken.  That's why we gave you a copy of

24  the Carter case.  I understand it's a Fourth Circuit case,

25  but --

1          THE COURT:  What does it say?  What does it stand

2     for?

3          MR. LUTZ:  This proposition, that you must look at

4     the pool from which they are taken.  Once you look at the

5     pool, then there has to be some probative basis for the

6     statistic.

7               In this situation -- in the Carter case, it

8     was an Afro-American claim of discrimination.  The relevant

9     pool, it was -- it was a zero case.  There were zero people

10    in the pool to pick from, and that was zero.  And the case

11    said that when you take a look at statistics, you have to

12    show that there is a disparity between the pool and

13    actuality.  And there has to be a difference.  In order to

14    establish that, the Court can require expert testimony, so

15    that you can compare what the pool is and discuss the

16    probabilities, the likelihoods that there is a disparity of

17    treatment because of a difference from one -- from what

18    actually occurred in the workplace to the pool.

19               No foundation has been laid with respect to

20    the pool before he gets into this statistical evidence.  He

21    has asked Mr. Taylor, who is now on the witness stand, these

22    questions, and he wants to put up there that there were X

23    number of employees, and Mr. Taylor is not even sure how

24    many employees there were.  And then he wants to, I assume,

25    argue somehow to the jury that because there are no women,

1    there is discrimination.  Well, that doesn't flow unless he

2    shows what the relevant pool is to choose from.

3            We know what that -- we don't know what that

4    pool is.  Because there's one labor union with Mr. Barrett,

5    there are other labor unions when that labor union has

6    exhausted its laborers and had to be called from, and then

7    we don't know who came to the job sites -- not this job

8    site, but various job sites in Cost Company.

9            Mr. Matesic also had an opportunity to use

10   discovery in this case.  His discovery was limited to things

11   at the Marienville site.  He has not obtained statistical

12   evidence from us with respect to all of these various things

13   that Cost Company does.  His Complaint does not suggest that

14   there is any disparate treatment claim being made

15   statistically.  It's just a flat-out she was discriminated

16   against because she wasn't hired for this particular job.

17           What we are really looking at is one

18   individual situation with one individual and whether or not

19   there was discrimination with respect to that one

20   individual.

21           Also, when you look at this pool, there are

22   time limitations you have to look upon.  What is the time

23   frame that we are talking about.  Is it just July 31st?  Are

24   we going to look at a snapshot of that?  Are we going to go

25   back years with Cost Company to establish this?  Are we

1    going to get into all that?  How many females they have

2    employed over the years, what the pool was from all these

3    various labor unions from over the years.  I don't think you

4    can do that.  I think you have to establish some limited

5    time reference that he's talking about.  There is no basis

6    for doing that.  It is very misleading to a jury at this

7    point to them, and I don't think it comes in.

8              THE COURT:  What do you have to say?

9              MR. MATESIC:  I have a lot of things to say about

10   it, Your Honor, and I will argue Third Circuit law here.

11   There is nothing -- and I believe that Cost will have to

12   concede that it would have been a very strong card in their

13   hand if they had gotten Mr. Barrett to acknowledge that

14   there were very few females in that union, because they

15   could then pass the buck to the union, and they could

16   introduce the contract, which Mr. Barrett testified about

17   and we showed him.  That really their hands are tied.  The

18   contract says, you got to take union referrals.

19             THE COURT:  As the first wave of people.

20             MR. MATESIC:  Exactly.  They never asked that

21   question.

22             THE COURT:  It's not their burden.

23             MR. MATESIC:  I understand that.  They are saying

24   I didn't ask the question.  They could have asked the

25   question to exonerate themselves.  They didn't do it.

1              As far as looking at -- in discovery, trying

2    to find out how many people applied, Cost does not keep

3    records of the numbers of females who apply.

4              MR. LUTZ:  That's not true.

5              MR. MATESIC:  Wait a second.  They do not use

6    applications, okay.  And Mr. Taylor testified that an

7    application -- that could be something as simple as the name

8    of a person and a phone number.  Nothing to identify the

9    gender of that person.  There is no -- there is no record

10   that Cost has produced that shows the gender of the

11   applicants.

12             Secondly, I think what Cost is doing is they

13   are confusing the standards for a disparate impact case and

14   a disparate treatment case.  The Third Circuit has very

15   clearly said that in a disparate treatment case, this kind

16   of evidence is relevant.

17             We submit it goes to both prongs under

18   Fuentes.  Fuentes say that the Plaintiff can show the

19   evidentiary burden by either showing pretext or showing that

20   discrimination was the likely reason or a motivating factor

21   or an explanatory factor in the adverse employment decision.

22   We are arguing pretext.  We said, look, they are talking out

23   of both sides of their mouths.  On the one hand, they are

24   saying they are firmly committed to the goal of equal

25   employment.  On the other hand, they don't have a problem

1    with zero females being employed at that site.

2              Dean Taylor will testify he has no

3    recollection of Georgia Pawk ever coming to him and saying

4    how many people do you have.  He has no recollection either

5    from Georgia Pawk's mouth or indirectly through the other

6    supervisors that Georgia Pawk ever had difficulty --

7              THE COURT:  Could I interrupt for just one second.

8    You said you had some Third Circuit cases?

9              MR. MATESIC:  Right.  The Circuit cases that we

10   mentioned in the brief; Fuentes, Abrams, Healy, and New York

11   Life.

12             So in terms of pretext, Mr. Taylor is going

13   to say Georgia Pawk never indicated to him that there was

14   discrimination going on or potential discrimination going

15   on.  That's one issue.

16             Secondly, if the jury sees that the Equal

17   Employment officer did not express to the foreman a problem

18   with 162 males to zero females, a jury can easily conclude

19   that there's something going on here; that something isn't

20   right.

21             THE COURT:  See, the problem -- and I have got to

22   sit down and think about this.  This isn't an affirmative

23   action case.  That's the point.  And it can't be re-cast as

24   an affirmative action case.

25             MR. MATESIC:  Right.  But let's go back to the

1  regulations.  The 6.9 percent does not refer to the

2  applicant pool.  The 6.9 percent refers to the current

3  profile of the current work force.  Those regulations don't

4  say, and show us that you have met a percentage based on

5  your number of applicants.  6.9 percent is only a goal.  It

6  doesn't have anything to do with the applications.  It says,

7  Employer, if you are going to be committed to diligently

8  pursuing this notion of equal employment, this is your

9  target.  We don't care how many applications you have got.

10  This is your target.  6.9 percent.  How is that measured?

11  It's measured on the basis of the current work force.  The

12  regulations say that it's relevant.

13          As I said before, under the second prong

14  under Fuentes, the jury is clearly going to see that -- or

15  we hope that they are going to see that this should have

16  raised a concern for the Equal Employment officer.

17          In addition, I want to go back to what

18  Mr. Lutz had said at the very beginning, and I'm going to

19  reiterate what I said yesterday.  At no time did Cost move

20  to exclude this evidence as it related to Cost.  Cost moved

21  to exclude this evidence as it related to Franco.  Ms. Pawk

22  is also an Equal Employment consultant for Franco.  And

23  there has been no ruling on that issue as to whether or not

24  that evidence can come in.  And I believe that if I need to

25  impeach Ms. Pawk, the fact that she serves as an Equal

1    Employment consultant for another construction firm is very

2    relevant to her understanding of what equal employment

3    means.  And I intended to bring this up before we began the

4    direct examination of Miss Pawk.  I expect to go there, and

5    I'm just putting that on the record for right now.  It

6    doesn't relate to this argument.

7              Essentially, the -- because we meet the

8    relevance standard under both prongs of Fuentes -- I mean,

9    I'm sorry, Your Honor, 162 males to zero females and the

10   Equal Employment officer saying nothing about that to the

11   person in charge of hiring, that's -- that's got to be

12   relevant to this case.  The jury has got to be presented

13   with that information.

14             MR. LUTZ:  My reading --

15             THE COURT:  Hold on one second.

16             (Discussion held off the record.)

17             MR. PAWK:  The problem with that -- and I'll say

18   this.  I spoke to Ron Barrett in the hallway yesterday.

19   Because of our discussion at the beginning of the case, I --

20   the discussion I had with him in the hallway was -- I never

21   talked to him before he came here yesterday, other than his

22   deposition.  Do you ever have any women -- in all your years

23   as a business agent, have you ever had a woman mason tender.

24   His answer was, no, we have never had one.

25             THE COURT:  Well, I mean, that's --

1          MR. PAWK:  I didn't get into all that.

2          THE COURT:  That's a conversation in the hallway.

3          MR. PAWK:  My point is we have been sandbagged.  I

4    could have got into it with Ron Barrett when he testified.

5    As he said that could have been a good card for us to play;

6    that the pool was zero, and it's always been zero.  I could

7    have got into that, but I didn't get into that.

8          THE COURT:  In my view, in the absence -- I'm not

9    precluding you from doing this, but I'm going to say this:

10   Statistical evidence in the nature of the fact that there

11   are no women -- that there were no women working at that job

12   site, the mere fact -- let me say it again.

13          The mere fact that there were no women

14   working at that job site in the absence of any other

15   contextual evidence such as the size of the pool, the

16   available -- the women who would have been available from

17   the union or otherwise, the number of qualified women who

18   would have been available, the number of women who

19   applied -- in other words, all those factors that form the

20   availability of the pool, in the absence of that, the raw

21   figure of zero is, in my view, irrelevant, and it would

22   cause the jury to speculate.

23          That having been said, you're still in your

24   case in chief, and if you can put some flesh on this in

25   whatever fashion you think you can, then I'm going to -- I

1    would be willing to revisit the issue.  But as it presently

2    stands, it essentially is a foundational issue.  There's

3    just not enough there.

4            MR. MATESIC:  And I need to say this for the

5    record too, Your Honor.  Again, we have been referring to

6    this as statistical evidence, and we're talking about the

7    case law --

8            THE COURT:  That may be inaccurate in a sense.

9            MR. MATESIC:  I think it's totally inaccurate.

10   With all due respect, Your Honor, again, we're not talking

11   about Dean Taylor right now.

12            The reason that I seek to introduce this

13   evidence is not because I want to show that Dean Taylor was

14   somehow in violation of the law.  That -- that's not my

15   primary goal.  My primary goal is to show that there was an

16   attitude cultured at Cost which tolerates that circumstance,

17   at the same time that it has this obligation under the law

18   to try to increase the participation of females.

19            So it is relevant to the mental state of

20   Georgia Pawk as president of Cost that she never once went

21   to a foreman and said, this is the goal, 6.9 percent; tell

22   me how many females you have on this job.  She never asked

23   this question.  The foreman says, I can't remember any

24   instance of that ever happening.  She never went to any of

25   the foremen.  Because Mr. Taylor is not the only person who

1    hires for Cost.  Cost is a pretty large company.  She never

2    went to any of those people.  According to Mr. Taylor, he

3    never heard indirectly that she went to any other foreperson

4    and said tell me how many women you have on this job.

5              She's the Equal Employment officer.  If the

6    Equal Employment officer is implicitly or tacitly sending a

7    signal to the hiring people that I'm not going to question

8    you about the number of females that you have on the job,

9    that has to go to pretense.

10         THE COURT:  Let me ask you -- this is a separate

11   issue, then.  He is going to ask Ms. Pawk, for instance, are

12   you the EEOC coordinator.  Yes.  And you're aware of the

13   6.9 percent target that you're supposed to hit, and that

14   type of thing.  What is your response to that -- we're off

15   the lack of women right now, per se, and we're on to the

16   inquiries that he just described that would be directed to

17   Miss Pawk.  What is your response to that?

18         MR. LUTZ:  I --

19         THE COURT:  I mean, presumably -- if he asked

20   her -- I don't know how it will play out -- well, you tell

21   me.  Is there an objection to that?

22         MR. LUTZ:  Sure.  I don't know what the relevance

23   of it is when you get back to what his claim is.  His claim

24   is -- let's look at Fuentes for a minute.  He has to show

25   the four prongs that we know from McDonnell Douglas.  If he

1    gets over that burden -- which we'll probably be arguing

2    that he hasn't at some point in this case.  If he gets over

3    that burden, then we have the responsibility for proffering

4    reasons why we didn't hire her, legitimate non-business

5    reasons --

6              THE COURT:  There's one.  One reason.

7              MR. LUTZ:  There are two.

8              THE COURT:  Oh, there are?

9              MR. LUTZ:  One, we legitimately thought she was

10   asking for an operator's position --

11             THE COURT:  The operator's position is out of the

12   case.  I mean, he is not -- you're not claiming -- you're

13   not making a claim for discrimination based upon the

14   operator position.

15             MR. MATESIC:  That's correct.  That's correct.

16             THE COURT:  The only claim in play here is a labor

17   position.  I have been of the opinion that the reason she

18   wasn't hired as a laborer is because you didn't have any

19   positions.

20             MR. LUTZ:  That's one.  The other reason is when

21   she came, all she asked for was an operator's position.  If

22   he tries to make an argument that she was continually

23   available for a laborer's position, she never advised us and

24   told us that.  It's the same -- for purposes of what we are

25   arguing right now, it doesn't matter --

```
 1          THE COURT:  Well, actually, it does matter.  It
 2   matters in this sense:  Because the mens rea as it -- the
 3   reasoning behind the decision as it existed at the time, not
 4   post hoc, is what is important here.  And do I take it that
 5   it is going to be Mr. Taylor's testimony -- is it Taylor?
 6          MR. LUTZ:  Taylor.
 7          THE COURT:  Is it his testimony and will it be his
 8   testimony that he and Cost were never advised that she
 9   wanted to be a laborer; therefore, that issue never really
10   was on his radar screen, and the only reason that -- the
11   only thing he thought that she was applying for was an
12   operator position, and he didn't hire her for an operator
13   position because she didn't have her union card?
14          MR. PAWK:  Judge, two reasons.  His testimony will
15   be she came on the job, she asked for an operator's
16   position.  He didn't have any available.  That was it.  And
17   she wasn't eligible to be hired as an operator anyway, but I
18   don't know if he got in that discussion.  But the testimony
19   will be she never asked for a laborer's job; she asked for
20   an operator's job.
21          THE COURT:  And there wasn't an operator's
22   position available.
23          MR. PAWK:  That's right.
24          MR. MATESIC:  When she arrived at that job site,
25   she had that Minority Recruitment Memorandum with her.  It
```

1    says laborer/operator.  He's going to -- I'm going to

2    confront him with his deposition testimony.  He's already

3    admitted she had it when she came to the job site.  So let

4    them take that position.  We have a material issue of fact

5    here as to what job -- and we have substantial evidence that

6    Taylor knew she was asking for a laborer's job.

7            MR. PAWK:  His testimony will clearly be she asked

8    for an operator's job, Judge.  That's definitely what Taylor

9    will say.

10           MR. MATESIC:  Then let him.

11           THE COURT:  That's going to be a pure jury issue;

12   what they believe she asked for and what they believe he

13   thought she was asking for.

14           MR. LUTZ:  Back to my argument with Fuentes, Your

15   Honor.  We're not standing before the Court and saying, hey,

16   we didn't discriminate against her because over the years we

17   have developed this situation of Cost Company where, you

18   know, we have this number of females here and this many

19   females there.  We have not proffered that.  And --

20           THE COURT:  As a legitimate nondiscriminatory

21   reason for --

22           MR. LUTZ:  He's trying to bootstrap evidence by

23   saying what we're saying is pretext, and that's not -- we

24   haven't said that.  We haven't gotten on the stand and got

25   into all these statistics and what females we hire, we don't

1    hire, what the pool is, what our reasoning is, EEO

2    requirements, and so forth.

3             THE COURT:  Let me ask you this question:  As a

4    factual matter -- I mean, what is the company's position as

5    to whether there were laborer positions that were open at

6    the time that she applied?

7             MR. LUTZ:  There weren't.

8             MR. MATESIC:  And we have a material issue there

9    as well, because Miss Brown has testified she was there on

10   July 31st.  It's in her diary.  She presented the memorandum

11   asking for a laborer's position on that day.  Mr. Barrett's

12   records indicate --

13            THE COURT:  That's the Barrett testimony.

14            MR. MATESIC:  Right.

15            THE COURT:  The company's position is that she

16   applied for X job and only X job.  There were no jobs

17   available, and you told her, and that's why you sent her

18   packing.  Her position is she applied for X and Y job.

19            MR. MATESIC:  Correct.

20            THE COURT:  And at least Y job was available.

21            MR. MATESIC:  And that they know that she applied

22   for X and Y.

23            THE COURT:  So that's that.

24            MR. MATESIC:  That's the pretense.

25            THE COURT:  Now, before we finish up here, let me

1   talk a little bit about the charge, and we'll have a draft.

2   We're not going to finish this case today, but we'll finish

3   the case tomorrow, I suspect.

4           It strikes me that since job availability --

5   position availability -- position remaining open is really

6   one of the prongs of a prima facie case, your legitimate

7   nondiscriminatory reason has conflated into part of the

8   prima facie case.

9           What I would suggest -- and there's no reason

10  I don't think we can't do it, for -- for ease for the jury,

11  we -- I don't say anything about the prima facie case.  I

12  say, you know, it's your burden to prove intentional

13  discrimination, et cetera, and then I say, the Defendant is

14  required to articulate a legitimate nondiscriminatory reason

15  for its failure to hire.  And I will say, in this case it

16  has done so by claiming that the Plaintiff applied for a

17  position which was not open; i.e., operator.  Then I'm going

18  to say that -- and then -- then I'll go through the pretext

19  analysis.

20          But I suggest that -- I can do it either way.

21  I mean, I can -- because if you -- if I lay out the elements

22  of the prima facie case, the only one which is in dispute is

23  was there a position available.  If I have the jury first

24  pass on that, it's somewhat confusing in the context of the

25  prima facie case.  Do you follow what I'm saying?  Do you

1    have any objection to that?

2              MR. MATESIC:  Well, I'm trying to think --

3              THE COURT:  I'm going to let you see the charge.

4    But how would you propose I do this?

5              MR. MATESIC:  A standard point for charge would

6    have all four elements before the burden shifts.

7              THE COURT:  In this case I can't say as a matter

8    of law a prima facie case has been made out, because one of

9    the elements is the key element in the case.

10             MR. MATESIC:  I don't think it's that unusual for

11   the facts that support the first four elements of the prima

12   facie case to also be relevant to the employer's legitimate

13   nondiscriminatory reason.  That doesn't happen that

14   infrequently.  I -- you know, at first blush, I'm having

15   trouble -- the most trouble, I think probably, quite

16   obviously, with any statement by the Court that the

17   Defendant has met its burden.  Because it appears to be --

18   in fact, it is sort of an instruction that they must make a

19   finding according to law.  And I'm always reluctant to agree

20   in advance to something like that.

21             I don't mean to interfere with your

22   prerogative about that, and I think I need to talk to

23   Mr. Olds about this.

24             THE COURT:  I think you need to see my proposed

25   charge.  That's what I am thinking.  And this is really --

1    when you talk about reasons, I still think it's one reason.

2    I think the reason is that she applied for a position which

3    you contend was not available.  Isn't that the reason?

4         MR. PAWK:  Judge, don't -- yes.  Well, it's one of

5    them.  With the four prongs, you know, don't we get the

6    opportunity, if you give a charge that would have the four

7    prongs and you tell the jury that the Plaintiff has to meet

8    these four prongs before you ever shift the burden to the

9    defense, shouldn't we be able to argue that they didn't meet

10   one of the prongs; therefore, there's never any burden on

11   the defense to do anything?  If they do that.  If they find

12   they didn't meet their third prong of availability, you need

13   to go no further.  That's my thoughts on that.

14         THE COURT:  In other words, the burden didn't

15   shift.

16         MR. PAWK:  That may be right.

17         THE COURT:  That may be right.  Maybe that's the

18   way to set it up.  And if the jury then concludes that

19   the -- but then look how this goes.  What do we tell them?

20   If they conclude that that third prong of the prima facie

21   case has been made out, then you have not, as a matter of

22   law, then, you have not met your burden of articulating a

23   legitimate nondiscriminatory reason, because the very reason

24   that you didn't hire her was the alleged unavailability of a

25   job, and they would have already concluded that there was an

1   available job.

2          MR. MATESIC:  Can I respond to that?  I think

3   actually they can.  If they -- because they can always

4   suggest that Kathleen is not credible.  I mean, it's up to

5   the jury to decide whether she's credible, whether, in fact,

6   Mr. Barrett is credible, whether, in fact, there was an

7   opening -- and by the way, Mike and Larry, I'm sorry, the

8   two reasons.  Job availability, and what was the other one?

9   The two reasons why she wasn't hired?

10          MR. LUTZ:  The fact we legitimately believe all

11   she was asking for was an operator's position.

12          MR. MATESIC:  Okay, operator's position.  So, you

13   know, it's up to the jury to decide whether or not Cost is

14   believable when it says, here are our records or here is our

15   evidence about availability, here is what -- it is a

16   credibility issue.  They can meet their burden if

17   Kathleen --

18          THE COURT:  Maybe it would go this way:  We'll lay

19   out the prima facie case.  Now, when we say was a job

20   available, will we spell out for the jury either laborer or

21   operator?  I mean, that's -- that gets into the dispute as

22   to what was actually asked for.

23          MR. MATESIC:  In the prima facie case?

24          THE COURT:  Yes.

25          MR. MATESIC:  We're dropping the operator's claim.

1    If we are hoping to not confuse the jury, take that out of

2    the mix.

3            THE COURT:  So this is how it goes.  Was a

4    laborer's position available.  This is how it's going to

5    work.  If they answer yes, that's not the end of the case,

6    because your legitimate nondiscriminatory reason is she

7    didn't ask for a laborer's position.  She asked for an

8    operator's position, and then we're back -- all right.  Feel

9    much better about that.  That's the way that is going to go

10   in.

11           Finally, getting back to this question about

12   the EEOC and meeting goals and that type of thing, I have

13   given it some significant thought last night, and I

14   appreciate the additional insight provided by counsel here.

15   I simply do not see it as relevant.  I simply do not see it

16   as relevant at all.

17           Now, on the other issue, though, on the --

18   and I'm going to say statistics, with this caveat:

19   Statistics meaning absence of women.  Understand, I'm not

20   precluding you from getting into that, but you just are

21   going to need some evidence from which a jury could draw

22   some conclusions about the availability of the pool.  If you

23   can do that, then I'm going to let you get into that.

24           MR. MATESIC:  So -- I didn't mean to interrupt.

25           THE COURT:  That's all right.  I get interrupted

1    all the time.

2              MR. MATESIC:  Well, if I understand the Court's

3    ruling, you're saying that the essential threshold for me is

4    to show what the applicant pool was.

5              THE COURT:  In some form or fashion.  And what the

6    applicant pool was so that -- so at least a reasonable

7    inference can be drawn by the jury that there were, in fact,

8    women knocking at the door, figuratively speaking, and

9    weren't getting in.

10             MR. MATESIC:  Let me ask it this way:  Why isn't

11   it sufficient for the Defendant's case for them to simply

12   put that evidence on themselves?  Because that's the obvious

13   defense to this.  I talk to Georgia Pawk about whether or

14   not she had a problem with the numbers.  I talk to Dean

15   Taylor about it.  What is their strongest card?  Their

16   strongest card is the applicant pool -- and I have nothing

17   to rebut.  I have no evidence that could rebut that.  But if

18   I'm put in the position of having to establish there were no

19   women, that prejudices my case.

20                 They -- it's perfectly natural and expected

21   of Cost to come forward and say -- and they will be able to

22   do it in an unrebutted fashion -- there were no women being

23   sent from the union.  I mean, Georgia Pawk is going to

24   testify that way, and I have no evidence to go against that.

25   So I don't see how they are prejudiced -- I mean, if that

1    evidence is going to come in, that's something that I have

2    to deal with.  I mean, I'm going to have to do a

3    recross-examination.  And I'm going to -- and I'm not going

4    to be able to rebut what she said.

5            THE COURT:  Just as a practical matter, not legal,

6    if that's the case, why would you want to ask the question?

7            MR. MATESIC:  Because optimally -- here's the way

8    it goes:  All right?  Equal employment means optimally that

9    the work force profile represents -- or the representative

10   of the profile, the gender profile of the surrounding

11   community.

12           THE COURT:  As near as it can reasonably be.

13           MR. MATESIC:  Right.  What is the percentage in

14   society?  50/50, 51/49.  Are we anywhere near that?  No.

15   The Federal Government says, okay, 6.9 percent.  That's a

16   fraction of 50 percent.  But they say, at least make this,

17   and if you can't make the 50 and you can't make the 6.9, go

18   to the 16 steps.  But, remember, this is a minimal number,

19   6.9, and 50 percent is true equal employment.  Okay?

20              Now, Miss Pawk understands that, and she

21   understands that the union is not sending her enough women

22   to employ at 6.9 percent or 50 percent.  I showed the Court

23   yesterday a memorandum from Charles Cost, Miss Cost's father

24   and the CEO of Cost, in really big type, "Urgent, we need

25   bricklayers."  He sends these out to all of the unions,

1   okay?  Has Cost ever sent out an urgent memo -- Cost is way

2   down here on the scale.  They are 1.9 percent female.  The

3   minimal goal is 6.9, the optimal goal is 50.  Have they ever

4   treated this as an urgent matter?  Bricklayers in the peak

5   of the construction season, that's an urgent matter.  Why is

6   it urgent?  Well, because there are two different objectives

7   here.  There is the objective of maximizing cash flow to

8   Cost, keeping those federal contracts, and there is the

9   objective of equal employment.

10          Which one -- which one prompts Cost to send

11  out urgent memos to all the various locals?  Is it the money

12  objective or is it the equal employment objective?  Okay?

13          I have to be able to show that if Cost -- if

14  Cost knew that they were nowhere near equal employment --

15  and Cost is certainly in business -- I mean, their whole

16  goal is to make money.  That of those two goals, making

17  money was a more urgent matter for Cost.  Okay?  They never

18  said to the union locals, you know what, you guys, you're

19  not helping us achieve the goal of equal employment, you're

20  frustrating our efforts.  We're a federal contractor, we're

21  subject to all these regulations, and say, you have got to

22  take, you know -- you got to make your best efforts to

23  achieve equality in employment, and you guys are frustrating

24  our efforts to do that.  They have never said that.  Okay?

25          And the 162 males to zero females is -- I

1    mean, that is entirely relevant.  That goes directly to the

2    issue of what their goals are and which goal is more

3    important, between making money and equal employment --

4              THE COURT:  Look, I have already ruled on it.  But

5    you made your point.  You preserved it for the record.

6              MR. MATESIC:  Well, let me ask -- Judge, I

7    apologize.

8              THE COURT:  That's all right.

9              MR. MATESIC:  If I ask Miss Pawk, tell me what the

10   profile was, how many women were they sending your way on

11   average --

12             THE COURT:  You certainly can do that.

13   Absolutely.

14             MR. MATESIC:  Once I do that, and she said they

15   weren't sending us any women, now that opens the door.  If I

16   understand the Court's ruling, if she's going to say the

17   union never sent us any applicants --

18             MR. LUTZ:  That closes the door.

19             MR. MATESIC:  Hold on a second.  This was a

20   project labor agreement that required us to employ every

21   referral that the union sent over, okay.  You know, I could

22   even stipulate to this; that the union didn't send them

23   women.  Okay?

24             THE COURT:  I don't know if it's true or not, but

25   you guys can stipulate to anything you want, I suppose.

1          MR. MATESIC:  The applicant pool is all males and

2     no females, okay?

3          THE COURT:  Okay.

4          MR. MATESIC:  So now we have established the

5     applicant pool.  Now I get to say, all right, I understand

6     your burden, you don't have enough women showing up.  But on

7     three occasions in the summer of 2002, the union wasn't

8     sending you people.  On three occasions -- it wasn't three

9     occasions, it was 15 occasions.  It was that three-page

10    document that Ron Barrett was --

11         THE COURT:  Right.

12         MR. MATESIC:  On 15 occasions, the union didn't

13    send you people.  You got to hire off the street.  You could

14    hire male, female, black, white, whatever you wanted.  Who

15    did you hire in those circumstances?  You hired white men.

16    I'm not going to use race, but you hired men.  That's what

17    you did.  When you had the freedom in these limited

18    circumstances to hire people, you only went for men.  You

19    knew that the optimal goal was 50, the minimal goal was 6.9,

20    and you were down here at 1.9.  Okay?  What did you do when

21    you had the opportunity to hire?  If I get her to say that

22    the applicant pool was zero women, based on the --

23         THE COURT:  From the union hall.

24         MR. MATESIC:  Right.  Based on the Court's ruling,

25    then I --

```
1              THE COURT:  Based on the Court's ruling, you would
2     still have to, with respect to non-union hires, you would
3     still have to establish the same background of availability
4     and pool availability that you would have had to have
5     established for the union people.  And you could ask the
6     questions.  Don't get me wrong.  I'm going to permit you to
7     establish, if you can, through Cost personnel the requisite
8     foundation for you then to get in and argue this -- this
9     pattern -- or this statistical type of evidence.
10             We've really got to get going.  I'm going to
11    have to take it question by question.  But do you understand
12    what I'm saying?
13             MR. MATESIC:  Yes.
14             THE COURT:  I'm going to let you try to develop a
15    foundation, if you can, both with respect to the applicants
16    coming from the union hall and with respect to the pool of
17    applicants that would have been available on the street.
18             MR. MATESIC:  Can't I -- would I be able to
19    stipulate to that as well?
20             THE COURT:  Well, you talk to him about it.
21             MR. PAWK:  I'm not stipulating to any of that.
22             MR. MATESIC:  Dean Taylor has already testified as
23    to the operator's positions.  No female ever applied.
24             MR. PAWK:  In his deposition, he didn't --
25             MR. MATESIC:  Yes, he did.
```

1              Judge, I apologize.  We have one more thing

2     to do.  I gave Mr. Pawk yesterday afternoon at lunch --

3     well, actually he has the same documents.  These are the

4     payroll modules that list all of the employees during the

5     summer of 2002 week by week and the total hours worked.

6              THE COURT:  Okay.

7              MR. MATESIC:  And I wanted to get a stipulation

8     from defense counsel as to the total number of employees and

9     the job titles.  Mr. Pawk said he was going to furnish that,

10    and, I apologize, I haven't had time to talk to Mike this

11    morning.  He was going to give that to Mr. Taylor and

12    Mr. Heaton, the foreman and subforeman respectively to have

13    them go through those documents and just confirm that the

14    numbers that I found were correct --

15             MR. PAWK:  I didn't do it.  I didn't do it, and I

16    didn't represent that I would do it.  I would take a look at

17    it.  I have not sat down -- I have been very busy with the

18    case.  Whatever you need to prove, you need to prove it.

19    I'm not stipulating to the numbers.

20             MR. MATESIC:  Your Honor, this is going to be

21    excruciating.  There is like 50 pages.  I gave it to counsel

22    yesterday --

23             THE COURT:  It is a list of employees and their

24    titles.  Is that what it is?

25             MR. MATESIC:  Yes it is.  Yes, it is.

1        THE COURT:  Well, are you just asking that it be

2  authenticated as accurate?

3        MR. MATESIC:  Yes.  That the total number of

4  employees -- it has -- it has the employees and their job

5  titles.

6        THE COURT:  During a certified time period or

7  during the summer?

8        MR. MATESIC:  Yes, week by week.  And there were

9  three weekly records that I gave him; weekend of August 5th,

10  August 12th, and October 28th.

11        THE COURT:  Why can't you ask Taylor, look at this

12  list, does this seem to be about right?

13        MR. MATESIC:  Mr. Taylor has given approximate

14  numbers of people on the job site, and he's off.  His

15  numbers are low.  The fact is he had 162 people at that job

16  site in July and August of 2002, and I need to have those

17  numbers.  And --

18        THE COURT:  Why don't you ask Pawk.  Somebody will

19  know.  If it's a list they generated, presumably they will

20  adopt the list as accurate when you ask them the question.

21  It won't take that long.

22        MR. MATESIC:  With all due respect, if I ask the

23  question of Georgia Pawk, there's 162 people in here, she's

24  going to say I don't know.  She's going to say --

25        THE COURT:  Well, that's the best I can do.  I

```
 1    can't force people to stipulate to stuff.
 2              MR. LUTZ:  This was my day -- I hate to bring this
 3    up -- when I asked you if I could leave at 4:00.
 4              THE COURT:  All right.
 5              MR. PAWK:  Just on that, if he's not in the
 6    Georgia Pawk testimony -- it's just me.  I know you told the
 7    jury you wanted to stay late.  But if we're in the middle of
 8    Georgia, and he's got to leave --
 9              THE COURT:  Thank you.
10              (End of discussion in camera.)
11              (Whereupon the proceedings were resumed in open
12               court at 10:40 a.m.)
13              THE COURT:  Members of the jury, I'm sorry for the
14    delay this morning.  It's unavoidable.  As you can see, we
15    have moved you to yet another courtroom, and by the time
16    it's over, there is a distinct possibility we may finish in
17    my own courtroom.  So you will be the only jury to have been
18    in three different courtrooms.
19                   All right, let's go.
20              MR. MATESIC:  All right.  The Plaintiff recalls
21    Dean Taylor.
22
23         D E A N   T A Y L O R, having been previously
24         sworn, testified as follows:
25
```

CONTINUED DIRECT EXAMINATION

1

2   BY MR. MATESIC:

3

4       Q.   You can see this, Mr. Taylor, members of the jury?

5       A.   Yes, fine.

6       Q.   Mr. Taylor, we were talking yesterday about your

7   work as a foreman for Cost.  I'd like you at this point,

8   just for a few moments, to describe how Cost is set up.  Who

9   the chief executive officer is with Cost, any of the

10  administrative employees.  Or if you can just help us map

11  out sort of the corporate hierarchy; who is in charge and

12  where you fit in, in that scheme.

13           First of all, Cost is owned by a gentleman named

14  Corky Cost; is that correct?

15      A.   Charles Cost.

16      Q.   Charles Cost.  He goes by the nickname Corky,

17  correct?

18      A.   Correct.

19      Q.   Okay.  And you do supervise --

20      A.   I'm sorry, I can't hear you.  I don't hear too

21  well.

22           THE COURT:  Why don't you use the mic., if you

23  can.

24           (Discussion held off the record.)

25      Q.   Now, Charles Cost is the owner of Cost Company.

1      A.    That's right.

2      Q.    Okay.  And in your capacity as a foreman, you

3   supervise employees at Cost; is that correct?

4      A.    Correct.

5      Q.    Okay.  And who is your direct supervisor?

6      A.    Corky Cost; Charles Cost.

7      Q.    Corky Cost, okay.  And who is directly under you?

8      A.    (No response.)

9      Q.    For example, there's a job title known as

10  subforeman; is that correct?

11     A.    Well, I mean, there are still foremen.

12     Q.    There are still foremen who are under you?

13     A.    Right.

14     Q.    Okay.  How many foremen do you supervise?

15     A.    All depends on how big the job is.

16     Q.    Okay.  Back in the summer of 2002, back at the SCI

17  Marienville site, how many foremen did you supervise?

18     A.    I think there was seven out there.

19     Q.    And you know who Georgia Cost Pawk is, correct?

20     A.    Yes, I do.

21     Q.    She's the president of Cost Company, correct?

22     A.    I'm not sure if that's her title, but --

23     Q.    Okay.  She is supervised by Charles Cost?

24     A.    Not really sure about that either.

25     Q.    Okay.  You are aware that Georgia Cost is the

1    Equal Employment Opportunity officer --

2        A.    Yes.

3        Q.    -- for Cost?  And she's also the safety director

4    for Cost.

5        A.    Yes.

6        Q.    I'm going to put a question mark next to

7    president.  You are sure, though, she is the Equal

8    Employment officer and the safety director.

9        A.    Correct.

10       Q.    Okay.  And in her capacity as the safety director,

11   one of her jobs is to come out to the work site, as work is

12   progressing, to monitor the work; to see if, in fact, the

13   employees are following the proper procedures, correct?

14       A.    Well, actually, we -- we have another safety guy

15   that comes out and does that.

16       Q.    Okay.  Has Georgia Pawk visited the work sites

17   that you've worked on?

18       A.    A few.

19       Q.    Okay.  And has she visited them for the purposes

20   of checking up on the safety at the work site?

21       A.    Correct.

22       Q.    Okay.  We were talking yesterday about your work

23   hiring -- or the work that you did in terms of hiring

24   personnel at SCI Marienville.  Do you remember that

25   testimony?

1    A.   A little bit, yeah.

2    Q.   All right.  You began sometime in the spring of

3 2002.

4    A.   That's correct.

5    Q.   Before you got there, there was a subforeman named

6 Bill Heaton who was there, who was in charge of hiring.

7    A.   Yeah.  He started the job.

8    Q.   He started the job.  How long is he on the job

9 before you got there?

10    A.   You know what, I'm not really sure of that.

11    Q.   And who is Bill Heaton's direct supervisor?

12    A.   Corky Cost.  Charles Cost.

13    Q.   All right.  Let's talk a little bit about

14 construction work in general.  Construction work is

15 seasonal.  You would agree with me?

16    A.   Yeah, it's seasonal.

17    Q.   Okay.  So it's very dependent on the weather.

18    A.   That's right.

19    Q.   So when the weather is inclement, if it's too wet,

20 if it's too cold, construction has to stop.

21    A.   That's not true all the time.

22    Q.   In most cases?

23    A.   Most cases.

24    Q.   All right.  And in most cases, construction work

25 peaks at some time during the summer months.

1    A.    Sometimes.

2    Q.    All right.  The SCI Marienville job, you were the

3    foreman in the summer of 2002.

4    A.    Yes.

5    Q.    And you have already testified in this case that

6    that job peaked sometime in July of 2002.

7    A.    Yeah, it was around July.

8    Q.    Okay.  And when I say it peaked -- or, excuse me,

9    when you say it peaked, you mean that Cost had the maximum

10   number of employees during July of 2002?

11   A.    Correct.

12   Q.    And that situation continued until sometime in

13   late September of 2002.

14   A.    I'm not real sure when it started declining.

15   Q.    You have previously testified in this case, Mr.

16   Taylor?

17   A.    Yes.

18   Q.    You were previously asked the question, when did

19   the job begin to wind down.

20   A.    It had to be sometime in September.  But I'm not

21   sure exactly when.

22   Q.    All right.  Yesterday when we were talking, you

23   gave these estimates for the number of employees at the SCI

24   Marienville site during the summer of 2002?

25   A.    Yes.

1      Q.    These numbers do not represent the peak number of

2  employees.

3      A.    I don't know what the peak number of employees

4  were.

5      Q.    If I showed you the payroll records from Cost

6  Company which listed all those employees, you would be able

7  to count them up and tell us what the peak number of

8  employees were during the summer of 2002?

9      A.    Correct.  If you have the paperwork, yes.

10     Q.    I'd like to do that right now.

11          MR. MATESIC:  And, Your Honor, I beg the Court's

12  indulgence.  This document runs approximately 50 to 60

13  pages, there are two to three names on each page.  What I

14  want Mr. Taylor to do is go through each page and just yell

15  out to me what he sees on that page, in terms of the type of

16  job that was being performed.

17  BY MR. MATESIC:

18     Q.    Mr. Taylor, you would agree with me that the

19  payroll records reflect the job title of a particular

20  employee?

21     A.    Certified payroll?

22     Q.    Yes.

23     A.    Yes.

24          THE COURT:  Let me make a suggestion, then.  In

25  essence, you are going to have him read the entire document

1    into the record.

2            MR. MATESIC:  I attempted to get a stipulation

3    from defense counsel and was unable to.

4            THE COURT:  Well, this is by way of a suggestion

5    towards a shorter distance between two points.  If this

6    witness can look through the payroll record and confirm that

7    it is, in fact, Cost's record and it is authentic, why is it

8    necessary that he do anything more than do that?  You then

9    have the record.  You can total up the total number of

10   individuals and their job descriptions at a break or at your

11   convenience.  I just don't think it's a good use of the

12   jury's time.

13           MR. MATESIC:  I'd be happy to have him

14   authenticate the record.

15           THE COURT:  Why don't we just have him do that.

16           MR. MATESIC:  Fine.

17               Your Honor, I need to make clear for the

18   record, Exhibit 14 actually consists of three separate

19   payroll records; one for week ending August 5th, one for

20   week ending August 12th, and a third for week ending

21   October 28th.  Mr. Taylor is now examining the first of

22   those three payroll records.

23           THE COURT:  All right.

24   BY MR. MATESIC:

25       Q.   Are you through taking a look at that?

1          A.    I'm done with this.

2          Q.    Okay.  Is that Cost's certified payroll record?

3          A.    This is our certified payroll, yes.

4          Q.    And you recognize the names -- do you recognize

5     the names on this payroll record?

6          A.    Honestly, you're asking me do I recognize these

7     names --

8          Q.    Can you find your name in there?  It's in

9     alphabetical order.

10          THE COURT:  Well, he's authenticated the document.

11     It's of no moment whether he can recollect the specific

12     names.

13          A.    Yeah, my name is in here.

14          Q.    Okay.  And it also indicates the job title of the

15     employee?

16          A.    Yes.

17          Q.    Mr. Taylor, you would agree with me that among the

18     people -- well, let me ask it a different way.  A number of

19     people showed up at that job site during the summer of 2002

20     seeking work from Cost Company.

21          A.    That's correct.

22          Q.    Okay.  And that number, you estimated, was around

23     a hundred.

24          A.    It could have been a hundred people.

25          Q.    You previously filed an affidavit in this case,

```
 1   where you estimated the number of people who showed up and

 2   asked for work?

 3        A.   I'm sorry?

 4        Q.   Did you file an affidavit in this case concerning,

 5   among other items, the number of people who showed up at the

 6   Cost site seeking work?

 7        A.   Yes.

 8        Q.   And do you remember the number that you gave in

 9   that affidavit?

10        A.   No, I don't.

11        Q.   If I showed it to you, would that refresh your

12   recollection?

13             (Discussion held off the record.)

14        Q.   Do you see the part that I highlighted there?

15        A.   Yeah, I see it.

16        Q.   Okay.  Your estimate was that there were a hundred

17   people that applied for work that summer?

18        A.   It could have been a hundred people, yes.

19        Q.   All right.  You specifically remembered that

20   Kathleen Brown was among those people.

21        A.   Yes.

22        Q.   And you recalled that several months after

23   Kathleen Brown showed up at that site?

24        A.   Repeat that, please.

25        Q.   You had a discussion with Georgia Pawk, the
```

1    president of Cost Company -- in 2002, you had a discussion

2    with Georgia Pawk about Kathleen Brown, correct?

3        A.    Correct.

4        Q.    And that discussion concerned Kathleen Brown's

5    request for employment by Cost.

6        A.    Correct.

7        Q.    That discussion concerned Kathleen Brown actually

8    coming onto the Cost job site at Marienville and speaking

9    with you about possibly being employed?

10       A.    Correct.

11       Q.    That conversation that you had with Georgia Pawk,

12   that was sometime after Kathleen Brown showed up at the job

13   site?

14       A.    Correct.

15       Q.    All right.  And you specifically remembered

16   Kathleen Brown, as opposed to any of the other 99 persons

17   who showed up for work at that job site?

18       A.    Well, I -- I remember a lot of people who showed

19   up on the job site.

20       Q.    Okay.  If you remember a lot of people that showed

21   up at the job site, it's fair to say that it was highly

22   unusual for a female to show up at that job site.

23       A.    I'm not sure of that.  There was a lot of people

24   up there looking for a job.

25       Q.    Could you estimate for me how many of the people

1    that showed up looking for a job were female.

2        A.   No, I couldn't.  Because once I left the trailer

3    and was on the site -- and you saw the picture of the job

4    site.  Once I left the trailer in the morning, you very

5    seldom see me go back up to the trailer.  People weren't

6    able just to walk onto the job site anytime they wanted to

7    walk up on the job site.  They had to stay up on the

8    trailers.  So during the course of the day, I might have

9    been up on -- on -- in the job trailer for a half of an hour

10   during an eight-hour day.

11       Q.   All right.  If I understand your testimony, then,

12   you're saying that because you were only at the trailer for

13   a half an hour a day, you don't have a clear recollection of

14   what you did when you were at the trailer?

15       A.   What I did when I go to the trailer?

16       Q.   Where would people who were applying for work go

17   if they wanted to get a job with Cost?  Where on that job

18   site?

19       A.   Well, they would go to the trailers.

20       Q.   All right.  And they would wait for you to show

21   up.

22       A.   Sometimes they would wait for me to show up, yes.

23   Sometimes they would leave a note.

24       Q.   Okay.  But they weren't authorized to go all

25   throughout the job site looking for you.

1      A.    No.

2      Q.    All right.  So they waited there for you to show

3  up, and on one occasion in the summer, you remember that

4  Kathleen Brown was one of those people.

5      A.    Correct.

6      Q.    All right.  How many other people do you remember?

7      A.    Actually, I could remember a few of the guys.

8  Okay?

9      Q.    Well, give me some names.

10     A.    Well, I remember Ted Gregory, I remember -- there

11 was a Smith I remember.  Why I remember these guys is they

12 were all good guys.  Okay?  Good scaffold builders.  You

13 know, so they stay in my head.

14     Q.    How many women can you remember?

15     A.    I'm sorry?

16     Q.    How many women can you remember applying for work?

17     A.    One.

18     Q.    Who was that?

19     A.    Kathleen Brown.

20     Q.    You don't remember any other women applying for

21 work?

22     A.    No.

23     Q.    The union, the Laborers International Union of

24 North America, you're familiar with that union?

25     A.    Not really.  That was the first time I ever dealt

1     with them.

2          Q.   Okay.  But you know who Ron Barrett is?

3          A.   Oh, yeah.

4          Q.   He's the local business agent for Local 952?

5          A.   Yes.

6          Q.   Did he ever send you any women to employ at that

7     job?

8          A.   No.

9          Q.   Okay.  You clearly remember that Ron Barrett was

10    sending you employees, sir?

11         A.   He was sending me people?

12         Q.   Yes, he was.

13         A.   Yeah.

14         Q.   Okay.  You clearly remember that.

15         A.   Yeah.

16         Q.   Let me go back to my earlier question.  How many

17    women -- if you clearly remember that Ron Barrett didn't

18    send you any women, then tell me, of the people that you

19    hired off the street, or the people who applied off the

20    street, how many of those people were women?

21              MR. PAWK:  Object, Your Honor.  That's not what

22    his testimony was.  He didn't say he doesn't remember Ron

23    Barrett ever sending him any women.  That's a

24    mischaracterization of his testimony.

25              MR. MATESIC:  I don't believe that's correct.

1    THE COURT:  Well, to clear it up, it's what he

2    says and not what anybody else thinks.  Go ahead.  Ask the

3    question again.

4    BY MR. MATESIC:

5    Q.    You clearly remember that Ron Barrett never sent

6    you any women?

7    A.    Yes.

8    Q.    That all the employees that Ron Barrett sent you

9    were men.

10   A.    Yes.

11   Q.    Okay.  Let me go back to my question.  Let's put

12   aside all the people that Ron Barrett sent you.  I want to

13   talk about the people who came in off the street seeking

14   work from you.  Tell me how many were women.

15   A.    One.

16   Q.    And all the rest were men?

17   A.    Well, again, I can't answer you that.  There were

18   people that was on that job site that could have left a

19   note, could have been up there while I was down on site.

20   Q.    Just tell me about the people that you know of who

21   applied.

22   A.    One.

23   Q.    Okay.  And all the rest of the people that you

24   know of who applied were men.

25   A.    Correct.

1          Q.    Okay.  And Cost does not use employment

2    applications.

3          A.    I'm sorry?

4          Q.    Cost does not use employment applications.

5          A.    I'm not sure of that.

6          Q.    Mr. Taylor, you have previously testified in this

7    case that if a person simply left you with a phone number

8    and a name, that that would constitute an application for

9    work.

10              MR. PAWK:  Object, Your Honor.  I believe the

11    proper way to ask this question is -- if he's previously

12    testified, is to show him what his testimony was.

13              THE COURT:  Well, you can ask him either way.  If

14    he remembers his previous testimony -- if he doesn't, then

15    you can show him the transcript.  Go ahead.

16              MR. MATESIC:  And I'm asking questions as if on

17    cross.

18              THE COURT:  Correct.

19    BY MR. MATESIC:

20          Q.    You previously testified in this case?

21          A.    Yes.

22          Q.    And I previously asked you a question; did Cost

23    use employment applications?

24          A.    I don't remember.

25          Q.    You told me during that deposition that a slip of

1    paper with somebody's name written on it and a phone number

2    was sufficient as an application for employment.

3         A.    I don't remember if I said that or not.  I'm

4    sorry.

5         Q.    Would it be sufficient as an application?

6         A.    I wouldn't call it an application.  I would call

7    it a way to get in touch with somebody if you needed

8    somebody.

9         Q.    All right.  Let me go back to the earlier

10   question.  What other records do you have of people applying

11   for work, besides a slip of paper with a name and a phone

12   number?

13        A.    That's usually all I ask of them.

14        Q.    All right.  So the best evidence that we have of

15   the applicants for that job is your memory of who came onto

16   that job site looking for work.

17        A.    Right.

18        Q.    And in your -- in your mind, it was only one

19   female who showed up at that job site looking for work in

20   the summer of 2002.

21        A.    Correct.

22        Q.    And all the rest were men.

23        A.    Correct.

24        Q.    I apologize for the sloppy handwriting.  127

25   employees you estimated at that job site in the summer of

1  2002.

2       A.    I don't know how many employees I had on that job

3  site.

4       Q.    We'll find out.  How many of these people were

5  female?

6            MR. PAWK:  Objection, Your Honor.

7            THE COURT:  Can I see you at side-bar.

8            (Whereupon the following discussion was held on

9             the record at side-bar:)

10           MR. LUTZ:  Your Honor, he's about to do what he

11  was specifically instructed not to do.  He has to lay a

12  foundation.  He's not even close to laying a foundation.

13  This person doesn't know how many applicants.  We're not

14  even into how many people were sent from the Union, we're

15  not into how many unions and what the various applicant

16  pools were.  We're not into the -- we can go all over the

17  place.  We're getting into all this statistical evidence.

18  He's right now about to say --

19           THE COURT:  Let me ask this question to you:  So

20  you ask him -- and presumably he'll even say I don't know,

21  or let's say he says he doesn't think that there were any.

22  Okay?

23           MR. MATESIC:  Um-hum.

24           THE COURT:  Then --

25           MR. MATESIC:  Actually, if I can just interrupt.

 1    I think he's already said there were no other women besides

 2    Kathleen Brown who showed up as walk-ons.  That's what his

 3    testimony is.

 4            MR. LUTZ:  That he knew of.

 5            MR. MATESIC:  It doesn't matter.  He's clear in

 6    his mind that no other female showed up.  This actually

 7    helps the Defendant, because it establishes that of an

 8    available pool of labor, there weren't a sufficient number

 9    of females.

10            THE COURT:  That's precisely why you haven't

11    succeeded in laying the necessary foundation for which the

12    jury can draw a reasonable inference that the absence of

13    women at the job site was indicative of discriminatory

14    intent.  Sustained.

15            MR. MATESIC:  I'm not clear as to the ruling.

16    First of all, it is still open for me to lay a foundation?

17            THE COURT:  Yes.

18            MR. MATESIC:  Okay.  So specifically if I ask him,

19    this was a union job, you were instructed to hire anybody

20    that the union sent over, and you did that, he's going to

21    answer yes.  Then I say, all right.  And after the union

22    exhausted its referrals, then you are free to hire off the

23    street?  Yes.  And you remember that you did hire off the

24    street.  And you did it in the summer of 2002.  And out of

25    all of those people who came off the street looking for a

1    job, there were about 100 of them, and not one of them was a

2    female.

3            THE COURT:  Right.

4            MR. MATESIC:  That's my foundation.

5            THE COURT:  Here's the thing:  Here's the point:

6    In terms of whether -- if he knows -- you have already

7    established through him, because he was the primary hiring

8    conduit -- that no women applied for the job during the

9    summer, so implicitly the jury already knows or can conclude

10   that there weren't any women on the job site if nobody was

11   applying, there weren't any women on the job site.  All I'm

12   saying is that based upon the foundation that has been

13   established so far, I'm not going to let you argue to the

14   jury that the absence of women at the job site is

15   circumstantial evidence of discrimination.  That's all I'm

16   saying.

17           MR. MATESIC:  As we stand now with the evidence

18   that is --

19           THE COURT:  Right.  But you -- and, furthermore,

20   it seems to me, given the testimony he's elicited, there's

21   no harm or foul in asking were there other women on the job

22   site.  That's either a yes or no.

23           MR. MATESIC:  You mean for Cost.

24           THE COURT:  Yes.  But for purposes of argument to

25   the jury, absent further foundation, it's irrelevant.

1          MR. MATESIC:  Just so I understand the Court's

2     ruling, the further foundation that I have to lay is that,

3     in fact, that the union was --

4          THE COURT:  Look it.  With all respect --

5          MR. MATESIC:  Because we're going to be up here

6     again.  That's why I asked the question.

7          THE COURT:  Well, we may be.  But it's up to you

8     folks to try your cases.  I tried to sketch it out.  This

9     jury has been in this box a long time.  Let's go.

10          (End of discussion at side-bar.)

11          THE COURT:  All right, you can fire away.

12     BY MR. MATESIC:

13     Q.    All right.  Mr. Taylor, the SCI Marienville job

14     was subject to a project labor agreement between Cost and

15     the general contractor on that job.

16     A.    There was no general contractor on the job.

17     Q.    Well, Cost was a prime contractor on that job.

18     A.    Correct.

19     Q.    And one of the provisions in that contract was

20     that Cost had to hire any laborer that was referred to Cost

21     by Local 952.

22     A.    Correct.

23     Q.    And Cost complied with that provision in the

24     contract.

25     A.    Correct.

1     Q.    And all of the people that the Union sent over to

2   Cost pursuant to that contractual clause were men.

3     A.    Correct.

4     Q.    And the only other people besides those Union

5   referrals that were hired by Cost were -- in the summer of

6   2002 were the people that you hired off the street.

7     A.    Correct.

8     Q.    And you do -- and you have already testified that

9   of that number, that second group of employees, that second

10   group of people who were seeking employment with Cost, only

11   one of them was a female.

12     A.    Correct.

13     Q.    And, therefore, if we look at this number, 127,

14   your estimate of the total employees, we know that of this

15   127 employees, all of them were men.

16     A.    Correct.

17     Q.    Let's talk a little bit about mason tender work.

18   A mason tender is one job that a laborer can perform.

19     A.    (No response.)

20     Q.    That's a question.  I'm sorry.

21     A.    No.  Actually, the mason tenders are mason

22   tenders.

23     Q.    Who was supplying Cost with mason tenders in the

24   summer of 2002?  Which union?

25     A.    There was three different Locals.

1     Q.   Okay.  Was Local 952, the laborers union,

2  supplying laborers to Cost that summer?

3     A.   Correct.

4     Q.   Let's talk about mason-tending work.  In general,

5  the mason tender's job is to assist the bricklayers.

6     A.   Well, they don't assist the bricklayers.

7     Q.   Well, who mixes the bricklayer's mortar?

8     A.   The -- the mason tender.

9     Q.   Okay.  You wouldn't consider that assisting the

10  bricklayer?

11     A.   No, I don't call that assisting the bricklayer.

12     Q.   Okay.  Who carries the bricks or the blocks over

13  to the bricklayer?

14     A.   Mason tender.

15     Q.   All right.  The mason tender doesn't actually

16  perform the work of bricklaying.

17     A.   Correct.

18     Q.   That's your point.

19     A.   Correct.

20     Q.   All right.  But let's put aside the issue of

21  laying the bricks, putting them in place, and applying

22  mortar.  All of the preparation that has to be done before

23  that in terms of mixing mortar, taking the mortar to the

24  bricklayer, carrying the blocks, carrying the bricks, all of

25  that is done by a mason tender.

1    A.    That's right.

2    Q.    And mason tenders do other work as well.  They

3  build scaffolding.

4    A.    Correct.

5    Q.    They push plank.

6    A.    Correct.

7    Q.    They shovel mortar onto boards.

8    A.    Correct.

9    Q.    Okay.  And they do this out in the open, out in

10  the hot summer sun.

11    A.    Correct.

12    Q.    It's a really tough job, isn't it?

13    A.    It all depends.

14    Q.    A mason tender can be called upon to lift weights

15  between 40 and 150 pounds.

16    A.    That's right.

17    Q.    And oftentimes those weights are so -- or, excuse

18  me, I'll ask it this way:  Oftentimes the reason why those

19  weights are so large and those loads are so large is because

20  the mason tender is hoisting wet mortar.

21    A.    Repeat that.

22    Q.    The mortar is wet.  It's got water in it.

23    A.    Well, I don't think that's where you're getting

24  your weight from, though.

25    Q.    Where do you get the weight?

1        A.    From the unit itself.  From the block itself.

2        Q.    Okay.  And how heavy is each individual block?

3        A.    Again, it goes anywhere from 40 pounds to

4    90 pounds.

5        Q.    Okay.  Compare that to the weight of a brick.

6        A.    About eight pounds.

7        Q.    So if a guy is doing this job eight hours a day

8    under the hot sun, if he's not in shape, he's going to be

9    pretty beat at the end of the day.

10       A.    I couldn't answer, yeah.

11       Q.    You have never heard any of your mason-tender

12   employees complain to you about how hard the work is?

13       A.    Well, you're always gonna hear something like

14   that.

15       Q.    Okay.  You do hear it commonly, don't you?

16       A.    Well, you hear it.

17       Q.    Okay.  It's tough to work eight hours.  It's even

18   tougher to work 16 hours a day doing mason-tending work,

19   isn't it?

20       A.    We have never worked 16 hours a day.

21       Q.    Never?

22       A.    Never.

23       Q.    The skills that we were talking about or the tasks

24   that we were talking about, lifting the bricks, mixing the

25   mortar, pushing the planks, building the scaffolding,

1    there's no school that you go to, to learn these skills.

2        A.    It all depends on where you're working at.

3        Q.    You have hired people at Cost who had no prior

4    experience as a mason tender.

5        A.    I try not to, but sometimes, yeah.

6        Q.    Okay.  You have done that more than once?

7        A.    No.  I have not done it more than once.

8        Q.    Mr. Taylor, these tasks, these skills of mason

9    tending can be learned on the job.

10        A.    They could be learned on the job.

11        Q.    And they have been learned on the job at Cost.

12        A.    Some places.

13        Q.    Which places?

14        A.    Well, actually, I can only think of one; the

15    CSI -- SIC, I'm sorry [sic].

16        Q.    You're familiar with the equal employment policy

17    at Cost?

18        A.    Yes, I am.

19        Q.    In your own words, that policy prohibits

20    discrimination against women in terms of hiring.

21        A.    Correct.

22        Q.    Which means that when an applicant presents

23    herself for a job at Cost, you can't deny her a job based on

24    her gender.

25        A.    Correct.

1      Q.    Your understanding is that that policy only --
2  only is relevant to the issue of hiring.

3      A.    Correct.

4      Q.    It does not apply to firing.

5      A.    I'm not sure of that.

6            (Discussion held off the record.)

7            MR. MATESIC:  May I approach, Your Honor?

8            THE COURT:  Sure.

9      Q.    All right.  Mr. Taylor, I'm placing before you the
10 transcript of your deposition.  I want to ask you a few
11 questions, just as a preliminary matter.

12           You do you remember being deposed in this case?

13     A.    Um-hum.  Yes.

14     Q.    You remember that that deposition occurred in May
15 of 2004?

16     A.    Yes.

17     Q.    Okay.  And at that deposition, you were
18 accompanied by an attorney.

19     A.    Yes.

20     Q.    And that attorney is with you today.

21     A.    Yes.

22     Q.    And during that deposition, you answered questions
23 under oath.

24     A.    Yes.

25     Q.    And you understood the seriousness of that matter.

1      A.   Yes.

2      Q.   All right.  I'd like you to read your answer to my

3  question.  Do you see where I'm indicating on Page 41 of

4  your deposition?

5      A.   Yes.

6      Q.   I asked you -- this is the question:  "I asked you

7  to explain what you meant by discriminating, and you said

8  white, black, Indian, or minority; we'll hire anybody.  So

9  my follow-up question to you is am I to understand the EEO

10  policy, as you understand it, applies only to the issue of

11  hiring?"  What was your answer?

12      A.   "Yes."

13      Q.   You're familiar with the Minority Recruitment

14  Memorandum?

15      A.   I'm sorry.

16      Q.   Minority Recruitment Memorandum.  You're familiar

17  with that document?

18      A.   I don't believe so.  I probably have seen it, but

19  I'm not familiar with what it reads.

20      Q.   All right.  Give me one moment.

21           MR. MATESIC:  May I approach, Your Honor?

22           THE COURT:  Sure.  In fact, you don't even have to

23  ask permission.

24           MR. MATESIC:  Thank you.

25           MR. PAWK:  What exhibit is this?

1          MR. MATESIC:  This is 12.

2      Q.    All right, Mr. Taylor, I have placed before you

3  what has been previously labeled as Plaintiff's Exhibit 12.

4  Can you identify this document.

5      A.    Yeah.  Yes, I can.

6      Q.    Okay.  What are we looking at here?

7      A.    This is what is set out probably once a month in

8  everybody's paychecks, and it's usually stapled to the

9  employer's paycheck [sic].

10     Q.    All right.  This is a document that Cost provides

11 to its employees seeking referrals of women and minorities

12 to Cost Company for the purposes of hiring.

13     A.    Correct.

14     Q.    All right.  And you see at the bottom of this

15 memorandum a name.  You see Kathleen Brown's name.

16     A.    Yes.

17     Q.    And you see that she has also provided an address

18 on this form.

19     A.    Yes.

20     Q.    And you see right next to the line, right next to

21 the item, "position requested or interested in", please read

22 what you see there?

23     A.    "Operator/laborer".

24     Q.    Okay.  You saw this document on the day that

25 Kathleen Brown showed up at the Cost job site looking for

1  work?

2      A.   I don't remember.

3      Q.   Do you remember me asking you about this when you

4  were deposed?

5      A.   No, I don't.

6      Q.   All right.  Now, I'm turning to Page 66 of your

7  deposition, Mr. Taylor.  I'd like you to follow along.  I'll

8  read the question, you read the answer.

9         Before we get there.  I'm going to start on Page

10 65.  On Page 65, at Line 11.  "I hand you this exhibit,

11 which for the purposes of the deposition was marked as

12 Exhibit No. 1."

13        Now, you would agree with me that this document

14 runs for more than 20 pages.  Do you want to count through

15 that and see how many pages there are?

16     A.   (Witness complies.)  Okay.

17     Q.   Okay.  It's more than 20 pages?

18     A.   Yeah.

19     Q.   All right.  Now, at the time that I gave you that

20 document to look through -- and by the way, this document is

21 Cost Company's response to Miss Brown's equal employment

22 complaint.  Correct?

23     A.   Correct.

24     Q.   Okay.  Miss Brown filed a charge of discrimination

25 with the Equal Employment Opportunity Commission.

```
 1        A.   Correct.

 2        Q.   And this is the response that Cost filed.

 3        A.   Correct.

 4        Q.   All right.  And this response includes answers to

 5   Ms. Brown's Complaint.

 6        A.   Okay.

 7        Q.   Okay?  And it also includes the Minority

 8   Recruitment Memorandum that we were just talking about.

 9        A.   Okay.

10        Q.   All right?  It also includes an affidavit by the

11   president of Cost, Georgia Pawk.

12        A.   Okay.

13        Q.   It also includes a form letter to contractors

14   which reads as follows:  "Gentlemen:  This is to officially

15   notify you that Cost Company has been awarded a contract at

16   various jobs that will be starting in the near future.  This

17   contract is subject to Executive Order 11246, and the

18   Implementing Affirmative Action Regulations as Established

19   for Federally Assisted Construction Contracts.  As a result,

20   we are requesting your assistance in this matter in the

21   referral of minority and female candidates in accordance

22   with the following Equal Opportunity Employment policy."

23             I read that correctly, did I not?

24        A.   You read that correctly.

25        Q.   All right.  And continue for just another moment
```

1    here.  "Cost Company's EEO policy is intended to provide

2    employment and training without regard to race, color,

3    religion, gender, sexual orientation, union membership,

4    national origin, ancestry, so on."  Have I read that

5    correctly?

6         A.   Yes.

7         Q.   This packet also contained a document called a

8    Nondiscrimination Clause Agreement.

9         A.   Yes.

10        Q.   All right.  This packet also included a document

11   called the Policy Statement of Cost Company.

12        A.   Correct.

13        Q.   This packet also included a document called the

14   Affirmative Action Plan.

15        A.   Correct.

16        Q.   Okay.  And in that affirmative action plan, it is

17   stated, "This Nondiscrimination policy includes, but shall

18   not be limited to, employment, upgrading, demotion,

19   transfer, recruitment, recruitment advertising, layoff, or

20   termination and rates of pay or other forms of

21   compensation."

22             Have I read that correctly?

23        A.   Correct.

24             MR. PAWK:  Your Honor, I'm going to lodge an

25   objection to the line of questioning with respect to this

1    document.  He has shown this witness an EEO -- a response to

2    an EEO Complaint filed by me and attached documents to it.

3    I don't know what the relevance of it is at this time.

4          MR. MATESIC:  The relevance is that Mr. Taylor's

5    prior testimony today was that he couldn't remember whether

6    or not Miss Brown had the Minority Recruitment Memo with her

7    when she applied for work.  I previously gave Mr. Taylor the

8    opportunity to fully review this entire document with

9    counsel and to point out any document that he recognized.

10   The testimony that I'm going to show, Mr. Taylor will show

11   that he recognized the Minority Recruitment Memo and

12   specifically recalled that Miss Brown had it with her --

13         THE COURT:  All right.  Overruled.  Go ahead.

14   BY MR. MATESIC:

15      Q.   Before we get there, you would agree with me,

16   Mr. Taylor, that this statement of the Affirmative Action

17   Policy at Cost Company is different from your notion of the

18   Affirmative -- excuse me.  This statement of the Equal

19   Employment Policy at Cost Company is different from your

20   understanding of the Equal Employment policy?

21      A.   I don't understand the question.

22      Q.   Well, you testified that you believed the Equal

23   Employment policy only applied in the context of hiring.

24      A.   (No response.)

25         THE COURT:  Do you understand the question?

1          THE WITNESS:  No, I don't.

2          THE COURT:  Can you sharpen that.

3      Q.   I previously asked you, did you not testify that

4  the Equal Employment policy, as you understood it, applied

5  only in the context of hiring.  And your answer to me was?

6      A.   Yes.

7      Q.   And the policy on this paper is different.  It's

8  not in accordance with what you said.

9      A.   (No response.)

10      Q.   This statement on this document indicates that the

11  Equal Employment policy applies in many other contexts;

12  firing, rates of pay, other forms of compensation, transfer,

13  recruitment, upgrading, demotion.

14          THE COURT:  Do you understand?

15      Q.   Correct?

16      A.   Correct.

17      Q.   All right.  Mr. Taylor, when I gave you this

18  packet of information, I asked you to go through the entire

19  packet of information and tell me when you saw something

20  that you recognized.

21      A.   Correct.

22      Q.   All right?  And do you remember what document you

23  identified; what document you said that you recognized?

24      A.   No, I don't.

25      Q.   All right.  Would it help you if I showed you your

1    deposition transcript?

2        A.    Yeah.

3        Q.    Okay.  Let's go back to Page 65 of your

4    deposition.  All right?  Mr. Taylor, I'll read the question,

5    you read the answer.

6            "Mr. Taylor, I'm putting before you what has been

7    labeled as Exhibit No. 1.  Now, I actually am not going to

8    ask you questions about everything that's in this packet,

9    but I would like you to page through it, and let me know

10   whether you have seen any of the documents in this packet

11   before.  Take as much time as you need."

12           Have I read that correctly?

13       A.    Yes.

14       Q.    All right.  And then in parentheses, you see the

15   court reporter has written, "Witness reviews the document."

16       A.    Yes.

17       Q.    That's correct?  You reviewed this document?

18       A.    Yes.

19       Q.    All right.  "Question:  Have you finished paging

20   through that?"  Your answer?

21       A.    "Yes."

22       Q.    "Question:  First of all, did you see anything --"

23           THE COURT:  Too fast.  She's got to get this down.

24           MR. MATESIC:  I apologize, Your Honor.

25           THE COURT:  Read it again.

1    Q.    "Question:  Have you finished paging through
2    that?"
3    A.    "Yes."
4    Q.    Pardon.  Your answer was?
5    A.    "Yes."
6    Q.    Next question, "First of all, did you see anything
7    in this packet that you recognized?"
8    A.    "Yes."
9    Q.    That was your answer.
10   A.    Yes.
11   Q.    My next question.  "Starting from the beginning
12   and then paging through towards the back, tell me the first
13   document that you come across that you recognize."  Your
14   answer?
15   A.    "Memorandum --"
16         THE COURT:  Speak into the microphone, if you can.
17   A.    Answer was, "Exhibit A-1."
18   Q.    And I'm showing you right now Exhibit A-1.
19   A.    Yes.
20   Q.    And Exhibit A-1 is the Minority Recruitment
21   Memorandum.
22   A.    Yes.
23   Q.    All right.  My question to you, "And this would be
24   a memorandum with a date of July 18th, 2002?"  And your
25   answer?

1     A.    "Yes."

2     Q.    "Question:  When do you first remember seeing

3  that?"  Your answer?

4     A.    "The day she was at the trailer.  And I don't know

5  what day that it was."

6     Q.    Okay.  The "she" in your answer was Kathleen

7  Brown.

8     A.    Correct.

9     Q.    Your testimony in May of 2004 was that on the day

10 that Kathleen Brown showed up at the trailer, she had this

11 memorandum with her.

12    A.    Correct.

13    Q.    Besides the obvious difference between men and

14 women, there's a specific difference between men and women

15 when it comes to construction.

16    A.    I'm not sure of that.

17    Q.    With the specific job of mason tender, women are

18 less suited than men are for performing that job.

19    A.    I couldn't tell you that, because I never had a

20 woman work for me before.

21    Q.    In your mind, Mr. Taylor, you believe that women

22 are not as capable as men are of performing the job of mason

23 tender.

24    A.    I can't answer that, because I never had a woman

25 mason tender in 25 years.

1      Q.   Do you have an opinion, regardless of whether

2   you've had a woman mason tender or not, do you have an

3   opinion as to how much weight on average a woman can carry?

4      A.   I'm not sure.

5      Q.   The job requires the mason tender to lift loads of

6   between 40 and 150 pounds.

7      A.   That's right.

8      Q.   And they have to lift these loads all day long;

9   eight hours a day.

10     A.   That's right.

11     Q.   And they do it in the hot sun.  There's no

12   shelter, it's hot and humid, and they've got to keep

13   working, every day, eight hours, lifting, carrying, helping

14   the bricklayers.

15     A.   You don't necessarily have to be outside.

16     Q.   Mr. Taylor, you don't think that women can lift as

17   much weight as men can?

18     A.   I have never had a woman mason tender work for me,

19   so I can't answer your question.

20     Q.   In fact, when you were deposed in May of 2004, I

21   asked you questions about your understanding or your opinion

22   concerning women as mason tenders.  Do you remember my

23   questions to you?

24     A.   I think I remember that question.

25     Q.   All right.  And at the time you said that on a

1    prison job in particular, because blocks were used, it would

2    be a problem for a woman, given that she can't lift as much

3    as a man can on average.

4        A.    I have never had a woman mason tender work for me.

5        Q.    That's not my question -- sir, that does not

6    answer my question.  When I asked you a question during your

7    deposition, I asked you whether women were as capable as men

8    were of lifting loads, lifting heavy objects.  What was your

9    answer?

10       A.    I probably said they are probably not as capable.

11       Q.    Okay.  And you also said that it usually wasn't a

12   problem that they weren't as capable.  The fact that they,

13   on average, could not lift as much as a man didn't usually

14   present a problem.

15       A.    I don't remember that.

16       Q.    Let's take a look at your deposition transcript.

17             (Discussion held off the record.)

18       Q.    All right.  We're at Page 77 of your deposition,

19   Mr. Taylor.  Once again, I'll read the question; you read

20   the answer.

21             "Question:  Which job requires a greater

22   weightlifting capacity?  Bricklayer or mason tender?"

23       A.    I'm sorry?

24       Q.    "Question:  Which job requires a greater

25   weight-lifting capacity?  Bricklayer or mason tender, or are

1    they about the same?"

2         A.    "I would say the laborer."

3         Q.    That's your answer?

4         A.    That's my question.

5         Q.    My next question, "The mason tender."  Your

6    answer?

7         A.    "The mason tender."

8         Q.    "Question:  Do you have a sense as to whether, on

9    average, a woman --"  Let me slow down.  "Question:  Do you

10   have a sense as to whether on average a woman is as well

11   suited to perform a mason tender's job in terms of the

12   weightlifting capacity as a man?"  Your answer?

13        A.    "They could."

14        Q.    "Question:  As a general matter, they are as

15   capable as a man in performing the weightlifting duties of a

16   mason tender?"  Your answer?

17        A.    "No, they are not as capable."

18        Q.    The court reporter correctly took down your

19   answer?

20        A.    Yeah.  Yes.

21        Q.    My next question, "And why do you say that?"  And

22   your answer?

23        A.    "Well, just because of the weight of the

24   material."

25        Q.    Go on.

1     A.   "But if you're on a brick job, then it's not a

2  problem."

3     Q.   My question, "And why isn't it a problem if you're

4  on a brick job?"

5     A.   "They are not as heavy."

6     Q.   "Question:  The mason tender's work on the brick

7  job is not as heavy."

8     A.   "It's not as heavy as when you're building a

9  prison."

10     Q.   "What is heavier about building a prison?"

11     A.   "It's all block."

12     Q.   "All block as opposed to brick."

13     A.   "Correct."

14     Q.   "So each individual unit of construction weighs

15  more."

16     A.   "Correct."

17     Q.   Let's go back to the Equal Employment policy at

18  Cost Company.  You understand that if you witness

19  discrimination on the job, you have a duty as a foreman to

20  report that.

21     A.   Correct.

22     Q.   And the person you're supposed to report that to

23  is this person right here (indicating), Georgia Pawk.

24     A.   Correct.

25     Q.   Mr. Taylor, you have never reported any incident

```
 1    of discrimination on the job to Miss Pawk.
 2         A.   No, I did not.
 3         Q.   I'm correct, you have never made such a report to
 4    her?
 5         A.   No.
 6         Q.   Am I correct?
 7         A.   Yeah, you're correct.
 8         Q.   Thank you.  You can't remember Miss Pawk ever
 9    coming to you in the summer of 2002 to talk to you about
10    this number (indicating)?
11         A.   No.
12         Q.   You can't recall Miss Pawk ever coming to you and
13    saying, Dean, tell me how many females you have working on
14    that job?
15         A.   No.
16         Q.   In fact, it's fair to say, Mr. Taylor, that you
17    can't remember any instance in which any other employee
18    communicated to you that Miss Pawk was concerned about the
19    numbers of females that Cost was hiring.
20         A.   Repeat that.
21         Q.   You're not the only person who hires personnel at
22    Cost.
23         A.   Right.
24         Q.   Okay.  How many foremen are there right now?
25         A.   I couldn't tell you that.
```

1      Q.    Well, estimate for me.

2      A.    I couldn't even estimate for you.

3      Q.    Cost is a really big company.

4      A.    I don't have no idea how many foremen he has.

5      Q.    Pick a year when you could estimate for me.

6            MR. PAWK:  Objection, Your Honor.  He says he

7  can't.

8            MR. MATESIC:  I'm not -- I'm asking for in a year.

9            THE COURT:  Well, go ahead.  He can answer that.

10 If you know.

11     Q.    How about 2002?  How many foremen did they have in

12 2002?

13     A.    30.

14     Q.    Okay.  So 30 people had the power to hire.

15     A.    Right.

16     Q.    Okay.  And you never heard any of those people --

17 any of those 30 people never said to you, you know, Georgia

18 is concerned about the numbers of women that Cost is hiring.

19     A.    Correct.

20     Q.    You never heard words to that effect.

21     A.    Correct.

22     Q.    Georgia Pawk once a year convenes a safety meeting

23 that is mandatory for all the foremen.

24     A.    Yes.

25     Q.    And during that safety meeting, the issue of equal

1    employment is supposed to be discussed.

2        A.    Yes.

3        Q.    And in those meetings -- those meetings are held

4    on an annual basis, are they not?

5        A.    Yes.

6        Q.    Okay.  Georgia Pawk never said to the foremen

7    during those meetings, we're not hiring enough women?

8        A.    I don't recall.

9            MR. MATESIC:  Nothing further.

10           THE COURT:  All right.

11

12                        CROSS-EXAMINATION

13   BY MR. PAWK:

14

15       Q.    Mr. Taylor, do you talk to all the other foremen

16   Cost has on all their other projects on a regular basis?

17       A.    I never talk to any of them.

18       Q.    Okay.  So if you didn't hear anybody say that they

19   were concerned about Georgia Pawk saying that there weren't

20   enough women, you don't talk to them?

21       A.    I never talk to any of the foremen on the job.

22       Q.    And why not?

23       A.    Because you are only concerned about your job.

24       Q.    You've got a job to do.

25       A.    I got a job to do.

1       Q.    And what is that?

2       A.    Run whatever job I'm running.

3       Q.    So if another foreman mentioned that to Georgia

4   Pawk, would you be privy to that conversation?

5       A.    No.

6       Q.    I'm going to address a couple things that

7   Mr. Matesic showed you in your deposition.  Do you remember

8   your deposition at Mr. Matesic's office?

9       A.    Yes.

10      Q.    Do you remember that we were there a few hours?

11      A.    Yes.

12      Q.    That he asked you many questions?

13      A.    Yes.

14      Q.    Did he show you all the questions that he asked

15  you today that he asked you in the deposition?

16      A.    Not all of them.

17      Q.    Okay.  Let me show you Page 66.  And this is with

18  respect to the EEO form that he showed you.  Do you remember

19  that?

20      A.    Yes.

21      Q.    Okay.  And when he was asking you today, he

22  stopped on Page 66 with, I believe this line; Line 11.  You

23  were asked, "When do you first remember seeing that," and

24  your answer, "The day that she was at the trailer, and I

25  don't know what day that was."  Do you remember that?

1       A.    Yes.

2       Q.    All right.  Then the next question he asked you

3  was, "When you say that you remember seeing this, do you

4  remember seeing this in its exact form as photocopied here,

5  a typewritten memorandum with handwritten entries at the top

6  and at the bottom?"  And your answer?

7       A.    "I don't know."

8       Q.    And then the next question, "So you don't know

9  whether when you first saw this, there was any information

10  filled out at the bottom where the form requests an

11  individual's name, for example."  And your answer?

12      A.    "I recognize it, because it -- I recognize it

13  because it goes in their paychecks on a monthly basis."

14      Q.    The next question, "You're talking about the form

15  itself."  And your answer?

16      A.    "Correct."

17      Q.    And, question, "On a monthly basis, you get one of

18  these in your paycheck."  Answer?

19      A.    "Correct."

20      Q.    So when he was asking you that question, you told

21  him you didn't know whether, when you saw that form that

22  day, whether she had filled it out or not.

23      A.    Correct.

24      Q.    Let me show you another part of your deposition.

25  You were asked just today about your testimony with respect

1    to the weightlifting abilities of women versus men as mason

2    tenders.  Do you recall that?

3        A.    Yes, I do.

4        Q.    All right.  And he asked you questions on Page 77,

5    I believe.  But I want to show you Page 76.  And he asked

6    you on Line 14, "Do you have a sense in your experience as a

7    foreman working in construction that you can size somebody

8    up visually as to whether or not they are able to perform

9    the work of a mason tender?"  And your answer?

10       A.    "You can't do that."

11       Q.    "Question:  Why not?"

12       A.    "Because I have seen some of the smallest people

13   that will run rings around you."

14       Q.    And on that same -- the very next page, Page 77, I

15   want to go back to something he asked you, and you testified

16   earlier.  On Line 18, the first time he asked you the

17   question as it related to women, he said, "Do you have a

18   sense as to whether, on average, a woman is as well-suited

19   to perform a mason tender's job in terms of the

20   weightlifting capacity as a man," and your initial answer

21   was?

22       A.    "They could."

23       Q.    As you sit here today, I think you said, sir -- do

24   you recall know?

25       A.    No, I don't.  Because I --

1      Q.    And why not?

2      A.    I have never had in my 26 -- well, 25, 26 years, I

3   have never had a woman come up and ask me for a mason tender

4   job ever.

5      Q.    And, finally, with respect to your deposition, he

6   asked you about your understanding of Cost Company's equal

7   employment policy.  Remember he asked you today about

8   whether it just related to hiring.  Do you remember that?

9      A.    Yes.

10     Q.    He showed you part of your deposition.  I'd like

11  to show you Page 116 of your deposition, where you were

12  asked on Line 20, "Getting back to my question that I posed

13  to you earlier regarding the Cost EEO policy, do you know if

14  it's applicable to areas other than just hiring decisions?"

15  And your answer?

16     A.    "Employment and laying off or firing."

17     Q.    Next question, "What do you mean by that?"  And

18  your answer?

19     A.    "Well, you don't fire anybody because he's

20  black --"

21     Q.    Go slow.  Read it.

22     A.    Okay.  "Well, you don't fire anybody because he's

23  black or he's Hispanic or if he's a woman.  I don't --"

24     Q.    Excuse me.  Or it's a woman?

25     A.    "Or it's a woman.  I don't do that.  We don't do

1  that."

2      Q.    Next question.   "What about at the workplace?"

3      A.    "No.  Everybody gets treated the same."

4      Q.    "Question.  Is that your understanding of the

5  policy?"

6      A.    "Yes."

7           MR. PAWK:  Your Honor, it's my intent to, instead

8  of recalling Mr. Taylor in our case, I'd like to go through

9  a few questions with him as if it were in our case in chief,

10 if that's okay.

11          THE COURT:  It is.  But you've got about five

12 minutes before we break.

13          MR. PAWK:  All right.  I won't be finished, I

14 don't think.

15          THE COURT:  I understand.

16          MR. MATESIC:  Your Honor, if I may, could we

17 approach, please.

18          (Whereupon the following discussion was held on

19           the record at side-bar:)

20          MR. MATESIC:  I certainly appreciate his desire to

21 expedite this proceeding, but given that the Plaintiff is

22 still in her case in chief, presentation of her case in

23 chief and in recognition of striking while the iron is hot,

24 I think we should be able to cross-examination before

25 Mr. Pawk takes his cross-examination.  Because he brought

1    things in his case that I think are damaging to the

2    explanation he gave on direct.

3            THE COURT:  I apologize.  I'm not sure what you

4    want me to do.

5            MR. MATESIC:  Mr. Pawk is now going to move into

6    other areas for the purposes of his case in chief.

7            THE COURT:  Okay.

8            MR. MATESIC:  On behalf of the Plaintiff, I

9    suggest he may have inflicted damage on my work in grilling

10   Mr. Taylor, and I would like to address those points while

11   those issues are still fresh in the jury's mind --

12           THE COURT:  In other words, you want to recross

13   him before he moves on to his -- I don't have a problem with

14   that.

15           MR. PAWK:  Let me look at my notes and see if

16   there is anything that I can cover with him in the next five

17   minutes as it relates to his questioning from this morning.

18           MR. MATESIC:  I might be more than five minutes.

19   Is this a time for break?

20           THE COURT:  We have already wasted three of our

21   minutes.  Well, then what do you want to do?  You want to go

22   up and recross?

23           MR. MATESIC:  That's my thought.

24           THE COURT:  Then you start fresh on direct.

25           MR. PAWK:  I may have a few more questions of him

1    based on what he has asked him this morning.  I don't know.

2            MR. MATESIC:  So he's going to continue --

3            THE COURT:  And then I'm going to let you do your

4    recross.

5            (End of discussion at side-bar.)

6            THE COURT:  Members of the jury, we're going to

7    take a break until five to 1:00, and then we're going to

8    push ahead.

9            (Recess held from 11:57 a.m. till 1:07 p.m.)

10   BY MR. PAWK:

11       Q.   Mr. Taylor, I have before you what has been

12   previously marked as Defendant's Exhibit BB, and it's a

13   photograph.  Can you see this photograph?

14       A.   Yes.

15       Q.   All right.  And it has a date on it of July 12,

16   2002.  Can you see that?

17       A.   Yes.

18       Q.   All right.  Can you tell me what the photograph --

19   what is depicted in the photograph?

20       A.   I'm sorry?

21       Q.   What is depicted in the photograph?

22       A.   All the buildings that we built there.

23       Q.   What is the picture of?

24       A.   It's the prison; SCI.

25       Q.   All right.  And does that accurately reflect what

1    the job looked like on July 12, 2002?

2         A.    Yes.

3         Q.    How many buildings was Cost a part of, in terms of

4    the construction?

5         A.    I want to say there was 18 buildings on that site.

6         Q.    I just want to direct your attention down here

7    (indicating).  Do you see where I'm pointing with my finger?

8         A.    Yeah.  That's all the job trailers.

9         Q.    Those are trailers?

10        A.    Um-hum.

11        Q.    Where was Cost's trailer?  Was it at this end or

12   at this end (indicating)?

13        A.    It's on the other end.

14        Q.    Down at this end (indicating).

15        A.    Yeah.

16        Q.    But these trailers -- and I'm trying to count

17   them.  Looks like there's about 14 or 15 of them.  Is that

18   accurate?

19        A.    Yeah.  Yes.

20        Q.    And do those trailers -- does each contractor on

21   that job have a trailer?

22        A.    Yes.

23        Q.    And there's been a lot of discussion about Kathy

24   Brown coming to your trailer, Cost's trailer on this

25   project, down here at this end where you said --

1     A.    Yeah, we was -- we was toward the far end.

2     Q.    Okay.  Down there where the trees are.

3     A.    Yes.

4           (Defense Exhibit CC marked for identification.)

5     Q.    All right.  Let me show you next what's been

6  marked as Defense Exhibit CC.  Can you tell me what that

7  picture is.

8     A.    That's SCI prison.

9     Q.    All right.  Can you tell -- it doesn't have a date

10  on it, I don't believe.  Do you see that?  Can you tell me

11  if you can give me an estimate timewise when this picture

12  was taken.

13    A.    That there had to be somewhere in September.

14  Because the trees are starting to turn some colors out

15  there, so --

16    Q.    You mean out here (indicating)?

17    A.    Yeah.

18    Q.    All right.  Anything else about the project, the

19  status of the project that would lead you to believe that?

20    A.    Yeah.  Toward the end, down by where that mountain

21  is down there -- looks like a mountain --

22    Q.    Back here (indicating)?

23    A.    Yeah.

24    Q.    Okay.

25    A.    Them are the last couple of buildings that we had

1    to complete on that job site at the time.

2         Q.   All right.  So --

3         A.   We had -- actually, we had two buildings that

4    needed completed at that time.

5         Q.   So are you saying that all --

6         A.   All them were complete.

7         Q.   Except for these buildings back here, the masonry

8    work was performed -- completely performed on all the other

9    buildings on the project by then?

10        A.   Yes.  By September?  Yeah.  Yes.

11        Q.   All right.  You testified earlier you have got

12   about 26 years experience in the construction industry?

13        A.   Yes, I do.

14        Q.   And is that all -- is your experience all masonry

15   experience?

16        A.   All masonry.

17        Q.   All right.  You have already testified that you

18   were the foreman on this project.

19        A.   Correct.

20        Q.   And how long have you worked as a foreman for Cost

21   Company?

22        A.   Since 1987.

23        Q.   All right.  And are you familiar, then, with what

24   the job duties of an operating engineer are with respect to

25   Cost jobs?

1      A.   Yes, I do [sic].

2      Q.   Are you familiar with the job duties of a mason

3  tender with respect to Cost jobs?

4      A.   Yes, I do [sic].

5      Q.   And are you familiar with the job duties of a

6  bricklayer with respect to Cost jobs?

7      A.   Yes, I do [sic].

8      Q.   And what are your current job duties as a Cost

9  foreman?

10     A.   Well, the first thing you do when you -- before

11 you start the job is you read specifications for the job;

12 how it's supposed to get built.  Second thing you do, you go

13 through all the drawings and see what materials need to get

14 ordered to build that building.  That particular job had a

15 1,500,000 block on it.  Okay?  So you have to make sure that

16 you're able to get the material when you need the material,

17 and then you have to put a plan together how you're going to

18 build the thing.

19          After that, it's just a matter of getting the

20 equipment that you need up there to do the job in the time

21 fashion that you have to do the job.  After that, you start

22 hiring people.  You start putting the buildings together.

23     Q.   All right.  Now, you said that you have got to get

24 the right materials and the right equipment to build the job

25 in the time frame you have to build the job.  Is that what

1   you said?

2       A.   That's correct.

3       Q.   Are you familiar with how long you had to build

4   this project?

5       A.   I had to be 90 percent complete in one year.

6       Q.   Okay.  There's been testimony that William Heaton

7   from Cost was on the project in November of 2001.

8       A.   Correct.

9       Q.   What was your understanding as to when Cost had to

10  be done with its masonry work?

11      A.   90 percent complete by November '02.

12      Q.   And did Cost meet that deadline?

13      A.   Yes, we did.

14      Q.   Just briefly, tell me what a mason tender would do

15  on this project.  What did they do?

16      A.   Well, this particular project, you had what they

17  called multi-width walls.  Which means when you start below

18  grade -- which I'm talking foundation.  Okay?  You had block

19  down there that were 20 inches wide.  One unit, 20 inches

20  wide.  And the reason for that was because once you come

21  above grade, you had 10-inch block, 12-inch block,

22  insulation, air gap, outside material.  So when you start

23  the building below grade, you have to carry a block below

24  grade, but you don't have to carry what you're bringing out

25  of the ground.

1          So instead of laying two units, like we used to 15

2    years ago, now we lay one.  So if you come out of the ground

3    with a 20-inch wall, which you have in the hole, which could

4    be 10 foot below the dirt, that's what you start out with.

5    16-inch block, 18-inch block, 20-inch block, whatever it

6    takes.

7          Q.    All right.  But the mason tenders on this project,

8    they were required to move those units?

9          A.    Oh, yeah.

10         Q.    Okay.  What else besides moving those units?

11         A.    Mixed the mortar, build scaffold, grout.  We did a

12   lot of grouting out there with a grout hose.  Pumping.

13   Level with that.  It was bricklayer's work, though.

14         Q.    What about the operating engineers on this

15   project?  What did operating engineers do?

16         A.    They ran the forklifts, and I had two cranes out

17   there.

18         Q.    All right.  Were they large cranes?

19         A.    I'm sorry?

20         Q.    Were they large cranes?

21         A.    I had an 80-tonner out there and a 65-tonner.

22         Q.    The forklifts, are those sometimes called Lulls?

23         A.    Lulls, SkyTraks, yes.

24         Q.    Is Lull a brand name of a forklift?

25         A.    Lull is a brand name, and SkyTrak is a brand name,

1    yes.

2        Q.    Okay.  On this project, with respect to the cranes

3    and the Lulls or forklifts, were operating engineers running

4    those pieces of equipment?

5        A.    Yes.  Yes.

6        Q.    When I say "operating engineers", were those

7    people that were referred to you from the Local 66 Operators

8    Union?

9        A.    Yeah.  Every one of them except one.  One guy was

10   Jimmy Brinkle, who works for us all the time, which he is an

11   Operator Local.  He came up from Pittsburgh with us, yes.

12       Q.    But he's out of the union?

13       A.    He's out of the hall, yes.

14       Q.    Did you have any laborers, laborers or mason

15   tenders, running Lulls on this project?

16       A.    No.  No.

17       Q.    Now, with respect to the mason tenders that we

18   were talking about earlier, other than this project -- just

19   take Marienville out of the equation -- how do you normally

20   get the mason tenders on your projects?

21       A.    Wherever you're working, you call the hall.  Like

22   right now, I'm in Cincinnati.  I'm working at University of

23   Cincinnati, I call the union hall up, and they send me

24   people.

25       Q.    All right.  And on this project, is that how you

1    did it normally?

2        A.    That's how I did it normally, yes.

3        Q.    All right.  Were there other occasions when they

4    weren't able to send you mason tenders, though?

5        A.    On that job, yes.

6        Q.    Yeah.  And was that a usual occurrence or was it a

7    rare occurrence?

8        A.    Rare occurrence.

9        Q.    All right.  And on the occasions when they weren't

10   able to find you a mason tender, did you hire anybody off of

11   the street?  We have been calling it "off the street".

12       A.    Yes.

13       Q.    All right.  Can you tell me how that happened.

14       A.    Well, there was a couple ways that happened.

15   Either, you know, one of the bricklayers knew somebody that

16   they worked with before, coming to the job trailer -- there

17   was two ways.  Word of mouth.  There was word of mouth when

18   people showed up on the job site.

19       Q.    Was it a usual occurrence, though, to have people

20   showing up at your trailer and other trailers on that job

21   site looking for work?

22       A.    Oh, yes.

23       Q.    Was that almost on a daily basis?

24       A.    Yes.

25       Q.    With respect to laborers or mason tenders, people

1    looking for that particular job, did you keep any records of

2    people that showed up on the site?

3        A.    No.

4        Q.    Are you aware of any requirement for keeping those

5    records?

6        A.    No.  There isn't.

7        Q.    Now, I'd like to direct your attention to Kathleen

8    Brown in this case.  Did you meet Kathleen Brown on the job

9    site?

10        A.    Yes.

11        Q.    Okay.  Tell the jury what you remember about

12    meeting Kathleen Brown -- about meeting Kathleen Brown on

13    that day.

14        A.    It was -- it was probably -- it was early in the

15    morning.  And I was already down on the site.  I had to come

16    up to the trailer for something that I can't remember.  She

17    was there.  And I just kept walking into the trailer.

18    She -- she came in.  She said she was looking for an

19    operator's position.  I said, I got five forklifts, two

20    cranes; I got people running all the equipment.  The meeting

21    lasted about a minute and a half.  I walked back out the

22    trailer.

23        Q.    Did she ever ask you for a laborer's position?

24        A.    No.

25        Q.    And do you remember the specific date that

1    occurred on?

2        A.    No, I do not.

3        Q.    Okay.  Did you ever see Kathleen Brown after that

4    date?

5        A.    No, I did not.

6        Q.    Did you not hire Kathleen Brown that day because

7    she was a woman?

8        A.    No.

9        Q.    Was the reason you didn't hire her is because

10   she -- she asked for an operator's position and you didn't

11   have any available?

12       A.    That's correct.

13       Q.    Did you ever have any communication with Georgia

14   Pawk about Kathleen Brown after she came on the site?

15       A.    Yes.

16       Q.    What do you remember?

17       A.    In this -- I think I remember she called me up and

18   asked me do I remember Kathleen Brown showing up on the job

19   site.  I said yes.

20       Q.    Okay.

21       A.    And shortly after -- or a couple weeks -- and I

22   can't remember a time frame that went by -- she called me

23   back and says, if Kathleen Brown shows back up, see if we

24   can't put her to work.

25       Q.    Okay.  Do you remember if the time frame when she

 1    called you the second time was towards the end of the

 2    project or when was it?

 3         A.   I -- I honestly don't know.

 4         Q.   All right.  But in any event, you said earlier,

 5    Kathleen Brown never showed back up on the site.

 6         A.   Not that I saw.

 7         Q.   That you saw, that's right.  What is the lay-off

 8    procedure on this project and any other project that you

 9    work on?

10         A.   There is no procedure.

11         Q.   What does that mean?

12         A.   That means you keep your best people.  When you

13    start getting down and the jobs are winding down -- and

14    there is no union rule that says just because you hired this

15    guy this date, and he's been there longer than this guy,

16    there is no -- there's no rules anymore.  Okay?  And I don't

17    even know if there ever was.  The only person you can't lay

18    off is the stewards.

19         Q.   That's the union steward?

20         A.   That's the steward.

21         Q.   All right.

22         A.   He's the first guy on the job and the last guy to

23    leave.  But I have gotten rid of stewards before because of

24    certain reasons, you know, that you can.

25         Q.   Okay.  But on this particular job, the Marienville

1    prison project, did you hire laborers and then either

2    through lack of work or maybe they quit, they left the job

3    within a few days?

4        A.    There was a lot of them that showed up and quit.

5        Q.    So I guess the question is, is there any guarantee

6    for long-term employment in this construction field?

7        A.    No.  No.  No, sir.

8              MR. PAWK:  Just one second, Your Honor.

9              (Discussion held off the record.)

10       Q.    Let me show you next --

11             (Discussion held off the record.)

12       Q.    Let me show you what I have previously marked as

13   Defendant's Exhibit AA.  And because of its size, I can't

14   put it on the overhead -- the document camera.  Okay?

15             Could you take a look at that and tell me if that

16   is a copy of Cost Company's weekly payroll certifications on

17   this project for weeks ending 7/22/02, 7/29/02, August 5,

18   '02, August 12, '02, August 19, '02, and August 26th, '02?

19       A.    This is it.

20       Q.    Okay.  Do you, when you're out on the project, do

21   you prepare the information that goes into these certified

22   payroll records?

23       A.    Yeah.  I turn in a weekly time sheet.

24       Q.    Okay.

25       A.    Either faxed to the office or mailed to the

1    office.  And then from my time sheets goes the certified

2    payroll that gets sent into the State.  So they know who is

3    there and the hours they worked.

4         Q.   All right.  And the company, Cost Company, is

5    certifying to the State that these are --

6         A.   Correct.

7         Q.   -- accurate records --

8         A.   Right.

9         Q.   -- of who worked on the job and what dates?

10        A.   Correct.

11        Q.   And how many hours and what you paid them.

12        A.   Right.

13        Q.   All right.  I'd like to direct your attention to

14   the week ending August 12, if I could.  Can you find that.

15        A.   (Witness complies.)  Um-hum.  Okay.

16        Q.   I think it's actually marked as AA-4.  Do you see

17   that on the side there, the label AA-4?

18        A.   Yeah.

19        Q.   All right.

20        A.   Yes.

21        Q.   Now, the week ending August 12, that would be from

22   what date to what date?

23        A.   That's from -- our pay period goes Monday to

24   Monday.

25        Q.   Okay.  And I want to direct your attention to an

1    employee named John Bell.  Did John Bell work on the Cost --

2    for Cost on the Marienville project from August 6th to

3    August 12, 2002?

4        A.   Yes.

5        Q.   All right.  And can you tell me, from looking at

6    this document and any other documents there, was that the

7    first week he worked on the project?

8        A.   Yeah, that was the first week.

9        Q.   And if you could go back to the week of 8/12 --

10   and by the way, are all the names here alphabetical?

11       A.   They are in alphabetical order.

12       Q.   John Bell -- and it shows -- maybe I could get

13   some of it on here.  Do you see the name John Bell

14   highlighted there?

15       A.   Yes.

16       Q.   Okay.  And do you see the first date that's listed

17   there?  It's 8/6.

18       A.   Yes.

19       Q.   Would that be the first date he worked on the

20   project?

21       A.   That's the first date.

22       Q.   Do you remember, was John Bell one of the

23   individuals that you hired off the street?

24       A.   Yes.

25       Q.   He wasn't in the union?

1        A.    Yes.

2        Q.    Okay.  Do you remember Mr. Barrett testifying

3    yesterday?

4        A.    Yes.

5        Q.    You were in the courtroom?

6        A.    Yes.

7        Q.    Do you remember he had records of labor initiation

8    dates and that kind of thing?

9        A.    Yes.

10       Q.    Okay.  With respect to Cost records, payroll

11   records, is this the best record that Cost has as to when a

12   person started working on the project?

13       A.    Yes.

14             MR. PAWK:  Nothing further, Your Honor.

15             THE COURT:  All right.  Mr. Matesic?

16             MR. MATESIC:  Yes, Your Honor.

17

18                      REDIRECT EXAMINATION

19   BY MR. MATESIC:

20

21       Q.    Do you still have that exhibit book in front of

22   you, Mr. Taylor?

23       A.    Yes.

24       Q.    You just said that this is the best record that

25   Cost has of who was employed by Cost during the week that

1    ended August 12th, 2002?

2        A.    That's correct.

3        Q.    Let's turn to the page where John Bell's name

4    appears, please.

5        A.    (Witness complies.)  Got it.

6        Q.    Give me one moment.

7              (Discussion held off the record.)

8        Q.    Mr. Taylor, do you see on the screen the portion

9    that I have highlighted?

10       A.    Yes.

11       Q.    In my previous questioning of you, I specifically

12   raised the issue of a mason tender working 16 hours in a

13   day.  Do you remember me questioning you about that?

14       A.    Yes, I do.

15       Q.    And your answer was that that never happened.

16       A.    Never does happen.

17       Q.    Okay.  Let's take a look at the hours that are

18   recorded for John Bell.

19       A.    Okay.

20       Q.    On August 8th, 2002.  How many hours do you see

21   there?

22       A.    Eight, eight, 16 --

23       Q.    No, no, hang on.  Just on August 8th; Thursday,

24   August 8th.  How many hours are recorded there?

25       A.    August 8th?

1    Q.    August 8th.

2    A.    16.

3    Q.    And how many hours are recorded on August 9th?

4    A.    16.

5    Q.    According to this record, Mr. Bell performed the

6    job of a mason tender on those two days.

7    A.    Correct.

8    Q.    And then on each of those days he performed the

9    job of mason tender for 16 hours.

10    A.    No, that's not right.

11    Q.    Mr. Taylor, that's what this record indicates.

12    A.    No, that's not what this record indicates.

13    Q.    But you see the number 16 on that.

14    A.    I see the number 16.

15    Q.    Okay.  And on Monday August 12th, what number is

16    recorded there, sir?

17    A.    16.

18    Q.    So if the record says he worked 16 hours on

19    Friday, August 9th, the record is wrong.

20    A.    Well --

21    Q.    Yes or no, sir?

22    A.    It's wrong.

23    Q.    Thank you.

24         MR. LUTZ:  Objection.

25         MR. PAWK:  Objection.

1          THE COURT:  First of all, one person objects.  No

2     tag teams.

3               The objection, whoever was making it, is

4     sustained.  Explain your answer.

5          THE WITNESS:  Yeah, I will.  Thank you.

6          THE COURT:  Go ahead.

7     A.    He worked overtime that day.  So he worked 12

8     hours that day, and then it reflects into hours.  So he

9     didn't physically work 16 hours that day.

10    Q.    Okay.  Mr. Taylor, do you see the total number of

11    hours for that week that were recorded for Mr. Bell?

12    A.    Yes, I do.

13    Q.    I'm going to shift the focus a little bit here.

14    Okay.  72 hours for Mr. Bell.

15    A.    That's correct.

16    Q.    You know, Mr. Taylor, I have gone completely

17    through this record, and on this record, I count 162

18    employees by Cost during the week ending August 12th, 2002.

19    Do you have any reason to doubt that number?

20    A.    I have no reason to doubt that number.

21    Q.    Do you accept that number as true?

22    A.    I would accept that number.

23    Q.    Okay.  I have also reviewed all of the hours that

24    were worked by each of the individuals whose names appear on

25    this record.  And no one on this record worked 72 hours

1    except for one person, and that person was John Bell.  Do

2    you have any reason to doubt that?

3         A.    I would have to look through that.

4         Q.    In fact, would you like to do that?

5         A.    (No response.)

6         Q.    Find me another employee who works -- I'll tell

7    you what.  Find me another employee who worked 60 hours that

8    week.  60 or over.

9         A.    I can't.

10        Q.    Mr. Bell was the new kid on the block the week

11   that ended August 12th?

12        A.    He was the -- yeah.

13        Q.    He was the newest employee for Cost?

14        A.    Right.  Right.

15        Q.    You would agree with me that when an employee is

16   offered overtime, oftentimes that's considered to be a bonus

17   because of the higher pay?

18        A.    (No response.)

19        Q.    I'll ask the question a different way, Mr. Taylor.

20   You have many employees who consider it a bonus when they

21   are offered the chance to work overtime.

22        A.    I don't know about that.

23        Q.    No one has ever expressed to you a desire to work

24   overtime so that they could make more money?

25        A.    Not in this business, no.

1      Q.    Out of 162 employees on that job site, no one ever
2  came to you and said, Mr. Taylor, if you've got overtime,
3  let me have it, because I need the money?
4      A.    There might have been a couple.
5      Q.    So a couple of your employees consider it a bonus.
6      A.    Yes.
7      Q.    Okay.  And the only guy who got the bonus of 72
8  hours in the week that ended August 12th was the newest guy,
9  the least-senior employee?
10     A.    And, again, I didn't really watch people.  I never
11  have -- what do I want to say -- run a crew, because I
12  didn't -- I had other people doing other things.  So do I
13  know what they did all the time out there?  No.
14     Q.    Mr. Taylor, you testified that this document
15  represents the information that you turned in to Cost
16  Company so that they could prepare this document.
17     A.    I -- right.
18     Q.    You reported to Cost that Mr. Bell -- according to
19  your testimony, you reported to Cost that Mr. Bell worked 16
20  hours on Thursday, August 8th.
21     A.    That's what was wrote on the time sheet.
22     Q.    And you reported to them -- to Cost, that Mr. Bell
23  worked 16 hours on the following day.
24     A.    Must have been on the time sheet.
25     Q.    Okay.  Well, let me ask another question.  If, in

Case 1:03-cv-00224-SJM    Document 54    Filed 10/17/2005    Page 103 of 182

fact, Mr. Bell had worked 16 hours two days in a row as a
mason tender, he would be extremely tired on that third day.
You would agree with me?

    A.   I --

        MR. PAWK:  Objection.

    A.   I disagree with that.

        MR. PAWK:  I don't believe he said he worked 16
hours.  It's 12 hours.  It reflects overtime on that
document.

        THE COURT:  Well, the jury's recollection will
control.  Let me see you at side-bar a second.

        (Whereupon the following discussion was held on
         the record at sidebar:)

        THE COURT:  In the absence of any objection, I'm
not poking my nose in here and telling anybody how to try
the case, but it just strikes me that we're going down a
road here, and I'm not sure what the relevance of it is.

        MR. MATESIC:  Our contention is that it's likely a
false record, and it's probative on the issue as to whether
or not a job vacancy existed on July 31st.  If, in fact, Mr.
Bell had been hired before the weekend of August 12th, 2002,
he may have been hired and began working in the prior week.
There should be a record for that.  There isn't.  Instead,
what we believe happened is that Cost gave him extra hours
during his first week of work.

103

1              We don't believe it's humanly possible that a

2      mason tender could work a double shift, 16 hours, and yet

3      that's what the record reflects.

4              MR. PAWK:  Judge, if I could respond.  First of

5      all, does he have any evidence or information to try to

6      prove that this is some kind of a false or fabricated

7      document?

8              THE COURT:  Well, I don't know.

9              MR. PAWK:  If he doesn't, it's not relevant.  Two,

10     the testimony is it's 12 hours.  It reflects time and a

11     half, which comes out to 16 hours.  That's what the

12     document --

13             THE COURT:  I'm going to let you go on and see

14     what you can do --

15             MR. MATESIC:  I'm not going to spend a lot of time

16     on it.

17             MR. PAWK:  His testimony is he doesn't prepare

18     that document.  He prepares the underlying document.

19             THE COURT:  Whatever.  We have to hear it from

20     him.

21             MR. MATESIC:  He's going to answer the question?

22             THE COURT:  Yes.

23             (End of discussion at side-bar.)

24             (Record read back by reporter.)

25     BY MR. MATESIC:

```
 1        Q.   Your answer?
 2        A.   I'm sorry; I didn't even know she was talking to
 3   me.
 4             (Record read back by reporter.)
 5        A.   I don't know if he would be tired or not.
 6        Q.   How long have you been working as a bricklayer?
 7        A.   26 years.
 8        Q.   And how long have you been working with mason
 9   tenders side by side?
10        A.   26 years.
11        Q.   Mr. Pawk asked you whether you remembered if
12   Kathleen Brown requested a laborer's position when you and
13   she met.  Do you remember that?
14        A.   I remember that.
15        Q.   And your answer was she did not ask for a
16   laborer's position.
17        A.   She didn't ask me, no.
18        Q.   Do you remember being asked that question at your
19   deposition, sir?
20        A.   Could I see it?
21        Q.   Sure.  Do you see that on the screen?
22        A.   (No response.)
23        Q.   How about if I read the question, you read the
24   answer.
25        A.   Go ahead.
```

1      Q.    "Do you have any sense --" this is your deposition

2    from May of 2004.   "Question:  Do you have any sense as

3    to --"

4            (Mr. Matesic interrupted by the reporter.)

5      Q.    "Do you have any sense as to whether Kathleen

6    requested work in any other capacity besides operator?"

7      A.    "I don't know."

8      Q.    Your answer in 2004 was that you couldn't

9    remember.

10     A.    I don't know.

11     Q.    Sir, your answer in 2004 is different from your

12   answer today.

13     A.    (No response.)

14     Q.    True?

15     A.    I don't believe she asked me for a laborer's

16   position at the time.

17     Q.    You said that you remembered several aspects of

18   that meeting that you had with Kathleen Brown.  You said you

19   remember that it happened early in the morning --

20           THE COURT:  Excuse me.  Hold your thought.  I want

21   to shut this door.  All right, go ahead.

22     Q.    You said that you recall that the meeting happened

23   early in the morning.

24     A.    It was -- it was in the morning.

25     Q.    You said that you remember her requesting a

1    position as an operator.

2        A.    I remember her asking me for an operator's

3    position, yes.

4        Q.    You said you remembered telling her that you had

5    two cranes on the job.

6        A.    Two cranes and five forklifts.

7        Q.    And you remember saying those words to her.

8        A.    I had -- I explained to her what equipment I had

9    on the job.

10        Q.    And you remember walking back out of the trailer.

11        A.    Yes, I do.

12        Q.    Okay.  Take a look -- let's take a look at the

13    affidavit that you filed in this case that we talked about

14    previously.  Okay.  Do you see that on the screen in front

15    of you?

16        A.    Yes.

17        Q.    Paragraph 8, "During the course of the project,

18    over 100 people presented themselves to me at the site

19    seeking work, who were turned away because we were not

20    hiring at that time."  Do you see that?

21        A.    Yes.

22        Q.    Okay.  I want you to name for me another person

23    out of that hundred, another person who came to you seeking

24    work.  Someone who you remember the time of the day, you

25    remember what they asked, you remember exactly what you

1    said, and you remember what you did afterwards.

2        A.   Well, I can't remember the guy's name, but I do

3    remember a guy showing up looking for a job out there.  But

4    I can't remember his name.  And I asked him what he did for

5    a living, and he says he used to paint cars.  My reply to

6    him was, you really don't want to work out here with us,

7    then.

8        Q.   Okay.  Now we're down to 99.  Give me another one.

9        A.   Well, there was a lot of them that came up looking

10   for work.  My replies to them always was what did you do

11   prior to coming out and asking me for a job.

12       Q.   My question is different.  I want you to give me a

13   specific instance.

14       A.   I can't.

15       Q.   Okay.  So out of all the hundred people that

16   showed up, you can relate to me two specific instances.  And

17   Kathleen Brown's is one of them.

18       A.   There was a lot of instances out there.

19       Q.   You can't name for me another instance in

20   detail --

21       A.   No, I cannot.  No, I cannot.

22       Q.   I'm going to place before you what has been

23   previously labeled as Plaintiff's Exhibit 13.  Do you see

24   that on your screen?

25       A.   It's blurry.  Yeah.

1      Q.    Okay.  Let me --

2      A.    Yeah, that's okay.  Yeah.

3      Q.    This is a memorandum from Georgia Pawk to you, to

4  Ray Sekowski, to Jamie Grego, and to the EEO file.  Correct?

5      A.    Yes.

6      Q.    Who is Raymond Sekowski?

7      A.    He is a project manager.

8      Q.    And Jamie Grego is an administrative assistant?

9      A.    I'm not sure what Jamie does.

10     Q.    Do you see the date on this memo, September 18,

11 2002?  See where my finger is indicating?

12     A.    September 18th, yes.

13     Q.    Yeah, September 18th, 2002.  You didn't receive

14 this memo on that date, did you?

15     A.    I'm sorry?

16     Q.    You did not receive this memo on September 18th,

17 2002.

18     A.    I couldn't answer you that question.

19     Q.    In fact, you never received this memo.

20     A.    I couldn't answer that question.

21     Q.    But you were asked this question during your

22 deposition, sir.  Do you remember me asking you about it

23 then?

24     A.    No, I do not.

25           MR. PAWK:  Your Honor, I'm going to object as to

1    the relevancy as to whether he received this memo or not.

2              MR. MATESIC:  Your Honor, I think it's entirely

3    relevant.  His name is on the memo.  Miss Pawk is going to

4    be asked to adopt this memo.  She already has.  And she

5    stated in her testimony that she sent it to Mr. --

6              THE COURT:  All right.  Overruled.

7    BY MR. MATESIC:

8         Q.   We're at Page 86 of the deposition.  Actually, the

9    exhibit, I believe, is marked -- okay, it's marked on Page

10   86.  Okay.  I'm going to actually start at Page 84.  Let me

11   highlight this one.

12             (Discussion held off the record.)

13        Q.   I take that back.  I'm going to go to Page 86 --

14   87.  Okay.  Is that on your screen, Mr. Taylor?

15        A.   Yes.

16        Q.   Do you see in the parentheses whereupon Deposition

17   Exhibit No. 2 --

18        A.   Yes.

19        Q.   -- was marked?  And that's this exhibit; the memo

20   that we were just talking about.

21        A.   Yes.

22        Q.   "Mr. Taylor, I'm placing before you --" this is

23   the question.  "Mr. Taylor I'm placing before you what's

24   been labeled as Exhibit No. 2.  Please take a moment to

25   review --

1             (Mr. Matesic interrupted by the reporter.)

2             THE COURT:  Slow down.

3        Q.   "Mr. Taylor, I'm placing before you what's been

4    labeled as Exhibit No. 2.  Please take a moment to review

5    this and let me know when you are finished."  And then in

6    parentheses it indicates that you have reviewed the

7    document.  Correct?

8        A.   Yes.

9        Q.   And then I asked you, "Are you finished," and your

10   answer is "yes".  Then my next question, "Have you seen this

11   before?"  What was your answer?

12       A.   "No, I haven't."

13       Q.   And that's different than your answer today.

14       A.   I don't think I gave you an answer on that today,

15   did I?

16       Q.   You said you couldn't remember.

17       A.   Well, yeah.  But I think I also told you at my

18   deposition, though, that she called me and told me, and I'm

19   sure it's in there, that if Kathleen Brown showed up on the

20   job site, you were to hire her.

21       Q.   Okay.  Mr. Pawk early in his questioning of you

22   was asking you about portions of your deposition which I had

23   not read into the record.  And specifically he asked you

24   about the equal employment questions or the equal employment

25   policy questions.  Do you remember Mr. Pawk's questioning to

1   you?

2       A.   Yes.

3       Q.   Okay.  And Mr. Pawk showed you these pages in your

4   deposition.  Okay.  Do you see that right now?

5       A.   Um-hum, yes.

6       Q.   Can you read that answer when I read the question.

7   "You were asked about Cost's EEO policy and whether it was

8   applicable only to hiring decisions.  Do you remember that

9   question?"

10      A.   "Yes."

11      Q.   Your answer was yes.

12      A.   Yes.

13      Q.   "Do you know if that EEO policy is applicable to

14  any other areas of employment at Cost Company?"

15           Okay, I'm going to stop you right there.

16  Something happened before you were asked this question,

17  Mr. Taylor.  Do you remember what that was?

18      A.   No.

19      Q.   Mr. Taylor, before you were asked this question,

20  there was a recess in the deposition.  Do you remember that?

21      A.   No, I do not.

22      Q.   You don't remember that after I was finished with

23  my questions of you, you and Mr. Pawk went out into the

24  hall?

25      A.   No, I do not remember that.

1     Q.    Okay.  Do you have any reason to doubt that that
2  happened?
3     A.    (No response.)
4     Q.    You don't know?
5     A.    I don't know.
6     Q.    Okay.  Let's continue reading through the
7  deposition.
8          All right.  Now this quote's me.  "Before you
9  answer that question, I'm just going to place an objection
10 on the record.  I guess I want the record to reflect --"
11         MR. PAWK:  I'm going to object, Your Honor.  He's
12 reading an objection he made at a deposition.  This isn't a
13 question that was posed to this witness.
14         MR. MATESIC:  Actually, Your Honor, what I want to
15 read is this -- and I also want to read Mr. Pawk's
16 follow-up.  Because he had an opportunity to respond to what
17 was my --
18         THE COURT:  Let me see it.
19         (Whereupon the following discussion was held on
20          the record at side-bar:)
21         MR. MATESIC:  My position is that Mr. Taylor was
22 taken out into the hallway, he was coached immediately
23 before this question was posed to him, and his response to
24 the question was opposite to what he had said on direct
25 examination.  I want Mr. Taylor to adopt that he gave that

1    answer after there was a recess.

2              I also want the record to reflect that I

3    characterized the recess as having taken place and having

4    lasted for five minutes.  Mr. Pawk had an opportunity to

5    rebut that characterization.  He did not.

6              MR. PAWK:  Judge, first of all, that doesn't

7    reflect that.  There was a break in the deposition after his

8    direct examination question.  We went out in the hall, we

9    took a break, we went to the bathroom.  You know, it wasn't

10   coaching.  And the record doesn't reflect that.  And I think

11   it's improper questioning to read this into the record in

12   front of the jury.  He has the ability to ask this

13   witness --

14             THE COURT:  Excuse me.  I don't think it's germane

15   to the jury how the two lawyers are arguing between

16   themselves.  But what I do think is germane and what you can

17   do and the appropriate thing to do is you can either, A,

18   attempt to impeach this guy by attempting to show that he

19   gave two different answers; one on the direct and one on the

20   cross, and, B, flat-out ask him, did anybody coach you to

21   change your testimony.  Let's go.

22             (End of discussion at side-bar.)

23   BY MR. MATESIC:

24        Q.   Mr. Taylor, your answer on the issue of whether

25   the EEO policy applied in contexts other than hiring, your

1    answer to that question changed during the course of this

2    deposition.

3        A.   (No response.)

4        Q.   True or false, sir?

5        A.   I'm not sure.

6        Q.   What was your first answer?

7        THE COURT:  What is the question?  I apologize.  I

8    drifted.

9        MR. MATESIC:  That's all right.  My question was:

10       Q.   Mr. Taylor, your answer to the question of whether

11    the Equal Employment policy applied in contexts other than

12    hiring changed during the course of your deposition.

13        A.   I'm not sure.

14        MR. MATESIC:  We're on Page 41 of the deposition.

15       Q.   I'm going to show you an excerpt of the deposition

16    that we looked at prior in your testimony today.  Do you

17    have that in front of you?

18        A.   Yes.

19        Q.   Here is the question.  "I asked you to explain

20    what you meant by discriminate, and you said, white, black,

21    Indian, or minority; we'll hire anybody.  So my follow-up

22    question to you is, am I to understand that the EEO policy,

23    as you understand it, applies only to the issue of hiring?"

24    And your answer was?

25        A.   "Yes."

1        Q.    Later on in the deposition, Mr. Pawk asked you

2   whether that EEO policy applied in contexts other than

3   hiring.  And what answer did you give then?

4        A.    I don't know.

5        Q.    Okay.  This is Mr. Pawk's question to you.

6   "Question:  You were asked about the Cost EEO policy and

7   whether it was applicable only to hiring decisions.  Do you

8   remember that question?"

9        A.    "Yes."

10       Q.    The answer is yes.  The next question, "Do you

11  know if that EEO policy is applicable to any other areas --"

12            THE COURT:  Too fast.  It is too fast.

13            MR. MATESIC:  Sorry.

14       Q.    "Do you know if that EEO policy is applicable to

15  any other areas of employment at Cost Company?"  Okay.  And

16  then the question is reasked.  "Getting back to my question

17  that I posed to you earlier regarding the Cost EEO policy,

18  do you know if it's applicable to areas --"  Terrific.

19            (Discussion held off the record.)

20       Q.    "Getting back to my earlier question that I posed

21  to you earlier regarding the Cost EEO policy, do you know if

22  it's applicable to areas other than just hiring decisions?"

23  And your answer was?

24       A.    "Employment, laying off, and firing."

25       Q.    So your answer changed.

1        A.    I forgot the firing part.

2        Q.    And the laying off part.

3        A.    Well, that's part of firing.

4        Q.    Mr. Pawk was also asking you about your answers to

5    me concerning whether women were as capable as men were to

6    perform the job of mason tender.  Do you remember your

7    answers to Mr. Pawk?

8        A.    No.

9        Q.    You don't remember the answers that you gave

10   today?

11       A.    To you?

12       Q.    Yes.

13       A.    Yeah, I remember the answers I gave to you.

14       Q.    No, no.  The answers that you gave to Mr. Pawk.

15       A.    No.

16       Q.    Mr. Pawk showed you -- do you remember Mr. Pawk

17   showing you sections of your deposition where this issue of

18   whether women were as capable as men to be mason tenders

19   came up?  Do you remember that?

20       A.    Yes.

21       Q.    And Mr. Pawk made a point of saying that -- strike

22   that.  Mr. Pawk made a point of showing you the testimony

23   where you said that you couldn't size someone up -- in other

24   words, you couldn't look at somebody and, based on their

25   appearance, estimate how capable they were of performing the

1    job of mason tender.

2        A.    That's correct.

3        Q.    Do you know which of your answers came first?  The

4    one concerning a woman's capability or capacity for mason

5    tending and your observation that you can't size somebody

6    up?

7        A.    No, I don't.

8        Q.    I'm on Page 76 of your deposition.  "Do you have a

9    sense, in your experience as a foreman, working in

10   construction, that you can size somebody up visually as to

11   whether or not they are able to perform the work of a mason

12   tender?"  And your answer was?

13       A.    "No, you cannot."

14       Q.    My question, "Why not?"  And your answer?

15       A.    "Because I have seen some of the smallest people

16   run rings around you."

17       Q.    Okay.  And then on the following page, after you

18   gave that answer, you were asked the question, "Do you have

19   a sense as to whether on average a woman is as well-suited

20   to perform a mason tender's job in terms of the

21   weightlifting capacity as a man?"  Your answer was?

22       A.    (No response.)

23       Q.    Sir?  Your answer was they could?

24       A.    Yes.

25       Q.    "Question:  As a general matter, they are as

1    capable as a man in performing the weightlifting duties of a

2    mason tender?"  Your answer?

3        A.    "No, they're not as capable."

4        Q.    Your opinion about a woman's capacity to do a

5    mason tender's job came after you said that you couldn't

6    size somebody up based on their visual appearance.

7        A.    I have never had a woman mason tender work for me.

8        Q.    My question is different, sir.  Your opinion about

9    a woman's capacity to do mason-tending work came after you

10   said that you couldn't size somebody up visually.

11       A.    Yes.

12            MR. MATESIC:  That's all I have.

13            THE COURT:  Anything else?

14            MR. PAWK:  No questions, Your Honor.

15            THE COURT:  All right.  Thank you, sir.

16            MR. MATESIC:  Your Honor, the Plaintiff would move

17   at this time to admit the exhibits that we used in

18   Mr. Taylor's examination.

19            THE COURT:  All right.  What would they be?

20            MR. MATESIC:  Plaintiff's Exhibit 13, Plaintiff's

21   Exhibit 20, Plaintiff's Exhibit 12.  And I think that's all.

22   Give me one moment, please.

23            THE COURT:  All right.

24            MR. MATESIC:  We would also move to admit

25   Plaintiff's Exhibit 14, the payroll records.

```
 1              THE COURT:  Any objection to any of those
 2   exhibits?
 3              MR. PAWK:  No objection, Your Honor.
 4              THE COURT:  They are admitted.
 5              (Discussion held off the record.)
 6              MR. PAWK:  Your Honor, I made a list of the
 7   exhibits we have marked -- throughout the trial, and I would
 8   move for their admission at this time.  Defense Exhibits A,
 9   C, D, E, F, O, R, BB, CC, AA.
10              THE COURT:  Those are admitted.  Are you ready to
11   call your next one?
12              MR. MATESIC:  Yes, Your Honor.  Plaintiff calls
13   Georgia Pawk.
14
15      G E O R G I A  P A W K, first having been
16      duly sworn, testified as follows:
17
18                      DIRECT EXAMINATION
19   BY MR. MATESIC:
20
21      Q.   Good afternoon, ma'am.
22      A.   Good afternoon.
23      Q.   Your name is Georgia Pawk.
24      A.   Yes.
25      Q.   You are the president of Cost Company.
```

1          A.    Yes.

2          Q.    You also hold another title with Cost Company.

3     You are the safety director?

4          A.    Yes.

5          Q.    And in addition to that, you also hold a third

6     title.  You are the Equal Employment Compliance Officer.

7          A.    Yes.

8          Q.    You have been the president of Cost Company since

9     1995.

10         A.    Correct.

11         Q.    Okay.  And before that, you worked as an attorney.

12         A.    Yes.

13         Q.    As the president of Cost, it's fair to say that

14    you oversee the day-to-day operations of that company?

15         A.    Yes.

16         Q.    All right.  I'd like you to help me map out, if

17    you will, the managerial pyramid.  Who is in charge of Cost,

18    who supervises whom.  Okay?

19         A.    Okay.

20         Q.    The owner and chief executive officer of Cost is

21    Charles Cost.

22         A.    Correct.

23         Q.    All right?  And he is your direct supervisor?

24         A.    Yes.

25         Q.    All right.  Who else does Charles Cost directly

1   supervise?

2       A.   Charles Cost directly supervises the project

3   managers.

4       Q.   And how many project managers do you have?

5       A.   It varies.

6       Q.   All right.  You were the president in the year

7   2002.

8       A.   Yes, sir.

9       Q.   All right.  Do you remember how many project

10  managers Cost employed in that year?

11      A.   Anywhere from six to 12.

12      Q.   Six to 12, all right.  Whom else did he directly

13  supervise?

14      A.   The foremen.

15      Q.   How many foremen did you have in 2002?

16      A.   I don't know.

17      Q.   Can you estimate for us?

18      A.   I'm not comfortable estimating.

19      Q.   Would it have been more than a dozen?

20      A.   Yes.

21      Q.   Would it have been more than two dozen?

22      A.   Yes.

23      Q.   How many administrative employees does Cost have?

24      A.   Approximately 20 to 25, 27.

25      Q.   And by "administrative employees", I mean the

1    people that do the clerical functions, that manage the

2    payroll, that perform the office functions.

3        A.    Are you including the office project managers?

4        Q.    Sure.  How about let's include everybody who works

5    at Cost headquarters.  Where is Cost headquarters located,

6    by the way?

7        A.    2400 Ardmore Boulevard, Pittsburgh --

8        Q.    How many people --

9        A.    -- 15221.

10       Q.    Sorry.  How many people work in that office?

11       A.    Including the project managers and estimators, I'd

12   say roughly 27, 28 persons total.

13       Q.    And are you including the clerical workers as

14   well?

15       A.    Yes.

16       Q.    And you are including the payroll people as well?

17       A.    Yes.

18       Q.    In the year 2002, Cost was performing work,

19   performing contracts that were worth around $40 million.

20           MR. LUTZ:  Objection to the relevance, Your Honor.

21           THE COURT:  What is the relevance?

22           MR. LUTZ:  What does this have to do with

23   anything?

24           MR. MATESIC:  The relevance is that this company

25   obtains a substantial amount of federal funding, of

```
 1   Government money --
 2              THE COURT:  Sustained.
 3              MR. MATESIC:  All right.
 4   BY MR. MATESIC:
 5        Q.   It is true that Cost oftentimes contracts to build
 6   or perform masonry work on publicly funded projects?
 7        A.   Yes.
 8        Q.   All right.  And when I say "publicly funded
 9   projects", I mean federally funded projects, as well as
10   State funded projects.
11        A.   Are you asking me if the owner -- I wouldn't know
12   how a project is funded necessarily.
13        Q.   You're the president of Cost Company?
14        A.   Yes.
15        Q.   Are you familiar with the contracts that Cost
16   signs to perform masonry work?
17        A.   Yes.
18        Q.   And you're not sure whether or not those contracts
19   are publicly funded or privately funded?
20        A.   Typically Cost Company acts as a subcontractor to
21   a general contractor.
22        Q.   Cost receives federal funds to do masonry work.
23   That's your understanding.
24        A.   Please clarify the question.  We don't receive --
25   we may perform work on a contract for the State.
```

1          Q.    I'm going to show you what has been previously

2     labeled as Plaintiff's Exhibit 11.  Do you see that on your

3     screen?

4          A.    Yes, I do.

5          Q.    Okay.  The title of this document is Project Labor

6     Agreement, Construction of Prototypical 1,000-Cell Medium

7     Correctional Facility, Forest County, Pennsylvania.  Did I

8     read that correctly?

9          A.    Yes.

10         Q.    That was a publicly funded project, wasn't it?

11         A.    I believe so.

12         Q.    All right.  And when Cost receives publicly

13    funded -- excuse me.  When Cost receives money that flows

14    out of a publicly funded project, Cost knows that there are

15    strings attached to that money.  That in exchange for that

16    money, Cost has to give something back.  Do you follow where

17    I'm going with this?

18         A.    I think so.

19         Q.    Okay.  Cost has to show the Government that Cost

20    is committed to the goal of equal employment.

21              MR. LUTZ:  Objection, Your Honor.  Relevance.

22              THE COURT:  Sustained.

23              MR. MATESIC:  May we approach, Your Honor.

24              (Whereupon the following discussion was held on

25               the record at side-bar:)

1           MR. MATESIC:  I don't know how the aspect of --

2    let me say it a different way.  I don't know how the fact

3    that a project is publicly funded and is, therefore,

4    restricted in terms of eligibility based on equal

5    employment, I don't see how that can be irrelevant.

6           THE COURT:  Tell me the question again.

7           MR. MATESIC:  The money that you get from the

8    Government has strings attached.  She said I think I know

9    where I'm going.  And I said you have to show you are

10   receiving public money or money that comes out of the

11   publicly funded project, that you are committed to the goal

12   of equal employment.  That comes from right out of the

13   regulations.

14          MR. LUTZ:  So what?

15          MR. MATESIC:  That's where we are coming from on

16   this.  Because that is absolutely relevant because it takes

17   it to the issue of -- it places a foundation on the issue

18   did Cost meet --

19          THE COURT:  It is irrelevant.  It is completely

20   irrelevant.  It is sustained.

21          (End of discussion at side-bar.)

22          THE COURT:  Members of the jury, we're going to

23   take a short break.

24          (Recess held from 2:20 p.m. till 2:45 p.m.)

25          (Whereupon the following discussion was held on

1           the record at side-bar:)

2           MR. MATESIC:  General question of whether or

3   not -- there is a general question of whether or not there

4   were strings attached to publicly funded projects, which

5   would be relevant.  My next question to this witness is

6   there was strings attached to the money Cost received

7   pursuant to the project labor agreement for the --

8           THE COURT:  I don't know what "strings attached"

9   means.  That's my problem.  What do you mean by that?

10          MR. MATESIC:  Well, the strings attached -- it's a

11  metaphor.  There is a condition that any recipient in Cost's

12  position must comply with, and that's the employment

13  restriction they have to show either the 50 percent or the

14  6.9 percent.  That's the intention.  That's the purpose or

15  the thrust of this line of questioning.

16          THE COURT:  Presume she says yeah, it's in there,

17  and we did this --

18          MR. MATESIC:  Right.  And then we're going to look

19  at the regulations, and then we're going to look at --

20          THE COURT:  No.  It's irrelevant.

21          MR. MATESIC:  I'm sorry I'm taxing your patience.

22          THE COURT:  You are not taxing my patience.  My

23  patience has been taxed much more than this.  I will not

24  visit this issue again.  It's irrelevant --

25          MR. MATESIC:  All right.  Now --

```
 1              THE COURT:  We're done.

 2              (End of discussion at side-bar.)

 3    BY MR. MATESIC:

 4        Q.    Miss Pawk, I'm going to talk to you about your

 5    work as the Equal Employment Compliance Officer for Cost

 6    Company.  Am I using the correct phraseology or terminology?

 7        A.    Equal Employment Opportunity Officer.

 8        Q.    Equal Employment Opportunity Officer.

 9        A.    Yes.

10        Q.    And for how long have you been the Equal

11    Employment Opportunity Officer?

12        A.    For Cost Company?

13        Q.    Yes.

14        A.    Since 1995, when it was formed.

15        Q.    And this concept of equal employment, how do you

16    understand that, in your capacity as the Equal Employment --

17        A.    The Cost Company does not discriminate against any

18    individual on the basis of race, color, creed, national

19    origin, sex, gender, veteran status, disability, sexual

20    preference, sexual orientation, mental or physical handicap,

21    regardless of the nature of the job.  On any job site.

22        Q.    And for how long has that been the policy of Cost

23    Company?

24        A.    Since I began at Cost Corporation.

25        Q.    Now, it's fair to say, then, that that was the
```

1    policy that applied to the SCI Marienville project.

2        A.    Yes.

3        Q.    That was a -- excuse me.  That was a fairly large

4    project for Cost, was it not?

5        A.    (No response.)

6        Q.    Let's just start with in terms of employees.  The

7    number of employees who were working there in the summer of

8    2002.  That was one of the largest projects that Cost has

9    ever undertaken.

10       A.    One of the largest.

11       Q.    Right.  And you also worked on the Boston

12   Courthouse?

13       A.    Boston Fanfare Courthouse.

14       Q.    Now, in addition to having that policy, Cost has

15   created documents, postings, and other objects, other

16   posters, other forms which are meant to implement that

17   policy in the workplace?

18       A.    Yes.  We have dissemination of our EEO policy.

19       Q.    In fact, you post in the workplace your EEO

20   policy.

21       A.    It is posted by the foremen.

22       Q.    It is posted by the foremen.  And on a yearly

23   basis, you hold a meeting with all of the foremen to

24   discuss, among other topics, the equal employment policy.

25   Is that correct?

1       A.    Yes.

2       Q.    And you had one of those meetings this year?

3       A.    In 2005.

4       Q.    And you had one in 2004?

5       A.    Yes.  We had one on April 20th in 2004.

6       Q.    And you had one in 2003?

7       A.    Yes.

8       Q.    And you had one in 2002.

9       A.    Yes.

10      Q.    And Mr. Taylor attended that meeting.  Is that

11  correct?

12      A.    Which meeting?

13      Q.    The -- oh.  I apologize.  Let's go to the meeting

14  in 2002.

15      A.    I would have to look at the attendance.

16      Q.    Did he attend the meeting in 2005?

17      A.    Pardon me?

18      Q.    The last meeting, again, was when?

19      A.    Our last meeting was April 20th of 2004,

20  specifically.

21      Q.    I apologize.  I misheard you.

22      A.    That's okay.

23      Q.    Did he attend that meeting?

24      A.    I am not certain without seeing the attendance

25  roster.

1      Q.    Okay.  I'm going to place before you what's been

2   labeled as Defendant's Exhibit U-28.  This is a statement of

3   Cost's equal employment policy, correct?

4      A.    That is a statement as to sexual harassment.

5      Q.    Okay.  This is part --

6      A.    And establishing a work site free of harassment.

7      Q.    This is part of the equal employment policy,

8   correct?

9      A.    Yes.

10      Q.    And what we're looking at here is a form letter

11   that Cost has created which describes their equal employment

12   policy.

13      A.    Okay.

14      Q.    All right?  I'm going to highlight a section here.

15   First of all, you'll agree that this is your signature --

16      A.    Yes.

17      Q.    -- on this exhibit?  Okay.  And do you see the

18   text on the first paragraph?  "Cost Company is --"

19      A.    Yes.

20      Q.    "-- legally and morally committed to

21   nondiscrimination in employment."

22      A.    Yes.

23      Q.    Did you write that?

24      A.    Yes.

25      Q.    You did, okay.  And this policy regarding

1    harassment in the workplace, did you write that?

2        A.    Yes.

3        Q.    All right.  Now, I'm placing before you

4    Defendant's Exhibit U-23.  And this is your signature at the

5    bottom of that document, correct?

6        A.    Yes.

7        Q.    And this document is a form letter that Cost sends

8    to those parties -- well, why don't I have you explain what

9    this is.

10       A.    Well, Cost Company often subcontracts work.  Or if

11   we have any trades beneath us, we always send out a packet

12   to our subcontractors, letting them know what our EEO policy

13   is and asking them to sign off on it and that they will also

14   abide by it.  Also, when we hire individuals, it is also a

15   part of their welcome packet and our Cost Company new hire

16   package.

17       Q.    All right.

18       A.    This one -- go ahead.

19       Q.    No, you go ahead.

20       A.    Go ahead.

21       Q.    All right.  You send this out to every party that

22   you contract with?

23       A.    Every subcontractor that we may employ?

24       Q.    Yes.

25       A.    Yes.  With all new hires, yes.

1     Q.    And that's without regard to whether the project

2  is privately funded or publicly funded?

3     A.    Absolutely.

4     Q.    All right.  I'm going to place before you what's

5  been marked as Defendant's Exhibit U-24.  Now, tell us what

6  we are looking at here.

7     A.    Again, that is a statement that is sent to all of

8  our employees that is part of the new hire packet.

9     Q.    I apologize.

10    A.    I don't know why you're --

11    Q.    Go ahead.

12    A.    It's stating our policy.  This is to be posted at

13 the headquarters at all job sites.

14    Q.    And for how long have you been sending this notice

15 out to your employees?

16    A.    (No response.)

17    Q.    Ever since you have been the EEO Officer?

18    A.    Yes.

19    Q.    And did you write this?

20    A.    Yes, I believe so.

21    Q.    All right.  And what are we looking at here?

22    A.    That is something we send out to any vendors,

23 suppliers, purchase orderers, recipients --

24             THE COURT:  Excuse me.  Is that identified?

25             MR. MATESIC:  Oh, I'm sorry.  Defendant's U-25.

```
 1      Q.   Go ahead.
 2      A.   I'm sorry.  That is sent to all venders, again,
 3 suppliers, recipients of purchase orders, and also any subs
 4 that we may employ.
 5      Q.   And what's the purpose of sending -- well, first
 6 of all, let's read this title into the record.
 7 Nondiscrimination Clause Agreement.
 8      A.   Yes.
 9      Q.   What does that mean?
10      A.   They have to agree not to discriminate against any
11 persons or individuals on the basis of age, gender, sex,
12 national origin, race, creed, color, veteran disability,
13 mental, physical handicap, sexual orientation, sexual
14 preference, union membership, et cetera.  And in order for
15 them to be paid, they have to fill this out, sign it, and
16 send it back.  Any vendors, suppliers, et cetera.
17      Q.   And this --
18      A.   They have to sign off.
19      Q.   And that's for any contract.
20      A.   I believe it's for all subcontracts and all
21 purchase orders that are over a certain amount.
22      Q.   All right.  Now, this is U-29, Defendant's Exhibit
23 U-29, Nonsegregated Facilities Certificate?
24      A.   Yes.
25      Q.   Okay.  What is the purpose of this document?
```

1      A.    That is something that is also posted at the job

2  sites, ensuring that we do not have segregated facilities at

3  our job sites.   Only changing rooms or toiletry facilities

4  can be segregated.   But normally on a job site there is a

5  unisex Port-A-John which is for all employees.   We do not

6  have segregated facilities for employees.

7      Q.    All right.   And this is your signature yet again

8  on the document?

9      A.    Yes, sir.

10      Q.    And did you -- did you write this document?

11      A.    Yes.

12      Q.    Okay.   And I forgot to ask you about the previous

13  two pages.   If we could go back several pages.   The

14  Nondiscrimination Clause Agreement, did you write this as

15  well?   This is U-25 and U-26.

16      A.    I believe so.   I can't see the whole document.

17      Q.    Okay.   Would you like me to move it up on the

18  screen for you?

19      A.    Yes.

20      Q.    As the Equal Employment Compliance Officer, one of

21  your concerns is the total number of females employed by

22  Cost.

23           MR. LUTZ:   Objection, Your Honor.   We have been

24  discussing this issue --

25           THE COURT:   Well, I don't think there's really a

1    question on the table yet.

2              MR. MATESIC:  Actually, that was the question.

3         Q.    True or false; as the Equal Employment Compliance

4    Officer, one of your concerns is the total number of females

5    employed by Cost Company?

6              MR. LUTZ:  Objection.

7              THE COURT:  Let me see you at side-bar for a

8    minute.

9              (Whereupon the following discussion was held on

10              the record at side-bar:)

11              MR. LUTZ:  We had a discussion in chambers, and I

12    thought the Judge's ruling was very clear that before we are

13    going to get into any statistical evidence, he's going to

14    lay a foundation.  He is far from doing that, and he hasn't

15    even come close.  And now he's ready to go into all these

16    statistics about the lack of female hires.

17              That is totally improper, and I think he's

18    trying to get this out in front of the jury in his questions

19    because he knows the Judge is not going to let it in.

20              MR. MATESIC:  I understand what you said.  The

21    Court's ruling this morning was different.  The foundation

22    was laid this evidence could come in.  Mr. Taylor testified

23    that of the hundred --

24              (Mr. Matesic interrupted by the reporter.)

25              MR. MATESIC:  The Court's ruling this morning was

1    that a proper foundation was laid for this evidence.  It

2    could come in under questioning today.  Mr. Taylor

3    acknowledged that there were approximately 100 persons who

4    applied for work in a walk-on capacity to Cost Company in

5    June of 2002.  He also testified that he clearly recalled

6    that only one of them was female, and the other 99,

7    approximately 99, were males.  One was female.

8         We have established what the applicant pool

9    was for the walk-on laborers.  There are, in effect, two

10   different labor pools that Cost is drawing on in that job.

11   The union labor pool is right now off the table.  We're

12   looking at the walk-on labor pool.  And Mr. Taylor has

13   established what that labor pool was.  He said it was 99 to

14   one, male to female.

15        Being as I have established the foundation

16   required of us this morning, we note the applicant pool was,

17   because the person that makes the decision who is hiring

18   those people has said it was a hundred people, and all

19   except for one were female.

20        MR. LUTZ:  I don't believe so.  He is suggesting

21   to this Court that he has laid a proper foundation when

22   there is testimony there was 100 people showed up at

23   trailers.  We have no idea whether they were male or female.

24   We didn't establish anything from Mr. Barrett with respect

25   to the demographics of the labor union.  We don't know what

1    time frame we are talking about with respect to the

2    demographics.  We don't know about all the other unions that

3    were secondary to call out for this purpose.  We can't go

4    there.

5              MR. MATESIC:  If I can get this in -- if I can't

6    get this in, I'm not going to have any case.

7              THE COURT:  Well, that isn't my fault.  I mean,

8    the -- let me see if I can try to make myself clearer on the

9    point.

10             It seems to me that quite apart from

11   statistical evidence -- that is, do you have 6.9 percent, or

12   how close did you get.  There is still a case here which you

13   are wandering away from.  It's your main case involving that

14   man back there.  This is not necessary, critical for your

15   case to get to the jury.

16             MR. MATESIC:  I agree with that.  I appreciate

17   that.

18             THE COURT:  Number one.  Number two, I'm going to

19   say one more time as a follow-up to what I said in chambers,

20   I gave you a chance to lay a foundation.  There is not a

21   foundation laid.  Do not push me on this.  Do not bring this

22   up in front of the jury again.  Forwarned is forearmed.

23   Let's go.

24             (End of discussion at side-bar.)

25   BY MR. MATESIC:

1        Q.    All right.  Miss Pawk, in addition to the

2    documents that you were just testifying about, Cost has

3    undertaken other efforts to hire -- excuse me, to put into

4    force and effect its equal employment policy, correct?

5        A.    Yes.

6        Q.    Okay.  You would agree with me that under the

7    contract that was in force at the SCI Marienville project,

8    any mason tender that was hired had to come from the

9    Laborers International Local 952, assuming that they had a

10   member to refer to Cost.

11       A.    I'm going to -- rephrase that.  I would believe

12   that any laborer hired would have to be out of the Western

13   District Council Laborers Union, and whatever that

14   envelopes.

15       Q.    Okay.  On the SCI Marienville site, the local was

16   Local 952.

17       A.    Yes.

18       Q.    All right.  And Cost did, in fact, hire the

19   members that Local 952 referred to Cost in the summer of

20   2002.

21       A.    (No response.)

22       Q.    Correct?

23       A.    I assume so.

24       Q.    All right.  And at some point in the summer of

25   2002, that local ran out of members to refer to Cost.

1    A.    I don't have any personal knowledge about that.

2    Q.    You don't have any reason to dispute it,

3    Miss Pawk?

4    A.    No.

5    (Discussion held off the record.)

6    THE COURT:  All right, go ahead.

7    (Record read back by the reporter.)

8    BY MR. MATESIC:

9    Q.    You do agree with me that at some point Kathleen

10   Brown appeared at the Cost job site seeking work from Cost?

11   A.    I have no personal knowledge of that.

12   Q.    What has your foreman told you?

13   A.    (No response.)

14   Q.    You talked to Dean Taylor about this case?

15   A.    I asked my foreman that if a person came looking

16   for a job as an operator, and she was a female, I wanted her

17   to be hired and to get a phone number so that I could

18   possibly contact her to hire her.

19   Q.    Mr. Taylor explained to you that Ms. Brown

20   appeared at the Cost job site seeking work?

21   MR. LUTZ:  Your Honor, could I ask when -- I mean,

22   there has been three years since this has happened.  There

23   have been a lot of discussions between Mr. Taylor and

24   Miss Pawk.

25   MR. MATESIC:  Let her answer.

1           THE COURT:  Well, hang on a second.

2           MR. LUTZ:  I object --

3           THE COURT:  I'm not sure.  Hang on.  Is the

4   objection you don't know when the conversation took place?

5           MR. LUTZ:  I object to the form of the question,

6   because it's up in the air as to when he's talking about.

7   Is this the month after this alleged act of discrimination?

8   Is it years later?

9           THE COURT:  All right.  I think that's fair

10  enough.  Can you sharpen up just a little bit.

11          MR. MATESIC:  All right.

12  BY MR. MATESIC:

13      Q.   Well, the summer of 2002, I think it's safe to

14  assume, until I ask you differently, that I'm asking about

15  events that occurred in 2002.  Okay?

16      A.   Okay.

17      Q.   Okay.  So in 2002, you and Dean Taylor had a

18  conversation about Kathleen Brown.

19      A.   On September 18th, when I received the partially

20  filled-out Recruitment Memorandum, which I send to all

21  current employees stapled to the paycheck asking for the

22  referral of minorities and female qualified persons that may

23  be interested in operator, bricklayer, PCC, regular

24  positions, I received back a -- a partially completed

25  memorandum.

1      Q.    All right.  Let's --

2      A.    At that time I picked up the phone, and I dialed

3  Dean Taylor.  I don't know that I reached him in the first

4  instance.  I called him and said -- I think I left a

5  message; if a woman comes looking for an operator position,

6  get a phone number, please, so I can contact her.

7      Q.    Okay.  That's a message that you left for Dean?

8      A.    Yes.

9      Q.    I want to know about a conversation that you had

10  with Dean.

11      A.    On October 29th of 2002, I spoke with Ms. Brown.

12  After I hung up with her, she had expressed an interest in

13  becoming an operator for us.  I immediately contacted Dean

14  Taylor and asked him to let me know.  I wanted to hire her

15  as an operator.  He told me, Georgia, we're done; we're

16  winding down.

17      Q.    He also told you that Kathleen Brown had appeared

18  personally at the job site.  Excuse me.  Strike that

19  question.

20      A.    I did not know that at that time.  If she did.

21      Q.    You subsequently learned from Dean Taylor that

22  Kathleen Brown appeared at the Cost job site looking for

23  work.

24      A.    I don't believe he recalled Kathleen Brown per se.

25  He did say a woman had come down looking for a position as

1    an operating engineer.

2        Q.    Miss Brown -- excuse me.  I hope I won't make that

3    mistake again.  I'm sorry, Miss Pawk.

4        A.    That's okay.

5        Q.    You know that Mr. Taylor filed an affidavit in

6    this case.

7        A.    (No response.)

8        Q.    That's a yes or no question.  I apologize.

9        A.    I have not seen his affidavit.

10        Q.    You are Mr. Taylor's supervisor; is it fair to

11    say?

12        A.    Raymond Sekowski is Mr. Taylor's direct

13    supervisor.

14        Q.    Who is Raymond Sekowski's direct supervisor?

15        A.    Corky Cost.

16        Q.    Do you mean to say that if you wanted to fire Dean

17    Taylor, and Ray Sekowski did not, that Dean Taylor would

18    still have a job?

19        A.    I think that's speculative.  I don't know the

20    circumstances.

21        Q.    You're the president of Cost Company, ma'am.  You

22    don't have the power to fire Dean Taylor?

23        A.    I do not directly supervise the field.  Only when

24    it comes to Workers' Comp. and safety and EEO issues am I

25    interacting with the field.

1        Q.    What does the word "president" mean to you?

2   Define that term, please.

3        A.    I supervise most of the day-to-day office matters.

4   I am not a field supervisor.  I would oversee as far as -- I

5   would step in as far as safety, which I believe is first and

6   foremost on any job site.  I would oversee as far as any

7   Workers' Comp. or injuries, as far as any insurance matters,

8   as far as any general liability, auto, any property theft,

9   matters like that.  I do not interact on a day-to-day basis

10  with the foremen.

11       Q.    If Dean Taylor -- if Dean Taylor talked with

12  Kathleen Brown, and you went to him to find out what they

13  talked about, he would have to answer you, wouldn't he?

14       A.    If I asked him?

15       Q.    Yes.

16       A.    Absolutely.

17       Q.    Yes.  He has an obligation to respond to your

18  inquiries.

19       A.    Yes.

20       Q.    Mr. Taylor filed an affidavit in this case.  And

21  we're going to look at it right now.  Paragraph 11.  This is

22  Plaintiff's Exhibit 20.  Do you see that on your screen?

23       A.    I see two highlighted segments.

24       Q.    Paragraph 11, ma'am.  Sorry.

25       A.    Yes, I see the beginning of Paragraph 11.

1      Q.    Okay.  Please read that into the record.

2            THE COURT:  Slowly, ma'am.

3      A.    "I recall briefly meeting Kathleen Brown on one

4  occasion at the Cost job trailer.  I recall that she

5  presented herself to me as someone seeking employment with

6  Cost as an operating engineer.  I recall telling her that we

7  were not hiring any more operating engineers, and that there

8  was no further need for additional operators on that

9  project."

10     Q.    All right.  Mr. Taylor was referring to a meeting

11  that happened in 2002.  Correct?

12     A.    I assume so.

13     Q.    And it's now 2005.

14     A.    Yes.

15     Q.    And you, as the Equal Employment Compliance

16  Officer, have never had occasion to ask Mr. Taylor whether

17  or not Ms. Brown showed up at that job site.

18     A.    I asked Mr. Taylor if a female showed up at the

19  job site looking to be an operator, and that I wanted her

20  phone number to contact her to hire her.

21     Q.    The Minority Recruitment Memo that you were

22  talking about before --

23     A.    Yes.

24     Q.    -- I correctly identified that as a Minority

25  Recruitment Memo?

1      A.    Well, I don't believe it's "minority".  It's --

2      Q.    I'm sorry.

3      A.    -- to recruit minorities and females and qualified

4  persons for possible future employment with our company.

5  Whether we're hiring at that time or not, we're always

6  interested in canvassing our current work force in the hopes

7  of attaining more minorities and more females and more

8  qualified persons.

9      Q.    I'm going to put before you -- this is actually

10  Exhibit A-1 -- or this was Exhibit A-1 to your response in

11  Ms. Brown's EEOC case.

12         Before I ask you questions about it, Ms. Brown

13  filed a charge of discrimination with the Equal Employment

14  Opportunity Commission; is that correct?

15      A.    Yes.

16      Q.    All right.  And you were aware of that charge of

17  discrimination shortly after it was filed.

18      A.    I don't recall the date it was filed.

19      Q.    Because you were the Equal Employment Officer,

20  you're the one that received notice that she had claimed

21  discrimination --

22      A.    Yes.

23      Q.    -- against Cost.  And after she made that

24  complaint, you went about the business of responding to the

25  charge of discrimination, correct?

1          A.    (No response.)

2          Q.    You filed an affidavit -- this affidavit.

3    Defendant's Exhibit 1.

4          A.    Yes, that's my affidavit.

5          Q.    Okay.  And this is not the only document that you

6    filed.  Okay?  You included exhibits with this document.

7          A.    Correct.

8          Q.    Among them, this exhibit right here (indicating).

9          A.    But I responded to this partially completed

10   memorandum on September 18th, sir.  And I do not recall that

11   she filed her EEOC Complaint until November or December.

12         Q.    Let me ask you a few questions related to this.

13   This is a form that goes out in the paychecks on a monthly

14   basis, correct?

15         A.    Yes, it is.

16         Q.    All right.  And the purpose of this form is so

17   that Cost can be notified if there are any minorities or

18   women who might be interested in working for Cost.

19         A.    Yes.

20         Q.    And that is pursuant to Cost's goals as stated in

21   their equal employment policy.

22         A.    Yes.

23         Q.    That's consistent with the goal as stated in all

24   of those documents that you identified about 20 minutes ago

25   as having authored.  All the documents that you send out to

1  contractors.

2       A.    Yes.  Cost wants to hire qualified persons,

3  whether they are female, minority, whatever.  We want them.

4       Q.    All right.  And let me direct your attention to

5  the top of this exhibit.  Do you see that handwritten

6  information there?

7       A.    Yes.

8       Q.    That's Cost's name and address, isn't it?

9       A.    Yes.

10      Q.    And the reason that it's handwritten, Ms. Pawk, is

11 because when these things go out, Cost doesn't -- doesn't

12 print its name and address on the memorandum.

13      A.    These are attached to the pays, and the workers

14 get them.  Sometimes the workers fill them out and turn them

15 in to the foremen.  Sometimes they take them home and fill

16 them out, bring them back to the job site.

17      Q.    And sometimes you get these forms directly mailed

18 to you from the female or from the minority who is seeking

19 work.

20      A.    Very possible, yes.

21      Q.    But you don't provide that female or that minority

22 with your name and address so they know where to send the

23 thing.

24      A.    I believe the address got -- gets cut off when you

25 look down further where the -- I think the -- after they

1    state the position they are interested in.  I can't see it

2    on here, but I believe there's not enough lines for their

3    experience or whatever is on there.  So it probably would

4    have been cut off, yes.

5        Q.   When you receive documents at Cost's office, you

6    or any of the clerical workers, it is your practice to put a

7    stamp on that document to show the date that it was

8    received.

9        A.   I personally do not receive the mail.

10       Q.   I understand that.  But I'm asking you a different

11   question.  When Cost receives documents in the mail, such as

12   a request for employment, an expression of interest in

13   employment, Cost's practice is to stamp that document with

14   the date on which it was received.

15       A.   Yes.

16       Q.   Your testimony is that you received this memo on

17   September 18th, 2002.

18       A.   I received this memorandum on September 18th.  It

19   was along with the Tool Box Talks that came from the Forest

20   County, Marienville prison job site.  This document did not

21   come in through mail.

22       Q.   Your testimony was -- strike that.  Cost has an

23   interest in dating any documents that it receives.

24       A.   Only documents that arrive by the mail are stamped

25   received.

1    Q.   Let's go back to what steps you take to realize

2    the goal of equal employment.  You write a lot of documents.

3    You draft the notices to the employees, the notices to

4    applicants, the notices to contractors, the notices to

5    unions.  You, Georgia Pawk, you write all those things.

6    Correct?

7    A.   Yes.

8    Q.   And you do a lot more than that.  In addition to

9    writing all those documents, you also maintain what's called

10   an EEO file.

11   A.   Yes.

12   Q.   And that EEO file is Cost's record of every female

13   and every minority who has sought employment with Cost.

14   A.   It is a record of anyone, any individual who has

15   contacted Cost for employment.

16   Q.   And my point is --

17   THE COURT:  Hang on a second.  Excuse me.  If

18   you're going to stand, you have to object.  If you're not

19   going to object, sit down.  Go ahead.

20   BY MR. MATESIC:

21   Q.   My point, Ms. Cost [sic], is you maintain records

22   pursuant to Cost's equal employment policy.

23   MR. LUTZ:  Objection, Your Honor.  Relevance.

24   THE COURT:  Sustained.

25   Q.   Ms. Pawk, if you go to the trouble of maintaining

1    a file of all of the applications that you get for

2    employment --

3         A.    These are not applications for employment, sir.

4         Q.    If you go to the trouble of maintaining a file of

5    every instance in which somebody seeks employment from you,

6    wouldn't it make sense to put a time stamp on that document

7    to show when you received it?

8         A.    These documents are collected at the job site by

9    the project managers, along with Safety Tool Box Talks,

10   along with other project information.  They are collected by

11   the project managers, and they are distributed once they

12   come back to the office.  They are not stamped as -- as --

13   versus documents that would come through the mail.

14        Q.    There is no instance in which --

15        A.    There have been instances where these recruitment

16   memoranda do arrive by mail.  Frequently, the project

17   managers collect these job sites -- these job papers, excuse

18   me, from the foremen.

19        Q.    How many instances, ma'am?

20        A.    I would say the bulk of them would be collected by

21   the project managers.

22        Q.    You would agree with me that with regard to

23   regular mail, you do time-stamp or you date-stamp those

24   documents?

25        A.    I personally do not.  Someone in the office date

1    stamps mail.

2         Q.    All right.  And you would agree with me that there

3    is no stamp on this document.  Nothing to indicate on what

4    day you received it --

5         A.    No, I don't -- I don't --

6         Q.    So the only evidence we have as to when Cost

7    received this is your testimony.

8         A.    Yes, sir.

9         Q.    At the bottom of this form -- well, first of all,

10   I think we have to take a look at the text in here.  You

11   wrote this form.  Is that fair to say?

12        A.    I don't know that I typed it.  I believe I

13   authored it.

14        Q.    Well, let's read what you authored.  Would you

15   start at the first paragraph.

16        A.    "At this time we may not be accepting employment

17   applications.  However, in the future, should we be

18   commencing new projects, any additional manpower, we would

19   like you to inform us if you know of any individuals who are

20   minority or female that are qualified and may be interested

21   in any of the above positions.  If so, please --"

22        Q.    Go ahead.

23        A.    "Please fill out --"

24        Q.    Go ahead.

25        A.    I'm sorry.  "If so, please fill out the bottom

1    portion of the sheet, and we will ensure that it's presented

2    to the correct person for future consideration."

3         Q.   All right.  Whose idea was it to put these items

4    at the bottom of the document?

5         A.   This form was drafted by myself and Mary Ann

6    Sedlacek, the district director of the Office of Federal

7    Contract Compliance in Pittsburgh.

8         Q.   And why were you working -- I'm sorry, what was

9    her name again?

10        A.   She is the district director of the Office of

11   Federal Contract Compliance in Pittsburgh.  Her name is Mary

12   Ann Sedlacek.

13        Q.   And why were you working with her?

14        A.   Because when I started with Cost Company, our

15   previous controller had left, and I was then becoming the

16   Equal Employment Officer.  And I wanted to make sure that I

17   was fulfilling all the different requirements.  And one goal

18   we strive for, we try to use our best efforts, is to try to

19   solicit possible females, minorities, and other qualified

20   persons for future employment opportunities.  Very often

21   these forms are filled out by not necessarily a minority or

22   a female.  They are followed up on.  Whoever fills it out,

23   it is followed up on.

24        Q.   You would agree with me that on the form, then,

25   according to your testimony, on the form that you received

1    on September 18th, Ms. Brown had indicated that she was

2    interested in two positions; operator or laborer?

3         A.    Her form is partially filled out to say operator,

4    laborer, and resume attached, dot dot dot.

5         Q.    My question is, she was asking you for work as an

6    operator or a laborer.

7         A.    She filled out an interest in either.

8         Q.    And she attached her resume.

9         A.    Yes, she did.

10        Q.    All right.  Let's take a look at the resume.  You

11   acknowledge that you got the resume along with this

12   document.

13        A.    I believe the resume was attached to this

14   document.

15        Q.    And at the time that you received the memorandum

16   with the resume, you read both of those documents.

17        A.    Yes, I did.

18        Q.    All right.  And, now, do you see the first item

19   that's on -- that's listed on her resume under the --

20        A.    Yes.

21        Q.    -- heading of "Experience"?

22        A.    Yes.

23        Q.    Okay.  What do you see there?

24        A.    It states that she was a laborer with Parks.

25        Q.    Department of Conservation and Natural Resources.

1        A.    Yes.

2        Q.    Bendigo State Park.   Okay.   And then below that,

3    all right -- now, read this into the record, please.

4        A.    Yes.   It appears she was a general laborer who had

5    operated power tools, lawn equipment --

6               THE COURT:   That's too fast.   That's too fast.

7               THE WITNESS:   I'm sorry.

8               THE COURT:   Do it again.

9        A.    General laborer.   Operated power tools, lawn

10   equipment, and hand tools.   Operated backhoe with forks,

11   front-end loader, and triaxle.   Maintained pool facility,

12   setting docks and launches.   Cleaning and brushing under

13   bridge.   Cleaned up dump site and loaded roll-offs with

14   scrap material.   Hauled equipment.   DCNR Parks.

15       Q.    You read all of that on December 18th when you

16   received the resume.

17       A.    Yes.   I was especially interested in the last

18   page, where it talks about her forklift certification by the

19   International Union of Operating Engineers, which would be

20   Local 66.   She was a heavy equipment -- very skilled in

21   heavy equipment operating.   The bulk of her resume, sir, I

22   believe addresses her skill in running rigs; forklifts,

23   rough-terrain vehicles, et cetera.

24       Q.    With all due respect, that strays far beyond my

25   question.   My question was --

1       A.    Okay.

2       Q.    -- you read -- you read that part of her resume --

3       A.    Yes.

4       Q.    -- on September 18th, 2002, that you just read

5  into the record.

6       A.    Yes.

7       Q.    Now, you would agree with me that construction

8  work is seasonal in nature.  It peaks at a certain time,

9  generally speaking, every year.

10      A.    Generally.

11      Q.    Okay.  And in 2002, when you -- you, Cost -- were

12  doing the masonry work on the SCI Marienville project, that

13  project peaked somewhere around July of that year.

14      A.    I would not know that.

15      Q.    Well, we would be able to determine that if we

16  looked at your payroll records, correct?

17      A.    Payroll would know that.

18      Q.    Because payroll records would indicate the total

19  number of employees that Cost had at that job site in the

20  summer of 2002.

21      A.    Yes.

22      Q.    Have you had an opportunity to review your payroll

23  records in preparation for this trial?

24      A.    No, I have not reviewed them.

25      Q.    Okay.  You have not asked to review them?  You

1    have not asked anybody to review them for you?

2        A.    No.

3        Q.    Okay.  Let me show you what has been previously

4    labeled as Plaintiff's Exhibit 14.  Do you have that on your

5    screen?

6        A.    Yes, partially.

7        Q.    What are we looking at here, Ms. Pawk?

8        A.    We are looking at a weekly payroll

9    certification --

10       Q.    Okay.

11       A.    -- for Forest County Prison, Marienville prison.

12       Q.    Not just any weekly payroll certification.  This

13   is Cost's, right?

14       A.    Yes.

15       Q.    Okay.  And you have to send this information in to

16   the state government on a weekly basis?

17       A.    This will be sent with the pay application on a

18   monthly basis.  Well, you clipped them all together with the

19   billing.

20       Q.    Why do you send them to the State?

21       A.    It's a prevailing wage project, and the State

22   requires certified payrolls on this project.

23       Q.    What does "prevailing wage" mean?

24       A.    That would mean the wage dictated by the union or

25   the building trade in that category or craft.

1     Q.    And you would agree with me that if this is the

2     payroll certification for the week ending August 5th, 2002,

3     this document would contain the total number of employees

4     that Cost had at the SCI Marienville site at that time.

5     A.    Yes.

6     Q.    Okay.  I have previously gone through this

7     document, Miss Pawk, and I have counted up all of the

8     employees on this document.

9     A.    Okay.

10    Q.    And I come up with a total of 162 employees.  Do

11    you have any reason to doubt that number?

12    A.    No, sir.

13    Q.    Okay.  And among those 162 were 58 laborers.  Do

14    you have any reason to doubt that number?

15    A.    No.  I don't see the totals on my screen.  But,

16    no, I wouldn't doubt you.

17    Q.    You wouldn't doubt me.  And I went through the

18    rest of the payroll records that you provided to Ms. Brown,

19    and I never found a week in which there were more than 162

20    employees at that site.  Would you have any reason to

21    disagree that this is the highest numbers of employees that

22    Cost had at that job site?

23    A.    I would -- no.  Based on --

24    Q.    So you accept --

25    A.    I didn't personally do that.

1    Q.   You accept that as true.

2    A.   Yes.

3    Q.   This 162 represents the largest number of persons

4  that Cost employed at SCI Marienville.

5    A.   If you say so.

6    Q.   It's not if I say so, ma'am.

7    A.   I don't see the totals on my --

8    Q.   Do you want to take the time --

9    A.   No.  If you --

10   Q.   I am offering you that opportunity.

11   A.   No.  I believe you.

12   Q.   Okay.  In addition to believing me, you accept it

13  as true.

14        MR. LUTZ:  Objection, Your Honor.  He can ask a

15  question.

16        THE COURT:  Look it, have you seen the document --

17  has counsel seen the document he's referring to?

18        MR. LUTZ:  We know what document.  It's in

19  evidence.

20        THE COURT:  All right.

21        MR. LUTZ:  She's indicated she hasn't reviewed it.

22        THE COURT:  Well, it puts the witness in a

23  difficult position.  But my suggestion would be that this

24  issue could be solved if both of you look at it.  And if you

25  conclude at a break that there are 162 people there, then

1    there's 162 people on the sheet.

2            MR. LUTZ:  I'll withdraw any objection.  Let's

3    move on.

4            THE WITNESS:  Okay.

5            MR. MATESIC:  My question is actually slightly

6    different, Your Honor.

7            THE COURT:  Oh.

8            MR. MATESIC:  In addition to there being 162

9    people on that sheet, that represents the highest number of

10   employees at that job site during the year 2002.

11           THE COURT:  All right.  Do you know one way or

12   another whether that's true; whether 162 is the highest --

13           THE WITNESS:  I have no personal knowledge of

14   that; if it's the highest that we have employed.

15           MR. MATESIC:  And I would state for the record,

16   Your Honor, we have been pursuing this issue since

17   yesterday.

18           THE COURT:  Well, she says she doesn't know.

19           THE WITNESS:  I don't know how many are employed

20   on each job site.  I wouldn't know that.  That's payroll.

21           MR. MATESIC:  May we have a side-bar.

22           THE COURT:  Yes.

23           (Whereupon the following discussion was held on

24            the record at side-bar:)

25           THE COURT:  Are these weekly payroll

1    certifications?  They are for the period 8/5/02 through

2    what?

3                MR. MATESIC:  Weekly.  It's the 30th of July.

4                THE COURT:  Okay.  Now, during what week -- are

5    these week payroll periods or two-week payroll periods?

6                MR. PAWK:  One week.

7                THE COURT:  During what week do you believe

8    there's 162 people?

9                MR. MATESIC:  This one right here (indicating).

10   And this is the -- this is the day -- Wednesday July 31st is

11   the day on which Kathleen Brown appeared for work at the

12   Cost trailer.  It is also the day that we contend Cost had a

13   vacancy or knew of a vacancy for a laborer's position.

14               THE COURT:  Okay.  Now, are these all individual

15   pay stubs, if you will, for different people?

16               MR. MATESIC:  Actually, they are not pay stubs,

17   Your Honor.  What they were, as Miss Pawk was describing in

18   her testimony, the State requires that Cost demonstrate that

19   it has paid the prevailing wage, and this is the document

20   that Cost turns in to support its good-faith compliance with

21   the prevailing wage requirement.

22               THE COURT:  All right.  Well, then, look it, she

23   hasn't been able to answer your question because she hasn't

24   gone through this document.  And if the only way she can

25   answer the question is to go through the document and

1    satisfy herself that the highest number of employees that
2    there ever was during this period was on July 31st, then
3    we're going to take a recess, and she's going to look at the
4    document.

5             MR. MATESIC:  I have to add to this.  She also is
6    going to be asked to compare that, because the job peaked at
7    this time.  We have all the paperwork --

8             THE COURT:  Then you ask her when we get back on
9    the record here what you want her to look at, with an eye
10    toward that.

11                Now, you have got to go back to Pittsburgh at
12    4:00, so I'm not going to have you appear objecting -- you
13    know, doing your wife's objection.

14             MR. PAWK:  Can I state something on this issue,
15    Judge?  What she's going to do in order to answer this
16    question is -- and I have the box back there.  We produced
17    all the certified payroll records on this entire project,
18    which is over a year.  She's going to have to review each
19    week in order to satisfy his question accurately.

20             MR. MATESIC:  I don't understand why they can't
21    stipulate to this.

22             MR. PAWK:  Because I haven't reviewed them.  I
23    haven't reviewed every payroll record.  Let me finish.

24             THE COURT:  Hang on a second.

25             MR. PAWK:  What he could have done, and he chose

 1   not to do it, he wants to call Cost witnesses to review his

 2   case.  He had people review Cost records and sign affidavits

 3   for his motion in summary judgment.  He could have had

 4   people --

 5            MR. MATESIC:  We can't do that.

 6            THE COURT:  Could have, would have.  But we are

 7   where we are right now.

 8            MR. MATESIC:  May I respond?

 9            THE COURT:  No, you -- in a minute.

10            MR. LUTZ:  This witness said he's not familiar

11   with these documents.  What he's doing is being

12   argumentative in his questioning --

13            THE COURT:  We're beyond that.  I don't even want

14   to hear this.  The point is, the reason she can't answer

15   your question is she has not reviewed the documentation upon

16   which her answer would then have to be based.  She doesn't

17   have to accept your proposition.

18            MR. MATESIC:  Exactly.

19            THE COURT:  And so then I'm going the let her

20   review it.

21            MR. PAWK:  In order to expedite things, Judge,

22   could I talk to Larry --

23            THE COURT:  Who is Larry?

24            MR. PAWK:  Larry (indicating) and Georgia off the

25   record to see if we can stipulate, because here is what I

1  want to avoid, if I can.  How much testimony do you have

2  left of Georgia?

3          MR. MATESIC:  An hour.

4          THE COURT:  Well, you're going to have to come --

5  then we're going to have to break at 4:00, because -- you

6  want to go at 4:00, don't you?

7          MR. LUTZ:  Well, I have to be there at 6:30.  I

8  can drive fast.

9          THE COURT:  But then you're going to be here

10  tomorrow, aren't you?

11          MR. PAWK:  I expressed the personal nature of the

12  matter in chambers.  Our daughter is graduating from a fifth

13  grade school tomorrow at 11:00 in Pittsburgh, and I was

14  trying to avoid this.  I wanted Georgia yesterday.  I'm

15  saying let's see if we can stipulate.

16          MR. MATESIC:  My assistant went through these

17  records for purposes of tallying up the total number of

18  employees.  And it took him less than seven minutes to go

19  through records.  And all they have to do is to look at a

20  representative sample.

21          THE COURT:  Let's see if we can stipulate first.

22          (End of discussion at side-bar.)

23          THE COURT:  Miss Pawk, would you be so kind as to

24  step off the stand and go back and chat with counsel back

25  there to see if we can resolve this.

1          (Recess held from 3:38 p.m. till 3:47 p.m.)

2          MR. MATESIC:  We need to have a side-bar for the

3   stipulation.

4          THE COURT:  Can't we do it on the record?

5          MR. MATESIC:  We have been unable to reach one.

6          MR. LUTZ:  We will stipulate that Mr. Matesic has

7   counted the numbers of people correctly.  We're going to

8   take his word on that; that he has counted the number of

9   laborers, the number of bricklayers, the number of operating

10  engineers in his review of these documents, which is what he

11  asked us to stipulate to.  And we'll accept his word that he

12  has added them up correctly and the total number of

13  employees as well.

14         MR. MATESIC:  I have a response that --

15         THE COURT:  Look it, it's not appropriate for me

16  to force a stipulation.  I'm not going to do it.  But the

17  question that was on the table was whether or not 162 people

18  as of July 31st represented the highest number of workers

19  that were on that job site during the summer.  Is that

20  right?

21         MR. MATESIC:  Exactly.

22         THE COURT:  Are you willing to stipulate to the

23  accuracy of that?

24         MR. LUTZ:  For the purposes of moving on, Your

25  Honor, let's stipulate.

1          THE COURT:  It's not just for the purposes of

2     moving forward.  That is a fixed and stipulated fact.  Let's

3     go.

4     BY MR. MATESIC:

5          Q.   And if, Ms. Pawk, you reached the peak in July of

6     2002, that implies that at some point after July 2002, the

7     numbers of persons employed by Cost began to decrease.

8     Specifically, the numbers of persons employed at the SCI

9     Marienville site.

10         A.   Yes.

11         Q.   On September 18th, 2002, when you received the

12    Minority Recruitment Memorandum --

13         A.   Yes.

14         Q.   -- this document (indicating), when you received

15    that, it was after you had reached the peak at SCI

16    Marienville.

17         A.   I would not know when the peak was at the time I

18    received that.  I would not know on each job site when we

19    were winding down.  I do not supervise the field.

20         Q.   That's not my question.  On September 18th --

21    strike that.  My question is, when you received this

22    document, it was sometime after the workforce had peaked.

23         A.   Yes.

24         Q.   In fact, as we head into the fall of 2002, your

25    workforce at SCI Marienville is dropping.

1      A.    Yes.

2      Q.    So if we look at payroll records from October of

3  2002, we will see fewer numbers of employees than we saw in

4  July of 2002.

5      A.    I assume so.

6      Q.    We talked about whether or not Cost had a practice

7  of stamping these Minority Recruitment Memoranda when they

8  were received.  And you said sometimes -- strike that.  You

9  said that because this wasn't received in the mail, it

10  didn't get a stamp.

11      A.    I do not believe it was received in the mail.  I

12  believe it came with the Tool Box and other project papers

13  from that job site.  Very often foremen hold their Tool Box

14  Talks and some of their project papers, and they are

15  collected sometimes when the job is winding down.  I don't

16  know.  They all differ.  I have no idea.

17      Q.    I'm going to return to this in a moment.  Okay.

18  Minority Recruitment Memorandum, April 17th, 2002.

19      A.    Yes.

20      Q.    Do you see that on your screen?

21      A.    Yes.

22      Q.    What is --

23      A.    That says received April 25th.  Some do come

24  through the mail, yes.

25      Q.    And it looks like --

1      A.    It was faxed --

2            THE COURT:  Hang on a second.  You're going a

3  little bit too fast.  You're talking over him.  Wait until

4  he finishes, because the court reporter has to get it down.

5      Q.    Did you finish your answer?

6            THE COURT:  Go ahead.  What were you saying before

7  I interrupted you?  Okay, go ahead.

8            THE WITNESS:  He asked me about the stamp.

9      Q.    This is a date stamp, isn't it?

10     A.    Yes.

11     Q.    And, in fact, there is a header here; Cost

12  Company.

13     A.    Yes.

14     Q.    This was faxed to somebody.

15     A.    Or we received it by fax.

16     Q.    Got you.  The day on which it was received, that's

17  recorded on this memoranda.

18     A.    Yes.

19     Q.    And the person who filled this out, Joseph

20  Brooks --

21     A.    Yes.

22     Q.    -- do you know that person?

23     A.    I know of him.

24            MR. MATESIC:  By the way, Your Honor, that was

25  Defendant Exhibit W-5.

1          THE COURT:  All right.

2     Q.   And this document here, another Minority

3  Recruitment Memorandum dated April 17th, 2002.

4     A.   Yes.

5     Q.   And this one is filled out by James Phillips?

6     A.   Yes.

7     Q.   I apologize.  This is Defense Exhibit W-8.  And

8  what do we see up here?

9     A.   It says "received May 2nd".

10    Q.   2002.

11    A.   Yes.

12    Q.   All right.  Defense Exhibit W-10, another Minority

13 Recruitment Memorandum dated April 17th, 2002.  What do we

14 see right here (indicating)?

15    A.   It looks like it was received May something, 2002.

16 I can't -- I can't read it very well.  I'm sorry.

17    Q.   Received by Cost.

18    A.   Yes.  Looks that way.

19    Q.   Defense Exhibit W-12, another memorandum.

20    A.   Yes.

21    Q.   Do you see a date stamp on there?

22    A.   Yes.

23    Q.   Defendant Exhibit W-14, another memorandum with a

24 date stamp.

25    A.   Yes.

1     Q.    By the way, 14 and 12, they both had names at the

2  bottom of those memoranda, correct?  Kevin Burket on 14?

3     A.    14 and 12.

4     Q.    Carolyn Carter on 12?

5     A.    Yes, they have names.

6     Q.    All right.  This is W-16.  The name at the bottom

7  is Trevor John.  The memorandum is dated April 17th, 2002.

8  And up here in the right-hand corner, what do you see?

9     A.    May 2nd.

10     Q.    Date stamp?

11     A.    Yes.

12     Q.    All right.  Defense Exhibit W-18, the name Jerry

13  Hall at the bottom?

14     A.    Yes.

15     Q.    Minority Recruitment Memorandum, April 17th, 2002.

16     A.    Yes.

17     Q.    The date stamp is --

18     A.    May 2nd.

19     Q.    2002.

20     A.    Yes.

21     Q.    Defendant Exhibit W-22.  Name at the bottom is

22  Bernard L. Jones, Junior.

23     A.    Yes.

24     Q.    Date is May 9th, 2002.  And what do you see right

25  here where my finger is indicated?

1        A.    "Received May 20th, 2002".

2        Q.    A date stamp?

3        A.    Yes.  Yes.

4        Q.    Okay.  This is W-31 and W-32.  Now, I'll pull back

5   a little bit.  This is a two-page letter.  Do you see the

6   name at the bottom of the letter on the second page, on page

7   W-32?

8        A.    Yes.

9        Q.    Danette Wroblewski?

10        A.    Yes.

11        Q.    And now turning back to the first page of the

12   exhibit, W-31 --

13        A.    Yes.

14        Q.    -- the date of this letter is September 24th,

15   2002.

16        A.    Yes.

17        Q.    So that's at least four months after all the other

18   exhibits that we just looked at.

19        A.    Yes.

20        Q.    And what do you see in the upper right-hand

21   corner?

22        A.    "Received September 25th".  I can't read it very

23   well.  Sorry.  Received --

24        Q.    2002?  Let me zoom in for you.

25        A.    It looks like 2002, yes.

1    Q.   2002.

2    A.   Yes.

3    Q.   W-34.  September 19th, 2002.

4    A.   Yes.

5    Q.   A date stamp.  Carol A. Vedro.

6    A.   Yes.

7         MR. LUTZ:  Your Honor, can I ask what the

8    relevance of this is to Kathleen Brown?

9         THE COURT:  What is the relevance?

10        MR. MATESIC:  The relevance is that Kathleen

11   Brown's Minority Recruitment Memorandum was not

12   date-stamped.  The only evidence we have as to when it was

13   received was Miss Pawk's testimony.

14             In addition, Miss Pawk has, I believe,

15   suggested that it was not a practical procedure,

16   time-stamping, date-stamping the document they received.

17   And this exhibit shows that they did follow a practice of

18   date-stamping the exhibits that they received.

19             Given the fact that there is this issue of

20   the peak in the construction season, the timing of an

21   application for work, the receipt of an application for

22   work, it's extremely relevant to the question of whether or

23   not there's going to be a vacancy that that employee is

24   going to be able to serve in.  That's why --

25        THE COURT:  How many more documents are there?

1          MR. MATESIC:  I think there are about five more.

2          THE COURT:  All right.  We'll go finish it off.

3          MR. MATESIC:  Okay.

4    BY MR. MATESIC:

5      Q.   W-40, Bernard Jones, May 9th, 2002.  Do you see

6    the date stamp?

7      A.   Yes.  May 20th.

8      Q.   Why don't we do this:  You don't have any reason

9    to doubt that the rest of these documents -- this section or

10   this portion of Defense Exhibit W, that --

11     A.   Not all of them are date-stamped.  Some are put

12   under my door.  I do not have a date stamp.  I do not stamp

13   them.  Some may have been sent by the mail from out-of-town

14   job sites.

15     Q.   You maintain an EEO file, Miss Pawk.  You

16   testified to that.

17     A.   Yes, I do.

18     Q.   These documents go into that EEO file.

19     A.   Yes, they do.

20     Q.   There is some interest served in placing a date

21   stamp on that memorandum.

22         MR. LUTZ:  Object to the relevance, Your Honor.

23   He said he was going to go through a couple more.  Now we're

24   talking about the EEO file.  What does this have to do with

25   Kathleen Brown?

1          THE COURT:  What's the relevance?

2          MR. MATESIC:  Your Honor -- once again, Your

3    Honor, they received a document which they -- they say that

4    they got this document on September 18th, 2002.  Miss Brown

5    has testified that on July 31st, some two and a half months

6    prior to that, she hand-delivered that document to Dean

7    Taylor.  Mr. Taylor has testified that on the day that

8    Kathleen Brown showed up at the job site, that Ms. Brown had

9    this memorandum up with her.

10          If Ms. Brown is telling the truth about the

11   date and Mr. Taylor is telling the truth about the fact that

12   she had this document with her, then Cost received Kathleen

13   Brown's memorandum on or about July 31st, 2002, not two and

14   a half months later, as Ms. Pawk has just testified to.

15          MR. LUTZ:  What does that have to do with an EEO

16   file?

17          THE COURT:  I'm going to sustain the objection.

18   Move on to something else.

19   BY MR. MATESIC:

20        Q.   You did eventually speak with Kathleen Brown?

21        A.   Yes, I did.  On October 29th.  And I want to point

22   out that her resume says September through August of 2002.

23   So she must have prepared that resume which she handed to

24   someone after that date of August 2002, sir.

25        Q.   You don't have an earlier resume from Ms. Brown?

1      A.    You just had it a few minutes ago.  I believe it

2   said September through August she worked as a general

3   laborer doing pool, deck, and cleanup and et cetera for the

4   parks.

5      Q.    All right.  Let's go back to the memorandum.

6      A.    So I don't understand how she could have handed it

7   to someone --

8            THE COURT:  Just wait for questions.

9            THE WITNESS:  Sorry, sir.

10     Q.    This is an exhibit that Cost prepared.  This is

11  not an exhibit that Ms. Brown prepared.

12     A.    Correct.  And attached to that was her resume,

13  sir.

14     Q.    The resume attached.

15     A.    Yes.  It says "resume attached", dot dot dot.

16     Q.    I understand that.  And you're saying that this

17  was the resume --

18     A.    Yes.  It says May 2002 to August 2002, she worked

19  for the Department of Conservation and Natural Resources.

20     Q.    And you're saying that you don't have an earlier

21  version of this resume?

22     A.    That is the first version of the resume.  The

23  second resume I received, sir, said at the bottom it was

24  printed on October 4th, 2002 or October 2nd, 2002, sir.  And

25  the first time we spoke was October 29th, sir.

1    Q.    Let me ask you this:  You would agree with me that

2    from September 18th until October 29th, we're talking about

3    six weeks.

4    A.    If you go to my note that I wrote her, I mailed

5    her a note.  I also spelled her city Sigel both ways;

6    because in one, the resume stated it spelled one way,

7    whereas the Recruitment Memorandum had it spelled

8    differently.

9         I also called information, and I tried to try

10   different area codes to try to get a phone number, a contact

11   number, a way of contacting Ms. Brown, because I was very

12   impressed with her operating engineer background.

13   Q.    Are you saying that Ms. Brown never provided an

14   earlier resume to Cost?

15   A.    I have never received an earlier resume.  I

16   received that partially completed Recruitment Memorandum and

17   a resume attached.

18   Q.    But you have no personal knowledge as to whether

19   or not she may have given Dean Taylor a prior version of

20   that resume.

21   A.    No.  And it appears that it goes to August on that

22   original resume.

23   Q.    My question is different.  You have no personal

24   knowledge as to whether or not Kathleen provided an earlier

25   resume to Dean Taylor.

1       A.    No, I do not.

2       Q.    You have no personal knowledge as to whether or

3  not Kathleen provided a resume on July 31st.

4       A.    No, I do not.

5       Q.    Kathleen Brown called you repeatedly after she

6  first went to the Cost job site looking for work.

7       A.    I spoke to Kathleen Brown on October 29th.  I do

8  not recall her calling me prior thereto.

9       Q.    Does your company keep phone records?

10      A.    We have voicemail.

11      Q.    Do you keep telephone records?  Let me ask the

12  question definitely.  If you have voicemail, does that mean

13  there is no written record of who called on a particular

14  day?

15      A.    I believe the receptionist asks if someone would

16  like the voicemail, and if they do, she puts it through.

17      Q.    Puts them through to voicemail.

18      A.    Yes, sir.

19      Q.    But she doesn't make a written record of that

20  call.

21      A.    I do not believe so.

22      Q.    All right.  So you do not have any record as to

23  whether or not Kathleen Brown called you once or twice or 10

24  times before September 18th, 2002.

25      A.    No, I do not.

1        Q.   You have no record as to whether or not she called

2   you once or multiple times before October 29th, 2002.

3        A.   No, I do not.

4             THE COURT:  Just trying to get a time frame.  I'm

5   not trying to cut you off.  Do you have any idea?

6             MR. MATESIC:  Actually, I am going to get into a

7   whole other line of questioning now, which I think is going

8   to go about 45 minutes.

9             THE COURT:  Sorry?

10            MR. MATESIC:  I think it's going to go about 45

11  minutes.

12            THE COURT:  All right.  Let me see you at side-bar

13  for a minute.

14            (Whereupon the following discussion was held on

15             the record at side-bar:)

16            THE COURT:  I'm trying to figure out how we can

17  accommodate everybody's problems here.  She has a graduation

18  at what time this morning?

19            MR. PAWK:  It starts at 11:00, I think.  I could

20  ask her.  She knows better.

21            (End of discussion at side-bar.)

22            (Discussion held off the record.)

23            THE COURT:  Members of the jury, remember when I

24  told you we're going to go later tonight?  It wasn't a lie.

25  Let's put it that way.  Because I had every intention of

1    doing it.  But we have legitimate logistical problems.

2    Certain counsel have to be back in Pittsburgh at a certain

3    time.  There is other issues requiring someone to be down in

4    Pittsburgh tomorrow morning.

5                    To make a long story short, report back here

6    at 9:00.  My courtroom may be functional.  If it is, we'll

7    take you over there so we can break the record of being in

8    three courtrooms in one trial.

9                    (Whereupon the jury was dismissed at 4:06 p.m.)

10               THE COURT:  How long --

11               (Discussion held off the record.)

12               THE COURT:  All right, what is the story?

13               MR. PAWK:  She's making a call.  I thought the

14    thing starts at 11:00.  She thinks it starts at 9:00.  We're

15    going to find out in a second.

16               THE COURT:  Well, why couldn't we do this:  You've

17    got to finish her up.  I mean, she could go to the

18    graduation if it starts early in the morning and hightail it

19    back up here.  In the meantime, who else are you going to

20    call?

21               MR. MATESIC:  Bill Heaton, at the most.  And if I

22    talk to him, it's going to be 10 minutes.

23               THE COURT:  Well, then what we'll do is -- put it

24    this way, whether her thing is at 11:00 or whether it's at

25    9:00 -- I mean, how long can a fifth grade graduation be?

1      MR. PAWK:  It's an hour or so.  We're going to

2  try -- I told her to see if she could have her mother there,

3  you know, just so the child knows that one of us is there

4  for a little while and then try to get up here.  You know,

5  just right after lunch.

6      THE COURT:  What we'll do is this:  If you're

7  going to start with Miss -- if she can't be here first thing

8  in the morning, you put Mr. Heaton on or whatever you want

9  to do.

10      MR. MATESIC:  Okay.

11      THE COURT:  And then so we don't waste any time,

12  then what are you going to do?  Who are you going to put on?

13      MR. PAWK:  I asked Dean Taylor what I was going to

14  ask him.  And I think Larry is going to ask Georgia what he

15  is going to ask her when she comes back up.  And I was going

16  to call Bill Heaton for probably 10 minutes of questioning.

17      THE COURT:  So the jury is sitting around.  I'm

18  not happy about that.  You know --

19      MR. PAWK:  If you want me to make some calls,

20  she'll have to be here at 9:00.

21      THE COURT:  Well, I'm not happy about that either.

22      (Discussion held off the record.)

23      MR. LUTZ:  While he's out there, Your Honor,

24  Mr. Matesic has said there's another 45 minutes or so, which

25  surprises me.  And maybe if we had an offer of proof with

1    respect to what's left, we could address some of that and

2    shorten things.

3            THE COURT:  Just in general, I mean, by broad

4    subject categories, where else are we going?

5            MR. MATESIC:  Well, the reasons she was rejected.

6    Miss Pawk has given several reasons; the lack of a phone

7    number, the lack of qualifications to be a mason tender, the

8    lack of union membership, and --

9            THE COURT:  You're talking the EEOC responses?

10           MR. MATESIC:  Yes, the EEOC responses.

11           THE COURT:  All right.  You don't have to lay out

12   the whole thing.  It will be what it will be.  She's going

13   to have to be back up here anyways.

14                   But I am going to give you -- I want

15   everybody to be here at 8:30 tomorrow morning, because I'm

16   going to give you a draft of the charge.  And then -- 20

17   after 8:00 would be better, because then you can read it,

18   and we'll try to spend some time before 9:00 reviewing it.

19   And then -- because we'll be charging -- we'll be charging

20   maybe even in the morning, depending upon how we go.

21           MR. LUTZ:  I assume your draft charge is not ready

22   now?

23           THE COURT:  It may be.  Because I have been

24   working on it periodically during the breaks.

25               (Discussion held off the record.)

1          (Whereupon the following discussion occurred on

2           the record in camera:)

3          MR. PAWK:  I will have Georgia here, being ready

4    to finish her testimony at 9:00.

5          THE COURT:  I appreciate that.  It's good for the

6    jury.

7               Did you make the revisions to the draft?

8          THE CLERK:  Yes, I did, Judge.

9          THE COURT:  Can you give them each a copy.

10         THE CLERK:  Yes, I can.

11         THE COURT:  Do that now.  And then so you folks be

12   here about 20 after, and you'll have a chance to read the

13   thing tonight, and we can tinker with it.

14               And how long is your closing going to be?  Do

15   you have any idea?

16         MR. MATESIC:  The Court suggested no more than 30

17   minutes.  Is that right?  That's my number one goal.

18         THE COURT:  Okay.

19

20         (Proceedings adjourned at 4:19 p.m.)

21

22

23

24

25