1                IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    KATHLEEN BROWN,                 :
                Plaintiff           :
4                                    :
        v.                          :   C.A. No. 03-224 (WDPA)
5                                    :
COST COMPANY,                        :
6                Defendant           :

7

8

9

10

11          Trial in the above-captioned matter held

12      on Friday, June 10, 2005, commencing at

13      8:39 a.m., before the Honorable Sean J. McLaughlin,

14      Courtroom C, at the United States Courthouse, 617

15      State Street, Erie, PA 16501.

16

17   For the Plaintiff:
          Richard S. Matesic, Esquire
18        1007 Mount Royal Boulevard
          Pittsburgh, PA 15223
19

20   For the Defendant:
          Lawrence P. Lutz, Esquire
21        Michael J. Pawk, Esquire
          Lutz & Pawk
22        The Morgan Center Building
          Suite 102, 101 E. Diamond Street
23        Butler, PA 16001

24

25              REPORTED BY JANIS L. FERGUSON, RPR

1                          I N D E X

2

3    TRANSCRIPT OF THE PROCEEDINGS  . . . . . . . . . . . . 3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (Whereupon the following discussion occurred on

2                     the record in camera:)

3              THE COURT:  I gave you the revised charge, which I

4    think addresses your point.

5              MR. MATESIC:  It does.

6              THE COURT:  So with those corrections, do I take

7    it that you have no objection to the charge?

8              MR. MATESIC:  One last thing.

9              THE COURT:  All right.

10             MR. MATESIC:  We have a Pennsylvania

11   Constitutional claim in the Complaint.  And I apologize, it

12   slipped my mind.  You said yesterday that, you know, the

13   main objective is to get to the right result.  The analysis

14   is exactly the same.

15             THE COURT:  It's duplicative.  You're not losing.

16   Why confuse the jury with the charge on it?  That's my view.

17             MR. MATESIC:  I would propose one sentence.

18   Whatever you say about Title VII.

19             THE COURT:  Well, why do it?  What is the point?

20   I mean, I just don't want to -- it's completely

21   gratuitous -- I mean, why put something in that doesn't

22   further the cause of making it simpler for the jury?

23                  Let me put it this way:  You're not losing

24   anything in terms of damages by -- you can't get a double

25   recovery, right?

```
 1          MR. MATESIC:  Right.  We're asking to put it in
 2   because it informs the jury that not only has the Federal
 3   Government recognized the problem with discrimination, the
 4   State Government has as well.
 5               In our proposed point for charge --
 6          THE COURT:  What does it say?
 7          MR. MATESIC:  At 24, it says, "The Pennsylvania
 8   Constitution provides that equality of rights under the law
 9   shall not be denied or abridged --"
10          THE COURT:  So where would you want me to put a
11   sentence in, in this charge that explains --
12          MR. PAWK:  Can I see this, Rich?
13          MR. MATESIC:  Sure, go ahead.
14          THE COURT:  Under Page 6?
15          MR. MATESIC:  Right.  At the very end of that
16   first page --
17          THE COURT:  What page?
18          MR. MATESIC:  I guess this is Page 7.  Well, it
19   would have to be both pages.  Kathleen Brown, the federal
20   law makes it -- on Page 6, you describe the federal law.
21   And then right after that, you would say the Pennsylvania
22   Constitution also provides da-da, da-da, da-da, okay, and
23   the analysis is the same under both laws.
24          MR. PAWK:  Judge, I would object at this point.
25   I'll tell you why.  They have never heard anything about
```

1    Pennsylvania -- he doesn't lose anything if you don't put it

2    in.  All they have heard about is Title VII, the Civil

3    Rights Act, this entire trial --

4            THE COURT:  I'm not going to put it in.  If I

5    thought that you were harmed in the slightest by doing it, I

6    would put it in, but my view is it will be much clearer to

7    the jury the way that this is set up.

8            All right.  And the verdict slip, you have

9    already indicated what your view of the verdict slip is.

10   But do you each have a copy of the verdict slip?  Let's go

11   off the record.

12           (Discussion held off the record.)

13           MR. PAWK:  One brief concern on the record.  Just

14   want to make a record.  That's all.  I know that -- I was

15   concerned after my closing yesterday that Mr. Matesic made a

16   motion for a mistrial.  Quite frankly -- and I know that

17   Mr. Matesic disagrees with the Court's earlier rulings in

18   this case with respect to the statistical evidence, we'll

19   call it, for lack of a better term, and he's tried many

20   times to get it in over objection, et cetera, then made a

21   motion for a mistrial after my closing, which, of course,

22   I'm partial, but I didn't think I raised anything that

23   warranted a mistrial motion.

24           I don't believe you would do this, but I am

25   concerned that he might try to get a mistrial by saying

1    something in his closing that would be inappropriate.  I

2    hope that's not the case.

3              MR. MATESIC:  That's not the case.

4              THE COURT:  I have no doubt that Mr. Matesic would

5    not do that.

6              MR. MATESIC:  May I just note my objection on the

7    on the record as to the Court's ruling.

8              (End of discussion in chambers.)

9              (Whereupon the proceedings resumed in open court

10             at 9:05 a.m.)

11             MR. PAWK:  Your Honor, just so the record is

12   clear, we were just going through the exhibits.  I would

13   move for the admission of two exhibits that weren't already

14   moved; Defense Exhibit W and Defense Exhibit DD.

15             THE COURT:  They are admitted.

16             MR. PAWK:  Thank you.

17             THE COURT:  Mr. Matesic?

18             MR. MATESIC:  Thank you, Your Honor.

19             Good morning, ladies and gentlemen.  We're

20   very close to the end of this process.  I'm going to try to

21   make my remarks as brief as possible.

22             Mr. Pawk talked to you yesterday about the

23   truth finally coming out.  He also talked to you about the

24   smoking gun in this case.  I'm glad he raised those two

25   issues, because I also am going to address those issues.

1          The truth didn't come out for the first time
2     during this trial.  The truth was known a long time ago.
3     Back in 2002, at that job site at Marienville, there were
4     162 Cost employees, and not a single one -- not a single
5     one -- was a woman.
6          This case really poses the question, should a
7     woman have to work harder than a man to get the same job.
8     Should she have to jump through just one more hoop to get
9     the same job that a man gets.
10          If you were one of the walk-on mason tenders
11     who got hired that summer, if you were one of the walk-on
12     mason tenders who Cost gave a $17-an-hour job to, what did
13     you have to do to get that job?  This is what you had to do:
14     You had to walk right up to this trailer and present
15     yourself and say give me a job.  There was one more thing.
16     You had to be a man.
17          What did Kathleen Brown have to do to get a
18     $17-an-hour job?  Well, she walked up to that trailer.  She
19     walked up to that trailer more than once.  She walked up to
20     that trailer with a copy of her resume.  She walked up to
21     that trailer with the Minority Recruitment Memorandum that
22     she had filled out.  We have looked at that memorandum a
23     dozen times in this case.  What does it say at the very
24     bottom?  Laborer, operator.  Resume attached.  What does her
25     resume say?  I am a laborer.  What does Ron Barrett say?  A

1    mason tender is a laborer.  I have got experience.  That's

2    what Kathleen's resume says.  I have got eight years of

3    experience in construction.  I am a laborer.  I'm an oiler,

4    I'm a field technician, I'm an operator.

5              I didn't know what those terms were.  Those

6    terms are unfamiliar to most people.  Kathleen knows,

7    because she's an experienced construction worker.  She knows

8    a lot about the building trade.

9              So she walked up not once, but twice,

10   documents in hand.  You know what?  Dean Taylor -- Dean

11   Taylor admits that Kathleen Brown handed him a copy of that

12   Minority Recruitment Memorandum on the day she went to that

13   job site.  Well, to be more accurate, it depends on what day

14   you asked Dean Taylor, as far as the answer to that

15   question.  Dean Taylor was asked that question in 2004, and

16   he said, yes, she had this memorandum with her.  What did he

17   say to you a year later?  "I don't remember that."  What did

18   Dean Taylor say when asked whether or not Kathleen Brown had

19   ever asked for a laborer's job.  What did he say in 2004?

20   He said, I can't remember if she did.  What did he say in

21   2005?  "No."  Filed a sworn affidavit.  In that affidavit he

22   said, she never asked me for a laborer's job.  So Dean's

23   story changed, not once, but twice.

24             Dean Taylor was asked, are women as capable

25   as men.  He was asked that question in 2004.  His answer?

1    Generally speaking, they are.  But there's one exception.
2    What is the exception, Dean?  Well, it's performing masonry
3    work at a prison site.  Because at a prison site, you don't
4    use bricks.  You don't use things that you can carry in your
5    hands easily.  You use blocks.  Remember?  He used his arms,
6    he showed us the size of the blocks.  Women weren't as
7    capable as men of doing that kind of work.  That's what he
8    said in 2004.  And what did he say when he had had a chance
9    to tell you his story here?  I really don't have an opinion
10   about it; I don't know.

11           Ladies and gentlemen, what Dean Taylor did
12   was try to take a middle position between equality for women
13   and inequality for women.  There is no middle position.  You
14   either believe that men and women are equal or you don't.
15   You can't be a little bit pregnant.  There's no middle
16   position between those two points.

17           What Dean Taylor said was false.  The
18   question is, why did he say something that was false?  There
19   is more than one answer to that.  Dean Taylor might be
20   wanting to conceal his own bias.  On the other hand, Dean
21   Taylor's boss is the Defendant in this case.  The woman who
22   he answers to, Georgia Pawk, is a Defendant in this case.
23   Dean Taylor is an 18-year employee of the Cost Company.
24   2002, he was running one of the biggest jobs that they had
25   ever done.  He had 162 employees under his command.  Dean

1    Taylor's job is on the ropes.  That's his livelihood.  Do

2    you suppose he might want to come to court and go to bat for

3    his boss?  Why would a person do such a thing?

4              You know, Dean Taylor is not the beginning

5    and the end of this case.  We asked Dean Taylor, Dean, of

6    the 162 employees at that site, how many were female.  He

7    said zero.  He gave us a lower estimate in the earlier part

8    of his testimony.  We later found out it was an even larger

9    number, a larger disparity.

10             It just so happens that the Cost Company has

11   an Equal Employment Compliance Officer.  I take that back.

12   She's the Equal Employment Opportunity Officer.  Right?  We

13   were all together on Wednesday when I asked Ms. Pawk the

14   question, what is your job title, and she answered my

15   question.  Do you remember me going to this board and

16   writing it out word for word?  Equal Employment Compliance

17   Officer.

18             She was asked the same question in that chair

19   yesterday.  And what did she do?  She corrected me.  She

20   said, I am the Equal Employment Opportunity Officer.  She

21   didn't correct me, she corrected herself.  When was the last

22   time you were asked what you do for a living and you gave

23   the wrong answer?  What does that say about her commitment

24   to this; how important this really is to her?  She can't

25   even get the job title straight.

1          You know, actions speak louder than words.  I

2   asked Georgia Pawk 50 or 60 questions, and in at least a

3   third of those instances, I would ask a question that

4   required a simple yes or no answer, and she would go on for

5   five minutes of all the things that she did to achieve this

6   goal at Cost; equal employment.  Is that right, Georgia?  Is

7   that your idea of equal employment (indicating)?

8          Dean Taylor said that Georgia Pawk never once

9   came to Dean and said, Dean, I've got a problem with that

10  number; 162 men and zero women.  Actions speak louder than

11  words, folks.

12         Do you remember these (indicating)?  The

13  stack of the Minority Recruitment Memoranda.  Okay.  This is

14  Defendant's Exhibit 12.  You're going to have this back in

15  the jury room when you go back to deliberate.  All right?

16         Now, what does Cost say on this memorandum?

17  They say, at this time we may not be accepting employment

18  applications --

19         THE COURT:  Slowly.

20         MR. MATESIC:  "-- but in the future, we would like

21  to have some contact information of women who would want to

22  work with us.  We went through a stack of these.

23         When it comes time to hire a walk-on at this

24  trailer, where was that stack of paper?  Was it in that

25  trailer so that Bill Heaton or Dean Taylor could use it to

1    get in contact with one of these people?  No.  Ladies and

2    gentlemen, it was in a filing cabinet 100 miles away in

3    Pittsburgh.  Actions speak louder than words.  Action speaks

4    louder than words.

5                    Georgia Pawk never took this document --

6    these documents, this stack of names and addresses, contact

7    information, and gave it to the guys who were actually

8    hiring.

9                    What does this say at the top?  All foremen,

10   bricklayers, da-da, da-da.  Laborers, right?  Laborers.

11   That's a very important point.  They are seeking laborers.

12   We all know now that the vast majority of laborers who were

13   hired for this site came from the union hall.  Okay?  These

14   aren't union members.  So this information, a person who

15   wants a laborer's position, who fills this out, the only way

16   they are going to get a job is if the guys who are hiring

17   during those limited, what, 12, 17 instances in 2002, they

18   are only going to get a job if the hiring people have this

19   information in front of them.  Because in all other

20   instances -- let's take the 15 or 17 names out of here.

21   Okay?  We're left with 145 names.  Those other 145, okay --

22   well, actually, I'll say it a different way.  We had 58

23   laborers among these 162.  All right?  So take out the 15 to

24   17 names of the walk-on employees.  All right?  The vast

25   majority of the laborers came from the union.  There were

1   only limited circumstances in which Cost could hire

2   non-union members.  The people who want to be laborers have

3   sent their information to Cost.  Cost never gives it to the

4   guys who do the hiring.  Actions speak louder than words,

5   ladies and gentlemen.

6           I asked Georgia Pawk to tell us exactly why

7   Kathleen Brown didn't get a job as a mason tender.  She

8   talked about this (indicating); no operator's position

9   available.  Their whole theory of the case is Kathleen only

10  wanted an operator's position.  That's what Mr. Pawk told

11  you yesterday during his closing argument, that's what the

12  witnesses said under examination by Mr. Pawk.  All right?

13  She only wanted an operator's position.

14          In other words, they want you to believe --

15  they want you to believe that Kathleen Brown, who in July of

16  2002 was making $395 a week, driving 450 miles a week, that

17  she is going to hold out for a better-paying job.  She is

18  not going to take a $17-an-hour job located one mile from

19  her home.  That's what they want you to believe.

20          You know, the IRS has a mileage range.  If

21  you can deduct your mileage from your taxes, they tell you

22  how much you can deduct based on your miles.  Okay?  That

23  rate is based on things like the cost of gasoline, the cost

24  of car maintenance, the cost of car insurance.  I don't know

25  what the figure is today.  Back in the mid 90's, it was

1    somewhere around 30 cents.  Let's say it's still 30 cents.

2    What is 30 cents times 450 miles?  $135.  And that comes off

3    of her net.  All right?  $400 a week, take out 20 percent

4    for taxes, so she nets 320.  And I am being charitable to

5    the Defendant when I say she only loses 20 percent in

6    withholding.  She's down to 320.  Now take out another 135.

7    Where is she?  She's below 200 bucks a week.  And she's

8    going to hold out, she's going to reject a $17-an-hour job?

9              What else did Kathleen Brown do to try to get

10   a $17-an-hour job?  Well, you saw her diary, you heard her

11   testimony.  I called this employer, I called that employer.

12   I signed up with Career Link.  I fractured wells.  I helped

13   a bricklayer for a couple days, I cleaned other people's

14   homes, I cleaned the Kelly Hotel.  I drove to Philadelphia;

15   from the northwestern corner of the state to the

16   southeastern corner of the state.  What are we talking

17   about?  320 miles?  I drove all the way to Philadelphia to

18   get a $15-an-hour job, no benefits.  Okay?  She is still

19   working toward the goal.  I want the $17-an-hour job, right?

20   She is still scraping, scratching, clawing.  She's trying to

21   get up that hill.  So that makes her an opportunist,

22   Mr. Pawk?

23              Mr. Pawk argued yesterday, she's an

24   opportunist, she's a gold digger.  She filed three EEOC

25   complaints.  Do you suppose that when a guy like Dean Taylor

1    can say, in my 18 years as a bricklayer I have never worked

2    alongside a female mason tender, do you suppose that that

3    might indicate a problem in the construction trades?  This

4    is a feisty individual.  She stands up for what she believes

5    in.

6             Is this -- is this an example of something

7    that women typically confront when they try to get a job in

8    the building trades?  Dean Taylor says, I never worked

9    alongside a female mason tender.  Can you think of any other

10   profession in which a man could say that?  In the last 18

11   years, I worked alongside this person, this -- this worker,

12   and never once in that 18 years have the workers around me,

13   the mason tenders around me, been women.  Is there any other

14   profession where it's that segregated?  Can you think of

15   one?  He says it without blushing.  It's not a problem for

16   Dean.

17            But, again, Dean doesn't carry all the blame

18   in this case.  Cost Company -- Cost Company has somebody who

19   is supposed to make sure that women are treated fairly.

20   Right?  Georgia Pawk.  What message is Georgia Pawk sending

21   to Bill Heaton and Dean Taylor?  They both -- Bill and Dean

22   have seen these things.  They go out in their paychecks

23   every month.  Every month Dean and Bill know that Cost is

24   collecting, is keeping on file records of people that aren't

25   going to get hired.  What message does that send to the guys

1    that are hiring?  Does it send a message that the 162 is a

2    problem, or does it send a message that it's not a problem?

3            Georgia Pawk said Kathleen Brown was not

4    qualified to be a mason tender.  She didn't have the skills.

5    Georgia Pawk is not a laborer, ladies and gentlemen.  Ronald

6    Barrett is.  He's been a laborer for decades.  What did

7    Mr. Barrett say?  There's no school where you learn how to

8    be a mason tender; you learn these skills on the job.  What

9    do you do as a mason tender?  You mix mortar.  You put it in

10   a wheelbarrow.  You carry it.  You move it.  You push planks

11   around.  You build scaffolding.  You learn these skills on

12   the job.  Mr. Barrett said the lack of previous experience

13   as a mason tender is not a disqualifier.

14           Who is the expert on what it takes to be a

15   mason tender?  Georgia Pawk or Ron Barrett?

16           What else did Ron Barrett say?  Remember this

17   guy, Mr. Bell, on the payroll records?  Mr. Bell, the guy

18   who worked the three double shifts?  Had the distinction of

19   working the most hours -- the new guy got the most hours

20   that week; got all the bonus pay that week.  Surprisingly,

21   there's another employee who the records indicate worked 24

22   hours one day.  We had to rely on Mr. Barrett to tell us

23   when the walk-ons were hired, because they wouldn't tell us.

24   What was their defense?  Sorry, bad records.  Sorry.  What

25   did Mr. Barrett say?  If I have a dues authorization signed

1    on August 1st, 2002, this is what I infer; a vacancy, either

2    on that day or the day before.

3              What day did Kathleen Brown write in her

4    diary that she went though that job site?  July 31st.  You

5    saw her diary.  A daily account, line by line of all the

6    things she did.  Do you really believe that after she didn't

7    get a job, she went out and purchased a diary and started

8    creating entries in there because she's a gold digger?  Is

9    that what a gold digger -- is that what explains why

10   Ms. Brown would drive 320 miles to Philadelphia to work a

11   $15-an-hour job, why she would work for the state for $10.40

12   an hour, why she would clean somebody else's house, why she

13   would clean somebody else's hotel room?

14             What else did Mr. Barrett say?  At least

15   three, right?  Three hires, walk-on mason tenders.  Men.

16   The guys who, you know, walked up to the trailer, said hire

17   me.

18             Kathleen Brown had given Dean Taylor her

19   contact information on July 31st.  Yeah, she didn't have a

20   phone, because she was working this crummy job that didn't

21   pay her any money.  She doesn't -- she's not the best

22   budgeter in the world.  She lost her phone service.

23   Whatever.  What was stopped -- she was a mile away.  She

24   told them, I'm at the Kelly Hotel.  Okay?  All your

25   bricklayers hang out at the Kelly Hotel.  If you're

1  interested, that's how you can get a hold of me.  Are you

2  interested?  Are you interested, Cost Company?  The same

3  Cost Company that doesn't have a woman yet.  Are you

4  interested?

5           What did Georgia Pawk say?  Here is what she

6  said:  "I would love -- I would kill for a female foreman."

7  Not to overuse a metaphor, ladies and gentlemen.  If she had

8  a female foreman, she would be dying to bring that person

9  into court and introduce her to you.  If she had a female

10  mason tender, she would have brought that person to court

11  and let her tell you how committed Georgia Pawk and the Cost

12  Company are to the goal of equal employment.  She would have

13  done that.  And she didn't.  Actions speak louder than

14  words.

15           Ladies and gentlemen, Judge McLaughlin, in a

16  few moments, is going to give you instructions about the

17  law.  And I just want to review a couple of the points that

18  he's going to make with you before I end my statement to you

19  today.

20           The first one is this:  If you find by a

21  preponderance of the evidence that the reason given by Cost

22  was not the real reason for its decision, you may, but are

23  not required to, find in favor of Brown.

24           Now, what does that mean?  Do wrongdoers in

25  our society generally admit that they are wrongdoers?  When

18

1    somebody does something bad, how often is it that they own

2    up to it?  You're right; I lied.  I cheated at poker, I

3    cheated on my taxes.  How often does that happen?  Would an

4    employer who doesn't really care about equal employment,

5    would a hiring supervisor who doesn't think they are as

6    capable as men, would they admit that to you?

7              In this case Mr. Pawk talked a lot about how

8    bad our evidence was.  There's a particular problem that

9    people in Miss Brown's position confront, because the people

10   who did her wrong are not going to come into court and admit

11   that.  So the law has a very special standard, and the

12   standard is appearing on your screen right now.

13             If an employer gives a false reason to

14   explain what it's doing, the law permits you to infer that

15   what the employer is really doing is covering up.  It is

16   covering up wrongful conduct.  And on that basis, you can

17   conclude what the employer is covering up is discrimination.

18             Do you believe what Georgia Pawk told you?

19   Did she give you a convincing argument for why Kathleen

20   Brown was not hired?  Do you believe what Dean Taylor told

21   you?  Well, it's kind of hard to disbelieve the statement in

22   his sworn testimony a year ago; women aren't as capable as

23   men.  Hard to disbelieve this (indicating).  How about this?

24   I don't know if there were any laborer's positions open.  I

25   don't keep any records.

1              Oh.  No emergency phone number.  She made an

2    issue of that.  She put that in the response that they filed

3    with the EEOC.  It was an incomplete application.  She

4    didn't give us an emergency phone number.  We need emergency

5    phone numbers, in other words, for people that we do not

6    even employ.

7              If you think that they are not telling you

8    the truth, you can conclude that what's really going on here

9    is discrimination.

10              The second point I want to make, you're going

11    to be asked to consider whether or not Cost's actions in

12    this case were willful.  And the law has a particular

13    standard about that issue as well.  And that's the portion

14    that I have highlighted for you.  A violation is willful if

15    the employer either knew or showed reckless disregard for

16    the matter of whether its conduct was prohibited by Title

17    VII.

18              Miss Pawk told you what Title VII is.  Title

19    VII is the federal law that was passed to protect women

20    against discrimination in employment.

21              What is the opposite of reckless disregard?

22    Commitment, diligence, decisive action.

23              She never once went to Dean Taylor to talk to

24    him about this.  Does that show diligence, commitment,

25    decisive action?  Three vacancies opened up in August.  The

1   people who filled those vacancies, this document right here

2   (indicating), it wasn't at that trailer.  It was in

3   Pittsburgh.  Does that show diligence?  Does that show

4   commitment to equal employment?  I didn't read Dean Taylor's

5   deposition, she said.  Miss Pawk is a securities fraud

6   lawyer, white-collar crime.  She went to Georgetown

7   University.  She didn't practice law for a long time, but

8   she knows something about the law.  She's the president of

9   the Cost Company.  Her company is the Defendant in this

10   action.  All of the evidence, the sworn evidence has been

11   typed up in a deposition transcript.  She never once took a

12   peek to see what Dean Taylor had to say and --

13         (Mr. Matesic asked for clarification by the

14          reporter.)

15         MR. MATESIC:  She didn't look at that?  And maybe

16   my memory is a little fuzzy, and I apologize.  I think she

17   looked at some of the depositions.  She did say that.  She

18   just didn't look at all of them.  Well, there weren't too

19   many in this case that we talked about.

20         One more portion of the Judge's instructions

21   that I'd like to talk about.  It starts here.  "While Brown

22   must establish that sex was a determinative factor in the

23   action taken by Cost, she need not establish that sex was

24   the sole factor."

25         I talked before about jumping through hoops.

1    I talked before about all the reasons that Cost gave for why

2    Ms. Brown wasn't hired.  If just one of those hoops was

3    based on gender, if just one of those reasons was based on

4    the fact that Miss Brown was a woman, that's all it takes.

5    You have to return a verdict in her favor.

6              Ladies and gentlemen, I put some numbers on

7    the board.  It might have appeared a bit confusing at the

8    time.  I have prepared a document here that I'd like to go

9    over with you concerning Ms. Brown's claims for damages.

10             Now, you see in the left-hand column the

11   wages and pension benefits that she earned, and it's for the

12   time period July 31st, 2002 until April 13th, 2003.

13   April 13th is when she got that job with KGL -- excuse me,

14   with Trumbill Corporation, where she was working for $17 an

15   hour.  That's when she got her $17-an-hour job.

16             What we have to do in determining her right

17   to collect damages or back wages and pension benefits is add

18   up all the money that she would have earned if she had

19   worked for Cost, if she had been hired, and deduct from that

20   any of the money that she earned through other sources

21   during that same time period.  And that's what this chart

22   indicates.  The total amount of the wages and pensions that

23   she earned during that time period, that appears on the

24   fourth line.  Total wage and pension, $8,038.

25             Now, her wage claim.  Had she been hired by

1   Cost, and had she remained an employee of Cost up through

2   April 13th of 2003, she would have earned $25,725 in wages.

3   She also would have gotten pension benefits; a pension

4   contribution of $1.94 an hour over that.  That totals

5   $2,910.

6           So here is what we do:  We add the pension

7   that she would have earned from Cost to the wage that she

8   would have earned at Cost, and then we take out the money

9   that she actually earned, and what we are left with is

10  $20,597.  That's her claim for wages, for lost compensation.

11          That is not her only claim.  Things were not

12  going well for Miss Brown in 2002.  And she will be the

13  first one to admit.  She doesn't blame Cost for all of her

14  problems.  She had problems with her kid, she had her own

15  health problems to deal with.  You know, life has been a

16  struggle for this family.  Life wasn't working out for her

17  in 1997.  She was living day to day.  And that's why she

18  wanted to get into the building trades.  And she's had to

19  scrounge for work ever since.

20          The bricklayers who were meeting up at the

21  Kelly Hotel every night for beers were telling her, they are

22  hiring people up the street.  You're a laborer; go up and

23  get that job.

24          And on July 31st, when she comes back without

25  a job, how does she feel?  The next day she's got to go back

1    to work for the State.  She's got to drive 90 miles the next

2    day because she failed to get that job.  Now she's got to go

3    back to her $10.40-an-hour job.  So that hurts.

4            But then she loses that job in the middle of

5    September or August.  September -- I'll say September.  She

6    loses it.  Now what does she have?  Nothing.  Now her life

7    starts to unravel.  She can't afford housing, has to bum

8    money off friends, has to clean people's houses, can't

9    sleep, drinking.  Begins -- begins the downward descent.

10   The lowest point of her life.  Why?  Would she have gotten

11   there -- put it to you this way:  Did she get there on her

12   own, or did somebody from Cost give her a little push down

13   the hill?

14           What is the value of the anguish that this

15   woman described to you on the witness stand?  I don't have a

16   number.  I don't have a chart for that.  That's your

17   decision.  And the only guideline I can give you is

18   fairness; what do you think is fair.

19           We're almost done.  There is another kind of

20   damages that the law provides in a case like this.  It's

21   called punitive damages.  Punitive.  It means punishment.

22   The standard for punitive damages, ladies and gentlemen, the

23   standard that we look at, reckless disregard.  If you find

24   reckless disregard in this case, then the law provides you

25   the authority to punish Cost.  Why?  Because you have to

1  send a message.  You have to send a message to Cost that

2  this will not be tolerated.

3              I don't have a chart for punitive damages,

4  ladies and gentlemen.  Again, all that I have is one word;

5  fairness.  That's all that we ask.

6              At the beginning of this case -- at the

7  beginning of this case, I suggested to you the picture of a

8  woman in a hardhat.  Can Georgia Pawk imagine a woman in a

9  hardhat?  Can she picture that in her mind?  Well, she's

10 going to have to, because in the summer of 2002, in

11 Marienville, Pennsylvania, the only women wearing hardhats

12 were in Georgia Pawk's mind.  Thank you very much.

13             MR. PAWK:  Can we approach, Your Honor.

14             (Whereupon the following discussion was held on

15              the record at side-bar:)

16             MR. PAWK:  Your Honor, I object.  Mr. Matesic's

17 entire closing argument was premised on the fact that there

18 was zero women on the job site and 162 total employees; the

19 very testimony that this Court sustained repeatedly

20 throughout the case.  In fact, the very question that he

21 asked Dean Taylor was, "162 people on the job.  How many

22 were women?"  Objection.  We went to side-bar, and you

23 sustained it.

24             His entire closing argument is premised on

25 the fact that they had zero women on the job site, and out

25

1    of courtesy, I did not object at the beginning of his

2    closing, but I think they need a curative instruction --

3              THE COURT:  You're going too fast.

4              MR. PAWK:  I'm sorry, Judge.  I'm excited.

5    Because we did not put any evidence in because that was

6    sustained.  We did not put any evidence as to other women

7    they have hired.  We did not establish the pool, as Your

8    Honor instructed him.  If he was going to get into that, he

9    could not establish a pool.

10             In fact, when he tried to with Dean Taylor,

11   Dean said, I can't tell you whether there was other women

12   who applied at the job because I wasn't always at the

13   trailer --

14             THE COURT:  All right.  What is your next point?

15             MR. PAWK:  The clear testimony from Mr. Barrett,

16   she would have to be eligible for any pension benefits.  He

17   just put that on the board.

18             THE COURT:  That's up to the jury, to their

19   recollection.

20             MR. MATESIC:  Your Honor, the door was opened.

21   Mr. Taylor clearly testified.  He was asked the question,

22   did Georgia Pawk ever come to you to talk about that number,

23   and he said no; no quotas.  We weren't talking about quotas,

24   percentages, or anything of that nature.  It was the simple

25   question that got into evidence that 162 men, none of them

1    were female.  It completely impeaches Miss Pawk's testimony

2    that she would kill to have a woman on that construction

3    site.

4            MR. PAWK:  That's not what he said.  He said she

5    never talked to me about hiring women on that project.  He

6    never got into numbers.  Your Honor, sustaining all those

7    objections went to numbers.  That's what it was.  So now

8    he's standing at the closing saying 162 people on the job,

9    not one woman; isn't that a problem for Cost.  He didn't

10   argue any other facts in detail except for that.  And that

11   was in his closing.

12           I think they are left with an improper

13   impression, based on all the other objections that were made

14   and sustained in this case.

15           MR. MATESIC:  And I would make one other point --

16           MR. PAWK:  Just to finish that point.  If that

17   evidence would have come in, he would have brought in

18   female, female.  He said, in fact, in his closing, Georgia

19   Pawk would kill for a female.  In fact, she would have loved

20   to have brought in a female before you in the jury -- she

21   would have died to have brought a female to the court and

22   showed her to you.  We have female employees.

23           THE COURT:  I thought I had ruled earlier in the

24   case -- I made a lot of rulings in the case.  But, in

25   essence, one of my rulings was absent a sufficient

1    foundation, statistical evidence, i.e., the number of women

2    who were on the job site at the peak period was not

3    probative of whether or not there was discrimination in this

4    case.  Had I not made that ruling?

5            MR. MATESIC:  My understanding of your ruling --

6    well, let me answer it this way:  Mr. Taylor testified

7    without objection that Miss Pawk never came in to address

8    this issue of 162 individuals on the job site.  Mr. Heaton

9    and Mr. Taylor both testified that at the annual EEO

10   meetings, there was never an issue brought up.  That that

11   information -- and Miss Pawk testified that she would kill

12   to have someone as a female foreman.  She never -- which

13   indicates that she does not have a female foreman.  She has

14   never had a female foreman.  That's what her testimony is.

15   It is her testimony she never had a female foreman, it's in

16   her deposition transcript.  She has already acknowledged

17   that she doesn't have a female foreman.  And Mr. Taylor has

18   already acknowledged that in the 18 years that he worked as

19   a bricklayer, he never had a female mason tender.  Okay?

20           If those pieces of evidence are in before the

21   jury, they have to be able to connect the dots.

22           MR. PAWK:  My objection goes to the numbers and

23   then comparing it to zero women on this job.  So to try

24   to --

25           THE COURT:  Excuse me a second.  Are you

1  suggesting that with a curative instruction, the jury be

2  told, in determining whether or not there was potential

3  discrimination in this case, they may not consider the

4  number of women who were on the work site?

5          MR. PAWK:  That would be fine.

6          MR. MATESIC:  I would consent to that.

7          THE COURT:  All right, we'll do that.

8          (End of discussion at side-bar.)

9          MR. MATESIC:  Pardon me.

10         THE COURT:  You know, this is the last time we're

11  coming up here.  This is definitely the last time.

12         (Whereupon the following discussion was held on

13          the record at side-bar:)

14         MR. MATESIC:  I apologize, for the sake of my

15  client's interest.  I made a mistake.  I don't want to have

16  a consent.  I want to place it on the record.  I understand

17  I have already given the Court my consent.  I understand

18  that.  I don't mean to delay the proceedings any further.  I

19  want to withdraw my consent at this time.  I apologize.

20         THE COURT:  You don't have to.  Don't apologize.

21         (End of discussion at side-bar.)

22         THE COURT:  Ladies and gentlemen, it is now my

23  duty to tell you about the law that is to be applied to this

24  case, in which you will be the finders of fact.  You have

25  heard all the arguments and all the evidence, and it is my

1    function to charge you on the law which you are required to

2    consider and which will govern your deliberations.

3                Let me also tell you before I go further in

4    my instructions that I am going to supply you with a copy of

5    these instructions so you don't have to -- unless you want

6    to, you don't have to scribble furiously to get every word

7    that I say down.

8                Now, as you know already, this is a civil

9    action brought by the Plaintiff Kathleen Brown, hereinafter

10   referred to as Brown, against Defendant Cost Company,

11   hereinafter referred to as Cost.  In this case Brown claims

12   that Cost discriminated against her on the basis of her sex

13   when it failed to hire her as an employee on July 31, 2002.

14   She seeks damages as a result of that alleged

15   discrimination.

16               Cost denies that its failure to hire Brown

17   was based upon her sex and contends that it is not liable to

18   her for any claimed damages.

19               Thus, what you will be call upon to decide at

20   this time is whether Cost discriminated against Brown

21   because of her sex when it failed to hire her as a laborer.

22               In deciding issues of fact in this case, it

23   is your duty to follow these instructions.  In doing so, you

24   must take into consideration all of the instructions that I

25   give you and not pick out any particular instruction and

1    disregard another one.  Your duty is to determine the facts

2    from the evidence that has been produced in open court, and

3    you are to apply the facts as you find them to the law as I

4    give it to you, and neither sympathy, nor prejudice should

5    influence you in any way.  Our system of law does not permit

6    jurors to be governed by sympathy, prejudice, or public

7    opinion.  Neither are you to be concerned with the wisdom of

8    any rule of law stated by me.

9              At the outset, you should understand I'm

10   absolutely neutral in presenting these instructions to you.

11   I will not give you my opinion about any issue of fact to be

12   determined by you.  Nothing in the way in which I give my

13   instructions to you is intended as an expression of my

14   opinion about any fact issue in the case.

15             As I told you at the beginning, the evidence

16   which you are to consider consists of the testimony of

17   witnesses and the exhibits offered and received into

18   evidence.  Also, when the attorneys on both sides stipulate

19   or agree to the existence of a fact, you must, unless

20   otherwise instructed, except the stipulation and regard the

21   fact as proved.

22             The proceedings during the trial have been

23   governed by rules of law, as you know, and we have had a

24   number of conferences to determine what evidence should be

25   allowed to be submitted to you.  From time to time it has

1    been my duty to rule on evidence to be submitted, and you

2    should not concern yourself with the reasons for those

3    rulings.  You are not to consider any testimony or any

4    exhibit to which I may have sustained an objection or any

5    exhibit which may have been ordered stricken from your

6    record or which has not been introduced into evidence.

7                Now, the attorneys here have argued very ably

8    and thoroughly, and they have been well prepared.  But their

9    remarks -- that is, what they have said to you -- is not

10   evidence.  They have argued to help you understand the facts

11   and their respective theories of the case, but their

12   arguments, again, are not evidence.

13               You must consider as evidence only the

14   testimony and the exhibits.  If you find that any argument,

15   statement, or remark of counsel has no basis in the

16   evidence, then you should disregard that argument,

17   statement, or remark.

18               Similarly, if you find that anything I tell

19   you about the facts is not based on the evidence, you should

20   disregard that too, because you are the finders of fact, and

21   it is up to me only to tell you what the law is.

22               This case should be considered and decided by

23   you as an action between persons of equal standing in the

24   community, of equal worth, and holding the same or similar

25   situations in life.  In this regard, a corporation is

1    entitled to the same fair trial in your hands as a private

2    individual.  All persons, including corporations, stand

3    equal before in the law and are to be dealt with as equals

4    in a court of justice.

5            When a corporation is involved, of course, it

6    may act only through its natural persons or its agents or

7    employees.  And, in general, any agent or employee of the

8    corporation may bind the corporation by his acts or

9    declarations made while acting within the scope of his

10    authority delegated to him by a corporation or within the

11    scope of his duties as an employee of the corporation.

12            Now, the first matter of law about which I

13    will instruct you is the applicable burden of proof.  And

14    the burden of proof is a concept which you must understand

15    in order to give the case proper consideration.  Because a

16    verdict cannot be based on speculation or conjecture.

17            In civil cases such as this one, the

18    Plaintiff has the burden of establishing every essential

19    element of her claim.  If the proof should fail to establish

20    any essential element of the Plaintiff's claim by a

21    preponderance of the evidence, then you should find for the

22    Defendant as to that claim.

23            Here, the applicable burden of proof is by

24    the fair weight or the preponderance of the credible or

25    believable evidence.  The fair weight or preponderance of

1   the evidence means evidence which has more convincing force

2   when it is weighed against the evidence opposed to it, so

3   that the greater probability of truth lies therein.

4          If we were to visualize evidence as something

5   weighed in on an ordinary balance scale, and if the evidence

6   admitted in support of the claim made by the party having

7   the burden of proof is more weighty in probative value than

8   the evidence offered in opposition, so it tips the scales on

9   the side of that party, then that party has proved the claim

10  by the fair weight or the preponderance of the evidence.

11         If, on the other hand, the evidence admitted

12  in opposition to the claim of the party having the burden of

13  proof outweighs or equally balances the evidence produced in

14  support of the claim, it can be said that there has been a

15  failure to carry the burden of proof imposed by the law.

16         When I say in these instructions that a party

17  has the burden of proof on any proposition, or use the

18  expression "if you find" or "if you decide", I mean you must

19  be persuaded, considering all of the evidence in the case,

20  that the proposition is more probably true than not.

21         It's important to note here that we speak of

22  the quality of evidence and not necessarily its quantity.

23  Also, all of the evidence admitted in support of and in

24  opposition to a claim must be considered and not just the

25  evidence offered by the party having the burden of proof.

1              In short, the test is not which side brings

2    the greater number of witnesses or presents the greater

3    quantity of evidence, but which witness or witnesses and

4    which evidence you considered most worthy of belief.  Even

5    the testimony of one witness may outweigh that of many if

6    you have reason to believe his or her testimony in

7    preference to theirs.

8              The Plaintiff, Kathleen Brown, has brought

9    this lawsuit against Cost Company under a federal law which

10   prohibits sex discrimination in employment.  The federal law

11   commonly known as Title VII, the Civil Rights Act of 1964,

12   or Title VII for short, makes it unlawful for an employer to

13   fail or refuse to hire or to discharge any individual or

14   otherwise discriminate against any individual with respect

15   to his compensation, terms, conditions, or privileges --

16   privileges of employment because of such individual's sex.

17             Your first duty in this case is to determine

18   whether Brown has proven her allegations that she was not

19   hired as a laborer because of her sex.  I will tell you the

20   rules of law on which you should base this determination.

21             Title VII forbids employers against

22   discriminating against employees on the basis of sex.

23   However, Title VII does not require that persons of a

24   certain sex receive special consideration or preferential

25   treatment.  Rather, Brown must prove by a preponderance of

1    the evidence that her sex actually placed a role in Cost's

2    decision not to hire her as a laborer, and that her sex had

3    a determinative influence on the outcome of that decision.

4    This does not mean that Brown has to prove that sex was the

5    sole cause of Cost's failure to hire her.  Even if you find

6    that other factors played a role, you may still find that

7    sex played a determinative role in her not being hired if

8    you find that Brown would have been hired, but for her sex.

9    The burden of proof remains at all times with Brown to show

10   that she was not hired as a laborer because of her sex.

11          Now, in order for Brown to prevail on her sex

12   discrimination claim, you must first find that she has

13   proven a prima facie case of sex discrimination by a

14   preponderance of the evidence.  To meet this burden, Brown

15   must establish each of the following elements by a

16   preponderance of the evidence:

17          First, that she is a member of a protected

18   class.  Second, that she applied for and was qualified for a

19   laborer position for which Cost was seeking applications.

20   Third, that she was rejected.  And, fourth, that after her

21   rejection, a laborer position remained open and Cost

22   continued to seek applications from persons of Brown's

23   qualifications.

24          I instruct you as a matter of law that Brown

25   has met her burden of establishing Element Nos. 1 and 3;

1  that is, that she is a member of a protected class, and that

2  she was rejected by Cost.  You, therefore, will not have to

3  pass upon those elements of the Plaintiff's case.

4            With respect to Element No. 2, I also

5  instruct you that as a matter of law, Brown was qualified

6  for a laborer position.  Therefore, in terms of a prima

7  facie case, you need only decide, first, whether Brown

8  applied for a laborer position on July 31st, 2002.  If you

9  find that she did, you must then determine whether a laborer

10  position was available when Brown applied.  If you determine

11  that Brown applied for a laborer position on July 31st,

12  2002, and that a laborer position was available when she

13  applied, you must then determine whether a laborer position

14  remained open and Cost continued to seek applications from

15  persons of Brown's qualifications.

16            If you find that Brown failed to prove that

17  she applied for a laborer position or that a laborer

18  position was open when she applied or that a laborer

19  position remained open and Cost continued to seek

20  applications from persons of her qualifications, you must

21  then find for Cost.

22            If you find by a preponderance of the

23  evidence that the reason given by Cost was not the real

24  reason for its decision, you may, but not -- but are not

25  required to find in favor of Brown.  Let me read that again,

 1  just in case I misread it.

 2             If you find by a preponderance of the

 3  evidence that the reason given by Cost was not the real

 4  reason for its decision, you may, but are not required to

 5  find in favor of Brown.

 6             In determining whether the reason given by

 7  Cost for its failure to hire Brown was the real reason, or a

 8  false or pretextual reason, you may consider whether Brown

 9  has demonstrated weaknesses, implausibilities,

10  inconsistencies, incoherencies, or contradictions in Cost's

11  stated reason, or introduce evidence that discrimination was

12  more likely than not the motivating cause of Cost's

13  decision.

14             Let me also tell you at this time, in

15  determining whether or not the Plaintiff was subjected to

16  intentional discrimination, you may not consider as a factor

17  in your determination the number of women that were on the

18  work -- on the job site at any given time.

19             If you find that Brown applied for a

20  laborer's position on July 31st, 2002, and that one or more

21  laborer positions were open when she applied, and that one

22  or more laborer positions remained open, and that Cost

23  continued to seek applications from persons of her

24  qualifications, you must then determine whether Cost

25  intentionally discriminated against Brown because of her

1    sex.  Brown cannot prove intentional discrimination by Cost

2    simply by showing that its stated reason for the challenged

3    employment decision is false.  Rather, Brown must show both

4    that the stated reason is false and that the real reason for

5    the challenged employment decision is because of her sex.

6    In other words, it is not enough for you, the jury, to

7    disbelieve the stated reason by Cost.  You must also believe

8    that -- you must also believe Brown's claim that the

9    decision was the result of intentional discrimination.

10           In order to satisfy her burden of proving

11   intentional discrimination in connection with her claim that

12   she was not hired as a laborer because of her sex, Brown

13   must prove that but for her sex, this decision and event

14   would not have occurred.  This means that Brown must prove

15   by a preponderance of the evidence that sex actually played

16   a role in the decision-making process and that sex had a

17   determinative effect on the outcome of the decision-making

18   process.

19           On the other hand, while Brown must establish

20   that sex was a determinative factor in the action taken by

21   Cost, she need not establish that sex was the sole factor

22   motivating Cost.  Sex may be one of a number of factors

23   contributing to the Defendant's action.

24           Again, the Plaintiff must demonstrate that

25   sex was a determinative factor if she chose -- let me say

1     that again.  Again, the Plaintiff demonstrates that sex was

2     a determinative factor if she shows that but for her sex,

3     the adverse action would not have happened.  That is, but

4     for her sex, she would have been hired as a laborer by Cost.

5                    I will now instruct you on the law regarding

6     damages which you may award if you have found by a

7     preponderance of the evidence that Cost discriminated

8     against Brown on the basis of her sex.  You will not

9     consider damages unless you find that Cost is liable to

10    Brown.

11                   Now, the fact that I am instructing you as to

12    the proper measure of damages should not be considered as

13    intimating any view of mind as to which party is entitled to

14    your verdict in this case.  Instructions as to the measure

15    of damages are given for your guidance, in the event that

16    you should find in favor of the Plaintiff from a

17    preponderance of the evidence in this case, in accordance

18    with other instructions.

19                   Brown is not required to prove her damages by

20    mathematical certainty, but she does have the burden of

21    proving her entitlement of damages by a preponderance of the

22    evidence.

23                   The first measure of damages that you may

24    award is called back pay.  Back pay is the amount of

25    compensation Brown would have received in the past.  The

1    appropriate measure of back pay is the amount of salary,

2    plus fringe benefits that Brown would have received from

3    July 31, 2002, to the present.  If you find that Cost did

4    not hire Brown because of her sex, an award of back pay is

5    mandatory.

6              From the amount of money Brown must prove

7    that she would have earned if she been hired as a laborer,

8    you must deduct any money that she received from another

9    employer during this time.

10              The second measure of damages that you may

11   consider is compensatory damages.  Compensatory damages

12   include compensation for any emotional pain, suffering,

13   inconvenience, mental anguish, and loss of enjoyment of life

14   that Brown has suffered as a result of Cost's

15   discrimination.  For items such as these, there is not and

16   there cannot be a fixed measurement.  It is measured by the

17   character, nature, and extent of the injuries as shown by

18   the evidence.  It is not compensation from a sentimental or

19   benevolent standpoint, but an amount that would be the most

20   reasonable amount of compensation under the circumstances as

21   shown by the evidence.  You should consider all the facts

22   and circumstances as evidence and give Brown the amount that

23   you believe will equitably, fairly, and justly compensate

24   her for these damages.

25              Finally, if you find that Brown was

1    discriminated against by Cost on the basis of sex, then you

2    must decide as part of the issue of Plaintiff's damages

3    whether Defendant's conduct was willful.  If you find that

4    Defendant's violation of Title VII was willful, the Court

5    will award Brown money damages in addition to that which you

6    have awarded.

7                    A violation is willful if the employer either

8    knew or showed reckless disregard in the matter of whether

9    its conduct was prohibited by Title VII.  A violation is

10   willful if it is done voluntarily, deliberately, and

11   intentionally and not by accident, inadvertence, or ordinary

12   negligence.

13                   I caution you that the Plaintiff need not

14   prove that the Defendant specifically intended to violate

15   Title VII in order to demonstrate willfulness.  The

16   Plaintiff need only establish that the employer knew or

17   showed reckless disregard for whether its conduct was

18   prohibited by Title VII.

19                   Violation of Title VII cannot be considered

20   willful if you find that the manager who was involved acted

21   in good faith.  If you find that the manager has shown good

22   faith and reasonable grounds for believing that he was not

23   in violation of the Title VII by reason of the challenged

24   employment action, you may not find willfulness.

25                   As I will explain later, intentional

1    discrimination is seldom admitted, and it is not necessary

2    to find direct evidence of intent to discriminate in order

3    to find that the violation was willful.  You may consider

4    statements made, acts done or omitted, and all facts or

5    circumstances received into evidence during the trial which

6    show whether or not the Defendant acted willfully.

7              In determining the amount of damages, if any,

8    that you decide to award, you should be guided by

9    dispassionate common sense.  You must use sound discretion

10   in fixing an award of damages, drawing reasonable inferences

11   from the facts in evidence.  You may not award damages based

12   on sympathy, speculation, or guesswork.

13             In deciding the facts of this case, members

14   of the jury, you should consider all the evidence presented

15   by the parties.  Consideration of all the evidence, however,

16   does not mean that you must accept all the evidence as true

17   or accurate.  In this connection, the evidence in this case

18   consists of the sworn testimony of witnesses, regardless of

19   who may have called them, all exhibits received into

20   evidence, regardless of who may have produced them, and all

21   facts which have been admitted or stipulated to by the

22   parties.

23             There are two types of evidence which you may

24   properly consider in deciding issues of fact in this case.

25   One type of evidence is called direct evidence.  Direct

1    evidence is where a witness testifies to what he or she saw,

2    heard, or observed.  In other words, when a witness

3    testifies about what is known to him or her of his or her

4    own knowledge by virtue of a witness' senses, what he or she

5    sees, feels, touches or hears, that's called direct

6    evidence.

7              The other type of evidence is called

8    circumstantial evidence.  Circumstantial evidence is

9    evidence which tends to prove a disputed fact by proof of

10   other facts.  And I'll give you an example of what the term

11   circumstantial evidence means.

12             Assume that when you came into the courthouse

13   this morning, the sun was shining, and it was a nice day.

14   And, of course, it is and it was.  Assume that the courtroom

15   blinds here were drawn so you couldn't look outside.  As you

16   were sitting here, somebody walked in the back with an

17   umbrella that was dripping wet, and somebody else walked in

18   with a raincoat that was also dripping wet.  You cannot, of

19   course, look outside of the courtroom to see whether it's

20   raining, so you have no direct evidence of that fact.  But

21   based on the combination of facts that I have asked you to

22   assume, it would, of course, be reasonable and logical for

23   you to conclude that it had been raining.  And that is all

24   there is to circumstantial evidence.  You infer on the basis

25   of reason, experience, and common sense from an established

1    fact the existence or nonexistence of some other facts.

2            Circumstantial evidence is of no less value

3    than direct evidence.  As a general rule, the law makes no

4    distinction between direct and circumstantial evidence.  The

5    law simply requires that before making a finding of fact,

6    the jury must be satisfied that the fact has been proved by

7    a preponderance of the evidence from all the evidence in the

8    case.

9            While you may consider only evidence in the

10   case in arriving at your findings of fact, you are permitted

11   to draw such reasonable inferences from the testimony and

12   the exhibits as you feel are justified in light of common

13   experience.  An inference is not a suspicion or a guess.  A

14   suspicion is a belief based on circumstances which do not

15   amount to proof.  A guess is speculation or conjecture.  An

16   inference, on the other hand, is a reasoned, logical

17   decision to conclude that a disputed fact exists on the

18   basis of another fact that you know exists.  In other words,

19   you may reach conclusions which reason and common sense lead

20   you to reach from the facts which have been established by a

21   preponderance of the evidence.

22            There are times when different inferences may

23   be drawn from the facts, whether proved by direct or

24   circumstantial evidence.  The Plaintiff will ask you to draw

25   one set of inferences, while the Defendant will ask you to

1  draw another.  It is for you and you alone to decide which

2  inferences you will draw.

3              In deciding this case, members of the jury,

4  you are required to pass on the credibility of witnesses.

5  Credibility simply means believability.  Your function is to

6  decide what is believable, who is believable, and how much

7  weight to give it.  In doing this, you must use your common

8  sense, your very background and experiences, the usual

9  indicators of truth that you would all use in your daily

10  life.

11             The witness' testimony depends on that

12  witness' observation and perception of what he or she

13  testifies to.  It also depends on the witness' memory and

14  what he or she experienced at the time and the witness'

15  ability to create that experience in court.  You may

16  consider the degree of the witness' intelligence, demeanor,

17  and appearance, the witness' frankness, his or her candor,

18  the evasiveness or responsiveness, as well as the

19  reasonableness or unreasonableness of the witness' testimony

20  in light of all the circumstances.

21             You may also consider any interest or bias

22  that might lead a witness to exaggerate, understate, or

23  otherwise color their testimony, such as a witness' interest

24  in the outcome of the case or a bias or prejudice that a

25  witness might have in favor of or against a party.  This is

1    not to suggest that the interest or bias of the witness will

2    lead the witness to tell you a falsehood or color their

3    testimony one way or the other, but bear these factors in

4    mind in passing on the credibility or believability of every

5    witness.

6              A witness may be discredited or impeached by

7    contradictory evidence or by evidence that at some other

8    time the witness has said or done something or has failed to

9    say or do something which is inconsistent with the witness'

10   present testimony.  If you believe that any witness has been

11   impeached and thus discredited, it is your exclusive

12   province to give the testimony of that witness such

13   credibility, if any, as you may think it deserves.

14             You are not required to accept testimony,

15   even though the testimony is uncontradicted and the

16   Defendant is not in -- and the witness, rather, is not

17   impeached.  You may decide, because of the witness's bearing

18   and demeanor or because of the inherent improbability of

19   that witness' testimony or other reasons which are

20   sufficient to you that such testimony is not worthy of

21   belief.

22             I charge you that if you find a witness has

23   lied to you in any material portion of their testimony, you

24   may disregard that witness's testimony in its entirety.  I

25   say that you may disregard that testimony, not that you

1    must.  If you choose to disregard the testimony of any

2    witness because you believe the witness has been untruthful

3    with you, there must have been untruthfulness in a material

4    portion of that witness' testimony.  You must be careful,

5    though, that the untrue part of the testimony was not as a

6    result of a mistake or inadvertence, but was, rather,

7    willful and stated with the design or intent to deceive.

8            Regardless of whether a witness' testimony is

9    untruthful by design or inadvertence, however, you may

10   reject all or any portion of the testimony, as in the case

11   of any witness, if the testimony is not believable by you.

12   On the other hand, you may be convinced that despite the

13   falsity of a part of the witness's testimony, he or she in

14   other parts testified truthfully.

15           Now, you may find inconsistencies in the

16   evidence, even actual contradictions in the testimony of

17   witnesses, although it does not necessarily mean that any

18   witness has been willfully false.  Poor memory is not

19   uncommon.  Sometimes witnesses forget.  Sometimes he or she

20   remembers incorrectly.  It is also true that two persons

21   witnessing the same incident may see it or hear it

22   differently.

23           If different parts of the testimony of any

24   witness or witnesses appear to you to be inconsistent, you

25   should try to reconcile the conflicting statements, whether

1    of the same or different witnesses, and you should do so if

2    it can be done fairly and satisfactorily.  If, however, you

3    find that there are genuine and irreconcilable conflicts in

4    their testimony, it is your function and your duty to

5    determine which, if any, of the contradictory statements you

6    will believe.

7              In this case you were called upon to assess

8    the intent of the decision-makers who acted on behalf of

9    Cost.  Intent ordinarily may not be proved directly because

10   there is no way of scrutinizing the operations of the human

11   mind.  But you may infer a person's intent from surrounding

12   circumstances.  You may consider any statement made or act

13   done or omitted by a party whose intent is an issue and all

14   of the other facts and circumstances which indicate his or

15   her state of mind, you may consider it reasonable to draw

16   the inference and find that a person intends the natural and

17   probable consequences of acts knowingly done or knowingly

18   admitted.  It is for you to decide those facts.  It is --

19   rather, it is for you to decide what facts have been

20   established by the evidence.

21             Liability for violation of Title VII depends

22   on the state of mind or motive of the individual who made

23   the employment decision at issue at the time the employment

24   decision was made.  Title VII does not protect people from

25   mistakes, bad decisions, or even harsh or unfair complaint

1    decisions, but only from adverse employment decisions

2    motivated by sex.  It is not your role as the jury to assess

3    the fairness or unfairness of Defendant's actions, but only

4    to determine whether that decision was motivated by sex.

5              Now, as I mentioned at the beginning, I am

6    entirely neutral about the outcome of this case.  I don't

7    want you to think that anything I said, any instruction I

8    have given you, any ruling I have made on the evidence, or

9    any statement I made to counsel or you implies that I have

10   any position at all in this case, other than to give you

11   fairly the law that you are required to apply, and that you

12   will rule fairly and impartially on the evidence that has

13   been submitted to you.  I have absolutely no interest in how

14   this case resolves itself, only in the procedure by which it

15   is done.  As I told you before, it is for you and you alone

16   to determine the facts of the case and credibility of the

17   witnesses.

18             If your recollection of the testimony varied

19   with any statements that were inadvertently made by me or

20   counsel or any party, you have to be guided by your own

21   memory and your own recollections of the testimony.  You

22   determine the facts from all the testimony that you heard

23   and from the other evidence which has been received during

24   the trial.  Neither I, nor anyone else, may infringe on your

25   responsibilities as sole judges of facts.

1          On the other hand, and of equal importance,

2    you must accept the rules of law as I have given them to you

3    and apply those rules to the facts of the case.

4          Now, in the next minute or so I am going to

5    instruct you on your deliberations; that is, what you are to

6    do when you retire to the jury room.

7          First, the attitude and conduct of the jury

8    at the outset of the deliberations are matters of

9    considerable importance.  When you retire to the jury room

10   for your deliberations, they should proceed in an orderly

11   fashion.

12         The first order of business in the jury room

13   will be to be select one person to act as the foreperson.

14   You are free to select any one of you to act in that

15   capacity.  The foreperson will preside over your

16   deliberations and will speak for you here in court, should

17   that become necessary.

18         One more thing about the foreperson.  The

19   fact that somebody is a foreperson does not mean that his or

20   her vote is entitled to any greater weight than the vote of

21   any other juror.

22         Now, in the course of your deliberations, if

23   you should find yourself in doubt concerning any part of my

24   instructions to you about the law, you may request further

25   instructions or clarification.  If that event, you should

 1    transmit a note signed by the foreperson to me through my

 2    courtroom staff.  Nobody should try to communicate with the

 3    Court by means other than a signed writing.  I will not

 4    communicate with you on any manner -- on any subject,

 5    rather, relating to the merits of the case, except in

 6    writing or orally here in court with all counsel present.

 7              You should not at any time reveal even to me

 8    how you stand numerically until you have reached a verdict.

 9              The responsibility is to reach a fair

10    conclusion from the evidence and the applicable law, and

11    that is an important responsibility.  Your verdict should be

12    reached only after careful and thorough deliberations,

13    during which you should consult with each other and discuss

14    the evidence and the reasonable inferences to be drawn from

15    the evidence freely and fairly in a sincere effort to arrive

16    at a just verdict.

17              It is your duty to consider the evidence with

18    a view toward reaching agreement on a verdict, if you can do

19    so without violating your individual judgment and

20    conscience.  You must decide this case for yourself,

21    examining the issues in evidence with candor and frankness

22    and with proper deference to and with regard to the opinions

23    of each other.  Mature consideration requires that you be

24    willing to reexamine your own views and to change your

25    opinions if you are convinced that your opinions lack merit

1    or validity.

2          On the other hand, while you may maintain

3    this flexibility, no juror is required to surrender his or

4    her honest convictions as to the weight or the effect of the

5    evidence because another juror's opinion differs from his or

6    hers or for the mere purpose of returning a verdict.  The

7    verdict must represent the considered judgment of each

8    juror.  In order to return a verdict, it is necessary that

9    each juror agree thereto.  Your verdict, therefore, must be

10   unanimous.

11         Keep in mind that the dispute here between

12   the parties in this case is for them a most serious matter.

13   They and the Court rely on you to give full and

14   conscientious deliberation and consideration to the issues

15   in evidence before you.  You should not allow prejudice or

16   sympathy to influence your deliberations.  You should not be

17   influenced by anything other than the law and the evidence

18   in the case.  Both of the parties here stand equal before

19   the Court, and each is entitled to the same fair and

20   impartial treatment at your hands.

21         Now, when you go to the jury room, you are

22   going to get the document called Special Interrogatories.

23   This is, in other words, a verdict form.  And it tracks

24   the -- in some measure, the charge that I have given you.

25   Read it carefully, follow it carefully.

1              At the back of the -- on the last page of the

2    verdict form, there is -- there are lines for the foreperson

3    and the individual jurors to sign.  When you reach a

4    verdict, each juror must sign the document.  And although

5    there is no date form that appears on this, you also have to

6    date it.  So, remember, everybody sign it and then date it.

7    All right.

8              (Courtroom clerk duly sworn at this time.)

9              THE COURT:  Why don't you take the jury back

10   there, and I have a few matters to take up with the lawyers.

11             (Jurors begin deliberations at 10:30 a.m.)

12             THE COURT:  I just want to make sure.  Are we all

13   squared away?  You have agreed on the exhibits that are

14   going out; is that right?

15             MR. MATESIC:  Yes.  We are still working on them.

16   We are just putting together the books.

17             MR. PAWK:  Mine are ready.  They are agreed upon.

18             THE COURT:  So, in other words, it doesn't require

19   any more involvement on my part.

20             MR. MATESIC:  I think -- I don't think I formally

21   admitted the exhibits.  I haven't read them into the record.

22             THE COURT:  All right.  Why don't you do that.

23             MR. MATESIC:  All right.  At this time Plaintiff

24   moves for the admission of Plaintiff's Exhibit 7,

25   Plaintiff's Exhibit 8, Plaintiff's Exhibit 9, Plaintiff's

1    Exhibit 11, Plaintiff's Exhibit 12, Plaintiff's Exhibit 13,

2    Plaintiff's Exhibit 14, Plaintiff's Exhibit 18, Plaintiff's

3    Exhibit 19, Plaintiff's Exhibit 20, Plaintiff's Exhibit 22,

4    and Plaintiff's Exhibit 24, and Defendant's Exhibit U-28,

5    Defendant's Exhibit U-23, Defendant's Exhibit U-25,

6    Defendant's Exhibit U-26, Defendant's Exhibit A-1,

7    Defendant's Exhibit W-1 -- I'm just going to read all the

8    W's.  W-1, W-5, W-8, W-10, W-12, W-14, W-16, W-18, W-22,

9    W-31, W-32, W-34, W-42, U-12 -- Defendant's Exhibit U-12 --

10   I apologize -- and Defendant's Exhibit F-3.

11              THE COURT:  Is that it?

12              MR. MATESIC:  That's it.

13              THE COURT:  Those are admitted.  All right.

14              (Proceedings adjourned at 10:35 a.m. till 1:30

15               p.m.)

16              (Whereupon the following discussion took place on

17               the record in camera:)

18              THE COURT:  Let's go on the record here.  Out of

19   an abundance of caution, I took a look at 42 USC 1981 on

20   this issue of damages.  And, frankly, I had -- I must have

21   been thinking of another statute or statutory scheme when I

22   was talking about molding it.  I don't think that's

23   appropriate.  I think looking at it, it's a jury question --

24   the jurors -- let me read three.

25                   "The sum of the amount of compensatory

1   damages under the section for future pecuniary losses,

2   emotional pain, inconvenience, mental anguish, and other

3   nonpecuniary losses and the amount of punitive damages

4   awarded under the section shall not exceed for each of the

5   complaining party and in the case of the respondent who has

6   more than 134 and fewer than -- the next group higher, 100

7   to a cap of 300.  So there's no doubling here of punitive

8   damages.  The jury can enter their own award.  And I'm going

9   to bring the jury out and tell them that right now.  All

10  right?

11          MR. PAWK:  What does your charge say?

12          THE COURT:  My charge says the Court will set

13  punitive damages.  That is incorrect.  I have been working

14  under a misconception for whatever reason.  I don't know why

15  I would be.  Maybe I drew a blank that it was simply an

16  exercise of mathematical doubling.  That's not the case.  I

17  am going to tell them it's up to them to award, if they find

18  the need.

19          MR. PAWK:  I would appreciate it if you say it

20  that way.

21              (End of discussion in camera.)

22              (Jury returned to courtroom at 1:32 p.m.)

23          THE COURT:  Members of the jury, lest you think

24  that judges never make mistakes, I'd like to disabuse you of

25  that, because I did, and I want to call it to your attention

1    in connection with your deliberations.

2                    On Page 13 of the jury charge, at the top of

3    the -- at Page 13 of the jury charge at the top of the page,

4    I told you in my charge, "If you find that Defendant's

5    violation of Title VII was willful, the Court will award

6    Brown money damages in addition to that which you have

7    awarded."

8                    The fact of the matter is, under the

9    statutory scheme, if you were to conclude that Cost Company,

10   per No. 6 in your special interrogatory form, willfully, or

11   recklessly discriminated against Kathleen Brown because of

12   her sex, then it will be up to you to enter an amount of

13   punitive damages.  And there is no line for that, but if you

14   decide to do it, you would simply put the figure directly

15   under No. 6.  Is that clear to everybody?

16                   All right, Becky.

17              (Jury recessed to resume deliberations at 1:36

18                p.m.)

19              (Proceedings resumed in open court at 2:41 p.m.

20                with the jury present.)

21              THE COURT:  I understand you've reached a verdict.

22   Would you please give your verdict slip to my courtroom

23   deputy.  If the verdict is in order, you can publish the

24   verdict.  Let me make sure it's dated.  I think it was.

25              THE CLERK:  In the United States District Court

1    for the Western District of Pennsylvania, Kathleen Brown,

2    Plaintiff, versus Cost Company, Defendant, Civil Action No.

3    03-224-Erie, Special Interrogatories, No. 1, "Do you find

4    that Plaintiff, Kathleen Brown, has proven by a

5    preponderance of the evidence that she applied for a laborer

6    position on July 31, 2002?  Yes."

7            "No. 2.  Do you find that Kathleen Brown has

8    proven by a preponderance of the evidence that a laborer

9    position was available at Cost Company when she applied?

10   No."

11           No. 3 is left blank.  No. 4 is left blank.

12   No. 5 is left blank, and No. 6 is left blank, and it's dated

13   June 10th, 2005, signed by the seven jurors.

14           THE COURT:  Members of the jury, let me take -- do

15   you have any requests?

16           MR. MATESIC:  If the jury is willing to speak with

17   counsel for the Plaintiff, we would be very happy for those

18   discussions.

19           THE COURT:  No, I'm not talking about that now.

20   I'm talking about do you want them polled?

21           MR. MATESIC:  I do want them polled.

22           THE CLERK:  Juror No. 1, would you please stand.

23   Is the verdict as read your verdict?

24           A JUROR:  Yes.

25           THE CLERK:  Juror No. 2, would you please stand.

1    Is the verdict as read your verdict?

2            A JUROR:  Yes.

3            THE CLERK:  Okay, thank you.  No. 3, would you

4    please stand.  Is the verdict as read your verdict?

5            A JUROR:  Yes.

6            THE CLERK:  Okay, thank you.  No. 4, is the

7    verdict as read your verdict?

8            A JUROR:  Yes.

9            THE CLERK:  Thank you.  No. 5, is the verdict as

10   read your verdict?

11           A JUROR:  Yes.

12           THE CLERK:  No. 6, is the verdict as read your

13   verdict?

14           A JUROR:  Yes.

15           THE CLERK:  No. 7, is the verdict as read your

16   verdict?

17           A JUROR:  Yes.

18           THE CLERK:  Thank you.

19           THE COURT:  Members of the jury, let me take this

20   opportunity to thank you for your service.  Although the

21   reality is everyone thanks you, but you don't have a lot of

22   choice.  You get the thing in the mail, and you've got to be

23   here.  But what you do have a choice about is your

24   promptness and your attentiveness.  And I see a lot of

25   juries come through here, and you have been very prompt, and

1   you have been very attentive.

2              When you come to this courthouse, as you have

3   over the last several days, you have seen court security

4   officers, clerk's office personnel, court reporters, law

5   clerks, lawyers, Judge, but nobody in this courthouse,

6   really, is more important than the jurors, because without

7   the jurors, to state the obvious, we would not be able to

8   have jury trials.  And that's the system that we're very

9   proud of.

10             On the way out, I would simply ask that you

11  check within the clerk's office downstairs.  I'm sure they

12  have no further need for you.  It sounds rather final,

13  doesn't it.  But poke your head in.  And wait just a minute

14  in the jury room.  I'm going to poke my head in and thank

15  you from a perch other than this bench before you leave.

16             All right.  We now are adjourned.

17

18             (Proceedings concluded at 2:46 p.m.)

19

20

21

22

23

24

25