IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


KATHLEEN BROWN,
     Plaintiff

v.            CIVIL ACTION NO. 03-224 ERIE

COST COMPANY,
     Defendant


JURY TRIAL - DAY NO. 1


Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Judge's Chambers & Courtroom A,

United States Courthouse, Erie, Pennsylvania,

on Monday, June 6, 2005.


APPEARANCES:
     RICHARD S. MATESIC, Esquire, appearing on behalf
     of the Plaintiff.

MICHAEL J. PAWK, Esquire, and LAWRENCE P. LUTZ,
Esquire, appearing on behalf of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1              I N D E X
              – – – – –

2

3    WITNESSES:              DIRECT  CROSS  REDIRECT  RECROSS
     _____              _____  _____  _____  _____

4  FOR THE PLAINTIFF:

5  Kathleen Brown           68     --     --      --

6

7

8

9              - - -

10

11

12    EXHIBITS:              IDENTIFIED
      _____              _____

13  FOR THE PLAINTIFF:

14  Plaintiff's Exhibit 24                    80

15  Plaintiff's Exhibit 12                    84

16

17

18

19

20

21

22

23                    - - -

24

25


                                        3


1              P R O C E E D I N G S
               – – – – – – – – – – –

2

3              (Whereupon, the proceedings began at 8:40 a.m., on

4  Monday, June 6, 2005, in Judge's Chambers.)

5

6          THE COURT:  All right, rather than look at the

7    motions in limine, let's look at the proposed voir dire.  And

8    we'll start, I'll start with the plaintiff's proposed voir dire

9    here.  I'll run through them and kind of indicate my feelings

10   on them.  If the defendant, when I'm doing that, and

11   vice-versa, has any strong feelings, pipe up, I will construe

12   silence as acquiescence.

13          We're going to come back to the issue on whether

14   Franco gets in this case at all is still on the table.

15          Two we'll give.

16          I will reluctantly give three, we'll be here until

17   the cows come home.  Do you really want me to do that, Mr.

18   Matesic, or maybe sharpen it up a little bit?

19          MR. MATESIC:  Of course, I think the court

20   understands the thrust of it, the thrust of the question.

21          THE COURT:  I think it's somewhat duplicative of

22   four.  We'll give four rather than three.

23          MR. MATESIC:  Okay.

24          THE COURT:  Five, we'll give five.

25          We'll give six.

4

1          What's the deal on seven, the labor union is only

2     tangentially involved here?

3          MR. MATESIC:  That's correct.  The fact is if

4     Kathleen were to have been employed by Cost, she would have

5     become a member of the labor union.

6          THE COURT:  I just don't see it being relevant.

7          Eight, we're not going to give.

8          We'll give 9 and 10.

9          We'll give 11.

10          Do you have a witness list?

11          THE CLERK:  I provided counsel both lists of

12     witnesses.  That list of witnesses appears in the pretrial

13     statements.  I explained if there are any names you know you're

14     not going to call, scratch them off.

15          THE COURT:  Thirteen I'm not going to give.

16          Fourteen I'm not going to give.

17          Fifteen I'm not giving.

18          Sixteen we'll give.

19          Seventeen I'm not going to give.

20          Eighteen I'm not going to give.

21          Nineteen we'll give.

22        Twenty-one we'll give.

23        Twenty-two and twenty-three we'll give.

24        Twenty-four we're not going to give.

25        Twenty-five we're not going to give.


                              5


1         Twenty-six -- let me go back and look at 25.  I

2    think we'll give 25.

3         Twenty-six we'll give.

4         Twenty-seven is duplicative, we're not going to give

5    it.

6         Twenty-eight -- as a general across the board

7    proposition, I don't give voir dire on broad, philosophical

8    questions that require juries to reflect ad nauseam.

9         Twenty-nine --

10        MR. PAWK:  I think that was asked earlier.

11        MR. MATESIC:  I'm sorry, it's duplicative.

12        THE COURT:  Twenty-eight I'm not going to give.

13   Twenty-nine I'm not giving.  Okay, now the defendants.  Some of

14   these are going to be in the standard voir dire.  One is given.

15        Two is given.

16          Three is given.

17          What's the relevance of their unemployment,

18   everybody has been unemployed at some point?

19          MR. PAWK:  That's okay, judge.

20          THE COURT:  Four is out.  I'm not going to go

21   through the last five jobs they've held.  They will be asked

22   what their present occupation is.

23          Educational background.  Six is all right.

24          Seven is in the standard anyway.

25          Is eight in the standard?


                          6


1          THE CLERK:  Yes, judge.

2          THE COURT:  I think nine is probably duplicative of

3   one of the plaintiff's, so we won't give it.

4          Have you ever managed employees -- didn't you ask

5   something about that, Mr. Matesic?

6          MR. MATESIC:  I don't think so, your Honor.

7          THE COURT:  Ten we'll give.

8          Eleven we'll give.

9          Twelve should be somewhat apparent from what their

10   occupation is.  Workforce, current status, we're not going to

11   go there.  We're not going to give 12.

12          Thirteen, I presume, is just to find out if they can

13   serve.  I think what we'll ask them is this case is expect to

14   last -- how long did you tell me, five days?

15          MR. MATESIC:  At the most.

16          THE COURT:  Approximately four days.  Is there any

17   reason that any of you could not serve for that period of time.

18          MR. PAWK:  I think 14 is suppose to go with 15.

19          THE COURT:  By the way, in terms of what the case is

20   about, this is what would I propose we say.  Jot this down.

21   In this case the plaintiff, Kathleen Brown, claims that the

22   defendant, Cost Company, discriminated against her on the basis

23   of her gender when it failed to hire her, or when defendant

24   failed to hire her as an employee -- what's the operative date

25   here, August of?


7


1          MR. MATESIC:  July 31st.

2          THE COURT:  July 31, 2002.

3          MR. MATESIC:  Actually on and after.

4          THE COURT:  On and after July 31, 2002.  She seeks

5   damages as a result of that alleged discrimination.  Defendant

6   denies that its failure to hire the plaintiff was based upon

7   her gender and contends that it is not liable to the plaintiff

8   for any claimed damages.  Is that acceptable to everybody?

9          MR. PAWK:  Yes.

10          MR. MATESIC:  Acceptable here.

11          THE COURT:  All right.  Is fifteen duplicative of

12   anything you have, Mr. Matesic?

13          MR. MATESIC:  We didn't ask specifically about any

14   discrimination.

15          THE COURT:  All right, we'll give 15.  Then here's a

16   list of witnesses which you guys can refine.  Or parties or

17   people that they might know.

18          Seventeen we'll give.

19          Eighteen we're not going to give.

20          Nineteen we're not going to give.

21          We're not going to give twenty, what is your opinion

22   of those rules.  We're not going to give any of it.

23          Twenty-one we'll give.

24          Twenty-two is duplicative, there's already a

25  question about filing of gender complaints.


8


1           We're not going to give twenty-two.

2           We're not going to give twenty-three.

3           We're not going to give twenty-four and its

4   subparts.  Because if I start asking about serious disputes,

5   I'll be into my next trial in 2008.  What they perceive to be

6   one.

7           I'm not going to give twenty-five.

8           We're not going to give twenty-six.

9           Twenty-seven, to the extent it wasn't already asked

10  with Mr. Matesic, we'll give it.

11           Twenty-eight we're not giving.

12           Twenty-nine we're not giving.

13           Thirty we're not giving.

14           Thirty-one we're not giving.

15           Thirty-two we'll give.

16           Thirty-three we're not giving.

17           Thirty-four we're not giving.

18           Thirty-five we're not giving.

19          Thirty-six is duplicative.

20          Thirty-seven we're not giving.

21          Thirty-eight we're not giving.

22          Thirty-nine we're not giving.

23          MR. MATESIC:  I have to object to forty.

24          THE COURT:  I'm not giving it.

25          Forty-one we're not giving.


9


1          Forty-two we're not giving.

2          Incidentally, I find those argumentative, just for

3   the record, that's why I'm not giving them.

4          Forty-three we're not giving.

5          Forty-four we're not giving.

6          Forty-five, it doesn't matter what it means to them,

7   it's what I tell them it will mean, we're not giving it.

8          Forty-six we'll give.

9          Forty-seven we'll give.

10          Forty-eight we'll give.

11          I think forty-nine is asked, is there any reason you

12   can't decide this case fairly.

13          Forty-nine is duplicative.

14          Right there, fifty.  We'll give fifty, we won't give

15   forty-nine.

16          The case is expected to last -- we'll say, we'll

17   change that to be on the safe side, five days.  And that

18   subsumes your question, Mr. Matesic.

19          THE COURT:  Fifty-two we're not going to give.  If

20   somebody has a problem, they'll let us know.  All right.

21          THE CLERK:  Judge, how many jurors are we going to

22   seat?

23          THE COURT:  My practice is, unless there is some

24   strong objection, to seat eight jurors, I generally do that.

25   Technically, there are two alternates, my feeling is they sat


                            10


1   through the trial, they ought to be able to deliberate as well.

2   Anybody have any problem with that?

3          MR. MATESIC:  No.

4          MR. PAWK:  No, judge.

5          THE COURT:  All right.

6          THE CLERK:  How many strikes, judge?

7        THE COURT:  What did you do the last time?

8        THE CLERK:  Three.

9        THE COURT:  My preference is three strikes.  Let's

10   then turn to the motions in limine.  You didn't have any

11   motions?

12        MR. MATESIC:  Did not.

13        THE COURT:  We're going to take up the defendant's

14   motion in limine.  Let's start with this Franco business.  And

15   you're asking that there be no reference to Franco or

16   development of this alleged, this other company that some of

17   the principals are involved in?

18        MR. PAWK:  Correct.  Judge, the reason being is in

19   plaintiff's motion, brief in opposition to defendant's motion

20   for summary judgment, he brought in an outside newspaper

21   article from the Pittsburgh Post Gazette regarding Franco,

22   regarding some work they did at stadiums in Pittsburgh.  Franco

23   is a partnership owned by Rebecca Snyder and her mother,

24   Frances Cost.  Cost Company is a different company.  Cost

25   Company is the defendant in this lawsuit.  I submit to you if

11

1  we're going to get into, what I think the plaintiff wants to do

2  is get into Cost Company and discriminatory practices and all

3  of a sudden shift over into Franco and somehow tie that into

4  Cost, we're going to be trying this case --

5       THE COURT:  Maybe the thing to do is sharpen our

6  discussion.  First, you have to tell me why it's relevant, then

7  I'm going to have him discuss it, too.  To frame the issue,

8  having read your papers last night, as I understand it, you

9  think that an exploration of Franco insofar as it might inform

10  the jury concerning Franco's hiring practices and knowledge of

11  equal employment laws, particularly insofar as they are

12  participants in that federal program, what's the name of it?

13       MR. MATESIC:  They're disadvantaged business

14  enterprises regulations in general apply to the contracting

15  money that Franco is eligible as a women owned business.

16       THE COURT:  In any event, what do you want to tell

17  me -- my understanding is that you think the evidence

18  concerning Franco may be relevant on the issue of the mens rea

19  of the Cost employer under the Kolstad case, is that right?

_____

20       MR. MATESIC:  Right.

21       THE COURT:  I'm having a hard time figuring it out.

22          MR. MATESIC:  Just in general our contention is that

23  Franco and Cost are one in the same entity.  Ms. Pawk, when she

24  testified without any prompting by plaintiff's counsel, talked

25  about Franco as if it was the same as Cost.  In fact, there is

12

1  an overlap between the two companies.  Ms. Pawk works for both

2  of them.  They share employees.  They share projects.  Both

3  entities ties are owned by the Cost family.  It's our belief

4  that Franco, I should say it differently, it's our belief that

5  Cost predated Franco.  That Franco is a relatively recent

6  creation that was put together specifically for one purpose.

7  To go out to go after these dollars specially earmarked for

8  women owned businesses.

9          THE COURT:  How does the program work; in other

10  words, you receive federal funding in return for making

11  affirmative efforts to be more inclusive to various minorities,

12  is that right?

13          MR. MATESIC:  Actually, there's two different facets

14  of the program.  Maybe it's easier to begin with the

15  non-disadvantaged garden-variety businesses.  If you have such

16  a business and you want to work on public projects that are

17  federally funded and oftentimes is the case with state funding

18  and local government funding projects as well.  You have to

19  show that you're committed to the goal of equal employment.

20  Now, the federal rules require that you do one of two things.

21  And, again, this is just for the non-disadvantaged.

22       THE COURT:  Like Cost?

23       MR. MATESIC:  This would be like Cost.  You have to

24  either show that you hit these targets for women hiring and

25  minority hiring.  6.9 percent for females.  6.3 percent for


13


1   minorities.  You have to show that as a condition to keeping

2   the money that you get as a contractor.  If you don't show

3   that, you have one affirmative defense.  And that is that you

4   have followed this 16 step procedure --

5        THE COURT:  I made good faith efforts?

6        MR. MATESIC:  You made good faith efforts.  Ms. Pawk

7   testified about good faith efforts that Cost goes through.

8   That they never hit these targets, at least in terms of

9   women -- they never hit the target of 6.3 percent.  If you are,

10    on the other hand, a women owned enterprise, you are under the

11    law considered to be a disadvantaged business enterprise.  Now,

12    there's a whole different set of contracts, a whole different

13    type of money only the disadvantaged business enterprises are

14    eligible to receive.  Cost can't get that money.  But Franco

15    can.  Our contention is that Franco really is a creation of

16    Charles Cost, the same person who owns Cost Company, and the

17    same person who would ultimately be held liable in the event

18    that Kathleen prevails in the case.  The creation of Franco

19    indicates this mens rea of the same decision-maker involved in

20    the case, who we also contend does not have communication to

21    his lower-level employees you must diligently pursue this goal

22    of equal employment.  Dean Taylor, foreman, you must hire women

23    when they come to the job site, you can't simply show them the

24    door or discriminate against them.  Ms. Pawk also testified

25    that, and I'm going back now to Cost, that she would kill, and


14


1    this is her own language, she would kill --

2         THE COURT:  Figuratively, no doubt?

3         MR. MATESIC:  Right, let's use that metaphor.  I

4    think they would be dying to tell the jury if in fact Cost had

5    met these targets of 6.3 percent and 6.9 percent hiring, and

6    she can't do that.

7         THE COURT:  I'll tell you tentatively where I'm

8    going.  First off, this is not a disparate impact case.  This

9    is a disparate treatment case.  I would no more be inclined to

10   let the defendant, by way of defending itself, come in and say

11   I met this hiring goal or I met that hiring goal, than I'm

12   going to let you attempt to use their failure to meet those

13   goals as evidence of discrimination in this case.

14        MR. MATESIC:  Not that it's evidence of

15   discrimination in this case, it's evidence of the disregard or

16   reckless indifference for federally protected rights.  If the

17   same decision-maker on the one hand is saying we are totally

18   committed to equal employment, we would kill to have female

19   employees in the workforce, that if the same employer when

20   confronted with written applications from a female saying give

21   me an opening as a laborer as soon as you have one, that same

22   employee just rips that up or whatever they do, if they just

23   ignore that application, that undermines the earlier statement

24   that they would kill, that they are really diligently committed

25   to hiring females.  So it goes to state of mind.

15

1          THE COURT:  Let me ask you a couple factual

2    questions here, then I'll hear what defense counsel has to say.

3    Who was the man who interviewed, who was the front line person

4    who first met your client on or about July 31st and indicated

5    that they didn't have any positions?

6          MR. MATESIC:  Dean Taylor.

7          THE COURT:  And here's the all important question

8    under Kolstad or one of them, was he the manager, did he
          ———————

9    function in a managerial capacity?

10          MR. MATESIC:  Yes.

11          THE COURT:  What was his position?

12          MR. MATESIC:  He was the foreman of that job site.

13    So in his own words he ran the job, he hired all of the

14    employees, he supervised or coordinated delivery of materials

15    to that job site.  There is one other thing, I can't remember

16    what it is.  He did all the hiring since April, 2002 when he

17    arrived on that job until it was completed, I don't know if it

18    was a year later, Mr. Taylor was the hiring authority.

19          THE COURT:  All right.  Before I spin over here,

20   now, let's focus on what I think the standard here is.  I read

21   this Kolstad case, I hadn't looked at it in a long time, to
         ———————

22   make a long story short, the court was struggling with the

23   concept of vicarious liability under Title VII insofar as it

24   applies to punitive damages.  And they looked at the common law

25   and restatement.  And, essentially, I guess the holding of the


16


1   case would be this.  They said recognizing Title VII as an

2   effort to promote prevention of -- well, as remediation and

3   absorb the very principles underlying the restatement's strict

4   limits on vicarious liability for punitive damages, we agree

5   that in the punitive damage context an employer may not be

6   vicariously liable for discriminatory employment decisions of

7   managerial agents where these decisions are contrary to the

8   employer's good faith efforts to comply with Title VII.  And,

9   by the way, the type of recklessness or evil motive that is

10   afoot there is something more than just being gender

11   discriminatory.  You have to know what the law is, it is a

12   reckless indifference to the dictates of federal law.  And in

13  Kolstad they sent it back to determine whether he was
    ⎯⎯⎯⎯

14  receiving, for instance, in a managerial capacity, whether the

15  association had been making "good faith efforts" to enforce an

16  anti-discrimination policy.  So that's the legal backdrop here.

17  Now, in response to what Mr. Matesic said, what is your

18  position?

19      MR. PAWK:  I don't know how that applies to Franco

20  at all.  If you're talking about that case, Kolstad, that seems
    ⎯⎯⎯⎯

21  to apply to Cost with respect to punitive damages based on

22  maybe if she shows there was some kind of reckless indifference

23  on Dean Taylor's part in terms of hiring.

24      THE COURT:  The way I see this playing out is this,

25  and then we're going on to the other points, I'm going to rule


                                17


1  on this all at once.  You don't question his managerial status,

2  do you?

3      MR. PAWK:  He's a foreman.  Judge, there's going to

4  be testimony that Georgia Pawk, who is the EEO officer and

5  president of Cost Company, judge, the facts are going to come

6   out like this.  That Kathleen Brown, she's testified at her

7   deposition that she didn't expect necessarily to get hired on

8   July 31st or August 23rd.  That she wanted to get hired on

9   those days or sometime later with Cost Company.  And there's a

10  continuing dialogue between her and Georgia Pawk in the fall of

11  2002, who is the EEO officer and president of the company, and

12  the testimony will show that they attempted to hire her, when

13  we're talking about hiring her, she didn't have her

14  certification as an operating engineer.  My problem with Franco

15  is this.  Franco gets inserted into the case, I'm going to

16  bring Rebecca Snyder up from Pittsburgh, she's the managing

17  partner of Franco.  Testifying about all the certifications

18  she's gone through in Harrisburg.  We're going to be here,

19  instead of five days, we're going to be here 10 days --

20      THE COURT:  Length of time is never determinative as

21  to whether something is relevant.

22      MR. PAWK:  It's confusing for the jury.  Under the

23  Federal Rules of Civil Procedure, especially 403, 401, I don't

24  believe it's relevant.  It's going to be confusing.

25      THE COURT:  Let me ask you a question.  On Cost, are

1   they required, I don't mean on Cost, on Franco as a participant

2   in the program, a federal program, are they required to

3   maintain a certain percentage of minorities?

4       MR. MATESIC:  I believe that's the case, I haven't

5   actually investigated that.

6       THE COURT:  Do you know about Franco as a

7   participant in a federal funding program?

8       MR. PAWK:  I think the same discrimination rules

9   apply to them as does Cost.  I don't think that's different.

10  It's more ownership.

11      THE COURT:  As long as you make good faith efforts.

12      MR. MATESIC:  Judge, as we said on page eight of the

13  memorandum, the regulations, which set out 16 good faith steps,

14  instruct contractors like Franco and like Cost, an affirmative

15  action program is just more than a paperwork exercise.  The

16  whole intent of the program is to increase female participation

17  in the workforce.  Chronically, as we go year after year, Cost

18  never meets those numbers, Franco never meets those numbers,

19  then that suggests that they treating this like a paperwork

20  exercise, that's a violation of the regulations.

21          THE COURT:  Let's talk about the other aspect of the

22  motion in limine.

23          MR. PAWK:  If I could just respond to that, judge.

24          THE COURT:  Yes.

25          MR. PAWK:  The testimony will be from Cost and its

19

1  employees, all of the efforts, they'll detail the efforts that

2  they go through with those 16 steps, okay.

3          THE COURT:  Cost?

4          MR. PAWK:  Cost, yes.  And in great detail how they

5  try it.  It's very difficult in the industry to get women to

6  work in this business.

7          THE COURT:  I take it that your efforts to come,

8  your efforts to push each button on the 15 steps in an effort

9  to get women will in part be your good faith defense, would be

10  your good faith defense to a claim of punitive damages; in

11  other words, even if you were liable, under Kolstad you would

_____

12  argue -- put it this way.  Obviously, you're not taking the

13  position that Cost, through its managerial employees and

14  supervisory folks, were ignorant of the federal

15  anti-discrimination laws, quite contrary?

16      MR. PAWK:  No, they have a very detailed program to

17  comply with.

18      THE COURT:  Further, unlike some rare situations

19  that Kolstad says that could develop where you think you aren't
    _____

20  discriminating by doing something or think it's in compliance,

21  that's not one of these cases, that's not the thrust of your

22  defense, there wasn't any work available as a factual matter,

23  right?

24      MR. PAWK:  That's one of the defenses.

25      THE COURT:  And so to flush it out, then, if the


                                20


1  case were going to the jury on the issue of punitive damages,

2  your defense liability and punitive damages, your defense as an

3  employer to defeat the imposition of punitives is coming

4  from -- what's the guy's name?

5      MR. MATESIC:  Taylor.

6      THE COURT:  Taylor, would be the employer's good

7  faith?

8          MR. PAWK:  That's true, judge.  We also think there

9   are many components to the defense --

10          THE COURT:  They're mixed together.  I just want to

11   get the lay of the land.  Let's go to these damages.  Let me

12   ask you, Mr. Matesic, what is, first of all, I'm hard pressed

13   to figure out what your front pay claim is, given what she's

14   done?

15          MR. MATESIC:  She's entitled to the rate that was in

16   place at SCIM, $10.94 an hour contribution pension.  Over and

17   above the $17 and change they earned per hour.  Now, as an

18   operator she's making less that.

19          THE COURT:  Who is she working for now?

20          MR. MATESIC:  Trumbull.

21          THE COURT:  What is her hourly rate?

22          MR. MATESIC:  About the same.  She's getting 50

23   cents an hour less in contribution.

24          THE COURT:  Really the only future economic claim is

25   not under wage, it's pension contribution, is that right?


                              21


1          MR. MATESIC:  Correct.

2          THE COURT:  And what about your back lost wages?

3          MR. MATESIC:  You want a total number?

4          THE COURT:  In theory.

5          MR. MATESIC:  We're going from July 31st, when we

6  contend there was an opening, until April 13th, when she got on

7  with Trumbull, I believe April 13th.

8          THE COURT:  Of?

9          MR. MATESIC:  Of 2003.

10         THE COURT:  Okay.  So you don't have a dispute about

11  that period of time?

12         MR. PAWK:  Yes, we do.  She took a job in November

13  of 2002.

14         THE COURT:  With who?

15         MR. PAWK:  KGL.

16         THE COURT:  Was that at a lower hourly rate than

17  what she would have been making before?

18         MR. MATESIC:  $15 an hour.

19         MR. PAWK:  They have a constructive discharge from

20  KGL.

21         THE COURT:  That's not my case.

22         MR. MATESIC:  They offered her room and board.  And

23  when she got there -- it was a house with two other employees

24  of KGL who were boyfriend and girlfriend.  There were domestic

25  instances in the house, she asked for alternative housing.


                                    22


1  They said, to use the curse words, we're not your fucking

2  babysitter, you like it or leave.  So she left, that was it.

3  It lasted all of a month.

4          THE COURT:  Whatever, the fact of the matter is --

5  that's your wage claim.  Now, why, given it's not really a

6  front pay claim as a pension contribution claim and lost wages,

7  why for heavens sake would you need expert testimony for any of

8  that?

9          MR. PAWK:  I was basing it on what he filed in his

10  pretrial statement, judge.  He had future health benefits,

11  future pension benefits, that is something that an economist

12  would need to come in and express.  It's more akin to opinion

13  testimony, that's why I filed that.

14          THE COURT:  All right.  I want to digest this a

15  little bit, we'll get back together on the record and I'll rule

16  on this.

17          MR. PAWK:  Judge, before we start with the jury, I

18  wanted to address an issue because I might want to talk about

19  it in my opening.  As you know, Kathleen Brown filed an EEO

20  complaint against Cost Company in December, 2002.  By March of

21  2003 and April of 2003, there was ongoing dialogue with

22  Kathleen about hiring her.  In addition to the dialogue that

23  occurred before.  An offer of employment was made to her for a

24  laborer's job, the exact job she complains about today.  They

25  didn't hire her for the job that she said she would have taken

23

1  then or in the future.  I would like to mention that, I just

2  wanted a clarification on that.  I think it's relevant for a

3  number of reasons.

4       THE COURT:  Was this during the pendency of the

5  case?

6       MR. PAWK:  The EEOC claim.

7       THE COURT:  Why would you want to mention that, from

8  your standpoint?

9       MR. PAWK:  Because it's the third EEOC complaint

10  filed within a year and half, first of all.  Second, we don't

11  believe that the evidence will show that there was

12    discrimination.  They were willing to hire her at that point.

13          THE COURT:  Was she already working at the time she

14   was offered that job?

15          MR. MATESIC:  She had been give an offer from

16   Trumbull.

17          MR. PAWK:  She said in deposition she was employed

18   at that time but she was having dialogue with Trumbull.

19          THE COURT:  Tell me again what the relevance of it

20   is?

21          MR. PAWK:  It's relevant because the same job they

22   complain about here today, I submit --

23          THE COURT:  Laborer job?

24          MR. PAWK:  She couldn't be hired as an operator,

25   they backed off that.  They complain they should have hired her

24

1    for a laborer's job.  The very job she complains then we offer

2    her, it's in her diary, judge, she writes Cost offered her a

3    shit laborer's job (not), it's in her diary.

4          THE COURT:  What is it probative of?

5          MR. LUTZ:  The fact she was looking for an

6   operator's job with Cost, not this laborer's job that they say

7   she was denied.  And Georgia Pawk's testimony is going to be

8   yeah, I had an ongoing discussion with her about an operator's

9   job, I finally find out after, this is in the EEO claim file,

10   she wants a laborer's job then.

11        THE COURT:  Are you saying that the relevance of the

12   subsequent request -- why would you offer her a laborer's job?

13        MR. LUTZ:  She finally said after the EEOC

14   proceedings that she wanted a laborer's job, we said okay.

15   That's the first time we were aware of this was after.

16        MR. MATESIC:  I don't really have a problem with it,

17   I thought it was going to come up anyway.

18        MR. LUTZ:  The other thing is it goes to damages,

19   too, that cuts off any future thing from that point onward.

20        THE COURT:  Do you mean on pension?

21        MR. LUTZ:  There is a claim for future pension, how

22   can they make that claim when she received this offer.

23        THE COURT:  What about that, that does strike me as

24   somewhat potentially accurate?

25        MR. MATESIC:  The problem is that she never would

1   have been put in the position of having to make what was

2   charitably speaking a Hobson's choice.  If she had been hired

3   by Cost and become a laborer then back in July of 2002, she

4   could have advanced to some other position since July of 2002.

5   Cost had mistreated her.  She was forced to give up her career

6   with Cost in exchange for Trumbull.  Anybody who would be

7   mishandled the way she was by Cost would be reluctant to take

8   any employment with Cost.

9        THE COURT:  In any event, you don't have an

10  objection to it coming in, you can argue for what you think

11  it's worth.

12       MR. LUTZ:  Before we move from that, your Honor, I

13  think it goes to ruling on our motion in limine with respect to

14  the amount of damages that can come in.  Because if she

15  receives this offer, I don't think --

16       THE COURT:  Do you mean as a matter of fact?

17       MR. LUTZ:  As a matter of fact she should not be

18  able to put this evidence in.  On those benefits from that day

19  onward.

20       THE COURT:  Do you dispute that an offer was made as

21  a factual matter?

22      MR. MATESIC:  I don't dispute that.  But I what do

23  insist is that she was looking for work on July of 2002, for

24  which she would have been paid more than $17 an hour, plus the

25  pension benefits.  They said no, she went back a month later.


26


1  They said no again.  She had complained, they still said no.

2  By the time they called her in April, come work for us, what

3  would any reasonable person in Kathleen Brown's position do if

4  Trumbull was offering her a job at a slightly smaller

5  compensation rate.  Trumbull is at least an unknown quantity.

6  But Trumbull hasn't jerked her around like Cost.

7      THE COURT:  You're saying it's a reverse

8  constructive discharge, where an employee is reluctant to be

9  employed by an employer for whom she allegedly believes is

10  discriminatory?

11      MR. MATESIC:  Correct.  I think conceptually that's

12  exactly the point.

13      THE COURT:  I don't have to rule on this right now,

14  I can rule on it at any point during the case, it will be in or

15   it will be out.

16         Now, I'm not sure how this cuts or if it's relevant,

17   but it has to be brought out, the jury may draw their own

18   conclusions.  To state the obvious, you're married to one of

19   the principals here.  And I was just reflecting on what if any

20   problems that creates.  Does anybody have any thoughts on that;

21   I'm inclined to think it doesn't really, but --

22         MR. MATESIC:  I don't think it does, either.

23         MR. LUTZ:  I'm here to handle the witness.

24         THE COURT:  I think that really takes care of it.

25         MR. PAWK:  We talked about that at one of the

27

1   pretrial meetings.

2         THE COURT:  All right.  I'm going to look at this

3   stuff, I'll get a ruling on the record.  Any witness problems,

4   everybody got their witnesses lined up, we're ready to go?

5         MR. PAWK:  I have Dean Taylor and William Heaton

6   here today.  I don't know if you'll get through Kathleen and

7   Dean today.  William Heaton is here if you do.

8         THE COURT:  Here's a question that dawned on me,

9 occurred to me. And this is how this case ultimately would be

10 presented to the jury by way of instructions. Is this the

11 McDonnell_Douglas classic burden shifting case?

12          MR. MATESIC: Yes.

13          THE COURT: I view it this way, the standard prima

14 facie -- put it this way. I think the prima facie case will be

15 met as a matter of law. And the issue is going to be the

16 stated legitimate reason and whether or not the plaintiff can

17 demonstrate by a preponderance of the evidence that it was --

18          MR. MATESIC: Correct.

19          MR. PAWK: Just for the record, I don't believe

20 McDonnell_Douglas will be met, I think it's the kind of case --

21          THE COURT: I'm not saying it will be, I need to

22 construct, because there was some suggestion of a direct

23 evidence case. You know what at some point they kind of blend

24 together, it's confusing to try to charge on direct evidence.

25 And there's going to be here alleged testimony, from what you

28

1 say, the guy said, he can say what he wants, that all molds

2  into I think the pretext aspect.

3        MR. MATESIC:  Can we revisit that with regard to the

4  final charge, judge?

5        THE COURT:  To see if the evidence comes in.  I'm

6  viewing this right now as a garden variety Fuentes case in

         _____

7  terms of instruction.

8        MR. MATESIC:  Speaking of the final charge, judge,

9  what is your practice in terms of when you give that, the final

10  charge instructions on the law, does that come before or after

11  the closing statements?

12        THE COURT:  Do you mean the final charge to the

13  jury?

14        MR. MATESIC:  The final charge to the jury.

15        THE COURT:  After closing arguments.  What we do is

16  make that available to counsel in written form before closing.

17  As a matter of fact, what we do is we'll look at the points for

18  charge.  A lot of these are boilerplate, there's not much

19  dispute, from my experience, in a Title VII, particularly a

20  case like that.  We will have a complete charge prepared, 18,

21  19, 20 pages, I don't know how long my standard charge is in a

22  Title VII case.  You'll then have an opportunity to read and

23  review it, then we'll have a charge conference where you can

24  say this shouldn't be in there, this should, you didn't cover

25  one of mine adequately.  You'll have an opportunity to make any


29


1  objections on the record before I do my charge.

2        MR. MATESIC:  The reason I'm asking about this is if

3  the points for charge are in the final version at a time just

4  prior to the closing arguments, is it appropriate for counsel

5  to refer to any part of that closing charge?

6        THE COURT:  I don't usually jump up and down about

7  that.  What I find permissible and I rarely seen evince an

8  objection, where counsel simply will, to the extent necessary

9  they feel it should be delineated into their closing, read it

10  verbatim what I'm going to tell the jury, but not make any

11  independent interpretation of what it is.  I don't want the

12  jurors thinking that lawyers who are telling them what the law

13  is beyond just reading what they know they're already going to

14  be told.  So yeah, you can do that.

15        MR. LUTZ:  With these screens we have available in

16  the courtroom, is it permissible to put that on the screen?

17          THE COURT:  I don't have a problem with that.  That

18  assumes the screens over there are working.  How long is your

19  opening?

20          MR. PAWK:  Fifteen, 20 minutes.

21          MR. MATESIC:  About the same here.

22          THE COURT:  All right, I'll get you back in here in

23  a little bit and I'll rule on these things.

24          (Recess from 9:29 a.m.; until 9:40 a.m.)

25          THE COURT:  All right, this is an order.


                                30


1                  ORDER

2          Presently pending before the court is Cost Company's

3  motion in limine.  For the reasons discussed more fully on the

4  record, the defendant moves to prevent the plaintiff from

5  introducing evidence concerning Franco Associates.

6  Essentially, defendant contends that evidence is irrelevant

7  and/or alternatively its prejudicial effect outweighs its

8  probative force.  Plaintiff on the other hand contends that the

9  evidence concerning Franco is relevant in light of the United

10  States Supreme Court case of Kolstad_v._American_Dental
        _____ __ _____ _____

11    Association, 527 U.S. 526.  As discussed more fully at the

        _____

12    argument on the motion in limine, that case stands for the

13    proposition that where a managerial employee engaging in

14    discriminatory conduct in a Title VII case, punitive damages

15    are not an act with reckless malice or reckless indifference

16    described in this case, an employer is not automatically

17    vicariously liable and may defend on the basis of its own

18    independent good faith efforts to prevent discrimination in its

19    workplace.

20            Having carefully considered the matter, I find the

21    proposed evidence concerning Franco Associates involving

22    statistics and the amount of people, that is minorities have

23    been hired, etc., irrelevant to this action.  Even if it had

24    some marginal relevance, it would require -- an entirely

25    separate evidentiary road, taking us far away from this case.


                                    31


1    The question of the company's reckless indifference to Cost

2    Company reckless difference to the plaintiff's rights can be

3    squarely put before this jury relative to Cost's management

4   actions.  In so doing, once the plaintiff does that, under

5   Kolstad the defendant will have an opportunity to attempt to
    _____

6   demonstrate to the jury its independent good faith.  So that's

7   the ruling on that.

8           Insofar as the question of the back pay is

9   concerned, I think there has been an essential agreement

10  between counsel as to how that evidence or testimony is going

11  to be permitted to come in, is there not?

12          MR. MATESIC:  I believe.

13          THE COURT:  The back pay issue -- in other words,

14  the fact that she obtained that other position at a lower rate

15  doesn't necessarily cut-off her back pay, it would represent a

16  diminution in her back pay which you would be entitled to argue

17  to the jury.

18          MR. PAWK:  That would be on the November job she

19  took.  I don't think there's an agreement necessarily on the

20  job she took in April, are you talking about front pay or back

21  pay?

22          THE COURT:  Back pay right now.

23          MR. PAWK:  I understand.

24          THE COURT:  Then the front pay issue -- the only

25  thing that is arguably left on front pay is the question of

32

1  pension benefits.  However, the pure legal issue is whether or

2  not a party would be entitled to claim future pension, the

3  diminution of future pension benefits, whereas, as a matter of

4  fact they had been offered the same position by the defendant,

5  albeit at a later point in time.  The plaintiff contends that

6  the offering of the position should not necessarily preclude a

7  recovery of pension benefits because under the circumstances

8  and based upon what the plaintiff knew about the company, she

9  would have been justified in refusing the employment.

10  Defendant on the other hand contends it is an absolute bar to

11  future claims.  Intuitively, my sense of it is that this should

12  be treated in somewhat the same fashion as a constructive

13  discharge case.  And that it will be an issue for the jury as

14  to whether the plaintiff's refusal to have accepted that offer

15  of employment under all the circumstances was reasonable.  And

16  when I say reasonable, I think it should be judged by the same

17  constructive discharge standards that would determine whether

18  someone's leaving an employment was reasonable under the

19  circumstances.  So it's a fairly high hill to climb.  With that

20  qualification on front pay, it may end up going to the jury,

21  but it depends on their factual finding on that.  Does

22  everybody understand that?

23        MR. MATESIC:  Yes, your Honor.

24        MR. PAWK:  Yes.

25        MR. LUTZ:  Yes.


                                  33


1        MR. MATESIC:  One more thing, judge, before we

2  conclude.  I'm sorry I didn't bring this up the last time, the

3  defendant has moved to amend their pretrial statement to

4  include a list of names of female employees, I believe of Cost

5  and Franco.  As one piece of evidence demonstrating their good

6  faith compliance with the regulations.  That list does not have

7  any dates on it whatsoever.  And there's nothing to indicate to

8  the jury or any reasonable person reading that document when

9  those persons were in fact employed.  We believe that this is

10  not going to be probative at all, it's going simply going to

11  confuse the jury because --

12        THE COURT:  What is this list?

13          MR. PAWK:  Maybe to address that, I have to take a

14   closer look at that, I may not even present it.  My thought is

15   this.  Maybe we can address it if we intend to try to use it as

16   an exhibit, but I don't believe I will.

17          THE COURT:  I can make it easy for you, one, it's

18   irrelevant.  Just for the same reasons that I felt an attempt

19   to introduce statistical meeting bench marks is irrelevant.

20   The number of women that you have on your workforce is

21   irrelevant for purposes of attempting to rebut discriminatory

22   animus in the case.  Furthermore, to the extent it involved

23   names of people in Franco, if you introduce that, I would have

24   to revisit the whole issue on this Franco thing.  It's not

25   coming in.  That should make it easier.


34


1          MR. MATESIC:  I would like to note my objection to

2   the court's ruling on the Franco evidence.  As a point of

3   clarification, the Franco evidence, I'm sorry if there was a

4   misunderstanding on your part, but we did not seek to include

5   primarily because of its statistical work -- we did seek to

6   admit it primarily because we believe the decision to create an

7   entity specifically for purposes of taking federal money for

8   disadvantaged business enterprises, that decision was made by

9   the same person who owns Cost Company.  It goes to the mens rea

10   element under Kohlstad.

────────

11        THE COURT:  Basically, if someone is reading this

12   record at a future point in time i.e., the Third Circuit, to

13   make it clear, what you're really suggesting is that the other

14   company was set up as a sham, isn't that right, a scam, let's

15   put it that way?

16        MR. MATESIC:  Yes.

17        THE COURT:  For that reason, also, that's a

18   different battle for a different day.  But I just don't see

19   that it's relevant.  I think it would poison the atmosphere

20   here.  But your objection is noted.  All right.

21        (Whereupon, at 9:50 a.m., proceedings recessed in

22   Judge's Chambers; and at 2:40 p.m., reconvened in Courtroom A

23   as follows.)

24        THE CLERK:  What I'm going to do now is seat you in

25   the jury box, these are the seats you will maintain throughout

35

1    the course of this trial.  The first juror who will remain in

2    seat number one is Jeanne H. Sebald.  The second juror will be

3    Timothy Conrad.  The third juror will be Harlan E. Wimer.  The

4    fourth juror will be Joseph A. Newton.  The fifth juror, who

5    will be in the first seat in the second row of the jury box,

6    will be Marcia Waldnauer.  Next juror will be Shirley A.

7    Williams.  Next will be Gary G. Myers.  Next will be Sharon

8    Passmore.  Counsel, the jury has been selected.

9          THE COURT:  Swear the jury, please.

10          (Whereupon, the Jury was sworn.)

11          THE COURT:  Members of the jury, now that you have

12    been sworn, I'm going to give you some preliminary instructions

13    to guide you in your participation in this case.  Now, it's

14    going to by your duty to find from the evidence what the facts

15    are.  You and you alone will be the judges of the facts.  You

16    will then have to apply to those facts the law as I give it to

17    you.  You must follow those instructions, whether you agree

18    with them or not.  Nothing that I may say or do during the

19    course of this trial should be intended to indicate or should

20    be taken by you as indicating what your verdict should be.

21          Now, the evidence from which you will find the facts

22  will consist of the testimony of witnesses, documents and other

23  things received into the record as exhibits.  And any facts

24  that the lawyers agree to or stipulate to or that I may

25  instruct you to find.


36


1       Now, certain things are not evidence and must not be

2  considered by you as evidence.  I'm going to tell you what

3  those are now.  Statements, arguments and questions by lawyers

4  are not evidence.  Objections to questions are not evidence.

5  Lawyers have an obligation to their clients to make objections

6  when they believe that evidence is being offered for an

7  improper purpose under the rules of evidence.  You should not

8  be influenced by the objection or by my ruling on it.  If it's

9  overruled, treat the answer like you would any other.  If you

10  are instructed that some item of evidence is received for a

11  limited purpose only, then you must also follow that

12  instruction.  Testimony that the court has excluded or told you

13  to disregard is not evidence and must not be considered by you.

14  Anything that you may have seen or heard outside the courtroom

15  is not evidence and must also be disregarded.  You are to

16  decide this case only on the evidence presented here in the

17  courtroom.

18        Now, there are two types of evidence which you may

19  consider, direct and circumstantial.  Direct evidence is direct

20  proof of a fact, such as the testimony of an eyewitness.

21  Circumstantial evidence, on the other hand, is proof of facts

22  which you may infer or conclude that other facts exist.  Now,

23  I'm going to give you further instructions on these, as well as

24  other matters later on in the case.  But for present purposes

25  it is sufficient for you to know that both types of evidence


                                37


1  exists and can be considered.  Now, it's going to be up to you,

2  of course, to decide which witnesses to believe, which

3  witnesses not to believe and how much credence to give any

4  witness's testimony.  I will also give you some guidelines for

5  determining credibility later on in the case.

6        Now, this is a civil case.  The plaintiff has the

7  burden of proving her case by what is called the preponderance

8  of the evidence.  That means that the plaintiff has to produce

9  evidence which considered in light of all the facts leads you

10  to believe that what the plaintiff claims is more likely true

11  than not.  To put it differently, if you were put the

12  plaintiff's and the defendant's evidence on opposite sides of

13  the scales, the plaintiff would have to make the scales tip

14  somewhat on her side.  If the plaintiff fails to meet this

15  burden, then the verdict must be for the defendant.

16          Now, those of you who may have sat on a criminal

17  cases will have heard the term proof beyond a reasonable doubt.

18  The requirement does not apply in a civil case and, therefore,

19  you should put that out of your mind.

20          A few quick words about your conduct as jurors.

21  First, I instruct you that during the trial you're not to

22  discuss the case with anyone or permit anyone to discuss it

23  with you.  In other words, until you retire to the jury room,

24  you are simply not to talk about the case with anyone.

25          Secondly, don't read or listen to anything touching


38


1  on this case.  And as I told you earlier this morning, if

2  anyone should try to contact you or discuss the case with you,

3  you should advise one of the court's attendants.  Don't try to

4   do any independent research or do any outside investigation

5   about the case on your own.

6        And finally, and very importantly, do not form any

7   fixed opinion about this case until you have an opportunity to

8   start the deliberations at the end of the case.

9        Now, I see that there is a lady at the end here who

10  has a note pad, that's fine.  My only point is if you wish to

11  take notes in this case, I'm going to permit you to do so, it's

12  totally up to you.  I notice a number of you are at a serious

13  disadvantage, you don't have a pen, you don't have a pad.  I'm

14  going to see to it that you all get one and we'll see to that

15  after the opening statements.

16        Now, the trial is going to begin.  And this is the

17  way it goes.  First each side may make an opening statement.

18  An opening statement is neither evidence nor argument.  It's

19  simply an outline of what that party intends to prove offered

20  to help you follow the evidence in advance.  Next, the

21  plaintiff will call her witnesses and the defendant may

22  cross-examine them.  Then the defendant will present their

23  witnesses, and the plaintiff may cross-examine them.  After

24  that the attorneys will make what is called closing arguments

25  to you to summarize and interpret the evidence for you.  And

39

1   the court will then give you instructions on the law.  And at

2   that point you will retire to begin deliberating on your

3   verdict.

4          Before we begin with the openings, let me see

5   counsel at over here at side bar for just a second.

6          (At side bar on the record.)

7          THE COURT:  Just as a housekeeping matter, I am

8   functioning, due to his illness, without a Deputy Clerk right

9   now.  I want each of you to keep track, keep a list of your own

10   exhibits.  Admitted or rejected.  Do you have exhibit books or

11   anything along those lines?

12          MR. MATESIC:  We exchanged them already.

13          MR. PAWK:  I have one for the court.

14          THE COURT:  That way we have a compilation to go out

15   with the jury once we decide what is or is not admitted.  The

16   other thing I want each of you to keep track of, so it can be

17   subsequently transposed on to a trial sheet, is the list of

18   witnesses.  So, basically, in that sense you'll be doing

19   ministerial clerk work.

file:///A|/COSTDAY1.TXT

20          (End of discussion at side bar.)

21          THE COURT:  All right, Mr. Matesic, are you ready to

22  go?

23          MR. MATESIC:  Yes, your Honor.  Good afternoon,

24  ladies and gentlemen.  They say a picture is worth a thousand

25  words.  What's wrong with this picture.  A woman wearing a

40

1  hardhat.  Compared to the picture of a man wearing a hardhat.

2  Is there anything wrong with the first picture.  This case is

3  about whether or not people who are in a position to hire other

4  people think that there's something wrong with the picture of a

5  woman in a hardhat.  This case is about fairness.  This case is

6  about whether or not an employer should be allowed to use in

7  their decision of whether to hire someone, something for which

8  that applicant is not responsible for.  Something which she was

9  born with.  Her gender.  We concede that in many walks of life

10  women are still under-represented in terms of employment.

11          In this case in particular, the employer, the

12  defendant, Cost Company, is a construction contractor.  From

13  our common experiences we know that there some fields of work

14  where women or the numbers of women employees do not equal the

15  numbers of male employees.

16          Well, Congress understands this as well.  The United

17  States Department of Labor understands this as well.  The

18  government of the Commonwealth of Pennsylvania understands this

19  as well.  And that's why there's lawmaking bodies that have

20  passed legislation, have passed regulations, which require any

21  construction contractor who takes public money must give

22  something back.  And what they have to give back is their

23  commitment to equal employment under the law.

24          In other words, if you take public money to work on

25  the development of some construction project, you have to show

41

1  that you are committed to the goal of employing females equally

2  in the way that you employ males.  And so if a female

3  approaches you for a job when you have a vacancy and that

4  female is qualified for that job, you cannot use her gender

5  against her.

6          Now, construction work is seasonal.  Meaning that if

7  you are employed for a construction company, you work when

8   there's work.  The work is often times dictated by the weather

9   conditions.  When it becomes too cold or too wet to work, you

10  don't work any longer.  The summertime is the peak time for

11  construction work.  That's when the construction industry in

12  Pennsylvania employs its highest number of employees.

13          In the wintertime when things get too cold or too

14  wet, there is no work.  For this reason construction work

15  presents a particular hardship.  And those who want to work in

16  construction have to deal with this hardship.

17          Kathleen Brown is one such person.  She decided

18  eight years ago in 1997 that notwithstanding the fact that

19  construction work is seasonal and presents its own problems,

20  that she wanted to be a construction worker.  Up to that point

21  in time she had been a stay at home mom, a freelance artist.

22  But she lived hand to mouth, day to day, she didn't have a

23  steady income.

24          She had a friend who was a heavy equipment operator.

25  This friend let her operate heavy equipment and she saw that

42

1   she could do it.  And she knew that if she became a heavy

2    equipment operator, she could make a lot more money.  She could

3    sustain herself, she could sustain her family.  And so eight

4    years ago she committed herself to that line of work.

5         In the ensuing eight years, Kathleen Brown has

6    performed a variety of jobs in the construction industry, in

7    the building trades.  Today she's a heavy equipment operator.

8         On previous occasions she's been a laborer, she

9    labored for the Commonwealth of Pennsylvania.  She's been an

10   oiler.  She's been a field technician.  These job titles might

11   not mean anything to you now, but certainly by the end of this

12   case you will know what these job titles mean.  Because you

13   will hear from Kathleen Brown, she will tell you about all the

14   jobs that she has performed.

15        She will tell you, in particular, that in the summer

16   of 2002, about a mile from where she lived, Cost Company was

17   constructing a state prison in Forest County, also known as SCI

18   Marienville, state correctional institute at Marienville.  Cost

19   was the masonry contractor on that site.  They weren't the only

20   contractor, but they handled the masonry part of the project.

21   And it was an enormous project.  In order to complete that

22   work, Cost was employing over 150 individuals.  Bricklayers,

23  laborers and heavy equipment operators.  In all 162 employees

24  during the summer of 2002.

25          Kathleen Brown came to be acquainted with several of


43


1  those employees.  And at the time she was working a job for the

2  state that did not pay very well.  It paid her about $10 an

3  hour, and she had to compute everyday 90 miles.  90 miles to

4  work at a state park to be a laborer at $10 an hour.  One mile

5  from her house Cost Company was putting up an enormous prison.

6  They're paying their laborers $17 an hour and there is no

7  commute.  It was a no brainer.

8          Her friends who were bricklayers came to Kathleen

9  and said, you know, Cost Company is hiring right off the

10  street, we need laborers.  It was midsummer of 2002, the

11  construction season was at its peak.  You don't need to be

12  qualified, you don't even need to be in the union, you could be

13  hired and then later enroll in the union.

14          Not only did they tell her that Cost was hiring off

15  the street, they had documentation.  Once a month Cost Company,

16  in the payroll envelopes that it was handing out to its

17    employees, also attached what's called a minority recruit

18    memorandum.  This is the minority recruitment memorandum.  This

19    went out with every paycheck to every Cost employee on a

20    monthly basis.

21         This minority recruitment memo said "at this time we

22    may not be accepting employment applications, however, in the

23    future should we be commencing new projects, any additional

24    manpower, please inform us if you know of any individuals who

25    are a minority, who are female, who would be interested in such

44

1    a job."  You can see at the bottom there is a space for the

2    name of that employee.  There's a space with the address of

3    that employee.  There's a space where the employee can write

4    down what their previous experience was.

5         One of Kathleen Brown's friends gave her that

6    memorandum blank.  She filled it out and sent it in.  The peak

7    of construction season, maybe Cost needs employees.  They did

8    need employees.  But Cost never got back in touch with Kathleen

9    Brown after she first sent in that memo.

10        On July 31st, having not heard from Cost, Kathleen

11  Brown went to the job site personally.  At 6:30 in the morning,

12  before the shift even commenced, she was standing outside the

13  Cost trailer waiting for the foreman to show up.  Because she

14  knew they were hiring.  She waited two hours for that foreman.

15  When that foreman finally showed up, he said what do you want.

16  She showed him that memorandum, she showed that foreman her

17  resume.

18       On her resume she had listed five different jobs

19  that she had performed in the building trades.  Operator,

20  laborer, oiler, field technician.  The foreman looked at the

21  resume, looked at the memo, looked at Kathleen and said we're

22  not hiring, thank you very much.  She turns and walks away.

23       And within the next 30 seconds she hears the foreman

24  addressing two other men, two men who had arrived on the job

25  site after Kathleen.  She heard the foreman say to those men


45


1  follow me.  We're not hiring, follow me.

2       We know that Cost hired somebody, we're pretty sure

3  that they hired somebody on July 31st.  We can't be certain,

4  but we have the head of the laborer's union, the union that

5    represented the people that were hired for that job, and his

6    records indicate that in all likelihood on July 31st, Cost did

7    hire somebody.  They hired a man.

8            You will learn during the course of this trial that

9    of those 162 employees that I was mentioning a few moments ago,

10   absolutely none of them were female.  All of them were male.

11           Kathleen Brown having been snubbed on July 31st, did

12   not stop trying to get work with Cost.  She sent them or

13   delivered to them two more versions of that memorandum.  Each

14   time filled out with her name and her address.  Give me work.

15   Her bricklayer friends kept telling her, Kathleen, they're

16   still hiring people off the street.

17           The days went by, middle August comes, they're still

18   hiring laborers.  They're still hiring men, not women.  You

19   could say that it's just Kathleen's bad luck.  She just wasn't

20   in the right place at the right time.  Luck of the draw.  Had

21   she shown up at the Cost work site maybe a day later or two

22   weeks later, she would have ended up with a job.  This case is

23   about whether or not that's a good excuse.

24           Cost has an obligation under the law to show that it

25   is diligently pursuing a goal of equal employment.  Did Cost do

46

1  that in this case.  They had three applications, if you will,

2  they had three documents from Kathleen Brown with her contact

3  information.  Please hire me for an opening.

4        Cost did eventually get back in touch with Kathleen

5  Brown.  But they didn't get in touch with her in July, they

6  didn't get in touch with her in August when the construction

7  season was at its peak.  They waited until mid September.

8  Actually, just after mid September.  By then the construction

9  season was winding down.

10        They got in touch with Kathleen Brown and they said

11  we don't have any jobs for you.  You're competent to perform

12  the work of an operator or a laborer, but we're not hiring

13  right now.

14        Kathleen Brown was still working for the State of

15  Pennsylvania at that time.  She was still earning $400 a week

16  as a laborer.  She was still driving 90 miles everyday.  Within

17  a week of that phone call, the State of Pennsylvania would lay

18  her off because the state park where she was working was

19  winding down its season, they had no further need for her.

20        From that point forward Kathleen Brown's life went

21  into a tailspin.  She didn't have money.  She couldn't afford a

22  place to live.  She couldn't afford to keep her car on the

23  road, she couldn't afford to support her child.  She was

24  begging people for money, her friends.  She had to rely on her

25  friends to give her a place to stay, to buy her food, to buy

47

1  her postage stamps.  She couldn't have Christmas that year for

2  her child.  She couldn't afford to buy a gift.  We're not

3  hiring.

4        Luckily for Kathleen the following spring she got a

5  job as an operator with Trumbull Corporation.  She began to

6  make enough money to support herself, she began to make enough

7  money to payback the friends who had saved her over the course

8  of the last six months.

9        The picture of a woman in a hardhat.  Some employers

10  in this state don't have any problem with that picture.

11  Whether the defendant does is a question for you to decide.

12  Thank you.

13        THE COURT:  Mr. Pawk.

14        MR. PAWK:  May we approach briefly, your Honor.

15          THE COURT:  Yes.

16          (At side bar on the record.)

17          MR. PAWK:  Your Honor, I don't like to interrupt

18    counsel's opening or counsel's statement, I would ask for an

19    instruction to the jury.  My understanding is that Mr. Matesic

20    does not intend to present any witnesses that told Kathleen

21    Brown that Cost was hiring any of these guys she testified at

22    her deposition that were employees of Cost Company, no longer

23    on the job, no longer are employees of Cost Company, are not

24    listed as witnesses in this case.  He basically in his opening

25    statement put out all kinds of hearsay, that it is clearly


                              48


1    objectionable, when Kathleen Brown takes the stand, I don't

2    believe it will be admissible evidence when she does take the

3    stand as to what these men told her because it's clearly

4    offered to prove the truth of the matter asserted.

5          THE COURT:  As you were making your opening

6    statement, that occurred to me as well.  What is your response

7    to that?

8          MR. MATESIC:  This is state of mind evidence, it

9   explains all the conduct the plaintiff undertook to get

10  employment with Cost Construction.

11          THE COURT:  This is not the time to give a curative

12  instruction because I don't have any context yet because she

13  hasn't testified.  As her testimony comes in, I will rule on

14  whether the state of mind exception exists.  If it does, I will

15  give an appropriate limiting instruction.

16          (End of discussion at side bar.)

17          THE COURT:  Members of the jury, as you've noticed,

18  we've had a few side bar conferences, we'll try to keep them to

19  a minimum.  But really those times that we just engage in pure

20  discussion of law which don't involve you because you're the

21  finders of fact.  That's the reason we do those.  Are you ready

22  to go, Mr. Pawk?

23          MR. PAWK:  I am, your Honor, thank you.  May it

24  please the court, counsel, ladies and gentlemen of the jury.

25  My name is Mike Pawk, I represent Cost Company in this case


                                   49


1   that Kathleen Brown has filed.

2          I would like to introduce you to a few folks in this

3    courtroom that you are going to see around during the course of

4    the trial.  My partner, Larry Lutz, who is seated at counsel

5    table with me.  And then there are a couple Cost employees that

6    are seated behind us, William Heaton and Dean Taylor, they were

7    foremen on this project.

8            I know it's been a long day and you're probably

9    tired, I'll try to keep my remarks brief.  But there are some

10   very important things that I need to say to you at this time.

11   This is my opportunity, one of two opportunities that counsel

12   gets to address the jury directly during the course of this

13   case.

14           We're here because Kathleen Brown claims that Cost

15   Company discriminated against her, that Cost Company didn't

16   hire her for a job, that's why we're here.  You need to know a

17   little bit and you're going to hear testimony about Cost

18   Company in this case.

19           But, briefly, Cost Company is a masonry contractor

20   based in Pittsburgh, Pennsylvania.  They've been in business

21   for approximately 70 years, started in the 20's by two

22   brothers, Anthony and Charles Cost.  Italian immigrants that

23   started a small brick business.  Built it overtime and built it

24  and built it and they became successful.  They've since passed

25  away.  But Anthony's son, Charles Cost, runs the company today.


50


1  He is the CEO.

2         They are commercial masonry contractors.  They

3  perform mainly commercial work.  That's brick work, block work,

4  stone work, restoration work.  They're a union contractor.

5  You're going to hear testimony throughout the case as to what

6  that means.  Some of you, I know we've had chance to talk to

7  you in voir dire, clearly understand what that is.  But for

8  those of you who don't, that means they get their labor supply

9  from the unions.  The labor unions, the operating engineer

10  unions and bricklayer unions, as well as pointers, caulkers,

11  cleaners and stonemasons, I believe.

12         They don't just normally hire someone off the

13  street.  They have a union agreement.  They're a union

14  contractor, they do union jobs and they hire union people.

15  People that the unions supply to them.  That's the normal,

16  you'll hear testimony that's the normal course of operation for

17  them.

18          I'll tell you a little later that changed slightly

19   on this job on a few occasions when the labor union was unable

20   to supply a labor job called mason tenders.  A mason tender is

21   a person that basically provides all the materials that the

22   bricklayers need to lay the block during the course of the day.

23   The block and mortar, that's what a mason tender supplies to

24   them.

25          Now, you're going to hear testimony throughout this


51


1   case that Cost Company is a good contractor, that they don't

2   discriminate.  That they have policies and procedures in place

3   to insure that they don't discriminate.  That they hire

4   anybody.  One of the things they do in negotiating the labor

5   agreements with the unions, they have to agree with the unions

6   that they'll hire anybody.  You send them to me, I'll put them

7   to work.  You'll hear testimony from Cost employees that that's

8   what they do on the job.

9          Now, the name of this project that's at issue here

10   is called the Marienville prison project.  A very large project

11   that started in August of 2001.  Cost Company entered into an

12  agreement with the Department of General Services to be the

13  masonry contractor on that project.  It was a large site, 180

14  acres.

15          There were many contractors there, not just Cost

16  Company, many contractors.  And you heard testimony that

17  Kathleen Brown was very familiar with that site because she

18  worked for another contractor before she came and asked for a

19  job with Cost Company.  You'll hear her testify that she worked

20  for a company called Solar Testing Labs.  And worked for them

21  for a couple of months in late 2001, November, December of

22  2001.

23          Now, she had never worked for Cost.  It's important,

24  you'll hear this testimony, she never worked for Cost before,

25  before this project and she hasn't since.  But she was familiar


                                    52


1   with the site, as I stated earlier.  And you'll hear testimony

2   that her employment terminated with Solar Testing Labs in I

3   think December, 2001.  She was unemployed in the spring of

4   2001.

5           She took a job with the State Department of

6    Conservation, I believe, basically performed landscaping work

7    from May, June, July, August of 2002.  In fact, she was

8    employed there when she came to the Cost site and asked for a

9    job.  She was employed when she sought work from Cost Company.

10           Now, you'll hear testimony, Kathleen Brown will tell

11    you, that she came on the job site on two occasions.  She'll

12    say that she came on the job on July 31, 2002, and August 23,

13    2002.  You'll hear Cost employees tell you that their peak

14    manpower on this project occurred in July, before she came on

15    the project.

16           Now, did they have a few occasions to hire a spare

17    person here and there after mid July, yes.  You'll hear

18    testimony to that.  But the total manpower numbers were

19    dropping after mid July into August and September.

20           Cost, as many of you I'm sure are familiar with in

21    building your own home, you've got a time limit to build a

22    building.  And Cost was under tremendous time constraints to

23    build this prison.  They had a year to do it.  They didn't

24    actually get on the job until November, 2001, and they were

25    supposed to by done by November, 2002.  So they were moving.

53

1   And they peaked out with their manpower in July.  And when she

2   came on the project in late July, July 31st, that's her

3   testimony, she claims that she asked for a job.  She came to

4   the Cost trailer.

5        I'll submit to you that the credible testimony in

6   this case will be that she asked for an operating engineer's

7   job.  What's an operating engineer.  A person that operates

8   cranes, forklifts, heavy equipment.  Which is what her

9   background and training is.  You heard counsel tell you she

10  made a decision in 1998 to get certified.  In fact, you'll hear

11  her testify that she went through the process to become

12  certified by the Local 66 operating engineers' union to become

13  certified as a heavy equipment operator.

14       And I submit to you that credible testimony will

15  show that that's what she sought when she came on the job.  And

16  by that point in the project, Cost witnesses will tell you they

17  had two cranes on the project and five forklifts.  They were

18  all being operated by people.  By that point in the project

19  they had no openings.

20       I submit to you it wouldn't be fair to fire someone

21  on one of those pieces of equipment just to hire Ms. Brown.

22    And so Cost wasn't about to do that.

23          But you'll also hear testimony that in order to work

24    as an operator engineer on a project of this nature, you must

25    be referred by the operating union, Local 66.  Ms. Brown will

54

1    even tell you that.  She knew that.  You can't solicit your own

2    work.

3          So, in other words, if you're an operating engineer,

4    you can't go onto project and say hey, I want to run that

5    crane.  You have to go through the union, you have to be called

6    out of the union.  I submit to you that -- they didn't have any

7    jobs available as operating engineers when she came on the

8    project, either July 31st or August 23rd.

9          And something else that you didn't hear in

10    plaintiff's opening statement.  But Kathleen Brown will tell

11    you that this when she takes the stand.  She wasn't certified

12    at that time to be an operating engineer.  You have to be

13    certified, she had lost her certification.  Cost could not have

14    put her on a piece of equipment in July or August of 2002

15    because she was not in good standing with the union.

16          You'll hear testimony during the course of this case

17   that she did fill out one of those EEO memorandums.  What it is

18   that, you'll see it, we couldn't put it on the screen.  It's a

19   recruiting memorandum that Cost does.  Cost sends these out,

20   these forms out with their employees' paychecks saying, hey, if

21   you know of a minority who wants a job, we may not be hiring

22   right now, it wasn't an application.  We may not be hiring

23   right now, but if you know someone, give this to them, have

24   them fill it out and send it to us and we'll contact them.  She

25   did that, she filled one out and sent it to Cost Company.


                                   55


1          You'll hear clear testimony that Georgia Pawk, the

2   president of Cost and the EEO officer, the equal employment

3   opportunity officer at Cost Company, received that memorandum,

4   which did not have a phone number on it, and wrote her a letter

5   back saying we'd love to have you, I need to have your phone

6   number in order to hire you.  And you'll see that document.

7          Plaintiff claims in their opening that Cost never

8   contacted her, just ignored her.  That's not true and the

9   evidence is not going to show that.

10        But anyway Cost, you'll hear testimony, that during

11    September, and then into October, and then in November of 2002,

12    Cost was trying to hire her.  But when we found out, she had a

13    nice resume as an operating engineer in prior employment, but

14    when they found out she was not certified as an operator, she

15    was not in good standing with the union, they told her you got

16    to become certified, you got to be in good standing with the

17    union or we can't hire you.  And she knew that.  You'll see her

18    own diary records where she's going about trying to become

19    certified out by the operating union, Local 66 out of Erie.

20        She eventually is successful in becoming recertified

21    by the union.  But that isn't until November of 2002.  She

22    contacts Cost Company and says I'm now eligible.  That's on

23    November 6th.  Less than, about a week and a half later, she

24    takes a job with a company called KGL out of Philadelphia.

25        Counsel left that part out of his opening statement.


56


1    She took a job with another company.  She worked in November,

2    she worked in December.  Eventually she takes a job, as I

3    stated, in November.  Works there November and December with

4   KGL.

5          In December of 2002, about a month and a half after

6   she becomes eligible to actually be hired by Cost as an

7   operating engineer, she files what's called an EEOC complaint

8   against Cost Company, Equal Employment Opportunity Commission

9   discrimination complaint.  And Cost addresses it in early of

10  2003.

11         Negotiates with Kathleen Brown.  That's when they

12  learn through her complaint that she filed that she wanted a

13  laborer's job.  She said I asked for a laborer's job and an

14  operator's job.  And I didn't get hired as a laborer.

15         So what does Cost do.  In March and April they offer

16  her a laborer's job.  They had projects in Greenville, they

17  tried to find her a job as close to her home as they could,

18  Greenville, Erie, they had other jobs in the area.  The clear

19  testimony will show that she rejected the laborer's job.

20         So the very job that she complains today to you that

21  she did not receive by Cost Company, they offered to her and

22  she rejected it.  And took a job with Trumbull Corporation.

23  And you'll hear her testify about that.  She took a job with

24  another company.

25          Now, counsel talked about hiring off the street.


57


1   And it is true, you'll hear testimony that because of the

2   location of this project, it's in Marienville and there's not a

3   huge workforce there, there's not a huge labor workforce, on

4   occasion the laborer's union ran out of mason tenders to supply

5   to Cost Company on the project.

6          The normal course, you'll hear, was that Cost would

7   pick up the phone, hey, we need a mason tender over here today.

8   Okay, I'll send one over.  On occasion they didn't have

9   somebody, the labor union didn't have someone to send them and

10  Cost did hire a few people off the street and they put them to

11  work.

12          Ladies and gentlemen, it is Kathleen Brown's burden,

13  first of all, I submit to you all the credible evidence will

14  show that she wanted an operating engineer's job.  But if you

15  believe she wanted a laborer's job, it's her burden to show

16  you, I don't believe the evidence will show you this, that

17  there was a laborer's job available, and that Cost didn't hire

18  her because she was a woman, and they hired a man.  I don't

19  believe that the evidence will show that.  And I submit to you

20  that it will not.

21          Now, you're going to hear testimony from a number of

22  people.  You'll hear from the plaintiff, Kathleen Brown.

23  You'll hear from Ronald Barrett, who is the business agent for

24  the laborers' union out of Kittaning, Pennsylvania.

25          You'll hear from Georgia Pawk, who is the EEO

58

1  officer and president of Cost Company.  If that name sounds

2  familiar, she happens to be my wife.  That has no bearing on

3  this case.  But I did want to mention that to you so you

4  weren't confused.  The weight of her testimony is she should

5  have no more weight or no less wait to her testimony, she is a

6  witness like any other witness in this case.

7          Our law firm, Lutz, Pawk and McKay, has represented

8  Cost Company for about 14 years now, and we're based in Butler,

9  Pennsylvania.  But I did want you to know, you weren't confused

10  over the name.

11          You'll hear from Dean Taylor, who is a foreman on

12  the Cost project.  William Heaton, who's here.  You'll hear

13  from Charles Cost, the CEO of Cost Company.

14      The Cost witnesses will tell you that they don't

15  discriminate, they didn't discriminate in this case.  They have

16  a detailed equal employment policy at Cost Company that they

17  follow.  They have seminars.  During voir dire we talked to you

18  about different seminars.  Cost has those as well, they go over

19  all these things with their employees.  But they don't

20  discriminate in hiring and firing.

21      They'll tell you that when she came on the site,

22  Kathleen Brown always talked about an operator's job.  And they

23  didn't have one available and she wasn't certified, wasn't even

24  eligible to be hired as an operator at that time.

25      Now, as Judge McLaughlin instructed you, Kathleen,


59


1  as the plaintiff, does have the burden of proof here by the

2  preponderance of evidence.  She must show you that Cost failed

3  or refused to hire her based on the fact that she was a woman.

4  If she fails to do that, at the end of the case and fails to

5  meet that burden, I'll be back here and I'll be asking for you

6  to return a verdict for the defendant, Cost Company, against

7   Kathleen Brown.

8          It is important that you keep an open mind

9   throughout this case.  Plaintiff gets to go first.  And Cost

10  Company gets to present its case.  And I ask you to please keep

11  an open mind and listen to all the evidence before you make up

12  your mind.  You took an oath to that effect, I'm sure you'll

13  follow it.

14          You are the fact finders in this case.  The judge

15  will give you the law.  You're going to decide what the

16  evidence is and what the facts are and apply it to the law and

17  render a fair verdict.

18          Nothing magical happens when you enter this

19  courtroom in terms of your life experiences, use your common

20  sense, evaluate the witnesses' testimony.  Are they being

21  evasive, are they telling you the truth.  Some of you have

22  children.  You know in your own life experiences you can tell

23  whether someone is telling you the truth or not.  You have to

24  decide the issues of credibility in this case.

25          And finally a trial is an attempt to find the truth.

60

1  We try to search for the truth in this courtroom during the

2  course of this case.  And our legal system, it's easy for

3  someone to make a claim.  The courts are open to everybody and

4  it should be that way.  And it's a good thing.  We have the

5  best legal system in the world.  But it's important that you

6  realize that a claim is just a claim, it's not evidence of

7  anything.  You have to come into the courtroom and you have to

8  prove your claim.  You have to prove it.  You have to be

9  satisfied.  And if a person fails to prove a claim, then you

10  must find against that individual claimant.  And at the end of

11  the case I will be back before you and I'll be asking you to

12  return a verdict in favor of Cost Company.  Thank you for your

13  time.

14        THE COURT:  Call your first witness.

15        MR. MATESIC:  May we have a side bar.

16        THE COURT:  Sure.

17        (At side bar on the record.)

18        MR. MATESIC:  A few things came up in counsel's

19  opening statement that I'd like to comment on.  I quoted

20  counsel telling the jury Ms. Brown's counsel had claimed that

21  Cost never contacted her, which is a mischaracterization of the

22  statements, that Ms. Brown's own counsel did acknowledge there

23    was contact made after the construction season was winding

24    down.

25         Also, we did not attempt to introduce evidence of


                                   61


1    the relationship between one of the key witnesses in the case

2    and counsel for the defense.  Counsel for Cost did bring that

3    up in his opening statement.  And I believe it is unnecessarily

4    injects the highly prejudicial elements into the jury's

5    consideration of this case.  Husband defending his wife, which

6    is sure to arouse the emotions of one or more of the jurors.

7    We would request a curative instruction immediately on that.

8         THE COURT:  How can I cure that, they're married?

9         MR. MATESIC:  I understand, I have to make an

10   objection.

11        THE COURT:  Here's the thing, though, then I'll let

12   you go on with the rest of it.  I thought there was an

13   agreement in chambers that you were not going to have any

14   problem with the fact they were married.  Implicitly,

15   therefore, at least I assumed that that fact would likely be

16   made known in one form or fashion just how it was.

17        MR. MATESIC:  Okay, I did not assume -- I thought

18  when we discussed this in chambers, I was being requested, I

19  would not make this an issue during the course of the case.

20  Which I was happy to agree to.

21        THE COURT:  To go back and revisit that issue with

22  the jury, I presume you simply would like me to tell them, just

23  as Mr. Pawk told you, the fact they're married, that marital

24  relationship has no relevance, you judge on credibility.

25        MR. MATESIC:  I would ask you for a bit stronger, I


                          62


1  don't mean to tell your Honor how to do his job, but I think

2  because this might arouse a reaction from one or more of the

3  jurors --

4        THE COURT:  I'll say something appropriate.

5        MR. MATESIC:  Thank you.  Also, Mr. Pawk was

6  instructing the jurors as to the law regarding the conduct of

7  deliberations, that was before your Honor had the opportunity

8  to instruct them.  I don't believe it was appropriate for

9  counsel to do that.

10        THE COURT:  What did he say?

11        MR. MATESIC:  You have to make a credibility

12  determination, you are the fact finders.

13        THE COURT:  That's all true, people say that all the

14  time, I have no problem with that.

15        MR. MATESIC:  That's all I have for the record.

16        MR. PAWK:  Counsel said that Cost didn't contact

17  her, if I misspoke, I apologize, but it was in the context of

18  after she had sent the EEO memorandum, that Cost didn't contact

19  her.  I thought I said it in that context, it was in the fall.

20  Obviously, they had contacts at the trailer, I know that was

21  obvious.

22        THE COURT:  Well, tell me again on that point how

23  you think he misspoke?

24        MR. MATESIC:  He indicated that counsel for Brown

25  stated that Cost never got back in touch with Ms. Brown or


63


1  never contacted her.  That was a mischaracterization.

2        THE COURT:  This is how I'm going to handle it on

3  the question of mischaracterization.  My standard rule is I do

4  not tell the jury what they should remember and what they

5   shouldn't.  I'm going to simply remind the jury that with

6   respect to opening statements of both of you, to the extent you

7   characterize this or that, it's your recollection that

8   controls.  As far as the merits of the marital relationship is

9   concerned, I would say something appropriate that reminds them

10  of -- quite frankly, I think the issue was waived, the record

11  would have to speak to that.  So as to avoid any problem down

12  the road, I will address it with the jury.

13          MR. PAWK:  Let me just say for the record, judge, he

14  has known of the marital relationship in the case for over two

15  years now.  We've talked about it in chambers.  We've talked

16  about it before the case.  I said I was going to address it in

17  my opening.  This is not surprise.  I thought I tried to handle

18  it appropriately.  I'm a little surprised by how he is

19  characterizing it, that somehow it's prejudicial to his client.

20  It could be bad for me potentially, I don't know.

21          THE COURT:  I don't know, either.

22          MR. LUTZ:  We also made it clear in chambers that I

23  was here for that purpose, in front of Mr. Matesic.

24          THE COURT:  I think that in fairness, you had no

25  objection to the fact that they were married.  I don't recall

1  as I sit here today whether you represented on the record that

2  it was your intention to make this known to the jury, perhaps

3  you did.

4         MR. LUTZ:  I recall that this morning, your Honor.

5         THE COURT:  I'll do this, I'll have my court

6  reporter check his notes to see what the sum and substance of

7  that was.  And then at the appropriate point, if I think some

8  additional curative instruction is necessary, I will give it.

9  The only thing I'm going to do right now is I'm going to tell

10  the jury, remind the jury both with respect to openings and any

11  other statements, it's their recollection that controls.

12         MR. MATESIC:  Is the document machine working?

13         THE COURT:  I'll take a short break and have one of

14  my clerks come over to see if we can get that going.  Because

15  it will speed up whatever additional time we have left here

16  this afternoon.

17         MR. MATESIC:  Your Honor, one more thing.  With

18  regard to her union affiliation with the operator's union, the

19  fact she was taken out of the union, we didn't address this in

20    motions in limine, what your intention is, there's some

21    evidence that she was dropped from the union membership program

22    because of a failed drug test.  I don't believe that evidence

23    comes in, I'm not going to raise it.

24          MR. PAWK:  What we intend to get into is that she

25    filed an EEOC complaint against the operating engineers' union


                                    65


1    and she failed a drug test.  I think that goes to bias,

2    interest and improper motive.

3          THE COURT:  It's excluded, it's irrelevant and it's

4    prejudicial.

5          MR. PAWK:  The fact that --

6          THE COURT:  Against another outfit.  Why is that

7    relevant to this case -- how was it resolved, by the way?

8          MR. PAWK:  I'm not sure how it was resolved, but she

9    testified in her deposition that she filed an EEOC complaint

10    against them within a year, she filed an EEOC complaint against

11    Solar Testing Lab, the same company she worked for.

12          THE COURT:  You're introducing it to show?

13          MR. PAWK:  An improper motive in the case.

14          MR. LUTZ:  Also there are diary entries that are

15   going to be produced in evidence, the day that one of these,

16   I'm not sure which one, one of these other EEOC charges was

17   dropped, she has a note now I'm going after Cost.

18          THE COURT:  This is a whole can of worms that I

19   wasn't aware of, I'm not going to resolve this right here --

20   I'll take that up in chambers when we have the opportunity to

21   discuss it more fully.

22          (End of discussion at side bar.)

23          THE COURT:  Members of the jury, I'm going to take

24   just a very short break and bring one of my clerks over, who

25   are far more knowledgeable than I am about how the equipment


                              66


1    functions.  We'll try to get these screens up, it will speed

2    things up.  All right, we're going to take a recess.

3          (Proceedings recessed at 3:38 p.m., in Courtroom A;

4    and reconvened at 3:50 p.m., in Judge's Chambers.)

5          THE COURT:  Could you tell me your name and juror

6    number?

7          JUROR NO. 151:  Sure my name Is Tim Conrad, jury

8   number 151.

9          THE COURT:  My law clerk tells me that you mentioned

10  to her on the break that you were a Fed-Ex driver?

11         JUROR NO. 151:  I am a Fed-Ex freight driver.

12         THE COURT:  That you had delivered to the site that

13  forms this case, the Marienville state prison?

14         JUROR NO. 151:  Yes.

15         THE COURT:  Would the fact you periodically

16  delivered at that site for any reason in any way effect your

17  ability to be fair and impartial?

18         JUROR NO. 151:  No.  I just wanted to mention it.

19         THE COURT:  I'm glad that you did.

20         JUROR NO. 151:  What kind of construction they did,

21  I thought they were like small residential or small commercial.

22         THE COURT:  You never got to know any of the

23  principals involved here, you're simply calling it to our

24  attention out of an abundance of caution?

25         JUROR NO. 151:  Yes.


                          67


1          THE COURT:  Does anyone have any questions?

2          MR. LUTZ:  No, your Honor.

3          MR. MATESIC:  No.

4          MR. PAWK:  No, sir.

5          (Juror excused.)

6          THE COURT:  There's one other matter that I noticed

7   when I went out and looked at the jury panel.  There's a juror,

8   whose number I do not know, her name is Shirley Williams, who

9   is sitting in the back row.

10         MR. MATESIC:  She's number five.

11         THE COURT:  I know her.  My wife and I have known

12   her.  Her husband is Dennis Williams, he's an attorney.  We do

13   not have and have not ever regularly socialized with them.  I

14   know her to say hello to, as with her husband.  I don't see

15   that as any problem at all.  I'm not going to be talking to her

16   about this case, I assume nobody would object?

17         MR. MATESIC:  No objection.

18         MR. PAWK:  No objection.

19         (Whereupon, at 3:53 p.m., the proceedings concluded

20   in chambers; and reconvened at 3:55 p.m., in Courtroom A.)

21         THE COURT:  All right, Mr. Matesic, call your first

22   witness.

23         MR. MATESIC:  Plaintiff calls Kathleen Brown.

24          THE COURT:  Ms. Brown, come up here, raise your

25   right hand and I'll swear you in.


68


1          KATHLEEN BROWN, PLAINTIFF HEREIN, SWORN

2                    DIRECT EXAMINATION

3   BY MR. MATESIC:

4   Q.   Good afternoon.

5   A.   Good afternoon.

6   Q.   Would you state your full name for the record, please?

7   A.   Kathleen Brown.

8   Q.   Ms. Brown, you are the plaintiff in this case?

9   A.   Yes.

10   Q.   How old are you?

11   A.   I'm 43-years-old.

12   Q.   Where do you live?

13   A.   My residence is in Marienville, Pennsylvania.  But I'm

14   staying down in Orbisonia, Pennsylvania, 05222.

15   Q.   How long have you lived in Marienville?

16   A.   Well, again, three years.

17   Q.   What do you do for a living?

18   A.   Right now I'm with the operating engineers.

19   Q.   What is an operating engineer?

20   A.   I operate heavy equipment.

21   Q.   The operating engineers, that's a union?

22   A.   Correct.

23   Q.   How long have you been a member of that union?

24   A.   Eight years total.

25   Q.   That's eight continuous years?

69

1   A.   No, I have a break in service.

2   Q.   From when till when?

3   A.   2000 to 2002.

4   Q.   Okay.  I want to get back to your work as an operating

5   engineer, just a few more questions about your background;

6   how far did you go in school?

7   A.   11th grade.

8   Q.   Do you have a GED?

9   A.   Yes, I do.

10   Q.   Do you have any family?

11   A.   Yes, I have two sons.

12  Q.   And is one of them accompanying you today?

13  A.   Yes, that's my son, Eric, Eric Burtop.

14  Q.   How old is Eric?

15  A.   He's 12.

16  Q.   And your other son?

17  A.   Steven Meholick.

18  Q.   How old is Steven?

19  A.   He's 20.

20  Q.   Okay, back to operating engineer, you said you operate

21  heavy equipment?

22  A.   Correct.

23  Q.   What do you mean when you say heavy equipment?

24  A.   Tractors, dozers, loaders.  Forklifts, cranes.  I don't

25  particularly operate everything, but if I have the opportunity,


70


1  I would like to.  But I'm only certified in certain things.

2  Q.   How did you learn the skills necessary to operate those

3  various pieces of heavy equipment?

4  A.   I entered an apprenticeship.

5  Q.   When did you do that?

6   A.   In 1997.

7   Q.   And who was holding the apprenticeship?

8   A.   It was the operating engineers.

9   Q.   What had you done prior to 1997?

10  A.   I was a stay at home mom, I raised my two children.  They

11  were both with me at that point.  I had a studio in my

12  basement, I was a freelance artist.

13  Q.   And why did you decide to pursue work in the construction

14  trades?

15  A.   Well, it was up and down, you know, I'd get a little

16  ahead, then I'd fall behind.  I was on and off welfare

17  periodically.  I'd pick up a bartending job here and there.

18  I just wanted a better living for myself and my children.

19  Q.   So this is going back to 1997?

20  A.   Yes.

21  Q.   Were you married at the time?

22  A.   No, I was single.

23  Q.   And tell us about the apprenticeship program, what all

24  does that entail?

25  A.   It's 4,000 hour, four-year program.  And you have to

1    qualify in for a Class A or Class One piece of equipment to

2    become a journeyman.

3    Q.    What is a Class One piece of equipment, what does that

4    term mean?

5    A.    It would be whether you're like a tractor, a crane, a

6    dozer, a loader -- there's a lot of them are Class One.

7    Q.    Did you complete the 4,000 hours?

8    A.    No, I didn't.

9    Q.    How far along did you go?

10    A.    I had 2.5 hours or 2.5 years I mean.

11    Q.    Do you know how many hours that was?

12    A.    No, I'd have to --

13    Q.    Despite the fact that you didn't complete the

14    apprenticeship program, though, you're working as an operator?

15    A.    Yes, I'm journeyman.

16    Q.    So you don't need to have completed the apprenticeship

17    program in order to be an operator?

18    A.    No, I don't.

19    Q.    What do you like in particular about construction work?

20    A.    Well, I like working outside, I like the money.  I like

21   the insurance and the security it gives me.  I mean, I need it,

22   retirement, health benefits.  If I work good.  If I get to

23   work.

24   Q.    Anything else in particular that you prefer about

25   construction versus what you did before?

72

1   A.    Well --

2   Q.    Let me ask it this way.  What projects have you worked on

3   that we might know about, those of us who live in western

4   Pennsylvania?

5   A.    I worked on 522 last year.  I-99 was the year before

6   that.  When I worked in the building trades, I worked at the

7   indoor and outdoor track and field at Penn State.  I like to

8   drive by it, I have my kids with me and tell them I helped

9   build it.  I didn't build it myself, but I was there.

10   Q.    In addition to being an operator, you performed other

11   jobs in the building trades?

12   A.    Yes.

13   Q.    Tell us about those?

14   A.    I was a field technician.

15  Q.    What does a field technician do?

16  A.    Well, I was hired mainly because of my construction

17  background.  But I watched the material go in at the SCI

18  project.  And I made a daily report up, what material was used,

19  where it was placed, where it came from, where it went.

20  Whether it was stable, unstable, that kind of thing.

21  Q.    Okay.  What else have you done in the building trades?

22  A.    I was an oiler.

23  Q.    What does an oiler do?

24  A.    Well, I oiled on a crane, which I basically was the

25  operator's safety man, that's a big part of it.  Make sure all


73


1  the equipment is running right, all the cables are good.  Make

2  sure no one gets hurt by him or he doesn't hurt or swing into a

3  power line.  He's the operator, I'm just like the second man.

4  Q.    I neglected to ask you, you were a field technician for

5  how long?

6  A.    Two months.

7  Q.    And how long were you an oiler?

8  A.    I was an oiler for about two years.

9   Q.   Is that two continuous years or 24 months continuously or

10  sporadically?

11  A.   No, there was breaks.  There were different jobs.  I

12  oiled on a sheer, which cut metal in a demo, which cut I-beams,

13  to take off the site.  I did that for almost seven months.  And

14  then I oiled on various cranes.

15  Q.   But if we added up the total number of months that you

16  worked as an oiler, would that be 24 months?

17  A.   Yeah, easy.

18  Q.   Any other jobs you've worked in construction trades?

19  A.   I drove a truck, truck driver.  I've operated compactors.

20  I'm forklift certified.  Now you have have to have a

21  certification for a forklift.  I achieved that through the

22  operator engineers.

23  Q.   Okay.  And you heard the reference during the opening

24  statements to your work with the State of Pennsylvania as a

25  laborer?


                                74


1   A.   Yes.

2   Q.   Would you describe that, please?

3  A.    Yes.  I worked for the State of Pennsylvania as a laborer

4  in '02, I started in May.  It was for the parks services.

5  Pendigo was the main park, but I worked at Kinzua and Elk.  And

6  my job was to maintain those facilities, their equipment.  One

7  facility had a pool, we had to maintain it.  With all the

8  filters and everything that goes along with that.  At Kinzua we

9  brushed and cleaned out underneath the bridge.  And then we

10  replaced planks on the bridge, that was like 301 feet off the

11  ground, we replaced them, pulled the old ones out and put a new

12  one in.  At Elk they had a dam, so we had to put in and take

13  out the docks for them for launching boats.  When the water

14  went down, we would take them out.  And then restore them in

15  the fall at the end of the season.

16  Q.    I believe you heard counsel refer to your work with the

17  state as landscaping work.  Based on your experience, eight

18  years in the building trades, does this qualify as strictly

19  landscaping work?

20  A.    No.

21  Q.    But is landscaping included in that?

22  A.    Yes, I mowed grass.  But I also used wheelbarrows.  Used

23  drill shovels, I mean, we dug ditches.  We didn't just weed and

24  mow.

25  Q.   I asked you what you liked about construction work in


75


1  general; can you tell the jury in general were there any

2  problems or hardships or particular things about construction

3  work that you don't prefer?

4  A.   The weather, it doesn't cooperate very well.  And it's a

5  short season in Pennsylvania.

6  Q.   And what is the problem if the weather doesn't cooperate?

7  A.   Well, like the last couple years, I worked heavy highway.

8  So that's moving earth, I moved a lot of dirt.  And if it's

9  raining a lot, if it's raining previously and the earth is

10  saturated, the material, we can't move it or place it.  And if

11  you can't move it or place it, it's like I run a compactor this

12  year, I ran a truck last year, so you're not going to move it,

13  you're not going to work, they're going to tell you to go home.

14  Q.   Do you get paid if you don't work?

15  A.   You get a one hour show-up time, sometimes.  They might

16  call you and tell you not to even bother to come.  But usually

17  you get at least an hour show-up time, but no, you don't get

18  paid for anything.

19  Q.    In terms of safety, has that ever been a concern of yours

20  on the job?

21  A.    Yes, I'm very safety conscious.  I mean my motto is I go

22  home safe and everybody I work with goes home safe.  They have

23  families, they have a two-hour drive, whatever, so I take my

24  time, I make sure that my equipment that I run or whatever I'm

25  doing, I'm doing it safely.


76


1  Q.    Okay.  I want to take you up to, well, actually back to

2  the year 2002, a little bit forward in your work history.  You

3  were working for the Commonwealth of Pennsylvania; when did you

4  get that job?

5  A.    I got it in May of '02.

6  Q.    And the job title was?

7  A.    Laborer.

8  Q.    And how much did you earn at that job?

9  A.    I made $9.50, I think it started out at a rate of $9.50.

10  And after I got on the job, I was wasn't familiar with working

11  with the state or anything like that, they told me that if I

12  took the Civil Service test, I could upgrade.  So I went and

13    took the Civil Service test and passed it, and became a skilled

14    laborer and my rate went to $10.50.

15    Q.    When did that happen?

16    A.    Probably about a month or two into May, June or July,

17    it's in my diary, I think.

18    Q.    How many hours a week were you working for the state?

19    A.    39.5.

20    Q.    And did you get any other perks with the state, such as

21    pension benefits or any retirement?

22    A.    No, that's why they kept you under 40 hours.  And I was

23    temporary.  When they hired me, it was a temporary job.  It was

24    a temporary job, they told me that right from the beginning.

25    Q.    Where was that job located?


77


1    A.    Bendigo, in Johnsonburg.

2    Q.    How far is that from Marienville -- pardon me, where were

3    you living at that time?

4    A.    Marienville.

5    Q.    How far was Bendigo from Marienville?

6    A.    It was 45 plus miles one way.

7    Q.    So a 90-mile round trip commute?

8    A.    Yes.

9    Q.    Because you weren't staying in Bendigo, you were staying

10   at Marienville?

11   A.    Correct.

12   Q.    Were you being reimbursed for your travel?

13   A.    No.

14   Q.    I'm going to round off $9.50, $10.50, I'm going to say,

15   just for the sake of argument, you were making about $10 an

16   your, you were working about 40 hours a week.  So give or take

17   a few dollars, you were making about $400 a week, is that fair

18   to say?

19   A.    Correct.

20   Q.    You were working five days a week for the state?

21   A.    They averaged out that I would not work anymore than 40

22   hours.

23   Q.    But in any given seven-day period, you were working on

24   average of five days?

25   A.    Yes.

78

1   Q.   You were making five round-trip commutes each week?

2   A.   Yes.

3   Q.   So 450 miles?

4   A.   Yes.

5   Q.   Was that enough, the money that you were being paid by

6   the state, was that enough for you to live on?

7   A.   No.  I was really having a hard time taking care of, I

8   had a house on the river, meanwhile, before I made a permanent

9   residence in Marienville, I was 10 more miles away from

10  Marienville.  My friend, Mandy -- just told me, basically, to

11  bail on the house because I couldn't afford it.  I couldn't

12  afford driving 90 miles round trip, paying the rent, paying the

13  utilities.  My oldest son was with me then on the river.  I

14  just couldn't swing it, I was killing myself.

15  Q.   Did you own that home?

16  A.   No, I rented it.

17  Q.   At some point in the year 2002, you learned that there

18  might be some vacancies at the -- strike that question.

19  You did at some point apply for work with Cost Company?

20  A.   Yes.

21  Q.   How did you come to know there was or there may have been

22    a vacancy at Cost?

23    A.    Well, there's three bars in Marienville, one is the Kelly

24    Hotel.  And I frequented it because my best friend is the

25    manager there.  And she was the first one that pretty much


79


1    mentioned it --

2           MR. PAWK:  Objection, hearsay.

3           MR. MATESIC:  Goes to state of mind, your Honor.

4           THE COURT:  All right.  As to why she did something?

5           MR. MATESIC:  Yes.

6           THE COURT:  I'm going to overrule it and I'm going

7    to give the jury a curative instruction now.  Members of the

8    jury, although the witness hardly had much of an opportunity to

9    answer the question.  I believe, based upon a discussion we had

10    at side bar, there's going to be testimony to the effect that

11    one or more persons -- tell me if I have this right, informed

12    her that Cost was hiring, is that correct?

13           MR. MATESIC:  Yes.

14           THE COURT:  All right.  And then it's a result of

15    that she took certain action.  I instruct you that when you

16  hear that testimony, you may not hear it and consider it for

17  the proposition that Cost was in fact hiring, because that is

18  hearsay.  The only reason this testimony is coming in is why

19  she then did something in response, do you understand what I'm

20  saying.  So, once again, remember you have to listen to what I

21  tell you insofar as the law is concerned.  You may not

22  substantively consider the testimony.  It is only being offered

23  as to why she did thus and so.  Go ahead with your line of

24  questioning.

25          MR. MATESIC:  Thank you, your Honor.


80


1  BY MR. MATESIC:

2  Q.   Go ahead.

3  A.   Okay.  My best friend is Mandy Rogers, Mandy was the

4  manager of the Kelly Hotel.  So I frequented that bar and she

5  worked there, she's in there all the time.  Well, she, you

6  know, told me that they were hiring guys off the street in

7  Marienville.  She knew that, because she's a resident of

8  Marienville all of her life, she's lived there all her life.

9  She told me, you know, so and so got hired, I didn't know these

10    people because I'm not from there, you know.  And then I talked

11    to the bricklayers, and they're telling me that they were

12    putting recruiting forms in their paychecks.

13    Q.    How did you come across these bricklayers, how did your

14    path and theirs happen to cross one another?

15    A.    Started on a social level.  But, you know, get to

16    talking, they asked me what I did and you know I told them I

17    worked for the state, I used to be an operator, worked

18    construction.  So kind of build a -- get to know each other,

19    your friends.

20    Q.    Now, you were mentioning forms that were going out in the

21    bricklayers' paychecks?

22    A.    Yeah, they were recruitment forms.

23    Q.    I'm going to place on the document camera here what's

24    previously been labeled as Plaintiff's Exhibit 24; do you see

25    that on your screen?


81


1    A.    Yes.

2    Q.    Is this the recruitment form that you were talking about

3    before?

4   A.   Yes.

5   Q.   Couple things here.  In addition to the printed text,

6   there is also some handwritten language on this exhibit, and

7   I'd like you, if you can please, to identify whose handwriting

8   we're looking at here.  First of all, at the bottom,

9   individual's name, present address?

10   A.   That's my handwriting, that's my name and that's my

11   address at the time.

12   Q.   Where did you get this?

13   A.   I received this from one of the bricklayers, probably

14   when I was in the Kelly they handed it to me.  I told them to

15   give me one of these recruitment forms, I didn't see one, so

16   they gave me one.

17   Q.   Do you remember the name of the bricklayer?

18   A.   It was probably Pete Hartford, something like that, yeah.

19   Q.   Who did he work for?

20   A.   He worked for Cost.

21   Q.   And did he -- well, strike that.  What did you do with

22   this document after you got it?

23   A.   I filled it out.

24   Q.   And then what did you do?

25   A.   He wrote the address on the top of this form and that's

82

1   where I mailed it.

2   Q.   And when you say he wrote the address, where my finger's

3   indicating right now Cost?

4   A.   Correct.

5   Q.   When you got this document, did it have any address on it

6   for Cost?

7   A.   No.

8   Q.   If he had not filled this out, would you have known where

9   to send it?

10   A.   No.

11   Q.   So you say you mailed it to Cost?

12   A.   Correct.

13   Q.   Do you remember when that was?

14   A.   I'd say it was shortly after this date because as soon as

15   I got it, you know, I was anxious to get some work.

16   Q.   Did you have any idea how much money you would earn had

17   you in fact been hired by Cost?

18   A.   I know I would make a lot more than what I was making.

19   Q.   How would you know that?

20  A.    Because I worked union work, I know that union laborers,

21  any union, whether it be a carpenter, a laborer, would be

22  making more than $10.41 an hour.

23  Q.    Did you get any response from Cost after you mailed this?

24  A.    I didn't hear anything.

25  Q.    What did you do next?

83

1  A.    I waited a couple weeks, then I went up to the site.

2  Q.    By the site, you're referring to the SCI Marienville

3  site?

4  A.    Correct.

5  Q.    How far was that from your home?

6  A.    Well, by this time I was moving into Mandy's house.  On a

7  porch that she let me move in on.  And it was a mile away.  One

8  mile away from her door.

9  Q.    And do you remember when it was that you went to the site

10  for the first time -- strike that.  You had testified earlier

11  that you were a field technician?

12  A.    Correct.

13  Q.    When were you a field technician?

14  A.    I was a field technician in November, December of '01.

15  Q.    Where were you a field technician?

16  A.    At the SCI project.

17  Q.    So you were familiar with where that project was located?

18  A.    Yes.

19  Q.    You were familiar with how that project was arranged, how

20  it was laid out?

21  A.    Yes.

22  Q.    Let's go back to the earlier line of questioning.  You

23  went up to the SCI site when?

24  A.    July 31st was the first time I stepped on the site to

25  request employment from Cost.


84


1  Q.    And did you speak to anybody from Cost at that time?

2  A.    Yes, I did, I went to the trailer, I talked to Dean

3  Taylor.

4  Q.    When you got to the trailer, was he there?

5  A.    No, he wasn't there.

6  Q.    Did you have to wait for Mr. Taylor?

7  A.    Yes, I did.

8   Q.   How long did you wait?

9   A.   Well, I got there at 6:30 early because I've been on jobs

10  before, I wanted to catch him before he went out on the site.

11  Well, I didn't catch him, I missed him.  I don't know what

12  gentleman I talked to inside, I'm assuming one of the workers,

13  said that he was out on site, that he would be back, just to

14  hang out.  Because I told him what I wanted, he said just hang

15  out, he'll be back.

16  Q.   How were you dressed that day?

17  A.   I was dressed in blue jeans, boots and T-shirt.

18  Q.   Why were you dressed that way?

19  A.   Because I was hoping to go to work.

20  Q.   Did you have any documents with you when you went to the

21  Cost job site on July 31st?

22  A.   Yes, I did, I had one of these memorandums, I guess you

23  would call it, and a resume.

24  Q.   Now, I'm going to place before you what's been previously

25  labeled as Plaintiff's Exhibit 12 -- can you identify this

85

1   document, Ms. Brown?

2   A.   Yes, it's my resume.

3   Q.   And is this the resume that you took with you on July 31,

4   2002?

5   A.   Yes.

6   Q.   And the jobs that you identify as having worked on this

7   resume, I'll just read them, you can follow along.  Laborer,

8   May, 2002 to August, 2002?

9   A.   Right.

10   Q.    Those are correct, that's the correct time period for

11   this job as a laborer with the state?

12   A.   Yes.

13   Q.   Field technician, October, 2001 to December, 2001?

14   A.   Yes.

15   Q.   Heavy equipment operator, April, 2000 to May, 2000, do

16   you see that?

17   A.   Yes.

18   Q.   Oiler for shear/rock truck driver, May, 1999 to November,

19   1999?

20   A.   Yes.

21   Q.   Oiler, February, 1999 to April, 1999?

22   A.   Yes.

23    Q.    Oiler, September, 1998 to -- I don't have the actual date

24    on there, it's for Century Steel Erectors?

25    A.    Correct, that's mine.


86


1    Q.    This is the exact copy of the resume you took with you to

2    the Cost work site on July 31st?

3    A.    Well, if you flip back to the front page -- if you look

4    at this one, the front page, where the laborer conservation, I

5    already have August of 2002.  So this had to be like the

6    second, this was the one I made up second.  The only difference

7    being is that laborer wasn't on there.

8    Q.    I see.  You did in fact talk with Mr. Taylor on July 31,

9    2002?

10    A.    Yes.

11    Q.    Tell us about that discussion, how long did it last?

12    A.    Not very long.  When he did finally show up, he shook my

13    hand, I told him what I wanted, work.  He said what can you do.

14    I barely got out, you know, operating, I just wanted to explain

15    to him that I do have a construction background.  And he really

16    didn't give me time to explain anything.  He said we're not

17    hiring operators.  I said, well, all right, I'll do anything,

18    whatever you're looking for.  And he said, well, we're not

19    hiring, we're not hiring period.  So I left, that was it.

20    Q.    Were you the only person who was waiting for Dean Taylor

21    that morning?

22    A.    No.

23    Q.    Who else was waiting for him?

24    A.    There were two other gentlemen that showed up probably --

25    I'd say close to an hour after I showed up.  I was there at


87


1    6:30 and I didn't see Dean until 8:00, 8:30, that morning.

2    Q.    All right.  Of those three people, who was the first one

3    to talk with Dean Taylor?

4    A.    Myself.

5    Q.    Mr. Taylor told you that Cost was not hiring?

6    A.    Yes.

7    Q.    And you did what after that?

8    A.    I left.

9    Q.    Did you hear any other -- strike that question.  Have you

10    ever met Dean Taylor since that day, have you ever had occasion

11   to talk to him?

12   A.   I've met him one other time, August -- late in August,

13   August 23rd.

14        THE COURT:  What year?

15        THE WITNESS:  2002.

16   BY MR. MATESIC:

17   Q.   Let me go back to the two gentlemen that were waiting for

18   you; how were they dressed?

19   A.   One gentleman that had talked to me, he was in street

20   clothes.  The other one, he showed up even later than the first

21   guy.

22   Q.   What do you consider street clothes?

23   A.   He had sneakers on, he had jeans on, he had like a -- not

24   a dress shirt, but a street shirt.

25   Q.   Street shirt or street clothes, as opposed to?


                                88


1   A.   Showing up in a dirty, not a dirty T-shirt, a stained

2   T-shirt, worn jeans and a pair of boots.

3   Q.   Let me put it this way.  If you were dressed that way,

4   would you be dressed appropriately for construction work?

5  A.   No.

6  Q.   Did you hear Dean Taylor say anything to these two men?

7  A.   After I spoke with Dean, it was pretty short and I

8  started down the steps, I was probably 15, 20 feet, and we were

9  between trailers, I was 15, 20 feet away, my car was facing the

10  trailers that I had just exited, and I heard him say what do

11  you want --

12  Q.   Let me stop you there, I don't want you to tell me what

13  either of those two other men said, I just want to know what

14  Dean Taylor said?

15  A.   He said --

16  Q.   You heard him say what do you want?

17  A.   What do you want.

18  Q.   Did you hear him say anything else?

19  A.   Come with me or follow me.  Come with me.

20  Q.   And he was speaking to who?

21  A.   Those two guys.

22  Q.   Did you see Dean Taylor after that?

23  A.   I saw them, by the time I heard him and I got to the car

24  and turned around and I was getting in my car facing the

25  trailers, he was walking up towards the drug trailers, or the

89

1  drug trailer, testing.

2  Q.    What did you conclude based on what you saw?

3        MR. PAWK:  Objection, your Honor, calls for

4  speculation.

5        THE COURT:  Sustained, calls for speculation.

6  BY MR. MATESIC:

7  Q.    You said you visited the site on a second occasion?

8  A.    Yes.

9  Q.    August 23rd?

10  A.    Yes.

11  Q.    Tell us about that?

12  A.    I showed up and Dean and Bill Heaton were there.  I

13  didn't know who Bill Heaton was, but one of the construction

14  workers told me, he described him to me.  I says I don't know

15  who Bill Heaton is and they said, well, he's about as tall as

16  he is round and has a beard.

17  Q.    And why would you want to be talking to Bill Heaton?

18  A.    Because I didn't get anywhere with Dean Taylor.

19  Q.    Did you talk with Bill Heaton that day?

20  A.    Yeah, he was there.

21   Q.   Tell us about the conversation, what was said?

22   A.   It was pretty short, I shook his hand.  I told him I

23   wanted work.  They didn't give me much, let me explain, you

24   know, that I was a laborer.  He said what do you do.  I said

25   well, I operate.  I just wanted to explain that's where I had

90

1   my most experience, was in operating, and I was on site.  They

2   never gave me the time.  Anyway, he said about laboring.  And I

3   said your laborers run walls, I know how to run a wall.  He

4   said well, we're not hiring.  So I turned around and I left

5   again.

6   Q.   Did you have any documents with you at that time?

7   A.   Yes, I gave him -- I at least had a resume on me.  I'm

8   pretty sure I had a recruitment form, too.

9   Q.   Did you ever hear back from Cost after that second visit?

10   A.   I never heard anything till September.

11   Q.   Tell us about that?

12   A.   One of the recruitment memorandums, whatever you want to

13   call it, I mailed in.  Apparently it got to somebody, you know.

14   Because I made attempts.  But anyway this one got to somebody.

15    And they mailed it back to me and it said, they gave me a phone

16    number and told me to call.

17    Q.    Where did they mail it to?

18    A.    They mailed it to the 98 or the address on the form.  I

19    think it's Sigel?

20    Q.    RR 1?

21    A.    98-C, River Road, Sigel, PA.

22         THE COURT:  Members of the jury, how many of you are

23    from out of the county?

24         (Juror indicates.)

25         THE COURT:  Traveling some distance?


91


1          A JUROR:  About an hour and a half.

2          THE COURT:  Mr. Matesic, if that clock is anywhere

3    near accurate, I can't guarantee it the way mechanical things

4    have been running in this building lately, but close enough to

5    4:30 that we're going to take a break.  Let me remind you of

6    what I told you earlier, and that is don't talk about the case

7    with anybody.  My law clerk, when we break, is going to take

8    you back to the jury room, show you how to get in in the

9    morning, and answer any other additional questions you may

10   have.  We're going to start tomorrow at 9:00 a.m.  So we're in

11   recess until then.

12

13           (Whereupon, at 4:28 p.m., the Jury Trial proceedings

14   were adjourned for the day.)

15

16                   - - -

17

18

19

20

21

22

23

24

25



                                92



1            C E R T I F I C A T E
                  _ _ _ _ _ _ _ _ _ _

2

3

4

5      I, Ronald J. Bench, certify that the foregoing is a

6  correct transcript from the record of proceedings in the

7  above-entitled matter

8

9

10

11  _____

12   Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24

25