IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN BROWN,
    Plaintiff

v.           CIVIL ACTION NO. 03-224 ERIE

COST COMPANY,
    Defendant

JURY TRIAL - DAY NO. 2

Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Judge's Chambers & Courtroom A,

United States Courthouse, Erie, Pennsylvania,

on Tuesday, June 7, 2005.

APPEARANCES:
    RICHARD S. MATESIC, Esquire, appearing on behalf
    of the Plaintiff.

    MICHAEL J. PAWK, Esquire, and LAWRENCE P. LUTZ,

file:///A|/COSTDAY2.TXT

Esquire, appearing on behalf of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1               I N D E X
              _ _ _ _ _

2

3     WITNESSES:          DIRECT  CROSS  REDIRECT  RECROSS

4   FOR THE PLAINTIFF:

5   Kathleen Brown          3     36     116      136

6   Ronald Barrett        141    162     175       --

7   Dean Taylor            --    176      --       --

8

9     EXHIBITS:                IDENTIFIED

10  FOR THE PLAINTIFF:

11  Plaintiff's Exhibit 22           9

12  Plaintiff's Exhibit 24          14

13  Plaintiff's Exhibit 7            35

14  Plaintiff's Exhibit 16          105

15  Plaintiff's Exhibit 8          148

16  Plaintiff's Exhibit 9          151

17  Plaintiff's Exhibit 11         175

18  FOR THE DEFENSE:

19  Defendant's Exhibit U-12         14

20  Defendant's Exhibit 4            38

21  Defendant's Exhibit A-1          61

22  Defendant's Exhibit O            75

23  Defendant's Exhibit R            88

24  Defendant's Exhibit F-3         116

25  Defendant's Exhibit CC          165

3

1          P R O C E E D I N G S
            – – – – – – – – – –

2

3          (Whereupon, the proceedings began at 9:20 a.m., on

4  Tuesday, June 7, 2005, in Courtroom A.)

5

6          THE COURT:  Members of the jury, sorry for the

7   delay.  All right, Mr. Matesic.

8          MR. MATESIC:  Plaintiff recalls Kathleen Brown.

9          (Continued) - DIRECT EXAMINATION

10  BY MR. MATESIC:

11  Q.   All right, Ms. Brown, when we left off yesterday, you

12  were discussing the response that you received from Cost

13  Company after you had furnished them with the minority

14  recruitment memorandum.  Do you remember when you received word

15  from Cost for the first time?

16  A.   It was September 27th.

17  Q.   Tell us about that contact or that response?

18  A.   They mailed me back the recruitment form that I had

19  mailed them with my information on it, and it was signed by

20  Georgia Pawk.  It said we would love to hire you, but we need a

21  number, a phone number.  And she put a phone number on there to

22  contact her.

23  Q.   Okay.

24  A.   So the very next day I contacted her by phone.  And I

25  left the call back number at the Kelly Hotel, because I didn't

4

1   have a home phone.

2   Q.   Did you speak with Ms. Pawk that day?

3   A.   No, I left a message.

4   Q.   And did you hear back from her after you left that

5   message?

6   A.   Yes, she called me, I can't remember the exact date, she

7   did return my call.  But I don't know offhand what day was.

8   Q.   Was it within the week?

9   A.   No.

10        THE COURT:  Orient me on timeframe here, will you --

11   the timeframe again?

12   BY MR. MATESIC:

13   Q.   You said it was September when you received word --

14   A.   September 27th I received the letter.  I called them

15   September 28th, I called them the very next day.

16   Q.   And can you estimate at all how long it was before you

17   heard back from Cost Company?

18   A.   It was in October.

19   Q.   And who did you hear from?

20   A.   Georgia Pawk.

21   Q.   How did she get in touch with you?

22   A.   I called her -- I called her.  I talked to her after

23   leaving a message, I called her back.

24   Q.   Do you remember the substance of your conversation with

25   Ms. Pawk?

5

1   A.   Well, she asked me, you know, I told her about the letter

2   and that I got it, it was at that phone number and called her

3   back.  And I mentioned the Marienville project to her.  And she

4   basically asked me what I could do, I mentioned operating, that

5   they were hiring up there.  I think at that time she did

6   mention that work was slowing down up there, and that she would

7   get back to me about it.  And asked me about union, you know,

8   about being in the union.  I said I used to be in the union, in

9   the operators.  At that time I wasn't in any union, none at

10   all.  I just expressed to her that I really needed a job.  And

11   that I wanted to go to the Marienville project.

12   Q.   What job in particular or jobs in particular did you ask

13   for?

14   A.   I specified laborer/operator because at the time I was,

15   you know, I had just labored for the state and I was qualified

16   as an operator.

17   Q.   You said that she told you that work was winding down?

18   A.   Correct.

19   Q.   Did she give you a specific response to your request to

20   be a laborer?

21   A.   No.  This was three years ago, I can't really recall

22   every word that she said to me, but she mentioned that she

23   would get back to me and, you know, that the work was winding

24   down, she would find out and then contact me.

25   Q.   All right.  In October of 2002, were you working?


                              6


1   A.   Yes, I worked like the beginning of October, I worked

2   fracking wells with Robert.

3   Q.   And what is fracking wells?

4   A.   I really didn't know what it was.  It's where you go out

5   and he pumps water into the well that is already drilled, a gas

6   well and it gets clogged up with sand and sediment.  So they

7   pump water into it and they pump the water back out of it and

8   into a tanker that's sitting there, that they sat there.  And

9   my job was to just sit there and make sure that the tanker,

10   once they were pumping the water back out, it didn't overflow.

11   Q.   Let me ask the question differently.  What full-time work

12   did you have -- strike that question.  You worked for the state

13   until when?

14   A.   August.

15   Q.   August.  What full-time work did you have following your

16   layoff from the state?

17   A.   None.

18   Q.   So, in October of 2002, you had no full-time work?

19   A.   No, I didn't.

20   Q.   How much work did you perform with Robert fracking wells?

21   A.   I worked with him two days.  He paid me $100 a day, that

22   was 10 bucks an hour.  And anything over 10 hours he would pay

23   me, you know, as we worked.

24   Q.   All right.  Were you still looking for work in the

25   construction trades during that time?

7

1   A.   Yes, I was looking for construction and pretty much

2   anything else, I needed the money.

3   Q.   Can you describe for the jury what efforts you made in

4  finding employment?

5  A.   Well, I looked into Career Link, PA Career Link on the

6  Internet.  So I looked on that.  I had a resume.  I updated it.

7  I sent resumes out.  Anything that came in on Career Link, I

8  would mail, either mailed my resume or e-mailed it.

9  Q.   Do you know the name of any specific employer or party

10  that you would have sent your resume to?

11  A.   Yeah, I did get -- the state mails these out if you're

12  qualified, as a laborer, I was qualified as a semi-laborer,

13  semi-skilled laborer, so they sent me an application for

14  Torrence Hospital.  And right now I couldn't tell you where

15  that is located in Pennsylvania, but I applied for that job.

16  I applied for the PA Energy Corporation.

17  Q.   Okay.  Let me go back to Torrence for one second the.

18  Job you applied for Torrence, what was it?

19  A.   It would have been skilled, I said semi-skilled, it's a

20  skilled laborer.  Because I took the Civil Service test and it

21  bumped me up.

22  Q.   Then you said PA Energy?

23  A.   PA Energy.

24  Q.   What job were you applying for with them?

25  A.   I couldn't tell you, probably in the field.


8


1  Q.   But it was a construction job?

2  A.   Yeah.

3  Q.   And can you put these two applications in a time line?

4  A.   October --

5  Q.   Okay.

6  A.   Maybe a little later than that, I don't know.  I'm not

7  for sure about these certain specific dates.

8  Q.   All right.  Did you keep any record of these applications

9  that you made to these employers?

10  A.   Yeah, I kept a dairy or a ledger, ledger/diary of every,

11  pretty much every event that happened to me.

12  Q.   All right.  The dates on which you would have applied for

13  PA Energy, would that be in your diary?

14  A.   Yes.

15  Q.   The date that you applied for work with Torrence, would

16  that be in your diary?

17  A.   Yes, it would.

18  Q.   Let me just ask you, are there any other employers you

19    can remember applying to?

20    A.    Online I applied, I can't tell you exactly who they were

21    because I would just e-mail them.  Torrence Hospital -- in

22    October I was busy trying to, you know, I was sending them out

23    online --

24    Q.    All right.  If I asked you to identify the particular

25    dates, you're saying that you don't have a specific memory of

9

1    those dates?

2    A.    No.

3    Q.    If I showed you your diary, would you be able to identify

4    those dates?

5    A.    Yes.

6    Q.    All right.

7            MR. MATESIC:  Your Honor, if I may, the plaintiff

8    has previously labeled these as Exhibit 22, entries from Ms.

9    Brown's diary, because the witness professes at this point to

10    not being able to remember the dates which she applied for

11    employment, I'd like to show that to her.

12            THE COURT:  All right, you can do that.

13  BY MR. MATESIC:

14  Q.    In addition to showing you your diary, Ms. Brown, I will

15  also put the pages up on the monitor.  Is that on your monitor,

16  Ms. Brown?

17  A.    Yes.

18  Q.    What are we looking at here?

19  A.    I'm looking at September 20th, September 18th.

20  Q.    Well, first of all, can you identify this document?

21  A.    Yes, that's out of my diary ledger in '02, 2002.

22  Q.    And can you explain to the jury just your general

23  practice why were you keeping a diary?

24  A.    Well, I have a problem with long-term memory and

25  short-term memory, because I'm ADHD.  So this helps me just

10

1  keep track of everything, you know, a personal reference.

2  Q.    For how long have you kept a diary?

3  A.    Oh, at least 10 years.

4  Q.    On September 18th, do you see where I'm indicating with

5  my finger?

6  A.    Yes.

7   Q.    Could you read that into the record?

8   A.    It says "mailed application, Torrence State Hospital, PA

9   General Energy Corporation," and then it has the PA General

10  Energy Corporation's address.

11  Q.    That's the Torrence State Hospital job that you were

12  referring to before?

13  A.    Correct.

14  Q.    Okay.  And then now on the screen you'll see -- well,

15  tell me what you see on the screen?

16  A.    It's September 22nd, I went to my mom and my sister's.

17  Went to Colleen's and mom's and stayed overnight.  I had my

18  niece, Sarah, working on the computer because I'm not very good

19  on it.  I updated my resume, got addresses and e-mails.

20  Q.    Tell us again what is Career Link?

21  A.    It's Pennsylvania Career Link, it hooks me into any kind

22  of employment in Pennsylvania.  I put my resume in and what it

23  does is it kicks out anything that I'm qualified for.  Or that,

24  you know, they're looking for employees and I'm qualified.  It

25  just narrows it down for me.

11

1  Q.    All right.  And now would you please identify the

2  document that I've placed on the screen?

3  A.    It's September 27th, it's Friday, Cost and phone number,

4  that's when I got the letter in the mail.  Cost and phone

5  number.  I called at 5 o'clock, need to call tomorrow.  I

6  called at 5:00 p.m. that day.

7  Q.    This is the first time -- let me strike that question and

8  ask it differently.  You were testifying earlier as to when

9  Cost first got in touch with you?

10  A.    Yes, this would be the date by mail.

11  Q.    Five o'clock, could you read that into the record?

12  A.    Then I wrote "Cost and phone number.  Called at five.

13  Need to call tomorrow."

14  Q.    Need to call tomorrow, what does that signify?

15  A.    I spoke to someone, they said that no one was in and I

16  needed to call the next day.

17  Q.    All right.  What are we looking at here?

18  A.    We're looking at October 3rd and I worked with Robert.

19  6 o'clock I started, I made 150 bucks that day.

20  Q.    Who is Robert again?

21  A.    Robert is the one I fracked wells with.  His last name is

22  Miller.  But his father and his brothers own this business and

file:///A|/COSTDAY2.TXT

23  that's what they do.  They go out and frack wells.

24  Q.   All right.  What are we looking at here?

25  A.   I'm thinking that's October 5th, and it says mailed two


12


1  resumes from the computer, that I got off the computer.

2  Q.   Do you know who you mailed those resumes to?

3  A.   I'm not for sure.

4  Q.   Besides fracking wells with Robert, what other jobs, if

5  any, did you perform that fall?

6  A.   I worked at the Kelly Hotel.  They had a cleaning woman,

7  she left for two weeks for a vacation, so I picked up some work

8  there cleaning the rooms and making the beds upstairs.

9  Q.   How much did you earn working for the Kelly Hotel?

10  A.   It was like $40, $50 a week.

11  Q.   Do you know what date that was?

12  A.   The 10th I started.

13  Q.   What are we looking at here?

14  A.   October 20th.

15  Q.   Do you see the portion that I've highlighted?

16  A.   Yeah.

17  Q.   Do you say worked?

18  A.   I worked.

19  Q.   Where did you work?

20  A.   I apparently didn't put anything in there.  Probably did

21  something at the Kelly.

22  Q.   Let me show you this.  What are we looking at here?

23  A.   It says "worked Kelly."

24  Q.   How long did you work at the Kelly Hotel?

25  A.   It was about two weeks.


13


1  Q.   Do you know what you earned totally at the Kelly Hotel?

2  A.   He didn't really pay me by the hour, I just went and

3  picked an envelope up.  I'm thinking, from recall, I'd say it

4  was between 40, 50 bucks a week for each week I worked or time,

5  the time span that I worked.

6  Q.   All right.  I want to move now toward or back to your

7  testimony about speaking with Ms. Pawk in October; do you

8  remember the day on which you had that conversation?

9  A.   I called her October -- 27th, I think, or 28th, and I

10  spoke to her the 29th.

11   Q.   What are we looking at right here?

12   A.   It says that I called Georgia Pawk and I left a message.

13   And then it says mailed resume and wrote district available and

14   phone number on it.  And the arrow points up to Kenny, that's

15   the only callback number I had.

16   Q.   When you say it was the only callback number you had,

17   what do you mean?

18   A.   Well, Cost pretty much insisted the reason why I wasn't

19   hired was because they couldn't contact me.  So he had an

20   answering machine on his cell phone.  So he allowed me to use

21   this number on the PA Career Link or any application that I had

22   put in, any resume that I wrote, so they had a contact number,

23   a phone number, not just an address.

24   Q.   You said that you learned from Cost that they couldn't

25   contact you; when did you learn that?


                                14


1   A.   Well, when I received the letter in September that

2   basically it said we need a number to hire you, a phone number

3   to call you for hire.

4   Q.   All right.  If you'll take a look once again at Exhibit

5   24, you were testifying about this exhibit yesterday?

6   A.   Yes.

7   Q.   At the bottom of that exhibit, that's your name and

8   address?

9   A.   Correct.

10  Q.   That was the first minority recruitment memo that you

11  furnished to Cost, as far as you know?

12  A.   Yes, I'm assuming it is, yes.  Because I didn't have a

13  phone number or anything on it.  It's the River Road, Sigel

14  address.

15       MR. MATESIC:  One moment your Honor.

16  BY MR. MATESIC:

17  Q.   Ms. Brown, I'm going to place before you what has been

18  previously labeled as Defendant's Exhibit U-12, okay.  Can you

19  identify what we're looking at here?

20  A.   Yes, this would be the recruitment form that I mailed to

21  Cost and this is the one that they returned to me by mail.

22  Q.   You were testifying earlier about a letter that you got

23  from Cost?

24  A.   Okay.  Well, actually let me rephrase that, she wrote me

25  a note on that recruitment form that she mailed back to me.

15

1        THE COURT:  Who is she?

2        THE WITNESS:  Georgia Cost or Pawk, I'm sorry,

3   Georgia Pawk.

4   BY MR. MATESIC:

5   Q.    You said she had written something on that form?

6   A.    Yes.

7   Q.    I'm going to highlight a section of this form?

8   A.    "Kathleen, call me at 412-271-0420.  I need your phone

9   number to hire you.  We'd love to have you."

10  Q.    All right.  Is this the handwriting that you were

11  referring to or the written message that you were referring to?

12  A.    Yes.

13  Q.    All right.  Now, back to the end of October, you

14  testified you believed it was October 28th or October 29th when

15  you would have spoken with Ms. Pawk?

16  A.    Yes.  The day before I called and left a message that I

17  had mailed a resume to her with the information about the

18  operating engineers.

19  Q.    Do you see this section of this page that I'm

20  highlighting?

21  A.   Yes.

22  Q.   Can you explain to the jury what this represents?

23  A.   10 o'clock at Pittsburgh at store front, Kenny was

24  working on damaged property, and I got a phone call, it was

25  from Cost, Georgia Pawk, she mentioned something about the Erie

16

1  job and Jack Kramer and the courthouse.

2  Q.   All right.  Who's Jack Kramer?

3  A.   I'm assuming he was -- had something to do with the Erie

4  job and the courthouse.

5  Q.   And now the portion that I'm highlighting in pink, can

6  you read that, please?

7  A.   It says "Kenny and me finished up store front."  It says

8  "Barries and Howards."

9  Q.   What does that signify or represent?

10  A.   That I was helping him on this store front.  He is a

11  bricklayer.  And I was helping him fix this storefront, and we

12  had finished it up.  We worked on it a couple days.

13  Q.   Were you being paid for that?

14  A.    Yeah, he paid me about 20, 30 bucks to help him.

15  Q.    $20 or $30 total?

16  A.    Yeah.

17  Q.    Any other employer that you can remember seeking work

18  with during the fall of 2002?

19  A.    In October I worked at the Kelly, fracked wells, helped

20  Kenny with that.  And then in November -- oh, in November I

21  interviewed with Merit Contracting.

22  Q.    Do you remember when that was?

23  A.    It was the beginning of November.  I'm going to say maybe

24  the 2nd or 3rd, I'm not sure about the date.

25  Q.    Would the date be in your diary?


17


1  A.    Yes, it would.

2  Q.    What are we looking at here?

3  A.    It was the 6th of November.

4  Q.    All right.  Could you read that into the record, please?

5  A.    It says "9 o'clock interview, Merit Contracting, take

6  resume.  Called district 6 Erie operating engineers.  Paperwork

7  is in, on list."

8  Q.   Let me stop you there.  Let's go back to the very first

9  paragraph here.  9 o'clock interview Merit Contracting, take

10  resume?

11  A.   Yes.

12  Q.   Did you go to Merit Contracting that day?

13  A.   Yes.

14  Q.   And you took your resume with you?

15  A.   Correct.

16  Q.   88 back, what does that mean?

17  A.   I have no idea what 88 back means.

18  Q.   Okay.  Let's go on to the next paragraph, called district

19  6 Erie IUOE, paperwork is in, on list, what does that mean?

20  A.   That I called district 6 Erie.

21  Q.   I'm sorry?

22  A.   Erie International Union of Operating Engineers, IUOE,

23  paperwork is in, on list.

24  Q.   Okay.  What does district 6 represent?

25  A.   Six is the operating engineers, it's their district in

18

1  which they send out operators off the list.

2   Q.   Just to explain this for people who might not be familiar

3   with unions and the way they operate, there's a concept known

4   as the union local.  Now you're talking about the district?

5   A.   Correct.

6   Q.   How does those two things fit together?

7   A.   Well, the International Union of Operating Engineers is

8   Local 66.  And that consists pretty much of half of

9   Pennsylvania, from the middle of Pennsylvania to the Ohio line.

10  I'm not sure exactly where.  But it's like State College and a

11  little bit further it would stop, 66 would stop and another

12  operating engineers local would start.  But 66 is broken up

13  into sections.  So if there's work in say State College, that

14  would be district 4.  You would have to be on the district 4

15  list in order to be sent to go to State College.  If you were

16  on 5 or 6, you wouldn't be eligible, unless they didn't have

17  anybody in 4.  But that guarantees those guys in that area or

18  those people in that area to get work.  And you have to be on

19  the list and available to go to work.

20  Q.   The SCI Marienville project, what district was that in?

21  A.   That would have been in 5 and 6.

22  Q.   So if you had become a member in district 6, what would

23  that entail in terms of you being able to work at SCI

24   Marienville?

25   A.   I'm sorry, you have to say that again.


19


1   Q.   Sure.  Once you were in district 6 -- first of all, does

2   this entry here indicate that you were in district 6 at that

3   point?

4   A.   Yeah, indicating that I was on the list, that I had

5   talked to -- I can't think of the name right now, anyway I had

6   spoken to him, and I had made progress in getting on the list,

7   paying my entry fee, and I was on the list and available to

8   work.

9   Q.   How much was the entry fee?

10  A.   I'm going to say $55, $57, something like that.  It was

11  $50.

12  Q.   Let's go to the third paragraph here.  Could you read

13  that, please?

14  A.   I called Cost, Georgia, left voice mail, told her I was

15  all good with 66.

16  Q.   What does that mean?

17  A.   That means that when I had spoken to her, she mentioned

18    something about the union and that they're a union contractor,

19    and that she really couldn't do anything for me until I had

20    straightened out my end of being in the union.

21    Q.    All right.  What's the next step that you could remember

22    taking to try to get employment that fall?

23    A.    Oh, let me see.  Merit -- I got a job off the computer

24    with KGL.

25    Q.    What's KGL?


20


1    A.    It was a company -- what they called me for it was a rock

2    truck operator, truck driver.  They had a job in Philadelphia

3    in a quarry, I was qualified for it.  So he called me and he

4    made arrangements.  I'd say he called me around the 10th of

5    November and he made arrangements, and I think I went to work

6    for them on the 18th.

7    Q.    Okay.  Would you have made an entry in your diary as to

8    when you spoke with KGL?

9    A.    Yes.

10    Q.    At the bottom of this page, what are we looking at here?

11    A.    Well, called Sarah, that must have been the callback

file:///A|/COSTDAY2.TXT

12    number, Penns Park 1893, I can't even read that, the phone

13    number --

14    Q.    What's Penns Park?

15    A.    Penns Park would be the location of the quarry.

16    Q.    Okay.  The quarry that you referred to before with regard

17    to the KGL job?

18    A.    Correct.

19    Q.    We'll tie this into your testimony about contacting KGL.

20    Does this indicate if at all the date you had that discussion

21    with KGL?

22    A.    Yeah, I was writing it down -- I don't have it written

23    down here, I'm thinking they called Kenny's phone number,

24    Kenny's phone and left a message, that they got me off the

25    computer and this was the phone number to call, a callback


21


1    number.  It would be 50 -- 15 plus hours, I was scribbling.

2    Q.    Okay.  You said that you were qualified to do that job?

3    A.    Yes.

4    Q.    Did you accept employment with KGL?

5    A.    Yes, I did.

6   Q.   Do you know when you did that?

7   A.   I think I was on the job the 18th of November.

8   Q.   Would it be in your diary?

9   A.   Yes, it would.

10   Q.   Do you see anything on the 18th that indicates you were

11   working for KGL?

12   A.   Yeah, Jim called me 8 o'clock, well, it says at the very

13   top, "work 8.5 hours.  Meet Jim at parking lot on left."  I

14   come in Sunday night.  I called this Jim, he was -- I can't

15   think of his last name, I'm terrible with names, he gave me

16   directions to the room I was supposed to go to, the place they

17   set up for me.  And this would be he was telling me to meet him

18   at 8 o'clock at the plant, it was on Swamp Road.  Meet him in

19   the parking lot.  I got lost on the way to work, I got lost on

20   my way to work, I went 20 miles out of my way.  Actually, the

21   first day of work I backed into another truck.  Bent cat walk.

22   Q.   Let me ask you this.  This was full-time work with KGL?

23   A.   Yeah, when he called me and we talked about the job, it

24   was supposed to be at least 40 and probably more hours a week,

25   they were contracted to build a whole road for this quarry, so

1  they were a company, I couldn't tell you at this time where

2  they were even located.  We talked about, they were supposed to

3  set me up with my own room per diem.  I think my wage was --

4  I'm going to say $16, but I'm not for sure how much it was at

5  that time.

6  Q.    Did you keep any of your pay stubs from KGL?

7  A.    Yes.

8  Q.    Would those pay stubs reflect the amount of money you

9  earned per hour with KGL?

10  A.    Yes.

11  Q.    All right.  Can you identify this record?

12  A.    Yes, it's KGL Associates, Inc., it's a little fuzzy for

13  me.  It's pay period -- my regular was $15.

14  Q.    $15 an hour?

15  A.    Correct.

16  Q.    And then I'll direct your attention to the upper

17  right-hand corner.  Pay period, November 30th to December 6th?

18  A.    Correct.

19  Q.    How long did you work with KGL?

20  A.    I started in November, and I worked with them almost a

21  month to the day.  I think I started the 18th of November and I

22  ended with them the 17th of December.

23  Q.    Why did you end working or why did you stop working with

24  KGL?

25  A.    Well, when we talked over the phone, we negotiated the

23

1  terms of my employment, they promised me a room and my per

2  diem.  When I got there, they roomed me with a boyfriend and a

3  girlfriend that worked on the job, too, they were with the

4  company.

5  Q.    When you say they roomed you with them, the three of you

6  were sharing the same --

7  A.    Yes, correct.  I spoke to my boss, I said, you know, this

8  ain't working out, this isn't working out, these two people are

9  fighting all night, I got to work with them all day, this isn't

10  working.  They were screaming and slamming doors and

11  everything.  And my per diem wasn't coming in.  So this day I

12  went and spoke to my boss, he didn't want to hear it.

13  Q.    Explain what a per diem is?

14  A.    Per diem is a rate over your wage which isn't taxed.  If

15    it's $25 a day times five, then you get $125 a week, you had at

16    the end of the week.

17    Q.    What's the idea behind per diem, why doesn't every

18    employee receive a per diem?

19    A.    It's supposed to pay for your fuel on the way to work or

20    your meals, any costs that it would cost you to go to this job

21    and work for these people.

22    Q.    You said you spoke with the boss about the two people you

23    were living with?

24    A.    Yes.

25    Q.    What did the boss tell you?


24


1    A.    Well, do you want me to tell you exactly what he told me?

2    Q.    Yes.

3    A.    He said I'm not your fucking babysitter and if you don't

4    like it, quit.

5    Q.    What did you do then?

6    A.    I quit.

7    Q.    After you quit, where did you go?

8    A.    I went home to Marienville.  I applied for unemployment,

9    which I was denied, because I walked off the job and they

10   fought it.  When I went to apply for unemployment, they denied

11   me my unemployment because I quit work.

12   Q.    Okay.  What did you do for money?

13   A.    Well, I didn't do too much, I had to borrow money,

14   basically, I lived on like a barter system.  I had a friend, he

15   had a phone, if I had a couple bucks I would pay for a phone

16   card and, you know, I cleaned his house so I could use his

17   phone, you know, or he might give me 20 bucks to clean his

18   house or whatever.

19   Q.    Where were you living at the time?

20   A.    I was living with Amanda Rogers.

21   Q.    That's the friend that you were referring to before?

22   A.    Yes.

23   Q.    How were you paying her for food?

24   A.    I wasn't, I didn't have a steady income.

25   Q.    How were you paying for clothing or other essentials?


25


1    A.    I wasn't.

2    Q.    Did you have medical insurance at that time?

3   A.   No.

4   Q.   What about supporting your children?

5   A.   My sons, my oldest son I didn't have to pay support for,

6   he was over 18, or close to 18.  I didn't have to pay support

7   for my oldest son.  My youngest son I paid support for, it was

8   taken out of my payroll check.

9   Q.   How much was that in 2002?

10   A.   $260 a month.

11   Q.   Were you making those payments in December of 2002?

12   A.   Well, I don't know, I'd have to look at the payroll check

13   to see if it was taken out by KGL.  Usually I notified them

14   within a week of when I start working.

15   Q.   When did you stop working for KGL?

16   A.   December 17th.

17   Q.   Let's go after that date.  From December 17th through

18   January 17th, that 30-day period, were you able to pay child

19   support?

20   A.   No.

21   Q.   What about the next month?

22   A.   No.

23   Q.   And the month after that?

24   A.   No.

25  Q.   What were you doing for transportation?

26

1  A.   I had a car, but I would be afraid to take it anywhere,

2  because it was in need of repairs.

3  Q.   In addition to not being able to provide the necessities

4  of life, how else did this lack of income affect you?

5  A.   Well, because my work wasn't steady, it was hit and miss,

6  most of the time I get enough money just to pay somebody off, I

7  borrowed money to go to.  Like the money that I made basically

8  for KGL, I had to borrow money to go to that job.  Because you

9  can't be out there without any money.  So I had to wait two

10  weeks for a pay period.  I think I borrowed like $300 or $400

11  from Kenny, he lent it to me.  My first check was I paid that

12  man back.

13  Q.   All right.  You're working today?

14  A.   Yes, I am.

15  Q.   You're working full-time?

16  A.   Yes.

17  Q.   For whom?

18  A.   Mashuda Corporation.

19   Q.   What do you do for them?

20   A.   I'm a heavy equipment operator and I run a compactor.

21   Q.   How much do you earn an hour?

22   A.   My rate on that job is $17.64.

23   Q.   I'd like you to compare, if you would, please, the way

24   you feel now emotionally about your life versus the way you

25   felt back in 2002 and early 2003?

27

1   A.   Well, right now I have a good life.  Really my life is

2   good.  It took me a while to climb back up out of the hole.

3   But in 2002 -- you have to excuse me -- I wasn't a very good

4   person because I didn't feel very good about myself.  I

5   couldn't take care of my kids.  I had to depend on everybody, I

6   felt like a piece of shit.  Because, I mean, I'm very

7   responsible and I just lost it, I lost everything.  I had

8   nothing, not even my self-respect.  Excuse me.

9        THE COURT:  We're going to take a short break.

10        (Recess from 10:04 a.m.; until 10:12 a.m.)

11   BY MR. MATESIC:

12   Q.   Ms. Brown, is there anything else you want to tell us

13  about the way you were feeling in 2002?

14  A.   Well, I didn't sleep, I have a sleeping disorder anyway,

15  but it made it actually worse.  I hardly got any sleep.  I was

16  sick, I mean nauseous most of the time.  Because I was

17  constantly thinking about money, work and everything.  I

18  couldn't spend a whole day with my family because I didn't have

19  the money for gas to get there.

20  Q.   Where did your family live at that time?

21  A.   They lived 50 miles away from me.

22  Q.   You talked about a sleeping problem, how do you sleep

23  now?

24  A.   I sleep way better.

25  Q.   All right.  How was Christmas last year?

28

1  A.   Good.

2  Q.   I want to talk to you now about dollars and cents right

3  now.  I'd like to give the jury some understanding as to the

4  money that you were earning in 2002 based on the jobs that you

5  were doing, versus the money you would have earned if you had

6  gotten a job with Cost, okay?

7   A.   Okay.

8   Q.   We were talking yesterday about the money you earned

9   working as a laborer for the State of Pennsylvania?

10   A.   Yes.

11   Q.   All right.  You started off at around $9.40 you said?

12   A.   Correct.

13   Q.   Then you took a state Civil Service exam?

14   A.   Yes, I did.

15   Q.   As result of that your wage went up?

16   A.   Yes.

17   Q.   What was your wage when it was increased?

18   A.   I'm going say 10.40.

19   Q.   When did that happen?

20   A.   I couldn't tell you, probably in like a month.  I started

21   in May -- end of June, beginning of July.

22   Q.   Let's just take July 31st?

23   A.   Okay.

24   Q.   You were earning $10.40 an hour?

25   A.   Yes.

29

1  Q.   And how many hours did you work a week?

2  A.   39.5.

3  Q.   39.5, was that an average, did you ever work overtime or

4  less than 39.5?

5  A.   I'd say on the average.

6  Q.   Okay.  By my multiplication, that's $395 a week?

7  A.   Correct.

8  Q.   Okay.  You said that you were traveling at that time?

9  A.   Yes.

10  Q.   Ninety miles round trip a day?

11  A.   Yes, sir.

12  Q.   Okay.  And you worked five days a week on average?

13  A.   Yes, sir.

14  Q.   So 450 miles.  Do you have any estimate as to what the

15  mileage cost was for you, how many cents per mile?

16  A.   No, I don't know.

17  Q.   We'll leave that up in the air.  Okay.  Do you know how

18  much money you would have earned at Cost if you had been hired

19  on July 31st as a laborer?

20  A.   I think it would be $17 and change.

21  Q.   All right.  Have you ever seen any documents which

22  indicated how much a Cost worker was making were who were

23  laborers?

24  A.   Yes, I saw a document on wage for the laborers and the

25  operators for the '02 and '03, I think it was the '01 or '02


30


1  years, 2001, 2002.

2  Q.   How did you come to see that?

3  A.   You gathered that information.

4       MR. MATESIC:  Give me one moment, please.  Your

5  Honor, we have a stipulation as to the hourly rate for a

6  laborer on the SCI Marienville project for the period of June

7  1, 2002 to May 31, 2003.  And that stipulation is that the

8  hourly rate was $17.15 cents an hour.  And while I'm at it, the

9  pension contribution by the employer was $1.94 an hour.

10       THE COURT:  Members of the jury, a stipulation is an

11  agreement between the lawyers, it is a binding fact and so it

12  isn't a disputed fact anymore.  So that is something that has

13  been conclusively established.

14  BY MR. MATESIC:

15  Q.   Did you earn any pension benefits with the State of

16  Pennsylvania?

17  A.    No, I did not.

18  Q.    You were laid off from the State of Pennsylvania when?

19  A.    I'm going to say August, I'm not sure of the date.

20  Q.    Would it be in your diary?

21  A.    Yes, it would.

22  Q.    Let me ask you this.  If in fact you had been applying

23  for work with other employers in September, would that indicate

24  that you were laid off at that time?

25  A.    Yes.


31


1  Q.    Let me show you another entry from your diary, September

2  6th; do you see where I'm highlighting?

3  A.    Yes.

4  Q.    Could you read that into the record, please?

5  A.    Yes, it's Bendigo, check one week, an unemployment check

6  and Hud check.

7  Q.    So that indicates that you were employed, that you were

8  unemployed with Bendigo at that time?

9  A.    Yes.

10  Q.   Let's use September 6th.  Actually, one last second here,

11  okay.  Do you see where I've highlighted?

12  A.   Yes.

13  Q.   What are we looking at here?

14  A.   Bendigo, the 14th, the layoff.

15  Q.   14th of what?

16  A.   August, I'm assuming.

17  Q.   Okay.  The next thing that you did to earn money after

18  August 14th was what?

19  A.   The next thing that I did to earn money --

20  Q.   You said earlier that you had fracked wells, you had

21  worked with Kenny on a job, and you had cleaned the Kelly

22  Hotel?

23  A.   Then I went to work for KGL.

24  Q.   So there's four different jobs that you performed?

25  A.   Yes.


32


1  Q.   I'm not interested in the order necessarily, tell me how

2  much money you earned fracking wells?

3  A.   I think I made 200 bucks for those two days.

4   Q.   Okay.  And how much did you earn at the Kelly Hotel?

5   A.   I'm going to say $50, $40 a week every time they paid me,

6   $40 twice.

7   Q.   So a total of $80?

8   A.   Yes, 80 bucks.

9   Q.   And then the job with Kenny, was that a masonry job?

10  A.   Pardon.

11  Q.   What kind of job was that that you performed with Kenny?

12  A.   I was basically his helper.  He's a bricklayer and I

13  helped him lay brick.

14  Q.   Okay.  So we'll say bricklayer assistant; how much did

15  you earn?

16  A.   At the time I was staying in Pittsburgh, and he just

17  basically threw me 20, 30 bucks.  He was helping me out.  You

18  know, I went to work with him, he could have probably done that

19  job on his own, he said do you want to make a couple bucks,

20  come with me, and that's what we did.  I think he threw me 20,

21  30 bucks.

22  Q.   Total?

23  A.   Yes.

24  Q.   So we'll say $30.  You began working for KGL on November

25  18th?

33

1   A.   Correct.

2   Q.   I forgot something.  Those jobs that you performed with

3   the Kelly Hotel, with Kenny, fracking wells, the only

4   compensation that you received was the cash?

5   A.   Correct.

6   Q.   All right.  November 18, 2002 till -- when did you work

7   with KGL?

8   A.   December 17th.

9   Q.   And you testified that you earned $15 an hour?

10  A.   Yes.

11  Q.   On average how many hours a week did you work for KGL?

12  A.   We didn't quite hit 40, most of the time it was in

13  winter, it was bad weather.  Let's say 40 hours, nothing over.

14  Q.   Okay.  So that's $600 a week?

15  A.   Correct.

16  Q.   Okay.  And were you getting pension benefits when you

17  worked for KGL?

18  A.   No.

19  Q.   Okay.  What's the next job that you had after KGL, was it

20  Trumbull?

21  A.   Yes.

22  Q.   When did you start working for Trumbull?

23  A.   I started working for Trumbull in April.

24  Q.   Would you have the date in your dairy?

25  A.   Yes.  I'm not for sure if that's the correct date or not.


34


1  Q.   I think when we last looked at your paycheck from

2  Trumbull, we looked at something that was not your first

3  paycheck -- so I'd like you to identify this, please?

4  A.   That's my paycheck from Trumbull.

5  Q.   Okay.  And the areas that I'm highlighting here?

6  A.   April 20, 2003.

7  Q.   Okay.  The period ending, that's for the week ending

8  April 20th?

9  A.   Correct.

10  Q.   Were you paid weekly by Trumbull?

11  A.   Yes.

12  Q.   Okay.  Now, this shows that you worked 40 hours?

13  A.   Correct.

file:///A|/COSTDAY2.TXT

14  Q.  Straight time, eight hours overtime?

15  A.  Yes.

16  Q.  And you did earn a pension benefit with Trumbull, is that

17  correct?

18  A.  Yes.

19  Q.  And your pension contribution is right down here?

20  A.  Yes.

21  Q.  Is $132 for those 48 hours?

22  A.  Yes.

23  Q.  It's a little over $2 an hour in pension benefits?

24  A.  Yes.

25  Q.  Okay.


35


1       THE COURT:  Is that an exhibit, Mr. Matesic?

2       MR. MATESIC:  Yes, this is Plaintiff's Exhibit No.

3  7, sorry, your Honor.

4       THE COURT:  Those are component parts of it?

5       MR. MATESIC:  This is the entire exhibit.  Yes, this

6  is the entire exhibit.

7       THE COURT:  All right.

8          MR. MATESIC:  I think I'm going to save the math for

9   later.

10   BY MR. MATESIC:

11   Q.   I have one last question for you or maybe two remaining

12   questions.  On July 31, 2002, were you willing to accept

13   employment with Cost Company?

14   A.   Yes, I was.

15   Q.   In April of 2003, when you were offered a job with

16   Trumbull and you accepted that job, did you have any other job

17   offers on the table?

18   A.   Not when I accepted the job from Trumbull.

19   Q.   Suppose that you had the choice of working for several

20   different employers, one of whom was Cost and none of them were

21   Trumbull, would you work with Cost?

22   A.   At that point, no.

23   Q.   Why not?

24   A.   Because -- I'm not very educated, they dicked me around

25   enough and I had enough.  They dangled jobs in front of my face

36

1   and it was maybe, maybe, maybe and I figured if that was their

2  practice, you know, they basically dangled jobs and offered

3  and -- you know, maybed me to death.  So I figured when I got

4  on the job, they would just throw me all the shit and, you

5  know -- no, I wouldn't go to work for them.  I didn't like

6  their practices.

7        MR. MATESIC:  Nothing further, your Honor.

8        THE COURT:  Mr. Pawk.

9        MR. PAWK:  Thank you, your Honor.

10                  CROSS-EXAMINATION

11  BY MR. PAWK:

12  Q.   Good morning, ma'am.

13  A.   Good morning.

14  Q.   I want to go back to early on in your testimony during

15  direct examination, you went through some of your prior

16  employers, do you recall that?

17  A.   Yes.

18  Q.   And I think actually Mr. Matesic showed you some of --

19  the list of employers from your resume, do you recall that?

20  A.   Yes.

21  Q.   And do you recall that with the exception of the job you

22  had with the Department of Conservation and Natural Resources,

23  the one from May till August of 2002, all the other jobs that

24  you listed on your resume were operating engineer jobs?

25  A.   Except for I think I had a tech job, a technician for


37


1  Solar.

2  Q.   All right.  That's not anything related to an operating

3  engineer?

4  A.   No.

5  Q.   So that was the job that was on the Marienville site,

6  right?

7  A.   Right.

8  Q.   You worked there in November, December of 2001?

9  A.   Correct.

10  Q.   So you had the laborer's job in the summer, which you

11  said you did landscaping, in addition to operating a forklift,

12  setting some docks, cleaning brush under a bridge, you had that

13  job, right?

14  A.   I didn't use landscaping, you did.  I said I labored for

15  the state.  And I labored, dug ditches, whatever they wanted me

16  to do, drove a tri-axle.

17  Q.   Right, I understand.  You had that job, you held the

18  technician job at Solar Testing Labs, right?

19  A.   Yes.

20  Q.   And then you had a heavy equipment job with A & L in

21  Belle Vernon, Pennsylvania in April and May of 2000?

22  A.   Yes.

23  Q.   You had an oiler job for shear/rock truck driver in

24  Cleveland, Ohio in May through November of '99, right?

25  A.   I was an oiler on a crane and then I was a truck driver


38


1  for A & L.  So I had two jobs for them.

2  Q.   Both of those jobs are related to being an operating

3  engineer, isn't that right?

4  A.   Correct.

5  Q.   An oiler, I think as you explained in your direct

6  examination testimony, is to make sure that the equipment is

7  oiled and you're also a safety person to make sure that the

8  counterweight doesn't hit anybody and that kind of thing, isn't

9  that right?

10  A.   Yes.

11  Q.    And you did that for Tidewater Equipment Company in

12  Baltimore, Maryland in 1999, right?

13  A.    Yes.

14  Q.    And you performed that same job as an oiler for Century

15  Steel Erectors from September of '98 to November of '98?

16  A.    Yes.

17  Q.    And then at some point in time, ma'am, didn't you send a

18  resume to Cost Company with an attached list of previous

19  employers?

20  A.    Yes, I sent at least two.

21  Q.    Let me show you what's been marked as Defendant's

22  Exhibit 4 -- can you see that, ma'am?

23  A.    Yes.

24  Q.    So you listed in one of the resumes you sent to Cost your

25  work experience company list, and that's Century Steel


39


1  Erectors, Trumbull Corp., Tidewater Equipment Company,

2  Dickinson Crane Service, Highway Paving, Hawk Crane and

3  Equipment, A & L, Inc., and B & B Wrecking and Excavating,

4  Inc.?

5   A.   Yes.

6   Q.   And do you agree with me, ma'am, that all of these jobs

7   are operating engineer jobs?

8   A.   Yes, I was in the operating engineers when I performed

9   these jobs.

10   Q.   And you attached this to your resume you sent to Cost

11   Company?

12   A.   Yes, I did.

13   Q.   And, incidentally, looks like some of those jobs you had

14   to travel -- I don't know where the jobs were, maybe you can

15   tell me.  But I think earlier in your testimony some of these

16   jobs took you far away from Marienville, is that right?

17   A.   At the time I was wasn't residing in Marienville.

18   Q.   Which time was that?

19   A.   Well, you're going from '98 to 2000.

20   Q.   Okay in looking at your resume in -- excuse me, 2000,

21   when you were working for A & L, where were you living?

22   A.   I was living in Brocton, Pennsylvania.

23   Q.   And where is that?

24   A.   That's my hometown where I grew up.  It would be west of

25   Clearfield and east of DuBois.

1  Q.   And where was the job?

2  A.   State College.

3  Q.   So how far would that have been for you to travel?

4  A.   It was 57 miles one way.

5  Q.   So it was over 114 miles round trip?

6  A.   Yes, sir.

7  Q.   And then the job as an oiler for shear/rock truck driver,

8  where was that job?

9  A.   It was located in Penn State.

10  Q.   So that was about the same distance again?

11  A.   Correct.

12  Q.   And the job with Tidewater Equipment Company, you have

13  Baltimore, Maryland, where was that job?

14  A.   That was in State College, also.

15  Q.   Again, you were traveling over 100 miles round trip?

16  A.   Yes, sir.

17  Q.   And the job with Century Steel Erectors?

18  A.   That was also in State College.

19  Q.   Again, traveling over 100 miles round trip?

20  A.   Yes, sir.

21  Q.    As far as your resume goes, you list certifications --

22  this is D-2, let me show it to you, do you see that?

23  A.    Yes, sir.

24  Q.    And you list that you are certified as a forklift

25  operator, do you see that?


                                    41


1  A.    Yes, sir.

2  Q.    And you also list hazardous waste training program from

3  the operating engineers' union?

4  A.    Yes, sir.

5  Q.    And then also construction safety and health underneath

6  that?

7  A.    Yes.

8  Q.    And then on the third page of your resume, you list

9  skills, achievements and qualifications.  Heavy equipment

10  operator, four years experience.  Mechanics helper, oiler,

11  hydraulic and friction, rock truck, so on and so forth; do you

12  see that?

13  A.    Yes, I do.

14  Q.    You also list truck driver, that you have a CDL license?

15  A.   Yes.

16  Q.   To move cranes?

17  A.   And a hazmat.

18  Q.   Correct.  Were you also certified to operate a loader,

19  did you need certification for that?

20  A.   I was in the apprenticeship at the time you're speaking

21  when I did all these jobs, I had to go to training, I had to

22  qualify on pieces of equipment to achieve my journeyman -- to

23  achieve journeyman status through this apprenticeship program.

24  Q.   But you learned how to operate a loader?

25  A.   Yes, sir.

42

1  Q.   And then was there a roller, did you say in direct

2  examination?

3  A.   A compactor, yes.

4  Q.   You learned how to do that?

5  A.   A dirt compactor, yes.

6  Q.   And a truck and tire scrapper, you learned how to do

7  that?

8  A.   It was a loader, I don't have it in front of me, I had a

9  loader, track and tire, one that has track on it and one that

10  has tires.  And a scrapper, a pan.

11  Q.   I think it was your testimony on direct examination that

12  you entered into the apprentice program and became certified to

13  do these certain jobs because that's something that you

14  enjoyed, that's something that you liked?

15  A.   Well that, and I liked the money.

16  Q.   You liked the money?

17  A.   Yeah.

18  Q.   You liked the money because operating engineers get paid

19  well?

20  A.   Yes, they do.

21  Q.   They get paid more than laborers, isn't that right?

22  A.   Yes.

23  Q.   All right.  Now, you've got quite an experience in the

24  construction industry, don't you?

25  A.   I don't have as much as a lot of people.

43

1  Q.   How many years?

2  A.   I'd say seven or eight.

3  Q.   All right.  And you are familiar, I think you said this

4  on direct examination, that it's job to job in the construction

5  industry; meaning you get hired by a company to go to a job,

6  when that job ends, you might not stay on if they don't have

7  another job, is that fair?

8  A.   Yes.

9  Q.   All right.  And is it fair to say that the labor needs on

10  a construction project change regularly?

11  A.   Yes, but I'm not really familiar with the labor needs.

12  Q.   Okay.  Well, on the construction projects you've worked

13  on, you're familiar with the fact that when a job is first

14  being built, you might need certain amounts of manpower to

15  perform certain tasks and as the job gets built and almost to

16  completion, people can get laid off, isn't that fair?

17  A.   Oh, absolutely.  Layoff is inevitable for anyone in

18  construction.

19  Q.   There is no guarantee than you're going to work forever?

20  A.   Correct.

21  Q.   I think that your record, your employment record reflects

22  that?

23  A.   Yes.

24  Q.   Is that fair?

25  A.   Yes.


44


1  Q.   Now, your job for Solar Testing Labs at the Marienville

2  prison project, what did you do there?

3  A.   I was a field technician, was my title, and I watched the

4  materials being placed by Trumbull Corporation.  They were,

5  basically, they were at the level in which it was cleared, I

6  was there after they had taken the trees and cleared it.  And

7  they were placing and taking out the dirt, moving the dirt

8  around and getting to grade.

9  Q.   And why did your employment end with Solar Testing Labs

10  in December of 2001?

11  A.   They needed a concrete technician and I wasn't certified

12  as a concrete technician.

13  Q.   Did you take the test?

14  A.   Yes, I did.

15  Q.   And what happened when you took the test?

16  A.   I failed the test.

17  Q.   Okay.  Did somebody else pass the test?

18  A.   Yes.

19  Q.   Was that person a man or a woman?

20  A.   It was a man.

21  Q.   Did you file a complaint with the Equal Employment

22  Opportunity Commission against Solar Testing Labs?

23       MR. MATESIC:  Objection, your Honor.

24       THE COURT:  Let me see you at side bar.

25       (At side bar on the record.)


                              45


1        MR. MATESIC:  It was my impression after yesterday's

2   colloquy that we're not going to get into any testimony related

3   to other EEOC complaints.  Obviously, by counsel's last

4   question we're going down that path.

5        THE COURT:  What is the relevance, I thought I ruled

6   on it?

7        MR. LUTZ:  I thought your ruling, your Honor, was

8   that once the evidence came in, you were going to consider it

9   as to how it came in.

10       THE COURT:  Let's roll the tape back -- did she file

11   an EEOC complaint relative to this?

12          MR. PAWK:  She definitely did.

13          THE COURT:  Then how is that probative?

14          MR. LUTZ:  That's the exact same job, your Honor,

15   that is listed in the diary later as being the one where she

16   indicated she dropped her EEOC claim on the same date that she

17   put in the diary that she's now pursuing an EEOC claim against

18   Cost Company.  It shows her motive, her interest and bias with

19   respect to the filing of these types of claims and,

20   specifically, she's throwing things against the wall to see

21   what sticks.

22          THE COURT:  Sustained, it's irrelevant.

23          MR. PAWK:  May I add one other thing on this.

24   Plaintiff's counsel put an exhibit up there in front of the

25   jury during direct examination, I don't have the specific date,


                              46


1   I can go get it, I think it's early October, where he asked her

2   about something in her diary, and he quickly pulled it off, but

3   it was up there for a while in front of the jury.  That's

4   September or October of 2002.  It's relevant to at least bring

5   out, the jury saw it.  There was an EEOC pending at the time

6   which is what she drops against Solar and goes against Cost in

7   December.

8         MR. MATESIC:  She did not say she filed a complaint,

9   she called the EEOC, that's all the diary says.

10         THE COURT:  I thought about this, it's irrelevant,

11   sustained.  Stay away from the subject.

12         (End of discussion at side bar.)

13  BY MR. PAWK:

14  Q.   In any event, in your employment with Solar Testing Labs,

15   you became familiar with the Marienville prison project, is

16   that a fair statement?

17  A.   At that point in time as to what was happening on that

18   site at that time, yes.

19  Q.   I think you testified on direct examination that you

20   lived very close to the site?

21  A.   Yes, I did.

22  Q.   And after you left your employment with Solar Testing

23   Labs, did you do anything in January, February, March, April,

24   May, June, to obtain employment at the Marienville prison

25   project?

47

1   A.   What are we talking here.  I was employed '01, but you're

2   talking '02.  My son, oldest son, came to live with me.  So I

3   was setting up house and I was basically trying to get my

4   unemployment and get him in school, I had problems with him.

5   So I was dealing with him.  And I'm sure I probably asked about

6   working, you know, getting back up there.

7   Q.   Okay.  You became aware that there were other

8   construction companies at the Marienville prison site, other

9   than Solar and Cost Company?

10  A.   Yeah, there were union contractors, yes I knew there were

11  union contractors.

12  Q.   There were other union contractors; for instance, Ionadi

13  Corporation, isn't that correct?

14  A.   Yes.

15  Q.   They were the general contractor on the project, were you

16  aware of that?

17  A.   I wasn't aware that they were the general, no.

18  Q.   What was your understanding of what they were doing up

19  there?

20  A.   Ionadi?

21  Q.   Yes.

22  A.   Pouring footers and pouring floors, and that's what their

23  company does, isn't it.

24  Q.   They were hiring union laborers, weren't they?

25  A.   Oh, yes.


                                    48


1  Q.   And you knew that?

2  A.   Yeah.

3  Q.   Okay.  But you never went to Ionadi and sought a union

4  labor job with them at anytime, did you?

5  A.   No.

6  Q.   And there was W.G. Tomko on that site as well?

7  A.   Yes.

8  Q.   What was your understanding of what they were performing?

9  A.   I don't know what Tomko did for sure.  I couldn't tell

10  you, I wouldn't sit here and tell you for sure what they were

11  doing up there.

12  Q.   Do you know if they're a plumbing --

13  A.   I don't know them.

14  Q.   What about Lighthouse Electric Company?

15  A.   Well, they probably did the electrical.

16  Q.    Did you know that they were there, though?

17  A.    I didn't know the name of the company.  What I know is

18  that there were electricians up there, union electricians, yes.

19  Q.    Okay.  Just with the companies I just named, Ionadi,

20  Tomko, Lighthouse Electric, you didn't seek employment with any

21  of those companies, isn't that right?

22  A.    Well, no, because if I had come in contact with anybody

23  that worked up at that site, they were all union.  So it would

24  be a union electrician.  If there would have been plumbers,

25  they would have been union.


49


1  Q.    What about Ionadi, I just asked you were they hiring any

2  laborers off the street, if you know?

3  A.    Not that I'm aware of.

4  Q.    Did you ever inquire?

5  A.    No.

6  Q.    Okay.  So you really don't know?

7  A.    No, I don't know.

8  Q.    Now, wasn't it important to you to try to obtain

9  employment up at that Marienville prison project in the year

10   2002?

11   A.   Well, it would have made my life a lot easier, yeah.

12   Q.   In fact, you were interested in working for anybody, no

13   just Cost?

14   A.   Correct.

15   Q.   But you didn't seek employment with anybody else but Cost

16   on that project, isn't that right?

17   A.   Well, Cost was the one putting out the memorandum and the

18   Cost employees were the ones telling me they were hiring off

19   the street.

20   Q.   Now, on July 31, 2002, I think it's your direct testimony

21   that you went to the Marienville prison project and spoke to

22   Dean Taylor, is that your testimony?

23   A.   Yes.

24   Q.   And you asked for a job that day, isn't that right?

25   A.   Yes.


50


1   Q.   And didn't you also seek employment that same day with

2   Jenks Township?

3   A.   Yes.

4   Q.    And where is Jenks Township?

5   A.    Well, it was within walking distance of my residence.

6   It's in Marienville.

7   Q.    Do you recall seeking employment with Jenks Township that

8   day for an operator's position?

9   A.    I don't know if it was an operator's position, but I put

10  an application in, Jenks Township would be the borough.  And I

11  put an application in there, they weren't advertising for

12  hiring, but it was within walking distance.  It was, you know,

13  I just went down there and applied.

14  Q.    It was close by your home, just like the Marienville

15  prison project was?

16  A.    Right.

17  Q.    Let me just show you your diary entry for July 31, 2002;

18  do you see that, ma'am?

19  A.    Yeah.

20  Q.    Do you see the bottom part here, it says Jenks Township

21  operator, do you see that?

22  A.    Yep.  It also says laborer.  L-A-B, that's an

23  abbreviation for laborer.

24  Q.    So you applied for both of those with Jenks Township?

25  A.   Yes, I did.


51


1   Q.   All right.  Was there a position available?

2   A.   No.

3   Q.   Why did you apply?

4   A.   Because it was within walking distance.  It was July,

5   it's summertime, hey, if I can mow grass, whatever.

6   Q.   So you weren't aware if there was a position available,

7   you just went over there and said hey, can I get a job?

8   A.   Yes.  Well, no, I just applied, I got an application and

9   I applied.  They gave me an application and I applied.

10  Q.   But you don't know if there was a position available?

11  A.   No.

12  Q.   All right.  And, ma'am, isn't it true that, other than

13  what you said that other people told you, okay, you didn't have

14  any independent knowledge yourself that there was a position

15  available at Cost Company on July 31, 2002?

16  A.   Did I know myself?

17  Q.   Yes.

18  A.   That they were hiring off the street in Marienville?

19  Q.    Your own personal knowledge?

20  A.    Yes.

21  Q.    Not what people told you, I'm not asking you what people

22  told you?

23  A.    I was in the bar and people were pointing out to me, that

24  were residents of Marienville, that were employed or

25  surrounding areas, and they pointed out to me that they had got

52

1  a job for Cost off the street, no book, no union membership.

2  Q.    Do you recall testifying at your deposition in this case?

3  A.    Yes, I did.

4  Q.    About a year ago?

5  A.    Yes, I did.

6  Q.    In my office?

7  A.    Yes.

8  Q.    Do you recalling telling me that day that you didn't

9  have, you were not aware of --

10        THE COURT:  Give the page and line numbers for the

11  benefit of the record and other counsel.

12  BY MR. PAWK:

13   Q.    I'm going to show you page 141 of your deposition,

14   ma'am --

15          MR. MATESIC:  May we have a side bar, your Honor.

16          THE COURT:  All right.

17          (At side bar on the record.)

18          MR. MATESIC:  I must admit that I'm not equipped to

19   cite chapter and verse, but I believe the procedure would be

20   for Mr. Pawk to ask Ms. Brown what her answer was under oath,

21   to give her an opportunity so say whether or not --

22          THE COURT:  All right, what did she say at

23   deposition?

24          MR. PAWK:  Question:  "On July 31, 2002, you were

25   not aware of any specific job opening that Cost had for an

53

1   operator on that day, were you?"  Answer:  "You'll have to say

2   it again."  Question:  "On July 31, 2002, you were not aware of

3   any specific opening that Cost had for an operating engineer

4   that day, were you?"  Answer:  "No."  Next question.  "On July

5   31, 2002, you were not aware of any specific job opening that

6   Cost had for a laborer position on that day, were you?"

7   Answer:  "No."

8           THE COURT:  What's the objection?

9           MR. MATESIC:  My objection was to the previous

10  question, did she have knowledge that other people had been

11  hired by Cost.

12          MR. PAWK:  That wasn't my question.

13          THE COURT:  Overruled.

14          (End of discussion at side bar.)

15  BY MR. PAWK:

16  Q.   Directing your attention to page 141 of your deposition

17  transcript, ma'am; directing your attention to line 14, do you

18  see that line?

19  A.   Yes.

20  Q.   I asked you the following question.  "On July 31, 2002,

21  you were not aware of any specific opening that Cost had for an

22  operating engineer that day, were you?"  Did I read that

23  correctly to you?

24  A.   Yes, you did.

25  Q.   And your answer was "no?"

54

1  A.   Correct.

2  Q.   All right.  And then the next question, "On July 31,

3  2002, you were not aware of any specific job opening that Cost

4  had for a laborer position on that day, were you?"  Answer:

5  "No."  And you recall at the deposition you were sworn in

6  before you testified?

7  A.   Yes.

8  Q.   To tell the truth, you remember that?

9  A.   Yes.

10  Q.   Okay.  And, ma'am, your expectations when you went to the

11  Cost trailer on July 31, 2002, weren't necessarily to get hired

12  that particular day, were they?

13  A.   No, but if they would have hired me for that day, I would

14  have been ready to go.

15  Q.   Okay.  But I believe you also said in your deposition

16  that day that you didn't necessarily expect to get hired that

17  day, but you told them you had experience and that you could

18  get hired that day or some later time by Cost Company, do you

19  recall that?

20  A.   Yes, I was ready to go to work, yes.

21  Q.   So I think it was your testimony earlier that you

22  completed one of those Cost Company EEO memorandums, do you

23  remember that?

24  A.   I said that I completed at least three.

25  Q.   Okay.  But initially you completed one, I think in July?


                                    55


1  A.   Yes.

2  Q.   And you sent it to Cost Company, do you remember that?

3  A.   Yes.

4  Q.   All right.  Do you remember sending it to Cost Company on

5  or about September 12, 2002?

6  A.   I don't know if I mailed it, I might have mailed them

7  another one or not, I don't know, I'd have to refer to my diary

8  for a lot of things.

9  Q.   That's fair.  I think you said yesterday, though, that

10  you thought you sent it in July or August to Cost, but if your

11  diary said a different date, would the diary be more accurate?

12  A.   Well, the first one that I mailed in, I mailed in on my

13  own with the address on the top of it.  If you look at the

14  address, it's not my handwriting, for the Cost address.  I

15  mailed that on my own.  And that was -- I'm going to tell you

16  that was the first one I mailed.  That was dated July, and as

17   soon it was handed to me, I mailed one of them away.  At the

18   time I wasn't really, I couldn't tell you the date, the date

19   wasn't really my concern.  It was that I got my hand on one of

20   those recruitment forms and I got it to Cost as soon as

21   possible.

22   Q.    You don't know the date, though, is that fair?

23   A.    Yes.

24   Q.    Ma'am, wasn't it your intention when you went to the Cost

25   job site on July 31, 2002, and then again you said you went


                                    56


1   there on August 23, 2002, to be hired as a person who would

2   operate a roller or a forklift?

3   A.    No, my intention was to get a job with Cost for whatever

4   they were hiring for.  Whether it be a laborer or an operator,

5   those are two things at that time I would have been qualified

6   to do.  I wasn't going up there to be hired as a bricklayer,

7   because I'm not a bricklayer.  I couldn't tell you how to lay

8   brick.

9   Q.    Well, all your prior experience to that, prior to July

10   31, 2002 -- strike that.  Ma'am, isn't it fair to say you had

11  no prior experience as a mason tender?

12  A.   No.

13  Q.   Okay.  And you know what a mason tender is?

14  A.   Yes, I know what it is.

15  Q.   Tell us, someone who may not know what that is, tell us?

16  A.   You supply the bricklayer with his materials, the

17  materials that he needs.  Mortar, you carry the brick.  If he's

18  working with block, you carry it or make sure he has it.  Help

19  him string a line, I'm not sure, there's more to it.  I never

20  worked as one, so I don't know.

21  Q.   Right.  And that particular job you just detailed as a

22  mason tender was the only type of laborer position that Cost

23  was using on that prison job, isn't that right?

24  A.   I don't know.

25  Q.   So you don't have any idea what type of laborers they

57

1  have on the job?

2  A.   No, they just said they were hiring laborers off of the

3  street with no book.

4  Q.   Do you remember testifying at your deposition in this

5    case that one of the reasons you went up to that prison job and

6    talked to Cost was that you wanted to operate their lull or

7    forklift?

8    A.    No, I said I could operate a forklift or a lull.  Not

9    that I went up with the intention of only running a forklift or

10   a lull.

11   Q.    Let's explain for the people who may not know what a lull

12   is, what is a lull?

13   A.    A lull, it's basically a forklift that extends.  It

14   shoots out.  It's on four wheels.  You can tilt them so you're

15   carrying a load, you can keep your load at level, but your

16   machine is tilted.

17   Q.    Didn't you testify yesterday that it was your

18   understanding that laborers were operating the lulls for Cost

19   on that project?

20   A.    No, I understand that laborers operate lulls.

21   Q.    It wasn't your understanding that laborers were operating

22   lulls for Cost on that project?

23   A.    No, I don't know.  No, I would just assume that, I

24   understand that laborers operate lulls.  Just because that's a

25   piece of equipment on a job, does not mean that operators

file:///A|/COSTDAY2.TXT

58

1   operate them.  You can't assume because there is something with

2   a tire or an engine or whatever, that it's an operator's job.

3   So somewhere along the line of work I know that laborers

4   operate lulls.  But on this job, I don't know.

5   Q.   Well, in your experience with the operating engineers'

6   union, isn't that true that operating engineers normally

7   operate lulls or forklifts?

8   A.   It also depends on what job you're on.

9   Q.   Ma'am, let me show you page 42 and 43 of your deposition

10   transcript?

11   A.   All right.

12   Q.   I'd like to direct your attention to line 17, do you see

13   that?

14   A.   Yes.

15   Q.   And I asked you "do you know any operating engineer that

16   got hired by Cost Company that didn't get called out by the

17   Local 66?"  Do you see that?

18   A.   Yes.

19   Q.   And then your answer was, "well, no.  I'm not -- but I

20    would like to say something.  When I went up to that job, I

21    wasn't expecting an operator's job, I was expecting a laborer,

22    but I wanted them to know that I had operating experience and

23    construction background.  So when I went up there, I didn't

24    have the intention of being an operator because they were to

25    the part on the job where it was brick and mortar and a lull,

59

1    which would be a forklift.  They are run by laborers, not

2    operators.  It's a piece of equipment, but a laborer runs it,

3    not an operator.  So I went up there with the intentions I

4    could be either a lull operator or an operator."  Do you see

5    that?

6    A.    Yes.

7    Q.    Did I read that correctly?

8    A.    Yes, you did.

9    Q.    And that was your testimony?

10    A.    Yes, it was.

11    Q.    And I can't recall if you stated this during your direct

12    examination, but you were not certified by the operating

13    engineers' union in July, August, September, October of 2002,

14  right?

15  A.   Correct, I was not in the union.

16  Q.   In the union or holding your book I think it's called?

17  A.   Yes.

18  Q.   What does holding a book mean?

19  A.   That means I'm a member of the operating engineers.

20  Q.   It would have been impossible for Cost to hire you as an

21  operating engineer in July and August of 2002?

22  A.   I wouldn't go up there to be hired as an operating

23  engineer.

24  Q.   I didn't ask you that, ma'am.  What I asked you, Cost

25  could not have hired you as an operating engineer in July or

60

1  August of 2002, isn't that correct?

2  A.   Yes.

3  Q.   Because they could have got in trouble with the operating

4  engineers' union, right?

5  A.   Yes.

6  Q.   You could have gotten in trouble?

7  A.   I couldn't have got in trouble.  If this operating

8   engineers' hall wasn't available to work, then they must use

9   those operating engineers.  If they ran out of operating

10  engineers, then they go outside and use another source.

11  Q.    But they have to be called out by the union?

12  A.    They'd have to eliminate all the operators in that hall

13  that are capable of doing that job, yes.

14  Q.    Now, you then went, I believe, to the site again; the

15  second time you went to the site was August 23, 2002, do you

16  recall that?

17  A.    Yes.

18  Q.    Like I asked you before, ma'am, you don't have any

19  independent knowledge yourself that Cost needed an employee

20  that day, either as a laborer or an operating engineer?

21  A.    I don't understand the question, you have to say it

22  again.

23  Q.    The second time you went to the site was August 23, 2002?

24  A.    Yes.

25  Q.    Okay.  Other than what you've said earlier about other

61

1   people telling you things, you don't have any personal

2  knowledge that Cost actually needed a person that day, do you?

3  A.   That day?

4  Q.   August 23rd, that day?

5  A.   No, I just picked that day because it was a day off, I

6  went up.

7  Q.   All right.  That's kind of what you did on both days, you

8  just went up hoping to get a job, isn't that right?

9  A.   Well, what prompted me to go in July was because -- all

10  my friends and associates were basically on me, they're like

11  get up there, they're hiring.  Get up there, they're hiring.

12  And you're capable of doing it, get up there and get on the job

13  and check it out.  That's what I did.

14  Q.   Other than what people said to you, again, directing your

15  attention, you don't have any independent knowledge of their

16  needs, their labor needs on either July 31st or August 23rd?

17  A.   No.

18  Q.   All right.  Now, on either occasion, July 31st or August

19  23, 2002, neither Dean Taylor nor Bill Heaton ever said to you

20  we're not hiring women or we're not hiring you because you're a

21  woman, did they?

22  A.   No, they did not.

23  Q.   Now, you were shown earlier, I'm going to call it, its

24    marked as Defense Exhibit A-1.  I think you were shown this

25    document earlier, and I believe it was your testimony that you


                                    62


1    filled out one of Cost's EEO memorandums and sent it to them,

2    right, you sent more than one -- I apologize, you sent more

3    than one?

4    A.    Yes.

5    Q.    But, in any event, did you read the memorandum before you

6    filled it out and sent it in?

7    A.    Yes, I did.

8    Q.    And it clearly tells you that at this time we may not be

9    accepting employment applications, that's how it starts in this

10    paragraph?

11    A.    Yes.

12    Q.    But it's a recruiting memorandum, you agree with that?

13    A.    Yes.

14    Q.    Because you're a woman, you filled it out and sent it in?

15    A.    It says right up here minorities and women.

16    Q.    Correct.  And it's your testimony that over here on this

17    right-hand column, that handwriting was Georgia Pawk's,

18  correct?

19  A.   Yes.

20  Q.   Where she said, "Kathleen, call me at 412-227-0420," did

21  you learn that was Cost Company's phone number?

22  A.   When I called it --

23  Q.   They said Cost Company?

24  A.   Yes.

25  Q.   And "I need your phone number to hire you?"


63


1  A.   Right.

2  Q.   You had sent this in, you had an address but no phone

3  number?

4  A.   Correct.

5  Q.   And she wrote there, what does that say?

6  A.   "We'd love to have you."

7  Q.   Now, is this your handwriting over on this side?

8  A.   Yes.

9  Q.   And did you write that after you received that back, this

10  document from Georgia Pawk?

11  A.   I think this is a copy of it.  This was for my own use.

12   I was scribbling that to the point there was a response from

13   Georgia Pawk.  And that I gave them a phone number, it would be

14   Kenny's.  And that I must be in good with the union by this

15   time, so this had to be -- October.

16   Q.    You wrote this note sometime later?

17   A.    Later, yes.  Just because, just to keep track of what was

18   happening to me.

19   Q.    And then it's kind of cut off on the side, but does it

20   say respond from and then point to Georgia Pawk, it says she

21   wrote call me, love to have you, etc., K.B., your initials?

22   A.    Yeah.

23   Q.    And then down at the bottom, ma'am, you wrote, is this

24   your handwriting at the bottom, "Georgia?"

25   A.    Yep.


                                    64


1   Q.    You told her you need to be a union member, couldn't help

2   till I was so reinstated, do you see that?

3   A.    Yes, sir.

4   Q.    Was that note written after you had a telephone

5   conversation with Georgia Pawk?

6  A.   Yes, sir.

7  Q.   And so your conversation with her was about being hired

8  as an operating engineer?

9  A.   No, my first conversation with her, on this letter was

10  she asked me what I did, and I told her.  And she asked me

11  about being in the union.  I told letter about the SCI project.

12  She said well, you know, I don't really know at this time

13  what's going on there.  And then she mentioned something about

14  being in the union.  I said I was in the union.  She said well,

15  you know, I don't know what we could do for you right now.

16  Q.   Well, the union you talked about you were in was the

17  operating engineers' union?

18  A.   Right, but I was familiar with being in the union.

19       THE COURT:  Hang on a second, the court reporter

20  can't get down everything you're saying, you can't talk over

21  each other.

22       THE WITNESS:  All right.

23  BY MR. PAWK:

24  Q.   You didn't tell her that you used to be in the laborers'

25  union, did you?

1   A.   No.

2   Q.   Okay.  Isn't it true, ma'am, your discussion with her on

3   the phone was about being in the operating engineers' union and

4   you were going back and being reinstated?

5   A.   Not the first time, I talked to her about getting

6   reinstated in the operating engineers, no.  I told her I was in

7   the union, she said, you know, we're union contractors, she

8   mentioned something about looking into getting into the union

9   again.  She never mentioned anything about laborer or operator,

10  either one.

11  Q.   Well, why would she, why would you talk to her about

12  being reinstated in the operating engineers' union if that

13  wasn't what the discussion was about?

14  A.   Because she mentioned something about the union.

15  Q.   But --

16  A.   Union contractor.

17  Q.   Based on this conversation you had with her, maybe for

18  other reasons you did go back and was reinstated by the

19  operating engineers' union, isn't that right?

20  A.   Yes, I did.

21  Q.   In fact, attached to the back of this memorandum that you

22  produced during discovery, I'll show you what's been marked as

23  A-2 -- is that your handwriting?

24  A.   Yes, it is.

25  Q.   If I could show you here Erie Hall, do you see that?


                                    66


1  A.   Yes.

2  Q.   And below it Operating Engineers Local 66?

3  A.   Yes.

4  Q.   And then is that their phone number, 814 --

5  A.   Yes.

6  Q.   And then November 1, 2002 reinstated?

7  A.   Yes, that's me, that's my handwriting.

8  Q.   You didn't write anything on here that you went to seek

9  to join a laborers' union, did you?

10  A.   No.

11  Q.   In fact, you're fairly familiar with how union

12  contractors get their union workers?

13  A.   Yes.

14  Q.   I mean, I think you testified earlier today how the

15  process works, where a contractor would call a union and the

16  person would get called out of the union?

17  A.  Yes.

18  Q.  Okay.  You're familiar with that because that's how the

19  operating engineers' union works?

20  A.  Yes.

21  Q.  And isn't it fair to say that is how all the unions work?

22  A.  Yes.

23  Q.  And so if you really wanted a laborer's job, wouldn't the

24  easiest way for you to get that to be to join the laborers'

25  union so you can get called out of the laborers' union hall?


                                    67


1  A.  Yes.

2  Q.  I believe your testimony was that you first spoke to

3  Georgia Pawk on October 29, 2002, is that your recollection?

4  A.  I don't know if that was the first time I spoke to her.

5  If it's in my diary, I spoke to her.

6  Q.  You did speak to her that day?

7  A.  Yeah.

8  Q.  And, ma'am, isn't it true whenever you spoke to her --

9    did you speak to her on more than one occasion by the way?

10   A.    Yes.

11   Q.    You did.  How many times did you speak to her?

12   A.    Well, that was three years ago, I'd say that most of the

13   time I documented it.  I really called her a lot.  I called her

14   and occasionally she returned phone calls.

15   Q.    How many times did you -- actually that you spoke

16   directly to her?

17   A.    Well, I couldn't tell you.

18   Q.    Was it more than two?

19   A.    Yes.

20   Q.    More than three?

21   A.    Possibly.

22   Q.    Okay.  You agree with me, ma'am, that during at least

23   three phone conversations that you had with Georgia, that would

24   have been in either September, October or November of 2002?

25   A.    Yes.


68


1    Q.    Do you agree with me, ma'am, at no time during any of

2    those phone conversations did you say to her, hey, I feel that

3   I've been mistreated by Dean Taylor and Bill Heaton when I went

4   up there to the job site?

5   A.   No.

6   Q.   You never told her that you felt you had been

7   discriminated against by Cost Company during any of those phone

8   conversations, isn't that right?

9   A.   That's correct.

10  Q.   In fact, you have to agree with me, ma'am, she was trying

11  to hire you in the fall of 2002, but you weren't certified by

12  the operator's union, isn't that correct?

13        MR. MATESIC:  Objection, calls for speculation.

14        THE COURT:  Overruled.

15  BY MR. PAWK:

16  Q.   Didn't she tell you that she'd love to have you, hire you

17  because of their union contracts or they couldn't hire you

18  until you became reinstated with the union?

19  A.   On the memorandum that she mailed back, it said we would

20  love to hire you.  I feel if they really wanted to hired me,

21  she would of.

22  Q.   She told you they're a union contractor, isn't that

23  right?

24  A.   But at the same time that site wasn't hiring union, union

25   workers.

69

1   Q.   You would agree with me, ma'am, I think you said this

2   earlier in your deposition, that by the fall of 2002, that

3   project was winding down?

4   A.   Correct.

5   Q.   So they really didn't have any, they weren't hiring in

6   the fall of 2002, isn't that right?

7   A.   Well, they were hiring when I sent the recruitment forms

8   in and tried to make contact with Cost Company.

9   Q.   I'm talking about the fall of 2002, when you were having

10   the phone conversations with Georgia Pawk, that job was winding

11   down, isn't that correct?

12   A.   That's correct.

13   Q.   So she couldn't at that time hire you for that particular

14   project?

15   A.   Well, in her words or -- this was three years ago, so I

16   can't say word for word, that's impossible for me to tell you

17   that.  But she did say it wouldn't be fair for me to lay

18   somebody off and give you a job.  And I agreed with her because

19  I don't think that would have been fair for her to lay somebody

20  off, maybe they needed work.  I know what that's like.

21  Q.    Correct, that would not be fair to terminate somebody

22  else or lay them off and hire you?

23  A.    No, that wouldn't be fair.

24  Q.    Do you see this October 29th entry in your diary?

25  A.    Yes, I do.

70

1  Q.    It says "Cost, Georgia Pawk, Erie job," do you see that?

2  A.    Yes.

3  Q.    Isn't it true you were having discussions with Georgia

4  Pawk about that time about being hired for another job other

5  than the Marienville job?

6  A.    She mentioned the Erie job, but Ken Patenia, as an

7  employee of Cost, he pretty much knew where all the jobs were.

8  Q.    So she was talking about hiring you for another project?

9  A.    No, I probably mentioned to her about Erie, you know, it

10  was winding down, the Marienville.  I knew that they had a

11  project in Erie on the courthouse.  I mentioned well, maybe I

12  could go there or get some employment there.  She said well,

13   this Jack Kramer was apparently who was in charge on that job.

14   Q.   And she gave you Jack Kramer's name, right?

15   A.   Yes.

16   Q.   And you didn't know that yourself?

17   A.   No.

18   Q.   Did she tell you she was going to look into seeing about

19   getting you on that particular project?

20   A.   I can't recall, she said she was going to look into it.

21   I wrote Jack Kramer down.

22   Q.   One of the things you testified yesterday about, what you

23   don't like about the construction industry is the weather, do

24   you remember saying that?

25   A.   Yes.


                                    71


1   Q.   Do you recall especially in this climate, Erie,

2   Pittsburgh, wherever in western Pennsylvania, that come

3   November, December, January, February, there's not a lot of

4   jobs?

5   A.   Yes.

6   Q.   In the construction industry?

7   A.   Yes.

8   Q.   It's just, for instance, the masonry industry in

9   particular, you can't lay brick and block in very cold weather?

10   A.   Right.

11   Q.   You know that?

12   A.   Right.

13   Q.   So, did she tell you at that time, say November of 2002,

14   that Cost didn't have a lot of work because of the weather?

15   A.   No, I don't remember her, recall her mentioning the

16   weather.  She just said you know it's winding down, I don't

17   remember her saying really too much about the Erie job.  I

18   mentioned it to her.

19   Q.   That time of year, November, December, what you know

20   about the construction industry, it's traditionally a slow down

21   period, right?

22   A.   Yes.

23   Q.   And, ma'am, at least with respect to being hired as an

24   operating engineer, do you agree with me the first time you

25   told anyone at Cost Company that you were reinstated with the

72

1  union was November 6, 2002?

2  A.   Yes.  On or around that date, yes.

3  Q.   I think there was a diary entry that you looked at

4  earlier?

5  A.   Yes.

6  Q.   Do you see that?

7  A.   Yes.

8  Q.   "November 6, 2002, called Cost, Georgia, left voice mail,

9  told her I was all good with 66," do you see that?

10  A.   Yep.

11  Q.   All right.  And then --

12  A.   That same page, if you bring it back up on top, I

13  applied, I went for a job, it was nonunion.  It wasn't for an

14  operator, with Merit.  Was for truck driver.

15  Q.   You were looking for another job?

16  A.   I was looking for work.

17  Q.   I heard you say that earlier --

18        MR. MATESIC:  Could counsel put the exhibit back up

19  as the witness requested.

20        THE COURT:  It is up, is there a comment you want to

21  make on the exhibit?

22          THE WITNESS:  No, just that, like I said, I did tell

23   her that I was in the union at that time, same day I went and

24   interviewed for nonunion, non-operating job.

25   BY MR. PAWK:


73


1   Q.   Let me ask you this.  If you got a union job at that

2   time, it would have paid more than a nonunion job, right?

3   A.   Well, let me tell you something.  I didn't get a nonunion

4   job, at the time I didn't have any job.  You know, I could just

5   sit here and speculate, yes, I would have made more money, yes.

6   Q.   I didn't ask you that, ma'am.  What I asked you is on

7   November 6, 2002, if you would have been hired as an operating

8   engineer out of the union, your pay rate would have been higher

9   than receiving a nonunion operating engineer job, is that

10   correct?

11   A.   In November I would have made more money as a union

12   operator than a nonunion operator, is that what you're asking

13   me?

14   Q.   Yes.

15   A.   No, in November I would made more money than I was

16  making.  You're right, I would have made more money as an

17  operator.

18  Q.    As a union operator?

19  A.    Yes.

20  Q.    Just for the purpose of showing that was the first time

21  you notified Cost Company that you were now reinstated, isn't

22  that correct?

23  A.    Yes.

24  Q.    So based on your conversations with Georgia, she told you

25  she couldn't hire you until you were reinstated, now you're

74

1  telling her hey, I'm reinstated, isn't that right?

2  A.    Yes.

3  Q.    I was looking at your diary, I'll give it to you, you can

4  go through it if you'd like, for November 7th, November 8th,

5  November 9th, November 10th, all those dates, I didn't see any

6  entries in there that you contacted Cost about jobs again;

7  after that date, November 6th?

8  A.    Okay.  Well, I got called by KGL.

9  Q.    Right, you took a job with KGL on November 18, 2002,

10   isn't that right?

11   A.   Correct.  It was nonunion.

12   Q.   That was a nonunion job?

13   A.   Yeah.

14   Q.   Your job with KGL, if I recall correctly, was $15 an

15   hour?

16   A.   Yes, sir.

17   Q.   Plus the per diem, right?

18   A.   Yes.

19   Q.   That per diem was $25 a day?

20   A.   Yes.

21   Q.   So if I did my math correctly, at $25 a day, divided by

22   eight hours, say you just worked eight hours, that would come

23   out to $3.12 cents an hour, if you took the per diem and

24   divided -- I'm just asking you, does that sound about right?

25   A.   You know I'm not very good with math off the top of my

75

1   head.

2   Q.   I was trying to calculate your hourly rate with the per

3   diem.  If you made $15 an hour and you had a per diem of $25 a

4    day, I calculated it out to be $18.12 an hour, do you have any

5    reason to believe that's not accurate?

6    A.    No, because your per diem is paid on a weekly basis.

7    It's paid by the day, not by the hour.  If I worked two hours

8    that day, I still get $25.

9    Q.    I understand.  I was just extrapolating, trying to come

10   up with an hourly rate.  You got $15 an hour, plus the per

11   diem, and you don't have any reason to believe if I divided the

12   $25 by the eight hours a day, your actual hourly rate was $18

13   an hour?

14   A.    Yes.

15   Q.    Right?

16   A.    Yes.

17   Q.    You held that job at KGL from November 18th until, I

18   believe, your testimony was, I think you said about the month

19   of December, December 17th or so, is that right?

20   A.    Yes.

21   Q.    And you recall being shown one of your earnings

22   statements from KGL by Mr. Matesic, do you remember that?

23   A.    Yes.

24   Q.    Let me show you what's an exhibit out of Defense Exhibit

25   O, can you see that, ma'am?

76

1  A.    Yes.  It's a little small, I can see it.

2  Q.    Do you see up there KGL?

3  A.    Yes.

4  Q.    And then look over here and it says period ended 12/28

5  2002, do you see that?

6  A.    Yes.

7  Q.    And the pay date was January 3, 2003, do you see that?

8  A.    Yep.

9  Q.    And so during that period you got paid $420 and zero

10  cents, do you see that?

11  A.    Yes.

12  Q.    You actually worked beyond December 17, 2002, didn't you?

13  A.    No, I didn't.

14  Q.    Why would you get an earnings statement for that pay

15  period if you didn't?

16  A.    Because when you drag up, you don't get paid that day.

17         THE COURT:  When you?

18         THE WITNESS:  Drag up.

19         THE COURT:  What is that?

20      THE WITNESS:  That means you quit the job -- that

21   means you get fired, you drag up.  That means you grab your

22   stuff and you leave.  When I drug up on that job, I didn't get

23   my pay, I was very upset anyways.  But anyway I got my shit

24   together, I went back home, they mailed me my check like two

25   weeks later, and it was wrong.  So they cut me another check.

77

1   So the date on that last check, that was my last check, that

2   was probably wrong.  Like I said, they mailed me a check, it

3   was wrong.  Told me not to cash it.  And then they would mail

4   me another one.  Now, I have no proof of this.

5   BY MR. PAWK:

6   Q.    Your testimony is you didn't work past December 17th?

7   A.    Correct.

8   Q.    But if I recall your earlier testimony, you quit this job

9   voluntarily, right?

10   A.    We couldn't come to an agreement.

11   Q.    But as I just crunched those numbers, you didn't dispute

12   it, you agreed it was over $18 an hour, with an hourly rate,

13   plus the per diem, that was pretty good wages in 2002, wasn't

14  it?

15  A.    Yes, sir.

16  Q.    And you were in dire financial straits, weren't you?

17  A.    Yes, sir.

18  Q.    But you nevertheless voluntarily quit that job?

19  A.    Well --

20  Q.    Even though you needed the money?

21  A.    Well, I didn't quit it on a whim.  I thought about it, I

22  mean that day when I was confronted with you either take shit

23  or leave, quit.  So I chose the later.  It was a decision I

24  made right then and there.  I tried to talk it over with my

25  boss, and there was no talking over nothing with him.


78


1  Q.    What I'm trying to understand, though, you testified

2  earlier today that you had such a terrible time in 2002 with

3  your life, do you remember that?

4  A.    Yes.

5  Q.    And you were blaming Cost Company for that, I wasn't

6  clear?

7  A.    No.  But it would have helped a great deal if I could

8   have gotten employment in July or August.

9   Q.   So the bad times you had were back then, not October,

10  November, December, January into the 2003 year?

11  A.   Oh yeah, I had bad times up till, it took a while to get

12  back on my feet.

13      THE COURT:  How much more do you have on cross?

14      MR. PAWK:  Probably at least a half hour, judge.

15      THE COURT:  We're going to go to a quarter to 12,

16  then we're going to take our lunch break.

17  BY MR. PAWK:

18  Q.   I want to back up just a little bit.  You testified that

19  in October of 2002 you worked for a gentleman named Robert?

20  A.   Yes.

21  Q.   And what was that job again?

22  A.   Fracking wells.

23  Q.   You just worked two days?

24  A.   That's what he called it, okay.  I don't know if that's

25  the term, but fracking wells.  Yes, and I worked two days.


79


1   Q.   I went through your diary in detail before the trial, I

2   think you testified earlier you also worked at the Kelly Hotel

3   in October?

4   A.   Yes.

5   Q.   How many days do you recall working work at the Kelly

6   Hotel?

7   A.   I'm going to say two weeks.  And it wasn't like a Monday

8   through Friday, without really looking at my dairy to give me

9   some sort of reference, I can't tell you.

10   Q.   If I told you that you worked there from October 9, 2002

11   through October 20, 2002, would that be accurate?

12   A.   I'd say that's pretty close.

13   Q.   And when you worked there, you performed cleaning duties?

14   A.   Yes.

15   Q.   And you were paid cash?

16   A.   Yes.

17   Q.   All right.  And is it your testimony that you made $40

18   per week?

19   A.   Yes.

20   Q.   That's it?

21   A.   Yes.

22   Q.   You don't have any records of that, do you?

23  A.  No, I was paid cash in an envelope behind the bar.

24  Q.  How many hours per day would you put in -- I noticed in

25  your diary it would say worked Kelly; on a typical day how many

80

1  hours would you put in?

2  A.  Well, it would depend on how many rooms they rented that

3  day.  We're talking what October, it's not the busy season.

4  Maybe three rooms I would clean and then I had to clean the

5  bathrooms.  And I had to vacuum them.  And then my job duty,

6  also -- I was replacing, the only reason I got that work was I

7  was replacing this cleaning woman that went on vacation for two

8  weeks.  I just happened to be there and her mom said do you

9  want to make a couple bucks, Kathy, I said well, yeah I do.

10  I'd say maybe two hours, maybe three.

11  Q.  Okay.  Two or three hours a day and they would pay you

12  $40 to $50 cash per week?

13  A.  Yeah, I only did it two weeks.

14  Q.  You don't have any records of that, right?

15  A.  No.

16  Q.  All right.  I'd like to direct your attention to the date

17    of March 15th, I'll show you your diary entry that day --

18    strike that, March 11th. Do you see that, can you see that

19    from your seat there?

20    A.    Yes.

21    Q.    And it says "UPMC Franklin Oil City. Cost, guarantee in

22    writing labor position," do you see that?

23    A.    Yep.

24    Q.    Then underneath, "negotiating agreement" -- do you see

25    that?


81


1    A.    Yes.

2    Q.    And says Oil City, April, Greenville, Pennsylvania,

3    April. DuBois, PA, June." Do you see that?

4    A.    Yep.

5    Q.    And then under that it says "Forest County winding down."

6    Do you see that?

7    A.    Yes.

8    Q.    And that's your handwriting, right?

9    A.    Correct.

10    Q.    And you were writing that because you were corresponding

11  with Cost about various jobs they had that were going to be

12  started during those dates, isn't that right?

13  A.   Could you pull the page down a little bit so I can see

14  the top.

15  Q.   Sure.

16  A.   I was talking to John from EEOC.  So I wasn't

17  corresponding directly with Cost.  There was a gentleman that

18  was -- he was -- what did they call him, a mediator.

19  Q.   And investigator?

20  A.   A mediator or investigator I guess, yes.

21  Q.   In any event, he told you that Cost would guarantee you a

22  job in writing and those were the jobs and these were the dates

23  those jobs were starting, isn't that right?

24  A.   Well, he never said that Cost was going to guarantee me

25  anything.  The only time I was ever guaranteed anything from


82


1  Cost was when he did fax me something, an agreement for

2  employment as a laborer.  I don't know if it was this day or

3  not.  We were getting close, we were still negotiating, Cost

4  was offering me a laborer's job.

5          THE COURT:  Can I see counsel at side bar.

6          (At side bar on the record.)

7          THE COURT:  This horse already went out of the barn

8   because you guys have been down this road over no objection.

9   It seems like this is settlement negotiations.  That's what it

10  seems to me like.

11         MR. PAWK:  Judge, I would say it's admissible under

12  the Federal Rules of Evidence, I can't remember it off the top

13  of my head, which talks about this particular --

14         THE COURT:  This hasn't been focused for the jury

15  yet.  But it sure smacks of it to me.  It isn't my point to

16  object, I'm just pointing out what strikes me as obvious.

17         MR. MATESIC:  If I could respond.  I appreciate

18  that, I was waiting to see where this line of testimony was

19  going because she blurted out the EEOC.  Given the fact we're

20  touching on settlement negotiations, I would object at this

21  point to further testimony.

22         THE COURT:  You're not going that much further?

23         MR. PAWK:  On direct examination he brought up with

24  her whether Cost offered you a job in April of 2003, you didn't

25  want that job because she said she was dicked around by them.

file:///A|/COSTDAY2.TXT

83

1        THE COURT:  The point of this is they're off to the

2   EEOC now in their discussions.

3        MR. PAWK:  She brought it up.

4        THE COURT:  All right.

5        (End of discussion at side bar.)

6        THE COURT:  All right, members of the jury, we're

7   going to be in recess now until 1:15.

8        (Luncheon recess taken at 12:00 p.m.; proceedings

9   reconvened at 1:07 in Judge's Chambers.)

10        MR. PAWK:  Judge, there are a couple of matters that

11   I would like to bring to your attention before we get the jury

12   in.  I know what you ruled on with respect to EEOC issues.

13   There is a document that Kathleen filed that's a charge of

14   discrimination.

15        THE COURT:  In this case?

16        MR. PAWK:  In this case.  It's signed under penalty

17   of perjury, etc., which I want to cross her on.  I don't intend

18   to ask her about the EEOC.  But the fact that she completed

19   this charge of discrimination against Cost Company.  And I

20   would ask her about some things she put in it.

21        THE COURT:  There's nothing wrong with that.  My

22  point ran to settlement, which is completely unrelated to this

23  case.

24        MR. PAWK:  The other thing is a housekeeping matter.

25  I spoke to Mr. Matesic yesterday about witnesses and calling

84

1  them here.  I have accepted service of three subpoenas in this

2  case.  Georgia Pawk, Dean Taylor and William Heaton.  It was my

3  understanding that he was going to call Georgia Pawk today

4  sometime after lunch.  She's here.  He told me, Mr. Matesic

5  told me over lunch he probably will not call her today, because

6  he wants to call Dean Taylor before he calls Georgia.  It

7  creates somewhat of a hardship on our family.  She's available,

8  she's here to testify.  I would like her to be able to be

9  called today.

10        THE COURT:  What is the concern?

11        MR. PAWK:  We have three children, they're still in

12  school.  Their last day of school is tomorrow.  And then my one

13  daughter graduates from this school, she's in on Thursday

14  morning.

15          MR. MATESIC:  May I respond to that.  It's true that

16   I actually explained to Mike, which he didn't mention up to

17   this point in time, that yesterday when we talked about this, I

18   told him that I was unsure as to whether I was going to call

19   Dean before Georgia or vice-versa.  Secondly, my preparation of

20   Georgia, because I didn't anticipate that we would finish with

21   Georgia today -- but I have additional preparation that I need

22   to do for my examination of Ms. Pawk.  And with no disrespect

23   to Mr. Pawk, I think this goes back to the issue of spouse

24   representing spouse.  This would not have come up if Mrs. Pawk

25   and Mr. Pawk did not have children together, with all due


                                85


1   respect.

2          THE COURT:  It's a little late for that.  All right,

3   look it.  How are the kids getting back from school today?

4          MR. PAWK:  We have someone that we have arranged to

5   get them from school.

6          THE COURT:  Look it, I understand the bind that

7   these things put everybody in.  I think in deference to one

8   party's case in how they want to put it in, trumps a family

9    inconvenience in this case.  She could probably leave if she's

10   not going to testify today.

11        THE COURT:  We'll be able to fill up the afternoon

12   without her.

13        MR. PAWK:  Then she'll be able to leave.

14        THE COURT:  When you get out there, tell her she can

15   go.  All right, would you get the juror, Mr. Newton, in here.

16        (Whereupon, Joseph Newton, a Juror, entered Judge's

17   Chambers.)

18        THE COURT:  Hello, Mr. Newton, have a seat.  I'm

19   told by my law clerk that you're under the weather, not feeling

20   real well?

21        MR. NEWTON:  I'm fighting it.

22        THE COURT:  You're fighting nausea?

23        MR. NEWTON:  Nausea.  It just hit me, I didn't feel

24   good this morning.  It didn't occur until lunch break.  I got

25   back, right after I talked to this lady, I had to run and use

86

1    the restroom again.  I vomited, sorry I'm so graphic about it.

2        THE COURT:  I'm going to discharge you, I see no

3    point, unless there's serious objection by counsel?

4        MR. MATESIC:  No objection.

5        MR. PAWK:  No objection.

6        THE COURT:  You better go home and go to bed.  Poke

7    your head in the Clerk's Office on the way down, they can give

8    you any paperwork you need.  We can push ahead we have enough

9    jurors.

10       (Whereupon, proceedings recessed at 1:12 p.m., in

11   Judge's Chambers; and reconvened at 1:20 p.m., in Courtroom A.)

12       THE COURT:  All right, Mr. Pawk.

13       MR. PAWK:  Thank you, your Honor.

14   BY MR. PAWK:

15   Q.   Ma'am, what was the first date of work for you with

16   Trumbull Corporation?

17   A.   It would have been, I'm not sure, I'd have to look at my

18   diary.

19   Q.   Was it in April of 2003, I looked at my notes, you said

20   April, I wasn't sure of the date?

21   A.   I'd have to look at my diary to make sure.

22   Q.   Let me show you your diary for April 15th, do see that

23   there, "work Trumbull, 20 minutes late?"

24  A.    Yes.

25  Q.    Was that your first day of work?

87

1  A.    No.

2  Q.    You think you started there before then?

3  A.    Yeah, I started there earlier.  They called me up for

4  that job.  Dispatch called me from the hall for that job, they

5  told me I'm hired with Trumbull, they're having rain days and

6  that a Taurus, I remember Taurus because of the car, he

7  contacted me and was telling me --

8  Q.    That was the person's name, Taurus?

9  A.    Taurus, I don't know if that was his last or first, his

10  name was Taurus.

11  Q.    Let me show you April 11th, do you see that, "Taurus,

12  Trumbull called, 6:30, 322 State College, sign up drug test."

13  Do you see that?

14  A.    Yes.

15  Q.    All right.  Would that have been the date you received

16  the call from Taurus, which was a Friday -- do you see it up

17  there in the corner, Friday?

18  A.   Yes.

19  Q.   Telling you to show up then the following Monday for work

20  and for a drug test?

21  A.   Like I said, my first day on I'm not sure of, because we

22  had rain days.  So he called me, I'd have to look at, you know,

23  you're pulling dates out of my calendar.

24  Q.   Would you like to see your entire calendar?

25  A.   Yes.

88

1  Q.   Let me show you what's been marked as Cost Company

2  Exhibit R, please.  Maybe I could direct your attention to the

3  dates, starting with the date I showed you, Friday, April

4  11th -- could you look at April 14th, Monday, April 14th, I'm

5  putting a copy of that up on screen as well?

6  A.   Okay.

7  Q.   Do you see that Monday, April 14th?

8  A.   I'm sorry -- I don't have the 14th here.

9       THE COURT:  Look at the screen, ma'am, it's on the

10  screen.

11  BY MR. PAWK:

12  Q.    Do you see that?

13  A.    Yes.

14  Q.    Trumbull 6:30?

15  A.    That would be my first day.

16  Q.    They want you to take a drug test before you go on the

17  job?

18  A.    No, not always.

19  Q.    So that would be your first day?

20  A.    Yes.

21  Q.    Now, if I could direct your attention back to March of

22  that same year, specifically, March 15th, let me show you.

23  If you could look on the screen, please?

24  A.    Yes.

25  Q.    See that, that is March 15th?

89

1  A.    Yes.

2  Q.    That would have been approximately one month prior to the

3  date you started at Trumbull, right?

4  A.    Yes.

5  Q.    Do you see that first entry there, "DuBois, Cost," do you

6   see that?

7   A.   Yes.

8   Q.   "Cost, operator," do you see that, ma'am?

9   A.   Yes.

10  Q.   "Greenville, PA, North Mercer, April," do you see that,

11  ma'am?

12  A.   Yes.

13  Q.   And then "operator position, 66, belong already," do you

14  that, ma'am?

15  A.   Right.

16  Q.   Then you have, looks like "Marienville to Greenville,

17  Ohio border, Mercer, PA, Clearfield, PA, per diem and room."

18  Then below that it looks like you have some miles written down.

19  Did you go out and measure how far those jobs were from your

20  home?

21  A.   I measured to Greenville.

22  Q.   All right.  So you were having dialogue with Cost at that

23  time about these jobs?

24  A.   They mentioned that these jobs were going on and when

25  they were starting.  But they never said anything about me

90

1  going to them.

2       MR. MATESIC:  Objection, your Honor, may we

3  approach.

4       THE COURT:  All right.

5       (At side bar on the record.)

6       MR. MATESIC:  The document which counsel is now

7  showing Ms. Brown also includes her entry for March 13th.  It's

8  not so much the fact of that page, but rather the substance of

9  his line of questioning goes to again these issues.  The last

10  question concerning discussions that she had with Cost and the

11  number of jobs they were offering her was all pursuant to EEOC

12  mediation, which I believe the court already ruled cannot be

13  put into evidence.

14       MR. PAWK:  Judge, I'm not going to mention the EEOC.

15       THE COURT:  What is the relevance then?

16       MR. PAWK:  The relevance is he opened the door in

17  direct examination, he said to her if Cost offered you a job

18  but you didn't take it, she said because they dicked me around.

19       THE COURT:  I mean the door did get opened on this

20  stuff, not the mediation aspect of it, you specifically asked

21  her the question and she gave that response.

22        MR. MATESIC:  Counsel already acknowledged these

23   jobs were offered pursuant to mediation, that's part of the

24   settlement negotiations.  In fact, the March 13th entry is two

25   days before it shows she was in contact with the EEOC.


                            91


1         THE COURT:  May well be, but the jury isn't going to

2   hear anything about mediation here.  Let's put it in

3   perspective.  On direct examination you asked her if she had

4   been offered other jobs by Cost, right?

5         MR. MATESIC:  Yes.

6         THE COURT:  And when was it, I'm paraphrasing, was

7   inclined to accept that invitation?

8         MR. PAWK:  No, he used the term that she used.

9         MR. MATESIC:  I don't believe that I asked her was

10   she offered the additional jobs, I believe I asked her if she

11   was offered an additional job and she chose the offer from some

12   other employer.

13         THE COURT:  Fine.  In any event, what does this

14   prove and what is this probative of insofar as the question is

15   concerned of whether or not she was discriminated against at

16  the relevant time period?

17       MR. PAWK:  Well, they're asking for damages up to

18  this point, judge, is my understanding.  So I think goes to the

19  damage issue, first of all.  Second, I think it goes to,

20  they're going to try to argue mens rea and all these things.

21       THE COURT:  Was she offered the job -- what would

22  the evidence be that she actually was offered any of these

23  positions?

24       MR. PAWK:  The next exhibit goes into April 7th and

25  April 8th, I redacted the word EEOC that's on there.  But it


                              92


1   says "faxed no shit laborer's job, not."  Then the next page --

2        THE COURT:  I'm going to send the jury out and look

3   at this document while we're talking about this.

4        (End of discussion at side bar.)

5        THE COURT:  Members of the jury, there is a legal

6   matter that is going to take a few more minutes, rather than

7   just have us huddle in the corner while you sit there and stare

8   at our backs, why don't you go into the jury room, then we'll

9   get you back in a minute.

10          (Jurors are dismissed from Courtroom A.)

11          THE COURT:  Let me get my timeframes reestablished

12   here.  She took the Trumbull job on April 14th?

13          MR. MATESIC:  April 14th, correct.

14          THE COURT:  2003.

15          MR. PAWK:  Judge, if I may.  I don't know if it's

16   appropriate to have Ms. Brown here while we discuss this in

17   terms of --

18          THE COURT:  She's a party, she can't be asked to

19   leave.  Anyways, it's a pure legal question, it's not factual

20   one way or the other.  Your lost wage claim runs from July 31st

21   of 2002 through what?

22          MR. MATESIC:  April 14th.  April 13th, and she

23   commenced work on April 14th.

24          THE COURT:  The diary page that contained the

25   references to Cost, was what date?


                              93


1          MR. MATESIC:  March --

2          MR. PAWK:  Starts on March 11th.  Then I was just

3   going to ask her about the March 13th entry.  I'm sorry, March

4    15th.

5           MR. MATESIC:  Perhaps, your Honor, I could expedite

6    this.  Does Cost have any proof in fact they have vacancies as

7    of these dates.  I mean these jobs or these theoretical jobs,

8    if they were, what was the date of the vacancy of the job

9    availability, that's the threshold question, I think.

10          THE COURT:  Well, before we even get there, you are

11   offering this testimony on the issue of damage mitigation, is

12   that right; in other words, it runs to the question of cover or

13   mitigation of damages?

14          MR. PAWK:  That's the main reason, judge.

15          MR. LUTZ:  It goes to the laborer versus operator

16   position as well.  Because a subsequent entry that you're going

17   to hear about was in fact an offer of a laborer's job.  There

18   are discussions of a operator's job here, in a subsequent entry

19   when she was offered the laborer's job, she said no.

20          MR. PAWK:  In fact, judge, that's right.  On the 7th

21   she was offered the laborer's job, she says no.  On the 8th of

22   April she actually writes in her diary that no go with Cost, no

23   laborer, operator.

24          THE WITNESS:  Can I add something?

25        THE COURT:  No, you can't.  In fact, step down off

94

1  the stand.  It will be more comfortable down there than sitting

2  up here.  So your point is if this position were accepted, one

3  of those positions were accepted, there would be one less month

4  of back wages, is that your point?

5        MR. PAWK:  That's one of the points.  The other

6  point is it's a credibility issue as to what job she really

7  wanted, judge, I think that's in play in front of this jury.

8        THE COURT:  She didn't accept either of the jobs.

9        MR. MATESIC:  I don't know how that is probative.

10        MR. PAWK:  Well, she says on the 8th they offered

11  her a laborer's job and she wouldn't take it, she wanted an

12  operator's job.  Her testimony in this case is, judge, I wanted

13  a laborer's job in July and August, I wanted a laborer's job.

14        THE COURT:  So you're saying it runs to the question

15  circumstantially as to what jobs she was actually asking for?

16        MR. PAWK:  Correct.

17        THE COURT:  I think they're relevant.  But getting

18  back to my original point.  And quite frankly since both of you

19  guys got into it without objection from the other, I raised the

20  settlement question sua sponte, you both are probably waiving

21  the objection.  But, in any event, it seems the cleanest way to

22  handle it is to keep the EEOC and mediation out of it.  And you

23  can use it for those purposes.  All right, bring the jury back

24  in.

25        (Jurors reenter Courtroom A.)


                              95


1        THE COURT:  All right, Mr. Pawk.

2  BY MR. PAWK:

3  Q.   Ma'am, I think when we broke I was showing you the entry

4  for March 15th, do you see that?

5  A.   Yes.

6  Q.   I think your testimony was that you were, you had

7  measured the distances between your home and I think it was the

8  Mercer job or Greenville job?

9  A.   Greenville.

10  Q.   I'd like next to direct your attention to --

11  A.   What was you asking about, I got mixed up, so you pulled

12  the page -- you were asking me what, if that was what I --

13          MR. PAWK:  I don't have a question before her,

14  judge.

15          THE COURT:  Hang on a second.  Just wait for a

16  second, I don't think there's one on the table yet.

17          THE WITNESS:  All right.

18          THE COURT:  Just wait until he asks and then you

19  answer.  Go ahead.

20  BY MR. PAWK:

21  Q.   Let me show you the entry for April 7th, do you see that,

22  ma'am, April 7, 2003?

23  A.   Yes.

24  Q.   Okay.  And I'll direct your attention there to -- it says

25  "called John, 9:30, call Kenny phone, nothing in mail from


96


1  Cost."  Then what does that say after that, ma'am?

2  A.   It says "faxed me shit laborer job, not."

3  Q.   That's your handwriting?

4  A.   Yes.

5  Q.   When you wrote that, was that because Cost had faxed you

6  a laborer's job and you called it a shit laborer's job and then

7    put not, is that right?

8    A.    May I see the whole page, please.

9    Q.    Yes.

10    A.    Well, the reason why I didn't -- well, Cost didn't call

11    me.  This wasn't Cost that called me and offered me this job

12    first of all.

13    Q.    What I'm asking you is on that date --

14    A.    Yes.

15    Q.    You were offered a laborer's job with Cost and you were

16    saying in your diary that you didn't want it?

17    A.    Right.  I already had a job with Trumbull that day.

18    Q.    And that laborer's job that they offered you that day is

19    the exact laborer's job that you're complaining about in this

20    case that they didn't offer you in July and August of 2002,

21    isn't that right?

22    A.    No, they were hiring men off the street without a book

23    for laborers.  And I went up there as a laborer.  Because I

24    didn't have a book, I didn't have a laborer's book and I didn't

25    have an operator's book.  I wanted to go up and work as a

97

1   laborer.

2   Q.   Ma'am, you said you wanted to be hired as a laborer,

3   isn't that right?

4   A.   Right.

5   Q.   They offered you that very laborer's job and you rejected

6   it in April of 2003, isn't that right?

7   A.   Because that same day I got a job with Trumbull.

8   Q.   Okay.  But you said no to Cost?

9   A.   Correct.

10   Q.   All right.  Let me show you the next date, April 8th, in

11   your diary?

12   A.   All right.

13   Q.   Do you see that, ma'am?

14   A.   Yep.

15   Q.   "Call John, no go with Cost, no laborer, operator."

16   Do you see that, ma'am?

17   A.   "Call John, no go with Cost, no laborer, operator," yep.

18   Q.   You're saying there in your diary you don't want a

19   laborer's job with Cost, you want an operator's job or nothing,

20   isn't that right?

21   A.   No, put it back up there, please.

22   Q.   I'm not trying to trick you, ma'am, I'm just asking --

23  A.   I know, you're going a little too fast for me.  The

24  reason you're confusing me, all right --

25         THE COURT:  Let's get a question back on the table.


98


1  BY MR. PAWK:

2  Q.   Ma'am, you're writing in your diary on April 8th that no

3  go with Cost, no laborer, operator.  When you wrote that, what

4  you're saying to yourself is you don't want the laborer's job,

5  you wanted an operator's job, isn't that right?

6  A.   No, it probably meant call John, no go with Cost.  I got

7  an operator's job.  And I did tell him that.  That I was being

8  employed by Trumbull.  In fact, I knew prior to that that I was

9  going to be employed with Trumbull.

10  Q.   The day before you're offered a laborer's job by Cost,

11  that's April 7th.  Then on April 8th your diary entry is "no go

12  with Cost, no labor," you just rejected it the day before, you

13  wanted an operator's job, isn't that right, ma'am?

14  A.   I had an operator's job.

15  Q.   You didn't want --

16         THE COURT:  Hang on a second.

17    MR. PAWK:  He can't take both of us down.

18    THE COURT:  You took the words right out of my

19  mouth.  Slow down just a little bit, okay.  You're both

20  captains of your own speed.

21    THE WITNESS:  Okay.

22  BY MR. PAWK:

23  Q.   You wanted an operator's job, then, isn't that fair,

24  ma'am, on April 8th of 2003, you did not want to work as a

25  laborer, you wanted to be an operator?

99

1  A.   That's April and that day I had a job with Trumbull as an

2  operator.  And that's why I rejected Cost.  If someone else

3  would have called me and offered me a laborer's job and I

4  didn't have a job, I would have took it.

5  Q.   Well, ma'am, on your direct examination testimony you

6  were asked by Mr. Matesic that if you were offered a job by

7  Cost in the spring of '03, you didn't want it because you felt

8  you had been mistreated, remember that?

9  A.   That's correct.

10  Q.   You felt you had been mistreated.  But you don't write

11  that in your diary here, you just say no laborer, operator; you

12  don't say I'm rejecting Cost because they mistreated me, you

13  didn't write that in your diary, did you?

14  A.    No, I don't write everything in my diary.

15  Q.    All right.

16  A.    But I also said, when he asked me if I would work for

17  Cost as a laborer, I said no.  But I would work as a laborer.

18  Q.    Ma'am, I'd like to show you what's been marked as Defense

19  E-7; do you see that, ma'am?

20  A.    Yeah.

21  Q.    And during the discovery in this case you produced a copy

22  of your union card, is that a copy of your international union

23  card?

24  A.    Yes, it is.

25  Q.    I just have a couple questions about this.  Do you see


                                    100


1  down here in this corner it says "initiation 5/21/2003?"

2  A.    Correct.

3  Q.    I thought it was your testimony that you were good to go

4  with the union back in November of 2002?

5   A.   Yes, sir.

6   Q.   Why would your card say May of 2003?

7   A.   Because when I reinstated myself with the operating

8   engineers in November or October, whatever, I'd have to look at

9   my diary to tell you exactly what date, I paid my $50 to put on

10  the list.  And they researched it and they gave me my time and

11  my equipment.  So I was on the list and I was available for

12  work as requested.  If you requested me, I could have went out

13  on the job.  I only had so much time before I had to pay my

14  initiation fee to the international.  Which was $550, after I

15  started working.

16  Q.   So you don't get the card until you pay the $550?

17  A.   Correct.  But I paid my dues.

18  Q.   All right.  Let me show you what I've marked as Defense

19  Exhibit F-3 -- that's hard to read.  We'll start at the top.

20  Do you recognize this document, ma'am, as a document that you

21  prepared and signed with respect to your charge of

22  discrimination against Cost Company?  I could scale it down, is

23  that your signature, ma'am, in the lower left-hand corner?

24  A.   Yes.

25  Q.   Kathleen Brown, dated 12/30/02, do you see that?

101

1   A.   Yes.

2   Q.   And you signed this document right above your signature

3   there, it says -- it says, does it not, "I declare under

4   penalty of perjury that the foregoing is true and correct;"

5   do you see that?

6   A.   Yes.

7   Q.   And you understood what that meant at the time?

8   A.   Yes.

9   Q.   I'd like to ask you a few questions about it.  If you

10  would look over here, this side of the page, it says "date

11  discrimination took place;" do you see that, ma'am?

12  A.   Yes.

13  Q.   It says "earliest 7/1/2002," do you see that?

14  A.   Yes.

15  Q.   And then the latest was 11/15/2002, do you see that?

16  A.   Yes.

17  Q.   You've testified in this case under oath that the first

18  time you appeared on the job site was July 31, 2002, isn't that

19  right?

20   A.    That's correct.

21   Q.    Yet, when you filed this on December 30, 2002, you put

22   that you were discriminated against back to July 1, 2002,

23   didn't you?

24   A.    Yes, I did.

25   Q.    That's not correct, is it?

102

1    A.    That's what's on this paper, you're right.  But it's not

2    correct.

3    Q.    And over here you checked boxes of discrimination, you

4    felt Cost discriminated against you, you checked sex and

5    disability, do you see that?

6    A.    Yes.

7    Q.    And then down below under paragraph three, you say "I

8    believe that the respondent discriminated against me because of

9    my medical condition and/or disability and/or perceived

10   disability in violation of the Americans with Disabilities Act

11   of 1990 as amended."  Do you see that?

12   A.    And my sex --

13   Q.    Right, but the first part is what I want to ask you

14  about?

15  A.    Okay.

16  Q.    Did I read that correctly?

17  A.    Yes, you did.

18  Q.    There is no evidence whatsoever that Cost, specifically

19  Dean Taylor, William Heaton or Georgia Pawk, knew anything

20  about your condition of ADHD, isn't that right?

21  A.    No, but the woman, I think her name is Rose something,

22  helped me fill these forms out.  I did not type these in there.

23  And she helped me with this and she is with the EEOC.

24  Q.    You gave her the information, isn't that right?

25  A.    Yes, and I told her I do have a disability.


                              103


1  Q.    But what I'm asking you, ma'am, is you never told Dean

2  Taylor on July 31, 2002, and you never told William Heaton on

3  August 23, 2002, or any of the conversations you had with

4  Georgia Pawk, that you felt you were discriminated against

5  because you had a disability?

6  A.    I didn't tell any of them at the time that I felt was

7  being discriminated against.  But I knew by his demeanor when

8   he basically pushed me out the door that he wasn't going to

9   hire me.

10   Q.   Maybe I didn't ask it properly.  You didn't tell any of

11   them that you had a disability, isn't that right?

12   A.   No, you're correct, I did not.

13   Q.   So you never told any of them?

14   A.   I told this woman that filled out this form, helped me

15   fill this form out, that I had a disability.

16   Q.   But you didn't her when you were giving her the

17   information, hey, I have this disability, but I never told

18   anybody at Cost Company?

19   A.   No.

20   Q.   You didn't tell her that?

21   A.   No.

22   Q.   Okay.  So you signed this under penalty of perjury

23   knowing that you never told anybody at Cost Company that you

24   had a disability?

25   A.   Well, I didn't know at that time I was committing

104

1   perjury, no.

2  Q.   Let me go up above here to paragraph one, from July, 2002

3  to November, 2002 -- strike that, go to two.  "Dean Taylor,

4  foreman, told me that I would not be selected for a

5  laborer/operator position because I did not have a union card."

6  Do you see that?

7  A.   Yes.

8  Q.   Do you agree with me that if he told you that you could

9  not be selected as an operator because you didn't have a union

10  card, that was correct?

11  A.   Correct.

12  Q.   Okay.  Ma'am, you went to work for Trumbull Corporation

13  on April 14, 2003, you then worked for them all the way into

14  October of 2003, isn't that right?

15  A.   Correct.

16  Q.   Once that job ended, did you go to work for anybody else?

17  A.   I went to work for Giant Eagle.

18  Q.   Then how long did you work for Giant Eagle?

19  A.   I worked for them for two weeks training.

20  Q.   Did you work for anybody else after that?

21  A.   Yeah, I worked for A & L.

22  Q.   A & L is a heavy highway contractor, aren't they?

23  A.   They build bridges, yeah, highway.

24  Q.    You were working for them during the year 2004, isn't

25  that right?


105


1  A.    Yes.

2  Q.    And when did you finish your employment with A & L?

3  A.    In -- the beginning of November, I believe.

4  Q.    November of 2004?

5  A.    Correct.

6  Q.    Okay.  And then did you work anywhere from November, 2004

7  to today?

8  A.    Yes, I worked for Mashuda Corporation.

9  Q.    When did you go to work for Mashuda?

10  A.    In April -- I'd have to look at my diary.  Not in any of

11  the diaries you have, the one that I have now.

12  Q.    Ma'am, just so I'm clear on this, remember you were shown

13  this by Mr. Matesic -- it's Plaintiff's Exhibit 16, this was

14  the stipulated rate sheet for Cost Company laborers, do you see

15  that basic rate $17.15?

16  A.    Yes.

17  Q.    Is that better?

18  A.    Yeah.

19  Q.    Okay.  You agree with me when I was talking to you

20  earlier about KGL, when you went to work for KGL you were being

21  paid $15, plus the per diem of $25, do you remember that?

22  A.    Yes.

23  Q.    We talked that when you blended that per diem into the

24  $15, it came out to over $18 an hour?

25  A.    Well, that's the way you put it, yeah.


                                106


1  Q.    I think your testimony was you didn't have any reason to

2  dispute it.  You would agree with me, then, the amount of money

3  you were being paid by KGL for that month you worked there, was

4  more than you would have been paid as a laborer for Cost

5  Company on this project?

6  A.    Well, I would have got benefits on this job.

7  Q.    Doesn't that $17.15 include your benefits on top of it?

8  A.    I would have got a pension and an annuity with the union.

9  Q.    Let's talk about that.  You don't know how many hours

10  you'd have put in as a laborer in order to be eligible for a

11  pension, do you?

12   A.   No, I don't.

13   Q.   Okay.  And it could have been years, isn't that right?

14   A.   Well, it couldn't have been, too, I don't know, I'm not

15   sure.

16   Q.   You don't know how many hours you would have had to have

17   worked as a laborer in order to be eligible for health

18   benefits, either?

19   A.   No.

20   Q.   And you also agree with me you were aware of the layoff

21   policy on this project?

22   A.   Not on this protect, no.

23   Q.   Are you familiar with layoff policies in general with

24   union contractors?

25   A.   No.  You could start at any time and you can get laid off

107

1   at any time, yes.

2   Q.   Right, Cost Company could have hired you on July 31,

3   2002, and had you work for two days and laid you off, isn't

4   that right?

5   A.   Well, that's correct, if they would have hired me, yes.

6   Q.   They could have done that, right?

7   A.   Yes, they could of.

8   Q.   One of the things you wanted to do on this -- you wanted

9   to get hired by Cost, and if they laid you off, you wanted to

10  be eligible to collect unemployment, isn't that right?

11  A.   That's what most construction workers' goals are.

12  Q.   That was your goal?

13  A.   Well, no, I was hoping it would get me through.  I could

14  actually walk to work, so I wouldn't have the mileage.  I would

15  be making more money than I was at that time.  It would have

16  made by life a lot easier.  If I would have only been given the

17  chance to work for Cost.  I would be happy to go out, put my

18  boots on every day and work for them at that time and earn it.

19  Q.   Ma'am, aren't you claiming lost unemployment benefits in

20  this case by Cost's failure to hire you?

21  A.   Yes, I didn't get unemployment.

22  Q.   Okay.  You don't know how long you would had to work for

23  Cost in order to be eligible to collect unemployment, do you?

24  A.   Sixteen weeks.

25  Q.   About 16 weeks?

1  A.    Yeah.

2  Q.    So, again, if we talk about the layoff policy, you don't

3  know if you would have ever made 16 weeks, especially --

4  A.    You know --

5  Q.    Ma'am, let me finish my question.  You don't know --

6        THE COURT:  Hang on, Mr. Pawk, I'm going to make

7  this one more time now.  I'm getting serious about it, both of

8  you slow down a little bit, okay.  Courtrooms are tension

9  packed places, but slow is good.  Go ahead.

10  BY MR. PAWK:

11  Q.    Ma'am, you don't know, based on the layoff policy that

12  you just described earlier, whether you would have worked for

13  16 weeks for Cost Company and become eligible for unemployment

14  benefits, isn't that right?

15  A.    Well, I don't know that I wouldn't.

16  Q.    You just don't know -- you could have, you could not

17  have, you just don't know.  You already testified that the job

18  was winding down in the fall of 2002, isn't that right?

19  A.    Yeah, it was slowing down, but there were steelworkers up

20  there.  They had punch out work to do, which lasted into

21    December.  Cost had employees on that job longer than just till

22    the fall.

23    Q.    Ma'am, with respect to --

24          MR. PAWK:  May I approach, your Honor.

25          THE COURT:  Sure.


109


1    BY MR. PAWK:

2    Q.    Cost Exhibit R, the diary here, and have you had a chance

3    to look at that in its entirety -- is that a complete set of

4    your calendar, your diary for 2002, 2003, that you provided to

5    me during the course of this case?

6    A.    I haven't had a chance to look at every page and every

7    entry.  For the most part it looks like mine.  The only

8    difference is mine isn't turned and scattered like this.  So

9    when I look at this, I get a little bit confused.  Mine's in a

10   book and it corresponds, you know, it's not one page here and

11   there, you know, it's different.  But this is pretty much my

12   diary for two years.

13   Q.    You provided that to your attorney, who gave it to me, do

14   you remember that?

15   A.   Yes, I provided maybe three years, maybe four, to my

16   attorney, of my diaries.

17   Q.   You did that because you have trouble remembering things

18   and you record them --

19   A.   Yes.

20   Q.   You record them?

21   A.   Yes, I have ADHD.

22   Q.   Correct.  And you record things, you try to record things

23   on a daily basis that are important in your life, isn't that

24   right?

25   A.   On the most part, yes.


                              110


1          THE COURT:  Just so the record is clear, it may be

2   helpful to the jury if they don't already know it, but when you

3   refer to ADHD, could you tell the jury what that all means?

4          THE WITNESS:  It's attention deficit hyper disorder.

5   In other words, I have a short attention span, I have a bad

6   memory, and that's basically why I keep records.  It's not for

7   any other reason, other than for my mind, just so I know what's

8   happening, you know, and when.

9   BY MR. PAWK:

10   Q.   Ma'am, I think the question I asked you just before that

11   was you record important things that happen to you on a daily

12   basis in this diary, that's what you do, isn't that right?

13   A.   Yes.

14   Q.   You would agree with me, ma'am, that nowhere in the year

15   2002 or 2003, do you put any entries in there that you felt

16   that Cost Company had discriminated against you because you are

17   a woman?

18   A.   Well, I said that I didn't -- I don't put everything I

19   feel or do in there.  I mean, it's just something I do for

20   myself.  I don't put all my feelings in there.

21   Q.   That's not what I asked you.  I asked you did you ever

22   put any entry in there in the year 2002, 2003, that you felt

23   Cost had discriminated against you?

24   A.   I probably put in there things that I did -- how can I

25   put this.  I put things in there -- when I put into action that


111


1   I thought, you know, that I was being -- that I was being

2   discriminated against.

3   Q.    You're saying you did put entries in there that you felt

4   Cost was discriminating against you?

5   A.    No.

6   Q.    You didn't?

7   A.    No, I did not put in words that they discriminated

8   against me.

9   Q.    Let me ask you if you could just take a look at this

10  entry.  It's January 15, 2003, do you remember during your

11  direct examination testimony where you said after you left the

12  job with KGL?

13  A.    Yep.

14  Q.    In December until, I think you got the job with Trumbull,

15  you were going through terrible financial trouble?

16  A.    Right.

17  Q.    You couldn't celebrate Christmas, do you remember that?

18  A.    Yep.

19  Q.    I'm just going to show you a couple entries.  January

20  15th, do you see the second entry there, does that say "stopped

21  at Grove City, bought gifts for Colleen, Bob, Joy, Sarah;" do

22  you see that?

23  A.    Yep.

24  Q.    "Mom gift certificate Red Lobster," do you see that?

25  A.   Yes.  Those were very little kind gifts.  If you look at

112

1  the entry, it was January, so it wasn't Christmas.

2  Q.   Okay.  But it was the next month?

3  A.   That's not Christmas, is it.

4        THE COURT:  Hang on a second.  Let's get the

5  questions and answers going the right way.  Keep going.

6  BY MR. PAWK:

7  Q.   I thought I asked you between December, when you left the

8  job with KGL and when you took the job with Trumbull, you were

9  suffering dire financial straits?

10  A.   Yes.

11  Q.   I wanted to ask you about this entry was, you were buying

12  gifts for people on January 15, 2003, isn't that right?

13  A.   Yes, I got my unemployment.  And, like I said, I didn't

14  go out and buy fur coats or anything, they were little things.

15  And January 19th is not December 25th.

16  Q.   I thought you testified earlier you didn't have enough

17  money to buy basic necessities and support your family, isn't

18  that what you said?

19  A.    I didn't at Christmas time, I didn't get my unemployment

20  until after January.

21  Q.    You started collecting unemployment after January?

22  A.    Yes.

23  Q.    So you weren't in financial trouble in January and

24  February, is that what you're saying?

25  A.    Well, I wasn't in real good shape, either.


                                    113


1  Q.    All right.  What is it, were you having financial

2  trouble?

3  A.    Yes, I was having financial trouble.

4  Q.    Let me show you, then, February 6, 2003, do you see that?

5  A.    Yep.

6  Q.    Says "state store, BV Calvert, Jack Daniels," do you see

7  that?

8  A.    Yes, I do.

9  Q.    You had enough money to buy alcohol at the state store?

10  A.    No, Kenny bought that.

11  Q.    Kenny bought that?

12  A.    Yeah.

13   Q.   Prior to taking the job -- strike that. I guess shortly

14   after you started working -- strike that again. The month

15   prior to taking the job with Trumbull, which was April, we

16   established was April 14, 2003, do you remember that?

17   A.   Yes.

18   Q.   Do you recall taking a vacation to Hilton Head, South

19   Carolina?

20   A.   No, it wasn't really a vacation, I took my roommate,

21   Amanda Rogers. She asked me to drive her down there, she paid

22   for everything. The gas, my food, we stayed at her boyfriend's

23   mother's house. The only thing I did, because she doesn't have

24   a driver's license, the only thing I did was drive.

25   Q.   You went away with her to Hilton Head, South Carolina?


                                    114


1   A.   Yes, because she asked me to.

2   Q.   Okay. You went away to Hilton Head, South Carolina, and

3   you stayed what, approximately a week?

4   A.   Yes.

5   Q.   Ma'am, you testified earlier on direct examination that

6   you paid child support regarding your son?

7   A.   Yes.

8   Q.   And, ma'am, that's court ordered child support, right?

9   A.   Yes.

10  Q.   Your child hasn't lived with you since he was four?

11  A.   Correct.

12  Q.   So you've been paying child support to his father since

13  then?

14  A.   Yes.

15  Q.   All right.  Let me direct your attention to May 3, 2002.

16  Specifically, right down here, "phone turned off," do you see

17  that?

18  A.   Okay.  Put the date back up there.  Are we talking the

19  30th of May?

20  Q.   See May 30th up there in the corner, up here?

21  A.   Okay, 2002.

22  Q.   Do you see it says "phone turned off?"

23  A.   Yep.

24  Q.   Was your phone turned off because you couldn't pay the

25  bill?

115

1   A.   Yeah.  And then I had it turned back on.

2   Q.   So your financial trouble with respect to at least the

3   phone predated your ever coming to the Cost job site, isn't

4   that right?

5   A.   Yes.  I was bouncing up and down.

6   Q.   Let me show you June 29, 2002, do you see that date in

7   the corner up there; do you see June 29th?

8   A.   Yep.

9   Q.   And down there it says "shut off my gas last week," do

10  you see that?

11  A.   Yes.

12  Q.   Okay, was your gas shut off?

13  A.   Yep.

14  Q.   And that was because you were having financial troubles

15  at that time?

16  A.   Yes.

17  Q.   And, again, that date predates at least a month before

18  you ever went on the construction site looking for a job with

19  Cost?

20  A.   Yes.

21       MR. PAWK:  Just one moment, your Honor.

22  BY MR. PAWK:

23  Q.   Just one final question.  When did you actually join the

24  laborers' union?

25  A.   I never joined the laborers' union.


116


1       MR. PAWK:  I have no further questions.

2       THE COURT:  Any redirect, Mr. Matesic?

3       MR. MATESIC:  Yes, your Honor.  Your Honor, before I

4  begin, I only have about 20 minutes worth of questions for Ms.

5  Brown.  As a housekeeping matter, I did not move any of the

6  exhibits in at this time.  Is it the court's preference that

7  the exhibits related to the witness's testimony be entered at

8  that time?

9       THE COURT:  Let's do this.  For the time being you

10  go ahead with your examination.  Then we'll catch up with our

11  exhibits after that.  But, henceforth, as an exhibit is

12  identified or for both sides, move it, so we don't get

13  backlogged.

14       MR. MATESIC:  Okay.

15               REDIRECT EXAMINATION

16  BY MR. MATESIC:

17  Q.    Ms. Brown, I'm going to place before you, this is

18  Defendant's Exhibit F-3 that Mr. Pawk was asking you about?

19  A.    Yes.

20  Q.    This is your signature at the bottom, you have already

21  identified that?

22  A.    Yes.

23  Q.    Everything else that's on this sheet, did you write it?

24  A.    No.

25  Q.    Are you an attorney?

117

1  A.    No.

2  Q.    Do you have any training in discrimination law?

3  A.    No.

4  Q.    Who wrote this document?

5  A.    Somebody that had do with the discrimination.

6  Q.    Tell us how that discussion came about, how it came to be

7  that this person got information with which to write the

8  document?

9  A.    Verbal, my verbal, you know, trying to recall what

10  happened and when.

11  Q.   Did you go down there in person?

12  A.   Yes.

13  Q.   Okay.  And where was that?

14  A.   In Pittsburgh.

15  Q.   In Pittsburgh.  You drove down from Marienville?

16  A.   Yes.

17  Q.   What was the name of the person that you met with?

18  A.   Rose something -- Rose, I don't know.  I couldn't tell

19  you who.

20  Q.   All right.  Did that person indicate to you that she was

21  familiar with the law of discrimination?

22  A.   I assume she did --

23       MR. PAWK:  I object on two grounds, one it's

24  hearsay, two it's leading.

25       THE COURT:  Well, taking the first one first, you're


118


1  asking her what this person said for the truth of the matter?

2       MR. MATESIC:  I am not.

3       THE COURT:  What are you asking for?

4          MR. MATESIC:  I'm asking to show as to authorship,

5    who is responsible for the specific averments in this

6    complaint, whether those averments true.  Or I'll ask a more

7    general question, whether or not the person who wrote this

8    complaint in fact knows anything about discrimination law.

9          THE COURT:  Reask the question then.

10   BY MR. MATESIC:

11   Q.    What was the person's name who you told your story to?

12   A.    Like I said, Rosemary or something.

13   Q.    Okay.  Did you speak with anybody else at the EEOC on

14   that day?

15   A.    No.

16   Q.    Did you have an appointment with her that day?

17   A.    Yes.

18   Q.    How long did your meeting last?

19   A.    I can't tell you, I don't know.

20   Q.    All right.  Did Rose ask you particular questions that

21   day?

22   A.    Yeah.  She asked me where the site was, what happened.

23   Q.    All right, was she taking notes when she was asking you

24   those questions?

25   A.    Yes.

119

1  Q.  And you can't estimate how long that meeting lasted?

2  A.  I don't know.

3  Q.  When were you presented with this document for signature?

4  A.  At the end.

5  Q.  At the end of the meeting?

6  A.  Yes.

7  Q.  After that meeting you had to drive back to Marienville?

8  A.  Yes.

9  Q.  Okay.  Do you see this third paragraph here -- why don't

10  you read that into the record -- can you see that now?

11  A.  Yes.  Where it says in violation?

12  Q.  Number three?

13  A.  "I believe that the respondent discriminated against me

14  because of my medical conditions and/or disabilities and/or

15  perceived disability in violation of the Americans with

16  Disabilities Act of 1990 as amended, and my sex, female, in

17  violation of Title VII."

18  Q.  Keep going?

19  A.  "Of the Civil Rights Act of 1964 as amended, in that I am

20  fully capable of performing these essential functions of the

21  position with or without reasonable accommodations, yet I was

22  not selected for the position.  The respondent has been hiring

23  males from July, 2002 until November, 2002."

24  Q.    Had you ever heard of Title VII of the Civil Rights Act

25  before this day?

120

1  A.    No.

2  Q.    Did you have an attorney before this day to represent you

3  in any dispute that you might have had with Cost?

4  A.    No.

5  Q.    Did the EEOC provide you or offer to provide you with an

6  attorney?

7  A.    No.

8        MR. PAWK:  Can we approach, please.

9        THE COURT:  Yes.

10       (At side bar on the record.)

11       MR. PAWK:  My understanding of your prior

12  instructions with respect to EEOC matters is we were not going

13  to get into it.  But I think counsel is now trying to ask her

14  whether, and I didn't bring up the EEOC when I talked about

15  this document, just the charge of discrimination.  Now, he's

16  asking did somebody provide you with an attorney, Title VII.

17  And one other thing, he just asked are you familiar with Title

18  VII, she filed two other EEOC complaints.

19        THE COURT:  Look, this is an attempt to rehabilitate

20  her from impeaching or your attempt to impeach, it's fair game,

21  overruled.

22        MR. LUTZ:  Before we leave, so we don't have to come

23  up here again, are we going to be permitted to cross-examine

24  now about the prior EEOC filings that she said on redirect that

25  she has no knowledge with respect to filing with the EEOC?


                              121


1         MR. PAWK:  And Title VII.

2         THE COURT:  Temporally, the EEOC document which

3  concerns this case, would have been filed when?

4         MR. PAWK:  December 30, 2002.

5         THE COURT:  There were previous EEOC filings?

6         MR. PAWK:  Yes, two.  One against the operating

7  engineers' union, one against Solar Testing Labs on the same

8   project.

9        THE COURT:  You asked her the question, the door has

10  been opened.

11        (End of discussion at side bar.)

12  BY MR. MATESIC:

13  Q.   Before this date had you ever read Title VII of the Civil

14  Rights Act?

15  A.   No.

16  Q.   All right.  And right above that, Americans with

17  Disabilities Act of 1990, had you ever read that law before

18  this day?

19  A.   No.

20  Q.   All right.  Did Rose give you those laws and offer you

21  the opportunity to read them?

22  A.   No.

23  Q.   Were you in any position -- strike that question.  Whose

24  idea was it to put the American with Disabilities Act law in

25  paragraph number three?

122

1   A.   She wrote it, I told her I had a disability, but she

2    wrote it.

3    Q.    Whose idea was it to put Title VII of the Civil Rights

4    Act of 1964 as amended in paragraph three?

5    A.    She did.

6    Q.    Okay.  This language, "I am fully capable of performing

7    the essential functions of the position," just that part right

8    there; whose idea was it to put that in paragraph number three?

9    A.    Hers.

10    Q.    Did you use those words when you were describing your

11    problem with Cost to Rose, did you use the words "that you were

12    capable of performing the essential functions of the position?"

13    A.    No.

14    Q.    Did you use the words "with or without a reasonable

15    accommodation?"

16    A.    No.

17    Q.    The last sentence, "the respondent has been hiring males

18    from July, 2002 until November, 2002," did you refer to Cost as

19    the respondent?

20    A.    No.

21    Q.    Were you in any position to question Rose's work or

22    paragraph three?

23   A.   No.

24   Q.   Paragraph two.  "Dean Taylor, foreman, told me that I

25   would not be selected for a laborer/operator position because I

123

1   did not have a union card."  There is no such position,

2   laborer/operator, in your experience, is there?

3   A.   No.

4   Q.   They're two separate jobs?

5   A.   Yes.

6   Q.   Who wrote sentence number two?

7   A.   She did.

8   Q.   Okay.  Did you explain to her that there was such a job,

9   laborer/operator?

10   A.   No.

11   Q.   After you told Rose your story, and she presented you

12   with this complaint, did she tell you what you would have to do

13   with this complaint, for example, sign it?

14   A.   Yeah, I had to sign it.

15   Q.   And did she tell you what would happen after you signed

16   it?

17   A.   They would investigate it.

18   Q.   And did you have any reason in your mind to know what

19   would happen if you didn't sign this complaint?

20   A.   No.

21   Q.   Suppose that she handed this to you and you refused to

22   sign it, what would the effect of that have been?

23   A.   They'd probably throw that away.

24   Q.   Mr. Pawk was asking you about entries in your diary and

25   your testimony was that you don't record everything in your

124

1   diary?

2   A.   Correct.

3   Q.   And you specifically said you don't always record your

4   feelings in your diary?

5   A.   Yes.

6   Q.   Now, let me ask the question differently.  Is that the

7   case for sad feelings, as well as happy feelings?

8   A.   Yes.

9   Q.   You don't recall recording in your diary whether you

10   would have been grieving over some situation?

11  A.   No.

12  Q.   It is fair to say that in your diary entries, and there

13  are more than 100 pages here, you tend to record events rather

14  than feelings?

15       MR. PAWK:  Objection, leading.

16       THE COURT:  Sustained.

17  BY MR. MATESIC:

18  Q.   You would have received health benefits through Cost if

19  they hired you as a laborer, is that your understanding?

20  A.   Yes.

21  Q.   Did you receive health benefits with KGL?

22  A.   No.

23  Q.   Mr. Pawk was asking you about unemployment compensation

24  and you said the goal of construction workers is to be on

25  unemployment -- well, tell me what you said?


                              125


1   A.   No, what I meant was the goal was of construction workers

2   is to at least get their weeks in so if there is no work, they

3   can at least fall back on unemployment.

4   Q.   And your experience in construction with regard to this

5    issue of unemployment versus working, excuse me, unemployment

6    during the off season, just tell us about that?

7    A.    Unemployment during the off season?

8    Q.    Right.  You said, correct me if I'm wrong, this is a

9    common procedure for construction workers?

10    A.    Yes, it is.  It's inevitable, you're going to get laid

11    off.  It may be a week, might be two weeks, might be three

12    months, you just don't know.  It's unpredictable.  It goes by

13    the weather, the climate where you're at, what you're doing.  I

14    mean, it's unpredictable.  You know when you go to work you try

15    to get out there as early as you can, you try to work as long

16    as you can.  If you're lucky, you get out there for a year,

17    that would be good.

18    Q.    Do you look forward to not working?

19    A.    No.

20        MR. MATESIC:  Pardon me one second, your Honor.

21    BY MR. MATESIC:

22    Q.    Mr. Pawk was asking you before and he was showing you --

23    well, this was during his examination of you, when you were

24    going over various diary pages.  And he asked you a question

25    when you were speaking with me the first time, that you had

1 told me and told the jury that you had spoken with Georgia Pawk

2 on July 29, 2002; do you remember answering a question from Mr.

3 Pawk along those lines?

4 A.    Yes, I said it was in my diary, but he didn't show it to

5 me.

6 Q.    Let me show you your diary, maybe that's the way we

7 should start this.

8        MR. PAWK:  Your Honor, I don't believe that's an

9 accurate characterization of the question.

10        THE COURT:  It may or may not be.  But I think it is

11 appropriate to simply remind the jury, it is your recollection

12 that controls and I'm not here to tell you what my recollection

13 of the facts are.  So that goes for opening statements, that

14 goes for witness's testimony, that goes for everything.

15 BY MR. MATESIC:

16 Q.    I'm going to use Defendant's Exhibit R, although this is

17 also a Plaintiff's Exhibit -- Plaintiff's Exhibit 22, Ms.

18 Brown, and I've already shown you one of the pages from Exhibit

19 22; can you identify this as your entry for July 31, 2002?

20 A.    Yes.

21  Q.   Is that the date you first went to the Cost job site

22  looking for work?

23  A.   Yes.

24  Q.   As a laborer?

25  A.   Yes.


127


1  Q.   Now, what are we looking at here?

2  A.   July 29th.

3  Q.   Do you see any entries on this day?

4  A.   No.

5  Q.   In your direct testimony -- now, on July 31, 2002, you

6  went to the Cost job site at SCI Marienville?

7  A.   Yes.

8  Q.   And who did you speak with at that time?

9  A.   Dean.

10  Q.   Mr. Taylor.  And you also testified on direct that you

11  went to the Cost work site on August 23rd?

12  A.   Yes.

13  Q.   2002?

14  A.   Yes.

15   Q.   Who did you speak to then?

16   A.   Dean Taylor and Bill Heaton.

17   Q.   You also testified that you got laid off by the State of

18   Pennsylvania on August 14, 2002, is that correct?

19   A.   Yes.

20   Q.   I'm going to put before you September 27, 2002, from

21   Plaintiff's Exhibit 22, okay, do you see where I'm indicating

22   on here?

23   A.   Yes.

24   Q.   "Cost and phone number, called 5 o'clock, need to call

25   tomorrow?"


128


1   A.   Yes.

2   Q.   Who called whom that day?

3   A.   Pardon.

4   Q.   Who called whom that day, what does that entry mean?

5   A.   It means I got a letter with a phone number on it for

6   Cost and I called it at 5 o'clock.  And the whomever answered

7   the phone said I needed to call tomorrow.

8   Q.   Now, you said again, I think when I was asking you

9   questions earlier you corrected yourself, it wasn't a letter or

10  was it?

11  A.   It was a recruitment form with, at the time I didn't know

12  it was Georgia Pawk, but it was Georgia Pawk's handwriting on

13  it.  At the time I got the letter I didn't know who that was.

14       THE COURT:  Excuse me, members of the jury, we're

15  going to take a brief recess.

16       (Recess from 2:25 p.m.; until 2:40 p.m.)

17       THE COURT:  All right, Mr. Matesic.

18  BY MR. MATESIC:

19  Q.   Ms. Brown, when we left off, I believe it was with your

20  testimony concerning something that you received from Cost?

21  A.   Yes.

22  Q.   In September of 2002.  I show you what's been previously

23  identified as Defendant's A-1.  Is this the document that you

24  were referring to?

25  A.   Yeah, but it just had the written address on top,


129


1  Kathleen call me, the phone number, I need your phone number to

2  hire you.  And we'd love to have you.

3  Q.   All the other handwriting, the handwritten address and

4  the notes running down the right-hand side of the paper, those

5  weren't included on this document when you first got it?

6  A.   Correct.

7  Q.   Now, back to the time line -- so you received that on

8  September 27th, it was before September 27th because your diary

9  shows that you made a telephone call to Cost at that time?

10  A.   Right, the next day.

11  Q.   All right.

12  A.   The very next day.

13  Q.   Let me ask you this.  With regard to Mr. Pawk's earlier

14  question about July 29, 2002, did you in fact talk to Ms. Pawk

15  on that day?

16  A.   No.

17  Q.   Did you know who Ms. Pawk was on that day?

18  A.   No.

19  Q.   Did you know who she was on July 31st?

20  A.   No.

21  Q.   Did you know who she was on August 23rd?

22  A.   No.

23  Q.   Did you know who she was on September 27th when you got

24  that memo or the day on or before September 27th when you got

25  that memo?


130


1  A.   The reason is because her name is there.  But I mean --

2  Q.   Did you know what position she held with Cost Company?

3  A.   No.

4  Q.   Mr. Pawk was asking you about the short stint that you

5  had with KGL between November and December of 2002?

6  A.   Yes.

7  Q.   He asked you the question, you left that job voluntarily;

8  do you remember him asking you that question?

9  A.   Yes.

10  Q.   Do you remember what your answer was?

11  A.   Yes.

12  Q.   You said "yes?"

13  A.   Right.

14  Q.   What did you mean when you said yes voluntarily?

15  A.   Well, they didn't throw me off the job, you know, I got

16  in my car and drove away.  It was because it was unbearable, I

17  couldn't live in those conditions.  I tried to tell my boss, he

18   didn't want to hear it, that was my only option.  It was either

19   do it or quit.  I felt that's what, you know, I had to do was

20   quit.

21   Q.   Mr. Pawk was asking you about the per diem that you

22   earned with KGL?

23   A.   Yes.

24   Q.   And you and he were talking about the fact that you got

25   about $3 an hour over the $15 an hour that you earned at KGL?


131


1   A.   Yes.

2   Q.   And that $3 represented the per diem?

3   A.   Yes.

4   Q.   Okay.  What is your understanding of per diem, the

5   purpose for it?

6   A.   Well, it's to pay for your gas, your food, you're out of

7   town.  Your toothpaste if you run out of it.  Clothing that you

8   might need.  I was 300 miles away from home, if I needed

9   something I had to buy it or purchase it, that's what the per

10   diem was.  Food, I was eating out.  I mean, that is what the

11   per diem is about.

12  Q.   Are you familiar with the term cost of living?

13  A.   Yes.

14  Q.   Okay.  Compare the cost of living of a person who's out

15  town working on a per diem basis versus someone who is working

16  locally, which cost of living is higher?

17  A.   The one out of town.

18  Q.   And that's because?

19  A.   Well, you don't know where the deals are or anything, you

20  might be paying more for a room, you know.  It's got to be

21  convenient, you don't get to shop around for anything.  If you

22  got to pack a lunch, you're going to stop there and pack your

23  lunch.

24  Q.   Is it fair to say that when you're out of town working on

25  that basis, you're spending on things that you wouldn't have to


132


1  spend on if you were home?

2  A.   Yes.  If your car breaks down, you got to fix it or

3  whatever.

4  Q.   Mr. Pawk was asking you about union membership?

5  A.   Yes.

6   Q.   Specifically membership in the laborers' union?

7   A.   Yes.

8   Q.   You weren't a member of the laborers' union in July of

9   2002?

10  A.   No.

11  Q.   What was your understanding regarding union membership as

12  a prerequisite to working for Cost; do you understand what a

13  prerequisite is?

14  A.   No, you better explain it.

15  Q.   Prerequisite, meaning some attribute that is required of

16  the applicant for employment, something that they have to have

17  on their resume or some certification or some credentials that

18  they have to have.  Was union membership a credential that an

19  applicant had to have to get hired with Cost in July of 2002?

20  A.   No.

21  Q.   And how did you know that?

22  A.   Because they were hiring them off the street without the

23  union book, without any kind of union affiliation.  Once they

24  got the job, they would have to join the union, yes.

25  Q.   Mr. Pawk was asking you about other contractors on that

133

1   work site at SCI Marienville, and he wanted to know whether or

2   not you had sought work with those other contractors?

3   A.   Yes.

4   Q.   Okay.  Did you have any reason to know that any of those

5   other contractors had vacancies?

6   A.   I wouldn't know.

7   Q.   I believe you spoke earlier in your testimony about

8   information that was given to you by bricklayers employed by

9   Cost?

10  A.   Yeah, that's how I knew that Cost was hiring, they were

11  bricklayers and they were employed by Cost.

12  Q.   Did any other employees for any other company at that

13  site tell you in July of 2002 that their employer was hiring?

14  A.   No.

15  Q.   Okay.  You understand what mason tending is or what a

16  mason tender's job is?

17  A.   Yes.

18  Q.   How do you know -- well, first of all, explain what it

19  is?

20  A.   They help the mason, whoever is working on the brick or

21  the block, they make sure they get their mortar, they're

22  running a straight line, they're laborers.

23  Q.    Are there different jobs that a laborer could perform

24  besides a mason tender?

25  A.    Yes.

134

1  Q.    What other jobs?

2  A.    They could shoot grade, they do a lot of things.  They

3  build bridges, they work dirt.  They do a lot of things.

4  Q.    What is the source of your understanding about mason

5  tending work, how did you come to know what they do?

6  A.    I just thought they were laborers.  I mean, I thought a

7  laborer was a laborer.  Now, usually they might make a little

8  bit more, you know, because they're doing a different job.

9  Q.    Let me ask the question in a different way, I confused

10  you I think.  If you are a mason tender, you do specific

11  things, correct?

12  A.    Correct.

13  Q.    Okay.  How do you know what those things are -- you

14  today, Kathleen Brown, when did you first learn of what the

15  difference skills were for a mason tender?

16  A.   I've seen them on jobs.

17  Q.   Mr. Pawk asked you about your discussion with Georgia

18  Pawk and whether you ever told her that you believed you had

19  been discriminated against?

20  A.   Yes.

21  Q.   And your answer was that you had not told her that?

22  A.   No, I didn't tell her.

23  Q.   Why didn't you tell her?

24  A.   I wanted to get a job.  I didn't want to tell whoever

25  might be giving me job that I was dissatisfied before I even

135

1  got the job.  I don't think that makes good, you know, you

2  won't get hired.

3  Q.   And when did you tell her this?

4  A.   When did I tell her what?

5  Q.   Excuse me.  The conversation that Mr. Pawk was referring

6  to where you did not or what the conversation was he was

7  describing?

8  A.   No, I never told her because I wanted to get a job.

9  Q.   That was the case for every instance in which you spoke

10   with Ms. Pawk?

11   A.   Yes, I truly thought there for a while that I would be

12   getting a job, I really did.

13   Q.   All right.  And in the year 2002, Mr. Pawk was asking you

14   whether or not, given the bad circumstances you found yourself

15   in, you blamed Cost?

16   A.   Yes.

17   Q.   And you said you didn't blame Cost?

18   A.   Well, I didn't blame them for everything that happened to

19   me.  I mean, there was a lot of things that happened to me that

20   had nothing to do with Cost.  My son had a behavior problem, my

21   older son.  The cops were chasing him, you know, I didn't have

22   the money to help him or provide a home for him.  And Mandy

23   gave me a home.  She said Steve couldn't live with us because

24   of his behavior.  So if I would have had a job with Cost, I

25   probably would have been on my own -- I would have had my own

136

1   place.

2        MR. MATESIC:  That's all the questions I have.

3        THE COURT:  Anything further?

4          MR. PAWK:  Briefly, your Honor.

5          THE COURT:  Very brief.

6                    RECROSS-EXAMINATION

7  BY MR. PAWK:

8  Q.    Ma'am, you were just being asked by Mr. Matesic about

9  your familiarity with Title VII of the Civil Rights Act?

10  A.    Yeah, I remember him asking me.

11  Q.    And he put this document in front of you and I asked you

12  about that document earlier?

13  A.    Yes.

14  Q.    And I think your testimony was just now that you weren't

15  familiar, when you filled out this document or gave this

16  information to the woman in Pittsburgh, you weren't familiar

17  with Title VII of the Civil Rights Act, is that right?

18  A.    I'm not familiar with it at all or any other act.  I

19  don't know anything about it, that's why I went to them.

20  Q.    Ma'am, isn't it true that you, prior to filing this in

21  December of 2002, you filed two prior discrimination complaints

22  with the Equal Employment Opportunity Commission?

23  A.    I went to the EEOC because that's where we are directed

24  to go if we have any questions about employment.

25  Q.   Right.


137


1  A.   We are told all the time, it's posted on the job, that it

2  is our right to go to the EEOC if we had any questions.

3  Q.   Right.  And you filed an EEOC complaint against the

4  operating engineers' union, isn't that right?

5  A.   Yes.

6  Q.   And that was back between 2000 and 2002, sometime in

7  there?

8  A.   Right.

9  Q.   All right.  And from your earlier testimony, that's when

10  your lapse in your operating engineer's certification occurred?

11  A.   Right.

12  Q.   And you alleged in that case that they discriminated

13  against you because you had a positive urine test?

14  A.   Right.  It came out positive for an amphetamine, which I

15  take for the ADHD.

16  Q.   Right.  And then you filed another EEOC complaint against

17  Solar Testing Labs, which was the company you worked for on

18  this project in November and December of 2001, isn't that

19  right?

20  A.   Correct.

21  Q.   And your complaint there was that they discriminated

22  against you because they made you take a test and they made a

23  man take a test, he did better than you and he got the job and

24  you didn't?

25  A.   No.  It was about because I didn't pass the test, I

138

1  thought maybe they could send me back for the test one more

2  time.  Not whether it was male or female.

3  Q.   I thought that you --

4  A.   No --

5       THE COURT:  Excuse me, go ahead.

6       MR. PAWK:  I didn't ask a question.

7       THE WITNESS:  I was finishing.

8       THE COURT:  Let me see if I can tie this knot up

9  here.  I think you were just finishing your answer, but you

10  were talking over each other.  Now finish your answer, then

11  when she does, you go on to your next question.

12       THE WITNESS:  Okay.  The other tech was a male, but

13    it wasn't his gender.  He had a chance to take the test twice.

14    The only place I know to go get any information on employment

15    law or rights would be the EEOC because I don't have any money

16    to go to an attorney.  And I'm not an attorney.

17    BY MR. PAWK:

18    Q.    And, ma'am, I don't want to get into why you filed or why

19    you want to take the test twice or whatever.  The point is you

20    said you weren't familiar with Title VII of the Civil Rights

21    Act, but yet you filed two prior complaints under Title VII of

22    the Civil Rights Act, isn't that fair?

23    A.    Well, whoever filled out the paperwork, helped me to fill

24    the paperwork out, that's what they put it under.  I did not go

25    to them and say file it under this title because I don't know

139

1    one title from the other.

2    Q.    They were discrimination complaints?

3    A.    Yes.

4    Q.    All right.  And that complaint against Solar Testing

5    Labs, that investigation was ongoing during the year 2002,

6    isn't that right?

7          MR. MATESIC:  Objection, your Honor, can we

8   approach.

9          MR. PAWK:  Your Honor, I'll withdraw the question.

10          THE COURT:  All right.

11   BY MR. PAWK:

12   Q.    That complaint against Solar Testing Labs, you actually

13   thought that the proper party that discriminated against you

14   was SCI or the State Correctional Institution, isn't that

15   right?

16   A.    No, when I filled out the paperwork, I asked the people

17   that were helping me fill out the paperwork.  And they said

18   because it was a state project, to go through some other

19   something, some other channel.

20   Q.    Right.

21   A.    Because it was state funded, I don't understand

22   everything about that.

23   Q.    Here's my question.  Do you remember dropping your

24   complaint against SCI in December of 2002, and then going over

25   and filing the one against Cost Company?

140

1          MR. MATESIC:  Objection, your Honor, may we

2   approach.

3          THE COURT:  Yes.

4          (At side bar on the record.)

5          MR. MATESIC:  It is my belief, based on the court's

6   prior ruling, that the door is only opened partially.

7          THE COURT:  That's correct.  You are now trying to

8   get juice out of this lemon that I'm not going to let you get

9   into.  The purpose was to demonstrate that she had previous

10  experience and knowledge of the applicable federal statutes.

11         MR. PAWK:  The only thing I want to show, that's why

12  I asked that question, was it goes to judge her bias, improper

13  motive, this entry on January 8th of 2003, she says she's

14  dropping the case against SCI and going against Cost.

15         THE COURT:  Sustained.

16         (End of discussion at side bar.)

17         MR. PAWK:  Just one second, your Honor.  No further

18  questions, your Honor.

19         THE COURT:  Anything else?

20         MR. MATESIC:  At this time, your Honor, the

21  plaintiff would move for the admission of the following

22  exhibits.  Plaintiff's Exhibit 7, Plaintiff's Exhibit 12 -- do

23  you need me to read the description of the exhibit?

24          THE COURT:  We can catch up on that later.

25          MR. MATESIC:  Plaintiff's Exhibit 16.  Plaintiff's


141


1  Exhibit 18.  Plaintiff's Exhibit 22.  And Plaintiff's Exhibit

2  24.

3          THE COURT:  Any objection to any of those exhibits?

4          MR. LUTZ:  I don't have the book, your Honor.

5  Assuming that these are the ones we had shown to the jury

6  already, we don't have an objection.  I can check the numbers

7  to verify it.

8          MR. MATESIC:  We'll be happy to do that on a break.

9          THE COURT:  We'll do it on a break.  But unless I

10  forget, they're admitted.  But if for some reason upon checking

11  it appears to be something you have a problem with, you can

12  re-raise it with me.

13          MR. PAWK:  Thank you.

14          THE COURT:  You're excused, ma'am, thank you.

15          MR. MATESIC:  Plaintiff calls Ronald Barrett.

16          THE COURT:  Sir, spell your name for my court

17  reporter, please?

18         THE WITNESS:  Ronald Barrett, B-a-r-r-e-t-t.

19         RONALD BARRETT, PLAINTIFF WITNESS, SWORN

20                DIRECT EXAMINATION

21  BY MR. MATESIC:

22  Q.    Good afternoon.

23  A.    Good afternoon.

24  Q.    Mr. Barrett, you are the business manager or business

25  agent for Local 952 of the Laborers' International Union of


                         142


1   North America, is that correct?

2   A.    Not at the moment.

3   Q.    Not at the moment, you're retired.

4         THE COURT:  Keep your voice up just a little bit.

5   BY MR. MATESIC:

6   Q.    When did you retire, sir?

7   A.    March 1st.

8   Q.    Of this year?

9   A.    Of this year.

10  Q.    You were the business agent in the year 2002?

11  A.   Yes.

12  Q.   Tell the jury a little bit about your work as the

13  business agent for the laborers' international; first of all,

14  what is laborers' international, what is its function, what's

15  your function in that organization?

16  A.   You mean my function?

17  Q.   Yes.

18  A.   I'm the business manager, handle grievances, it refers

19  people to work.  That's more or less what the function is.

20  Q.   What about in terms of hiring, the Laborers'

21  International Local 952, how many members do you have or does

22  it have on average in a given year?

23  A.   My local has around 300, 400, it fluctuates.

24  Q.   What geographical area does that cover?

25  A.   Armstrong, Clarion and Forest counties.


143


1  Q.   When a job is a union job, meaning that one of the terms

2  and conditions of the contract is that union members be hired

3  to do that work, how does that tie into your job as a business

4  agent?

5   A.   The contractor would call me for the people if he needs

6   them, I would refer them to the job site.

7   Q.   You yourself are a laborer, is that correct?

8   A.   I was, I still am.

9   Q.   How long did you work as a laborer?

10   A.   From 1964 to 1993.

11   Q.   And in 1993?

12   A.   I became a business agent.

13   Q.   So you're familiar with laborer's work?

14   A.   Yes.

15   Q.   Tell the jury about laborer's work, what are the

16   different kinds of tasks that laborers can be called on to do?

17   A.   It involves asbestos removal, hazardous waste removal,

18   mason tending, rod tying.  Concrete, laying pipe, that kind of

19   function.  Any general labor.

20   Q.   You're specifically familiar with mason tending, is that

21   correct?

22   A.   Yes.

23   Q.   What kind of work is mason tending, what are the skills

24   involved in mason tending?

25   A.   Well, you supply the bricklayer the brick.  You mix the

144

1   mortar, you have to know that part of it.  You build the

2   scaffolding for the bricklayer.  You more or less do the

3   supplying for the bricklayer.

4   Q.   Is there any school that a person would attend in order

5   to learn these skills?

6   A.   Not a scaffold building school.  In general, but not a

7   school for mason tending.

8   Q.   Is it fair to say that these are skills that typically

9   learned on the job?

10  A.   Yes.

11  Q.   And for that reason is it fair to say that if a person

12  wants to be a mason tender, do they have to have -- well, let

13  me ask the question this way.  Would a person have to show

14  prior mason tending experience in order to be qualified to do

15  the job of mason tendering?

16  A.   No.

17  Q.   Are there any prerequisites to become a member of the

18  laborers' international?

19  A.   No.  Well, let me take that back.  You have to be, you

20   can't show you're subversive to the government -- and become a

21   member of the union, that is one of the qualifications.

22   Q.   That's the anticommunist provision?

23   A.   That's part of it.

24   Q.   Other than that, swearing a loyalty oath, there is no

25   other prerequisite to belong to the union?


145


1   A.   No.

2   Q.   You are familiar with the State Correctional Institute at

3   Marienville construction job?

4   A.   Yes.

5   Q.   What was your relationship with regard to that job or

6   your involvement in that job?

7   A.   Whenever the contractor called me for the people, I would

8   refer them to that job.

9   Q.   And the contractor in question was?

10   A.   Well, Cost Construction.

11   Q.   Did they in fact call you for referrals of your members

12   to that job?

13   A.   Yes.

14  Q.   And did that occur in the year 2002?

15  A.   Yes.

16  Q.   Are you familiar with the project labor agreement that

17  was in effect at that job?

18  A.   It's three years now, I'm vaguely familiar with it.

19  Q.   All right.

20  A.   That agreement was a stand-alone agreement.

21  Q.   A stand-alone agreement?

22  A.   Right.

23  Q.   Why don't you tell the jury what you mean by that?

24  A.   It was the project's labor agreement that the Department

25  of General Services of the Commonwealth of Pennsylvania.  It


146


1  was a different type of agreement than our master builders

2  agreement or any one of those type of agreements.  It required

3  different things.

4  Q.   Okay.  In terms of your ability to refer people to that

5  job, did it affect that at all?

6  A.   No.

7  Q.   All right.  In your years of experience as a laborer, you

8  became familiar with this notion of the peaking of the

9  construction season, is that fair to say?

10  A.   Yes.

11  Q.   And that typically happens on an annual basis?

12  A.   Yes.

13  Q.   And that typically happens during the summertime?

14  A.   Yes.

15  Q.   What happens if, as the season is peaking, you run out of

16  members to refer to a contractor?

17  A.   If my local runs out of members, I'll call the other

18  locals, the other labor locals.

19  Q.   Has that ever happened?

20  A.   Yes.

21  Q.   Would you say that that typically happens every year at

22  peak construction season?

23  A.   No, not typically.

24  Q.   Did it happen in the year 2002?

25  A.   Yes.


147


1  Q.   Do you remember when that was about?

2  A.    It was sporadic during 2002.  If Cost would call for a

3  mason tender, if I don't have one, I give them an opportunity

4  to hire whoever they wanted, it was more or less sporadic.  Mid

5  summer is probably when I was completely out of mason tenders.

6  Q.    The Local 952 keeps records of its members, correct?

7  A.    Yes.

8  Q.    And Local 952 has in its possession records which would

9  indicate when a particular individual joined the union,

10  correct?

11  A.    When he signed an authorization slip, that's necessary

12  when you join.

13  Q.    When they sign, say that again?

14  A.    An authorization slip.

15        THE COURT:  Sir, pull in just a little bit to the

16  microphone.  Go ahead.

17  BY MR. MATESIC:

18  Q.    Let me approach it this way.  Suppose that, you said that

19  in July of 2002, it's not a supposition, you know that in July

20  of 2002 you didn't have any people, any members of Local 952 to

21  refer to Cost?

22  A.    Any mason tenders?

23  Q.    Correct.

24  A.   Right.

25  Q.   And you called around to the other locals and you

148

1  couldn't round up anybody through that process, either?

2  A.   No.

3  Q.   Okay.  So what does Cost do in that event, they need

4  somebody to do mason tending work, mason tending is a type of

5  laborer's work, you can't give them a laborer, none of the

6  other locals can send a laborer, what does a contractor in

7  Cost's position do?

8  A.   According to that agreement, they can hire whomever they

9  want.

10  Q.   They can hire anybody off the street?

11  A.   Yes.

12  Q.   They can hire anybody regardless of whether they have

13  union credentials?

14  A.   Yes.

15  Q.   Okay.  And did that in fact happen in 2002?

16  A.   Yes.

17  Q.   And is it the case that your union has records of

file:///A|/COSTDAY2.TXT

18  individuals who were hired in 2002, who were not at the time of

19  their hire, members of the laborers' international?

20  A.   Yes.

21  Q.   I'd like to show you what's been previously labeled as

22  Plaintiff's Exhibit 8, and let me preface this line of

23  questioning this way.  You previously gave testimony in this

24  case, correct?

25  A.   I gave a deposition.

149

1  Q.   Correct.  And at that time you brought records and

2  abstracts of records with you to your deposition?

3  A.   That you subpoenaed.

4  Q.   Do you see the screen in front of you?

5  A.   Yes, it's a little out of focus.

6  Q.   Okay.  Why don't I do this.

7  A.   That's better.

8  Q.   What are we looking at here?

9  A.   Some of my members -- transferred to another local.

10  Q.   This is a document that you brought with you to your

11  deposition?

12  A.  Yes.

13  Q.  I'm going to actually page through to the third page

14  here.  And as I'm doing this, I believe -- I think there's 12

15  people on this document over three pages.  The people on these

16  pages were people who were not members of the Laborers'

17  International when Cost hired them as mason tenders, isn't that

18  correct?

19  A.  Correct.

20  Q.  I'd like you to explain to the jury what some of this

21  information means.  And let's start with John Bell at the very

22  top.  Underneath his address, date of birth, and you see below

23  that a Social Security number?

24  A.  Right.

25  Q.  And "Init. November 29, 2002"; what does that mean?


                              150


1  A.  That was the date his initiation fee got paid.

2  Q.  And what's the initiation fee?

3  A.  It's $450.

4  Q.  Why does somebody have to pay that, why did Mr. Bell have

5  to pay that?

6   A.   Pardon me.

7   Q.   Why did Mr. Bell have to pay an initiation fee, what's

8   the purpose of that?

9   A.   To become a member of the local.

10   Q.   Typically, when people become a member of the local, do

11   they have that $450 with them?

12   A.   Typically not.

13   Q.   Typically, how would someone like Mr. Bell pay off that

14   $450 obligation?

15   A.   There's an authorization slip that is presented to him.

16   Which authorizes the contractor to withhold $30 of working pay.

17   Q.   Do you know for a fact that Mr. Bell signed that

18   authorization slip?

19   A.   Yes.

20   Q.   Okay.  Below that, actually, I want to skip down two

21   lines.  Do you see the word start?

22   A.   Uh-huh.

23   Q.   What are we looking at there -- actually, let me withdraw

24   that question for one second.  You were talking about

25   authorization slips.  Let me put before you what's been

1  previously marked as Plaintiff's Exhibit No. 9, do you see

2  this?

3  A.   Yes.

4  Q.   Can you tell the jury what this is?

5  A.   This is the form that the employee signs to become a

6  member.  That authorizes the contractor to withhold the working

7  pay for the $450.

8  Q.   Would Mr. Bell have signed a document like this?

9  A.   Yes.

10  Q.   The $450 that you see on there, that is the initiation

11  fee you were referring to before?

12  A.   Yes.

13  Q.   Now, back to the prior exhibit with Mr. Bell's name on

14  it.  The Init. date we already talked about.  I want you to

15  tell the jury again the significance of this date, August 1,

16  2002, what does that signify?

17  A.   That would be when we got his authorization slip.

18  Q.   You got his authorization slip how, did he provide it to

19  you?

20  A.   It was provided to him and then it was brought down to

21  me.

22  Q.   Is there anyway to tell by looking at this date when Mr.

23  Bell began working for Cost?

24  A.   No, really it's just when he got his slip.

25  Q.   Typically speaking, how long after someone started

152

1  working for Cost would you receive their authorization slip?

2  A.   Well -- that would be tough to say.  It could be a week,

3  it could be a couple days, it could be the same day.  It's

4  never, my steward up there would give me the slip.  My steward

5  might not give it to me within a week.

6  Q.   Well, the typical case, you cited three different

7  instances there.  But in a typical case in August of 2002,

8  isn't it the case that --

9       MR. PAWK:  Objection, leading, your Honor.

10      THE COURT:  Well, sounds like it was, rephrase it.

11  BY MR. MATESIC:

12  Q.   Let's talk about -- do you see the name, the information

13  I highlighted on here, Mr. Barrett?

14  A.   Timothy Kimmel?

15  Q.   Right, what's his starting date?

16  A.   Pardon me.

17  Q.   The start date?

18  A.   July 22, 2002?

19  Q.   Do you remember me asking you about Mr. Kimmel during

20  your deposition?

21  A.   Yes.

22  Q.   Okay.  I'm going to place before you the deposition

23  transcript, I'd like you to review your questions or, excuse

24  me, my questions and your answers to those questions, if I

25  could please.  Can you see this?


153


1  A.   Yes.

2       MR. PAWK:  Your Honor, I'm going to object, this is

3  improper questioning of this witness.

4       THE COURT:  Let me see you at side bar.

5       (At side bar on the record.)

6       THE COURT:  Are you using this to refresh his

7  recollection?

8       MR. MATESIC:  I'm trying to impeach him with this,

9  he's changing his testimony during deposition.  The question is

10  "And I need to know to the best that you can help me here when

11  that happened during that three-month period?"  Answer:

12  "During June, July and August you're saying?"  Question:  "Yes.

13  Well, the end of June, all of July, all of August and most of

14  September."  Answer:  "July 22nd, July 29th, July 23rd, July

15  30th.  Those dates."  Question:  "Just help me understand this.

16  When you say July 22nd, you're looking at the Timothy Kimmel

17  entry, is that right?"  Answer:  "Right.  Well, yes."

18  Question:  "Because Timothy Kimmel started on July 22nd, 2002,

19  and he was not a union member prior to that time, and he

20  started as a mason tender on July 22nd, 2002, that allows you

21  to infer that on July 22nd, you didn't have any mason tenders

22  who were available for work?"  Answer:  "Well, it was actually

23  on July 21st."  Question:  "Why do you say July 21st?"  Answer:

24  "That's probably when the contractor called me to send people

25  up there for the next day."


154


1        THE COURT:  What was his original response?

2        MR. MATESIC:  If I can take a moment, I'll find it

3    in his deposition.  What he said was that typically speaking

4    the start date indicated the day the person started, not the

5    week after, not two weeks after.

6         THE COURT:  In other words, the start date on the

7    slip, it indicates the day before the person started to work?

8         MR. MATESIC:  The start date is the day after.

9         THE COURT:  Why don't you just ask him that and see

10   what he says?

11        MR. MATESIC:  I asked him about John Bell, he said

12   that he couldn't tell.  I asked him the question, we're talking

13   about John Bell.

14        THE COURT:  I apologize it's 3:30, my mind is

15   slowing down.  The start date --

16        MR. MATESIC:  Is on that document, it indicates the

17   day that the worker signed the authorization slip, and Mr.

18   Barrett's prior testimony was that date on that authorization

19   slip falls one day after they commence the work, because after

20   they commence work under the contract, Cost will be notified

21   there's a nonunion guy doing that job and the steward runs

22   right out and he gives him the authorization slip.  So the time

23   period is very short.  The start date of August 1st appears on

24   his document.

25          THE COURT:  These are nonunion guys, right, we're

155

1  talking about?

2          MR. MATESIC:  Right.

3          THE COURT:  What do you want to say?

4          MR. PAWK:  I was at the deposition, he said a number

5  of things.  He said it wasn't necessarily the day before the

6  initiation date.  He said that the initiation date is only the

7  date that the steward was on the job, got the guy to sign up.

8  And it doesn't mean that he started working that day.

9          THE COURT:  That may all be true.  We're not at his

10  deposition, we're here.  Just by way of moving this along,

11  before we get into impeachment and turn this guy into a hostile

12  witness, I haven't seen any evidence yet, it seems to me, not

13  by way of trying your case, but you ought to ask a general

14  question as a general proposition as far as the time line, what

15  does it mean.

16          MR. MATESIC:  I think I did ask.

17          MR. LUTZ:  With respect to Mr. Bell, that's only

18  one.

19        THE COURT:  Let's go back see what happens, then

20  we'll revisit this issue.  You are entitled to use the document

21  to refresh somebody's recollection.

22        (End of discussion at side bar.)

23  BY MR. MATESIC:

24  Q.    Mr. Barrett, we were talking about Timothy Kimmel.

25  Do you remember me questioning you about Mr. Kimmel during your

156

1  deposition last year?

2  A.    Yes.

3  Q.    I am going to turn back to John Bell, the August 1st

4  start date.  Do you see where I am?

5  A.    Yes.

6  Q.    Okay.  Do you remember me asking you about Mr. Bell

7  during the deposition?

8  A.    Yes.

9  Q.    Do you remember me asking you the specific question of

10  what I could infer, given a start date of August 1, 2002, what

11  that implies with regard to the hiring date of that person?

12  A.    Yes.

13   Q.   Do you remember what your answer was?

14   A.   That's the day he started.

15   Q.   That's the date that he was hired by Cost?

16   A.   Uh-huh.

17   Q.   Okay.  Let me show you your deposition transcript -- can

18   you see line number nine?

19   A.   Yes.

20   Q.   Is that large enough for you?

21   A.   That's good.

22   Q.   "The next page, John Bell, August 1st, 2002, we can infer

23   from that that as of July 31st, 2002, you had no mason tenders

24   who were available for referral to the Forest County

25   Marienville site?"  And what was your answer?


                                157


1   A.   "Yes."

2   Q.   Okay.  So let me ask you again today.  Why could you

3   infer that on July 31st you didn't have a mason tender based on

4   John Bell having a start date of August the 1st?

5   A.   See from my records, the office records, whenever I get

6   that authorization slip, I surmise that's the date he started.

7   Q.   Okay.  He started on August 1st?

8   A.   That's when I got the slip.

9   Q.   But your testimony was you had a vacancy on this day?

10  A.   I had no mason tenders.

11  Q.   You knew you had the vacancy on that date because John

12  Bell started on August 1st?

13  A.   I knew I had no mason tenders whether he started on

14  August 1st or not.

15  Q.   How did you know?

16  A.   I had a list of people, that I didn't have any mason

17  tenders on that list.

18  Q.   Okay.  The start date, does that refer to the date that

19  he began employment or the day that he signed up with the

20  union?

21  A.   From my records -- when I get the authorization slip,

22  that's the date he started.

23         MR. MATESIC:  May I have one moment, your Honor.

24         THE COURT:  Yes.  While he's doing that, you folks

25  can stand up.

158

1    BY MR. MATESIC:

2    Q.   Let's go back to Mr. Kimmel, Mr. Barrett.  I need to

3    clear this up.  Timothy Kimmel has a start date of July 22,

4    2002, correct -- let's look at your testimony concerning Mr.

5    Kimmel, and I'll start on page 42, Question:  "And I need to

6    the best that you can help me here" -- strike that question,

7    it's the one before.  "Then let's narrow the scope of the

8    question.  During the summer of 2002, June 21st to September

9    21st, 2002, did you run out of available mason tenders to send

10   to that job?"  And your answer was --

11         MR. PAWK:  Your Honor, I'm going to object, I don't

12   think this is proper questioning.  This witness, first off,

13   hasn't said he doesn't remember anything about this.  I think

14   his testimony is clear.  I thought that at side bar we were

15   going to ask a general question about this.

16         THE COURT:  With the previous question, I think

17   there was some indication that you were refreshing his

18   recollection.  I think the appropriate way to do it is to ask

19   him the question first, and then if there is some lack of

20   recollection, you can utilize the transcript.

21   BY MR. MATESIC:

22  Q.   What day did Timothy Kimmel begin working for Cost,

23  according to your records?

24  A.   July 22, 2002.

25  Q.   Okay.  Let me show you the testimony again.  I'm going to

159

1  have to start back up here on page 42.  Question:  "Then let's

2  narrow scope of the question.  During the summer of 2002, June

3  21st to September 21st, 2002, did you run out of available

4  mason tenders to send to that job?"  Your answer?

5  A.   "Yes."

6  Q.   Question:  "And I need to know to the best that you can

7  help me here when that happened during that three-month time

8  period?"  Your answer, please?

9  A.   Do you mean you want me to read this answer?

10  Q.   Please.

11  A.   "During June, July and August you're saying?  Yes.  Well,

12  the end of June, all of July, all of August and most of

13  September."

14  Q.   Let me stop you there, Mr. Barrett, that's actually my

15  question to you.  You just read the answer, I'll read the

16   question, okay?

17   A.   Okay.

18   Q.   So your answer was "during June, July and August you're

19   saying," do you see that?

20   A.   Uh-huh.

21   Q.   "Yes.  Well, the end of June, all of July, all of August

22   and most of September?"  Answer?

23   A.   "July 22nd, July 29th, July 23rd, July 30th."

24   Q.   Okay, let me stop you right there.  I take it back, I'm

25   going to continue.  "Just help me understand this.  When you


                              160


1   say July 22nd, you're looking at the Timothy Kimmel entry, is

2   that right?"

3   A.   "Right.  Well, yes."

4   Q.   "Because Timothy Kimmel started on July 22nd, 2002, and

5   he was not a union member prior to that time, and he started as

6   a mason tender on July 22nd, 2002, that allows you to infer

7   that on July 22nd, you didn't have any mason tenders who were

8   available for work?"  What's your answer?

9   A.   "Well, it was actually on July 21st."

10   Q.    My question "why do you say July 21st?"

11   A.    "That's probably when the contractor called me to send

12   people up there for the next day."

13   Q.    Your testimony was that Kimmel had the start date of July

14   22nd, he was hired the day before, correct?

15   A.    No.

16   Q.    You were notified of the vacancy?

17   A.    I was notified the day before.

18   Q.    Let's go back to Bell.  He started on August 1, 2002?

19   A.    That's when I got his authorization slip.

20   Q.    Which means he was hired on July 31st, excuse me -- there

21   was a vacancy on July 31st?

22   A.    The contractor called me for people the day before.  When

23   I say the day before, they could have called me on a Friday to

24   have people on Monday.

25   Q.    Okay.  Theodore Gregory, do you see where I'm reading


161


1   here?

2   A.    Uh-huh.

3   Q.    Do you see the start date of August 15, 2002?

4   A.   Yes.

5   Q.   Is that the date he joined the union or he signed an

6   authorization slip?

7   A.   That is the day we got his authorization slip.

8   Q.   And that would indicate that Cost had a vacancy when?

9   A.   The 14th of August.

10  Q.   Okay, assuming that the 15th was not a Monday?

11  A.   Yes.

12  Q.   Because if it was a Monday, they probably had a vacancy

13  the previous Friday?

14  A.   I don't know.  They probably called me the day before to

15  send these people the following day.

16  Q.   Brandy Smith -- by the way, Brandy Smith, that's a man?

17  A.   Yes.

18  Q.   Okay.  August 19, 2002 -- that's the start date, do you

19  see that?

20  A.   Yes.

21  Q.   And that indicates that Cost had a vacancy before August

22  19, 2002, correct?

23  A.   Right.

24  Q.   Unless August 19th was a Monday, that indicates that Cost

25  had a vacancy on August 18, 2002?

162

1   A.    Yes.

2   Q.    Cost had vacancies, your records indicate, on these three

3   days in 2002?

4        MR. PAWK:  Your Honor, I'm going to object, that is

5   a mischaracterization of his testimony.

6        THE COURT:  That's up to the jury to determine,

7   overruled.

8   BY MR. MATESIC:

9   Q.    On or before these days, Cost had vacancies on or before

10   these three dates, correct?

11   A.    Yes.

12   Q.    Do you recall when that job in the year 2002 started

13   winding down?

14   A.    The fall of that year.

15   Q.    Did Cost complete that job that fall or did it continue

16   until into the following spring?

17   A.    It continued to the following spring.

18   Q.    And were there still mason tenders working for Cost the

19   following spring?

20  A.   Yes.

21        MR. MATESIC:  One moment, your Honor, I think I'm

22  done.  Nothing further.

23              CROSS-EXAMINATION

24  BY MR. PAWK:

25  Q.   Good afternoon, Mr. Barrett.

                            163

1  A.   Good afternoon.

2  Q.   Just a few questions for you.  While you were the

3  business agent in 2002 while this Marienville prison project

4  was ongoing, did you become familiar with what contractors were

5  working there?

6  A.   Yes.

7  Q.   And was W.G. Tomko working there?

8  A.   Yes.

9  Q.   And was Ionadi working there?

10  A.   Yes.

11  Q.   Did they use laborers?

12  A.   Yes.

13  Q.   Did you supply them laborers?

14  A.  Yes.

15  Q.  Do you know whether W.G. Tomko hired laborers off the

16  street as we would call it?

17  A.  They probably did.  I can't say to a fact, but they

18  probably did.

19  Q.  Why do you think they probably did?

20  A.  They had the bulk of that work up there.  Tomko had quite

21  a bit of it.  We ran out of people somewhere in mid summer, and

22  I'm guessing that Tomko probably did hire off the street.  They

23  would let you know if they did, sometimes contractors don't do

24  that.  If I didn't have the people.

25  Q.  I'm sorry, I didn't hear that?


164


1  A.  I didn't have the people so --

2  Q.  You ran out of people to supply to Tomko as well?

3  A.  Yes.

4  Q.  And you said they had the bulk of the work?

5  A.  Let me preface that.

6  Q.  Sure.

7  A.  I still had people, but people weren't willing to go to

8    Forest County to work.  I would call them to work, they would

9    turn me down.

10   Q.    Okay.  Sir, if I understood your testimony here today,

11   you were being asked by Mr. Matesic about trying to calculate

12   when someone started for Cost Company; do you remember that?

13   A.    Uh-huh, yes.

14   Q.    You're not an employee of Cost Company?

15   A.    No.

16   Q.    You never had been an employee of Cost Company?

17   A.    No.

18   Q.    Wouldn't Cost Company, their own records be the best

19   source of information as to when someone started for their

20   company?

21   A.    I would think so.

22   Q.    In fact, your records are really just when people joined

23   the union, the laborers' union, isn't that right?

24   A.    Those authorization slips are for me to keep records, to

25   keep track of where the people are, as soon as I get that


165


1    authorization slip, I'm assuming that is the day they started.

2   Q.   You're assuming that?

3   A.   Yes.

4   Q.   But you don't know for sure, do you?

5   A.   No.

6   Q.   Because you're not on the job, that's when you said your

7   authorization slips are when the steward, the labor steward

8   went over and signed the person up, isn't that right?

9   A.   Right.

10   Q.   They could have started two or three days before that and

11   the steward didn't get to them?

12   A.   It's a possibility.

13   Q.   It was a very large project, wasn't it?

14   A.   Very large.

15   Q.   In fact, did you ever go to the project?

16   A.   Oh, yes.

17   Q.   Let me show you what I have marked as Defendant's Exhibit

18   CC, this is an aerial view -- let me rephrase that.  Do you

19   recognize what's in that photo?

20   A.   Ask me that again.

21   Q.   Do you recognize what's in that picture?

22   A.   That's the Marienville prison.

23  Q.   All I'm asking you does that look like it, the picture?

24  A.   Yes.

25        THE COURT:  He probably never saw it from up there.


166


1         THE WITNESS:  Not from up there.

2  BY MR. PAWK:

3  Q.   Do you see down here, does this appear to be job

4  trailers?

5  A.   Yes.

6  Q.   Do you remember how many acre site that was?

7  A.   No.

8  Q.   But, in any event, your steward would go to find a new

9  hire and sign them up, and sign those authorization forms,

10  right?

11  A.   Right.

12  Q.   Let me show you what I'll mark as Defense Exhibit DD --

13        MR. PAWK:  May I approach, judge.

14        THE COURT:  Sure.

15  BY MR. PAWK:

16  Q.   You were asked about John Bell, who you said his

17  initiation showed 8/1/2002, do you remember that?

18  A.   I remember being asked about John Bell, can I see when it

19  was.

20  Q.   Let me show you -- is this a copy of Mr. Bell's

21  authorization slip?

22  A.   Yes.

23  Q.   Let me just put it on the screen, maybe that's easier for

24  you to see.  See down below, do you see John Vernon Bell?

25  A.   Yes.


                              167


1  Q.   All right.  Do you see up above, normally that date is

2  filled in, isn't it?

3  A.   Yes.

4  Q.   So, at least with respect to Mr. Bell, you don't know for

5  sure what day your steward signed him up, isn't that right?

6  A.   Right.

7  Q.   And you were shown these three names, can you see that,

8  sir?

9  A.   Yes.

10  Q.   So when you say start date of 8/1/02, you really don't

11  know when he started based on that authorization form I just

12  showed you?

13  A.   From my record, when I get that authorization slip, I'm

14  assuming that's his start date.

15  Q.   But there's no date on that authorization slip?

16  A.   When I get the slip itself?

17  Q.   When you get it?

18  A.   Yes.

19  Q.   And then you keep some notes or something in the office?

20  A.   Well, I have to keep track of them, I'm assuming that he

21  started August 1, 2002, because that's when I got the slip.

22  Q.   Let me just ask you this way.  Are you familiar with what

23  are called certified payroll records?

24  A.   I'm not that familiar with them, but I know what you're

25  talking about.

168

1  Q.   What are they, what's your understanding of what they

2  are?

3  A.   They're contractor's payroll records.

4  Q.   Right.  Do you understand that the contractor is

5    certifying to the government on a government job that we have

6    these particular people working on these particular dates and

7    we're paying them this rate; is that your understanding of what

8    a certified payroll record is?

9    A.   Yes.

10   Q.   Would the certified payroll records of Cost Company, with

11   respect to when people started on the job, be the best records

12   of when someone started on this job?

13        MR. MATESIC:  Objection, your Honor.

14        THE COURT:  Sustained.  Is it a foundational

15   objection?

16        MR. MATESIC:  Yes.

17        THE COURT:  Rephrase the question.

18        MR. PAWK:  Sure.

19   BY MR. PAWK:

20   Q.   You just explained your understanding of what a certified

21   payroll record is, do you recall that?

22   A.   Yes.

23   Q.   How do you know what a certified payroll record is?

24   A.   I don't really know what a certified payroll record is,

25   I don't keep payroll records at all.

1  Q.    Right, but you worked as a laborer on projects from 1964

2  to, I think you said 1983?

3  A.    '93.

4  Q.    '93?

5  A.    Uh-huh.

6  Q.    You were a business agent after that, right?

7  A.    Yes.

8  Q.    And you generally understand that contractors on

9  government jobs have to submit certified payroll records?

10  A.    For the prevailing wage, yes.

11  Q.    You understand that?

12  A.    Yes.

13  Q.    And they're swearing and verifying to the government that

14  those records are accurate as to those employees who work for

15  them and what dates, is that your understanding?

16  A.    Yes.

17  Q.    Would that be the best record of --

18        MR. MATESIC:  Objection, calls for speculation.

19        THE COURT:  Overruled.

20  BY MR. PAWK:

21  Q.   Would that be the best record of when someone started on

22  a project such as this in Marienville?

23  A.   I would think it would be if you have to answer to the

24  government.

25       MR. MATESIC:  Your Honor, I would move to strike

170

1  that.

2       THE COURT:  Is the basis for your opinion that the

3  best evidence is that people would not be inclined to lie to

4  the government, is that what you mean?

5       THE WITNESS:  Yes.

6       THE COURT:  I'm going to sustain the objection.  I'm

7  going to direct that the witness's response be stricken, you

8  are to disregard it.

9  BY MR. PAWK:

10  Q.   With respect to these three individuals and all the other

11  individuals that you listed on your initiation sheet, this

12  document that you submitted at your deposition, do you remember

13  that?

14  A.   Yes.

15  Q.    All right.  With respect to those individuals, so I

16  understand it, the start date you put here is that the date

17  that your steward gives you as to when, that your steward

18  signed them up and signed the authorization forms, is that

19  right?

20  A.    Yes.

21  Q.    You don't know with any certainty, do you, that that's

22  the actual date someone started working for Cost?

23  A.    I wasn't there, so I wouldn't know with certainty.

24  Q.    And so, therefore, if Cost would have called you on a

25  particular date and said, hey, we need a mason tender, say


                                171


1  seven in the morning or eight in the morning, I'm not sure what

2  time you start, and you didn't have anybody, would they free to

3  hire someone right there that day?

4  A.    Yes.

5  Q.    So they could have done that, too, right?

6  A.    Yes.

7  Q.    So you were saying earlier -- well, if this date is 8/1,

8  then they probably called on July 31st, that's not necessarily

9  true, is it?

10  A.    No.  Normally that's what happens, but that's not

11  necessarily true.

12  Q.    They could have called you said I need five people today,

13  you said I don't have anybody, and they said we got a line

14  outside the trailer, we're just going to hire, they could have

15  done that all in one day, right?

16  A.    Yes.

17  Q.    And based on your familiarity with the construction

18  industry, is it your understanding that labor needs,

19  particularly on a project of this nature, would change on a

20  daily basis rather than a weekly basis?

21        MR. MATESIC:  Objection, leading.

22        THE COURT:  Overruled.

23        THE WITNESS:  Yes.

24  BY MR. PAWK:

25  Q.    So Cost's labor needs, one day they could have needed 10


172


1  people to do a particular project, finished it that day, and

2  might not have needed those people the next day?

3   A.   Possibly.

4   Q.   For instance, they might not have needed anybody on July

5   31st, but they could have needed someone on August 1st?

6   A.   Yes.

7   Q.   Is that right?

8   A.   Yes.

9   Q.   Sir, you have no -- strike that.  You never met Kathleen

10  Brown, is that right?

11  A.   No.

12  Q.   You have no specific knowledge yourself whether Cost

13  needed any mason tenders on July 1, July 31, 2002, do you, as

14  you sit here today -- do you understand my question -- let me

15  ask it again.  As you sit here today, you have no knowledge as

16  to whether Cost actually needed a mason tender on July 31,

17  2002?

18  A.   No, I wouldn't.

19  Q.   And you have no knowledge as to whether they needed any

20  mason tenders on August 23, 2002, either, right?

21  A.   Right.

22  Q.   In fact, in your exhibit here, I think it's your -- if I

23  understand your testimony correctly, the last person that Cost

24   would have hired off the street, then joined the union, was

25   this Brandy Smith, is that right?


173


1   A.   Right.

2   Q.   I understand from your testimony that they didn't hire

3   any mason tenders off the street after August 19, 2002?

4   A.   If they did, they didn't inform me.  Cost has always

5   informed me about who they hired.  Brandy Smith would have been

6   the last.

7   Q.   Your steward on the job would --

8   A.   Would have known.

9   Q.   Would have tracked that person down, isn't that right?

10   A.   Right.

11   Q.   Brandy Smith would have been the last person, isn't that

12   right?

13   A.   Right.

14   Q.   Are you familiar with the layoff procedure on the

15   project?

16   A.   Yes.

17   Q.   A person could get hired one day and be laid off the

18  next, isn't that right?

19  A.   Yes.

20       MR. PAWK:  Just one second, your Honor.

21  BY MR. PAWK:

22  Q.   Sir, what is your understanding as to how long a person

23  has to work as a union mason tender to be eligible for pension

24  benefits?

25  A.   You mean specifically as a union mason tender?

174

1  Q.   Yes, a mason tender?

2  A.   If a person starts at the age of 52, after one year,

3  they'd be eligible for a pension, not much of a pension, but

4  you could be paid in one check probably.  But vested pension

5  wise, would have to be your age plus the time you're in the

6  union, would have to equal 62.  You'd be vested for a pension.

7  Q.   What if the person was younger than that?

8  A.   Younger than 52?

9  Q.   Yes.

10  A.   Then they'd have to be the time that you're in the union

11  and your age equaling 62.

12  Q.    Okay.  So if the person was approximately 39 or 40, they

13  would have to be in the union for quite a while before they

14  would be eligible?

15  A.    Twenty-two years.

16  Q.    What about health benefits, how long would a person have

17  to work as a mason tender, a union mason tender to be eligible

18  for health benefits?

19  A.    Let me see if I can explain this.  The way our health

20  benefits are set up, if you work 425 hours, from February 1st

21  to July 31st, you're eligible for hospitalization from

22  September through March.  Then if you work another 425 hours

23  from September 1st to January, I'm sorry, from August 1st to

24  January 31st, then you're eligible from March to September.

25  You have to work the 425 in that six-month period to be


175


1  eligible for the following six months.

2  Q.    Okay.  Are there any other benefits that I've forgotten

3  that a mason tender would be eligible for as a member of the

4  union?

5  A.    The pension, hospitalization.

6          MR. PAWK:  That's it, okay.  I have no further

7  questions at this time.

8          THE COURT:  Anything further of Mr. Barrett?

9          MR. MATESIC:  Just one, I believe.

10              REDIRECT EXAMINATION

11  BY MR. MATESIC:

12  Q.    Mr. Barrett, I'm placing before you what has previously

13  been labeled as Plaintiff's Exhibit 11, can you identify this?

14  A.    It's the labor agreement for the prison in Marienville.

15  Q.    Mr. Pawk was asking you whether it was Cost's practice to

16  tell you that they had hired someone who wasn't a member of the

17  union.  Isn't the case that Cost had a duty under the

18  contract --

19  A.    Under this agreement?

20  Q.    Yes, they had to inform you that they hired somebody

21  who's not in this union?

22  A.    Yes.

23  Q.    And the reason for that was what?

24  A.    To give that person an opportunity to join.

25  Q.    And Cost did that in every instance, as far as you know?

176

1   A.   As far as I know.

2        MR. MATESIC:  That's all.

3        THE COURT:  Anything else?

4        MR. PAWK:  Nothing, your Honor.

5        THE COURT:  Thank you, Mr. Barrett, you're excused.

6   Before I forget, I have an unrelated legal matter I have to

7   address at 9:00 a.m. tomorrow.  It may take me as long as an

8   hour, no longer.  So we're going to have you come in, we're

9   going to start promptly at 10, and I may run a little later to

10   make up for lost time.

11        MR. MATESIC:  Your Honor, one more matter, if I may.

12   With regard to the exhibits, plaintiff would move at this time

13   to admit Plaintiff's Exhibit 8 and Plaintiff's Exhibit 9.

14        THE COURT:  Any objection to Exhibits 8 and 9?

15        MR. PAWK:  No objection.

16        THE COURT:  They're admitted.  Call your next

17   witness.

18        MR. MATESIC:  Plaintiff calls Dean Taylor.

19        DEAN TAYLOR, PLAINTIFF WITNESS, SWORN

20           (Called as on CROSS-EXAMINATION)

21   BY MR. MATESIC:

22   Q.   Good afternoon.

23   A.   Good afternoon.

24   Q.   Would you state your name for the record?

25   A.   Dean Taylor.


177


1   Q.   Mr. Taylor, you are employed by Cost Company?

2   A.   Yes.

3   Q.   You are a bricklayer by trade?

4   A.   Yes.

5   Q.   You've been working with Cost since 1987?

6   A.   That's correct.

7   Q.   And currently you hold the position of foreman with Cost?

8   A.   That's correct.

9   Q.   And in the year 2002, you were a foreman for Cost?

10   A.   Correct.

11   Q.   And in your capacity as a foreman, you ran the job at the

12   SCI Marienville site?

13   A.   Correct.

14   Q.   In terms of running the job, there were several tasks

15   that you had to perform to make that job go; one of them was

16  hiring personnel, correct?

17  A.    That was a small part of it.

18  Q.    But you did hire personnel for that job?

19  A.    Yes.

20  Q.    And, in fact, you arrived on that job site in April of

21  2002, correct?

22  A.    I'm sorry.

23  Q.    In April of 2002 is when you first arrived on the job as

24  foreman?

25  A.    I think it might have been before that, but I'm not sure

178

1  of the date.

2  Q.    Once you got there, though you were in control, you were

3  in charge of hiring the people to do specifically the work of

4  mason tender?

5  A.    Yes.

6  Q.    Now, you were in the courtroom as Mr. Barrett testified

7  and you heard his answers to my questions concerning Cost's

8  obligation under the contract to notify the union in the event

9  that it hired someone who was not a union member?

10  A.    That's right.

11  Q.    Okay.  And Mr. Barrett said that Cost was so obligated?

12  A.    Right.

13  Q.    And you would agree with that?

14  A.    Correct.

15  Q.    You heard Mr. Barrett's testimony that during the summer

16  of 2002, his local had exhausted its supply of members for

17  referral to the Cost work site?

18  A.    Correct.  His local?

19  Q.    Yes.  At that point Cost was free to hire any individuals

20  who were not members of the union?

21  A.    As long as he couldn't get members from the other locals,

22  yeah.

23  Q.    And that happened in 2002?

24  A.    Yeah, we pulled out of a different couple locals that

25  year.


179


1  Q.    You say you pulled out of different locals?

2  A.    We pulled from different locals that year.

3  Q.    I understand.  But you had occasion in 2002 to hire

4    people to work as mason tenders who were not at the time a

5    member of the laborers' international union?

6    A.    That's right.

7    Q.    With specific regard to John Bell, that Mr. Barrett was

8    testifying to -- who had a start date of August 1, 2002, he was

9    not a member of the laborers' international when he was hired

10   by Cost?

11   A.    No.

12   Q.    He was not a member, correct?

13   A.    No, he was not a member.

14        MR. MATESIC:  One moment, your Honor.

15   BY MR. MATESIC:

16   Q.    Let's talk about the SCI job.  You would agree with Mr.

17   Pawk's characterization that it was a very large job?

18   A.    Yes.

19        THE COURT:  Speak into the microphone.

20   BY MR. MATESIC:

21   Q.    That job at Marienville that was a very large project?

22   A.    Well, as you saw on the picture, about 180 acres.

23   Q.    Based on your experience, Mr. Taylor, working since 1987

24   for Cost Company, that was one of the biggest projects that you

25  ever worked on, correct?


180


1  A.   It was one of the biggest.

2  Q.   And do you have -- at the time that that construction

3  season peaked in 2002, Cost was employing somewhere between 150

4  and 200 employees at that job site?

5  A.   I couldn't really answer you that way.  We had a hundred

6  and some people there, yes.  I couldn't really answer you how

7  many.

8  Q.   Okay.  Let's talk about the hundred and some people that

9  you had there.  First of all, when I asked you about your role

10  as a foreman in terms of hiring, you hired every employee that

11  Cost hired for your work on that work site, correct?

12  A.   No, I didn't hire everybody.  Usually I made phone calls,

13  and I got people.

14  Q.   Starting in April or whenever it was in the spring of

15  2002 that you arrived at the job site and began hiring, from

16  that point forward, you hired the personnel for that job site

17  on behalf of Cost?

18  A.   Correct.

19  Q.    What were the different job categories that you hired

20  for?

21  A.    All graders, bricklayers and mason tenders.

22  Q.    And how many operators did you have on the job?

23  A.    There was seven of them at the peak.

24  Q.    How many bricklayers did you have on the job?

25  A.    You know what, I can't really honestly answer that


181


1  question because I don't know.

2  Q.    Estimate?

3  A.    Estimate -- 75.

4  Q.    Okay.  And what about mason tenders, estimate for me the

5  number of mason tenders you had?

6  A.    Forty-five to 50.

7  Q.    Did Cost employ anyone else that didn't fall into one of

8  these three categories at that job?

9  A.    No, we didn't.

10  Q.    Okay.  If I do my math correctly, there's an estimated

11  figure on that board of 127 employees, would you agree with

12  that?

13    A.    Again, that was a while ago, I've done four or five jobs

14    since that job.  So I really couldn't honestly answer you how

15    many people we had on that job.

16    Q.    Let me ask this question.  How many women did you have on

17    this job?

18    A.    I had no women on that job.

19          MR. PAWK:  Objection, relevance.

20          THE COURT:  Let me see you at side bar.

21          (At side bar on the record.)

22          MR. PAWK:  My objection, I thought when we were in

23    chambers at the beginning of the case, it was just like when

24    you said we weren't going into whether one or two women were on

25    the job and Cost couldn't use that to prove they didn't


182


1    discriminate, I think it's the same for him.  That's why I have

2    an objection, as to the relevance in the case.

3          THE COURT:  I think that is statistical evidence, I

4    think if all you have is evidence of how many women there were

5    or weren't, it isn't necessarily probative of anything.  If

6    it's being offered for something else --

7         MR. MATESIC:  First of all, my understanding was of

8   the ruling prior to trial was concerning evidence regarding

9   Franco, not statistical evidence recording Cost.  And I believe

10   that Mr. Pawk's motion only concerned statistical evidence as

11   related to Franco, it did not raise as a motion to exclude

12   evidence on statistical evidence.  Secondly, this is highly

13   probative evidence in the plaintiff's case.  The plaintiff has

14   testified that, among other things, she was involved with

15   several EEOC lawsuits which just came to light today.  But

16   there were no women being hired by Cost on that job

17   historically.  Cost has failed to meet its obligation under the

18   regulations, I'm not talking about Franco, I'm talking about

19   Cost, to hit those targets of 6.9 percent female.  The

20   regulations clearly point out that the targets are not meant to

21   just perpetrate a paperwork exercise.  The employer must show

22   that in fact it comes up to the goal to increase participation

23   in the workforce.  Cost has historically failed to come

24   anywhere near that 6.9 percent number.  Mr. Taylor is also on

25   record as having said that he believes that women are not as

183

1  well suited to performing the specific job of prison

2  construction, as opposed to any other masonry work.

3        MR. PAWK:  That's not what he said in deposition.

4        THE COURT:  That's a whole separate issue.

5        MR. PAWK:  I understand.

6        THE COURT:  Look it, there is nothing in this

7  record, I presume there won't be anything in the record about,

8  for instance, during this job, this relevant job period here,

9  the number of women who actually applied.  What the

10  qualifications were, the number of women versus the number of

11  men.  All I'm saying is you're free to explore, I presume you

12  will with this witness, of his alleged statements about women

13  aren't capable of performing this job.  Just raw statistical

14  evidence, whether it would cut one way or the other, is

15  completely non-probative and speculative absent anything else.

16  That's number one.  Number two, whether or not a company, any

17  company, whether it be this company or another company, in the

18  context of a gender case met certain suggested quotas, is not

19  probative of whether there was discriminatory animus in this

20  case.  So it's sustained.

21        MR. MATESIC:  If I could bring up one point, we are

22  going to be examining Ms. Pawk in the case.  Because she is the

23  company and we are seeking punitive damages in this case, we

24  have to establish the mens rea requirement, the regulation

25  standard and an admonition to the contrary that they do not

184

1  treat these goals as simply paperwork requirements is central

2  to our case.  If we're able to show that Cost did not make a

3  good faith effort as evidenced by the fact that -- let me put

4  it this way.  As evidenced by the fact that Georgia Pawk never

5  went to Dean Taylor and said to Dean Taylor, you are not hiring

6  enough women.  In fact, Mr. Taylor was asked that question

7  during his deposition.  Did Georgia Pawk ever come to you and

8  say, Mr. Taylor, you are not hiring enough women.  The answer

9  he gave was no, she never did.  Now, Georgia Pawk happens to

10  be, in addition to president, she also happens to be the EEO

11  compliance officer of that company.  That company has a very

12  detailed affirmative action plan which says this in black and

13  white.

14       THE COURT:  Let me make a suggestion, that we can

15  continue with our chat in chambers, I'm going to send this jury

16  home.  Because we'd only be going to 4:30, I don't see the

17  point.  So I'll get them moving, and then we'll chat about this

18  briefly in chambers.

19        (End of discussion at side bar.)

20        THE COURT:  Members of the jury, I apologize but

21  that's the way it goes sometimes.  This is going to take a

22  little bit longer.  We were going to stop at 4:30 anyways, I

23  don't see the point of having you sit there while we resolve

24  this, this may take a little bit more time.  So 10 o'clock

25  tomorrow we're going to resume.  Remember don't talk about the


185


1  case.  It's unlikely, but in the event there is something in

2  the newspaper, although I doubt it, don't read the newspaper.

3  And have a very pleasant evening, we'll see you tomorrow at 10.

4  Let me see counsel when you get an opportunity back here in

5  chambers.  All right.

6        (Whereupon, at 4:05 p.m., the Jury was excused for

7  the day; and at 4:10 p.m., the proceedings reconvened in

8  Judge's Chambers.)

9        THE COURT:  To get us oriented, I don't have the

10  Kolstad case here.  Basically, the Kolstad case says that an

11  employer is automatically liable for punitive damages, based

12  upon the acts of a managerial agent.  That's the first point.

13  The second point is -- that the touchdown for punitive damages

14  under the case, as I remember it, is reckless indifference or

15  malice with respect to the dictates of the federal Civil Rights

16  Act.  That's essentially the standard.  In other words, the

17  employer knows about it, and just recklessly or maliciously

18  proceeds in the face of it, I don't think there's any dispute

19  that's what it is.  Okay.  Now, for instance, in a case like

20  this, the plaintiff would attempt to establish that the

21  management agent was conversant with Title VII and/or other

22  decision-makers and yet recklessly or maliciously blew it off,

23  so to speak.  And in response to that kind of evidence, it

24  seems to me, impacts on both liability and punitives, that

25  employers typically come forward with their good faith efforts


186


1  to, post EEOC things, EEOC rules and regulations, to have

2  seminars for their people on gender or race sensitive things, a

3  whole laundry list of things that bespeak a sensitivity of the

4  problem.  That is the legal lay of the land.  Now, tell me

5  again, so I understand it factually, the testimony that you

6  want to introduce that would bespeak at least to raise a

7  triable issue of fact for the jury, perhaps on both liability

8  and punitives, of this type of malicious or reckless behavior?

9       MR. MATESIC:  Let me, I would like to expand this

10  discussion because I am not making a claim on a proffer of this

11  evidence based on this, solely based on punitive damages, this

12  goes directly to liability as well.  It doesn't implicate

13  punitive damages.  And we are prepared to brief this issue

14  because we do believe that it is absolutely critical to our

15  case.  Mr. Taylor --

16       THE COURT:  It would have to be a quick brief --

17       MR. MATESIC:  We can get it to you tonight.

18       THE COURT:  Tell me orally.

19       MR. MATESIC:  Mr. Taylor was the foreman on that job

20  site.  He hired everybody from the time he got there until that

21  job ended.  He never hired a single woman.  We concede we don't

22  have the number of female applicants.  However, under, I

23  believe it's Feeley v. Metropolitan Life, in disparate cases,

24  that's the kind of evidence that doesn't really qualify as

25  standard statistical evidence, we're showing the number of

187

1  applicants, the number of rejections and coming up with the

2  statistics.  It goes to the issue of state of mind.  It goes to

3  the issue of --

4        THE COURT:  What was the name of the case?

5        MR. MATESIC:  Feeley v. Metropolitan Life.  It's a

6  Third Circuit case.  We have something in the can, Mr. Olds is

7  going to e-mail that up.  Mr. Taylor testified at his

8  deposition that there were no women working on that site at

9  all.  Georgia Pawk, I think they'll concede this, was the EEO

10  officer.  They had yearly meetings with regard to the good

11  faith requirements.  Despite that she never went to Mr. Taylor

12  and said how many women have you hired.  She never went to him

13  and said you're not hiring enough women.  This is a chronic

14  problem at Cost.  This is a paradynamic example of a paper

15  shuffle or paperwork commitment of equal employment.

16        THE COURT:  What is Cost obligated to do under the

17  federal regulations?

18        MR. LUTZ:  Meet the 16-step requirements.  There is

19  no way statistically they're ever going to make the 6.3 percent

20  of female or 6.9 percent females -- I believe they did meet the

21  6.3 percent as I understand, your Honor.  There is an annual

22  requirement for all of their jobs.  They're not specific with

23  respect to Marienville.

24          THE COURT:  They're not job site specific?

25          MR. LUTZ:  The criteria is job site specific, for

188

1  the workforce.  We're going to have to get into records of

2  every applicant they have had, go through all the processes of

3  the different union halls they go into.

4          THE COURT:  What you want to show is that they don't

5  follow the 16 steps?

6          MR. MATESIC:  No, they follow the 16 steps.  They

7  follow the 16 steps because they've elected to do exactly what

8  the regulations admonish you not to do.  They've elected to

9  treat this goal of equally employment as a "paperwork

10  requirement".  The regulations specifically say this is not a

11  paperwork requirement.  You have to be committed to the goal of

12  equal employment.  In other words, you cannot take as --

13  chronically you can't adopt this position where you're not

14    going to employ 6.9 females, you're just going to show, you

15    send out memos.  With the memo that they sent out to the

16    bricklayers, locals seeking as an urgent matter, they send

17    every bricklayer they have to this job.  They have never sent

18    out a memo to the union saying urgent, send out any females

19    that you have.  They have never done that.  Okay.  If they were

20    so concerned, there are so many pieces of evidence that would

21    indicate that they really treat equal employment as a paperwork

22    obligation simply.  If Dean Taylor was hiring employees for

23    Cost, if they had 162 employees at the job site and not a

24    single one is female, what would the jury conclude about an

25    equal opportunity officer who doesn't even inquire of him as to

189

1    how many females there are.  Who doesn't go to him and say show

2    me the gender profile of the workforce.  Who never goes to him

3    and says you are not complying with our equal employment

4    opportunity goals.  Dean Taylor said in the entire history of

5    his employ he never knew of any complaint of discrimination at

6    Cost Company.  The jury, it is not going to be lost on the jury

7    as to whether or not these people at Cost have made a decision

8   to either follow the paperwork requirements or actively

9   diligently increase the participation of females in the

10   workforce.  The jury is going to see that we hope, as I said,

11   this is critical evidence in the case.

12        MR. LUTZ:   Mr. Matesic began his argument by making

13   a very interesting admission, when he stated that he concedes

14   that Cost Company follows the 16 steps.  So he, therefore, is

15   conceding that Cost does what it is required to do under the

16   law.  If Cost is doing what it is required to do under the law,

17   how on earth can that be evidence of discrimination.  They're

18   doing everything they are required to do.  How is he going to

19   get into, allow him to stand in front of the jury and say, boy,

20   they had 160 people here and none of them were women.  They're

21   doing what is required of them.

22        THE COURT:  Can I ask another question, then I want

23   the brief faxed to me, we'll give you our fax number.  Do you

24   have anybody at your office?

25        MR. PAWK:  Yes.


190


1        THE COURT:  Have somebody look at it.  If you get a

2  response in, I'll read it.  Okay.  But getting back to this

3  other thing.  The 6.7 percent, 6.9 percent goal, are these

4  goals that are set, is that a goal that is unique to this

5  particular industry, that is the construction industry, or are

6  they 6.9 percent goals across the board, do you know?

7         MR. MATESIC:  I don't know.  I know it's a

8  Department of Labor regulation.  I would assume, I can only

9  assume it's unique to construction, these are construction

10  jobs, it's a requirement by definition, they're building on

11  behalf of the government.

12         THE COURT:  It strikes me intuitively, but I don't

13  know, that there maybe some that may be job sensitive based

14  upon the government's perception, in other words, they may be

15  lowered for certain types of industry, so that the employers

16  aren't pushed, due to the fact they can't attract women to

17  apply, I don't know that.  I presume that may be the case.

18  Getting back to the other thing here.  Ms. Pawk being the EEOC

19  coordinator, she was not the decision-maker in this case, was

20  she -- she was not the person who turned your client away, is

21  that right -- it was Mr. Taylor who was the managerial person

22  who, so to speak, slammed the door on her?

23        MR. MATESIC:  Correct.

24        THE COURT:  At lease once, if not twice?

25        MR. MATESIC:  Correct.  And Mr. Heaton.


191


1        THE COURT:  So Ms. Pawk wasn't in the

2    decision-making stream at all insofar as the initial

3    determination of liability is concerned, right?

4        MR. MATESIC:  That's right.  It's a vicarious

5    liability theory that we're pursuing.

6        THE COURT:  To be clear, then, Ms. Pawk, this whole

7    business about Ms. Pawk not vigorously attempting to meet the

8    goals, to the extent she was not a decision-maker on the

9    underlying liability question, makes that evidence irrelevant

10  on the underlying liability, but it might, if it had any

11  probative value, it would go toward the mens rea of the

12  company; do you see what I'm saying?

13        MR. MATESIC:  Yes.  And not restricted to punitive

14  damages, either.

15        THE COURT:  Not to interrupt you, I'm just thinking

16  out loud, if your theory was Dean Taylor, who was the

17  decision-maker and also the person responsible to that

18  compliance officer, if you will, that might be a horse of a

19  different color where they blend together.  Fundamentally,

20  here's my question.  And my problem is with this whole idea of

21  outrageousness as that term is clarified in Kolstad.  It

_____

22  doesn't have to be outrageous, it can be reckless, although

23  reckless can be outrageous.  I'm hard pressed to see how

24  compliance with a prong of the regulatory scheme could ever

25  been evidence of reckless indifference.  Now, if they did

192

1  nothing in the form of paperwork, if you had evidence that

2  they, notwithstanding the program, they didn't do any of those

3  things, I might be disposed and I haven't reached a final

4  decision on it, that's a point that should be addressed in your

5  papers.  And however you want to do it, think about that.

6        MR. MATESIC:  Your Honor, I was mentioning when we

7  began that I need to keep this discussion expansive.  The

8  recklessness standard under Kolstad is not the only theory

_____

9  we're operating under.  We believe there is a corporate culture

10   of deliberate indifference, notwithstanding their compliance,

11   notwithstanding their obligation under the regulations.  If a

12   person, whoever is one of those decision-makers, the company is

13   looking for guidance on equal employment matters, if that

14   person is not coming to those decision-makers and saying you

15   guys need to change what you're doing, then that indicates

16   pretext.  That means they're saying that they believe in the

17   goal, they're not acting like they do.  That's pretextural.

18        MR. PAWK:  Can I raise one factual issue, this is

19   the problem with Mr. Matesic's argument.

20        THE COURT:  Yes.

21        MR. PAWK:  This job, we're going to get into, if we

22   get into this, other kinds of jobs.  This job, the testimony

23   has already been is unique, in terms of hiring -- in terms of

24   hiring, Cost picks up the phone, calls the union, the union

25   sends them people.  We don't turn them away.  If the union, I


193


1   mean this was very unique there, you have occasions where they

2   hired people off the street.  Mr. Matesic is couching his

3   argument if they hire everybody off the street and they're not

4   hiring women.  They get union members, the labor agreements

5   with the union require Cost to get union members.  Whether it's

6   a black person, a white person, a woman or whatever, they put

7   them to work.

8           MR. MATESIC:  I'd like to show the court -- among

9   the 16 steps, well, among the papers that were filled with the

10  EEOC, is a document entitled nondiscrimination clause

11  agreement.  And this was a document that doesn't appear in a

12  signed formed, this was produced by Cost.  Paragraph four --

13          THE COURT:  Let me read it.

14          MR. MATESIC:  Actually paragraph three will help,

15  too.

16          THE COURT:  What is the document, this is a

17  nondiscrimination clause agreement between who?

18          MR. MATESIC:  That's a nondiscrimination clause

19  contract that Cost would sign --

20          THE COURT:  This is a contract with the government,

21  who is the contract with?

22          MR. MATESIC:  That is filed with the EEOC.

23          MR. PAWK:  These are documents that Cost produced to

24  the EEOC.

25          THE COURT:  All right, let me read it.  This is part

194

1  of the record anyways?

2        MR. MATESIC:  Yes, it is.

3        THE COURT:  I still don't know, is this a statement,

4  is this a document prepared by the government?

5        MR. MATESIC:  This is a document which was provided

6  to us by Cost.  It's part of the standard documents they send

7  out to any party they contract with.  Which indicates --

8        THE COURT:  If the union, for instance, only

9  supplies, what's your point?

10        MR. MATESIC:  They only send men.  Their defense is

11  we're acting in good faith, the laborers' union only sent men

12  over.  We're not hiring females.  What this says is you can't

13  take that defense if in fact you were on notice that the union

14  itself was not hiring, excuse me --

15        THE COURT:  Was excluding in a discriminatory

16  fashion minorities or something --

17        MR. MATESIC:  Females, exactly.  You can't pass the

18  buck is what they're saying.

19        MR. PAWK:  I believe the agreement that Cost signs

20  with the general contractor, which it contracts with the

21  general on this job, they contracted directly with the state.

22  I believe they enter into agreements with the general, there is

23  a nondiscrimination agreement that we don't discriminate.  I

24  think that's where that comes from.

25        THE COURT:  Finally, let me just make this

195

1  observation.  With Mr. Taylor, your client testified that, or

2  you intend to elicit testimony from him that he made a

3  statement to the effect, because it was in the papers for

4  opposition to the motion for summary judgment, I think, that he

5  didn't think women are capable of being mason tenders?

6        MR. MATESIC:  As capable as men.

7        MR. PAWK:  One aspect of that, in fact, his

8  testimony in his deposition is really back and forth.  One

9  aspect, judge, he was asked specifically do you have a sense as

10  to whether women are as qualified as men to perform in a weight

11  lifting capacity as a mason tender, and he said they could.

12  And then Mr. Matesic pressed him, do you mean to tell me that

13  women can perform in a weight lifting capacity as men on a

14  mason tender job.  He says well -- he said generally not.  He

15  went back and forth.  The page before he said you can't look at

16  someone and tell whether they can lift more weight than other

17  people.

18       MR. MATESIC:  If I could read that exact section.

19       THE COURT:  You don't really need to, that got you

20  through the summary judgment part, and he will say what he will

21  say out here.  But I just want to state the obvious.  Without

22  all this other peripheral stuff, this is a run of the mill case

23  where there are allegedly discriminatory statements made by the

24  hiring person.  If a jury believes that, that they were

25  discriminatory and he was motivated, that's why he didn't do it


                              196


1  and there was a position available, then you're going to get at

2  least a compensatory award or compensatory damages.  This other

3  thing, I've got to take a look at it.  Call Mr. Olds, whoever

4  is doing this for you and tell him he could fax it to my

5  chambers.

6       MR. MATESIC:  Sure.

7       THE COURT:  I can read it tomorrow.  I've got a huge

8    bankruptcy appeal matter that I got to handle with about 15

9    lawyers at 9 o'clock tomorrow morning.  I'll have to get in

10   early and read it.

11        MR. MATESIC:  I have to put a couple of things on

12   the record before we conclude.  Number one, Mr. Lutz was saying

13   I conceded, I want to make it clear that I conceded for sake of

14   argument that they're following the 16 good faith steps.

15        THE COURT:  Your point is it's a sham -- what is the

16   other point?

17        MR. MATESIC:  As to this brief, we filed this brief

18   in another district court case, I don't know how much time

19   we'll have to edit it.  You're going to get a legal argument

20   with other parties, it's the best I can do, I'm sorry.

21        THE COURT:  I'll get a generic brief and I have to

22   retune it in my own head to apply to my case.  As long as it

23   gives me the law.

24        MR. LUTZ:  Are we going to be getting any more

25   evidence with respect to job availability in the plaintiff's


197


1    case in chief with respect to these dates of July 31st or

2  August 1st or August 23rd?

3        THE COURT:  I don't know.

4        MR. LUTZ:  If we're not, we may be wasting a lot of

5  time here.  I don't think they meet the prong of the McDonnell
                              _____

6  Douglas test indicating job availability.  Their own witness
   _____

7  has testified that he is much less than certain about when this

8  individual Mr. Bell was hired.

9        THE COURT:  I have no fixed opinion on that except

10  to say -- what was the second time she applied in August?

11        MR. MATESIC:  August 23rd.

12        MR. LUTZ:  Mr. Barrett's testimony was crystal clear

13  on that.

14        THE COURT:  Still presumes an available opening.

15        MR. MATESIC:  Mr. Barrett's testimony I think was

16  sufficient for the jury to conclude that there was an opening

17  on or about August 14th.  That there was an opening on or about

18  July 31st, that there was an opening on or about August 18th.

19        THE COURT:  I don't have to decide the issue right

20  now anyways.  I'll take it up later.  What more do you have in

21  your case?

22         MR. MATESIC:  Just to finish up with Mr. Taylor.  I

23   imagine he would go perhaps an hour.  And then with Ms. Pawk,

24   an hour and a half to two hours.

25         THE COURT:  That's it then for you?


                              198


1          MR. MATESIC:  I believe so.  I think I can get from

2    Mr. Taylor what I needed from Mr. Heaton.  But I want to

3    reserve the right to call Mr. Heaton.  If I call Mr. Heaton, it

4    would be very brief.

5          THE COURT:  Then what's going to be left, who are

6    you going to put on that haven't been done through his case?

7          MR. PAWK:  Except for Mr. Heaton, we'll put Mr.

8    Heaton on.

9          THE COURT:  Who's he?

10         MR. PAWK:  He's the sub-foreman on this job.  She

11   testified he was there on the 23rd of August.

12         THE COURT:  He won't be long.  Are your people going

13   to testify, Taylor or whoever, that we had no vacancies on

14   those two dates for mason tenders, is that what they're going

15   to say?

16          MR. LUTZ:  Yes.  And we have certified payroll

17   records.

18          THE COURT:  Where are you coming from on that?

19          MR. LUTZ:  One, to show on the certified payroll

20   records there was no job availability on July 31st.  It's going

21   to come from his witness because it's Dean Taylor.

22          THE COURT:  He called him as on cross.  By the way,

23   you can't ask a leading question on cross-examination, just as

24   an aside.  You certainly can cross-examine the heck out of a

25   hostile witness, but you made the objection, too, I think to


                                    199


1   one of their questions on the basis it was leading.  You called

2   Mr. Barrett, they cross-examined Mr. Barrett.  Just as an

3   aside.

4          MR. MATESIC:  It wasn't clear.

5          THE COURT:  That's neither here nor there.  We're

6   not going to finish this tomorrow, are we?

7          MR. PAWK:  Heaton will be brief.  I have Mr. Cost,

8   probably a 10 minute witness.  So I don't know -- I guess

9   depending on how much we're going to get into with Mr. Taylor

10    and Georgia Pawk.

11            THE COURT:  All right, that's it.

12

13            (Whereupon, at 4:40 p.m., the proceedings were

14    adjourned for the day.)

15

16                    - - -

17

18

19

20

21

22

23

24

25

                                    200

1            C E R T I F I C A T E
             – – – – – – – – – –

2

3

4

5    I, Ronald J. Bench, certify that the foregoing is a

6    correct transcript from the record of proceedings in the

7    above-entitled matter.

8

9

10

11

12    _____

13

14    Ronald J. Bench

15

16

17

18

19

20

21

22

23

24