IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN BROWN,                                  Civil Action No. 03-224

                Plaintiff,

   v.

COST COMPANY,

               Defendant.

### PLAINTIFF'S BRIEF IN SUPPORT OF AMENDED MOTION FOR NEW TRIAL PER F.R.C.P. 59

#### Argument

In this disparate treatment case, Plaintiff, Kathleen Brown ("Brown"), alleged that Defendant, Cost Company ("Cost"), refused her application for an available laborer's position at the SCI Marienville work site ("SCIM") in 2002, on the basis of Brown's gender, female, in violation of **Title VII (42 U.S.C. § 2000(e))**, the **Pennsylvania Human Relations Act**, and **Article I, § 28 of the Pennsylvania Constitution**. Brown sought awards for compensatory and punitive damages, and as to the latter, attempted to demonstrate that Cost was vicariously liable to her based on its chronic disregard of affirmative action goals mandated by law.

Trial in this case commenced June 6, 2005, and concluded on June 10, 2005, when the jury returned a verdict in favor of Cost and against Brown on all claims.

At trial, Brown was required to make the necessary showings under the **McDonnell Douglas/Burdine/Hicks** burden-shifting analysis, *viz.*, to establish the four elements of her prima facie case: (1) that she is a member of a protected class; (2) that she applied with Cost for an open position for which she was qualified; (3) that Cost

1

rejected her application; and (4) that following her rejection, the position remained open and Cost continued to seek applicants of Brown's qualifications. **McDonnell Douglas Corp. v. Green**, 411 U.S. 792, 802 (1973). Because Cost proffered one or more non-discriminatory rationales for refusing to hire her, Brown was also required to establish: (1) that Cost's proffered rationales were pretextual, and (2) that Cost intended to discriminate against her. **Fuentes v. Perskie**, 32 F.3d 759, 763 (3d Cir. 1994).

Brown adduced evidence as to all four elements of the prima facie case. The testimony of Brown, together with that of LIUNA Business Agent Ron Barrett, established:

(1)   that Brown belonged to a protected class (female);

(2)   that on July 31, 2002[1], and again on August 23, 2002, Brown presented herself at the Cost trailer at SCIM to seek employment as either a laborer (for which there were no prerequisite qualifications) or a heavy equipment operator, and that on several occasions during that same time frame Brown returned to Cost at least three of its "Minority Recruitment" memoranda containing her handwritten contact information and request for employment as a laborer or operator;

(3)   that Cost rejected each of Brown's requests for employment; and

(4)   that on three occasions, beginning on or about July 31, 2002, and continuing through August 16, 2002, Cost hired at least three males, with no greater qualifications than Brown, for laborer's positions (Testimony of Ronald Barrett, Tr. Vol. 2[2], at 160-61) .

---

[1]In the first special interrogatory in the verdict slip, the jury found that Brown had proven by a preponderance of the evidence that she applied for a laborer's position on July 31, 2002.

[2]Because the five volumes of the trial transcript do not feature contiguous pagination, citations to the transcript will refer to each day's proceeding as a separate volume, and will reference the transcript of the first day as Volume 1, the transcript of the second day as Volume 2, etc. Subsequent citations to a witness' testimony will identify the testimony by use of the witness' initials.

2

Brown also adduced evidence of Cost's rationale for rejecting her application. Under questioning from both parties' attorneys, Cost President, Georgia Pawk, and Dean Taylor, Cost's foreman, who also served as hiring authority at SCIM, testified that Brown was rejected because:

(1) Brown had made clear to Cost personnel, including Pawk and Taylor, that Brown was not truly interested in a laborer's position, and instead wanted to work only as an operator, and there were no operator positions available at SCIM on and after July 31, 2002 (Testimony of Dean Taylor, Tr. Vol. 3, at 91; Testimony of Georgia Pawk, Tr. Vol. 4, at 41-44); and

(2) Even if Brown had requested a laborer's position on the day that she first presented herself to Cost at SCIM, there is no evidence that Cost had a vacancy for a laborer at that time (GP, Tr. Vol. 4 at 41-44); in other words, Brown was subject to the luck of the draw—if there were no vacancies at the time that she applied for work, she had no reasonable expectation of receiving employment from Cost in the future.

To demonstrate the pretextual nature of the proffered rationales, and that Cost intended to discriminate against her on the basis of her gender (per **Fuentes**), and to establish the second and fourth elements of her prima facie case, Brown attempted to introduce evidence that Cost had failed to meet its affirmative action obligations pursuant to its status as a recipient of federal contract dollars. Further, Brown sought to show that, because Cost had failed to meet these obligations, chronically and repeatedly, Cost was not committed to the goal of equal employment, and that this disregard for its obligations was tacitly communicated to Cost's foremen, who reasonably concluded that they would face no sanction based on their failure to hire women.

3

Specifically, Brown sought to establish the following:

(1)  that Cost had affirmative obligations to maintain a workforce that was at least 6.9% female (45 Fed. Reg. 251, pp. 85750-85751, December 30, 1980));

(2)  that while the percentages of females in Cost's total workforce in 2001 and 2002 were, respectively, 2.38% and 1.54% (Plaintiff's Exhibit 23), even these figures overstated the percentages of female tradespersons employed by Cost, because a substantial number of the women included in the figures were administrative (e.g., clerical) employees;

(3)  that in light of its failure to meet the 6.9% female hiring goal, Cost was required to demonstrate that it diligently pursued a 16-step "good faith" process that was intended to increase the numbers of females in the workforce, including:

  (1)   maintaining and establishing a current list of female recruitment sources (41 C.F.R. § 60-4.3(7)(b));

  (ii)  maintaining a current file of the names, addresses and telephone numbers of each female off-the-street applicant, noting what action, if any, Cost took with respect to these individuals (41 C.F.R. § 60-4.3(7)(c));

  (iii) continually monitoring all personnel and employment-related activities to ensure that such practices do not have a disparate impact on females (41 C.F.R. § 60-4.3(7)(m)); and

  (iv)  developing, maintaining, and disseminating an EEO policy (41 C.F.R. §§ 60-4.3(7); 60-4.3(7)(f); 60-4.3(13); 60-4.3(14));

(4)  that Cost failed, as required by the regulations, to compile and maintain applicant data, and to monitor its personnel and employment-related activities to ensure equal employment opportunities for females (DT, Vol. 3 at 91; GP, Vol. 3 at 150; Vol. 4 at 39 (Court prohibits evidence of Cost's failure to monitor personnel practices); GP, Vol. 4 at 65, 66, and 73 (Court prohibits evidence demonstrating Cost failed to maintain applicant pool data);

(5)  that rather than pursue the goal of equal employment in good faith, Cost opted to treat the federal mandates as mere paperwork requirements, in defiance of the U.S. Department of Labor's explicit admonition that a contractor's affirmative action program was not to be treated as a "paperwork exercise." 41 C.F.R. § 60-2.10(a)(2)(emphasis added)(see

        also, 41 C.F.R. § 60-2.10(a)(1)(overall purpose of affirmative action regime is not that employer simply demonstrate "good faith," but rather that "over time a contractor's workforce, generally, will reflect the gender, racial and ethnic profile of the labor pools from which the contractor recruits and selects);

(6)    that Cost's failure to pursue and achieve the goal of equal employment as mandated by the regulations resulted in a gross gender disparity in its workforce at the SCIM site, where Cost employed zero females—out of 58 total laborers, and 162 total workers— in 2002;

(7)    that Cost's failure to pursue the goal of equal employment also constituted a violation of Cost's own Equal Employment Policy, which Cost ostensibly created to implement the federal affirmative action regulations;

(8)    that under the federal regulations Cost could not deflect blame from itself onto the labor unions that referred members to Cost, e.g., by asserting that Cost's failure to meet the 6.9% target was the result of the Laborers' Union failing to refer females to Cost (41 C.F.R. § 60-4.3(5));[3]

(9)    that Cost's Equal Employment Compliance Officer and President, Georgia Pawk, never approached the SCIM foreman, Dean Taylor, to express any concern or otherwise inquire about the male-to-female disparity of 162:0 at the SCIM worksite, nor ever told him, at any time during his eighteen-year tenure, that he had to hire more women (DT, Vol, 3, at 74-75);

(10)    that Cost, which maintained a file of female candidates seeking work, but did not, as required by the regulations, keep records of actual applicants (a violation of 41 C.F.R. § 60-4.3(7)(c)), failed to furnish the names and contact information of these female candidates to Cost's hiring personnel at SCIM, including the foreman, Dean Taylor; consequently, none of the female candidates were considered for vacancies during the 2002 construction season, which Cost instead filled with "walk-on" male applicants, i.e., males who presented themselves at the Cost trailer seeking work as unskilled laborers;

(11)    that Cost's failure to contact the female candidates as vacancies arose constituted a violation of the regulations, as well as Cost's own EEO policy (GP, Vol. 3 at 147-50);

---

[3]The same regulations require the contractor to take affirmative action for all women, to implement steps "at least as extensive" as those itemized at Para. 7, so as to achieve "maximum results" from such efforts. 41 C.F.R. §§ 60-4.3(5); (9); (13).

(12) that Cost's failure to hire Brown or any of the women who declared their availability for work during the 2002 season was ensured, given Cost's refusal to reform its hiring practices;

(13) that after Brown first requested employment on July 31, 2002, she was rejected for three laborers positions—on or about July 31, August 14, and August 16, 2002, respectively—which Cost instead filled with males who had no greater qualifications than Brown (Testimony of Ronald Barrett, Vol. 2 at 160-61).

The Court repeatedly blocked Brown's attempts to introduce evidence of Cost's affirmative obligations under the compliance regulations, its failure to satisfy those obligations, and its failure to follow its own EEO policy. (See, Vol. 1 at 14 (Court prohibits Brown from presenting evidence of Cost's failure to meet 6.3% female hiring goal); Vol. 2 at 183 (on Cost's objection, Court prohibits Brown from eliciting evidence of gender profile of Cost's workforce at SCIM); Vol 3 at 12 (Court prohibits Brown from presenting evidence of workforce gender profile in absence of evidence of gender profile of applicant pool); 24-27 (same); 125 (on Cost's objection, Court prohibits Brown from eliciting evidence of Cost's obligation to demonstrate its commitment to equal employment); 150 (on Cost's objection, Court prohibits Brown from eliciting evidence of records maintained by Cost pursuant to Cost's Equal Employment Policy); Vol. 4 at 39 (Court prohibits Brown from eliciting evidence of whether Cost monitored its procedures regarding candidate-application, evaluation, and hiring, for compliance with Cost's Equal Employment Policy); 73 (Court prohibits Brown from eliciting evidence that Cost does not maintain applicant data—thereby attempting to immunize itself against claims based on numerical disparities in its workforce).

Most seriously, the Court prohibited Brown from depicting the 162:0 hiring disparity at SCIM in 2002 as evidence of gender discrimination. Following Plaintiff's

6

closing argument, in which Plaintiff's counsel referred several times to the 162:0 disparity, and asserted that it demonstrated Cost's intention to discriminate against females[4], the Court gave the following curative instruction:

> . . [I]n determining whether or not the Plaintiff was subjected to intentional discrimination, you may not consider as a factor in your determination the number of women that were on the work – on the job site at any given time.

(Vol. 5, at 38).

In support of its rulings, the Court focused chiefly on Brown's inability to present evidence of the gender profile of the applicant pool at the SCIM worksite. According to the Court, any attempt by Brown to present the 162:0 disparity would be meaningless at best, and prejudicial to Cost at worst, in the absence of comparative data from the applicant pool. Importantly, the Court failed to give due weight to the fact that the lack of applicant data was wholly Cost's doing. As Cost's President, Georgia Pawk, and its foreman (who made all hiring decisions at the SCIM worksite ) Dean Taylor testified, Cost does not maintain application records or data, and did not do so in 2002. Thus, in addition to violating its obligations under the compliance regulations (41 C.F.R. § 60-4.3(7)(c)), Cost's failure to maintain applicant data also led the Court to prohibit Brown from introducing evidence of the 162:0 gender disparity at SCIM.

In the absence of the excluded evidence, Brown was unable to establish that Cost had an affirmative duty to hire her for the July 31 vacancy, as well as an affirmative duty to hire Brown or another similarly qualified woman, for the vacancies on August 14 and August 16.

---

[4] See Vol 5, at 7; 11; 15-16; 18; 20.

7

As explained below, the Court's decisions prohibiting Brown from introducing this evidence for the purposes of proving pretext, discrimination, and the second and fourth prongs of the prima facie case, caused Brown to suffer substantial, dispositive, and improper prejudice, and accordingly constitute reversible error.

The Court's decisions prohibiting Brown from introducing this evidence were also procedurally improper. Originally, Cost had filed a motion in limine to exclude any evidence related to its alter ego, Franco. In her response to Cost's motion, Brown cited the compliance regulations as applying to both Franco as well as Cost, and argued that given Franco's identity as an entity (owned, on paper, by the wife and daughter of Cost's owner, Charles Cost) which Cost had erected for the sole purpose of obtaining special set-aside contracts for women, this evidence demonstrated that Cost's commitment to equal employment was in bad faith. However, after ruling the Franco evidence inadmissible, the Court, with no prior notice to Brown, indicated that it would consider excluding the compliance regulation/affirmative action evidence as it related to *Cost*. Having little opportunity to research and brief the issue, Brown was placed at an extreme disadvantage, and was ultimately unable to persuade the Court to admit the evidence, to her detriment.

Brown respectfully submits that the Court's main error occurred when it failed to recognize and apply the appropriate standard governing the admission of evidence of an absolute disparity, i.e., where the employer's workforce evidences zero participation by members of the protected class. In **International Brotherhood of Teamsters v. United States**, 431 U.S. 324, 342, n. 23 (1977), the Supreme Court observed that fine

tuning of statistics was unnecessary where the employer's workforce demonstrates a "glaring" absence of employees in protected class ("In any event, fine tuning of the statistics could not have obscured the glaring absence of minority line drivers. As the Court of Appeals remarked, the company's inability to rebut the inference of discrimination came not from a misuse of statistics but from "the inexorable zero."); accord, **U.S. v. Gregory**, 871 F.2d 1231, 1245, n. 20 (4th Cir. 1989)(". . . Supreme Court does not require fine tuning of statistics when the inference of discrimination arises from "the inexorable zero" . . . In other words, the focus in this case may properly be upon the fact that the Sheriff's Office has *never* hired a woman as a deputy.")(emphasis in original); **Loyd v. Phillips Brothers, Inc.**, 25 F.3d 518, 24 n. 4 (7th Cir. 1994)(. . . "[T]he100% sex-segregated workforce is highly suspicious and is sometimes alone sufficient to support judgment for the plaintiff.").

      The Court's exclusion of this evidence fails to honor the distinction between the evidentiary standards applicable to disparate treatment cases, versus those applicable to disparate impact cases.  Unlike the more rigorous standard applicable to disparate impact cases, in which the plaintiff's case may rests entirely on statistical evidence and analysis, a far more liberal and less stringent standard applies in disparate treatment cases, when the proffered statistical evidence represents only one portion of the plaintiff's evidence. **Bruno v. W.B. Saunders Co.**, 882 F.2d 760, 766-67 (3d Cir. 1989)("Unlike the main cases cited by the defendants, this is not a class action disparate impact or disparate treatment case. . . By contrast, in individual disparate treatment cases such as this, statistical evidence . . . need not be so finely

tuned.")(internal citations omitted); accord, **Abrams v. Lightolier**, 50 F.3d 1204, 1217 (3rd Cir. 1995); **MacDissi v. Valmont Industries, Inc.**, 856 F.2d 1054 (8th Cir. 1988)(rejecting challenge to sample size where statistical evidence used in combination with other, independent evidence of disparate treatment); **Daines v. City of Mankato**, 754 F.Supp. 681 (D.MN 1990)(rejecting challenge to proffered statistics relying on census rather than applicant flow data)("The Court finds that plaintiff's statistical evidence supports an inference of discrimination.  *Minimally, the fact that no women were appointed into the officials and administrators category is surely the kind of fact which could cause a reasonable trier of fact to raise an eyebrow*.")(*citing,* **MacDissi**)(emphasis added).

The evidence of zero participation by females proffered by Brown, and excluded by the Court, represented only one portion of the evidence that Brown sought to introduce to satisfy her burden under **Fuentes** to show pretext and discrimination.  For example, in addition to this evidence, Brown also adduced Dean Taylor's prior testimony (which he disavowed at trial) that women were not as suited to work as laborers on prison projects such as SCIM, an admission that is evidence of both pretext and discrimination.

The Court's exclusion of this evidence stripped Brown of the ability to prove both pretext and intentional discrimination by demonstrating that Cost's failures—as measured by the 162:0 disparity, et al—to diligently pursue the goal of increased hiring of women constituted violations of, or deviations from, Cost's own EEO plan.  In **Antol v. Perry**, 82 F.3d 1291, 1300-01 (3d Cir. 1996), the Third Circuit held that an

employer's failure to follow its own affirmative action plan constituted relevant, circumstantial evidence of pretext and discriminatory intent under **Fuentes**' two prongs, and approvingly cited cases from the Seventh, Eighth, and Ninth Circuits which held similarly. **Antol**, 82 F.3d at 1300-01; accord, **Kepple v. GPU Inc.**, 2 F.Supp.2d 730, 746-47 (W.D.Pa. 1998)(statements by high-ranking officers to personnel involved in promotion, suggesting that company intended or permitted discriminatory promotion practices, constitutes relevant circumstantial evidence of discrimination); **Johnson v. Penske Truck Leasing Co.**, 949 F.Supp. 1153, 1179 (D.NJ 1996)(willful violation of affirmative action plan if combined with other evidence may be indicative of pretext). The Court's holding in **Antol** echoes holdings in the Eighth, Tenth, and Eleventh Circuits, which construe an employer's failure to promulgate or consistently follow its own employment policies to constitute circumstantial evidence of discrimination or pretext. See, **Ash v. Tyson Foods, Inc.**, 129 Fed.Appx. 529, 533 (11th Cir. 2005)(deviation from company policy may constitute circumstantial evidence of discrimination, especially when deviation results in advantages to candidates outside protected class)(citations omitted); **Daines v. City of Mankato**, 754 F.Supp. 681, 699 (D.MN 1990)(employer's failure to consistently follow its "employee relationship" policy constitutes circumstantial evidence of discrimination); **Carter v. Three Springs Residential Treatment**, 132 F.3d 635, 644 (11th Cir. 1998)(employer's failure to promulgate hiring and promotion policies can be circumstantial evidence of discrimination)(citations omitted); **Babich v. Unisys Corporation**, 842 F.Supp. 1343, 1357 (D.KS 1994)(employer's failure to follow its own reduction in force policy

constitutes evidence of pretext).

The Court's exclusion of Brown's proffered evidence also, perversely, rewarded Cost for its illegal and improper failure to maintain application data, in violation of 41 C.F.R. § 60-4.3(7)(c). In analogous circumstances, the law provides that the party claiming discrimination is entitled to an adverse inference based on the lack of application data. See, **29 C.F.R. § 1607.4(D)** (joint guidelines adopted jointly by Department of Justice, EEOC, and Department of Labor authorize federal enforcement agencies to draw adverse inference based on employer's failure to maintain employment data relating to discriminatory impact of hiring and retention practices); accord, **Sims v. Montgomery**, 873 F. Supp. 585, 601 (M.D.AL 1994); **Gaines v. Boston Herald, Inc.**, 991 F.Supp. 91, 108-09 (D.MA 1998)(failure to keep records of job applicants or their race supports claim of Title VII disparate racial impact violation); .**Wilfong v. Rent-A-Center, Inc.**, 2001 WL 578262 (S.D.IL 2001)(Granting EEOC motion to intervene in class action alleging pattern or practice discrimination based on employer's failure to maintain employment records).

In essence, by failing to comply with an affirmative legal obligation to maintain applicant data (and in so doing preclude Brown from conducting an analysis of the data so as to measure its impact on Cost's female-hiring goals—a violation of 41 C.F.R. § 60-4.3(7)(m)), Cost acted no differently than a party who knowingly destroys evidence. As such, Brown was entitled to a spoliation inference, *viz.*, that the missing data would have been adverse to Cost, and favorable to Brown. See, **Baliotis v. McNeil**, 870 F.Supp. 1285, 1292-93 (M.D.PA 1994)(sanction for destruction of evidence is adverse

inference that evidence would have been unfavorable to party's position).  See also, **Louiseau v. Oregon Dept. of Human Resources**, 567 F.Supp. 1211, 1217 (D.OR 1983)(employer's failure to keep records required by Federal Regulations entitles complaining party to adverse inference)(construing 29 C.F.R. 1607.4D); **Hicks v. Gates Rubber Company**, 833 F.3d 1406 (10th Cir. 1987)(plaintiff entitled to adverse inference where employer selectively retained employment and personnel records in violation of federal law).

In general, the Court's rulings fail to reflect the oft-repeated concerns of the Third Circuit that, due to the particular evidentiary hurdles confronting plaintiffs in employment discrimination cases, where direct evidence of discrimination is largely nonexistent, courts are to be particularly suspicious of requests to exclude evidence on the basis of relevance:

> A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario . . . What may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other incidents . . . In many respects, the facts of this case represent what has become the typical Title VII employment discrimination case of this decade.  Anti- discrimination laws and lawsuits have "educated" would-be violators such that extreme manifestations of discrimination are thankfully rare.  Though they still happen, the instances in which employers and employees openly use derogatory epithets to refer to fellow employees appear to be declining. Regrettably, however, this in no way suggests that discrimination based upon an individual's race, gender, or age is near an end. Discrimination continues to pollute the social and economic mainstream of American life, and is often simply masked in more subtle forms.  It has become easier to coat various forms of discrimination with the appearance of propriety, or to ascribe some other less odious intention to what is in reality discriminatory behavior.  In other words, while discriminatory conduct persists, violators have learned not to leave the proverbial "smoking gun" behind.  As one court has

> recognized, "[d]efendants of even minimal sophistication will neither admit discriminatory animus or leave a paper trail demonstrating it."  But regardless of the form that discrimination takes, the impermissible impact remains the same, and the law's prohibition remains unchanged.  "Title VII tolerates no racial discrimination, subtle or otherwise.". . .  The sophisticated would-be violator has made our job a little more difficult.  ***Courts today must be increasingly vigilant in their efforts to ensure that prohibited discrimination is not approved under the auspices of legitimate conduct, and "a plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled . . . because of crabbed notions of relevance or excessive mistrust of juries.***"

**Aman v. Cort Furniture Rental Corp.**, 85 F.3d 1074, 1081-82 (3rd Cir. 1996)(citations omitted); see also, **Goosby v. Johnson & Johnson Medical, Inc.**, 228 F.3d 313 (3rd Cir. 2000)(recognizing that employer may attempt to cloak discriminatory conduct in guise of neutral application of highly subjective (and thus suspect) criteria).

This Circuit disapproves of the practice of excluding evidence, in general (**Spain v. Gallegos**, 26 F.3d 439, 453 (3rd Cir. 1994)), and in discrimination cases, in particular. **Glass v. Philadelphia Electric Co.**, 34 F.3d 188, 195 (3rd Cir. 1994).  Thus, according to the Third Circuit, "Evidence should be excluded under Rule 403 only sparingly since the evidence excluded is concededly probative.  The balance under [Rule 403] should be struck in favor of admissibility." **Gallegos**, 26 F.3d at 453 (*citing*, **United States v. Dennis**, 625 F.2d 782, 797 (8th Cir.1980) and **United States v. Terzado-Madruga**, 897 F.2d 1099, 1117 (11th Cir.1990)).

As well, the law of this Circuit holds that error is not harmless unless it is "highly unlikely" that the error did not affect the outcome of trial. **Glass v. Philadelphia Electric Co.**, 34 F.3d 188, 191 (3rd Cir. 1994)(*citing*, **Lockhart v. Westinghouse Credit Corp.**, 879 F.2d 43, 53, 59 (3d Cir.1989)).

In **Glass**, the Third Circuit reversed the District Court's exclusion of evidence of a hostile work environment proffered by the plaintiff. In reaching its decision, the Court in **Glass** adopted the reasoning of the Eighth Circuit, which in turn focused primarily on the especially difficult evidentiary burdens confronting plaintiffs in employment discrimination cases:

> Our decision is buttressed by the judicial inhospitability to blanket evidentiary exclusions in discrimination cases. The Eighth Circuit explained in reversing similar evidentiary exclusions in an employment discrimination suit:
>
>> The effects of blanket evidentiary exclusions can be especially damaging in employment discrimination cases, in which plaintiffs must face the difficult task of persuading the fact-finder to disbelieve an employer's account of his own motives . . . Circumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work practices—evidence which in other kinds of cases may well unfairly prejudice the jury against the defendant. In discrimination cases, however, such background evidence may be critical for jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive.

Id. (*citing*, **Estes v. Dick Smith Ford, Inc.**, 856 F.2d 1097, 1103 (8th Cir.1988)).

In this case, the jury found, at the second special interrogatory of the verdict slip, that Brown had failed to establish the existence of an open position for laborer when she applied for employment with Cost. Notably, this finding was apparently not a consequence of the jury's failure to believe Brown. In fact, in the very first special interrogatory on the verdict slip, the jury indicated just the opposite, as it credited Brown's testimony (the only evidence presented on this issue) that she applied for a laborer's position on July 31, 2002.

Clearly, the evidence of any job availability was in Cost's possession. Thus,

Brown could not prevail unless: (1) Cost admitted that it had open laborers positions at the time that Brown sought employment; or (2) Brown proved by circumstantial evidence that such was the case. Because Cost did not admit to the first alternative, it was left to Brown to attack Cost's credibility.

The Court's evidentiary rulings deprived Brown of the right to introduce evidence attacking the credibility of Cost, as well as evidence demonstrating that Cost had failed to take affirmative steps to increase its numbers of female employees (including Brown), as well as evidence that would have suggested to any reasonable employer that its hiring practices were indicative of disparate treatment. In these respects, as well as in those cited above, the Court made it impossible for Brown to prevail on her claims.

Brown also asserts that the Court erred in its phrasing of the second special interrogatory. Prior to the Court's charging of the jury, Brown objected to the Court's decision to portray this portion of Brown's prima facie case in this fashion, because it suggested to the jury that Brown could not prevail if it were shown that other available vacancies arose within a short time after Brown first expressed interest in the laborer's position (as happened on at least two occasions, August 14 and August 16, 2002). Vol. 4, at 4-17 (Court denied Brown's counsel's request, at pages 10-11, that final charge adopt expansive definition of job availability—specifically, that any job that opened in the days following Brown's July 31, 2002 request for employment at the SCIM worksite would be considered as "available" to Brown—and stated, at page 17, that it would instead simply use the less-expansive language from **McDonnell Douglas**). Because of Cost's affirmative duty to hire more women, the issue of job availability should not

have been restricted, as Cost argued, to either the day on which Brown applied, or the first job that arose thereafter.

The consequences of the Court's wording of the second interrogatory were fatal to Brown, as the jury answered the second interrogatory, "Do you find that Plaintiff Kathleen Brown has proven by a preponderance of the evidence that a laborer position was available at Cost Company when she applied?" in the negative.

Finally, Brown also appeals the Court's ruling on Cost's motion in limine, which resulted in the exclusion of evidence related to Cost's alter-ego, Franco. Vol. 1, at 30. Brown's counsel argued at length that Cost and Franco were one and the same entity, and that Cost's creation of Franco, for the specific purpose of capturing minority set-aside contract dollars (for women-owned businesses), when juxtaposed with Cost's abject and chronic failure to employ female tradespersons, demonstrated Cost's reckless disregard for equal employment goals, as well as its intention to discriminate on the basis of gender. Vol. 1, 10-14. Brown stressed, inter alia, that Cost's president, Georgia Pawk, served as the Equal Employment Compliance officer for both Cost and Franco. By depriving Brown of the opportunity to present evidence that Pawk was a knowing and cynical manipulator of federal equal employment goals, the Court improperly prevented Brown from showing Pawk's intent to discriminate, or reckless disregard of Brown's federally-protected rights. Accordingly, the Court's exclusion of the Franco evidence was improper.

## **Conclusion**

For the reasons stated above, Plaintiff respectfully requests that the Court grant the Plaintiff's Amended Motion for New Trial.

Respectfully submitted,

_____

/s/ Richard S. Matesic
Richard S. Matesic

PAID No. 72211

Edward A. Olds

PA ID No. 23601

1007 Mount Royal Boulevard

Pittsburgh, PA 15223

412.492.8975

## **CERTIFICATE OF SERVICE**

      I hereby certify that on December 1, 2005, I electronically filed the forgoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

Michael J. Pawk, Esquire

LUTZ, PAWK & McKAY

The Morgan Center Building

Suite 102

101 East Diamond Street

Butler, PA 16001

lpm@zoominternet.net


Date: <u>December 1, 2005</u>　　　　　　　　　　/s/ Richard S. Matesic

　　　　　　　　　　　　　　　　　　　　　　　Richard S. Matesic