1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3  KATHLEEN BROWN,                 :
                Plaintiff          :
4                                  :
                v.                 :  C.A. No. 03-224 (WDPA)
5                                  :
   COST COMPANY,                   :
6                Defendant         :

7

8

9

10         Trial in the above-captioned matter held

11     on Thursday, June 9, 2005, commencing at

12     8:30 a.m., before the Honorable Sean J. McLaughlin,

13     Courtroom C, United States Courthouse, 617 State

14     Street, Erie, Pennsylvania 16501.

15

16

17  For the Plaintiff:
        Richard S. Matesic, Esquire
18      1007 Mount Royal Boulevard
        Pittsburgh, PA 15223
19

20  For the Defendant:
        Lawrence P. Lutz, Esquire
21      Michael J. Pawk, Esquire
        Lutz & Pawk
22      The Morgan Center Building
        Suite 102, 101 E. Diamond Street
23      Butler, PA 16001

24

25              Reported by Janis L. Ferguson, RPR

1                              I N D E X

2

3    TESTIMONY OF GEORGIA PAWK

4          Continued direct examination by Mr. Matesic  . . .  40

5          Cross-examination by Mr. Lutz  . . . . . . . . .  103

6          Redirect examination by Mr. Matesic  . . . . . .  114

7

8    TESTIMONY OF WILLIAM HEATON

9          Direct examination by Mr. Matesic  . . . . . . . .  122

10          Cross-examination by Mr. Pawk  . . . . . . . . .  128

11          Redirect examination by Mr. Matesic  . . . . . .  133

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Whereupon the following discussion occurred on

2            the record in camera:)

3          THE COURT:  Before we talk about this, let me

4   raise an issue here.  You'll note in this draft charge, you

5   have two dates; July 31st and August 23rd.  Now, it strikes

6   me that all you really need to be is turned down once in

7   order to get your damages.

8                Are we -- I guess this is for you,

9   Mr. Matesic.  Are we going to go to the jury here or try to

10  go to the jury on two operative dates, or just the July 31st

11  date, where she showed up with whatever she showed up with?

12         MR. MATESIC:  Just the July 31st date.

13         THE COURT:  So we can take out that -- I think it

14  would be confusing.  You could get everything you want with

15  one day.  That's number one --

16         MR. MATESIC:  Having said that, Your Honor, I

17  mean, our theory of the case is Ms. Brown, among other

18  women, were submitting these memoranda from spring through

19  summer to Cost; I'm available for a job.

20         THE COURT:  Right.

21         MR. MATESIC:  And at the time that those

22  memoranda -- on the day in which it was received, there may

23  not have been a job opening.  But jobs did open up during

24  that time period.  Cost had notice that there were available

25  people for work and jobs open on or about August 1st, on or

1  about August 14th, on or about August 18th.

2          THE COURT:  But the circumstantial theory of your

3  case, based upon Barrett's testimony, is that it was more

4  likely than not, based on the practice, that there was a job

5  available on the 31st.

6          MR. MATESIC:  Yes.  And let's assume that Kathleen

7  Brown persuades the jury that she was there on the 31st.

8  Okay.  She didn't get that job.  Another job opened up on

9  the 14th.  She didn't get that job.  Another job opened up

10  on the 18th.  She didn't get that job.  So to the extent

11  that there were multiple openings during that time period

12  for which she did not receive an offer of employment,

13  those -- the dates of those vacancies --

14          THE COURT:  Well, what do you want me to say,

15  then?  On or after --

16          MR. MATESIC:  On or after July 31st would cover

17  it.

18          MR. PAWK:  I don't think that's proper, based on

19  the facts of this case, Judge.  I mean, the clear testimony,

20  Kathleen Brown's own testimony, and all the witnesses he has

21  put on so far, is the labor -- the needs change on a daily

22  basis.  I don't think you can say that, you know, a job --

23  if the jury believes that, in fact, there was available on

24  the three -- I don't think the evidence shows that.  That

25  all of a sudden they had some duty, had to prove there's

1    some duty or obligation to keep her name and when a job

2    opens, hire her over someone else on the job and that those

3    needs remain open.  The labor needs change on a daily basis.

4    They don't keep any records --

5             THE COURT:  We'll come back and fine-tune this in

6    a second.  First let's go to Plaintiff's counsel here.

7                  Have you had a chance to go through my draft

8    charge?

9             MR. MATESIC:  I have, Your Honor.

10            THE COURT:  Do you want to talk to me; issues,

11   questions, concerns.  Then we'll talk to the other side.

12            MR. MATESIC:  The first deals with the Court's

13   articulation of the prima facie case.  Now, the fact --

14   well, there are four elements in the case, and the fourth

15   one, that there is a job -- that the employer continued to

16   seek applicants on or after the date upon which this

17   qualified individual presented herself for employment.

18            THE COURT:  All right.  Which I guess is omitted

19   from my charge.

20            MR. MATESIC:  It is omitted from the charge.

21            THE COURT:  Let me tell you what I also omitted

22   from this.  Because when I went back and looked at it again,

23   here is the monkey wrench in this thing.  It seems to me

24   that the Defendant's position is insofar as a laborer's

25   position is involved, is that she did not apply for a

1    laborer's position.  Application is one of the constituent

2    elements under the prima facie case.

3              MR. PAWK:  Right.

4              THE COURT:  Yet, your legitimate nondiscriminatory

5    reason, standing alone, is really she applied for an

6    operator's position, not a laborer's position.  So what I

7    did with -- and I want to see if I get acquiescence on all

8    counsel -- I lifted the application out of the prima facie

9    case, and I put it in your legitimate nondiscriminatory

10   reason.

11             MR. MATESIC:  And that's actually a problem that

12   we have here.  Because we're merging now these various legal

13   standards --

14             THE COURT:  What would you suggest that I do?

15             MR. MATESIC:  What I would suggest that we do is

16   we follow from McDonnell Douglas case the four elements of

17   the prima facie case, and we have quoted the language at

18   Paragraph 6 of our proposed charge.  And then the

19   standard --

20             THE COURT:  Do you want me to refine it to say a

21   laborer position?  Because that's the theory of your case.

22             MR. MATESIC:  That's fine, yes.  Because the

23   laborer's position is our case.

24             MR. LUTZ:  I'll get into that in ours, because we

25   have a problem with that.

1          THE COURT:  So I lay out the four points.  Now I

2    tell them that certain of them are satisfied, with the

3    exception of -- which point would it be?

4          MR. MATESIC:  Well, under 2, that -- well, that

5    she applied and -- No. 2 is that she applied and was

6    qualified for a job for which the employer was seeking

7    applicants.

8          THE COURT:  There's a dispute as to whether she

9    applied for a laborer's job.

10         MR. MATESIC:  There is a dispute.  No. 3, despite

11   her qualifications, she was rejected.

12         THE COURT:  No question about that.

13         MR. MATESIC:  4, after her rejection, the position

14   remained open, and the employer continued to seek applicants

15   from persons with the Plaintiff's qualifications.

16         THE COURT:  Well, is there a dispute about that?

17   That goes to -- the problem is -- it's not a problem.  It's

18   the way the thing is set up.  That suggests that after her

19   application, the position, I guess, in this case

20   occasionally would pop open.  I mean, is there really a

21   dispute that throughout the balance of this job, on

22   occasion, laborers were being hired?

23         MR. PAWK:  There's not a dispute of that.  No,

24   Judge.  But I guess it's hard to, you know, explain.  Our

25   position is that there was no job available on the 31st.  So

1    you can't say that it was -- it remained open, if there was

2    no job available.  But there is no dispute that -- I think

3    the record is clear, there were three hires after the 31st.

4              THE COURT:  Right.

5              MR. MATESIC:  On or after the 31st.

6              THE COURT:  Well, whatever.  But -- so that -- I

7    guess that prong isn't in dispute.  But implicit in the

8    application prong, where it says the person applied,

9    implicit in that prong is the concept that there had to have

10   been a job to apply for.  So it seems --

11             MR. MATESIC:  And it's her burden.

12             MR. PAWK:  That's right.

13             THE COURT:  So don't you think what I should tell

14   the jury is you have to determine whether she applied for

15   the labor position --

16             MR. MATESIC:  Yes.

17             THE COURT:  And you have to determine, when she

18   applied for the labor position, whether there was a labor

19   position available.

20             MR. MATESIC:  Well, no.  No, no.  That she

21   applied -- actually, it's not -- and this is not parsing the

22   language.

23             THE COURT:  All right.

24             MR. MATESIC:  It's not whether a job was open.

25   The standard is whether it was a job for which the employer

1  was seeking applicants.  Okay?  Cost knows, because it's

2  been in business for a long time, that during the peak

3  season, openings happen, because their needs, as Mr. Pawk

4  has just said, change on a daily basis.  So Cost is

5  continually receiving applications.

6          THE COURT:  Right.

7          MR. MATESIC:  With full knowledge that during the

8  peak months of the summertime, they are going to have needs

9  on this day, maybe a week after that day, maybe two weeks

10 after that day.

11          So what the second prong in the prima facie

12 case says is -- or it goes to is whether or not the employer

13 is seeking applications for a job.  Okay?  What is the job?

14 The job is mason tender.  Were they seeking applications

15 during the summer months of 2002?  And the answer is,

16 actually, they were getting them from the springtime of

17 2002.

18          We went through, for 20 minutes, through all

19 those minority memoranda that Miss Pawk has kept on file.

20          THE COURT:  What page are your --

21          MR. MATESIC:  Page No. 3, Paragraph 6.

22          MR. PAWK:  Judge, I want to address what

23 Mr. Matesic is saying now about this.  Because we're going

24 to get into a big objection, and I'd like to address it now.

25          He has asked Georgia Pawk about EEO

1    memorandums that were filled out by minorities in

2    Charleston, West Virginia, in a project they were doing in

3    Charleston, West Virginia.  That's what he asked her about,

4    in April and May of 2002.  Nothing to do with this job at

5    all.  So he wants to show they were receiving applications

6    from minorities in Charleston, West Virginia in April and

7    May of 2002, and so they were actively seeking these

8    applications.

9                It's just not true, Judge.  It's going to

10    confuse the jury, and it's not proper.

11          MR. MATESIC:  You don't dispute what Kathleen

12    said, that you were hiring bricklayers from Illinois, West

13    Virginia, Florida.  You were going all over the United

14    States, and Cost was bringing them in from everywhere.

15          THE COURT:  I think I can clarify this.  I'm

16    looking at the McDonnell Douglas language.  That she applied

17    and was qualified for a job for which the employer was

18    seeking applicants.

19                Is it your position that you don't have to

20    demonstrate, circumstantially, as you attempted to do, that

21    there was a position available on that day if they would

22    have chosen to hire her?

23          MR. MATESIC:  I'm saying that there is a -- when

24    they say a job in McDonnell Douglas, what they refer to

25    is -- that concept is expansive.  It includes a job on that

1    day, it includes that job title.  And in these circumstances

2    with Cost, mason tender, the job of mason tender was open on

3    all of these days in the summertime; July 31st, August 14th,

4    August 19th.  And actually there were 17 other occasions or

5    14 other occasions before July 31st.

6            So she meets the second prong of the test if

7    she shows that on or after July 31st, one or more instances

8    occurred where Cost was seeking a mason tender.  She gave

9    them notice.  She put -- you know, employers always do this.

10   They say --

11           THE COURT:  Hang on a second.  If she's seeking

12   it, though -- if they were seeking a mason tender, that

13   means a mason tender's job was available.  Right?

14           MR. MATESIC:  Right.  Let me answer it this way:

15   You know, the standard line in an employer's rejection

16   letter is we have decided to choose somebody else, but we

17   will keep your application on file.

18           THE COURT:  Yeah, right.

19           MR. MATESIC:  For further consideration.  I'm

20   going to ask Georgia Pawk that question; you kept these on

21   file for further consideration, right?

22           THE COURT:  All right.

23           MR. MATESIC:  Now, how is she going to answer that

24   question?  Yes, that's what I did.  I kept them on file for

25   further consideration.  What does that mean?  That means we

1    satisfied the second prong.

2          MR. LUTZ:  He's ignoring a lot of things.  He's

3    ignoring what his witnesses, own witnesses brought up,

4    Mr. Barrett in particular, that the union availability

5    changes from day to day.  So to say that there is a job

6    available for someone off the street on a daily basis is

7    just totally contradictory to what Kathleen Brown and Ron

8    Barrett said from the witness stand.  They said it changes

9    on a daily basis.  There is no continuing obligation with

10   Cost.

11         Also, the people that show up at the job site

12   are the ones who get hired.  That's what she said on the

13   witness stand.  She didn't show up on the job site on

14   subsequent days.  She didn't put a phone number on this

15   document that they sent to her.  How on earth were they ever

16   even going to get in touch with her?

17         THE COURT:  I think the fundamental question is

18   whether or not -- your theory is that once they had her

19   application, physically had her application, once she came

20   to the job site, she was in a continuous application mode,

21   even though she wasn't there.

22         MR. MATESIC:  Right.

23         THE COURT:  Is that what you're --

24         MR. MATESIC:  And I have a document where I can

25   show -- where I can support exactly what I'm saying, and

```
 1    it's their document, and he's going to get it for me.

 2              MR. PAWK:  What is it?

 3              MR. MATESIC:  The affirmative action program

 4    document that Georgia wrote.  Okay.  Now, this is

 5    Defendant's Exhibit U-1.  Now, I am totally mindful of our

 6    discussions over the last day or so concerning these

 7    percentages, 6.9 percent and how the Judge -- how the Court

 8    is mindful of the fact of how prejudicial this could be to

 9    the case and should not be sent to the jury.  This is

10    Georgia Pawk's own document.

11                   Mike, do you have this?

12              MR. PAWK:  Not in front of me.

13              MR. MATESIC:  This is U-32, the Defendant's

14    exhibit.  That's the second page of the exhibit titled

15    Affirmative Action Plan, under the letterhead Cost Company.

16    And Miss Pawk will adopt -- I believe she has already

17    adopted --

18              THE COURT:  Let me see the operative language that

19    you are talking about.

20              MR. MATESIC:  The operative language is Paragraph

21    10.

22              THE COURT:  Let me read it.  It says the contract

23    for equal employment opportunity goal is 50 percent.  The

24    female employment goal is 6 9/10 percent.  Okay?

25              MR. MATESIC:  Now, we're not talking about the
```

1    regulation.  Okay?  The CFR is off the table right now.

2    We're just talking about Cost's own internal policy.  We're

3    talking about Cost's contractual obligations.  Forget about

4    the law.  Forget about the CFR.  This is the goal of the

5    equal --

6            THE COURT:  I can't forget about the law.

7            MR. MATESIC:  But I'm not arguing --

8            THE COURT:  That's the position I find myself in.

9            MR. MATESIC:  I'm sorry.  But I'm not arguing the

10   law right now.  What I'm saying is Miss Pawk is the Equal

11   Employment Officer, has -- she has created this policy for

12   Cost, and these are the goals.  This is her goal.  Forget

13   about the law.  This is what she says the goal is under

14   their own policy.  All right?

15            Now, if the goal is under their own policy --

16   it's a fair question to ask Ms. Pawk -- what steps do you

17   take to achieve your goals, I don't think anybody can say

18   that's an unfair question; what steps do you take to achieve

19   your goals.

20            Another question for Miss Pawk is, what --

21   what methods do you use to determine whether you have met

22   your goals.  That has to be a fair question.

23            THE COURT:  Let me interrupt just for a second.

24   The critical question is, it seems to me, what is

25   necessary -- what -- what must one do as a walk-on to get

1    hired at Cost.  In other words, what -- what is the

2    application that will get you in the door.  And the question

3    is, it seems to me, does it, in fact, require that you do

4    what your client did on the 31st, if the jury were to

5    believe that, and that means physically show up at the door

6    to be hired.  I mean, is there anything in the record which

7    suggests that walk-ons get hired, other than being at the --

8    at the trailer on the day that they are hiring?

9         MR. LUTZ:  There's nothing.

10         MR. MATESIC:  As of now.  And that's exactly my

11    point.

12         MR. PAWK:  Judge, can I address that?

13         THE COURT:  Let him finish, and then I'll let you

14    go.

15         MR. MATESIC:  If this is really their goal,

16    there's more than one way to skin a cat.  You can hire

17    people off the street who show up.  You have an objective in

18    a business to get that project done in a certain amount of

19    time.  You have needs.  They arise on a daily basis.  We

20    have to put somebody in there immediately so the project can

21    continue.

22         On the other hand, you also have a goal, as

23    stated in Paragraph 10, that you're going to pursue equal

24    employment.

25         Now, those two goals sometimes clash.  There

1     are occasions when one of those goals trumps the other.

2     Okay?  And if that happens, if -- and -- okay, well, let me

3     put it to you this way:  If, for example, Miss Pawk, as the

4     Equal Employment Officer, believes that this is more

5     important, that Paragraph 10's goal is more important than

6     putting a person in that job immediately, okay, she can tell

7     us why she thinks that's more important.

8                 And to go right back to your point, that

9     means maybe -- maybe Cost's Equal Employment Officer would

10    say, well, we -- we're not just going to make jobs available

11    to people who walk in off the street.  Because we have this

12    goal of hiring 6.9 percent females.  Because we have this as

13    a goal, we're going to keep a job open so that I have enough

14    time to call one of those 30 people, 30, 35 people who sent

15    me their Minority Recruitment Memoranda in the spring, and

16    say, can you be in Erie -- can you be in Forest County

17    tomorrow, can you be there the day after tomorrow.

18                THE COURT:  See, here --

19                MR. MATESIC:  This is my goal.

20                THE COURT:  Here is my point:  If she was

21    discriminated against on the 31st, you have won.  All of

22    this other stuff is irrelevant.  You won.

23                MR. MATESIC:  Well -- but how do I prove -- and

24    you're exactly right.  And how do I prove that she was

25    discriminated against?  Pretext.  How do I prove pretext?  I

1  show that Georgia Pawk is talking out the side of her mouth.

2  That is my burden.

3          THE COURT:  What do you want to say on this?  And

4  then I'm going to rule, because we have got to get moving.

5          MR. LUTZ:  This is really hard, to deal with a

6  moving target constantly.  The first document came into

7  evidence with respect -- this recruitment memoranda says --

8  and I don't have it in front of me, Your Honor, but my

9  recollection is it talks very vaguely about what the process

10  is and how this is not an application, there may be

11  possibility in the future.

12          When you read all these documents together,

13  there is no way on earth that there -- it even remotely

14  creates any obligation on some employer.  He's trying to get

15  into the EEOC items that he knows he's restricted from

16  getting into.  He's trying to throw all these documents in

17  front of a jury and somehow insinuate to the jury that Cost

18  isn't doing what it has to do with respect to minorities.

19          THE COURT:  All right.  Let me solve the prima

20  facie case problem first.  All right.  Let's say I'm going

21  to give the prima facie's charge just as it appears in

22  McDonnell Douglas --

23          (Discussion held off the record.)

24          THE COURT:  And so that she applied and was

25  qualified for a job which the employer was seeking

1   applicants.  I'm going to tell the jury with respect to that

2   particular prong that -- what was your point about labor

3   position?  You want me to say labor position?

4           MR. LUTZ:  I think you just say "hire" throughout.

5           THE COURT:  Say what?

6           MR. LUTZ:  Well, I'm just looking at your charge.

7           THE COURT:  And I would just leave it position

8   rather than --

9           MR. LUTZ:  For a job.

10          THE COURT:  That she applied and was qualified for

11  a job for which the employer -- and in that respect, don't I

12  have to tell the jury that there is a dispute on

13  application?

14          MR. LUTZ:  Yes.  Whether or not she applied.

15          MR. MATESIC:  You know, Your Honor, I don't think

16  you have to say there's a dispute.  You have to say it's her

17  burden to prove it.

18          THE COURT:  You know, I got to tell you guys --

19  and this isn't your fault.  It just may be the way the case

20  is shaking out.  But I have done hundreds of Title VII

21  cases, and I have never seen one get more convoluted in my

22  life than this thing has.  And I started out with a -- with

23  a view that this was a rather straight walk to the goal

24  line.

25              I think the jury -- I think the jury in the

prima facie case is going to have to be told this:  That 1
is established.  With respect to No. 2, that the jury is
going to -- if the jury -- you have abandoned your
operator/engineer theory.

MR. MATESIC:  Yes.

THE COURT:  You are going only on a laborer's
theory.  So I don't see the harm in the jury being told
that.

MR. LUTZ:  Because she doesn't think she ever
applied for a laborer's --

THE COURT:  But that's her burden.  Her burden is
to establish that she applied for a laborer's position.  And
I'm going to tell the jury that in so many words, there's a
factual dispute there.  They are going to have to, A,
determine whether she applied for a laborer's position, and,
B, they are going to have to determine whether there was a
position available.

MR. PAWK:  Right.

THE COURT:  So with respect to No. 2, not unlike
what I think may have been in my charge already, I'm going
to say that they are going to have to determine whether she
applied for the laborer's position, whether one was
available, and the qualifications is a given.  There is no
doubt she was qualified for that position.  And, 4, after
her rejection, the position remained open and the

1    employer -- I mean, I will give that, but I just don't think

2    it's germane to the case.  If you want me to give it, I

3    will, but I just don't think it's -- I don't think it's in

4    dispute.  I'll give it -- I'll tell them it's not in dispute

5    that a position remained open.

6            MR. MATESIC:  If they are agreeable to that.

7            MR. PAWK:  I like that you left it out in your

8    original charge.

9            THE COURT:  I mean, it doesn't do you one whit of

10   harm for you to leave it out, so it's one less thing you

11   have to prove, so I'm inclined to leave it out.  In other

12   words, we'll just end up with "and rejected".  Do you follow

13   me?

14           MR. MATESIC:  Okay.  And I'm just wondering,

15   though, in the event that this ends up somewhere else, is it

16   going to be a problem that we didn't include all four

17   elements as stated under the Green case?  And you know my

18   tendency is always just get the language out of the case and

19   stick it in the charge.  But if they are agreeable to it and

20   I'm agreeable to it --

21           THE COURT:  I don't see it as being -- this is not

22   one of those plain air type of situations.  I mean, I think

23   it --

24           MR. PAWK:  We -- I'll state on the record, we

25   agree with Your Honor's draft where you left the fourth

1    element out, and we would agree with that.

2              THE COURT:  All right.  Well, then haven't we come

3    full circle to the point where at least insofar as the prima

4    facie case is set up, that there's no disagreement?

5              MR. PAWK:  I have one comment.

6              THE COURT:  You finish off, and I'll go over to

7    the Defendant.  Go ahead, Mr. Matesic.

8              MR. MATESIC:  I have reconsidered this.  I object

9    to not including the element.  I understand that it helps us

10   and there's no downside to it, but, in fact, that language,

11   reading that language to the jury --

12             THE COURT:  You know when you said if this case

13   ever goes someplace else, it might, but we won't have a

14   record, so slow down when you're talking.

15             MR. MATESIC:  When the Court reads the charge,

16   there's always this possibility that just the reading of the

17   charge, the language itself, is going to make an impression

18   on the jury.  So the jury is going to be thinking about

19   these issues.

20             THE COURT:  I hope so.

21             MR. MATESIC:  And it may be helpful to my client

22   that they be thinking about the issues of rejection and of a

23   position remaining open and the continuing --

24             THE COURT:  All right.  I'll give it.  We'll put

25   it in.  But then what do I tell the jury about it?  Because

1    when I say after rejection, the position remained open, that

2    suggests that it was open at the time she applied for it.

3            MR. MATESIC:  Well, that's her burden to show that

4    it was open.

5            THE COURT:  All right.  Then I'll say she will

6    have to -- fine.  So we got that done.

7                Now, with -- let's just finish off the

8    Fuentes burden shifting here.  Do you have any objection to

9    my articulation of the Defendant's --

10           MR. MATESIC:  That they have articulated a

11   legitimate reason?

12           THE COURT:  Yes.

13           MR. MATESIC:  I don't.

14           THE COURT:  Now let me flip over to you.

15           MR. PAWK:  Judge, I would suggest we add a

16   sentence after you complete the prima facie charge there.

17   You say, if you conclude that a labor position was available

18   when Brown applied, you must then determine whether she was

19   discriminated against because of her sex.  I think to be

20   fair, because we don't believe she has proven a prima facie

21   case, that you need to say if you conclude that she failed

22   to prove that a labor position was available, and that --

23   did you find that the --

24           THE COURT:  The sentence should be, if you find

25   that Miss Brown failed to prove that she applied for a

 1    laborer's position, or that a laborer's position was

 2    available, then you must find in favor of the Defendant.

 3          MR. PAWK:  Correct.  I think you need to add that,

 4    and it need go no further.

 5          THE COURT:  I think that that's correct.  You

 6    agree with that, don't you, Mr. Matesic?  In other words, if

 7    a prima facie case hasn't been made out.

 8          MR. MATESIC:  Yes, that's fine.

 9          MR. LUTZ:  My earlier comments were with respect

10    to that laborer thing.  But if you go to Page 8, Your Honor,

11    you say at the end of the first paragraph -- I'd like to

12    rephrase that a little bit.  The last sentence says,

13    "Therefore, in terms of a prima facie case, you need only

14    decide whether a laborer's position was available."

15               I would like it to say if and when Brown

16    sought employment, because this is still talking about a

17    prima facie case.

18          THE COURT:  That has to be changed because you're

19    going to have a -- we're going to have the fourth element as

20    well, which is the position remained open.

21          MR. PAWK:  Are we dropping the August 23 date as

22    well, Judge?

23          THE COURT:  Yes, we are.  Okay.  What else?

24          MR. LUTZ:  And, well, the second paragraph it was

25    the same type of comments.  "You concluded the position that

1    Brown sought was available when Brown sought that position,"
2    is the sentence.
3            MR. MATESIC:  Where are you?
4            THE CLERK:  The paragraph you just changed, Judge.
5    That would be reworded, because the charge is going to be
6    reworded in that place.  I'm sorry, where you just dictated
7    this change, "If you find that Brown failed to prove she
8    applied and/or that a position was open, then you must find
9    for Cost."
10           THE COURT:  Right.
11           THE CLERK:  So he was saying change this, and I
12   said you already did.
13           THE COURT:  All right.
14           MR. LUTZ:  At the very bottom of that page, it
15   says, "Cost further contends that there were no operator
16   positions."  I'd like it to say that Cost further contends
17   that there were neither laborer, nor operator positions
18   available at the time of Brown's -- at the time Brown was
19   seeking employment.
20           MR. MATESIC:  What are you suggesting, Larry?  I
21   apologize.  That there were no --
22           THE COURT:  At the bottom of Page 10, that there
23   were neither operator positions nor laborer positions.
24           MR. MATESIC:  This is Page 8?
25           MR. LUTZ:  8.

1          MR. MATESIC:  I thought you said 10.

2          MR. LUTZ:  Do you want us to get into the damages

3   part?

4          MR. MATESIC:  Before you do, Your Honor, we

5   started off with my objections --

6          THE COURT:  I'm going to come back and let you go

7   all the way through yours.

8          MR. LUTZ:  Page 12, Paragraph A, with respect to

9   back pay.  The appropriate nature of back -- the appropriate

10  measure of back pay is the amount of salary, plus fringe

11  benefits that Brown would have received, and you have

12  blanks.

13          I would propose we say it this way:  From the

14  date she was not hired by Cost until she obtained subsequent

15  employment at a higher rate of pay or until the time she

16  would have been laid off by Cost.

17          THE COURT:  I thought there was an agreement on

18  what those dates would be.  Wasn't it July 31st to August --

19  when did she get her next job?

20          MR. MATESIC:  She got a job that paid less in

21  November.

22          MR. PAWK:  No, she was working in October --

23          THE COURT:  When did she get a job that paid as

24  much or more?

25          MR. MATESIC:  April of '03.

1          MR. LUTZ:  November.  Because he tried to factor

2     in that pension stuff that made it less.  But it was obvious

3     from the testimony that the pension stuff doesn't come in,

4     because she wouldn't have qualified at that time.  So when

5     she got the job at KGL, she was making more than she did at

6     Cost Company.  So you can't put in an open date there.

7          MR. MATESIC:  That's not -- we have a conflict in

8     the evidence on this.

9          THE COURT:  Isn't this the way to do this -- it

10    would be -- this is the way to do it:  Because the jury is

11    then told in the next paragraph, from the amount of money

12    that she was told she would have earned, you have to deduct

13    the money she received from another employer.  So let them

14    do that.  So back pay would run from July 31st to the

15    present.

16         MR. MATESIC:  Any money she received, I have an

17    objection to that, because the per diem, as Ms. Brown

18    testified to, was paid to her to compensate her for

19    additional expenses that she would not have incurred had she

20    been working at Marienville.  So it really does not factor

21    into this motion of pay.

22         THE COURT:  But I don't say anything about it.

23         MR. MATESIC:  What is that?

24         THE COURT:  I don't say anything about per diem.

25         MR. MATESIC:  You say "any money".  And any money,

1   in construction, that's --

2        THE COURT:  You know, everybody was talking about

3   per diem out there and asking questions, like it was an

4   unknown term from the planet Mars.  Per diem is not salary.

5   It is money intended to compensate you for out-of-pocket

6   expenses that you otherwise would not have incurred.

7        MR. MATESIC:  I agree with that.  They disagree

8   with it.

9        THE COURT:  Don't you think?

10       MR. LUTZ:  It's money that she received in

11  connection with this job.  It's a fringe benefit, clearly,

12  to a job.  I mean, people have expenses, living and eating

13  expenses --

14       THE COURT:  I'm not going to overly parse this for

15  the jury.  You can say whatever you want on that.  I am

16  going to say whatever she would have received from July 31st

17  to the present.  The jury can calculate whatever they want,

18  if they think there should be deductions or offsets.  I'm

19  not going to lock into a date, because back pay can run up

20  to today.

21       MR. MATESIC:  My objection is to "any money", as

22  opposed to any wages that she would have earned from another

23  employer in Marienville.

24       MR. LUTZ:  Why, if you say benefits with respect

25  to the Cost position, you have to say benefits with respect

1    to any other position.

2            THE COURT:  That's how I am going to charge it, so

3    keep going.

4            MR. PAWK:  Punitive damage, Judge, I don't believe

5    there has been evidence sufficient in this case to charge

6    this jury on punitive damages.

7            THE COURT:  I haven't finished hearing the

8    testimony.

9            MR. PAWK:  Judge, I asked for in my request a

10   charge, the standard charge for failure to call available

11   witnesses, and I think the testimony in this case is, since

12   she's putting hearsay as to people who told her that Cost

13   was hiring -- and it goes to a key element in the case, and

14   I know you have given an instruction to the jury that they

15   at least couldn't consider Mandy's testimony --

16           THE COURT:  Some of it came in over no objection.

17           MR. PAWK:  I think she said something when I was

18   cross-examining her.

19           THE COURT:  From other people.

20           MR. PAWK:  I should be able to argue to these

21   people, these are her friends, Mandy is her best friend.

22   This is John Howard and Kenny Popini were working on the

23   project.  Wouldn't they be the best people to support her

24   statement that there was an available job, and Cost was

25   hiring, I would at least like to argue that to the jury.  I

1    think that's a proper charge.

2         MR. MATESIC:  Obviously, I would object to saying

3    she didn't call available witnesses.  The only evidence --

4    we put that evidence to the jury to show there was

5    reasonable mind, not to prove that there was a job

6    available.  The Court instructed the jury accordingly --

7         THE COURT:  I don't think it's appropriate to give

8    a missing witness charge on that.  For a variety of reasons.

9    And I have to look at the rule again.  What are you --

10        MR. PAWK:  Well, it's not a missing witness.  It's

11   failure to call available witnesses.

12        THE COURT:  Let me see the thing on that.  Those

13   witnesses would be equally available to you, would they not?

14        MR. PAWK:  True.  But, I mean, I didn't -- I

15   wasn't -- I wasn't proffering those people's names in

16   evidence that they were supporting my testimony.  She was.

17        THE COURT:  I understand that, but I don't think

18   the shoe fits here, so I'm not going to let you give that.

19   What else?

20        MR. PAWK:  Judge, if I can say, so I can avoid an

21   objection, I'm free to argue who she called and didn't call

22   in my closing.

23        THE COURT:  But you can't argue -- you can't

24   argue, for instance, that if those other people would have

25   been produced, the people that she testified to, made those

1    statements, that --

2        MR. PAWK:  You can draw an inference that it could

3    have been adverse.  I won't say that, but I can talk about

4    people she named.  I just don't want to revisit this later.

5        THE COURT:  Right.  You can't do it in such a way

6    that you are drawing an adverse inference about their

7    veracity.

8        MR. MATESIC:  And you're not going to question the

9    fact that she didn't call these people?

10       MR. PAWK:  Yeah, I am.

11       MR. MATESIC:  Why didn't she call these people?

12       MR. PAWK:  I'm going to talk about who she called

13   as witnesses and what evidence was presented, and I'm going

14   to say you heard her testify that her best friend Mandy

15   lived there, and you heard her say that this is how she knew

16   people were -- that Cost was hiring, and Kenny Popini was

17   working on the job, and did she bring -- present any of

18   these people in here to tell you anything --

19       THE COURT:  No, you're not.  That's the same thing

20   I just told you not to do.

21       MR. PAWK:  I wouldn't take the next step and tell

22   you the failure to call them would be adverse.

23       THE COURT:  When the issue first came up, just to

24   put this in perspective, there was an objection from you,

25   and I think it might have been somebody in a bar.  I can't

1    remember who they were.  You objected, and said, no, I'm not

2    doing it for the truth of the matter asserted.  I'm doing it

3    for why she went to the job site to seek employment.  I gave

4    a jury instruction on that.

5              On two or three occasions, testimony was

6    elicited from her that someone else had said that there -- a

7    different group had said that they were hiring.  I can't

8    remember who they were.  That came in over no objection.

9    Then you were cross-examining her, and she went off again.

10   So, you know, I gave a curative instruction to the jury when

11   an objection was made with respect to a distinct group.

12             What I'm saying is, it sounds to me, if I

13   remember correctly, that some hearsay came in over no

14   objection.

15             MR. PAWK:  Well, I apologize, Judge, because I was

16   sitting there with Larry at the time when she then -- she

17   first said about Mandy.  That was at the Kelly Hotel.  And

18   we objected, and you gave a curative instruction.  Then she

19   took the next step and talked about Kenny Popini and John

20   Howard.  I didn't keep objecting because I thought your

21   curative instruction was going to all those people.

22             THE COURT:  I was assuming that was it.  With

23   respect to any of these groups of people that you were

24   eliciting the testimony from, just like the first group, I

25   was working under the impression that it was your position

1    that that was all state-of-mind testimony all the way

2    through.

3          MR. MATESIC:  Yes.

4          THE COURT:  All right.  Then that curative

5    instruction that I gave the jury would apply for all of

6    those folks.  All right.  Let's go back to you, then.

7          MR. MATESIC:  All right.  All right.  This is Page

8    9.  And I am mindful at this point of the Third Circuit case

9    of Smith versus Borough of Wilkinsburg, 148 F.3d., 272, 1998

10   case.  It was issued five years after the Supreme Court's

11   decision in St. Marys Honor Center versus Hicks, 09 U.S.

12   1993.  Several observations that the Court made before it

13   announced the standard when instructing a jury as to

14   pretext.  And I'm going to read from the decision, in the

15   field of employment discrimination --

16         THE COURT:  Please go slower.  Just give the case

17   to me and point me to where the operative language is.

18         MR. MATESIC:  The operative language is this

19   portion underlined here.

20         THE COURT:  If the Plaintiff establishes the

21   elements of a prima facie case, the employer must articulate

22   a particular -- once such a justification is proffered, the

23   burden then reverts to the Plaintiff to prove that the

24   articulated reason is pretext.  When a jury finds that the

25   proffer is justified for its action, the jury is permitted,

1    albeit not mandated, to return a verdict in its favor.

2          MR. MATESIC:  Correct.  You say that later in the

3    charge.  I don't mean to be disrespectful.  That's not how

4    the Court addresses this issue in the first instance in the

5    instructions.

6          THE COURT:  All right.

7          MR. MATESIC:  What the Court says is, "Brown

8    cannot prove intentional --" this is the middle of the first

9    paragraph.  "Brown cannot prove intentional discrimination

10   by Cost simply by showing that its stated reason is false.

11   Rather, Brown must show both that the stated reason is false

12   and that the real reason for the challenged decision was

13   because of her sex."  Okay?

14          The Court in Smith versus Wilkinsburg

15   articulates this standard in a different way than the Court

16   in our case has articulated the standard.  The Court has

17   said it is not spoken in unequivocal terms, as the Court in

18   the present proposed charge has.  The Court uses the

19   terminology, "Brown must show both that the stated reason is

20   false and that the real reason for the challenged employment

21   decision was because of her sex."

22          THE COURT:  That's an accurate statement of the

23   law.

24          MR. MATESIC:  Okay.  But what the Court is saying

25   here is that once pretext -- once they disbelieve -- once

1    they disbelieve what the employer is saying, then they --

2    all that is left for the jury to do is to decide whether or

3    not it was discrimination.

4                THE COURT:  Okay.

5                MR. MATESIC:  What the Court suggests here in this

6    statement is there is a burden over and above that.  And the

7    burden is that the reason for the challenged employment

8    decision was because of her sex.  This -- this suggests to

9    the jury that Ms. Brown has a higher hill to climb than

10   the --

11               THE COURT:  I disagree.  I'm leaving it the way it

12   is.  It's accurate in my view.  What else?

13               MR. MATESIC:  My only objection for the record is

14   that this comes -- that the language on Page 9 precedes the

15   statement of the law on Page 10.  So my objection, for the

16   record, is that we take out No. 9 and use that language from

17   Page 10, which is the second full paragraph.

18               THE COURT:  All right.  What else?

19               MR. MATESIC:  Okay.  The Court talks about the

20   "but for" test.  But for discrimination.  And I apologize, I

21   do not have a case citation for the Court.  But I -- and I

22   believe that the proper terminology is determinative factor,

23   not "but for".

24               MR. PAWK:  What page are you on?

25               MR. MATESIC:  We are on Page -- this is Page No.

1  10 at the very bottom.

2         THE COURT:  Okay.  Let's see.

3         MR. MATESIC:  "Brown must prove that but for her

4  sex, this decision and event would not have occurred."

5              I believe the Court uses the determinative --

6         THE COURT:  So do I.  Read on.  Read the last

7  sentence of Page 10, onto 11.  I just define what it means

8  by saying it's -- I'm not going to change that.  What else?

9         MR. MATESIC:  Then the paragraph immediately above

10  that, "If after considering --"

11         THE COURT:  I'm sorry; what page are you on?

12         MR. MATESIC:  We're still on Page 10.  I would

13  suggest that we add at the end of the second paragraph, this

14  is because your disbelief of Cost's stated reason, when

15  added to Brown's establishment of the prima facie case is

16  enough evidence --

17         THE COURT:  No.  I'm not going to give that.

18         MR. MATESIC:  All right.  Note my objection for

19  the record.

20         THE COURT:  What else?

21         MR. MATESIC:  Let's see.  One more thing.  Give me

22  one second, Your Honor.  On Page 13, under Punitive Damages,

23  this is under Paragraph C, second sentence, if you find --

24  well, if you find that the Defendant's violation of Title

25  VII was willful, the Court will award Brown money damages.

 1    And I believe that the proper instruction is that the

 2    jury -- you, the jury, are to award punitive damages, not

 3    the Court.

 4              THE COURT:  Well, remember, though, the punitive

 5    damages here -- I think we're talking about a statutory --

 6    we're under the Civil Rights Act of 1990, are we not, or

 7    1991?

 8              MR. MATESIC:  '91, yes.

 9              THE COURT:  Isn't that a doubling -- I mean, this

10    is not an open-field punitive damage award.  If I remember

11    correctly, this is a statutory -- the statute itself speaks

12    of a doubling of, I think, of the compensatory award, does

13    it not?

14              MR. MATESIC:  Well, but it doesn't preclude the

15    jury from doubling.

16              THE COURT:  Actually, I was trying to make it less

17    complicated, because if they find willful misconduct, I

18    would simply mold the verdict by performing the appropriate

19    arithmetic to give you the award.

20              MR. MATESIC:  But -- okay.  But why tell the jury

21    that?  I mean --

22              MR. PAWK:  Maybe I can simplify this.  I brought

23    up the issue of punitives earlier.  I don't even think it's

24    proper to charge the jury on punitives at this point.  So

25    maybe we can revisit this.

1          THE COURT:  What, do you want the jury to do the

2     multiplication?  But then I have got to charge them on how

3     they do it.  You will lose not one bit by this.  If they

4     find it's willful, I will perform the math for you, and I

5     will give you whatever the multiplication comes out to be.

6     Otherwise, I have got to go in and charge them on you have

7     got to multiply -- it's just an unnecessary step.

8          MR. MATESIC:  Let me ask the question this way:

9     What in this instruction tells the jury -- because it seems

10    to be confusing.  The first sentence says you must decide as

11    a part of the Plaintiff's damages, and if you find the

12    violation was willful, the Court will award Brown money

13    damages.  That suggests to the jury that the calculation of

14    that is taken out of their hands and put into the hands of

15    the Judge.

16         THE COURT:  Okay.  I'll revisit that.

17         MR. LUTZ:  He wants to get into all this EEOC

18    stuff again, and I think it's utterly improper.

19         MR. MATESIC:  Go ahead, I'm sorry.

20         THE COURT:  You mean the 6.9 percent business?

21         MR. MATESIC:  Here is where Mr. Lutz left off.

22    You were saying -- we were talking about the issue of

23    whether or not it's relevant to the case -- whether or not

24    it's relevant to the case that after July 1st, positions

25    remained open.

1          THE COURT:  Right.

2          MR. MATESIC:  And Brown, as we contend, was -- had

3    an application on file.  Okay?  Mr. Pawk said, well, that's

4    not how it works.  Well, that's a factual issue, number one.

5    So it's now how it works.  Mr. Lutz pointed out some

6    specific language in the memorandum.  What is the memorandum

7    saying?  At this time we may not be accepting employment

8    applications; however, in the future, should we be

9    commencing new projects and need additional manpower, we

10   would like you to inform us if you know of any individuals.

11          Your Honor, they are keeping these on file.

12   Their only language says that they are keeping them on file.

13   Why would you do that, unless, in your mind, you knew that

14   there would be an opening later and you wanted to get in

15   touch with this person?

16          THE COURT:  I don't think that there's anything

17   wrong in asking Miss Pawk or any other representative of the

18   company whether as a matter of practice they would call

19   people whose applications they had on file to come in to --

20   to come to a job site if they needed manpower.  I think you

21   are entitled to ask that.

22          MR. MATESIC:  Thank you.  Now, the next point --

23          MR. LUTZ:  If she says no, that's it.

24          MR. MATESIC:  Wait a second.  I'm going to tip my

25   hand here, because this is so critical to the case.  I'll

```
 1   tell you --
 2            THE COURT:  Hang on just one second.
 3            MR. MATESIC:  This is going to take me 60 seconds.
 4   I beg everyone's indulgence.  She is the compliance officer.
 5   I'm going to tell you exactly where I'm going with this.
 6   She's the compliance officer.  A compliance officer has to
 7   ensure that a policy is followed.  How does anyone do that?
 8   Well, they have to monitor the situation.  What is your
 9   method for monitoring the situation?  Miss Pawk has
10   testified that there's this equal employment policy at Cost,
11   and that policy covers the employee from the time they apply
12   for work throughout their entire career with Cost;
13   application, evaluation of applicants, hiring or rejection,
14   promotion, suspension, all the way to the point where they
15   either resign or are fired.  Everyone agrees to that.  Okay?
16            If the policy applies at all stages, let's --
17   I don't care about anything that happens over here; I'm
18   talking about this end right here (indicating).
19   Application, evaluation, and hiring.  The policy applies.
20   You're the compliance officer, Miss Pawk?  Yes, I am.  How
21   do you evaluate compliance here?  What do you do?  How does
22   anyone evaluate compliance?  Well, they look at outcomes.
23   Right?  When you plant tulips in the fall --
24            THE COURT:  This is -- I'm going to -- this is
25   completely irrelevant, and I'm going to make the point
```

1    again.  The compliance statistics, everything we talked

2    about before, Mr. Matesic, in my view is completely

3    irrelevant to the issue of whether or not there was

4    intentional discrimination relative to this case.  That is

5    my ruling.  You have an objection to it.  It's noted for the

6    record.  Okay, let's go.

7                (Whereupon the proceedings resumed in open court

8                 at 9:36 a.m.)

9                THE COURT:  Good morning, please be seated.

10               (Discussion held off the record.)

11               (The record was read back by the reporter.)

12

13        G E O R G I A   P A W K, having been previously

14        sworn, testified as follows:

15

16                        CONTINUED DIRECT EXAMINATION

17   BY MR. MATESIC:

18

19        Q.   Miss Pawk, there is more than one reason why

20   Kathleen Brown was not hired by Cost Company.  Is that fair

21   to say?

22               THE COURT:  Keep your voice up, you're trailing

23   off.

24        Q.   I apologize.  There's more than one reason why

25   Cost Company did not hire Kathleen Brown?

1      A.   I believe we were not hiring operators at that

2   time, sir; that we were winding down.

3      Q.   So it's fair to say the first reason is that there

4   was no job available.

5      A.   It's my understanding that there was no operator's

6   position available at that time.

7      Q.   Was there a laborer's position at that time?

8      A.   I would not know.

9      Q.   Dean Taylor would know, wouldn't he?

10     A.   When I perused Ms. Brown's resume, I believe

11  there's at least 14 instances where she uses a form of the

12  word operator.  It's my understanding there was one time

13  when she said laborer.  It was a general laborer, not a

14  mason tender.  When I looked at that, I assumed she was

15  interested in an operating engineer's position with our

16  company.

17         I called Mr. Taylor, and I said if she came back,

18  I wanted her hired as an operator.  He called me and said,

19  we are done.

20     Q.   I'll show you again the Minority Recruitment

21  Memorandum from yesterday.

22     A.   It's not on my screen.

23         (Discussion held off the record.)

24     Q.   All right, Mrs. Pawk, you were saying there was

25  one instance in which Ms. Brown requested a job as a general

41

1    laborer.  You remember that?

2        A.    I don't recall any instance where Ms. Brown

3    communicated to me she wanted to be a general laborer.  We

4    do not hire general laborers.

5        Q.    Communicated to Dean Taylor.

6        A.    I would have no knowledge.

7        Q.    This is the memorandum that you identified.  You

8    have that on your screen right now?

9        A.    I have part of the memorandum on my screen.  Yes,

10   I do.

11       Q.    Okay.  At the bottom here?

12       A.    Yes.

13       Q.    "Position requested or interested in:  Operator,

14   laborer."  Do you see that?

15       A.    Yes, I do.

16       Q.    This is the memorandum that you received on

17   September --

18       A.    18th.

19       Q.    -- 18th, 2002.  So she was asking for a laborer's

20   position on September 18th, 2002, right?

21       A.    Where it says "qualifications", again, it says

22   "resume attached," dot dot dot.  There was no masonry tender

23   experience.  We hire mason tenders.

24       Q.    Not my question, Mrs. Pawk.  She was asking for a

25   job as a laborer.

1          A.    I cannot assume that.  I'm sorry.

2          Q.    You can't assume that from reading a document.

3    You don't know what the word "laborer" means?

4          A.    I don't see where it says her experience as a

5    masonry -- day mason tender.

6          Q.    Miss Pawk, for that job at Marienville, Cost

7    employed as many as 58 mason tenders, correct?

8          A.    I do not specifically know that.

9          Q.    I think we have a stipulation on the record --

10         A.    Okay, fine.

11         Q.    -- that there are 58 mason tenders being employed

12   by Cost as of the week ending August 5th.  Do you understand

13   that?

14         A.    Yes.

15         Q.    Where did those mason tenders come from?

16         A.    Laborer's hall.

17         Q.    The laborer's union?

18         A.    Yes.

19         Q.    Okay.  What is a laborer?

20         A.    There's general laborers and there's mason tenders

21   and there's mason scaffold, there's mixers, there's scaffold

22   erectors, scaffold-building persons.  Then there's persons

23   that operate a grout pump.

24         Q.    The laborer's union supplied most of the people

25   that were working as mason tenders, correct?

1      A.    Yes.

2      Q.    Okay.   That's Reason No. 1.   Job availability.

3 There was a second reason, according to Cost, that Ms. Brown

4 was not hired.   Is that true?

5      A.    I'm sorry?

6      Q.    There's another reason that you gave for why

7 Kathleen Brown did not get the job with Cost Company.

8      A.    We did not have a position available for an

9 operator.   When I read her resume, it says she was forklift

10 operator, certified by the International Union of Operating

11 Engineers --

12          THE COURT:   Ma'am, you're going way too fast.   You

13 have to slow down.

14      A.    International Union of Operating Engineers.   That

15 told me she was a member of 66.   And you cannot have two

16 books at the same time.   It's my understanding, if you're an

17 operator, you're an operator.

18      Q.    Just so we're clear about this, Ms. Pawk --

19      A.    I can only hire out of the Hall.   If you are a

20 member --

21          THE COURT:   Ma'am.   Ma'am.   You've really got to

22 slow down just a little bit.   Don't talk over him.   Wait

23 until he's done asking; and then don't talk over her.   Okay?

24 Start this again.   Go ahead.

25 BY MR. MATESIC:

1      Q.   I'm going to take this off the table right now.
2  I'm asking you a question, Miss Pawk, as to whether, in
3  addition to these reasons, there is something else that
4  explains why Kathleen was not hired by Cost.
5      A.   (No response.)
6      Q.   Didn't you testify earlier in this case as to
7  another reason why Kathleen was not hired by Cost?
8      A.   No.  It is my understanding she was seeking an
9  operator's position, and that we did not have an operator's
10  position available at that job site.  When she contacted me
11  on October 29th, I had talked to her, asked her if she --
12  she would talk to me.  She said she was willing to travel
13  and she would be interested in going to Erie.  It's my
14  understanding that she contacted -- she tried to contact
15  Jack Cramer, and I understand she could not be hired in
16  Erie, because we only had -- we already had a crane operator
17  there, and we did not hire any other operators at that
18  project.  There was no operator position available at that
19  time on October 29th when I first established contact with
20  Ms. Brown.
21      Q.   Those are the only reasons that explain why
22  Ms. Brown was not hired, according to your testimony today.
23      A.   Yes.  We did not have a position available for
24  her.
25      Q.   Okay.  I'm going to show you again the affidavit

1    that you filed in response to Ms. Brown's EEOC complaint.

2    Do you have that on your screen?

3        A.    Yes, sir.

4        Q.    Okay.  A couple questions.  First of all, you

5    understand the EEOC -- that's the Equal Employment

6    Opportunity Commission.

7        A.    Correct.

8        Q.    Okay.  That's a federal agency whose job it is to

9    investigate claims of discrimination in the workplace.

10       A.    Yes.

11       Q.    And Ms. Brown lodged a complaint with that agency

12   about Cost Company.

13       A.    Yes.

14       Q.    And in response, you filed this document and all

15   of the attachments to this document.

16       A.    Yes.

17       Q.    Which we went over yesterday at some length.

18       A.    Yes.

19       Q.    All right.  Do you see the highlighted section

20   here in the first paragraph?

21       A.    Yes, I do.

22       Q.    Okay.  Read that into the record, please.

23       A.    "At that time I perused her response and her

24   resume and noticed that neither the partially completed

25   memorandum --"

1          THE COURT:  That's too fast, ma'am.

2      A.   "At that time I perused her response and her

3  resume and noticed that neither the partially completed

4  memorandum, nor resume contained a telephone number.  I

5  noticed the different spelling of her city, Sigel, as

6  written on the memorandum, or Sigel as typed on her resume."

7      Q.   Okay.

8      A.   I then tried to obtain her telephone number from

9  the telephone company, but was unable to obtain her

10 telephone number, so I wrote a memorandum to my EEO file and

11 sent Ms. Brown a note requesting a telephone number so that

12 we could hire her.  I needed to be able to contact her, sir.

13     Q.   When you say that her Minority Recruitment

14 Memorandum was incomplete, you're referring to the fact that

15 she didn't give you a phone number.

16     A.   Yes.  I need a telephone number to contact

17 someone.

18     Q.   And that's another reason why -- that's another

19 reason that explains why Kathleen didn't get the job, isn't

20 it?  Because she didn't give you a completed response.

21     A.   No, I wrote a note to her immediately and sent it

22 off to her, to contact me.  I wrote her a note.  It's

23 attached to my exhibit.  And I sent it.  And I also made a

24 copy of the envelope where we put both spellings of her city

25 on it.

1      Q.    You --

2      A.    But I need to establish contact.  We have to have

3    a phone number to contact somebody in the event of

4    emergency.  And I wanted to speak to her, because her resume

5    was replete with her expertise as an operator operating

6    forklifts.  I discerned from her resume that she was

7    probably a member of Local 66.

8      Q.    All right.  You needed to have an emergency phone

9    number for Ms. Brown.

10     A.    Yes.  Safety is first and foremost in our company.

11     Q.    Ms. Brown was not your employee on September 18th,

12   2002.

13     A.    It doesn't matter.  I have to have a phone number

14   for emergency contact purposes.

15     Q.    You have to have an emergency phone number for

16   someone who doesn't work for you?

17     A.    I want to have a phone number to contact a person

18   to speak to them, yes.

19     Q.    That impacts or their application for work?

20     A.    It's not an application for work.  Unions process

21   the applications.  We hire from the union.  The people that

22   are members of the union have already been processed by

23   them.  If you are not in a union, but you are willing to

24   enter the union, we refer you to the union.  I need a phone

25   number so that I can also communicate that on to the union

1    as well.

2        Q.    That's relevant to her eligibility to work with

3    Cost?

4        A.    We like everyone to furnish us an emergency

5    contact number; be it their relatives, their friends.  It

6    doesn't matter.

7        Q.    Even before they are hired.

8        A.    (No response.)

9        Q.    Even before they are hired?

10       A.    It would have to be simultaneously.  I have to

11   have -- in the event of an injury -- we have workers that

12   get injured the first day of their hire.  I have to have

13   emergency contact.  Absolutely.

14       Q.    She wasn't your employee on September 18th.  You

15   wanted an emergency phone number before she became --

16       A.    I wanted to talk to her.  I wanted to talk to her

17   about her resume, to discern if she was willing to travel.

18   I needed to know if she could run all types of rigs, cranes,

19   forklifts, as well as lulls.  What cranes; 65-ton, 50-ton,

20   80-ton.  I needed to talk to her.

21       Q.    You had occasion to look at Ms. Brown's resume.

22       A.    Yes, sir.

23       Q.    At the time that you received her memorandum on

24   September 18th, 2002.

25       A.    Yes, sir.

1    Q.   And when you were previously deposed in the case,
2    you testified about what your impressions were after having
3    read her resume.  Correct?
4    A.   Yes, sir.
5    Q.   And you said that after having read her resume,
6    you did not believe that she was interested in a laborer's
7    position.
8    A.   I do not believe she would be qualified for a
9    laborer's position with our company or that she would be
10   interested, because she is a member of the operators'.  She
11   was forklift-certified by the International Union of
12   Operating Engineers, which is Local 66.
13   Q.   You did not believe that she was interested in a
14   laborer's position with Cost.
15   A.   That's correct.  And when she spoke, she never
16   mentioned it.
17   Q.   Okay.  And what is the first -- what is the first
18   position listed on her resume?
19        MR. LUTZ:  Your Honor --
20   A.   We went through this.
21        THE COURT:  Excuse me.  Hang on.
22        MR. LUTZ:  I object.  This has been asked and
23   answered yesterday.  He has been asking and answering the
24   same question time and again --
25        THE COURT:  I think this part of the field has

```
 1    been tilled, but I'll let you ask the question one more
 2    time, and move on to another area.
 3              MR. MATESIC:  I intend to, Your Honor.
 4         Q.   Go ahead.
 5         A.   It states, May 2002 to August 2002, laborer.  And
 6    if you read the description of the laborer, it has nothing
 7    to do with masonry, sir.
 8         Q.   Okay.  Let's talk about the qualifications to be a
 9    mason tender.  In your mind, a mason tender requires
10    particular skills.
11         A.   Absolutely.
12         Q.   Okay.  And -- well, let me strike that question.
13    These skills can be learned on the job, can they not?
14         A.   Safety is my first and foremost concern, sir.  I
15    want my mason tenders to have had fall protection, to have
16    had scaffold erection, to have had scaffold dismantling, to
17    be aware of our company safety programs, have gone through
18    our orientation program, have a drug-free eligibility
19    card --
20              THE COURT:  Ma'am, slow down.
21              (Discussion held off the record.)
22         A.   There is several areas that they must be familiar
23    with.  They must know our injury reporting requirements,
24    they must be familiar with how to properly access scaffold.
25    Rebar.  Open, you know, floors, open walls, elevator shafts.
```

1    There is several things.  They have to know how to mix

2    mortar, spread mortar, keep the job flowing, tend to the

3    bricklayers, stack the block, not overstack the scaffold,

4    make sure the scaffold is fully protected --

5              (Witness interrupted by reporter.)

6         A.   We tie off and we land any materials.  That all

7    scaffold work services are fully planked.  That the planks

8    are properly cleated.  That the planks do not have any

9    cracks.

10             There's numerous information that I would expect a

11   laborer to have, a mason tender absolutely, and I understand

12   that they do -- if they have masonry experience, have that

13   education in classes through the laborer's hall.  That is my

14   understanding, sir.

15        Q.   And I'm just going to ask you -- and with all due

16   respect --

17        A.   Yes.

18        Q.   -- because -- and I want to write down your

19   answers to this next question.

20        A.   Okay.

21        Q.   You just listed -- I don't know how many different

22   items that all relate to the issue of qualifications to be a

23   mason tender.  Okay?  Among those -- among those issues --

24        A.   Yes, sir.

25        Q.   -- if I correctly heard you, you said they have to

1    know our safety procedures.  Right?

2         A.    They have to go through the orientation program of

3    the job site as well, sir.

4         Q.    They would not have gone through that job

5    orientation process before they applied.  Excuse me.  They

6    would not --

7         A.    The hall does not send someone who is not --

8         Q.    Let me --

9         A.    -- experienced, sir.

10        THE COURT:  Folks, I have to really ask that we

11   slow this down and don't talk over each other.  Let's keep

12   going.

13        Q.    Your safety orientation program --

14        A.    Yes, sir.

15        Q.    -- an employee doesn't go through that until after

16   they have been hired.

17        A.    An employee that comes out of the hall is

18   qualified as a mason tender, has experience.  The hall

19   wouldn't send someone that did not.

20        Q.    I'm going to go back to that whole list of items

21   you just talked about.  I want to know which of those items

22   are items -- refer to qualifications or skills that a person

23   would have by virtue of working for Cost, as opposed to any

24   other masonry contractor.

25        A.    I don't think I understand your question, sir.

1        Q.    Well, you talked about Cost's safety program.  You
2    said that they --
3        A.    That is not our safety program.  You asked me what
4    I would expect a mason tender to have as experience or as
5    competency, qualification.
6        Q.    Okay.  Which qualifications are specific to Cost
7    Company versus any other masonry contractor?  Which ones?
8        A.    (No response.)
9        Q.    Are there any of that whole list that are
10   specific --
11       A.    I don't know what other mason contractors --
12       Q.    I'm sorry?
13       A.    I would not necessarily know what other mason
14   contractors require of their mason tenders.  We require --
15             (Witness interrupted by reporter.)
16             THE COURT:  Ma'am, I'm going to have to ask you
17   one more time -- there's no points for speed.
18       A.    I would not know what Harris, Friday, Kusler,
19   Marsa, what those mason contractors necessarily require.
20   Safety is first and foremost in our company.
21       Q.    You know of no other practices in the industry?
22   The practices of other contractors?
23       A.    I do not want any mason tenders that do not have
24   experience on scaffold.  We can't -- we do not want anyone
25   falling, we don't want any injuries.

1    Q.    You have plenty of employees at Cost who have

2   worked for those other contractors that you just named.  How

3   many other contractors did you just name?

4    A.    You have to read back.

5    Q.    Six?  10?  Bricklayers switch employers all the

6   time, don't they?  One season they are working for you, the

7   next season they are working for somebody else.

8    A.    I still don't want someone unskilled on my job

9   site.

10    Q.    I understand.  Okay?  You have been in this

11   business for a long time.

12    A.    Since I was a little girl, yes.

13    Q.    Dean Taylor has been in this business for 18

14   years.  You know, Dean Taylor knows, from having spoken with

15   those people, what the practices are in the industry with

16   regard to mason-tending work.

17    A.    (No response.)

18    Q.    You know what other contractors do in terms of

19   masonry.  You know what their policies and procedures are

20   because from time to time you employ their former employees.

21    MR. LUTZ:  Objection to relevance.  What

22   difference does it make with respect to Kathleen Brown what

23   other mason tenders --

24    THE COURT:  Sustained.

25    Q.    What qualifications does a mason tender have to

1    have to work at Cost that they don't have to have anywhere

2    else?

3                  MR. LUTZ:  Objection.  What does it have to do --

4    A.    We have to go through our procedures --

5                  THE COURT:  Hang on a second.

6    Q.    Your procedures.

7                  MR. MATESIC:  That's fine, Your Honor.

8                  MR. LUTZ:  Objection.  Relevance.

9                  THE COURT:  Overruled.

10                 MR. MATESIC:  It's fine.

11                 (Discussion held off the record.)

12   Q.    Okay.  I'm putting before you your deposition

13   transcript from May of 2004.  We talked about this issue

14   about the qualifications of a mason tender, the skills

15   required of a mason tender, the sorts of tasks that a mason

16   tender performs.  Do you remember that line of questions?

17   A.    Yes, sir.

18   Q.    Okay.  And do you remember me asking you whether

19   these were skills that could be learned on the job?

20   A.    If Dean Taylor is comfortable with someone and

21   their experience, then absolutely.  He is the foreman.  He

22   would know best.

23   Q.    You already testified on this issue, Miss Pawk.

24   You have already given an answer on this issue.  What was

25   your answer?

1          MR. LUTZ:  Objection, Your Honor.  Could he point
2     to a specific --
3          A.    I --
4               THE COURT:  Excuse me.  Excuse me.
5               MR. MATESIC:  I'm going to take this off the
6     screen, Your Honor.
7     BY MR. MATESIC:
8          Q.    What was your answer?
9               MR. LUTZ:  Objection.  He's now removed it from
10    the screen.  And my objection was could he just show her the
11    deposition transcript and point to a specific question.
12              MR. MATESIC:  I don't have to do that, Your Honor.
13              THE COURT:  Well, I'll be the judge of what people
14    do or do not have to do.  In this particular case, I think
15    in fairness, you should show her the deposition, either on
16    the screen or up there.  I don't know even what question we
17    are talking about, because it just came off my screen.  So
18    let's show her.
19              MR. MATESIC:  Well, I think, just for the
20    record --
21              THE COURT:  What is the question?
22              MR. MATESIC:  Well, the question is, you've --
23    well, you've already testified -- well, can you read back
24    the question, just so we're clear.
25                   (Record read back by the reporter.)

BY MR. MATESIC:

    Q.   What was your answer during your deposition in May of 2004 as to whether or not these skills could be learned on the job?

        MR. LUTZ:  Objection, Your Honor.  Is he going to show her the transcript?

    A.   I don't specifically recall my answer on --

        THE COURT:  All right.

    A.   -- May 27th, 2004.  I believe --

    Q.   Go ahead.

    A.   Again, I think some of the skills, possibly, you can learn on the job, but I am not a foreman.  When a labor union sends out a mason tender, I presume that person is experienced.

    Q.   Do you know of any laborer who hasn't learned those skills on the job?

    A.   I don't understand your question.  Do I know of a laborer that went to school?  Or what are you asking me?

    Q.   My earlier question was, aren't these skills that are learned on the job.  You're kind of unsure.  Is that fair --

    A.   I'm sure some of these skills can be learned on the job, absolutely.

    Q.   Can you name for me a single laborer who did not learn his skills on the job?

1     A.    Laborers may have learned their skills on previous
2     jobs.
3     Q.    Different question, ma'am.  Identify for me a
4     laborer -- from the hundreds of laborers that you have
5     employed, identify one for me who did not learn the skills
6     on the job.  Meaning they didn't have those skills on the
7     first day that they began working.  They learned those
8     skills after their first day of employment.  Name one for
9     me.
10    A.    There is a laborer apprenticeship program, sir.
11    Q.    Name somebody.
12    A.    That went to an apprenticeship program?
13    Q.    Name -- fine.  Name somebody.
14    A.    Ricky Alley, Jimmy Alley, Jimmy Born.  They have
15    had previous experience with our company.  I don't
16    understand your question.  I'm sorry.
17    Q.    The answer that you gave, that's not the same
18    answer that you gave in May of 2000 --
19    A.    I believe I said you need to have certain skills.
20    I believe I touched on qualifications --
21          (Witness interrupted by the reporter.)
22    A.    I believe I stated that you had to have certain
23    skills, such as understand the fall protection requirements
24    for OSHA, understand scaffold erection.  How we land
25    materials, we have a hundred percent tie-off.  And maybe

 1    some companies aren't.  OSHA is the minimum.  Maybe we

 2    require more.

 3              THE COURT:  Can I see counsel at side-bar for a

 4    second.

 5              (Whereupon the following discussion occurred on

 6               the record at side-bar:)

 7              THE COURT:  This isn't going -- this is -- I don't

 8    want to waste the jury's time with going round and round.

 9    It's not my position to butt into people's cases, but I do

10    have an obligation to keep this going.

11              At the break, tell her to slow down.  It's an

12    impossibility.

13              MR. MATESIC:  Judge, may I just have a second.  I

14    was going to show her her answer --

15              THE COURT:  That's okay.

16              MR. MATESIC:  That's what it is all leading to.

17              THE COURT:  You're cross-examining her now.

18              (End of discussion at side-bar.)

19    BY MR. MATESIC:

20         Q.   Let's start at Page 146, Line 13.  Do you see

21    where I am?

22         A.   Yes, sir.

23         Q.   I'm going to read the question, you read the

24    answer.  Okay?

25         A.   Yes, sir.

1    Q.    "Were there specific skills that someone would
2    have to have to work as a laborer at the Marienville site in
3    July of 2002?"

4    A.    "Yes."

5    Q.    I apologize.  Your answer?

6    A.    "Yes."

7    Q.    "Question:  What were those skills, please?"  Your
8    answer?

9    A.    "I think you need to be experienced in working
10   construction with masonry, with bricklayers, know how to mix
11   mortar, know how to spread the mortar, know how to stock the
12   scaffold, know how to not overstock the scaffold, know how
13   to access scaffold --"

14          (Witness interrupted by the reporter.)

15   A.    "Know how to spread the mortar, know how to stock
16   the scaffold, know how to not overstock the scaffold, know
17   how to access scaffold, know how to erect scaffold, know how
18   to dismantle scaffold, know how to properly cap rebar,
19   possibly know how to operate hilti guns, or how to operate
20   the mixing equipment," period.

21   Q.    Now, on Page 147.

22   A.    Yes, sir.

23   Q.    All right.  Line 12.  "Question:  Do you know of
24   any laborer who has not learned these skills on the job?"
25   Your answer?

1        A.    "No."

2        Q.    That's not the answer you gave today.

3        A.    Well, I think you learn your skills through

4   experience.  And I think also our scaffold erectors, they

5   also have special training.  We have sub --

6            (Witness interrupted by reporter.)

7        A.    We have Subpart M and Subpart L classes where we

8   invite the OSHA area directors and the compliance officers,

9   such as Bill Mason, Brian Goodrich, Tom Telly, Van

10  Stelsignor (phonetic), and they come, and they give training

11  seminars and -- scaffold erection and dismantling is very

12  dangerous, because it's almost impossible and not feasible

13  to be tied off.  Extremely dangerous.

14           So, yes, there is training and special classes for

15  the certain laborers, absolutely.  The scaffold erection and

16  dismantling.  Absolutely, sir.

17           MR. MATESIC:  Your Honor, I move to strike the

18  answer.

19           THE COURT:  Denied.

20           MR. MATESIC:  It's not responsive to the question.

21           THE COURT:  It's denied.

22       Q.    Miss Pawk, who were the people that you said were

23  the laborers that did not learn the skills on the job?  Tell

24  me again.

25       A.    A few minutes ago?

1        Q.    Yes.

2        A.    Jimmy Alley, Ricky Alley, James Born, Ronnie

3   Wright.   They have done both special training, as well as on

4   the job through their years and years of masonry tending

5   experience, sir.

6        Q.    Anyone else?

7        A.    Yes.   I can't name them all.

8        Q.    How many?   Just estimate.

9        A.    How many --

10            THE COURT:   Move on to another area.

11            MR. MATESIC:   Your Honor --

12            THE COURT:   After this.   Move on to another area.

13            MR. MATESIC:   I understand.

14   BY MR. MATESIC:

15        Q.    When did you learn that those people that you just

16   identified had learned their skills somewhere besides the

17   job?   Had learned their skills through some means other than

18   on the job.

19        A.    We hold some of the training seminars in

20   conjunction with the union.   I don't understand your

21   question.   I'm sorry.

22        Q.    A date.   A year.   A year.   When did you learn that

23   those three or four guys you just talked about learned their

24   skills --

25        A.    All of our -- our laborers and our foremen come to

1    safety meetings periodically throughout the year where we

2    address a topic.  I don't understand what you're saying.

3         Q.    Did you know in 2004 that those people you just

4    named had learned their skills by virtue of some process

5    other than on the job?  They had learned them not on the

6    job, but through some other training?  Did you know that in

7    2004?  Last year.

8         A.    Yes.  They have attended seminars throughout -- I

9    don't understand your question.  I'm sorry.

10        Q.    I understand your answer.

11        A.    All right.

12        Q.    Was the fact that Ms. Brown did not submit an

13   application, did that impact on her eligibility to work for

14   Cost?

15        A.    We do not have applications.  The union halls

16   process persons.

17        Q.    You don't use applications at all.

18        A.    No, we do not.  We have to hire out of the hall.

19   Or if they are not in the union, and we ask if they are

20   willing to join, we refer them to the hall.

21        Q.    What records, if any, do you have of the people

22   who apply for work with Cost?

23        A.    We do not have applications.  If someone is hired

24   or going to be hired, they go to their labor steward and are

25   referred to the hall, and the hall processes them.  We just

1    have employees fill out I-9's, W-4's, and emergency

2    information, contact.

3        Q.    How many applications do you get in a year?  Could

4    you estimate for me.  You're the president of the company.

5    How many applications do you get from people who are seeking

6    to do these jobs; operators, laborers, bricklayers?  Just

7    round it to the nearest hundred, if you can.

8        A.    I do not receive any applications --

9        Q.    I -- forgive me.  I misstated that.  How many

10   requests for employment do you get on average in a given

11   year?

12            MR. LUTZ:  Objection to relevance, Your Honor.

13            THE COURT:  Sustained.

14       Q.    You don't have any record of applications.  We

15   already established that.  Or we -- strike that question.

16   We have already established that you don't have any record

17   of the people, the identity of the people who seek work from

18   Cost.  Correct?

19       A.    (No response.)

20       Q.    That specific issue.  The identity of someone who

21   has come to Cost or by any other means has been referred to

22   Cost seeking a job.  You don't have any record of that.

23            MR. LUTZ:  Objection.  Relevance.

24            THE COURT:  Overruled.  Do you understand the

25   question?

1    A.    If someone calls me and is interested in a

2    position, I type up a memorandum.  I do not have

3    applications.  We hire out of the hall.  The hall sends the

4    work -- the manpower.

5    Q.    But Dean Taylor testified that if a bricklayer

6    came to the trailer and left his name and his phone number

7    on a little slip of paper, that would constitute a request

8    for employment.  Do you have any reason to disagree with

9    Dean Taylor?

10    A.    No, I have no reason to disagree with Dean Taylor.

11    Q.    Okay.  And you don't -- that would not end up in a

12    memorandum that you keep, correct?

13    A.    I wouldn't have knowledge of that.

14    Q.    Okay.  So what I want to know, Ms. Pawk, is in how

15    many instances in a given year, on average, do people come

16    to Cost and seek employment?  That's what I want to know.

17    Is it -- let me show you this --

18    A.    I would not know that.  If they come to Dean

19    Taylor, I would not know that, sir.

20    Q.    Okay.  Here is Dean Taylor's affidavit.  Paragraph

21    8.  Do you have that on your screen?

22    A.    Yes, sir.

23    Q.    Okay.  "During the course of the project, over a

24    hundred people presented themselves to me at the site

25    seeking work, who were turned away because we were not

1    hiring at that time."

2            Did I read that correctly?

3    A.    Yes, sir.

4    Q.    You have no record of those hundred people; who

5    they were.

6    A.    I do not.

7    Q.    Thank you.  You are the Equal Employment

8    Compliance Officer for Cost.

9    A.    Yes, I am.

10   Q.    Okay.

11           THE COURT:  Sir, I've got to ask you to sit down.

12           MR. LUTZ:  He's writing.  I can't see from there,

13   Your Honor.

14           THE COURT:  All right.

15           MR. LUTZ:  I need to know what he is writing.

16   A.    I'm the Equal Employment Opportunity Officer.

17   Q.    The Equal Employment Opportunity -- didn't you use

18   the word "compliance officer"?

19   A.    No, sir.  EEO Officer, sir.

20   Q.    Equal Employment Opportunity Officer.

21   A.    Yes, sir.

22   Q.    Well, part of your job is to measure compliance

23   with the Equal Employment folks, right?

24   A.    My job is to strive to meet the goals, which are

25   objectives, not quotas.  My job is to further the goals and

1  create an opportunity for someone to get equal employment.

2          If I get a female, a minority, an Indian, an

3  Asian, any person who is qualified, and I can increase the

4  pool and refer them to the union hall to increase the pool,

5  then I have succeeded in promoting and furthering those

6  goals, which are objectives.  And that they are now

7  available and have the opportunity to become employed where

8  they will receive equal treatment as those similarly

9  situated, they will not be discriminated against for race,

10 sex, gender, creed, national origin, ethnic background,

11 religion, veterans disability status, handicapped, mental or

12 physical handicapped, age, sexual preference, or sexual

13 orientation.

14      Q.   Okay.

15      A.   I try to give them the opportunity -- it's my

16 understanding that if I can increase the pool, and they are

17 now available and have an opportunity to be called out, if

18 they are not called out to Cost, and they end up getting

19 called out to Marsa or Kusler or Harris or P.J. Dick or

20 Trumbell, that they now have that opportunity for equal

21 employment, sir.

22      Q.   Okay.  Now, you see the document I have placed

23 before you?

24      A.   Yes, I do, sir.

25      Q.   Okay.  It's entitled the Affirmative Action Plan?

1          A.    Yes.

2          Q.    It's under Cost's letterhead?

3          A.    Yes, it is, sir.

4          Q.    You are the author of this document; is that fair

5    to say?

6          A.    I am the author of the document.

7          Q.    Okay.  And Paragraph 1, "All provisions of Title

8    VI [sic] of the Federal Civil Rights Act of 1964,

9    President's Executive Order 11246 --"

10         A.    Yes.

11         Q.    "-- Section 3 of the Housing and Urban Development

12   Act of 1968 shall be followed to provide equal opportunity

13   with the company for all people, regardless of race, creed,

14   color, sex, religion, national origin, age," et cetera.

15   Those are your words.

16         A.    Yes, those are my words.  But I want to say one

17   thing that I think will speed us along.  I do not know if

18   Dean hired off the street.  We do not hire off the street.

19   If they do, it's an exigent circumstance, so there would not

20   be a log kept of anyone coming off the street, so I would

21   not know about it, sir.

22         Q.    Okay.  It applies in the context of hiring,

23   doesn't it?  The Affirmative Action Plan.

24         A.    You are to promote and further goals --

25               MR. LUTZ:  Objection, Your Honor.

```
 1            THE COURT:  Hang on a second.
 2     A.    -- which are objectives, sir --
 3            THE COURT:  Ma'am, hang on a second, please.
 4            MR. LUTZ:  Objection, Your Honor.  We are getting
 5     into what we agreed we are not going to get into.
 6            MR. MATESIC:  I don't believe that's true, Your
 7     Honor.  We have to have a side-bar on this.
 8            THE COURT:  All right, side-bar.
 9            (Whereupon the following discussion took place on
10             the record at sidebar:)
11            THE COURT:  Go ahead.
12            MR. MATESIC:  Our burden is to show that --
13            THE COURT:  She has no burden.
14            MR. MATESIC:  Her, Kathleen Brown's burden, is to
15     show in terms of the punitive damages claim either malice or
16     reckless indifference to quote/unquote -- quote/unquote,
17     federally protected rights.  The federally protected rights
18     are the rights under Title VII.  Okay?  And I have to get
19     this witness to say that she knows what the rights are under
20     Title VII.  She has to identify that there is a federally --
21            THE COURT:  You can ask her that.  That's
22     legitimate.
23            MR. MATESIC:  That is where this is going.
24            THE COURT:  But I don't want this to meander into
25     quotas or affirmative action.
```

1            MR. MATESIC:  It's not going to.

2            (End of discussion at side-bar.)

3    BY MR. MATESIC:

4        Q.   Okay.  This is back up on the screen.  All

5    provisions of Title VI the Federal Civil Rights Act of 1964.

6    Is that a typo, Miss --

7        A.   Yes, that's a typo.  It should be Title VII.

8    There are numerous typos in this document.  I authored it,

9    someone else typed it.

10       Q.   Title VII of the Civil Rights Act, 1964?

11       A.   Correct, Title VII.

12       Q.   And that is a law that was passed by Congress to

13   prohibit discrimination in employment, correct?

14       A.   To prohibit discrimination in employment, in

15   hiring, promoting, training, firing, et cetera.

16       Q.   Title VII of the Civil Rights Act guarantees to

17   persons who are applying for employment that they will not

18   be discriminated against on the basis of, among other

19   things, their gender.

20       A.   Correct.

21       Q.   All right.  And President's Executive Order 11246,

22   what is that?

23       A.   I believe those are the implementing --

24   implementing regulations, sir.

25       Q.   The regulations that were promulgated by a federal

1    agency to make sure that Title VII's protections are carried

2    out in the United States.

3        A.    Yes.  And I believe we comply with this on all

4    jobs; federal, state; whether they are small, whether

5    they're large, whether they're for the Catholic Diocese,

6    whether they're for Brith Shalom; any project, any size.

7        Q.    And you have read those regulations; is that true?

8        A.    Yes.

9            MR. MATESIC:  Your Honor, we need another

10   side-bar.  I apologize.

11           (Whereupon the following discussion was held on

12            the record at side-bar:)

13           MR. MATESIC:  My intent is to show -- these are

14   the regulations that the witness just referred to.  Okay?

15   My intention is to put this before her and ask her if she

16   has read this document.  I am not going to get to the quotas

17   section, wherever that is.

18           THE COURT:  What does the regulation deal with?

19           MR. MATESIC:  The regulation, it states the

20   purposes of affirmative action programs.  To show that the

21   applicant pool -- I'll read it right into the record.

22               A central premise underlying affirmative

23   action is that absence of discrimination.  Over time, a

24   contractor's workforce generally will reflect the gender,

25   racial, and ethnic profile of the labor pools from which the

1   contractor recruits and selects.  Affirmative action

2   programs containing a diagnostic component which includes a

3   number of quantitative analyses and so forth.  And I don't

4   intend to go very far in here.  But she has already

5   identified the regulations, she has read the regulations.

6   Did you read this regulation?  That's a fair question.

7         THE COURT:  All right.  That's an affirmative

8   action regulation.  It is so specified by title.  And let's

9   assume she identifies it and says I had some passing or

10   general familiarity with it.

11         MR. MATESIC:  All I want her to say is that she

12   read these sections.

13         THE COURT:  What is it probative of?  She said

14   they don't keep application records.  They have no way of

15   knowing what the labor pool is.

16         MR. MATESIC:  I am not going to bring up

17   6.9 percent, 50 percent.  I am just saying they have no way

18   of knowing what the pool is.

19          This application, she said she read it.  This

20   application is --

21         THE COURT:  Sustained.

22         (End of discussion at side-bar.)

23         MR. MATESIC:  Just one moment, Your Honor.

24         THE COURT:  Okay.

25         (Brief pause.)

1  BY MR. MATESIC:

2      Q.   Ms. Pawk, I'm placing before you what has been

3  labeled Plaintiff's Exhibit 13.  Do you see that on your

4  screen?

5      A.   Yes, sir.

6      Q.   A memorandum dated September 18th, 2002.

7      A.   Yes, sir.

8      Q.   This memorandum was written by you.  The GCP

9  initials refer to?

10     A.   Georgia Cost Pawk.

11     Q.   All right.  And in the address line, you indicate

12 that this memo ended up in four different places; EEO file,

13 Raymond Sekowski, Dean Taylor, and Jaime Greco.  Correct?

14     A.   Yes, sir.

15     Q.   Did you ever confirm with Dean Taylor that he

16 received this memo?

17          MR. LUTZ:  Your Honor, this memo was brought up

18 yesterday.  All these questions were asked and answered

19 yesterday.  Why do we have to rehash this?  I object.  It's

20 asked and answered.

21          THE COURT:  Overruled.  Go ahead.

22     A.   I believe I may have even telephoned Dean Taylor,

23 and I stated to him that if a female came to the job site, I

24 wanted her phone number so that I could contact her, and I

25 wanted her to be hired.

1     Q.   And yesterday we were talking about the answers

2     that Mr. Taylor had provided in this case previously.  And I

3     believe you said that you had no idea what answers

4     Mr. Taylor had given in this case.  Is that a fair

5     characterization of your testimony?

6     A.   I have not reviewed Mr. Taylor's deposition or sat

7     in here while he testified.

8     Q.   Okay.  This case has been chugging along for about

9     two years now, right?

10    A.   (No response.)

11    Q.   Correct?

12    A.   Yes.

13    Q.   Okay.  And several employees of Cost were deposed

14    in this case.  Correct?

15    A.   Dean Taylor, Billy Heaton, myself.

16    Q.   Right.

17    A.   Yes.

18    Q.   And you are an attorney.

19    A.   Yes.

20    Q.   You worked for two years in securities fraud

21    cases, correct?

22    A.   Yes, I did.

23    Q.   You conducted depositions yourself?

24    A.   No, I did not.

25    Q.   You did not.  You know what a deposition is?

1    A.    Yes, sir.

2    Q.    You know that depositions are used to gather

3    evidence that can be used at trial.

4    A.    Yes, sir.

5    Q.    You knew that Kathleen Brown was claiming that

6    your company had discriminated against her.

7    A.    I did not know that at the time this memorandum

8    was drafted, no, sir.

9    Q.    Well, let's take that memorandum off the screen

10   for a second.  I'm talking about anytime before today.

11   Anytime before yesterday.  You knew that Kathleen Brown had

12   sued your company, correct?

13   A.    Yes, sir.

14   Q.    And you're the president of Cost Company, correct?

15   A.    Yes, sir.

16   Q.    And you know that your employees have given sworn

17   statements in this case which will impact on the result of

18   this trial, correct?

19   A.    Correct, sir.

20   Q.    Okay.  There's a lot of evidence in there.  And

21   you, as the president, have a concern as to whether or not

22   this case comes out in your favor or against you, correct?

23   A.    Yes, sir.

24   Q.    All right.  And it just so happens that as the

25   president of the company, you have access to these

1    transcripts.  You are the client here, correct?

2        A.   Correct.

3        Q.   And you never once looked at them.  Is that your

4    testimony?

5        A.   I reviewed some transcripts.  You asked me about

6    Dean Taylor's.

7        Q.   Which ones did you -- which ones did you review,

8    Miss Pawk?

9        A.   Ms. Brown's, Mr. Heaton's.

10       Q.   Mr. Heaton.  So you did look --

11       A.   But I did not review Mr. Taylor's in its entirety,

12   no, sir.

13       Q.   As the president of the company, you would have a

14   concern if a verdict came out against you, correct?

15            MR. LUTZ:  Objection, Your Honor.

16            THE COURT:  Overruled.

17       A.   Yes, sir.

18       Q.   Okay.  And as the president of the company, you

19   would want to do whatever you could do to assist these two

20   lawyers here in helping you win this case, correct?

21       A.   Yes.

22       Q.   And that would include getting together with them

23   and discussing the evidence in the case.  Correct?

24       A.   Correct.

25       Q.   That would include getting together with them and

1    discussing strategy; what evidence do we need to get out

2    there so that we can win this case.  Correct?

3        A.   Yes.

4        Q.   Okay.  And you had these deposition transcripts

5    available to you.  And you never looked at the transcript of

6    Dean Taylor?

7        A.   I looked at some of it, I did not read it in its

8    entirety, sir; no, I did not.  I spoke to Dean about this,

9    and I assumed that what he told me was accurate, sir.

10       Q.   So the fact that you didn't look at Dean Taylor's

11   transcript, that impaired your ability to help these

12   gentlemen defend you in this case.  Would you agree with

13   that?

14            MR. LUTZ:  Objection.

15            THE COURT:  Sustained.  We're going to take a

16   short break.

17            (Whereupon the following discussion occurred on

18              the record in camera:)

19            THE COURT:  Before we continue, I want to take a

20   minute, and I want you to go to Page 8 and read Page 8 and

21   Page 9.  And I made the changes consistent with our

22   discussion.  And there is a -- in my view, a hopeless

23   contradiction here.  But go ahead and read it, and I'll tell

24   you what I think it is; why we still have to tinker with it.

25            MR. PAWK:  I see what you're thinking.  Because of

1    the operator.

2            THE COURT:  Absolutely.  The point is, again --

3            MR. MATESIC:  I'm sorry, Your Honor.  I apologize.

4            THE COURT:  You finish reading it first.  Then

5    we'll talk about it.

6            MR. MATESIC:  Okay.

7            THE COURT:  My point is, the reason this doesn't

8    make sense is if they find a prima facie case has been made

9    out, they have -- in doing so, they have factually

10   discredited your legitimate nondiscriminatory reason.  And

11   so I'm wondering if they find a prima facie case, then they

12   will already have implicitly rejected your legitimate

13   nondiscriminatory reason.  Then the only question becomes

14   whether that reason -- well, to go to the -- do you see what

15   I'm saying?

16           MR. MATESIC:  Yeah.  And I can respond to it.

17   Okay.  Let's assume that everything that you said is true.

18   Let's assume that on the day that -- on the day that

19   Kathleen is hired, she says thank you very much, and then

20   she just bursts out an expletive, okay, and she doesn't get

21   the job.  At the time that they are about to hire her, she

22   says something totally irrelevant to qualifications, just

23   something --

24           THE COURT:  You're meandering off the point, with

25   all respect.  Assume that they find that she applied -- as

1    part of the prima facie case, she applied for the labor

2    position.  Let's assume they find that.  And let's assume

3    they also find that there was a laborer's position and all

4    the other elements of the prima facie case are made out.

5              My point is, that's precisely your defense;

6    that there wasn't a laborer's position.  But more

7    importantly, she didn't apply for one.  Where does that

8    leave you if the jury comes back and finds that there's a

9    prima facie case?

10             MR. MATESIC:  Who to believe.

11             THE COURT:  You're not following my point,

12   Mr. Matesic, but they are.  My point is that burden

13   shifting, given the fact that your -- your defense is part

14   of the prima facie case, they have answered your

15   burden-shifting factual contention by answering the prima

16   facie case.  That's why it was my suggestion -- and I think

17   it was a better one -- that the thing be set up the way that

18   it was.  Do you follow my point?

19             MR. MATESIC:  I'm having great difficulty

20   following the point.  Because as I -- obviously, as we

21   talked about with the Green case today, all right, it always

22   come back to this issue of pretext.  They do have reasons

23   for why they didn't hire her.  Okay?  Why she did not get a

24   job.  All right?  And those reasons are independent of the

25   facts --

1          THE COURT:  On the prima facie -- they are not.

2     Emphatically, the reason they didn't hire her and the only

3     reason that they are proffering to the jury is she came in

4     and asked for an operator's position, and we didn't have an

5     operator's position.

6               Now, as an aside, they are putting you to

7     your burden to prove that there were laborer positions

8     available.  That's their sole reason.  In answering the

9     prima facie case by saying we find she applied for laborer's

10    position, they have rebutted -- they have rejected the

11    Defendant's legitimate nondiscriminatory reason for not

12    hiring her.

13              See, this is good for you.  I don't know if

14    you realize that.

15          MR. MATESIC:  No, I do realize this.

16          THE COURT:  This falls out in the category of a

17    gift horse in someone's mouth.

18          MR. MATESIC:  As I said this morning, I see it

19    from both sides.  Because on the one hand, it's good for me,

20    but I'm fearful of the possibility that there's some way,

21    there's some instance, some scenario in which -- you know,

22    based on this language, we are still going to lose this

23    case.  And I don't want to give them that --

24          THE COURT:  Well, there is always that.

25          MR. MATESIC:  I don't want to give the Defendant

1  that they --

2          THE COURT:  Nor should you.  Nor they, on the

3  other side.  I'm not suggesting you give them anything.  I

4  don't want this record to come back -- I don't want a

5  reversal more than anybody else.  I like to try them and be

6  done with them.  What do you suggest to do about this?

7          MR. PAWK:  Judge, in your original draft, you put

8  in No. 2 under the prima facie case, you put -- I asked

9  Becky to get it, because I didn't bring it in.

10          (Discussion held off the record.)

11          THE COURT:  I think the other way to do it would

12  be this:  Here is another possibility.  If they find a prima

13  facie case, then they have implicitly rejected your

14  nondiscriminatory reason.  Explicitly, if you will, without

15  knowing it.

16              Then the only question is that doesn't mean

17  automatically that the mere fact that your reason was false,

18  then they may -- that's when I would say if you find the

19  prima facie case, you may, but you -- you may find that the

20  decision was -- then use that language out of my charge,

21  where you may find with -- and just skip the discussion

22  about burden shifting.  Because it doesn't make any sense.

23          MR. LUTZ:  I think that would clean it up some,

24  Your Honor.

25          THE COURT:  For instance, if they find there's a

1    prima facie case, what I would propose to do, then, is this:

2    Bear with me.

3              Do you have a thought on this?

4          MR. MATESIC:  Besides my general sense of

5    confusion?  No.  I mean --

6          MR. PAWK:  Judge, your thought was the second;

7    instead of putting burden shifting in it, they would have to

8    also find --

9          THE COURT:  Okay.  So now they find a prima facie

10   case.  I say, if you find all that, then you must

11   determine -- then you must determine whether Brown's [sic]

12   decision not to hire was, in fact, motivated by gender.

13         MR. LUTZ:  Cost's decision not to hire.

14         THE COURT:  Then I would say Brown must show that

15   the stated reason -- well, Brown must show not only that the

16   stated reason was false, but that the real reason for the

17   challenged employment decision was because of her sex.  Then

18   go on and give the rest of the charge on pretext.  I mean,

19   on how you demonstrate that.  Do you see what I'm saying?

20         MR. MATESIC:  Yeah, I do understand what you're

21   saying.

22         THE COURT:  In other words, once the prima facie

23   case has been established, I then say at the top of Page 10,

24   if you find that a prima facie case has been established --

25   has been established, Brown must show that the stated --

1    Brown must show that the stated reason --

2              MR. PAWK:  Judge, I'm sorry.  You're on 10.

3              THE COURT:  My Page 10.  I'm halfway up here at

4    the top of the page where it says, "Rather, Brown".

5                   Now, they already will have found by virtue

6    of the prima facie case that the stated reason is false.

7    But so I'm not -- I'm going to say, rather, if you find that

8    Plaintiff has made out a prima facie case, you must

9    determine whether the real reason for the challenged

10   employment decision was because of her sex.  In other words,

11   then I'll --

12             MR. MATESIC:  I think that's where the two prongs

13   from Fuentes come in.  There is two ways to do this.  You

14   can show that the employer has given reasons that are

15   implausible, incoherent, inconsistent, number one, or,

16   number two, that discrimination was --

17             THE COURT:  All right.  Then I propose I go ahead

18   and give the second part of that charge, just like it's

19   there.  But the problem is that charge presumes that the

20   jury is still struggling with your burden-shifting issue.

21   Basically, short of determining whether gender was a

22   motivating factor, if the jury finds there is a prima facie

23   case here, that's all there is for them to determine.

24             MR. LUTZ:  They have to find discrimination on top

25   of that.

1           THE COURT:  That's what I mean.  They have to

2    determine whether or not having concluded -- see, that's why

3    I think the way I had it set up made a heck of a lot more

4    sense.

5           MR. LUTZ:  That's the correct statement of the

6    law, because that is what his burden is.  Whether it shifts

7    or not, he still has to show those things.

8           THE COURT:  There would be no additional burden

9    placed on him.

10          MR. LUTZ:  Correct.

11          THE COURT:  Or on the Plaintiff.

12          MR. LUTZ:  And it would just confuse the jury if

13   we talk about shifting the burden, when there is really not

14   a shift, per se.

15          MR. MATESIC:  Well, hang on a second.

16          (Discussion held off the record.)

17          MR. LUTZ:  We don't have a problem with that.

18          THE COURT:  I don't think you will either, when we

19   see it.  We'll rework it, and I'd be happy to hear from you

20   after you see the draft.

21          MR. MATESIC:  Becky, can you reiterate what you

22   struck.

23          THE CLERK:  The prima facie case will stay the

24   same on Page 8 --

25          THE COURT:  Here; let me do it, Becky.  Everything

 1  is the same on 8.  And then on 9, where it says -- well

 2  this --

 3          (Discussion held off the record.)

 4          MR. LUTZ:  So you strike beginning with, "The law

 5  then requires".

 6          THE COURT:  It would be, "The law then requires

 7  her to demonstrate that the failure to hire her was the

 8  result of intentional discrimination."  And then all the

 9  rest of Page 9 comes out.  All the rest of 10 comes out.

10  All of 10 comes out.  And then on Page 11, the little top

11  paragraph and the second paragraph come out.  And we would

12  start, "In order to satisfy her burden of proving

13  intentional discrimination".

14              How much longer do we have with Miss Pawk, do

15  you figure?

16          MR. LUTZ:  Could we have -- he's way beyond -- I

17  realize it was a brief offer yesterday, but he has gone way

18  beyond in many ways.

19          THE COURT:  I don't want to do an offer.  Because

20  that will take up time.  Let's just go out and do it.

21          MR. MATESIC:  All right, sir.

22          (Whereupon the proceedings resumed in open court

23           at 11:13 a.m.)

24  BY MR. MATESIC:

25      Q.  Mrs. Pawk, do you know who Ronald Barrett is?

1        A.    I know of two Ronald Barretts.

2        Q.    Well, first of all, are those two Ronald Barretts

3   related to one another?

4        A.    I do not know.

5        Q.    Okay.  Do you know of the Ronald Barrett who is

6   the business agent or the recently retired business agent --

7        A.    Yes.

8        Q.    -- for Laborers -- let me finish the question.

9   For Laborers Local 952?

10            THE COURT:  Do you know him?

11       Q.    Do you know him?

12       A.    Yes.

13       Q.    And he also gave a deposition in this case.

14       A.    Yes.

15       Q.    Did you ever have occasion to read his deposition?

16       A.    I do not remember.

17       Q.    I'm placing before you what has been previously

18   labeled as Plaintiff's Exhibit 8.  Do you have that in front

19   of you?

20       A.    Yes, sir.

21       Q.    Do you recognize the three names on that exhibit?

22       A.    (No response.)

23       Q.    Those are Cost employees.  They were Cost

24   employees.  Excuse me.  In the year 2002.

25       A.    Okay.

1          Q.    You agree?

2          A.    I do not personally recognize those names, sir.

3          Q.    Okay.  Mr. Barrett testified that Mr. Bell joined

4    the union on August 1st, 2002.  Are you aware of that?

5          A.    Am I aware that Mr. Barrett so testified?

6          Q.    Yes.

7          A.    No, sir.

8          Q.    Okay.  Do you have any reason to doubt that; that

9    Mr. --

10         A.    No, sir.

11         Q.    And Mr. Barrett testified that that start date was

12   close in time to the date on which Cost hired that employee.

13              MR. LUTZ:  Objection, Your Honor.

14         Q.    Do you know that he testified to that?

15              MR. LUTZ:  I'm sorry.  I thought he was finished.

16              THE COURT:  If she doesn't know what he testified

17   to, then she doesn't -- maybe that's the first question.

18              MR. MATESIC:  It is the first question.

19              MR. LUTZ:  Well, she already said she doesn't know

20   what he testified to.  Now he's trying to sum up --

21              THE COURT:  You can't testify for the man who

22   already testified.

23              MR. LUTZ:  Right.

24              THE COURT:  It's sustained.

25   BY MR. MATESIC:

1     Q.   Do you have records of when John Bell was hired by

2   Cost?

3     A.   I would believe payroll would have records.

4     Q.   Well, let's look at the payroll records.

5          MR. MATESIC:  This is Plaintiff's 14.

6     Q.   Miss Pawk, I'm placing before you Plaintiff's

7   Exhibit 14.  Do you see that?

8     A.   Yes, sir.

9     Q.   This is one of those weekly payroll certification

10  documents that you were testifying about yesterday.

11    A.   Yes.

12    Q.   This is a document that Cost turns in to the State

13  on a weekly basis?

14    A.   Yes.  I believe they are generated weekly and

15  possibly sent in with the monthly billings, sir.

16    Q.   All right.  And this document represents to the

17  State that Cost has paid all of the employees listed in this

18  document the prevailing wage.  Correct?

19    A.   Yes.

20    Q.   And you have to include all of your employees in

21  that document.  Correct?

22    A.   Yes.

23    Q.   Okay.  You list the employees of Cost in this

24  document in alphabetical order, correct?

25    A.   I do not specifically recall.

1         Q.    Well, let's -- we'll turn to a few pages.  Okay?
2    I'm turning to the third page now.  What name do you see at
3    the top?
4         A.    Phillip J. Allen.
5         Q.    What name to you see below him?
6         A.    Jamie L. Altemus.
7         Q.    How about on the next page?  What name do you see?
8         A.    Gary Baker.
9         Q.    Okay.  John Beatty?
10            MR. MATESIC:  Would you stipulate that these names
11   are all in alphabetical order?
12            MR. LUTZ:  Yes.
13            MR. PAWK:  Yes.
14            MR. MATESIC:  All right.  We have a stipulation.
15   BY MR. MATESIC:
16        Q.    What is the page number that I am pointing to?
17        A.    Page 2.
18        Q.    The last entry on 2 is?
19        A.    John Beatty.
20        Q.    Okay.  What page am I pointing to right now?
21        A.    3.
22        Q.    What is the first entry of Page 3?
23        A.    Edward Bendevnas (phonetic).
24        Q.    So this record indicates that John Bell was not an
25   employee of Cost during the week ending August 5th, 2002,

1    correct?

2         A.    Yes, correct.

3         Q.    You have a duty under the law to provide accurate

4    information to the Commonwealth of Pennsylvania, correct?

5         A.    Yes.

6         Q.    And this document represents accurate information;

7    the accurate information that you provided to the

8    Commonwealth of Pennsylvania for all the work that was

9    performed by Cost employees during the week ending

10   August 5th, 2002.

11        A.    Yes.  But I would need to see the subsequent week.

12        Q.    Well, we'll take a look at that in a moment.

13   Let's go back to Phillip Allen.  Do you see that on your

14   screen?

15        A.    Yes.

16        Q.    Now, the information relevant to Mr. Allen's work

17   for Cost that I'm pointing to right now is the number of

18   regular hours that that employee worked, this first line of

19   information, this tells the reader of this document how many

20   hours the employee worked, regular hours, on July 30.  Do

21   you see that?

22        A.    Yes, sir.

23        Q.    Do you agree with my characterization?

24        A.    I believe so, sir.

25        Q.    Okay.  And then on Tuesday, July 31, this record

1    indicates that the employee named Phillip Allen worked 16

2    hours.  16 regular hours, correct?

3        A.   Correct.

4        Q.   And on Thursday, August 1st, this record indicates

5    that the employee, Phillip Allen, worked 16 hours.  Correct?

6        A.   Yes.

7        Q.   And on Monday, August 5th, this record indicates

8    that the employee named Phillip Allen worked 18 hours.

9    Correct?

10       A.   Yes.

11       Q.   Okay.  Go down to the second line.  This is the

12   line that indicates how many overtime hours the employee

13   worked, correct?

14       A.   I believe so.

15       Q.   Do you see any overtime hours on this second line

16   for Phillip Allen?

17       A.   No, I do not.

18       Q.   And right below that, that's the line for

19   double-time hours, correct?

20       A.   I believe so.

21       Q.   Do you see any entry for double-time hours on that

22   line?

23       A.   No, sir.

24       Q.   And right here (indicating), the number that I'm

25   pointing at right here, 88 hours, do you see that?

 1        A.    Yes, sir.

 2        Q.    That indicates that Mr. Allen worked 88 hours in

 3   the week ending August 5th, 2002.  Correct?

 4        A.    Yes, sir.

 5        Q.    That information is false, Miss Pawk, correct?

 6        A.    There may have been a situation where his

 7   paperwork was not received timely, and that -- I don't do

 8   the data entry.  Payroll does.  Possibly he had hours in the

 9   previous time period, or they -- they doubled it and just

10   did it in the hours instead of the second line.

11        Q.    You would agree with me that the information is

12   false.

13        A.    I -- I don't know when his -- when his paperwork

14   came into the office.  But -- I don't know if --

15        Q.    You think this might -- this information might be

16   true.

17        A.    I don't -- I'm not familiar enough with the coding

18   and the -- I don't know.

19        Q.    Is there some question as to the reliability of

20   this document, based on the information that we just

21   reviewed?  In your mind, is there some question?

22        A.    I don't know why it reflects that.

23        Q.    Answer my question, please.  Is there a question

24   in your mind as to the reliability of this record?

25              THE COURT:  Ma'am, can you answer.

1      A.   Yes.  I don't understand why it says that.  Yes, I

2   don't understand that.

3      Q.   So if there's some question as to the reliability

4   of this record with regard to the issue of total hours

5   worked, it's reasonable to assume that there might be other

6   aspects of this record that are also not reliable.  You

7   would agree with that.

8      A.   I have one question, sir.

9      Q.   Please answer my question first.

10      A.   Oh, I'm sorry.  It looks to me that there is five

11   times 16, which is 80, not 88.  And that there was eight

12   hours -- I'm not sure how they got the eight.  But it looks

13   to me that he was on payroll earlier; that the time sheets

14   did not arrive on time, sir.

15      Q.   Please answer my question.

16      A.   Okay.  We have to pull the manual time record to

17   see what happened here, sir.

18      Q.   Again, you're not answering the question.

19           THE COURT:  State your question again.

20           MR. MATESIC:  Sure.

21      Q.   My question is, based on the question in your mind

22   about the reliability of this document, which you said is

23   based on the number of hours recorded for John Allen, it's

24   reasonable to assume that there may be other aspects of this

25   document that are also unreliable.  It's reasonable to

1    assume that.  You would agree with me.

2        A.   No, I wouldn't make that assumption.  I would

3    assume the paperwork -- they can only enter them as of the

4    date they received the paperwork.  And if this is her [sic]

5    previous workweek, which it looks like obviously it is, that

6    that's why it's entered that way.  You would have to ask

7    payroll.

8        Q.   So in every other respect, with the exception of

9    Phillip Allen's case, in every other respect, this document

10   is 100 percent accurate.  Is that what you're saying?

11       A.   I'm saying I believe Phillip Allen's paperwork

12   must not have arrived in a timely fashion --

13       Q.   You're not answering my question.

14           MR. MATESIC:  I apologize.

15           THE COURT:  Now, look it.

16           MR. MATESIC:  I'm sorry?

17           THE COURT:  I'm going to say it again.  Let's not

18   talk over each other.  Let's wait until you finish.  And

19   after this, move on to another area.

20           MR. MATESIC:  I will.

21       A.   Please restate your question, sir.

22           MR. MATESIC:  Would you read back my question,

23   please.

24           (Record read back by the reporter.)

25       A.   I don't know.

1      Q.   If you don't know whether it's the case that every

2   other piece of information on this document is reliable,

3   then it's reasonable for me to question the fact -- it's

4   reasonable for me to question the fact as to whether or not

5   Mr. Allen worked on Saturday, August 3rd.

6           MR. LUTZ:  Objection, Your Honor.  Whether it's

7   reasonable for him to question or not is irrelevant.

8           THE COURT:  Sustained.

9      Q.   This is still Plaintiff's Exhibit 14.  Do you see

10  where I'm indicating, Miss Pawk?

11     A.   Yes, sir.

12     Q.   August 12, 2002.  This is the week following

13  August 5th, 2002, correct?

14     A.   (No response.)

15     Q.   Excuse me.  This is the week which follows the

16  week that ended in August -- that ended as of August 5th,

17  2002.

18     A.   Correct.

19     Q.   And on this time record, we see John Bell's name

20  for the first time.

21     A.   (No response.)

22     Q.   He wasn't on the previous week's record.

23     A.   Correct.

24     Q.   He was on this week's record.  Correct?

25     A.   Correct.

1       Q.    And what is the first day that you show in this

2   record that John Bell worked for Cost Company?

3       A.    I show that payroll received paperwork that he --

4   that he -- on August 6th.  That he was working.

5       Q.    So that's his first day of work.

6       A.    Based on this record, yes.  This is not the actual

7   manual time sheets, sir.

8       Q.    And you will agree with me that you -- this record

9   indicates that on Thursday of that week, Friday of that

10  week, and Monday of the following week, this record

11  indicates that Mr. Bell worked a double shift; 16 hours a

12  day.

13      A.    It could be that he worked a double shift, but you

14  would have to pull the time sheet, because it's possible

15  that his paperwork -- because this was an out-of-town job --

16  did not arrive in a timely fashion, sir.

17      Q.    You would agree with me that there is some

18  question in your mind as to the reliability of this

19  representation right here; 16 hours of regular time worked

20  on Thursday, August 8th.  There's some question in your mind

21  as to whether that's a reliable figure.

22      A.    I don't know.

23      Q.    If you don't know, that means there's a question

24  in your mind, correct?

25      A.    I don't know.

1      Q.   That job was still going on, in October of 2002,

2   wasn't it?  That job being the SCI Marienville job.

3      A.   I believe it was winding down in October of 2002,

4   sir.

5      Q.   Okay.  I'm placing before you now the last section

6   of Plaintiff's 14.  You can identify this for us, please,

7   Miss Pawk.  This is the payroll -- the certified payroll

8   record for the week ending October 28th, 2002, correct?

9      A.   Yes, sir.

10      Q.   Do you know how many mason tenders Cost was

11   employing at the SCI Marienville site during the week ending

12   October 28th, 2002?

13      A.   I do not know, sir.

14      Q.   Well, Miss Pawk, I have had the opportunity to go

15   through these payroll records.  And my count is that as of

16   the week ending October 28th, 2002, there were a total of

17   115 Cost employees on that job site; 47 of whom were mason

18   tenders, and one of whom -- well, I'll just stop right

19   there.  47 of whom were mason tenders.  Do you have any

20   reason to doubt that number?

21      A.   No, sir.

22           MR. MATESIC:  Can we get a stipulation on this

23   number?

24           MR. LUTZ:  Are you telling me that you accurately

25   counted them?

```
 1              MR. MATESIC:  It's right here.
 2         Q.   47 mason tenders --
 3              THE COURT:  Well, was there a stipulation or
 4    wasn't there?
 5              MR. LUTZ:  We'll so stipulate, Your Honor.
 6              THE COURT:  All right.
 7              MR. MATESIC:  And I believe the prior stipulation
 8    was that as of the week ending August 12th, 2002, there were
 9    57 mason tenders.
10              MR. LUTZ:  I don't remember the specific numbers.
11    If you say so, that's fine.
12    BY MR. MATESIC:
13         Q.   I'm turning to the fourth page in this record,
14    Miss Pawk.
15         A.   Yes.
16         Q.   Do you see that in front of you?  On the line for
17    regular hours for this employee, how many regular hours are
18    reported for this employee on October 22nd, 2002?
19         A.   24.
20         Q.   How many hours are reported for Wednesday, the
21    following day?
22         A.   16.
23         Q.   How many hours are reported for the next day?
24         A.   16.
25         Q.   How many hours are reported for the next day?
```

1        A.    16.

2        Q.    Do you know who this employee is?

3            MR. LUTZ:  Your Honor, I object.  He has a tab

4    over the -- over the employee's name on the document he's

5    showing her.

6            MR. MATESIC:  I'll show it to her in a minute.

7            MR. LUTZ:  Well --

8            MR. MATESIC:  I'll show it to her in a second.

9    Right after she answers the first question.

10           THE COURT:  Hang on a second.

11           MR. LUTZ:  It's grossly unfair to ask her to

12   memorize documents and ask her a question --

13           THE COURT:  How would she know who the employee

14   is, unless she sees the name?

15           MR. MATESIC:  No.  I just want to know, is she

16   aware of an employee at Cost --

17   BY MR. MATESIC:

18       Q.    You would agree with me, Miss Pawk, that it is an

19   extraordinary circumstance for an employee to work --

20           MR. MATESIC:  I'll withdraw the question for right

21   now, Your Honor.

22       Q.    It's an extraordinary circumstance for an employee

23   at Cost to work 24 hours in one day.

24       A.    Yes.

25       Q.    And it's extraordinary for that same employee to

1  then on the next day work 16 hours.

2      A.   I believe you need to pull the -- excuse me.  I

3  believe you need to pull the manual time sheet.  There could

4  be a shortage of persons; they could have been missed on the

5  time sheet for the preceding work, and that is how they

6  would document it.  These payrolls are generated weekly, and

7  they have to have their paperwork.  It looks in alphabetical

8  order like this person is Bell, because of the name below

9  it.

10      I don't collect the time sheets, I don't do the

11  data coding.  I don't understand this.  It looks to me like

12  they were missed on a previous time sheet.

13      Q.   This is John Bell.

14      A.   If there were many workers, people get missed.  It

15  happens all the time, sir, and they issue shortages.

16      Q.   You would agree with me, this is John Bell?

17      A.   Yes, sir.

18      Q.   This is the same John Bell -- this is the same

19  John Bell who in the week ending August 12th, 2002 -- the

20  same John Bell who in the week ending August 12th, 2002, has

21  a payroll record which reflects that he worked 16 hours on

22  Thursday, August 8th, 16 hours on Friday, August 9th, and

23  that his first day of employment with Cost was August 6th.

24  The same guy.  Answer my question, please.  It's the same

25  John Bell.

1      A.    It appears to be.

2      Q.    And this is the same John Bell who joined the

3  union on August 1st, 2002.

4      A.    The workers received their paychecks on Thursday.

5  Apparently on Thursday, he must have realized he was missed

6  on the time sheet for the previous week, so she bumped up

7  his hours on Thursday and Friday to accommodate that on

8  Monday.  He must have started prior to, and the paperwork

9  did not arrive at the job site.  That happens frequently.

10  People are missed on job sites.  Very often.  And it's

11  called a shortage.  But you have to pull the actual manual

12  time records.

13          So -- and that can happen frequently.  It can

14  happen in October, it can happen in August, it can happen

15  all the time --

16          THE COURT:  Wait for a question.

17      Q.    Let me ask my question.  This is an unreliable

18  representation, isn't it?  24 hours on October 22nd, that's

19  unreliable.

20      A.    It's possible, because two people have the same

21  last name, someone got missed.  I am not going to state

22  whether it's unreliable or not.  I would need to see the

23  manual records sir; this time sheet that Dean Taylor would

24  fill out, sir.

25      Q.    You submitted that record to the Commonwealth of

```
 1   Pennsylvania.
 2        A.    Excuse me?  Your question?
 3        Q.    The record that we just looked at, October 28th,
 4   2002.
 5        A.    Payroll submitted it, and I signed it.
 6        Q.    Yeah, this one right here (indicating).  You sent
 7   that to the Commonwealth of Pennsylvania.  You did?
 8        A.    Yes.  And clearly there's a shortage.
 9              MR. MATESIC:  Nothing further.
10              THE COURT:  All right.  Do you have anything?
11
12                        CROSS-EXAMINATION
13   BY MR. LUTZ:
14
15        Q.    Good morning.
16        A.    Good morning.
17        Q.    Georgia, I hope you don't object; I'm going to
18   refer to you as Georgia, so there's no confusion in the
19   record with respect to you and Mr. Pawk.  Is that okay?
20        A.    Not a problem, yes.
21        Q.    Georgia, let's talk about what we are here for;
22   Kathleen Brown.  When did you first become aware of --
23              THE COURT:  Use the microphone, please.  As a
24   matter of fact, can you move your material right onto it.
25   BY MR. LUTZ:
```

1    Q.    When did you first become aware that Kathleen

2    Brown was seeking employment with Cost Company?

3    A.    On September 18th of 2002.

4    Q.    And how did you become aware that Kathleen Brown

5    was seeking employment?

6    A.    I received a partially completed Female

7    Recruitment Minority Referral Memorandum with a resume

8    attached under my door.

9    Q.    I have placed on the screen in front of you

10   Defendant's Exhibit U-4.  Is that the document you were just

11   referring to?

12   A.    Yes.

13   Q.    And what did you do after you received that

14   document?

15   A.    I perused the attached resume that was stapled to

16   it.  I read the document in its entirety, and I paid

17   particular attention to her operating engineer experience,

18   sir.

19   Q.    Were you excited because you received her resume?

20   A.    Oh, yeah.  I was thrilled.  I couldn't believe

21   this female was in the operating engineers.  We love having

22   females as operators because they keep the boom or the arm

23   of the crane meticulous, the inside of the cab is

24   meticulous, the fire extinguisher is there, the operator's

25   manual.  Everything is in order.  We have had several

```
 1    operators, Sally Milligan, Tina Rich --

 2         Q.   Georgia, what --

 3         A.   -- Diane Angel, and they all have done a wonderful

 4    job for us.  I was excited.  It appears she had been

 5    certified by the International Union of Operating Engineers,

 6    which is Local 66, so I was thrilled.  I wanted to try to

 7    call and talk to her.  I dialed information.  I tried

 8    different area codes.  I tried to find the number.  I could

 9    not locate a phone number.  I wanted to speak with her.

10         Q.   We'll get back to that.  Let me back up for a

11    second.

12              THE COURT:  Listen to the question and answer the

13    question.

14         Q.   On her resume, Georgia, on Kathleen Brown's resume

15    that you received, it indicated that she was certified by

16    the operator's union; is that correct?

17         A.   Yes.

18         Q.   All right.  And that was what type of

19    certification, when it says -- it says on there "operation

20    of forklift".  What type of a certification is that?  Do you

21    understand my question?

22         A.   No.

23         Q.   Did you understand what type of certification

24    Kathleen Brown had?

25         A.   Yes.  She could operate a forklift alone.
```

1      Q.    Are there different types of operators in the

2   operators' --

3      A.    Yes.

4      Q.    Please.  You let me finish me question, take a

5   breather, and then I'll go ahead.  Are there different types

6   of operators in the operators' union?

7      A.    Yes.

8      Q.    Are there different levels of certification?

9      A.    Yes.

10     Q.    What are the levels of certification?

11     A.    I believe there is -- there is different levels

12  and different classes of certification.  There is the --

13  possibly it's called Level A or Level 1, which is the crane

14  operators, and the ones that have the ability to run various

15  equipment or all of the equipment.

16     Q.    Now, based on what you saw on Kathleen Brown's

17  resume, was she a Level 1 operator?

18     A.    No, I do not believe so.

19     Q.    All right.  When she indicates that she drives a

20  forklift, what level operator would that be, that drives a

21  forklift?

22     A.    I believe it's below C.

23     Q.    Below C.  Okay.

24     A.    Or below the first two levels, sir.

25     Q.    Now, could you explain for us your understanding

1    of how these different operators are classified and what

2    they are permitted to do with the operators' union and on

3    your job sites.

4        A.    It's my understanding that if you are a Level 1 or

5    a Level A operator, you are permitted to run all types of

6    cranes and all forklifts and all rough-terrain vehicles, and

7    you could be assigned to a crane, and you -- at a job site,

8    and if there's a forklift at the job site as well, you were

9    allowed to make a machine change, get on the forklift, do

10   forklift lifts, and then go back to the crane.

11            So you would be permitted, if you had equipment --

12   crane is A, let's say a forklift is B, and let's say another

13   vehicle is C.  You would be permitted to be on the crane and

14   go A to B to C, or to go A, then go to Machine B, do lifts,

15   and then go back to A.  You can make two moves.  That's it.

16   You can go A to B to C and stay at C, or you can go A to B

17   and back to A.

18       Q.    Now, the fact that Kathleen Brown had only this D

19   certification, would that limit what she was available to do

20   on your job sites?

21       A.    I believe so.  She would not be allowed to run the

22   crane.

23       Q.    Now, let's go back to Kathleen Brown and you

24   receiving this resume.  By the way, I put the first page of

25   the resume back up, Defendant's Exhibit E-5.  Are there

1    dates in the laborers' section of that resume?

2         A.    Yes.

3         Q.    And what do those dates show?

4         A.    May 2002 to August 2002.

5         Q.    And this resume was attached to the recruitment

6    memo that came back to your office?

7         A.    Yes.

8         Q.    And that came into your office, I believe you

9    said, on September --

10        A.    18th, 2002.

11        Q.    And when did you write to Kathleen?

12        A.    September 18th, 2002.

13        Q.    And when is the next time you heard from Kathleen

14   after you wrote that letter to her?

15        A.    October 29, 2002.

16        Q.    On October 29, 2002, what happened?

17        A.    I believe I received a phone call from Kathleen,

18   and she expressed an interest in working for Cost as an

19   operating engineer.

20        Q.    Tell us about the conversation.  What was

21   discussed?

22        A.    I told her I was very impressed with her resume, I

23   was very excited that she got my note, because I wasn't --

24        Q.    Slow down a little bit.

25        A.    I'm very sorry.  I was very excited that she was

1    able to contact me, because I had jotted a handwritten note

2    and put it in an envelope and wasn't sure it was going to

3    get to her.  And she called and said she received my note.

4    And I told her I received her resume, and I was very

5    impressed that she was a forklift operator.

6            And then I believe she told me that -- actually,

7    she had let her book lapse; her certification with the

8    International Union of Operators, Engineers 66 lapse.

9        Q.   Did she ever tell you whether or not she was in a

10   laborers' union?

11       A.   We never discussed a laborer position or laborers'

12   union or anything of that sort.

13       Q.   Did she mention in the oral conversations that you

14   had on the telephone, whether she had any interest in being

15   a laborer?

16       A.   No, she did not.

17       Q.   Did she ever discuss with you the duties

18   pertaining to a mason tender position?

19       A.   No.

20       Q.   Did she ever use the words "mason tender" in her

21   discussions with you on the telephone that day?

22       A.   No, she did not.

23       Q.   Did she ever indicate in any way, shape, or form

24   that she was interested in some other type of laborer's

25   position on that day?

1      A.    No.

2      Q.    How long did this conversation last?

3      A.    It was -- I don't know.  About five to 10 minutes.

4      Q.    And how did you leave it with her?  What was the

5   next step?

6      A.    I told her that I thought that she should try to

7   reactivate with the Operators, Engineers, and I wanted to

8   see if she was willing to travel.  I -- I don't recall if I

9   put her on hold and called Dean to say, hey, you know,

10  Kathleen called me and I want her hired, and then Dean said,

11  Georgia, we're done.  And I think I may have said to her,

12  listen, if I can't -- if I don't have a position for you at

13  Marienville Prison, would you be willing to travel to

14  another job site, to Pittsburgh or to Erie, and I believe

15  she indicated she was willing to travel.  And I was very

16  excited.  And I gave her Mr. Cramer's phone number, and I

17  asked her to please contact Mr. Cramer --

18     Q.    Who is Mr. Cramer?

19     A.    Jack Cramer is a project manager.  And he was

20  going to be running -- possibly had already started running

21  the Erie Federal Courthouse project right here.

22     Q.    So did you discuss specific locations with her as

23  to where you might be able to assist her in getting an

24  operator's position?

25     A.    Yes.

1          Q.    You mentioned Erie and you mentioned Pittsburgh.

2    Did you discuss any other specific locations?

3          A.    She was very excited about Erie.  I think she

4    stated that it was close to where she was then living.  I

5    think she maybe had moved -- I'm not exactly sure.  But she

6    had moved, and she was excited about working in Erie.  I

7    gave her Mr. Cramer's Nextel number and told her to please

8    contact him, and I was just thrilled to have her.

9          Q.    Did you assist her in any way in contacting the

10   operators' union, Union 66?

11              MR. MATESIC:  Your Honor, I have to place an

12   objection on the record at this point.  I think what we're

13   doing is merging the cross-examination with the direct

14   examination.  And given that, there is prohibition against

15   asking leading questions on direct.  I think I have a valid

16   objection to the manner in which Mr. Lutz is posing his

17   questions.

18              THE COURT:  Overruled.  Go ahead.

19   BY MR. LUTZ:

20         Q.    Did you assist her in getting into or attempting

21   to get into Operators' Union 66?

22         A.    I believe so, yes.

23         Q.    What did you do?

24         A.    I told her that I wanted her to try to reactivate,

25   and that she -- that we needed to contact Local 66.  Dennis

 1  Manown, I believe was the president at the time.  And if she

 2  wanted me to do anything -- I think she said that she was

 3  going to take care of straightening that out.

 4      Q.   If someone is in the operators' union, do you know

 5  if they can be in the laborers' union at the same time?

 6      A.   It's my understanding that you cannot carry two

 7  books at the same time.

 8      Q.   When you say "carry a book", does that mean

 9  belonging to the union or having a union --

10      A.   Yes.

11      Q.   -- or having a union card?

12      A.   Yes.  Carrying a book means carrying union

13  certification.

14      Q.   So when she told you that she was in the

15  operators' union, did you have any reason to believe that

16  she was in the laborers' union?

17      A.   No.

18          MR. MATESIC:  Pardon me.  Just for the record,

19  Your Honor, I'm placing a continuing objection, based on my

20  prior --

21          THE COURT:  Mr. Matesic, do me a favor -- and this

22  is because I need people to stand up to hear you better.

23  For future objections, get on your feet.

24          MR. MATESIC:  Sure.

25          THE COURT:  I'm sorry; a continuing objection to

1  what?

2          MR. MATESIC:  Well, based on -- I can't object to

3  his leading questions.  And I just wanted, for the

4  remainder --

5          THE COURT:  No, you don't get a -- under the

6  rules, you object as the questions are asked.  If you think

7  it's a leading question, I'll be happy to rule answer by

8  answer.  Go ahead.  Or I should say question by question.  I

9  apologize.  Go ahead.

10 BY MR. LUTZ:

11     Q.   Georgia, when --

12     A.   Yes.

13     Q.   -- when did you first learn that Kathleen Brown

14 was interested in a laborer's position with Cost Company?

15     A.   When I first received the EEOC complaint and I

16 reviewed it.  And I was shocked.  We had never discussed a

17 laborer's position whatsoever.

18     Q.   What had you discussed prior to your receipt of

19 that EEOC complaint?

20     A.   Her getting an operator's position.  Possibly at

21 Erie.

22     Q.   After you received the EEOC complaint, did Cost

23 offer her a laborer's job?

24     A.   Yes, we did.

25     Q.   And what did she do in response?

1      A.    She refused it.

2            MR. LUTZ:  No further questions.

3            THE COURT:  All right.  Anything further with this

4    witness, Mr. Matesic?

5            MR. MATESIC:  Just a few.

6

7                      REDIRECT EXAMINATION

8    BY MR. MATESIC:

9

10     Q.    You said that the first time that you learned that

11   Kathleen Brown was seeking a laborer's position was during

12   your phone call -- excuse me -- was after she filed the

13   complaint with the EEOC.

14     A.    Yes.

15     Q.    Okay.  Placing before you Defendant's Exhibit U-4.

16   You have seen this already today, correct?

17     A.    Yes.

18     Q.    Okay.  Does this not indicate that she was seeking

19   a laborer's position?

20     A.    It said "operator, laborer, resume attached," dot,

21   dot, dot.

22     Q.    Does it not indicate that as of September 19th,

23   2002, she was seeking a laborer's position?

24     A.    It states she's interested in an operator first,

25   laborer.  You can't be both, sir.

1    Q.   When was the EEOC case filed?

2    A.   I don't know when she filed exactly.

3    Q.   What is the date of your response?  Do you know

4  that?

5    A.   I don't specifically recall.

6    Q.   I am placing before you Plaintiff's Exhibit 24.

7  All right?  Give me one second.  Now, this is the same

8  memorandum that we were looking at a moment ago.  And the

9  difference is that someone has circled this date.  And I

10  will stipulate with counsel that it was my client who did

11  that.  All right?  Do you understand, Miss Pawk?

12    A.   Fine.

13    Q.   All right.  Now, you agree with me that Cost

14  received this memorandum on September 19th.

15    A.   I received that memorandum with the resume

16  attached, I believe on September 18th, 2002.

17    Q.   I apologize.  September 18th.  All right.  Now,

18  turning to the second page of Exhibit 24, do you see what

19  I'm pointing to down in the lower right-hand corner, Exhibit

20  B-2?  Do you see that?

21    A.   Barely.

22    Q.   Okay.  That's Cost's exhibit that they attached to

23  the EEOC response.  Correct?

24    A.   Yes.

25    Q.   And this shows that Kathleen Brown filled out a

1    second minority recruitment memorandum that was dated

2    August 15th, 2002.  Correct?

3        A.    Correct.

4        Q.    So this is the second Minority Recruitment

5    Memorandum that Cost received from Kathleen Brown.

6        A.    And we received that with her subsequent resume

7    attached, which was printed October 4th, 2002.  And I

8    believe she did that in response to receiving my note, and

9    she filled in the contact number.

10       Q.    Okay.  And what position is she asking for on that

11   second page of Exhibit --

12       A.    This time she states laborer, operator; three to

13   five years operating engineers; laborer, Department of

14   Conservation and Natural Resources; forklift certification;

15   four years construction.

16       Q.    This information right here, that's consistent

17   with the information that she put on her resume, isn't it?

18       A.    It's very similar.

19       Q.    Now, turning to the third page in Exhibit 24 --

20   and, once again, I'll stipulate that the handwriting up here

21   and the circling of the words was done by my client.  Do you

22   see the date, August 15th, 2002?

23       A.    Yes, sir.

24       Q.    Down at the bottom, do you see Kathleen Brown's

25   name?

1          A.    Yes, I see her name.

2          Q.    And do you see what she has written in there under

3     her address?

4          A.    I see what's written there.  I have never seen

5     this document, sir.

6          Q.    Okay.  So you never saw a document which

7     Kathleen -- before the EEOC case was filed, you never

8     received a document in which Kathleen had indicated that she

9     had given this form to the person in charge at the Cost work

10    site at Marienville.

11         A.    No, I have never seen this Document 1008, sir.

12               THE COURT:  Start wrapping it up.

13         Q.    Mr. Lutz was asking you about how excited you were

14    that this female, Kathleen Brown, had expressed an interest

15    to work for Cost Company.  You were excited by that, right?

16         A.    Yes.  I'm one of four daughters.  I am a mother of

17    three children, two of which are females.  Ever since I was

18    a little girl, I spent weekends with my father and my

19    sisters on his red pickup truck going job site to job site.

20    I love having females and qualified persons run our

21    equipment.  I was excited.  We love getting females,

22    minorities.  Anyone that's qualified, we want to hire.

23         Q.    It's fair to say you would kill for the chance to

24    get a female foreman.

25         A.    I shouldn't say kill, but, yeah, I would love to

1   have a bricklayer foreman as a female.  I would love to have

2   females, minorities, absolutely.  I am a woman in

3   construction.

4        Q.   But you have used that terminology before, right?

5   I'd kill to --

6        A.   I believe in my deposition, I did use the word

7   "kill", which was probably inappropriate, yes.

8        Q.   Now, it would help you to hire a female if you

9   knew --

10       A.   I tried to hire Miss Brown --

11            THE COURT:  Excuse me.  Please wait until he

12   finishes.

13       Q.   It would help you in your efforts to hire a female

14   if you knew you, Georgia Pawk knew, whether a female had

15   ever gone to Cost's work site at Marienville asking for a

16   job.  That would be helpful to you, wouldn't it?

17       A.   Yes, it would.

18       Q.   Okay.  But you don't have records of who shows up

19   at those work sites.  Right?

20       A.   I personally do not have knowledge --

21            MR. LUTZ:  Objection, Your Honor.  We have been

22   through this records issue before, and it's repetitive --

23            THE COURT:  Sustained.  Sustained.

24   BY MR. MATESIC:

25       Q.   Let me ask it this way:  We went over this

1    yesterday.  This is Defendant's Exhibit W-1.  These are all

2    the Minority Recruitment Memoranda that have the stamps with

3    the dates on which they were received by Cost.  Correct?

4        A.    I can't see them all, sir.

5        Q.    Okay.  I'm just going to summarize --

6            THE COURT:  Excuse me.  Excuse me.  I have got to

7    deal with one thing at a time.

8            MR. LUTZ:  Your Honor, I object.  It's beyond the

9    scope of my examination of Miss Pawk.  He's getting into new

10   matters again.  And it's also been asked and answered

11   yesterday --

12           THE COURT:  Were these the documents that were

13   reviewed yesterday?

14           MR. MATESIC:  Yes, they were.

15           THE COURT:  Sustained.

16           MR. MATESIC:  Your Honor, I have the right to

17   impeach the witness, based on her answers to Mr. Lutz.  And

18   this line of questioning goes towards that goal.

19           MR. LUTZ:  It has nothing to do with what I asked

20   her on my direct examination of her.

21           THE COURT:  All right.  I'll let you -- I'll let

22   you go for a few minutes if it's impeachment.  But we are

23   breaking in three minutes for lunch, and, if possible, I

24   would like to conclude with this witness.

25   BY MR. MATESIC:

1      Q.    One of the things that helps you -- hang on a

2   second.  You keep these documents on file.  All of these

3   documents that we went over yesterday with a date stamp, you

4   keep them in a file, right?

5      A.    I have binders for jurisdictions and job sites.

6      Q.    And what does this sentence right here

7   (indicating) say?  "At this time we may not be accepting

8   employment applications.  However, in the future, should we

9   be commencing new projects and need additional manpower, we

10  would like you to inform us of any individuals who might be

11  interested in those jobs."  Correct?

12     A.    Correct.

13     Q.    Okay.  So what this stack of papers represents is

14  a stack of names of people who want to get hired by Cost,

15  right?

16     A.    Yes.

17     Q.    Now, if you don't know -- if you don't know the

18  total number of people who come to you seeking work, how are

19  you in a position to figure out whether you're going to be

20  able to fill a vacancy with one of these people?

21     A.    I wouldn't know the number of persons that would

22  come to a given job site if it was not communicated to me.

23     Q.    Your object is to put those people, if they are

24  women -- you said -- this is what you said, right here

25  (indicating).  Do you see where I'm indicating?  Page 79.

1    "I would love -- I would kill for a female foreman, but I

2    don't think that there are any."  Do you see that?

3         A.    Yes.

4         Q.    Those are your words.

5         A.    Absolutely.  I would love any females.  Any

6    qualified persons in any of our trades that we are assigned

7    with.

8         Q.    And if you don't know if there are vacancies or if

9    there are applications that are coming in, how are you in a

10   position to put these people into jobs?

11        A.    Because to my knowledge, we don't have

12   applications.  To my knowledge, we hire directly from the

13   hall.

14        Q.    And that's exactly my point.  Thank you.

15        A.    And we refer to the hall.

16             MR. MATESIC:  Nothing further.

17             THE COURT:  All right.

18             MR. LUTZ:  We have no further questions.  Your

19   Honor, I'd ask for Miss Pawk to be excused.

20             THE COURT:  She's excused.  We're going to be --

21   I'm going to say we're going to take an hour, but apparently

22   that was inadequate the last time.  Take an hour and 15

23   minutes.

24             (Recess held from 12:06 p.m. till 1:30 p.m.)

25             THE COURT:  All right, Mr. Matesic.

1           MR. MATESIC:  Thank you, Your Honor.  Plaintiff

2    calls William Heaton.

3           THE COURT:  Sir, if you'd be so kind as to come up

4    here.  And spell your last name for the benefit of my court

5    reporter.

6           THE WITNESS:  It's H-E-A-T-O-N.

7

8        W I L L I A M   H E A T O N, first having

9        been duly sworn, testified as follows:

10

11                      DIRECT EXAMINATION

12   BY MR. MATESIC:

13

14       Q.   Good afternoon.

15       A.   Good afternoon.

16       Q.   Mr. Heaton, you are a sub foreman with Cost

17   Company?

18       A.   Yes, I am.

19       Q.   I just have a few questions for you.  In 2002, you

20   were the sub foreman at the Cost Marienville Prison site,

21   correct?

22       A.   Yes, I was.

23       Q.   And at the time you were the sub foreman -- strike

24   that question.  In the early part of that year, when you

25   arrived at that site, you were in charge of hiring personnel

```
 1   to work for Cost?
 2        A.   No, I was not.  Not in 2002.
 3             THE COURT:  Would you pull in just a little bit,
 4   sir.
 5        Q.   In 2002 --
 6             MR. PAWK:  I'm sorry, Judge.  If he could pull the
 7   microphone.  I can't hear him.
 8             THE COURT:  What was your answer to that last
 9   question?
10             THE WITNESS:  No, I was not in charge of hiring in
11   2002.
12        Q.   You were in charge of hiring for Cost at some
13   other time?
14        A.   Yes, I was.
15        Q.   Okay.  Dean Taylor joined that job site in April,
16   approximately, 2002?
17        A.   No.  I believe he come in December of 2001.
18        Q.   Well, let me ask it this way:  After Dean Taylor
19   arrived on the job, he was doing the hiring at that job
20   site, correct?
21        A.   Correct.
22        Q.   Was anybody hiring on that job site before Dean
23   Taylor?
24        A.   For Cost Company or for --
25        Q.   Did Cost have work going on before Dean Taylor
```

1    arrived in December of 2001?

2          A.    On that site or --

3          Q.    Yes, on that site.

4          A.    Can you repeat the question, please.

5          Q.    Sure.  The point I'm getting at, Mr. Heaton, is

6    who from Cost had the power to hire employees to work on

7    that site leading up to the summer of 2002?  Now, you would

8    agree with me that Dean Taylor was hiring people for Cost

9    during the year 2002.

10         A.    Correct.

11         Q.    In fact, your testimony is that he joined that job

12   site or he arrived on that job site in December of 2001.

13         A.    Correct.

14         Q.    Okay.  Did anybody else before Dean Taylor arrived

15   in December of 2001, did anybody else for Cost hire people

16   to work on that site?

17         A.    In 2001 or 2002?

18         Q.    2001.

19         A.    I hired in 2001.

20         Q.    You hired in 2001.

21         A.    Yes.

22         Q.    Okay.  All right.  You're familiar with the hiring

23   practices of Cost Company, since you've worked in that

24   capacity?

25         A.    Yes, I am.

1      Q.   All right.  Now -- and you're familiar with the

2    events that arise during the course of a construction season

3    with regard to hiring.  And when I say the issues that

4    arise, I'm talking about the scarcity of labor.

5      A.   (No response.)

6      Q.   Do you understand my point?

7      A.   No, I do not.

8      Q.   The construction season peaks at some time during

9    the summer.

10     A.   Yes.

11     Q.   On average.

12     A.   Yes.

13     Q.   All right?  So in the months before summer, the

14   workforce is expanding.  It's growing.  You're hiring

15   additional employees, correct?

16     A.   Pertaining to what job?

17     Q.   The Marienville job site.  That's -- all my

18   questions go to the Marienville job site.

19     A.   Okay.

20     Q.   Okay?

21     A.   All right.

22     Q.   You would agree with me, in the months before

23   summertime, Cost is hiring more and more employees, until

24   some point in the summer their total number of employees

25   reaches a peak.

1          A.    Correct.

2          Q.    All right.  That peak in 2002, that occurred when?

3          A.    I'm not really familiar with that, sir.

4                THE COURT:  That's a stipulated fact.

5                MR. MATESIC:  I'm sorry?

6                THE COURT:  That's stipulated to.  The peak is

7    stipulated to, if I remember correctly.

8                MR. MATESIC:  I think the peak is, is that there

9    was a peak as of July 31st, 2002 [sic].

10               THE COURT:  Well, I don't want to misrepresent

11   what I thought you gentlemen agreed to, but I'm just trying

12   to obviate the need for proof on a point that has already

13   been established.

14               MR. PAWK:  I believe that we stipulated that the

15   highest number of employees that Cost had on that project

16   was the week of -- I can't remember.  Was it ending

17   August 5 or August --

18               THE COURT:  That's my recollection.

19               MR. MATESIC:  Right.  I have a slightly different

20   question, but I'll withdraw it.

21   BY MR. MATESIC:

22        Q.    Mr. Heaton, on a yearly basis, the people who

23   exercise hiring powers by Cost are required to attend a

24   meeting in which Cost's equal employment policy is

25   discussed.

1    A.    That is correct.

2    Q.    All right.  And you attended such a meeting this

3  year, correct?

4    A.    No.  I have not.

5    Q.    All right.  Did you attend the one last year?

6    A.    Can I restate?

7    Q.    Sure.

8    A.    Can I explain, please?

9    Q.    Sure.

10    A.    I didn't attend a meeting this year, because this

11  year's meeting hasn't happened yet.  In place of this year's

12  meeting, we were doing certification for CPR and first aid.

13    Q.    So you haven't had your equal employment meeting

14  yet.

15    A.    Correct.

16    Q.    But in all prior years, those meetings occur early

17  in the year, before the construction season peaks.

18    A.    They could either occur in the -- depending on

19  when our slow time is.

20    Q.    And Georgia Pawk, the Equal Employment Opportunity

21  Officer presides over that meeting.

22    A.    Yes, she does.

23    Q.    Georgia Pawk never went to you and indicated that

24  she believed there was any problem with regard to sex

25  discrimination at Cost; is that fair to say?

1          A.    Referring to what job?

2          Q.    You understand that Cost has an equal employment

3     policy.

4          A.    Correct.

5          Q.    And that policy applies in the context of hiring.

6          A.    Correct.

7          Q.    And that policy says that with regard to hiring,

8     no applicant can be discriminated against on the basis of

9     gender.

10         A.    Gender, race, color, creed.

11         Q.    Among them --

12         A.    Sex.

13         Q.    Right.  Georgia Pawk never went to you and said

14    she believed that Cost had a problem with regard to

15    discrimination in the context of hiring.

16         A.    At the Marienville Prison?

17         Q.    Right.

18         A.    No, she never did, sir.  Never.

19              MR. MATESIC:  That's all I have.

20              THE COURT:  Anything else?

21              MR. PAWK:  Just a few questions, Judge.

22              THE COURT:  All right.

23

24                        CROSS-EXAMINATION

25    BY MR. PAWK:

1      Q.    Mr. Heaton, how long have you been working for

2   Cost Company?

3      A.    I believe it's in -- in the capacity of a foreman?

4      Q.    In any capacity.

5      A.    Any capacity?  I started in 1986.

6      Q.    All right.  And how long have you been a foreman?

7      A.    For five years.

8      Q.    And you worked on the Marienville prison project?

9      A.    Yes, I did.

10     Q.    Were you there for its entire duration?

11     A.    No, I was not.

12     Q.    Tell me when you were there and when you weren't

13  there.

14     A.    I left the site briefly on August 6th, and I

15  returned on August 13th.  And then left again sometime in

16  September.

17     Q.    Okay.  Are you aware that one of the allegations

18  in this case is that Kathleen Brown met you on that site and

19  asked you for a job?

20     A.    (No response.)

21     Q.    Are you aware that she's alleged that?

22     A.    Yes.

23     Q.    Okay.  And did that ever happen?

24     A.    I never met Kathleen Brown.

25     Q.    In fact, before you came to the courthouse earlier

1    this week, had you ever seen her?

2        A.    I couldn't tell you what she looked like, up until

3    the courthouse.

4        Q.    In fact, it's her testimony that she met you on

5    August 23, 2002.  Did that ever occur?

6        A.    No, it did not.

7        Q.    Now, there's been other testimony in this case --

8    and I won't belabor this point.  But do labor needs change

9    on a daily basis on a construction project for Cost?

10       A.    Yes, it does.

11       Q.    And you were familiar with the construction --

12   with the labor needs on this project.

13       A.    Yes, I am.

14       Q.    Would you describe how those labor needs may

15   change on a daily basis.

16       A.    Every day there would be bricklayers calling and

17   saying that I'm done, I found a job closer to home.  At

18   night we may find out, after the foremen come in, sub

19   foremen come in, that certain laborers wouldn't be back.  So

20   they would have to rehire people.

21       Q.    Do you know whether Cost needed any mason tenders

22   on July 31, 2002?

23       A.    No, I'm not aware of any need.

24       Q.    All right.  Are you familiar with how the union

25   stewards, the laborers' union stewards would go and meet the

1    new off-the-street hires that Cost hired on that project?

2        A.    A lot of times the steward wouldn't sign a

3    particular member up right away.  They may work for a week

4    or a couple days before they -- he would actually sign them

5    up.  Or he might meet with them that day, depending on where

6    he was on the site.  I mean, it was a big site.

7        Q.    All right.  Do you know who Ron Barrett is, the

8    labor union business agent?

9        A.    Yes.  Yes, I do.

10       Q.    He's testified in this case.  And I don't think

11   you were in the courtroom when he testified, were you?

12       A.    No, I was not.

13       Q.    All right.  And he testified he prepared a sheet

14   of individuals, a document of individuals that Cost hired

15   off the street on that project, and then those individuals

16   later joined the union.  Okay?  And he said that the start

17   date for an individual was an indication of when the steward

18   signed that person up.  Okay?

19       A.    Right.

20       Q.    Is that an accurate record of when a mason tender

21   may have started on your project?

22       A.    No, it wouldn't have been.

23       Q.    Why?

24       A.    Like I said before, that person may have started a

25   couple days before that, and it may have taken them time for

 1   the steward to track them down on the site.  Because we

 2   really aren't -- I mean, we don't -- we really don't assist

 3   the steward in the new hires.  That's his job.  That's not

 4   our job.  So he would have to find them and talk to them.

 5          Occasionally, he would ask us if a -- if we hired

 6   somebody new, and we would say yeah and then give the name,

 7   and he would say, well, all right, I'll catch up to him.

 8      Q.   All right.  And might that take more than a day?

 9      A.   Sure.  Sure.

10      Q.   Might it take more than two days?

11      A.   Could have tooken a week.

12      Q.   Let me show you this Page 3 of an exhibit that

13   Mr. Barrett prepared.  Do you see the first name there, John

14   Bell?

15      A.   John V. Bell, yes.

16      Q.   And he says -- it says, start date, August 1,

17   2002.  Do you see that?

18      A.   Yes, I do.

19      Q.   Do you know from looking at that whether Cost

20   needed someone on July 31st, 2002?  If he, in fact, started

21   on August 1, 2002.

22          MR. MATESIC:  Objection, Your Honor.  I think the

23   witness has already said he can't draw a conclusion based on

24   the representations of Mr. Barrett.

25          THE COURT:  Well, overruled.  You can answer that.

1    Go ahead.

2         A.    I can't tell when he started from that paper, no.

3              MR. PAWK:  No further questions, Your Honor.

4              THE COURT:  All right, anything else?

5              MR. MATESIC:  Just a few, Your Honor.

6

7                    REDIRECT EXAMINATION

8    BY MR. MATESIC:

9

10        Q.    Mr. Pawk asked you if labor needs changed on a

11   daily basis.

12        A.    Yes.

13        Q.    And that was the case during the summer of 2002?

14        A.    Probably, yes.

15        Q.    And there were occasions during that summer of

16   2002 when the union, Local 952 of the laborers' union, was

17   unable to refer people to the job site.

18        A.    Like I said, I really wasn't doing the hiring in

19   2002, so I couldn't tell you when they had a shortage.

20        Q.    Well, let me ask a more general question.  That

21   project that you were working on, that was subject to a very

22   specific time constraint, wasn't it?

23        A.    Yes, it was.

24        Q.    Go ahead.

25        A.    We had to be done by a certain time frame, yes.

1     Q.   All right.  In fact, you had a 90 percent

2  completion requirement by sometime later that year?

3     A.   Yes, I believe so.

4     Q.   Okay.  That was, what, November of 2002?

5     A.   I'm not sure of the date.

6     Q.   Okay.  So my question to you, Mr. Heaton, is this:

7  If you have a vacancy on July 31st, 2002, and you know that

8  you have got to meet this target date in November 2002, you

9  have got to hurry up and find somebody to stick in that

10  position.  Would you agree with that?

11     A.   Are you asking me if we had a vacancy on

12  July 2000, 31st [sic]?

13     Q.   I'm just asking you as a general proposition.  You

14  have a time constraint on that project.  Suddenly, there's a

15  vacancy that needs to be filled.  You know, because you hire

16  people for Cost -- you know, because Cost's projects are

17  subject to these time constraints, that the longer that

18  vacancy remains open, the more it's going to cost -- the

19  more expensive that project becomes.  Because that increases

20  the risk that you're not going to make your target date.

21  You would agree with me.

22     A.   (No response.)

23     Q.   Let me say --

24     A.   You lost me on that.  Completely lost.

25       (Mr. Matesic writes on board.)

1      Q.   You're familiar with that phrase?

2      A.   Time is money, right.

3      Q.   Time is money.  Exactly.  The longer a vacancy

4  remains open, the more expensive it becomes.

5      A.   Correct.

6      Q.   To the contractor.

7      A.   Correct.

8      Q.   All right.  So you want to hurry up and put

9  somebody in that slot as soon as possible, don't you?

10     A.   Yes.

11     Q.   And if you had a stack of papers in front of you

12  of people who before July 31st had said to you, I'm

13  interested in working as a laborer, you would have an

14  immediate source of where you could go to find somebody to

15  stick in that slot, wouldn't you?

16          MR. PAWK:  Objection, Your Honor.  He's assuming

17  facts not in evidence.

18          THE COURT:  Overruled.

19     A.   We -- it's a general practice that we do not keep

20  numbers of people who show up for the job.

21     Q.   Tell me that again.

22     A.   We do not keep numbers of laborers who show up at

23  the job site.

24     Q.   You have no records of the people who show up at

25  the Cost job site.

1       A.    We have no record of laborers who show up at the
2    Cost job site.
3       Q.    But there's been testimony in this case that the
4    Equal Employment Opportunity Officer maintains a file of,
5    among others, women who have expressed an interest in
6    working for Cost.  The Equal Employment Officer testified
7    she maintains such a file.
8       A.    She probably would back at the office, not on
9    site.  We wouldn't have those stacks of files out in the
10    field.  I mean, the only thing that we kept out in the field
11    is names of bricklayers that would show up at the site.
12       Q.    I understand.
13       A.    Laborers -- laborers, we called the hall for
14    laborers.
15       Q.    I understand that.  But when the hall couldn't
16    send you a laborer, then what?  You had to find somebody
17    from off the street to do that job.
18       A.    Sir, I never did that.
19       Q.    It happened on that job site.
20       A.    I'm not familiar with that practice, sir.  As I
21    stated, sir, I did the hiring in 2001.  I did not do any
22    hiring in 2002.
23            MR. MATESIC:  One moment, Your Honor.
24            (Brief pause in proceedings.)
25       Q.    Let me ask you the question this way:  Cost has

1    hired mason tenders off the street.

2         A.    Correct.

3         Q.    Thank you.

4         A.    Only -- excuse me.  Can I finish?  Only in very

5    rare occasions would we hire somebody off the street.  The

6    hall would have to be completely empty.  The business agent

7    would say, I have no one to give you.  Only in that instance

8    could we hire off the street.

9         Q.    But that's happened.

10        A.    I believe it has.

11        Q.    Fine.  Thank you very much.  Now, it would assist

12   you in filling that vacancy if you had sitting on your desk

13   in your Cost -- in Cost's trailer on that job site, it would

14   help you as the hiring person to have the name and the

15   contact information of a person who had expressed an

16   interest in working for Cost in the event that any opening

17   ever opened up -- ever occurred.

18        A.    I believe I told you we did not keep a list of

19   that.

20        Q.    I know.  I know you didn't keep a list.  And I'm

21   asking you a different question.  What I'm asking you is,

22   if, in fact, Ms. Pawk, for example, had given you the name,

23   the address of a person who wanted to be a mason tender, if

24   you had that information in front of you on the day that a

25   vacancy arose, that would solve the problem for you,

1    wouldn't it?

2         A.    (No response.)

3         Q.    You wouldn't have to look for somebody coming in

4    off the street.

5         A.    As I stated, we didn't keep those records on site.

6         Q.    You're not answering my question.

7         A.    I didn't understand your question.  You're asking

8    me if I kept a record book of people on site, and I said no.

9              THE COURT:  Mr. Matesic.

10             MR. MATESIC:  Yes.

11             THE COURT:  Do me a favor, will you?  Try to

12   confine yourself to a certain space.  We're wasting some

13   time.

14             MR. MATESIC:  No problem.

15             (Discussion held off the record.)

16             MR. MATESIC:  One moment, Your Honor.

17             (Brief pause in the proceedings.)

18        Q.    I'm going to show you an example, Mr. Heaton.

19        A.    Example of what?

20        Q.    Get to it in a moment.  Have you ever seen a form

21   like this (indicating) before?

22        A.    Yes, I have.

23        Q.    These go out in monthly payrolls?

24        A.    Yes, they do.

25        Q.    And this form instructs the employee that if they

1    know anyone who is interested in having a job with Cost,

2    that they should get the contact information from that

3    person, stick it on the bottom of this form, and get it back

4    into Cost's hands.  Do you see that?

5        A.   Yes.

6        Q.   If you had such a document in front of you on the

7    day that you needed some -- to hire somebody off the street,

8    that document would assist you in hiring somebody.  It would

9    make your job easier.

10       A.   This document, when I receive this document, this

11   document is sent to the office.  I do not keep this document

12   on file at the site.  This document would either be mailed

13   in, if you were out of town, or sent back with the project

14   manager when he visited the project.

15       Q.   I'm showing you what has previously been labeled

16   as Plaintiff's Exhibit 24.

17       A.   Yes.

18       Q.   Okay?  Now, let's put the date aside for a moment.

19   If you needed a mason tender on a day that the union was

20   completely out of mason tenders to send to Cost --

21           MR. PAWK:  Your Honor, I'm going to object.

22       Q.   And you had this -- you had a piece of --

23           THE COURT:  Hang on.

24           MR. PAWK:  I'm going to object.  He's already

25   testified this is not what they did, this is not what they

1   do.  I don't understand the relevance of beating this over

2   and over.  He's testified to what they do with these

3   documents.

4           THE COURT:  Let me see you at side-bar.

5           (Whereupon the following discussion occurred on

6            the record at side-bar:)

7           THE COURT:  What difference does it make if -- if,

8   for instance, if they would have done something, then,

9   according to your theory, they would have been in a position

10  to more readily contact people when they needed a vacancy

11  filled.  What is the relevance?

12          MR. MATESIC:  It all goes to this:  A company like

13  Cost has -- has several objectives.  Okay?  And we have them

14  on the record.  One of them is to make money.  The other one

15  is to advance the goals of equal employment.  There are

16  times when those two goals --

17          THE COURT:  Sustained.

18          (End of discussion at side-bar.)

19          MR. MATESIC:  Nothing further.

20          THE COURT:  You're excused, sir.

21              Are all the exhibits moved that you wanted?

22          MR. MATESIC:  We haven't done that yet.  Actually,

23  Your Honor, your clerk asked us to prepare --

24          THE COURT:  That's fine.  I mean, I just want to

25  make sure that -- you needn't do it right now, but we will

```
 1   make sure we're all on the same page.

 2              And, similarly, have you kept your list of

 3   exhibits?

 4         MR. PAWK:  I have.

 5         THE COURT:  All right.  Have you anything further,

 6   then?

 7         MR. MATESIC:  Plaintiff rests.

 8         MR. LUTZ:  Can we have a motion, Your Honor.

 9         THE COURT:  We're done with the case now.  So the

10   next thing that would typically happen would be the

11   closing -- closing arguments and then my charge.  So if you

12   go back in there.  And I want to have my clerk come back

13   out.  I'll be back presently.

14              (Jury recesses at 1:55 p.m.)

15              (Discussion held off the record.)

16         THE COURT:  All right?  Who is making the motion?

17         MR. LUTZ:  I will, Your Honor.

18              Your Honor, obviously, this will be a Rule 50

19   motion for a directed verdict in accordance with the law for

20   the Plaintiff's failure to state a case under the law.

21              We have discussed this in -- we have

22   discussed the elements of these types of cases in the

23   charge, and we all know that there are certain --

24         THE COURT:  Pull the mic. over to you more.

25         MR. LUTZ:  -- certain items necessary to present
```

1    the prima facie case, and Plaintiff has the burden.   The

2    Plaintiff has the burden.   One of the items, obviously, is

3    to establish that there were vacancies.

4              With the record as it exists now, we believe

5    the Plaintiff has not met its burden under the law.   There

6    is vague testimony about possibilities of hiring dates. When

7    you couple it with the testimony from their own witnesses,

8    particularly the Plaintiff, with respect to the changing

9    patterns on this job site day in and day out, it is -- they

10   have not met the burden of establishing that there were

11   vacancies on the job site for laborer's positions with

12   respect to that -- to the position for which Miss Brown

13   sought employment.

14             Even if they make this prima facie burden,

15   then the burden shifts for us to establish a

16   nondiscriminatory reason.   And we know, from our discussion

17   in chambers, that those things sort of lump together.   But

18   then they still have the burden of showing some type of

19   animus and some type of intentional discrimination on the

20   part of the Defendant.

21             Now, they have attempted -- and in their

22   brief in support of motion for -- or in response to motion

23   for summary judgment, they indicated that there was a stray

24   remark by Mr. Heaton that was some type of evidence of a

25   gender -- or a company-wide animus towards women.   And

1    that's what they were going to attempt to show.

2              Obviously, they were not able to show that in

3    this case.  They put on no evidence of that, because they

4    were unable to establish statistically, by a comparison to

5    the available labor pool and the people hired and then fired

6    at Cost Company, that there was any disparity.  They

7    couldn't show that.

8              So now all we have, even if they make their

9    prima facie case, and even if they are able to establish

10   that there's some job availability through this testimony of

11   Mr. Barrett and the testimony -- or the testimony regarding

12   John Bell's hiring date, they need to show there's some type

13   of animus.  And the only thing that is of record that is

14   even suggestive of that is these very stray remarks at a

15   deposition a year, if not two or three years after -- I

16   guess two years after the hiring or failure-to-hire decision

17   was made.

18             There is nothing else in the record that

19   suggests any type of animus on behalf of Cost Company

20   towards women.  And I would submit that it's very contrary

21   to that, from the witnesses that Mr. Matesic called.

22             Very difficult case for him to make, calling

23   witnesses, hostile witnesses on cross-examination.  That's

24   how he chose to make his case.  No statistical evidence,

25   because we couldn't establish a proper foundation.  Just a

1    wild stray remark.

2                And, Your Honor, if you look at that remark,

3    I don't think it suggests any type of racial -- or, I'm

4    sorry, sexual discrimination on behalf of Mr. Heaton.  He

5    made a statement in a deposition that he thinks, generally

6    speaking, men may be able to carry heavier loads than women.

7    How that indicates that sex was a determinative factor --

8            THE COURT:  Let me ask you this, just to cut to

9    the chase here:  If, for the sake of argument, there is a

10   triable issue of fact on the prima facie case, and if, for

11   the sake of argument, the jury were to determine that a

12   prima facie case had been made out, then what -- then one of

13   the things that that would mean is that the jury had chosen

14   to disbelieve the Defendant's proffered reason for its

15   failure to hire.

16               Why wouldn't, for instance, that, coupled

17   with any other evidence the jury might want to consider,

18   such as the remark, be sufficient for the jury to infer that

19   the real reason was gender-motivated?

20           MR. LUTZ:  Because that in and of itself doesn't

21   do it.  There has to be some proof.  Just the fact that we

22   did not hire a woman, we all know that that might --

23           THE COURT:  That's not enough.

24           MR. LUTZ:  That's not enough.

25           THE COURT:  But in deciding the -- here is my

1    point:  To me, it is crystal clear, notwithstanding the

2    rather unique posture of this case.  You have gone to trial

3    defending on the basis that you did not apply for the

4    laborer position, and, furthermore, she applied for an

5    operator's position.  And, furthermore, that even if she had

6    applied for a laborer's position, one isn't available.

7            If the jury comes back and says we disbelieve

8    implicitly, we disbelieve you; she applied -- we think she

9    did apply for a laborer's position, and, furthermore, we

10   think one was available, well, then, they have, in essence,

11   done one of the things you would do on the second Fuentes

12   test prong; is they have found that your stated reason was

13   pretextural.

14            MR. LUTZ:  No.

15            THE COURT:  Why not?

16            MR. LUTZ:  Because under the Fuentes prong -- and

17   I realize this requires mental gymnastics because of the

18   burden-shifting thing.  If the burden shifts, and they

19   have -- and we had -- and we present this evidence, it still

20   is on them to show animus.

21            THE COURT:  I understand.  And I'm not disagreeing

22   with you on that.  But in demonstrating -- in a typical

23   Fuentes burden-shifting case, where the question of pretext

24   is up in the air, and it isn't resolved in a prima facie

25   case, and the jury then turns to a legitimate

1    nondiscriminatory reason, my standard charge on that would

2    say, the law recognizes there are generally two ways in

3    which a Plaintiff can show that Defendant's stated reason is

4    pretext.  The first is by demonstrating weaknesses,

5    implausibilities, inconsistencies, incoherences, or

6    contradictions in the Defendant's stated reason.  All right?

7    The second is by introducing evidence that discrimination

8    was more likely than not the motivating cause of Cost's

9    decision.

10             What I'm saying in this case, if the jury

11   concludes that she has made out a prima facie case, they

12   have already concluded, have they not, that there must have

13   been weaknesses or inconsistencies or contradictions in your

14   stated reason, and, therefore, at least that prong is

15   satisfied.

16             Now, that doesn't necessarily mean that they

17   have to then find that the mere fact that it was a wrong

18   reason was a gender-motivated reason, but they could.

19   Couldn't they?

20             MR. LUTZ:  Only if there is animus.  They can't

21   just assume that it's a gender-related reason.  And that's

22   the point.

23             THE COURT:  Well, what about -- what about the

24   uncontradicted evidence that the only person who was in a

25   position to hire her expressed the opinion, at least in

1    part, that a female would not be as capable in some respects

2    to performing the position of mason tender.

3            MR. LUTZ:  Well, first, he didn't say the position

4    of mason tender.

5            THE COURT:  Well, a laborer.

6            MR. LUTZ:  He said lifting.  Lifting.  Generally

7    speaking, lifting.  It's a remark made -- I forget the date

8    of the deposition.  Say a year, two years --

9            THE COURT:  Yes.

10           MR. LUTZ:  It has nothing to do with the

11   decision-making process on July 31st or whatever the date

12   was when she showed up.

13           THE COURT:  I have your point.  On what other

14   basis are you moving under Rule 50?

15           MR. LUTZ:  That's all, Your Honor.

16           THE COURT:  Do you have anything you want to say

17   to me?

18           MR. MATESIC:  Well, just that you put your finger

19   right on it.

20           THE COURT:  All right.  Then don't look a gift

21   horse in the mouth.  It's denied.

22           MR. LUTZ:  Your Honor, one other housekeeping

23   item.  You never asked us on the record before the jury if

24   we had a case to present.  I realize how this has gone back

25   and forth.  We would like the opportunity to stand up and

1   say we have no witnesses.

2         THE COURT:  I'm going to do that.  But before we

3   do that -- you sit down, if you want.  In my never-ending

4   attempt to fine-tune this charge -- have you had an

5   opportunity to read my most recent effort?

6         MR. MATESIC:  I have not, Your Honor.  I have

7   gotten partially through it.

8         THE COURT:  All right.  Well, then, I think it's

9   something that we should do, and make sure it's complete and

10  done.  I think it is.  Because I don't want to roll into

11  these closing arguments if there is something in -- if you

12  are going to be tailoring your facts to the law, I want to

13  make sure we are all on the same page.

14              So have you finished reading?  You haven't

15  read it, have you?

16        MR. LUTZ:  Mr. Pawk hasn't.  I started to.  But

17  does Your Honor include a punitive damages charge?

18        THE COURT:  Yes.  And I'm going to send that out.

19        MR. LUTZ:  "Send that out" meaning --

20        THE COURT:  I'm going to charge on punitive

21  damages.

22        MR. MATESIC:  Your Honor, you also are allowing us

23  to voice an objection to the verdict slip?

24        THE COURT:  Sure.  Do you have a thought on that

25  right now?

1          MR. MATESIC:  I do, actually.

2          MR. LUTZ:  Before we jump to that, Your Honor, I

3    would like to place my objection on the record --

4          THE COURT:  It is.

5          MR. LUTZ:  -- with respect to the punitive damages

6    charge.  I think it's --

7          THE COURT:  It is.  It's protected.

8              What do you want to tell me?

9          MR. MATESIC:  Sure, Judge.  First of all, I think

10   it would unnecessarily confuse the jury to present them

11   with -- rather than present -- let me say that a different

12   way.

13         THE COURT:  Slowly, now.

14         MR. MATESIC:  Right.  There's two alternatives

15   here at the very least.  One is to ask them the simple

16   question of was Miss Brown discriminated against.  Do you

17   believe that Cost discriminated against her.

18         THE COURT:  Right.

19         MR. MATESIC:  The other alternative is to state

20   the legal standard of four separate elements of a prima

21   facie case --

22         THE COURT:  Right.

23         MR. MATESIC:  -- et cetera.  The Court's points

24   for charge already instruct the jury as to the law.  This is

25   duplicative.  This makes the ultimate decision that the jury

1    is going to return more -- more laborious, if you will.

2    They are going to have to spend more time now reaching this

3    decision.

4                    All of the instructions that they need to

5    reach their resolve are contained in the points for charge.

6    They have to go through this slip now, and they have to do

7    what I would contend is double work.  And it would be --

8                    THE COURT:  So I'm clear, though --

9                    MR. MATESIC:  I'm sorry.

10                   THE COURT:  So I'm clear, your point isn't that

11   there is anything legally incorrect with the structure of

12   the slip, is there?

13                   MR. MATESIC:  It's just the tendency --

14                   THE COURT:  Is that right?

15                   MR. MATESIC:  -- to confuse the jury, given that

16   they have already been instructed on this --

17                   THE COURT:  What is confusing about the slip?

18                   MR. MATESIC:  Well, you have given them

19   instructions in the points for charge.

20                   THE COURT:  Yes.

21                   MR. MATESIC:  Okay?  This slip does not verbatim

22   reproduce those instructions.  This is a portion of the

23   instructions.  Right?

24                   THE COURT:  I am using the slip.  I have used -- I

25   have found a special verdict form in cases like this to be

1    uniformly helpful to a jury.  I have never heard an

2    objection to greater specificity, rather than lesser, so I'm

3    going to use it.

4            MR. MATESIC:  One last comment.  No. 6 states, "Do

5    you find by a preponderance of the evidence --

6            (Mr. Matesic interrupted by the reporter.)

7            MR. MATESIC:  I apologize.

8            THE COURT:  He said, "Do you find by a

9    preponderance of the evidence that Cost Company willfully

10   discriminated against Kathleen Brown."

11           MR. MATESIC:  It's the "willfully".  Because the

12   legal standard is the intentionality or reckless

13   indifference.  The absence of reckless indifference --

14           THE COURT:  You don't have to go any farther.

15   I'll change it.  It will be defined by a preponderance of

16   the evidence that Defendant Cost Company willfully or

17   recklessly discriminated against Kathleen Brown.

18           MR. MATESIC:  My -- I would just like to say my

19   preference would be to use the word "indifference", as

20   stated by the Third Circuit.  And I would object to the slip

21   to the extent that that word or that term is not included in

22   the slip.

23           THE COURT:  Well, I'm not sure what the difference

24   between reckless or reckless indifference is, but --

25           MR. MATESIC:  For the purposes of my closing

1    argument, I will be saying reckless indifference.

2              THE COURT:  Well, you can say reckless

3    indifference, and then we will be saying the same thing.  So

4    as soon as you're done reading -- finishing this charge -- I

5    want you to concentrate on the prima facie point.  That's

6    where we changed it.  Then let my clerk know.  I want to

7    come out, and I want to get her revising it, if I have to,

8    and I want to go on to closing arguments.

9              MR. LUTZ:  Your Honor, we were not asked about the

10   verdict slip.

11             THE COURT:  Oh.  Did you have something on the

12   verdict slip?  I'm sorry.

13             MR. LUTZ:  Yes, Your Honor.

14             (Discussion held off the record.)

15             MR. LUTZ:  The No. 4 in the verdict slip says, "Do

16   you find that Kathleen Brown has proven by a preponderance

17   of the evidence that sex was a determinative factor in Cost

18   Company's failure to hire her as a laborer."

19             THE COURT:  Right.

20             MR. LUTZ:  I think the Court has to inject the

21   element of intentional discrimination, and what I would

22   propose would be to read it this way:  Do you find that

23   Plaintiff Kathleen Brown has proven by a preponderance of

24   the evidence that Cost Company intentionally discriminated

25   against Kathleen Brown by using her sex as the determinative

1    factor in failure to hire her as a laborer.

2             THE COURT:  So it's intentional discrimination, as

3    opposed to -- I think that's accurate.

4             MR. LUTZ:  Correct.

5             THE COURT:  I think it would have been implicit,

6    but I'll change it that way.  All right.  I'll --

7             MR. MATESIC:  I would lodge an objection, because

8    now we have two different standards here; talking about

9    intentionality in one, reckless indifference in the other.

10   We are highlighting that, intentionality in Paragraph 4.  We

11   are not using the word indifference in No. 6.  I believe

12   it's going to confuse the jury.  And "intentionally

13   determinative" is redundant.  Determinative states a legal

14   standard.

15            THE COURT:  Let me see the jury slip there.  Which

16   one are you talking about?

17            MR. LUTZ:  I'm talking about No. 4.  And I think

18   he's confusing No. 4 with the punitive damages question at

19   No. 10.  No. 4 is a correct statement of the law with

20   respect to case in chief --

21            THE COURT:  You know, I already charged -- when I

22   say sex was a determinative factor, I already charge the

23   jury that the discrimination has to be intentional.

24            MR. LUTZ:  Right.  I think the slip should be

25   consistent with the charge, by saying they have to find it

 1  was intentional.

 2          MR. MATESIC:  Where is the section of the charge?

 3  Pardon me.

 4          MR. LUTZ:  It's at --

 5          THE COURT:  It's at Page 10.

 6          MR. LUTZ:  -- Page 10.

 7          THE COURT:  "It is not enough for you, the jury,

 8  to disbelieve the reasons stated by Cost.  You must also

 9  believe Brown's claim that the decision was the result of

10  intentional discrimination."

11          MR. MATESIC:  That's --

12          MR. LUTZ:  And all I'm asking is to make the slip

13  consistent with the charge.

14          MR. MATESIC:  I'm sorry, Your Honor; I'm having

15  trouble with --

16          THE COURT:  All right.  Well, this is what I'm

17  going to say for 4, because it's an accurate statement of

18  law.  If you find that the Plaintiff Kathleen Brown has

19  proven by a preponderance of the evidence that the

20  Defendant -- that Cost Company intentionally discriminated

21  against her in failing to hire her as a laborer and that sex

22  was a determinative factor in Cost's decision.  All right.

23          (Recess held from 2:13 p.m. till 2:26 p.m.)

24          (Whereupon the following discussion took place on

25           the record in camera:)

1          THE COURT:  Let's return yet again.  Do you have

2    objections to the charge?

3          MR. PAWK:  We don't, Judge.

4          THE COURT:  How can we improve this charge, then?

5          MR. MATESIC:  I guess I'll limit it to one comment

6    then.  Page 9, second full paragraph.  I believe that this

7    paragraph is far too restrictive, given the evidence of

8    record.

9          THE COURT:  Which one?  "Brown cannot prove"?

10         MR. MATESIC:  That she has to prove that on the

11   date that she applied, there was one or more -- on the day

12   that she applied, there was a labor position which was open

13   and that position remained open and Cost continued to seek

14   applications from persons of her qualifications.

15         THE COURT:  That, by the way, is precisely the

16   prong of the prima facie case that you wanted me to include.

17         MR. MATESIC:  Right.  Well, then, let me say this:

18   Upon further consideration, what the facts have shown as of

19   right now is that there were laborer positions -- I'll

20   restate that.  Brown had -- according to Brown's testimony,

21   she had delivered a piece of paper with her name and contact

22   information on it, and after the date that she did that, a

23   position arose, which Cost filled.  And our position is that

24   the facts in evidence show that -- the facts in evidence

25   show that she was discriminated against not only on

1  July 31st, but also on August 14th and also on August 18th.

2           And so I would suggest that the charge be

3  revised to read -- and I'm only revising the first three

4  lines here.  Well, my revision is restricted to the first

5  three lines.  If you find that Brown applied for a laborer's

6  position on July 31st, 2002, that one or more laborer

7  positions were open when she applied, and that one or more

8  laborer positions remained open, and Cost continued to seek

9  applications from persons of her qualifications.

10          THE COURT:  Isn't that what I have?

11          MR. MATESIC:  Not one or more.

12          THE COURT:  Well, that -- a laborer position --

13  all you need is one, don't you?

14          MR. MATESIC:  What this suggests to the jury is

15  luck of the draw.  She has to show up at exactly the right

16  moment in time and be denied at one precise moment.

17          THE COURT:  All right.  Then I'll say that one or

18  more labor positions were open, because I don't really see

19  what the difference is.  With that correction, are you

20  satisfied with the charge?

21          MR. MATESIC:  Yeah.

22          THE COURT:  What I'm going to say is if you found

23  that Brown applied for a labor position on July 31st, 2002,

24  and that one or more laborer's positions were open when she

25  applied, and that one or more laborer's positions remained

156

1    open, and Cost continued to -- that's what I'll put in.

2            MR. MATESIC:  Right there.

3            THE COURT:  Then we're good.  I'll make that

4    change on there.  Then we're ready to go.  And the Defendant

5    goes first, in case there's any confusion.

6            (Whereupon the proceedings resumed in open court

7             with the jury present at 2:42 p.m.)

8            THE COURT:  Mr. Pawk.

9            MR. PAWK:  Thank you, your Honor.

10           With respect to the Defendant's case, we are

11   calling no witnesses in our case.  But I would move at this

12   time for admission of all of our exhibits.  I think I have

13   previously moved for Defendant Exhibits A, C, D, E, F, O, R,

14   B.  But I would also move at this time for CC, AA, and U.

15           THE COURT:  Any objection to any of those

16   exhibits?

17           MR. MATESIC:  No objection, Your Honor.

18           THE COURT:  They are admitted.  Just so I'm clear

19   again, are we all admitted up, or do we have to do that

20   housekeeping later?

21           MR. MATESIC:  Actually, your clerk Becky asked me

22   to provide her with a list of all the exhibits, and I did --

23           THE COURT:  I'll do that on the record after

24   closings.  Are you ready to go?

25           MR. PAWK:  I am.

1          THE COURT:  All right.

2          MR. PAWK:  May it please the Court, counsel,

3    members of the jury.

4               I get to address you first in my closing,

5    because the Plaintiff has the burden of proof.  She has the

6    burden of proving the elements of this case and the elements

7    of discrimination.  So counsel for Kathleen Brown will get

8    to go last.  So this is my last opportunity to speak to you.

9    And on behalf of my partner, Larry Lutz, I want to thank you

10   for your service in this case.

11              When you first came here on Monday, and you

12   were sitting for jury selection, and you heard that this

13   case was about gender discrimination or sex discrimination,

14   I'm sure each of you formed some expectations in your mind.

15   It's natural.  Anybody would.  Did you hear anything close

16   to what you expected to hear in this case?  Did you hear any

17   evidence at all that Kathleen Brown was discriminated

18   against by Cost Company?  I submit to you that you didn't.

19              There is no evidence of sex discrimination in

20   this case, ladies and gentlemen.  And I'm going to go

21   through the evidence that has been presented to you and help

22   explain why.

23              First of all, as the Plaintiff -- as I

24   stated, Kathleen Brown has the burden of proof in this case,

25   and she has a couple huge hurdles to get over before you can

1    find in favor of Kathleen Brown and against Cost Company.

2    And the Judge will instruct you on the law at the end of the

3    case, and I'm not attempting to do that.  But this is my

4    time for argument, and I do want to inform you of a couple

5    hurdles she has.

6                The first one is, she has to present what's

7    called a prima facie case; fancy words for a bear-bones

8    case.  Certain elements.  One of those elements is that

9    there was a job available; an available job.  I submit to

10   you that she has not proven and met her burden that there

11   was an available job.  If she doesn't get over that

12   hurdle -- and I submit to you that she hasn't -- you don't

13   need to go any further in this case.

14               The Judge will read you and give you the law.

15   The Judge will read you the jury charge.  And he will tell

16   you that if you find that she did not apply for a laborer's

17   position -- and that's our contention, as you know; that she

18   applied for an operator's position -- and that that

19   laborer's position was open -- in other words, if you -- if

20   she failed to prove that she applied for a laborer's

21   position and that that laborer's position was open when she

22   applied and remained open, then you must find for Cost,

23   because she's failed to meet her first hurdle.

24               You will be given special interrogatories

25   when you leave the courtroom at the end of the case.  And

1    this is how you arrive at your verdict.  The very first one

2    is, "Do you find that Plaintiff Kathleen Brown has proven by

3    a preponderance of the evidence that she applied for a labor

4    position on July 31, 2002?"  There is a box for yes, there's

5    a box for no.  It goes on.  It says -- I'll skip the first

6    part.  But it says, "If you have answered no to Question 1,

7    please do not answer Questions, 2, 3, 4, 5, and 6.  Please

8    sign and date the form, notify the courtroom staff, you have

9    completed your deliberations."  And I submit to you that

10   that is what you should find in this case.

11              Second question.  "If you do find --" it goes

12   on.  It says, "If you find yes," okay, that she did show

13   that she applied for a laborer's position, the second

14   question is, "Do you find that she has proven by a

15   preponderance of the evidence that a laborer position was

16   available at Cost Company?"  So even if you believe that she

17   said I want to be a laborer, you have to be satisfied that

18   she's proven that there was a position available on

19   July 31st, 2002.  And I submit to you that she has not met

20   that burden.  And if you answer no to that question -- you

21   will read the document, but it instructs you to return back

22   to the courtroom.

23              And then, finally, if you believe she gets

24   over those two hurdles, the document instructs you that even

25   if you believe she has proven those two elements, then you

1    next still have to determine -- this is the second hurdle I

2    was talking about earlier.  You still have to find that Cost

3    intentionally discriminated against her because of her sex.

4              In other words, Kathleen Brown has to prove

5    she applied for a laborer's job, the laborer's job was open

6    when she applied, and if you're satisfied with that, then

7    the third thing is you have to decide if she's proven that

8    Cost didn't hire her -- intentionally didn't hire her

9    because of her sex.  And there is no evidence, ladies and

10   gentlemen, in this case that Cost failed to hire her because

11   of her sex, her gender.

12             Let's talk about the evidence that was

13   presented by Kathleen Brown in this case.  And I submit to

14   you that this will help you arrive at the decision in this

15   case.  She called, herself; she called Rob Barrett from the

16   laborers' union; she called Dean Taylor, Cost witness, Cost

17   employee; she called Georgia Pawk, Cost witness, Cost

18   employee; she called William Heaton, again, a Cost employee.

19   What evidence from those witnesses did she present to you

20   that a job was available as a laborer on July 31st, 2002,

21   and that she applied for a laborer's job on July 31st, 2002,

22   and that that job then remained open?

23             I submit to you that she didn't elicit that

24   testimony from Ron Barrett, nor Dean Taylor, nor Georgia

25   Pawk, nor William Heaton.

1              Kathleen Brown, even in her testimony, said

2     she had no independent knowledge that Cost needed a mason

3     tender on July 31st, 2002.  She admitted that.  I don't know

4     if you remember when we were in the first courtroom in this

5     case.  I was asking her that question, do you have any

6     independent knowledge, do you know that Cost needed a

7     laborer on July 31st, 2002, and she said no, I don't.

8              So I submit to you, ladies and gentlemen, her

9     entire case is premised on two things:  That on July 31,

10    2002, she applied for a laborer's job or mason tender job,

11    and, second, that there was a laborer's job available on

12    that date.  And she hasn't proven either.

13             Let me first talk about whether there was --

14    whether she applied for a laborer's job on July 31st, 2002.

15    Remember, when she was testifying, she took the stand, and

16    she said -- and this is out of her mouth -- when she saw

17    Dean Taylor on July 31, 2002, the first thing out of her

18    mouth, even on the witness stand, wasn't I'm a laborer, hey,

19    I have labored before, I have been a mason tender.  No, no,

20    no.  The first thing that she said on the witness stand that

21    she said to Dean Taylor, when she went to the job trailer,

22    was, I have got an operating background, I have operated.

23    That's what she told him.  And he said, if you recall when

24    he testified, we didn't have any operating positions

25    available.  We're not hiring.

1          Her training was in operating engineering.

2     She had no prior training in mason tendering.  Her

3     background was an operating engineer.  Remember, she

4     testified that she made a life-changing decision, I think in

5     the late 80's, that she was going to enter this field of

6     operating engineers, became certified, went through the

7     apprentice program?  Remember all that?  And then she worked

8     as an operating engineer for years.  There was a little

9     lapse in her service with the union.  But that that's what

10    she enjoys.  She enjoys being outside.  She told Dean Taylor

11    about her operating experience and her job.  When she spoke

12    to Georgia Pawk in the fall of 2002, she talked to her about

13    operating experience, operating training.

14          And think of this:  If she wanted a laborer's

15    job when she's talking to Georgia Pawk in July of 2002, why

16    on earth is she going through the process of being certified

17    by the operating engineer's union during that whole fall?

18    Do you remember that testimony?  She went through that to

19    get recertified.  Because Georgia said, I can't hire you as

20    an operating engineer; I can't, you know, legally put you on

21    the job until you are with the union.  So she goes through

22    that process of being recertified.  She's not telling Cost

23    she wants to be a laborer.

24          So she then -- she tells Georgia she wants to

25    be an operating engineer.  She fills out the EEO form, if

1    you remember.  She sends that to Cost.  Remember also, she

2    testified, she admitted, Cost could not have hired her.  Not

3    only did Georgia tell her that, she admitted she knew Cost

4    could not have hired her as an operating engineer until she

5    became certified at the union.  And what did she do?  She

6    gets certified in the union.  She calls Cost on November 6th

7    and says, I'm certified.  Remember?  Now I'm ready.  I'm

8    ready, I'm good with Local 66.  Ready to be hired.

9              She takes a job on November 18 with KGL.

10   Remember that company out of Philadelphia where she went.

11   And it was a non-union job.  She got paid $15 an hour, plus

12   $25 per diem.  And what was interesting about her testimony,

13   I thought anyway, was at no time from November 6th, when she

14   said she desperately wants a job with Cost Company and she

15   notified them she's good with the union, and she gets this

16   job offer from KGL, does she call Cost back and say, hey, by

17   the way, I got a job offer with KGL, but I really want to

18   work with you guys, you know, because you're a good company,

19   and, you know, we have been talking, having all this

20   dialogue in the fall of 2002; you know, do you have anything

21   available or anything coming up soon that I could work at,

22   any jobs or anything, and maybe I'll forego that job.  She

23   doesn't.  She doesn't do that.  That is not her testimony.

24   She takes the job in Philadelphia.

25              And then what is the next thing she does?

1    She files an EEOC complaint against Cost Company in December

2    of 2002.  Says Cost discriminated against me.

3              She admitted that construction work is very

4    seasonal in Western Pennsylvania.  Cost most likely doesn't

5    do much work.  They are a masonry contractor.  She said

6    that; November, December, January, February.  It's very

7    slow.  There's not jobs available.  She really didn't expect

8    to be hired by Cost Company during that time.  In fact, her

9    testimony was that if she got hired by Cost Company before

10   that time period, she would have been laid off during those

11   months.  And she knows that.

12             So what happens?  She files that EEOC

13   complaint.  Remember?  Then Cost, for the first time when

14   they get those documents, realizes that she now says,

15   because she put it in documents, that she wanted a laborer's

16   position.  All the dialogue and all the communication they

17   had was operating engineers, operating engineers.  She now

18   says for the first time in this document to them that she

19   wants a laborer's job.

20             If you recall looking at her diary, when I

21   had her -- I showed her some diary entries in March of 2003.

22   There were discussions about job sites Cost had that were

23   gearing up for spring.  We have got one in Mercer, we have

24   got one in -- trying to find jobs close to her home.

25   Remember, she actually drove one day and mapped it out

1    mileagewise so she could know how far she would have to

2    travel.  There were ongoing discussions about jobs in the

3    spring of 2003.

4            Then what happened?  On April 7, 2003, she --

5    this is her handwriting, this is her diary.  Cost offers a

6    laborer's job, remember, because we now know she wants a

7    laborer's job.  She writes, April 7th, 2003, "Nothing in

8    mail from Cost.  Faxed me --" and this is her words "-- shit

9    laborer job. (Not)"  Well, the truth is starting to come out

10   now.  Okay?

11           What happens the next day?  Again, her diary.

12   She testified that she put events that happened in her life

13   on a daily basis in her diary.  Remember?  Next day, April

14   8th, "Called John.  No go with Cost, no labor.  Operator."

15   The truth is revealed.  She always wanted an operator's job.

16   She's made this whole story up about wanting to become a

17   laborer because it's the only way she can win this case.

18   It's the only way.  She knows that they couldn't hire her as

19   an operator.  That's what she came on the site and asked

20   for.  But they couldn't legally hire her, because they

21   didn't have any jobs available.  But we now know, through

22   all her actions and course of conduct, she always wanted an

23   operator's job.  If she wanted to get in with Cost and this

24   great company and be a laborer and true mason tender, she

25   had the opportunity.  She rejects it.

1          Now, she testified that the reason she

2     rejected them was -- again, her words -- they dicked me

3     around.  Curious, though.  No mention of any mistreatment by

4     Cost Company in her diary during the whole fall of 2002 and

5     after she files the EEOC complaint about Cost not treating

6     her properly, Cost discriminating against her.  No mention

7     of that anywhere.  Of course, this is her diary where she's

8     writing her most personal details and her feelings every

9     day.

10         Remember, I said at the beginning, opening

11     statement, a trial is a search for the truth.  We found the

12     truth in her own handwriting in the spring of 2003.  She

13     wanted an operator's job.  There was none available.  She

14     couldn't have been hired, because she wasn't in the union.

15         And also, remember, she testified, because I

16     showed her a deposition -- still trying to maintain and

17     contend here at trial that she wanted that laborer's job, so

18     I showed her her deposition where she said, well, I went up

19     there, wanting to operate a lull, because I heard the

20     laborers were operating the lulls.  She wanted to operate

21     equipment.  That's what she wanted to do.

22         But you heard testimony from Dean Taylor,

23     operating engineers were operating the forklifts and lulls

24     and cranes, not laborers.  She was misinformed.  But that's

25     what she went up there to try and find.  She didn't want to

1    be a mason tender.  And the proof is in her own handwriting.

2                    She told you she knew the process of union

3    hiring.  By union contractors, she was aware of the process.

4    If you want a laborer's job, you join the laborers' union,

5    because you get called out of the union.  If you want an

6    operator's job, you join the operator's union.  Oh, yeah, by

7    the way, what union did she join?  Operators' union.

8                    What jobs has she been working since April of

9    2003 to today?  Asked her on the witness stand on Tuesday.

10   She rattled off three or four jobs.  Trumbell Corporation,

11   heavy highway.  She was running a truck.  A & L Corporation.

12   They make -- they build bridges.  Operator's job.  She works

13   for Mashuta (phonetic) Corporation today.  Heavy highway.

14   Operator's job.  That's what she does, that's what she has

15   always done, that's what she wanted to do, that's what she

16   wanted to do when she stepped on Cost's job site on July 31,

17   2002.

18                    Well, the other thing I said she has to prove

19   is whether there was a laborer's job even available on

20   July 31, 2002.  She told you she knew the labor needs

21   changed on a daily basis on a construction site.  One day

22   you might need a laborer, the next day that laborer might

23   not show up.  All of a sudden they need someone.  No

24   warning.  Cost might hire someone right off the street that

25   day.  These are not the type of jobs that remain open and

1   available and they publish a listing and people send in

2   applications.  It changes on a daily basis.  Daily.  Not

3   weekly, daily.

4           What proof did she provide, if any, that

5   there was a job available the day she walked up there on

6   site.  I mean, Dean Taylor testified that people came on the

7   site every day looking for jobs.  Sometimes we had openings,

8   sometimes we didn't.

9           As an aside, her contention in this case is

10   that she was discriminated against by Cost Company on

11   July 31, 2002.  If she really believed that, that day, why

12   did she go back on August 23, 2002?  If you felt you have

13   been mistreated and discriminated by Dean Taylor on July 31,

14   2002, why would you bother to go back?  She wasn't

15   discriminated against.  She never felt they discriminated

16   against her.

17           But she does come back on August 23, 2002.

18   And we know, though, there were no new hires by Cost Company

19   after August 19, 2002, so there's no job available on

20   August 23, 2002.

21           But getting back to the July 31, 2002, let's

22   look at the evidence with respect to whether there was a

23   laborer's job available that day and what proof she has

24   presented.

25           They call Ron Barrett, the business agent

1    from the laborers' union, and they had him show a

2    document -- or they put a document in front of him that

3    showed Cost Company initiations, meaning people that Cost

4    hired off the street during that project who then join the

5    union.  He testified that the start date on his document,

6    the start date, doesn't necessarily mean that's the date the

7    person started at Cost Company.  It's the date his

8    business -- his steward that was on the project representing

9    the union went over to that person and had them sign up.  An

10   authorization slip.  Remember that?

11              And I showed them the authorization slip for

12   John Bell, who they contend -- Kathleen Brown contends --

13   was hired on August 1st.  Okay?  And I showed them John

14   Bell's.  But there is no date on John Bell's authorization

15   slip.  It's not dated.  Wouldn't that have been -- wouldn't

16   that have helped you, knowing that the steward went over and

17   signed him up?

18              In any event, Kathleen Brown will argue to

19   you that Ron Barrett gave some general testimony that, well,

20   whenever we ran out of mason tenders to supply to Cost, they

21   would call us regularly.  That was the normal process.  They

22   would call, hey, we need mason tenders, I'd send them.  If

23   we didn't have any in his local union, he would call other

24   laborers' unions and get them for him, and when they

25   exhausted all of those, only then would Cost then hire off

1    the street.  Remember, that was the process.  And this job,

2    I think all the Cost witnesses testified, was very unique.

3    They don't do this.  They don't hire off the street.  The

4    normal process is, because they have a labor agreement, is

5    you have to hire from the union, and you have to take who

6    they send you.  But he said, well, the start date I would

7    have in that document might be a day or two after Cost

8    called me saying that they needed somebody.

9               Is that -- is that sufficient proof, ladies

10   and gentlemen, that there was a job available on July 31st,

11   2002?  Proof that there was a vacancy when she stepped on

12   the site that day?  I'm sorry, ladies and gentlemen, but

13   that's not sufficient.

14              Dean Taylor was shown Cost certified payroll

15   records, and he said that the first date that John Bell

16   showed up on Cost payroll records was August 6th, 2002.  And

17   remember, today, William Heaton testified he was familiar

18   with the hiring process on that job, and he said John Bell

19   could have been hired or anybody could have been hired the

20   same day that their name appears on that initiation sheet.

21   It doesn't mean that they were -- they started working two

22   or three days before, and then they appeared on that

23   initiation sheet later.  He said we could hire them that

24   day.  I mean, somebody didn't show up for work, call the

25   union, don't have anybody, have people standing outside the

1  trailer, come on in, we'll sign you up.

2          Again, it's their burden to show you

3  sufficient evidence that there was a job opening for a

4  laborer position on July 31, 2002.  It is very far from

5  clear that there was any job available for a laborer on

6  July 31 of 2002.

7          Just for a moment here, I'd like to ask you

8  to look at this case from Cost Company's perspective.  You

9  have been hearing -- all the evidence so far is from

10  Kathleen Brown's perspective, and the evidence that's been

11  presented has all been presented by Kathleen Brown.

12          Large project.  You saw the photograph.  Very

13  large.  25 buildings.  Had to be built in a year.  One year

14  to complete.  Cost gets bricklayers, operating engineers,

15  laborers, all from the union.  They are a union contractor.

16  They have a union agreement with all of those unions.  And,

17  again, as I stated earlier, if the unions aren't able to

18  supply them, you know, on that -- on a few occasions they

19  hire mason tenders off the street.  Not normal, though.

20  July 31st, 2002 wasn't one of those days where they ran out

21  of people.

22          Dean Taylor was busy running a large project.

23  As he testified, people showed up all the time.  He didn't

24  keep records.  There was no obligation to keep records.

25  Kathleen Brown would have you believe that there was some

1    obligation that they have to keep all these records.  He's

2    busy.  He's working.  She even testified, he would -- she

3    showed up at the trailer at 6:30.  He was already out of the

4    trailer and out on the job site.  He was supervising all the

5    other foremen.  He didn't have time to keep records of

6    everybody that showed up at the site.  If he did, he would

7    never get the job built.

8               Bill Heaton -- this is interesting --

9    today -- Bill Heaton, she testified under oath that she

10   talked to Bill Heaton on August 23, 2002.  Remember that?

11   She went on the site, and she called him.  Well, I was told

12   to look for him, because he's as round as he is tall.  It's

13   an interesting comment by someone who believes they have

14   been discriminated against.

15               But Bill Heaton, he has no reason to tell

16   you -- to come into court and say I never met this woman,

17   which he did.  There is no reason to lie or fabricate that.

18   Because as we know, Cost didn't hire any mason tenders off

19   the street after August 19, so there were no jobs available.

20   So why would he even lie, if that's what they contend, that

21   he didn't meet her on August 23?  But he didn't.

22               Georgia Pawk receives an EEO memorandum.  She

23   writes on it -- and you saw the document -- "Love to hire

24   you.  Need your phone number to contact you."  She wanted to

25   hire her.  Love to hire you, love to have you, need your

1    phone number to contact you.  Wrote a memorandum to her

2    foreman and project managers.  Remember that?  On the same

3    date she gets the memo.  She doesn't throw it under her

4    desk.  She writes a memo; hey, a Kathleen Brown, I got a

5    memo, an EEO memo from Kathleen Brown; she appeared on the

6    site apparently, filled out an EEO form; if she comes back

7    to the site, I would like to hire her, because she was

8    impressed with her operating engineer resume.  Remember

9    that?

10            Georgia Pawk talked to her on the phone on

11   October 29, 2002.  Told her, I would love to hire you, but I

12   can't until you are certified.  Remember that?  Is this --

13   is this indicative of a company that doesn't want to hire

14   this woman, that's trying to discriminate against her?

15            The Marienville job was winding down at that

16   point.  Georgia Pawk, she called Dean Taylor, and he told

17   her, I don't have anything.  I mean, no operators for sure.

18   Job is winding down.  Couldn't put her back on Marienville.

19   She wasn't eligible to even be hired as an operating

20   engineer until November 6th, 2002.  And what does Georgia

21   Pawk do at that point in time?  Just blow her off?  She

22   talks to her about hiring her at a job in Erie.  Remember

23   that testimony?  She talked to -- Jack Cramer was the guy's

24   name, and she talked to Kathleen about hiring Kathleen at

25   the job in Erie.  Not the Marienville job, another Cost job.

1    Sound like a company that was trying to discriminate against

2    her or didn't want to hire her because she was a woman?

3                As we know, Kathleen Brown took a job with

4    KGL on November 18th, 2002.  Kathleen Brown never called

5    Georgia Pawk back, as I said earlier, hey, I got this other

6    job offer; you know, can you still work something out with

7    me on the Erie job.  No, no.  She takes another job.  She's

8    not worried about being discriminated against by Cost

9    Company.  Instead, she files an EEOC claim in December of

10   2002 claiming that Cost discriminated against her.

11               And we looked at that charge document, if you

12   recall, when she was on the witness stand; charge of

13   discrimination.  Remember this document (indicating)?  And,

14   ladies and gentlemen, I submit to you, this is the smoking

15   gun document in this case.

16               She testified Tuesday that this -- she

17   provided the information that went into this document.

18   Remember that?  And that she said -- and I pointed down here

19   (indicating).  That's her signature.  It's dated 12/30/2002.

20   And, "I declare under penalty of perjury that the foregoing

21   is true and correct."  Remember that?  She understood what

22   perjury meant.  She said that too.

23               But then I went and asked her about some

24   things that she put in the document.  Remember?  Up here

25   (indicating).  I asked her, date of discrimination,

 1    earliest, 7/1/2002.  She admitted she never went on the job

 2    site until 7/31/2002.  She admitted under oath Tuesday that

 3    that's wrong.  She knew it was wrong.

 4                    Then I showed her over here (indicating), you

 5    say that Cost discriminated against you based on sex and

 6    disability.  She admitted under oath Tuesday that that's

 7    wrong; they didn't discriminate against her her based on

 8    disability.

 9                    And I showed her down here (indicating) with

10    respect to disability.  She wrote, "I believe that the

11    Respondent discriminated against me because of my medical

12    condition and/or disability."  She testified Tuesday she

13    never told Dean Taylor, she never told William Heaton, she

14    never told Georgia Pawk she suffered from any kind of

15    disability.  Yet when she wanted to prepare a document

16    charging discrimination against Cost under penalty of

17    perjury, she said they did.  That they discriminated against

18    her based on her disability.

19                    Ladies and gentlemen, you're going to hear

20    the jury charge from Judge McLaughlin, and one of the things

21    he's going to tell you is, in that jury charge, is -- and

22    it's, again, in Latin, and I'm not trying to be legalese

23    with you -- Falsus in uno, falsus in omnibus, which in Latin

24    means, false in one, false in all.  And he's going to tell

25    you, I charge you that if you find that a witness has lied

1    to you in any material portion of his or her testimony, you

2    may disregard that witness' testimony in it is entirety.

3    That's the law.  Again, the Judge will give you the law, but

4    that's what is going to be read to you in the charge.

5            What is Kathleen Brown's motive here?  I

6    submit to you that when that charge of discrimination was

7    put up in front of her and she talked about it, her

8    attorney, Mr. Matesic got up and asked her, well, you're not

9    familiar with what Title VII in a Civil Rights Act is, are

10   you?  You don't know what that means.  You didn't put

11   that -- you didn't type this up.

12           Well, then, remember, I got up, had another

13   opportunity to ask her questions, and I said, well you just

14   said you weren't familiar with Title VII of the Civil Rights

15   Act charging discrimination, right?  But, yet, you filed two

16   prior EEOC complaints, didn't you?  Yes, I did.  Under Title

17   VII of the Civil Rights Act.  Yes.  She admitted she filed

18   an EEOC complaint; a charge of discrimination against her

19   own operating engineer's union.  Remember that?  Saying that

20   she gave a positive drug test.  Then she admitted she filed

21   an EEOC charge against Solar Testing Labs, another company

22   that she worked for on this same project, because they made

23   her take a test.  Remember that?  A written test.  She

24   didn't score well on it, but she didn't get to take it a

25   second time, so they discriminated against her, based on her

1    testimony, and she sued them for discrimination.

2              Well, she's familiar with what Title VII is.

3    She's familiar with what a Title VII, a Civil Rights Act is.

4    Yes, she is.  And contrary to her testimony, she's very

5    familiar with it.  She has filed now three EEOC complaints,

6    that I'm aware of.

7              I submit to you, ladies and gentlemen, she's

8    abused the Civil Rights Act.  She's abused it.  That statute

9    was designed to help people who truly have been victims of

10   discrimination.

11             This case isn't about someone who wants to

12   wear a hardhat.  That's not what this case is about.  This

13   case is about someone who wants something for nothing.  It's

14   a shakedown.

15             Getting back to Cost Company's perspective in

16   this, again, I reminded you that after she filed that charge

17   of discrimination, they then had dialogue with her about

18   hiring her.  They still didn't harbor any ill will.  Come

19   on, we'll hire you.  They were talking to her about jobs,

20   but she rejected them.  What more could Cost Company have

21   done?  Look at it from their eyes.  What else could they

22   have done?

23             Ladies and gentlemen, I submit to you that

24   after I sit down here, Mr. Matesic will come before you, and

25   he'll tell you that you should find for his client.  And

1    then he's going to go over to that easel there, and he's

2    going to flip the pages down, and he's going to ask you to

3    award his client money damages.  And when he does that, I

4    want you to look him in the eye and think to yourself, for

5    what?  For what?  On this proof?  The proof you presented

6    here that this -- the evidence you presented in this case?

7    No way.  Ladies and gentlemen, they haven't come close to

8    meeting any of the hurdles that she has in this case.

9                    Finally, your verdict must be unanimous.  The

10   Judge will instruct you on that as well.  Your verdict must

11   be unanimous.  In order for you to find for Kathleen Brown,

12   all seven of you must find that she has met all the elements

13   of her proof that the Judge will give you.

14                    I submit to you that you will not be able to

15   do that; that you should not condone Kathleen Brown's

16   behavior in this case by awarding her anything.  You should

17   reject it.  Your verdict should be unanimous in favor of

18   Cost Company and against Kathleen Brown.

19                    And in closing, I'd like to tell you that I'm

20   proud to represent Cost Company.  My partner is proud as

21   well.  It's a good company.  And you heard their witnesses

22   take that stand and say they have EEO policies, they don't

23   discriminate.  They hire anybody.  They will take anybody.

24   And maybe Georgia got a little animated because it's

25   personal to her.  She doesn't discriminate.  They hire

1    people of all walks of life.  You heard that.  They have

2    had -- she has an EEO file on it.  She tries to hire people

3    that are disadvantaged, people of minority.

4                    Ladies and gentlemen, thank you for your time

5    in this case.

6              MR. MATESIC:  May we approach, Your Honor.

7              (Whereupon the following discussion was held on

8                the record at side-bar:)

9              MR. MATESIC:  I would want to put the motion on

10   the record for a mistrial.  Counsel for the Defendant has

11   made highly prejudicial statements repeatedly in his closing

12   argument.  He referenced --

13             THE COURT:  I'm having a little trouble hearing

14   you.

15             MR. MATESIC:  He has made highly prejudicial

16   statements repeatedly during his closing argument.  He

17   referenced three civil rights action cases -- excuse me, he

18   referenced three civil rights cases that Ms. Brown has filed

19   as evidence of her lack of credibility.  He was warned

20   repeatedly by the Court as to the irrelevance of that

21   evidence.

22                    He also attempted to prejudice the jury

23   against Miss Brown's counsel.  I believe I quoted him

24   correctly.  I'm now going to read into the record.  "I want

25   you to look Ms. Brown's attorney in the eye when he asks you

1    for damages and ask him, for what."  He is trying to suggest

2    that Ms. Brown's attorney is motivated by concerns other

3    than the objective of justice.

4              He also personally vouched for his client.

5    He said he was proud to represent Cost Company.  An attorney

6    may not vouch for the client.

7              MR. PAWK:  Do you want me to respond, Judge?

8              THE COURT:  Well, yeah.

9              MR. PAWK:  The issue of the three EEOC complaints

10   is clearly in evidence, because counsel opened the door to

11   that.  Because you initially ruled I couldn't get into that.

12   So that's clear.

13             The second comment that I asked them to

14   look -- I asked them to look at him, for what, I thinks it's

15   all fair argument.  I don't think there's anything improper

16   with that.  And I can say I'm proud to represent my client.

17             THE COURT:  To me, this is just good old-fashioned

18   closing argument.  As far as the specific objection about

19   the reference to the previous charges, that door was opened

20   in -- by virtue of -- by virtue of a series of questions

21   asking her whether she had any experience in Title VII.  So

22   the mistrial is denied.

23             MR. MATESIC:  Your Honor, if I may.

24             THE COURT:  You may.

25             MR. MATESIC:  One more thing.  I am going to ask

1    for an instruction that I understand the Court is not going

2    to do.  I had asked your clerk for a final copy of the

3    points for charge so I could place it on the record in

4    camera, and --

5            THE COURT:  Do you mean the final copy of my

6    charge to the jury?

7            MR. MATESIC:  Right.

8            THE COURT:  I have a copy here.  Do you want to

9    use it?

10           MR. MATESIC:  Sure.

11           THE COURT:  Let me make sure this is the right

12   one.  Yes.  You just have to give it back to me after the

13   break.

14           (Discussion held off the record.)

15           THE COURT:  This is the final.  Okay, what I am

16   going to do is this:  You have got about a half an hour,

17   right?  Maybe?

18           MR. MATESIC:  Maybe.

19           THE COURT:  I think, you know, my charge takes

20   about 30 minutes, 35 minutes.  And I would take a break

21   anyways after this.  I probably am going to send this jury

22   home and charge them tomorrow morning, rather than start

23   this at 4:30 this afternoon.  I don't keep juries much

24   beyond a quarter to 5:00 anyways.  We'll see how it goes.

25           MR. PAWK:  Could I suggest this, Judge:  Could you

1    inquire of the jury what they might want to do?

2            THE COURT:  Well, they might want to, but they are

3    not going to stay beyond that time anyways.  That's just the

4    way it is.  This had the possibility of running into Friday.

5    And that's just the way, unfortunately, it's shaking out.

6            (End of discussion at side-bar.)

7            (Discussion held off the record.)

8            (Whereupon the following discussion occurred on

9             the record at side-bar:)

10            MR. MATESIC:  The portion of the charge regarding

11    the pretext, specifically the language, "If you disbelieve

12    the employer's reasons, you may or may not be required to

13    find discrimination."

14            THE COURT:  Yeah.

15            MR. MATESIC:  -- I am having difficulty finding

16    that in here.  Do you?

17            THE COURT:  Now, what is it you want me --

18            MR. MATESIC:  After the burden shifts to the

19    Defendant, the Defendant articulates the reason it goes back

20    to the Plaintiff.  And, again, we get into the discussion of

21    pretext.

22            There is specific language from the Third

23    Circuit regarding the analysis that the jury is to partake

24    in, in determining pretext, and what the effect of a finding

25    of pretext --

```
 1              THE COURT:  I know what you're talking about.
 2    Okay.
 3              (End of discussion at side-bar:)
 4              THE COURT:  Members of the jury, we're going back
 5    into chambers for a second.  Let me see counsel in my
 6    chambers.
 7              (Whereupon the following discussion took place on
 8               the record in camera:)
 9              THE COURT:  You're talking about the two ways to
10    prove pretext?
11              MR. MATESIC:  That, and if you believe they
12    articulated --
13              THE COURT:  Apparently that did not find its way
14    into my final charge.  I'll take a look at it.
15              MR. MATESIC:  Judge, I don't want the jury to get
16    the idea that I'm making meritless objections, procedural
17    objections.  Would you be willing to explain to them what
18    the cause of this --
19              THE COURT:  I will.  I will.
20              All right, Mr. Matesic, is this the section
21    here (indicating)?  Take a look at that and on the next
22    page.  Is that what you are talking about?
23              MR. MATESIC:  The highlighted section?
24              THE COURT:  No, here (indicating).
25              MR. MATESIC:  Yes.  I still don't see the -- it
```

1   might be easier if I show you the language from the Circuit

2   case.  Here you are right here.  This is Smith versus

3   Borough of Wilkinsburg.  "When a jury finds --"

4              (Mr. Matesic interrupted by reporter.)

5              MR. MATESIC:  When a jury finds that the

6   employer's proper justifications for his actions is

7   pretextual, the jury is permitted, albeit not mandated, to

8   return a verdict in the Plaintiff's favor.

9              THE COURT:  Don't we say that someplace in here?

10  In other words, we say you may, but you are not required to.

11             MR. PAWK:  Yes, you do.

12             THE COURT:  Where do I say that?  I know it's in

13  here.

14             THE CLERK:  Judge, it may have come out, because

15  it was part of the pretextural suggestions, and we said take

16  all this out.

17             THE COURT:  Well, I have the original here.

18             THE CLERK:  This was the draft this morning that

19  we had, and then we went through it, so it should be in

20  there.  And, remember, we changed that.

21             THE COURT:  Here it is.  This was my original

22  draft.  It says, if, after considering the evidence in light

23  of the principles as I have just outlined for you, you find

24  that the reasons stated by Cost for failure to hire as a

25  laborer was a true reason, you must find a verdict in favor

1    of Cost.

2              That's true.  The way the thing is set up

3    right now, if you find by a preponderance that the reason as

4    given by Cost was not the real reason, you may, but are not

5    required to find in favor of Brown.  Is that what you're

6    talking about?

7              MR. MATESIC:  That's essentially the issue that

8    I'm talking about.  What did I do with that case?

9              THE COURT:  Right here (indicating).

10             MR. MATESIC:  Now, the reason given by Cost --

11             THE COURT:  I mean, I'll be happy to insert this,

12   if you want.

13             MR. MATESIC:  Actually, what I would ask for is

14   this line right out of the Circuit case.  If you find that

15   the employer's proper justifications is false, pretextural,

16   you are permitted, but you are not required, to return a

17   verdict in the Plaintiff's favor.

18             MR. PAWK:  Isn't that what it says?  We just read

19   it.

20             THE COURT:  How is this different?

21             MR. MATESIC:  First of all, you're putting a

22   preponderance issue in there.  The Circuit does not include

23   that.  And you limit it to the reason.  This refers to the

24   general category of actions --

25             THE COURT:  No, I'm going to give this.  I'm happy

1    to do this.  I am going to include this paragraph, just as

2    it sits, because this has been given hundreds of times, and

3    it's an accurate -- it's an accurate reflection of that.

4    And the Defendant isn't articulating any more than one

5    reason.  So I'm going to -- let's see where we can insert

6    this.

7              (Discussion held off the record.)

8              THE COURT:  It is right here.  It should come

9    right before the discussion of intentional discrimination.

10   I think.

11             MR. MATESIC:  What page are we on?

12             THE COURT:  We're on Page 9.

13             MR. MATESIC:  Now, the Fuentes two-prong test,

14   which we talked about earlier --

15             THE COURT:  I thought -- I'm not trying to be

16   argumentative, but I thought an hour ago I asked you if you

17   had any objections to the charge, and you said no.

18             MR. MATESIC:  Well, because you had also asked me

19   in the previous conference to just look at this one section

20   of the --

21             THE COURT:  All right.  Maybe my question wasn't

22   broad enough.  But anyway, the two-prong -- by "here", you

23   mean on -- there are two ways in which Brown can show that

24   Cost stated reasons?

25             MR. MATESIC:  Yes, that's it.

1          THE COURT:  All right.  Here is the -- we can talk

2     about -- here is the paragraph.  Right there.  Take a look

3     at that.  And that is going to have to be retooled in the

4     context of where we are, because it's not a --

5          MR. PAWK:  Judge, I apologize because we went

6     through this specifically here in chambers.  We agreed to

7     strike that.  Counsel agreed to that.  Mr. Matesic agreed to

8     strike that too.  It was agreed upon.

9          MR. MATESIC:  Wait a second.  We were rushing

10     around to get this charge done --

11          THE COURT:  I would prefer to reach it on its

12     merits, rather than on the possibility that there had been a

13     miscommunication.  So the point is here, weaknesses,

14     implausibilities, inconsistencies, that suggests that the

15     jury is still toying with the -- is still toying with the

16     idea as to whether the legitimate nondiscriminatory reason

17     is, in fact, legitimate or is it contextual.

18          MR. MATESIC:  Correct.

19          THE COURT:  You're giving away here more than if

20     you even -- if you thought about it, than you would.  If

21     they found the prima facie case, they have already concluded

22     that the stated reason is false.

23          MR. MATESIC:  That actually goes back to a point

24     which we disagreed about earlier.  As I was explaining while

25     you were out in the office, I think the Court's concept of

 1   the prima facie problem here is that the Court cannot

 2   imagine a scenario in which the Plaintiff establishes all

 3   four points of that prima facie case, and despite that, the

 4   Defendant wins.  That's --

 5            THE COURT:  I can imagine that scenario.

 6            MR. MATESIC:  You can?

 7            THE COURT:  I can.  Sure.  The scenario would be,

 8   yeah, they lied, but they didn't lie because they were

 9   gender-biased.

10            MR. PAWK:  Second hurdle.

11            MR. MATESIC:  I think that goes right to the point

12   we are just discussing.  Just because they find on the four

13   issues, doesn't mean that we necessarily win.

14            THE COURT:  No, it doesn't.  It's as I thought I

15   told them here, they still are going to have to prove that

16   it's intentional discrimination.

17            MR. LUTZ:  You tailored it to avoid confusion,

18   which is what our discussion was.

19            THE COURT:  Here is the final.  I say -- now, look

20   at my final charge on Page 9, if you would.  And start the

21   second paragraph, and read the second paragraph and the

22   third paragraph and then tell me what you think is wrong

23   with that.

24            MR. LUTZ:  Nothing.

25            THE COURT:  Well, I know that's what you think.

1          MR. LUTZ:  I know.  But we have been through this

2     before.

3          MR. MATESIC:  Actually, I think it's this second

4     sentence in the third paragraph.  "Rather, Brown must show

5     both that the stated reason is false --"

6          THE COURT:  "Rather, Brown must show both that the

7     stated reason is false and that the real reason for the

8     challenged employment decision was because of her sex."

9     That's precisely correct.

10          MR. MATESIC:  And now the Fuentes, the two prongs

11     that we talked about before, that should go here.  Because

12     those two prongs are it's either pretext, or the

13     discrimination was more likely to be explanation.

14          THE COURT:  I agree with that.  You know, the

15     jury -- except that -- except that by the time they get to

16     this analysis, they already will have passed on a prima

17     facie case.  Do you know what I mean?

18          MR. MATESIC:  Theoretically.

19          THE COURT:  Then what sense does it make?  They

20     already will have passed on it.

21          MR. MATESIC:  Because under Fuentes, it's a more

22     favorable status.  Fuentes is not discovered in this

23     discussion if it's separated from this portion of the

24     charge.

25          THE COURT:  Wouldn't this make sense, that --

1   first of all, do we all agree that when we say, can show

2   that Cost's stated reason is pretext, it's just another way

3   of saying Cost's reason is wrong, is incorrect?

4              MR. MATESIC:  Is false.

5              THE COURT:  Is false.  Okay.

6              MR. MATESIC:  And you're reading from Page 10.

7              THE COURT:  Yeah.  But -- and up here we would

8   say, you can't prove intentional discrimination by showing

9   that a stated reason is false.  You've got to say false and

10  the real reason is because of sex.  Fine.  You now want me

11  to charge a Fuentes --

12             MR. MATESIC:  Fuentes is the law, Your Honor.

13             THE COURT:  I know it is the law.  But, you know,

14  you have to think outside the box.  And the box that I'm

15  living in right now is a situation where if a jury -- this

16  is not a burden-shifting case anymore.  Once you have -- all

17  the jury has to find, if they find there's a prima facie

18  case, is that -- that what they did was motivated by sex.

19  That's all they have to find.  If they find that there's a

20  prima facie case.  And if that's the case, why should I tell

21  them --

22             All right, this is what I'm going to do.

23  Flip back to the Page 8.

24             MR. PAWK:  Are we on the third version, Judge?

25             THE COURT:  We're on the final.  Where in the

1  charge do I talk about your position, where I say, "It's the

2  Defendant's position that she didn't apply for the job."?

3          MR. PAWK:  I think it's early.

4          THE CLERK:  No, Judge, that was in the previous

5  draft when that was in the Fuentes burden shifting.  That

6  was taken out because we --

7          THE COURT:  I want you guys to go out in the

8  courtroom, and I'm going to get you when I'm ready for you.

9          MR. MATESIC:  May I say one more thing?

10         THE COURT:  No, you may not.  This is only by the

11  grace of God that I'm taking this much time to do it,

12  because nine judges out of 10 would have said you're bound

13  by what you already put on the record.

14         MR. MATESIC:  I am not addressing that issue at

15  all.  I wanted to inform the Court.  I don't want to incur

16  the Court's wrath if I go an hour.  And I just wanted to put

17  that on the record.

18         THE COURT:  In other words, will you incur the

19  Court's wrath if you go the hour?  Is that what you're

20  asking me?

21         MR. MATESIC:  No.  I don't want to incur the

22  Court's --

23         THE COURT:  As a practical matter, the way things

24  are going, it could very well end up you do your closing

25  tomorrow morning.  That's the way it's going now.

1          MR. MATESIC:  I don't have a problem with that.

2               (End of discussion in camera.)

3               (Whereupon the proceedings resumed in open court.)

4          THE COURT:  Members of the jury, due to, first of

5     all, a legal matter of concern to all of us that we have

6     been addressing, and we don't have it quite ironed out yet,

7     but I will shortly -- the upshot of that is, is that there's

8     one more closing to go, and then my jury charge.  My jury

9     charge typically takes about 35 minutes, and I do not keep

10    jurors here past much more than like 10 to 5:00, 5:00, which

11    means we can't squeeze in everything to finish this today.

12    And even if I could finish my charge to you, I would hate to

13    send you home before you had a chance to start deliberating.

14    Longhand way of saying that this case is going to end

15    tomorrow morning.  That's just, of course, the way it is.

16              I'm going to ask you to come back at 9:00,

17    and you'll be deliberating tomorrow morning.

18              And as far as counsel is concerned, I'm going

19    to work on this matter, and then let me see counsel -- be

20    hereby 8:30 tomorrow morning -- some counsel be here by

21    8:30 tomorrow morning, and then we'll take it from there.

22    Don't talk -- remember not to talk about the case.

23

24              (Proceedings adjourned at 3:48 p.m.)

25